IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

FRITZ MAIGNAN

      Petitioner,          CASE NO. 00-6043-CIV-JORDAN

vs.

                           MAGISTRATE JUDGE SORRENTINO

MICHAEL W. MOORE, et. al.
          Respondents.

_____

### RESPONSE TO PETITION FOR WRIT OF HABEAS CORPUS/ MEMORANDUM OF LAW

COMES NOW Respondent, STATE OF FLORIDA, by and through the undersigned counsel, and pursuant to this Honorable Court's order dated February 29, 2000, hereby files this response to the petition for writ of habeas corpus, and states:

### CUSTODY

Petitioner is currently subject to the lawful custody of the State of Florida pursuant to a valid judgment of guilt entered by the Circuit Court of the Seventeenth Judicial Circuit, in and for Broward County Florida.

### PROCEDURAL HISTORY

On September 7, 1995, Petitioner, along with co-defendant, Katan Maignan, were charged by information with conspiracy to traffic in cocaine (Exhibit A). On August 31, 1995, Petitioner filed a Motion to Dismiss the Information gust 27, 1997, the State filed (Exhibit B). On March 19, 1996, Petitioner filed a second



motion to dismiss as a matter of law based on an entrapment defense
(Exhibit C).  A hearing was held on  June 4, 1996 after which the
trial denied the motion (Exhibit E, pp. 86-7).

Petitioner was tried before a jury on June 10-14, 1996
(Exhibit F).  The trial court denied Petitioner's motions for
judgment of acquittal (Exhibit D).  The jury found petitioner
guilty of the charged offense (Exhibit G).  On June 14, 1996,
Petitioner was adjudicated and sentenced to fifteen years Florida
State Prison (Exhibit H).  On June 20, 1996, Petitioner filed a
Notice of Appeal to the fourth district court of appeal (Exhibit
I).  On April 23, 1998, Petitioner filed his initial brief, in
which he raised three issues[1]:

> The trial court erred in failing to grant a
> judgment of acquittal where the state did not
> establish that Petitioner committed conspiracy
> to traffic in cocaine;

> the trial court erred in failing to grant a
> judgment of acquittal on entrapment at the
> close of the evidence;

---

[1]Petitioner withdrew his argument contained in Point II of his
Initial Brief (Exhibit L).

> Petitioner's conviction violates due process
> of law because the jury was not instructed
> that the state had the burden of proving
> predisposition beyond a reasonable doubt
> (Exhibit K).

On March 26, 1997, the state responded by an answer brief
(exhibits K). On October 1, 1997, the Fourth District issued a *per
curium* affirmance without a written opinion (Exhibit M). <u>Maignan
v. State</u>, 701 So.2d 882 (Fla. 4th DCA 1997). On October 15, 1997,
Petitioner filed a motion for rehearing, (Exhibit N), which was
denied on November 14, 1997 (Exhibit O). On December 5, 1997, a
mandate issued (Exhibit P).

On June 11, 1998, Petitioner filed a motion for postconviction
relief pursuant to <u>Fla. R. Crim. P.</u> 3.850 in the trial court
alleging the following grounds:

> trial counsel provided ineffective assistance
> by failing to call Joseph Clark, the
> confidential informant in this case, to
> testify at trial;
>
> the trial court committed fundamental error in
> admitting into evidence, over defense
> objection, the recorded three-way telephone
> conversation between the co-defendants, the

D.E.A. agent and the informant;

trial counsel provided ineffective assistance
by failing to incorporate a sufficiency of the
evidence argument in his motion for judgment
of acquittal on the conspiracy to traffic
cocaine charge;

trial counsel provided ineffective assistance
by failing to object to an incomplete jury
instruction on the state's burden of proof as
to proving the predisposition of the defendant
beyond a reasonable doubt; and

trial counsel provided ineffective assistance
by failing to move to dismiss the conspiracy
to traffic cocaine charge based on the D.E.A.
agent's improper supervision of the
confidential informant which in turn violated
Petitioner's right to due process of law and
his right to privacy

(Exhibit Q).

On November 24, 1998, the trial court issued an order
requiring the state to respond to the motion (Exhibit R).    On

January 25, 1999, Petitioner filed a motion for an evidentiary hearing on his 3.850 motion (Exhibit S). On February 16, 1999, the state filed its response with attachments to Petitioner's 3.850 motion (Exhibit T). On March 19, 1999 the trial court entered an order summarily denying Petitioner's 3.850 motion (Exhibit U). On June 2, 1999, Petitioner filed a motion for rehearing, (Exhibit V), which was denied by the trial court on June 9, 1999 (Exhibit W). On June 23, 1999, Petitioner filed a notice of appeal to the fourth district court of appeal appealing the trial court's order denying of his 3.850 motion (Exhibit X).

On September 29, 1999, the Fourth District issued a per curium affirmance without a written opinion (Exhibit Y). <u>Maignan v. State</u>, 748 So.2d 281 (Fla. 4th DCA 1999). On October 12, 1999, Petitioner filed a motion for rehearing *en banc*, (Exhibit Z), which was denied on November 30, 1999 (Exhibit AA). On December 17, 1999, a mandate issued (Exhibit BB).

JURISDICTION

Petitioner properly invokes the jurisdiction of this Court pursuant to § 28 U.S.C. section 2254.

STATUTE OF LIMITATIONS

On January 7, 2000, Petitioner signed his Petition for Writ of Habeas Corpus in this Court. The Petition is timely filed under the provisions of the 1996 Antiterrorism and Effective Death Penalty Act, 28 <u>U.S.C.</u> §2244(d).

PROCEDURAL DEFAULT

In his Petition, he raise four grounds for relief:

the trial court committed fundamental error in instructing the jury that Petitioner had the burden of disproving predisposition beyond a reasonable doubt thereby violating Petitioner's right to a fair trial by jury;

Ineffective assistance of appellate counsel;

the trial court erred in failing to grant a judgment of acquittal where the state did not establish that Petitioner committed conspiracy to traffic in cocaine; and

the trial court erred in failing to grant a judgment of acquittal on entrapment at the close of the evidence.

Respondant submits that Petitioner's first claim is procedurally defaulted and thus non cognizeable. This is true since, as Respondant argued on direct appeal, Petitioner did not object to the erroneous charge and/or request a special instruction, Petitioner was foreclosed from arguing his claim on direct appeal in that same was not properly preserved (Exhibit K,

pp. 25-32). *See also*, <u>Watson v. State</u>, 651 So.2d 1159 (Fla. 1994); <u>Marek v. Singletary</u>, 626 So.2d 160, 162 (Fla. 1993)(unconstitutional jury instruction not preserved where not objected to during death penalty phase); <u>Fla. R. Crim. P.</u> 3.390(c)(allowing any party to submit written requests that the court instruct the jury on the law as set forth in the requests...").

Despite this, in his initial brief filed in the fourth district as well as in the instant petition, Petitioner argues that providing the jury with the then-current standard jury instruction on the defense of entrapment was "fundamental error," thus requiring that his conviction be reversed (Exhibit J, pp. 24-6). Petitioner, both in this petition and his initial brief, relies on the Florida Supreme Court's decision in the case of <u>Munoz v. State</u>, 629 So.2d 90 (Fla. 1993) which in turn cites <u>Jacobson v. United States</u>, __ U.S.__, 112 S.Ct. 1535, 118 L.Ed.2d __ (1992)(Exhibit J, pp. 24-6). Petitioner further relies on <u>Crutchfield v. State</u>, 739 So.2d 1193 (Fla. 4th DCA 1999), <u>Vasquez v. State</u>, 700 So.2d 5 (Fla. 4th DCA 1997) and <u>Miller v. State</u>, 723 So.2d 353 (Fla 4th DCA 1998). However, the Florida Supreme Court expressly disapproved <u>Miller</u> which held that the failure to give a <u>Munoz</u> jury instruction constituted fundamental error. <u>Holiday v. State</u>, 25 Fla. L. Weekly 153S (February 24, 2000).

"Absent a showing of cause and prejudice, federal habeas

courts may not reach the merits of 'procedurally defaulted claims in which the petitioner failed to follow applicable state procedural rules in raising the claims.'" Kight v. Singletary, 50 F.3d 1539, 1543 (11th Cir. 1995)(citing Sawyer v. Whitley, ___ U.S. ___, ___, 112 S.Ct. 2514, 2518, 120 L.Ed.2d 397 (1986))(emphasis in original); Coleman v. Thompson, ___ U.S. ___, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991); Teague v. Lane, 489 U.S. 288, 297-99, 109 S.Ct. 1060, 1068-69, 103 L.Ed.2d 334 (1989); Engle v. Isaac, 456 U.S. 107, 128-9, 102 S.Ct. 1558, 1572-73, 71 L.Ed.2d 783 (1982).

In Tower v. Phillips, 7 F.3d 206, 210 (11th Cir. 1993), the petitioner there filed a state habeas petition beyond the applicable statute of limitations period. Id. at 210. However, no state court had ever decided the petition, either procedurally or on the merits. Id. The Court analogized this inaction to a "summary denial, in which no explanation is given for a court's ruling." Id. at 210. Nevertheless, the Court found that:

> Coleman and Ylst[v. Nunnemaker, ___ U.S. ___, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991)] lead us to conclude that we may not assume that had the state court issued an opinion, it would have ignored its own procedural rules and reached the merits of this case. In fact, the most reasonable assumption is that had the state court ruled, it would have enforced the procedural bar.

Tower, supra., 7 F.3d at 210.

Noting that had the state court held Tower's motion to be procedurally defaulted, this Court would have enforced that bar as

it has routinely done. Id. at 210 (citations omitted). Based on this, the Court concluded that Tower was likewise procedurally precluded from advancing his habeas petition in federal court.

Likewise, in Kight, supra., 50 F.3d at 1543, the petitioner there, similar to the one at bar, claimed, in his federal habeas petition, that his death sentence was unconstitutional because the jury was not given a proper instruction during the penalty phase. Also, similar to the one at bar, the petitioner failed to object to the error during this phase. Id. at 1544. Also, the petitioner did not raise his claim in his first motion for postconviction relief. Id. After exhausting his rights on direct appeal, the Florida Supreme Court summarily denied the petitioner's appeal of the trial court's denial of his postconviction relief motion. Id. The Court held that Kight's federal claim was likewise procedurally barred. Id. at 1545. In so doing, the Court found:

> [I]n this case, although the state court summarily denied Kight's petition, there is nothing in its disposition of the case which 'discuss[es] the federal grounds at issue.' [Tower, supra., 7 F.3d at 211]. We thus cannot assume that had the Florida Supreme Court explained its reasoning, it would have reached the merits of Kight's claim. Furthermore, Kight's claim was clearly procedurally barred in two different ways... In light of the Supreme Court's mandate that a narrowing construction be given when the state seeks the death penalty based upon the 'heinous, atrocious or cruel' aggravating circumstance, had Kight preserved his claim for review, he would have had a strong case in the Florida Supreme Court... Where as here, a clearly meritorious claim is procedurally

> barred and the state court denies relief
> without opinion, 'the most reasonable
> assumption is that ... the state
> court...enforced the procedural bar.' Id.

Kight, 50 F.3d at 1545 (fn. omitted).

At his trial, Petitioner certainly was or should have been aware of Munoz and Jacobson, yet failed to object to the standard jury instruction and/or request a special instruction to incorporate the change in the law as set forth in those cases. Furthermore, given that Petitioner's claimed error is not a fundamental one, Holiday, he was obliged to properly preserve it below. With these arguments presented to the fourth district court of appeals, it affirmed without opinion (Exhibit M) and further denied Petitioner's motion for rehearing (Exhibit O). At no time during either his direct appeal or in his motion for rehearing, did Petitioner respond to the Respondent's argument that his claim was barred for his failure to properly preserve it below. It follows that, the "most reasonable assumption" is that the fourth district based its "summary denial" on the fact that petitioner's claim there was not properly preserved at trial and thus, Petitioner's claim is procedurally defaulted.

UNEXHAUSTED CLAIM

Respondent submits that Petitioner's second claim has not been exhausted. Further, Respondent submits that it would be futile to permit Petitioner to pursue this claim in state court. Title 28 U.S.C. §2254 provides, in part:

> (b)(1) An application for a writ of habeas
> corpus on behalf of a person in custody
> pursuant to the judgment of a State court
> shall not be granted unless it appears that
> (A) the applicant has exhausted the remedies
> available in the courts of the State...
>
> (c) An applicant shall not be deemed to have
> exhausted the remedies available in the courts
> of the State, within the meaning of this
> section, if he has the right under the law of
> the State to raise, by any available
> procedure, the question presented....

To exhaust a claim, it must, at some point in time have been raised in state court. Campbell v. Wainright, 738 F.2d 1573, 1577, n.3 (11th Cir. 1984). Further, a claim is fairly presented when the substance of it is presented to the state court by citing the provision of the Constitution, federal decisions using constitutional analysis, or state decisions employing constitutional analysis in similar fact patterns. Hannah v. Conley, 49 F.3d 1193 (6th Cir. 1995).

In the instant case, Petitioner has never raised the issue presented in his second claim in state court. In addition, when, as in this case, the petition contains both exhausted and unexhausted claims, the Petition generally must be dismissed. Rose v. Lundy, 445 U.S. 509, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982). Nevertheless, although Petitioner has the option to resubmit a Petition with only his exhausted claims or, alternatively, first exhaust the remainder of his claims, Id. at 509, 102 S.Ct. at 1204, Petitioner will be unable to exhaust his second claim in state court since the time to

do so has expired.  This is true since Petitioner's direct appeal became final on December 5, 1997 (Exhibit P) and he would have had until December 4, 1999 to file a petition in state court alleging ineffective assistance of appellate counsel. *See*, <u>Fla. R. App. P.</u> 9.140(j)(3)(B). Consequently, Respondant submits that it would be futile to permit Petitioner to exhaust his second claim in state court and then re-file the instant Petition with the exhausted claims. <u>Tower,</u> supra., 7 F.3d at 210; <u>Parker v. Dugger</u>, 876 F.2d 1470 (11th Cir. 1989); <u>rev'd on other grounds</u>, 498 U.S. 308, 111 S.Ct. 731, 112 L.Ed.2d 812 (1991); <u>Lindsey v. Smith</u>, 820 F.2d 1137, 1143 (11th Cir. 1987), <u>cert. den.</u>, 489 U.S. 1059, 109 S.Ct. 1237, 103 L.Ed.2d 595 (1989).  Therefore, Petitioner's second claim should be dismissed.

<u>ARGUMENT ON THE MERITS</u>

As previously argued, since it would be futile to permit Petitioner to exhaust his second claim in state court, Respondant will address the merits of Petitioner's third and fourth claims. Respondant submits that they are without merit.  Title 28 <u>U.S.C.</u> Section 2254(d) states:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable

> application of, clearly established Federal
> law, as determined by the Supreme Court of
> the United States;  or
>
>      (2) resulted in a decision that was
> based on an unreasonable determination of the
> facts in light of the evidence presented in
> the State court proceeding.

The standard of review under this section is highly

deferential. *See* Lindh v. Murphy, 521 U.S. 320, n.7, 117 S.Ct.

2059, 138 L.Ed.2d 481 (1997); Jackson v. Virginia, 443 U.S. 307,

99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *See also*, Pettiway v. Vose,

100 F.3d 198, 200 n.1 (1st Cir. 1996); Montgomery v. Meloy, 90

F.3d 1200, 1203, n.1 (7th Cir. 1996); Dickerson v. Vaughn, 90

F.3d 87, 90 (3d Cir. 1996); Earnest v. Dorsey, 87 F.3d 1123, 1127

n. 1 (10th Cir. 1996).  Further, even where a federal habeas

court disagrees with a state court's decision, the state court's

decision must nonetheless be upheld unless the error of its

holding is not debatable among reasonable jurists. Neeley v.

Nagle, 138 F.3d 917, 923 (11th Cir. 1998).

Finally, where, as here, a petitioner challenges the

sufficiency of the evidence upon which he/she was convicted,

he/she will be "entitled to habeas relief if it is found that

upon the record evidence adduced at trial no rational trier of

fact could have found proof of guilt beyond a reasonable doubt."

Jackson, supra., 443 U.S. at 324, 99 S.Ct. at 2791-2.  This is

because "most meritorious challenges to constitutional

sufficiency of the evidence undoubtedly will be recognized in the

state courts, and, if the state courts have fully considered the issue of sufficiency, the task of a federal habeas court should not be difficult. Id at 322, 99 S.Ct. at 2790.

In the case at bar, Petitioner's third and fourth claims are identical to the arguments he raised and rejected on direct appeal by the fourth district.

Petitioner's Third Claim.  Entry of judgment of acquittal is appropriate only in those rare instances in which no evidence exists to support entry of a conviction. In the Interest of T.M.M., 560 So. 2d 805 (Fla. 4th DCA 1990). In Lynch v. State, 293 So. 2d 44, 45 (Fla. 1974), the Florida Supreme Court set the standard for rulings on motions for judgment of acquittal as follows:

> A defendant, in moving for a judgment of acquittal, admits not only the facts stated in the evidence adduced, but admits every conclusion favorable to the adverse party that a jury might fairly and reasonably infer from the evidence.  The courts should not grant a motion for judgment of acquittal unless the evidence is such that no view which the jury may lawfully take of it favorable to the opposite party can be sustained under the law.  Where there is room for a difference of opinion between reasonable [people] as to the facts from which an ultimate fact is sought to be established, or where there is room for such differences, the Court should submit the case to the jury for their finding, as it is their conclusion, in such cases, that should prevail and not primarily the views of the judge [e.s.].

An appellate court may not retry a case or re-weigh the

evidence. <u>Clark v. State</u>, 379 So. 2d 97, 101 (Fla. 1979).  In

<u>State v. Law</u>, 559 So. 2d 187, 188 (Fla. 1989), our the Florida

Supreme Court stated the following

> A motion for judgment of acquittal should be
> granted in a circumstantial evidence case if
> the state fails to present evidence from
> which the jury can exclude every reasonable
> hypothesis except that of guilt. [c.o.].
>          ***
> <u>The state is not required to "rebut</u>
> <u>conclusively every possible variation"</u>
> <u>[footnote omitted] of events which could be</u>
> <u>inferred from the evidence, but only to</u>
> <u>introduce competent evidence which is</u>
> <u>inconsistent with the defendant's theory of</u>
> <u>events</u>. <u>See</u> <u>Toole v. State</u>, 472 So. 2d 1174,
> 1176 (Fla. 1985).  Once that threshold burden
> is met, it becomes a jury duty to determine
> whether the evidence is sufficient to exclude
> every reasonable of hypothesis of innocence
> beyond a reasonable doubt [e.s.].

559 So. 2d at 189; <u>Barwick v. State</u>, 660 So. 2d 685, 695

(Fla. 1995); <u>I.R. v. State</u>, 385 So. 2d 686, 687-88 (Fla. 3d DCA

1980)(the testimony of a single witness, is sufficient to sustain

a conviction); <u>Thomas v. State</u>, 512 So. 2d 1099, 1101 (Fla. 5th

DCA 1987)(circumstantial evidence which contradicts the

defendant's theory of innocence should go the jury).

Further, it is important to note that "direct proof of the

criminal agreement is not necessary to establish a conspiracy;

the jury may infer from all the surrounding circumstances that a

common purpose to commit a crime existed." <u>Pino v. State</u>, 573 So.

2d 151, 153 (Fla. 3d DCA 1991); <u>LaPolla v. State</u>, 504 So. 2d

1353, 1357 (Fla. 4th DCA 1987)(intent to agree may be inferred

from circumstantial evidence); <u>United States v. Perez-Tosta</u>, 36
F. 3d 1552, 1553, 1557 (11th Cir. 1994)(guilt of participation in
criminal activity may even exist when the defendant plays only a
minor role and does not know all the details of the conspiracy;
circumstantial evidence suffices to show participation in the
conspiracy); <u>Borders v. State</u>, 312 So. 2d 247 (Fla. 3d DCA 1975);
<u>Wyant v. State</u>, 659 So. 2d 433 (Fla. 2d DCA 1995)(direct proof of
the criminal agreement is not necessary to establish a
conspiracy).    To prove conspiracy the state had to present
evidence of agreement and intent to purchase or possess the
cocaine.  <u>Spera v. State</u>, 656 So. 2d 550, 551 (Fla. 2d DCA 1995);
<u>King v. State</u>, 104 So. 2d 730 (Fla. 1957).  Petitioner takes
issue with the agreement to possess.  Petitioner claims that the
state did not present sufficient evidence to prove the agreement
between Petitioner and his co-defendant to possess the cocaine.
Respondent disagrees.

Here, Special Agent Anderson testified that he, Petitioner
and his co-defendant had series of telephone conversations during
which they negotiated the purchase of two kilograms of cocaine at
$33,000 (Exhibit F, pp. 40-41).  Anderson was to sell to
Petitioner and his co-defendant one of two kinds of cocaine
(Exhibit F, p. 41).  Petitioner told Anderson that he would not
mind to take the less expensive wet shipment of cocaine, because
he (Petitioner) cooked the cocaine anyway (Exhibit F, p. 42).

Throughout the entire transaction both Petitioner and his co-defendant participated in negotiating the deal.  They both negotiated with Anderson the price, the amount of cocaine, the kind of product, the location of their meeting, and the conditions attached to the deal (Exhibit F, p. 43).  Petitioner told Anderson that he had provided his brother with the money for the deal (Exhibit F, p. 91).  They actively participated in all the telephone conversations with Anderson (Exhibit F, pp. 67, 70-71).  Both of them were apprized of the details of the deal (Exhibit F, p. 54).  And most importantly, after setting a location for the meeting, they both showed up to the meeting with Anderson (Exhibit F, p. 50).

At the meeting between Anderson, Petitioner and his co-defendant during which all shook hands with each other, they negotiated the terms of the deal (Exhibit F, pp. 52-53).  Both Petitioner and his co-defendant negotiated the price, in an attempt to reduce the price of the cocaine (Exhibit F, pp. 53).  They then agreed to purchase two kilos at $33,000 from Anderson (Exhibit F, p. 53).

Petitioner and his brother worked together, and made decisions regarding the deal together.  On August 10, 1995, Petitioner called Anderson, spoke to him for a while, and then transferred the telephone to his brother (Exhibit F, pp. 70-71).  It was Katan who contacted Anderson to set the time and location

of their meeting, during which they decided that each one of them would show up by himself.    Nonetheless, both Petitioner <u>and</u> his co-defendant showed up at Denny's at the scheduled time for the deal (Exhibit F, p. 91).  Petitioner told Anderson that he (Petitioner) gave Katan the money for the deal (Exhibit F, pp. 91, 94-95, 98).  Petitioner was surprised to hear that the deal fell through (Exhibit F, p. 98).  Petitioner was sufficiently involved in the meetings, arrangements, and negotiations.  The state presented ample of evidence from which the jury could infer that Petitioner and his co-defendant agreed to possess the cocaine.  The state did not have to present direct evidence of every detail of the agreement.  See <u>U.S. v. Lluesma</u>, 45 F. 3d 408, 409 (11th Cir 1995)(the government needs only demonstrate that the defendant knew the essential nature of the conspiracy not of all details of the phases of conspiracy); <u>Rouse v. State</u>, 583 So. 2d 1111, 1113 (Fla. 4th DCA 1991)(circumstantial evidence of prearrangement such as the negotiation of price, and assuring the legitimacy of the supplier, is more than minimal involvement of the defendant and thus correctly was sent to the jury).

Although Petitioner was not present when Katan was about to consummate the deal with Anderson, Petitioner played a role in the entire exchange in furtherance of the conspiracy.  From the evidence introduced at trial the jury could infer Petitioner's agreement.  See <u>U.S. v. Marx</u>, 635 F. 2d 436, 439 (5th Cir. 1981).

Agreement can be inferred from acts that furthered the conspiracy's purposes. U.S. v. Camargo-Verfara, 57 F. 3d 993, 1000 (11th Cir. 1995); Romani v. State, 542 So. 2d 984, 986 (Fla. 1989).

A judgment should not be reversed if there is competent evidence which is substantial in nature to support the fact finder's conviction. See Welty v. State, 402 So. 2d 1159 (Fla. 1981). The jury did not have to believe Petitioner's theory of defense. See Peterka v. State, 640 So. 2d 59, 68 (Fla. 1994)("the circumstantial evidence standard does not require the jury to believe the defense version of the facts"). Accord Cochran v. State, 547 So. 2d 928, 930 (Fla. 1989); Bedford v. State, 589 So. 2d 245 (Fla. 1991), cert. denied, 503 U.S. 1009 (1992)(the jury free to reject defendant's version of events as unreasonable); Holton v. State, 573 So. 2d 284, 289-90 (Fla. 1990)(jury not required to believe defendant's version of events where state produced conflicting evidence), cert. denied, 500 U.S. 960 (1991); Finney v. State, 660 So. 2d 674, 680 (Fla. 1995). Petitioner has failed to present any reasonable theory which exculpates him.

Petitioner's Fourth Claim. Petitioner's fourth claim is likewise without merit. He advances the identical argument he presented in state court on direct appeal (Exhibit K, pp. 20-23). Entrapment is an affirmative defense and, as such, is in the

nature of an avoidance of the charges.  Herrera. See Gonzalez v. State, 571 So. 2d 1346, 1351 (Fla. 3d DCA 1990)(defendant in criminal case has burden of proving affirmative defense), review denied, 584 So. 2d 998 (Fla. 1991).  Here, there were factual disputes as to predisposition, and thus the trial judge correctly submitted the case to the jury.

The entrapment defense and the subjective test are codified by § 777.201, Fla. Stat. (1987), as follows:

777.201 Entrapment.--

> (1) A law enforcement officer, a person engaged in cooperation with a law enforcement officer, or a person acting as an agent of a law enforcement officer perpetrates an entrapment if, for the purpose of obtaining evidence of the commission of a crime, he induces or encourages and, as a direct result, causes another person to engage in conduct constituting such crime by employing methods of persuasion or inducement which create a substantial risk that such crime will be committed by a person other than one who is ready to commit it.

> (2) A person prosecuted for a crime shall be acquitted if he proves by a preponderance of the evidence that his criminal conduct occurred as a result of an entrapment. *The issue of entrapment shall be tried by the trier of fact.* [e.s.]

As summarized in State v. Dawson, 681 So.2d 1206 (Fla. 3d DCA 1996), three questions must be addressed pursuant to Munoz:

> (1) "The first question ... is whether an agent of the government induced the accused to commit the offense charged." Id.  The accused must establish this element by a preponderance of the evidence. Id.

(2) "If the first question is answered affirmatively, then a second question arises as to whether the accused was predisposed to commit the offense charged; that is, whether the accused was awaiting any propitious opportunity or was ready and willing, without persuasion, to commit the offense." Id. The defendant must initially produce proof on lack of predisposition. Id. If he does so, "the burden then shifts to the prosecution to rebut this evidence beyond a reasonable doubt." Id.

(3) "The third question ... is whether the entrapment evaluation should be submitted to a jury." Id. at 100. The first two questions ordinarily present factual issues to be decided by the jury, and should be submitted to the jury "when factual issues are in dispute or when reasonable persons could draw different conclusions from the facts." Id. If the material facts are undisputed and reasonable persons could not disagree, then the trial court may rule on the entrapment issue as a matter of law. Id.; State v. Ramos, 632 So.2d 1078, 1079 (Fla. 3d DCA 1994).

In Munoz, the Florida supreme court said the following:

Given the history of the entrapment defense, we find that the legislature, in establishing a legislatively-created entrapment defense through section 777.201, codified the subjective test delineated by the United States Supreme Court as the means for determining the application of that defense. As indicated under the federal cases discussed above, the application of the subjective test is the test articulated by Judge Hand in Sherman, as further explained by the United States Supreme Court in [Jacobson]. Three principles arise under this test. The first two involve questions of fact and differing burdens of proof, and the third addresses whether the issue of entrapment must be submitted to the jury or whether the issue can be decided by the judge

> as a matter of law. [e.s.]
>
> * * *
>
> ... we construe section 777.201 as requiring
> the <u>question of predisposition to be</u>
> <u>submitted to a jury when factual issues are</u>
> <u>in dispute or when reasonable persons could</u>
> <u>draw different conclusions from the</u>
> <u>facts</u>.[e.s.]

In the instant case, there were factual disputes as to both
inducement and predisposition.  First, Respondent contends that
there was no police conduct which would indicate a violation of
due process <u>and</u> there was evidence of predisposition of
Petitioner to commit the crimes of conspiracy to purchase or
possess cocaine; thus, the issue of entrapment was properly
submitted to the jury.

INDUCEMENT.  The fact that Anderson contacted Petitioner first,
and the fact that Clark promised Petitioner financial gain from
the deal does not establish an outrageous government conduct.
Neither Anderson nor Clark ever made personal threats to
Petitioner's personal safety, nor were there promises of
outrageous gains.  <u>See</u>  <u>Lusby v. State</u>, 507 So. 2d 611 (Fla. 4th
DCA 1987) (conduct of confidential informant, who contacted
defendant 10-14 times over a ten day period with promises of
financial gain attempting to persuade defendant to enter into a
drug deal, did not fall below the standards set in *Cruz*); <u>Sallomi</u>
<u>v. State</u>, 629 So. 2d 969, n. 1 (Fla. 5th DCA 1993) (defendant had
not been entrapped even though there was sufficient testimony to

the effect that the informant had called the defendant numerous times regarding drugs); Gonzalez v. State, 525 So. 2d 1005 (Fla. 3d DCA 1988) (defendant was not entrapped despite the fact that confidential informant called defendant 10-15 times to arrange transaction); Lewis v. State, 634 So. 2d 207 (Fla. 3d DCA 1994). See also Winkfield v. State, 601 So. 2d 1261 (Fla. 3d DCA 1992) (entrapment is not established by the fact that confidential informant is sent out into the community with instructions to respond to any inquiry regarding the sale or purchase of narcotics). Petitioner did not establish that the government encouraged him to commit a crime which he had *never* contemplated before and that he resisted the temptation. See Wilson v. State, 577 So. 2d 1300, 1300 (Fla. 1991) (Citing W. LaFave and J. Israel, Criminal Procedure section 5.3, at 254-55 (1985)).

PREDISPOSITION. Even assuming the government induced Petitioner to commit the crime of conspiracy to traffic in cocaine, the state proved beyond a reasonable doubt Petitioner's predisposition. In establishing the predisposition of a defendant based on conduct that results from the inducement, the United States Supreme Court in Jacobson, explained what conduct may be used to establish predisposition as follows:

> Where the Government has induced an individual to break the law and the defense of entrapment is at issue,...,the prosecution must prove beyond reasonable doubt that the defendant was disposed to commit the criminal act prior to first being approached by

> Government agents.
>
> Thus, an agent deployed to stop the traffic
> in illegal drugs may offer the opportunity to
> buy or sell drugs, and, if the offer is
> accepted, make an arrest on the spot or
> latter.  In such a typical case, or in a more
> elaborate "sting" operation involving
> government-sponsored fencing where the
> defendant is simple provided with the
> opportunity to commit a crime, the entrapment
> defense is of little use because the ready
> commission of the criminal act amply
> demonstrates the defendant's predisposition.

Jacobson, 112 S. Ct. at 1540-41.

Here, Petitioner and his co-defendant flew from New York to Florida to "do business" and "to shop."  Petitioner responded to Anderson's paging on the same day.  Petitioner and his co-defendant in several telephone conversations discussed with Anderson the deal about the purchase of cocaine.  Petitioner was apparently familiar with the drug lingo, and did not have any difficulties understanding Anderson.  Petitioner was also familiar with the wet cocaine product, as he stated that he cooks wet cocaine.  Petitioner had direct access to large sums of money to fly to Florida and to buy cocaine; Petitioner and his co-defendant were able to come up with at least $1,750 instantly as soon as they agreed upon the terms of the deal.  Although Petitioner did not have $33,000, he pretended to have it by wrapping bills of $100 and $50 around $1.00 bills.  Petitioner manifested a skill and experience as a negotiator when he actually set a date, carefully picked a location, tried to

negotiate a lower price, and chose a wet shipment of cocaine, to execute the deal.  Petitioner was equipped with the know how to deal in drugs.  Petitioner was ready and willing to commit the crime when he showed up to all the meetings, and participated in all the negotiations.  The evidence presented was sufficient for a reasonable jury to conclude that Petitioner was predisposed to take part in the conspiracy, independent of the government's role in assisting such commission, and that Petitioner did not have an innocent mind prior to his contact with Clark and Anderson. Petitioner was not entrapped as a matter of law. See U.S. v. Miller, 71 F. 3d 813, 814-815 (11th Cir. 1996)(the prompt commission of the crime at the first opportunity is enough to show predisposition).  All these factors plus Petitioner's ready assent to the proposed drug deal amply demonstrates his predisposition.

Based upon the above arguments, it cannot be said that "upon the record evidence adduced at trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." Jackson, 443 U.S. at 324, 99 S.Ct. at 2791-2.  Therefore, Respondant submits that Petitioner's third and fourth claims should be dismissed.

<u>CONCLUSION</u>

WHEREFORE, respondent respectfully requests that this Honorable Court dismiss this petition and deny any and all relief requested.


Respectfully submitted,


ROBERT A. BUTTERWORTH
ATTORNEY GENERAL

_____
AUGUST A. BONAVITA
Assistant Attorney General
Florida Bar # 962295
1655 Palm Beach Lakes Blvd
Suite 300
West Palm Beach, FL 33401
(561) 688-7759

Counsel for Respondent

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing response to this Petition for Writ of Habeas Corpus has been furnished by U.S. mail to: FRITZ MAIGNAN, D.C. #196119, Mail # 4017, DeSoto Correctional Institution, P.O. Drawer 1072, Arcadia, Florida, 34265, on this 26 day of May, 2000.


_____
AUGUST A. BONAVITA
Assistant Attorney General

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the appendix (without the trial transcript portion) to petition for writ of habeas corpus has been furnished by U.S. mail to: FRITZ MAIGNAN, D.C. #196119, Mail # 4017, DeSoto Correctional Institution, P.O. Drawer 1072, Arcadia, Florida, 34265, on this ___ day of May, 2000.

AUGUST A. BONAVITA
Assistant Attorney General

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA


FRITZ MAIGNAN

      Petitioner,        CASE NO. 00-6043-CIV-JORDAN

vs.

                    MAGISTRATE JUDGE SORRENTINO

MICHAEL W. MOORE, et. al.
      Respondents.
_____


APPENDIX

<u>APPENDIX</u>

Exhibit A information 9/7/95

Exhibit B Petitioner's motion to dismiss 8/31/95

Exhibit C Petitioner's second motion to dismiss based on the defense of entrapment 3/19/96

Exhibit D trial court order denying motion for judgment of acquittal 6/12/96

Exhibit E transcripts of hearing on second motion to dismiss based on defense of entrapment 6/4/96

Exhibit F trial transcripts 6/10-6/14/96

Exhibit G jury verdict 6/14/96

Exhibit H judgment of conviction and sentence 6/14/96

Exhibit I notice of appeal 6/20/96

Exhibit J initial brief 2/20/97

Exhibit K answer brief 3/26/97

Exhibit L Petitioner's motion to withdraw argument on Point II contained in initial brief 3/21/97

Exhibit M filed opinion from the fourth district court of appeal 10/1/97 (<u>State v. Maignan</u>, 701 So.2d 882 (Fla. 4th DCA 1997))

Exhibit N Petitioner's motion for rehearing 10/15/97

Exhibit O order denying motion for rehearing 11/14/97

Exhibit P mandate from the fourth district court of appeal 12/5/97

Exhibit Q Petitioner's motion for postconviction relief pursuant to <u>Fla. R. Crim. P.</u> 3.850 6/11/98

Exhibit R trial court's order requiring state to respond to motion 11/24/98

Exhibit S Petitioner's motion for an evidentiary hearing on his 3.850 motion 1/25/99

Exhibit T state's response to Petitioner's 3.850 motion 2/16/99

Exhibit U trial court's order summarily denying Petitioner's 3.850 motion 3/19/99

Exhibit V Petitioner's motion for rehearing 6/2/99

Exhibit W trial court's order denying motion for rehearing 6/9/99

Exhibit X notice of appeal of order denying Petitioner's 3.850 motion 6/23/99

Exhibit Y filed opinion from the fourth district court of appeal 9/29/99 (State v. Maignan, 748 So.2d 281 (Fla. 4th DCA 1999))

Exhibit Z Petitioner's motion for rehearing *en banc* 10/12/99

Exhibit AA order denying motion for rehearing *en banc* 11/30/99

Exhibit BB mandate from the fourth district court of appeal 12/17/99

# EXHIBIT   A

IN THE CIRCUIT COURT OF THE SEVENTEENTH JUDICIAL CIRCUIT
IN AND FOR BROWARD COUNTY, STATE OF FLORIDA

**THE STATE OF FLORIDA**                    **INFORMATION FOR**

vs.

FRITZ MAIGNAN                  I. CONSPIRACY TO TRAFFIC IN COCAINE

KATAN MAIGNAN                 II. CARRYING A CONCEALED FIREARM

IN THE NAME AND BY THE AUTHORITY OF THE STATE OF FLORIDA:

MICHAEL J. SATZ, State Attorney of the Seventeenth Judicial Circuit of Florida, as Prosecuting Attorney for the State of Florida in the County of Broward, by and through his undersigned Assistant State Attorney, charges that    FRITZ MAIGNAN and KATAN MAIGNAN

Beginning on or about August 8, 1995 continuing through and including xxxthe __11th__ day of ___AUGUST_____, A.D. 1995____ , in the County and State aforesaid,

did then and there conspire, combine, agree, or confederate with one another and others unknown to the State Attorney's Office to commit a criminal offense, to-wit: Trafficking in Cocaine, a controlled substance, in that the said FRITZ MAIGNAN and KATAN MAIGNAN and others unknown to the State Attorney's Office did conspire, combine, agree or confederate with one another, to purchase and/or have in their actual or constructive possession a controlled substance, to-wit: Cocaine, or a mixture containing Cocaine, in an amount of four hundred (400) grams or more, but less than 150 kilograms contrary to F.S. 893.135(5), F.S. 893.135(1)(1)1c and F.S. 893.03(2)(a)4.

01

**STATE OF FLORIDA vs.**   FRITZ MAIGNAN, B/M DOB: 10/12/76    **INFORMATION, Page** 2

KATAN MAIGNAN, B/M DOB: 1/21/76
SS# 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

COUNT II.

AND MICHAEL J. SATZ, State Attorney of the Seventeenth Judicial Circuit of Florida, as Prosecuting Attorney for the State of Florida in the County of Broward, by and through his undersigned Assistant State Attorney, charges that KATAN MAIGNAN on the 11th day of August, A.D. 1995, in the County and State aforesaid did then and there unlawfully, and knowingly, carry on or about his person a concealed firearm, to-wit: handgun, contrary to F.S. 790.01(2)

COUNTY OF BROWARD
STATE OF FLORIDA

Personally appeared before me _____ JOHN J. GALLAGHER _____ , duly appointed as an Assistant State Attorney of the 17th Judicial Circuit of Florida by MICHAEL J. SATZ, State Attorney of said Circuit and Prosecuting Attorney for the State of Florida in the County of Broward, who being first duly sworn, certifies and says that testimony has been received under oath from the material witness or witnesses for the offense(s), and the allegations as set forth in the foregoing Information would constitute the offense(s) charged, and that this prosecution is instituted in good faith.

_____
Assistant State Attorney, 17th Judicial Circuit of Florida

SWORN TO AND SUBSCRIBED before me this __7th__ day of ____ SEPTEMBER ____ , A.D. 19 95

ROBERT E. LOCKWOOD

Clerk of the Circuit Court, 17th Judicial Circuit, Broward County, Florida

By _____
Deputy Clerk

To the within Information, Defendant pleaded ................................................................

ROBERT E. LOCKWOOD

Clerk of the Circuit Court, 17th Judicial Circuit, Broward County, Florida

0 2

By _____
Deputy Clerk

# EXHIBIT  B

ORIGINAL

IN THE CIRCUIT COURT OF THE
17TH JUDICIAL CIRCUIT, IN AND
FOR BROWARD COUNTY, FLORIDA.

STATE OF FLORIDA,

      Plaintiff,

v.

FRITZ MAIGNAN,

      Defendant.

_____/

CASE NO.: 95-14082CF10A

JUDGE: DIMITROULEAS

## MOTION TO DISMISS

COMES NOW, the Defendant, FRITZ MAIGNAN, by and through his undersigned attorney, and moves, pursuant to Florida Rule of Criminal Procedure §3.190, to dismiss the Information filed herein and states:

1.    That the Defendant is charged with the offense(s) of count one: possession of cannabis; count two: drug paraphanelia;

2.    That the allegations of the Information do not charge the Defendant with the violation of the law of the state of Florida;

3.    That the Information is so vague, indefinite and uncertain that the Defendant is not apprised of what he is called upon to defend against at a trial of this cause;

4.    That the Information fails to meet and comply with the legal requirements of Sections 11 and 12, Declaration of Rights, Florida Constitution, and the Fifth, Sixth and Fourteenth Amendments of the United States Constitution and the Florida Rules of Criminal Procedure;

5.    That the Court should dismiss the Information heretofore filed for reasons that, pursuant to Rule 3.190(c)(4) there are no material disputed facts and the undisputed facts do not establish

11

a prima facie case of guilt against the Defendant;

6. That the Information is so defective that it will not support a conviction, and an Arrest of Judgment would be appropriate if the Defendant is convicted;

7. That the Information is so vague, indistinct and indefinite as to mislead the Defendant and embarrass him in the preparation of his defense or expose him after conviction or acquittal to the substantial danger of a new prosecution for the same offense;

8. That the Information wholly fails to state a crime under Florida law. See Cantanese v. State, 251 So.2d 572 (Fla. 4th DCA 1971);

9. That the State has included more than one type of criminal act within one count of the Information, and the Statute draws distinctions in the acts as well as the defenses;

10. That the State has included a criminal act within the Information that is not found within the Statute cited;

11. That the Information violates the Defendant's due process and equal protection rights under the United States and Florida Constitutions.

WHEREFORE, the Defendant, FRITZ MAIGNAN, respectfully requests this Honorable Court to dismiss the Information in the instant matter.

12

I HEREBY CERTIFY that a true and correct copy of the Motion to Dismiss has been furnished by Hand-Delivery to: State Attorney's Office of this Court on this 31 day of AUGUST, 1995.

LAW OFFICES OF H. SCOTT HECKER, P.A.

H. SCOTT HECKER, ESQUIRE
Florida Bar Number 602530
517 Southwest First Avenue
Fort Lauderdale, FL 33301
(305) 523-3811
Attorney for Defendant

13

# EXHIBIT   C

IN THE CIRCUIT COURT OF THE
17TH JUDICIAL CIRCUIT, IN AND
FOR BROWARD COUNTY, FLORIDA.

STATE OF FLORIDA,                    CASE NO.: 95-14021CF10B

     Plaintiff,                     JUDGE: TYSON

V.

FRITZ MAIGNAN,

     Defendant.

_____/

### MOTION TO DISMISS

DEFENDANT, FRITZ MAIGNAN, by and through undersigned counsel, respectfully moves this Honorable Court for entry of an order dismissing these charges and in support thereof would show as follows:

1.  That the Defendant was arrested and charged with trafficking in cocaine.

2.  That the Defendant has no prior record for drug dealing and/or drug possession.

3.  That a confidential informant was utilized in this case that targeted the Defendant for arrest. The confidential informant knew that the Defendant had no drug history whatsoever and the confidential informant knew that the Defendant was not a "known drug dealer".

4.  That a review of the evidence, even in the light most favorable to the State, would show that the Defendant, Fritz Maignan, and his brother Katan Maignan, never agreed to purchase any drugs (specifically cocaine) with any Government agents and/or confidential informants.

5.  The Defendants never had sufficient monies to purchase the

19

cocaine and the Government never had the cocaine to actually supply.

6. That there is no evidence showing that Fritz Maignan ever engaged in any type of serious negotiations with the confidential informant and/or the Government agents in this matter, whatsoever.

7. That the Defendant is respectfully requesting that this Court dismiss the charges based on the egregious police conduct in this matter. The fact that the Defendant had no prior drug history, nor is the Defendant a "known drug dealer" or a "known drug target" and for the violation of the Defendant's due process rights. That the Defendant was entrapped by law enforcement in violation of Section 77.201 of the Florida Statutes as well as the criteria set out in the case of <u>Munoz v. State</u>, 629 So.2d 90 (Fla. 1993).

WHEREFORE, DEFENDANT, FRITZ MAIGNAN, prays that this Honorable Court grant the relief requested in this motion.

I HEREBY CERTIFY that a true and correct copy hereof has been furnished by Hand Delivery to: John Gallagher, State Attorney's Office of this Court on this ____ day of March, 1996.

LAW OFFICES OF H. SCOTT HECKER, P.A.

H. SCOTT HECKER, ESQUIRE
Florida Bar Number: 602530
517 Southwest First Avenue
Fort Lauderdale, FL 33301
(305) 523-3811
Attorney for Defendant

20

PAGE

1ST CASE of Level 1 printed in FULL format.

MANUEL MUNOZ, Petitioner, v. STATE OF FLORIDA, Respondent.

No. 78,900

SUPREME COURT OF FLORIDA

1993 Fla. LEXIS 1663; 18 Fla. Law W. S 537

October 14, 1993, Decided

NOTICE: [*1]   NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION AND, IF FILED, DETERMINED.

PRIOR HISTORY: Application for Review of the Decision of the District Court of Appeal - Direct Conflict of Decisions.  First District - Case No. 91-8. (Bay County).

COUNSEL: Alvin L. Peters of McCauley & Peters, Panama City, Florida, for Petitioner.

Robert A. Butterworth, Attorney General and Laura Rush, Assistant Attorney General, Tallahassee, Florida, for Respondent.

JUDGES: OVERTON, BARKETT, McDONALD, GRIMES, HARDING, KOGAN, SHAW

OPINIONBY: OVERTON

OPINION:
OVERTON, J.

    This cause is before us to review State v. Munoz, 586 So. 2d 515 (Fla. 1st DCA 1991), in which the district court held that section 777.201, Florida Statutes (1987), abolished the objective entrapment test we set forth in Cruz v. State, 465 So. 2d 516 (Fla.), cert. denied, 473 U.S. 905, 105 S. Ct. 3527, 8? L. Ed. 2d 652 (1985). The Second District Court of Appeal reached a contrary conclusion in Bowser v. State, 555 So. 2d 879 (Fla. 2d DCA 1989), by determining that the objective test in Cruz was still applicable despite the enactment [*2]   of section 777.201. We have jurisdiction. Art. V, @ 3(b)(3), Fla. Const. We find that, in enacting section 777.201, the legislature did eliminate the objective test in Cruz, but we find that the legislature cannot prohibit the judiciary from objectively reviewing the issue of entrapment to the extent such a review involves the due process clause of article I, section 9, of the Florida Constitution. As to the facts of this case, we do not reach a due process objective evaluation of entrapment because, under the subjective test established by section 777.201, we find that Manuel Munoz was entrapped as a matter of law.

Evolvement of the Entrapment Defense

    In order for this Court to properly evaluate the subjective test set forth in section 777.201 and determine whether section 777.201 abolished the objective entrapment test set forth in Cruz, it is necessary to examine the evolvement of the entrapment defense under both federal and Florida law.

Federal Cases

1993 Fla. LEXIS 1663, *2; 18 Fla. Law W. S 537

The defense of entrapment was first recognized by the United States Supreme Court in Sorrells v. United States, 287 U.S. 435, 53 S. Ct. 210, 77 L. Ed. 413 (1932). [*3]   In that case, Sorrells was charged with illegally possessing and selling whiskey based on the following facts. A prohibition agent, posing as a tourist, befriended Sorrells and gained his confidence through fraud. On several occasions during the course of their "friendship," the agent asked Sorrells to get him some liquor. At first, Sorrells declined. Eventually, however, Sorrells obtained a half-gallon of whiskey for the agent. At trial, conflicting evidence was presented as to whether Sorrells had the reputation of being engaged in the business of obtaining liquor for others, but no evidence was presented that Sorrells had actually ever possessed or sold any intoxicating liquor before the transaction at issue.

Even though the evidence of reputation was in dispute, the trial judge determined that, as a matter of law, there was no entrapment, and Sorrells was subsequently convicted by a jury. The Circuit Court of Appeals affirmed.

On appeal, a majority of the United States Supreme Court acknowledged that law enforcement officials could appropriately provide opportunities for the commission of crimes. However, the Court stated that "[a] different question is presented when the criminal [*4] design originates with the officials of the Government, and they implant in the mind of an innocent person the disposition to commit the alleged offense and induce its commission in order that they may prosecute." Sorrells, 287 U.S. at 442. The Court further stated that, when government officials instigate the commission of a crime by "persons otherwise innocent in order to lure them to its commission and to punish them," the defense of entrapment should be available to prohibit such behavior. Id. at 448. Applying that standard to the facts of Sorrells, the majority concluded that the defense of entrapment should have been available to Sorrells, that the trial court erred in holding as a matter of law that Sorrells was not entrapped, and that the issue should have been submitted to the jury.

The dissenting justices in Sorrells agreed that the entrapment defense should have been available to Sorrells. They believed, however, that the majority erroneously placed the focus of that defense on the predisposition of the defendant to commit the crime, rather than [*5] on the conduct of law enforcement personnel. In the dissent, Justice Roberts stated:

The doctrine [of entrapment] rests . . . on a fundamental rule of public policy. The protection of its own functions and the preservation of the purity of its own temple belongs only to the court. It is the province of the court and of the court alone to protect itself and the government from such prostitution of the criminal law. . . .

. . . .

. . . To say that such conduct by an official of government is condoned and rendered innocuous by the fact that the defendant had a bad reputation or had previously transgressed is wholly to disregard the reason for refusing the processes of the court to consummate an abhorrent transaction. . . . . The accepted procedure, in effect, pivots conviction in such cases, not on the commission of the crime charged, but on the prior reputation or some former act or acts of the defendant not mentioned in the indictment.

287 U.S. 435, 457-59 (Roberts, J., dissenting).

22

1993 Fla. LEXIS 1663, *5; 18 Fla. Law W. S 537

The view of the majority and the view of the dissent subsequently came to be characterized, respectively, as the "subjective" and "objective" [*6] views of entrapment.

The Supreme Court next addressed the entrapment defense in Sherman v. United States, 356 U.S. 369, 78 S. Ct. 819, 2 L. Ed. 2d 848 (1958), under the following undisputed facts. A government informant met Sherman at a doctor's office where both the informant and Sherman were being treated for narcotics addiction. After several chance meetings at the doctor's office and pharmacy, they began to discuss mutual experiences regarding their addiction. Eventually, the informant told Sherman he was not responding to treatment and asked Sherman to supply him with a source of drugs. Sherman tried to avoid the issue at first, but, after repeated requests predicated on the informer's presumed suffering, Sherman finally acquiesced. He subsequently provided the informer with drugs on numerous occasions.

At trial, the issue of entrapment was submitted to the jury. Evidence of Sherman's nine-year-old conviction for sale of narcotics and his five-year-old conviction for possession of narcotics was introduced to show his predisposition. Sherman was convicted as charged.

On appeal, the United States Supreme Court [*7] reversed the conviction. The Court reaffirmed its earlier adoption of the subjective view of entrapment and expressly rejected the objective view Justice Roberts propounded in Sorrells. However, unlike its holding in Sorrells, the Court held that, even under the subjective view, the circumstances in Sherman required a finding of entrapment as a matter of law.

In writing for the majority, Chief Justice Warren set forth the primary principles of the subjective entrapment defense stating:

The fact that government agents "merely afford opportunities or facilities for the commission of the offense does not" constitute entrapment. Entrapment occurs only when the criminal conduct was "the product of the creative activity" of law-enforcement officials. [Sorrells, 287 U.S. at 441, 451.] To determine whether entrapment has been established, a line must be drawn between the trap for the unwary innocent and the trap for the unwary criminal. The principles by which the courts are to make this determination were outlined in Sorrells. On the one hand, at trial the accused may examine the conduct of the government [*8] agent; and on the other hand, the accused will be subjected to an "appropriate and searching inquiry into his own conduct and predisposition" as bearing on his claim of innocence. [Id. at 451.]

Sherman, 356 U.S. at 372-73 (alteration in original; emphasis added). In enunciating those principles, the Court effectively approved the decision in United States v. Sherman, 200 F.2d 880, 882-83 (2d Cir. 1952), authored by Judge Learned Hand, which succinctly set forth the subjective test as follows:

In [ entrapment] cases two questions of fact arise: (1) did the agent induce the accused to commit the offence charged in the indictment; (2) if so, was the accused ready and willing without persuasion and was he awaiting any propitious opportunity to commit the offence. On the first question the accused has the burden; on the second the prosecution has it.

1993 Fla. LEXIS 1663, *8; 18 Fla. Law W. S 537

Applying the rationale of this test to the case in Sherman, the Supreme Court first concluded that the informant had induced Sherman to commit the crime. The Court then determined [*9]  that neither Sherman's prior record nor his behavior under the facts of the case was sufficient to establish predisposition. Consequently, the Court determined that " entrapment  was established as a matter of law." 356 U.S. at 373. The Court noted that it had reached its conclusion based on the "undisputed testimony of the prosecution's witnesses." Id.

In 1973, the Supreme Court again reaffirmed the subjective  entrapment defense in United States v. Russell, 411 U.S. 423, 93 S. Ct. 1637, 36 L. Ed. 2d 366 (1973). In Russell, an undercover agent was assigned to locate a laboratory believed to manufacture illicit drugs. The undercover agent met with Russell, advising him that he represented an organization interested in controlling the manufacture and distribution of methamphetamine. He then offered to supply Russell with a difficult to obtain but legal ingredient essential to the manufacture of methamphetamine in return for Russell's supplying him with a specific amount of methamphetamine. The undercover agent provided the ingredient, the drug was produced, and  [*10]   methamphetamine was manufactured at the laboratory. Subsequently, a warrant was obtained and Russell was arrested.

At trial, the issue of  entrapment  was submitted to the jury and Russell was found guilty as charged. The Circuit Court of Appeals reversed, holding that the conduct of law enforcement officers required a finding of  entrapment  as a matter of law without regard to Russell's predisposition to commit the crime charged. On appeal to the United States Supreme Court, Russell sought to have the Court reconsider its rejection of the objective standard for the entrapment  defense by seeking the Court's approval of the Circuit Court's opinion. For purposes of the appeal, Russell conceded his predisposition to commit the offenses charged, but he sought to have the Court rule that he was entrapped as a matter of law given the intolerable degree of government participation in the criminal enterprise. The majority in Russell rejected this position and once again reaffirmed the subjective standard set forth under Sherman and Sorrells, choosing to focus on a defendant's predisposition to commit the crime, rather than on the conduct of law enforcement officials. Significantly,  [*11]   however, the majority did admit that, at some point, the conduct of law enforcement officials, which is the focus of an objective evaluation of  entrapment,  might violate due process. n1 The Court stated: "While we may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction, the instant case is distinctly not of that breed." Russell, 411 U.S. at 431-32 (citation omitted).

- - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - - -

n1 In Hampton v. United States, 425 U.S. 484, 96 S. Ct. 1646, 48 L. Ed. 2d 113 (1976), the United States Supreme Court did state that the due process defense would be unavailable to a predisposed defendant. However, that statement in Hampton was made in a plurality opinion in which only three justices joined and, as such, did not undermine the Court's pronouncement in Russell.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - - - -
[*12]

1993 Fla. LEXIS 1663, *12; 18 Fla. Law W. S 537

Recently, in Jacobson v. United States, 112 S. Ct. 1535, 118 L. Ed. 2d 174 (1992), the Supreme Court again addressed its subjective standard of entrapment. In that case, two government agencies encouraged Jacobson to break the law by tempting him to order child pornography through the mail. Using at least five fictitious organizations and a bogus pen pal to entice him into ordering pornography, the agencies targeted Jacobson for over two-and-one-half years before he finally ordered illegal materials. These efforts had been aimed at Jacobson because he had previously ordered pornographic materials. However, at the time he did so, receipt through the mail or possession of pornographic materials was not illegal. At trial, Jacobson pleaded entrapment, and the issue was submitted to the jury. Rejecting the entrapment defense, the jury found him guilty.

On appeal, the United States Supreme Court determined that Jacobson was entrapped as a matter of law. Writing for the majority, Justice White strongly condemned a sting operation that would target an individual when little basis existed for doing so.

Evidence of predisposition to do what once [*13] was lawful is not, by itself, sufficient to show predisposition to do what is now illegal, for there is a common understanding that most people obey the law even when they disapprove of it. . . .

    . . . .


    . . . As was explained in Sherman, where entrapment was found as a matter of law, "the government [may not] play on the weaknesses of an innocent party and beguile him into committing crimes which he otherwise would not have attempted." [356 U.S. at 376.]

Law enforcement officials go too far when they "implant in the mind of an innocent person the disposition to commit the alleged offense and induce its commission in order that they may prosecute." [Sorrells, 287 U.S. at 442]. . . . When the Government's quest for convictions leads to the apprehension of an otherwise law-abiding citizen who, if left to his own devices, likely would have never run afoul of the law, the courts should intervene.

Jacobson, 112 S. Ct. at 1542-43.

The Supreme Court's decision in Jacobson emphasized a basic principle [*14] of the subjective evaluation of entrapment. Although the dissenting justices in Jacobson asserted that a key question in determining predisposition should be how an accused responded to the government's inducement, the majority rejected this view. The majority explained that the evidence must demonstrate predisposition beyond a reasonable doubt both prior to and independent of the government's acts. In effect, the majority emphasized that predisposition means predisposition. On the evidence presented, the Court found that neither Jacobson's prior behavior nor his response to the agencies' inducements was sufficient or proper to establish predisposition.

An evaluation of these federal 'entrapment cases clearly reflects that the United States Supreme Court has adopted the subjective standard of entrapment, which focuses on a defendant's predisposition, and that the Court has specifically rejected the objective standard, which focuses on the

1993 Fla. LEXIS 1663, *14; 18 Fla. Law W. S 537

government's conduct. Nevertheless, as noted in Russell, the United States
Supreme Court has indicated that government conduct may at some point become so
egregious that a defendant's federal constitutional due process rights could be
[*15]    violated regardless of that defendant's predisposition.

     In summary, under the subjective test set forth by the United States Supreme
Court, once a defendant raises  entrapment  as a defense, the defendant has the
burden to establish that the government induced the defendant to commit the
offense charged. However, once that burden is met, the burden shifts to the
government to establish the defendant's predisposition to commit the offense.
Sherman. In proving a defendant's predisposition, the government must establish
that the defendant was predisposed to commit the offense both prior to and
independent of the government's inducement. Jacobson. In doing so, the
government may make an appropriate and searching inquiry into the conduct of the
defendant and present evidence of the defendant's prior criminal history so long
as that history is relevant to the issue of the defendant's predisposition.

     Additionally, from these federal cases we also note that the subjective
evaluation of an  entrapment  defense is not always one for a jury. Clearly,
when evidence is not conflicting and factual circumstances are not in dispute,
the determination of whether a defendant has been entrapped is  [*16]    an issue
that rests with the trial judge as a matter of law. Jacobson; Sherman.

Florida Cases

Having examined  entrapment  under federal law, we now turn to the  entrapment
defense as it has recently evolved in Florida. In 1985, in State v. Glosson, 462
So. 2d 1082 (Fla. 1985), this Court evaluated the issue of  entrapment  under
the due process provision in article I, section 9 of the Florida Constitution.
Subsequently, in Cruz v. State, 465 So. 2d 516 (Fla.), cert. denied, 473 U.S.
905, 105 S. Ct. 3527, 87 L. Ed. 2d 652 (1985), we specifically rejected the
subjective test for  entrapment  and adopted instead the basic principles of the
objective standard of  entrapment  originally suggested by Justice Roberts in
Sorrells. In doing so, we articulated a threshold test for evaluating
 entrapment  as a matter of law. Then, in 1987, the Legislature enacted section
777.201 establishing the subjective test for  entrapment.

     In reviewing the history of the  entrapment  defense in Florida, it is
important to first examine the constitutional due process issue addressed
[*17]   by this Court in Glosson. In that case, Glosson was charged with
trafficking in and conspiring to traffic in cannabis as the result of a
reverse-sting operation. The sting was conducted through a paid informant. For
the informant's services in assisting in this and other sting operations and
subsequent prosecutions, the State agreed to pay the informant ten percent of
all civil forfeiture proceedings resulting from any case the informant
initiated. Asserting that the State's conduct violated his due process rights,
Glosson moved to dismiss the charges. The trial court agreed that the State's
conduct was improper as a matter of law and dismissed the charges.

     On appeal before this Court, the State argued that the due process defense
was not available to a predisposed defendant. We disagreed, stating:

We reject the narrow application of the due process defense found in the federal
cases. Based upon the due process provision of article I, section 9 of the
Florida Constitution, we agree with [the state supreme courts of Missouri and

1993 Fla. LEXIS 1663, *17; 18 Fla. Law W. S 537

New York] that governmental misconduct which violates the constitutional due process right of a defendant, regardless of that defendant's predisposition [*18] , requires the dismissal of criminal charges.

Glosson, 462 So. 2d at 1085 (emphasis added). Under the facts of Glosson, we found the behavior of law enforcement officials in entering into a contingency contract to obtain convictions to be violative of due process under the Florida Constitution. Under that objective philosophy of entrapment, we determined that Glosson was entitled to a dismissal as a matter of law.

Shortly thereafter, we addressed the issue of entrapment in Cruz. In Cruz, law enforcement personnel positioned an officer, who appeared inebriated and who had money hanging visibly from his pocket, as a decoy in a high crime area. Cruz took the money from the decoy's pocket and was arrested as he walked from the scene. The police officers had not been seeking a particular individual nor were they aware of any prior criminal acts by Cruz. Focusing on Cruz's lack of predisposition, the trial court dismissed the charges, finding that Cruz was entrapped as a matter of law.

In reviewing the trial court's decision in Cruz, we stated that the federal subjective test of entrapment generally involved a question of predisposition, [*19]    i.e., a question of fact for a jury. However, because we found that " entrapment  is a potentially dangerous tool given to police to fight crime," we rejected the federal subjective standard, adopting instead the principles of the objective standard suggested by Justice Roberts in Sorrells. Cruz, 465 So. 2d at 519. In adopting this objective standard, we propounded a judicially formulated two-part objective threshold test for determining entrapment as a matter of law. Under that test,

 entrapment  has not occurred as a matter of law where police activity (1) has as its end the interruption of a specific ongoing criminal activity; and (2) utilizes means reasonably tailored to apprehend those involved in the ongoing criminal activity.

465 So. 2d at 522. We did not, however, expressly find that such an evaluation was mandated by the due process clause contained in article I, section 9, of the Florida Constitution.

Applying the objective threshold test to the facts in Cruz, we concluded that law enforcement agents had not targeted any specific activity. Consequently, we determined that Cruz had been entrapped as a matter [*20]  of law.

Subsequent to our decision in Cruz, the Florida Legislature, in 1987, enacted section 777.201, which provides:

(1) A law enforcement officer, a person engaged in cooperation with a law enforcement officer, or a person acting as an agent of a law enforcement officer perpetrates an entrapment if, for the purpose of obtaining evidence of the commission of a crime, he induces or encourages and, as a direct result, causes another person to engage in conduct constituting such crime by employing methods of persuasion or inducement which create a substantial risk that such crime will be committed by a person other than one who is ready to commit it.

(2) A person prosecuted for a crime shall be acquitted if he proves by a preponderance of the evidence that his criminal conduct occurred as a result

27

1993 Fla. LEXIS 1663, *20; 18 Fla. Law W. S 537

of an entrapment. The issue of entrapment shall be tried by the trier of fact.

The legislative history of that statute clearly reflects that section 777.201 was enacted to reinstate the federal subjective test we rejected in Cruz. See Staff of Fla. H.R. Comm. on Criminal Justice, CS/HB 1467 (1987) Staff Analysis 177 (final June 22, 1987)("[Section 777.201] overrules [*21] the Florida Supreme Court's decision in Cruz v. State, 465 So. 2d 516 (Fla. 1985), which held that the objective test of whether law enforcement conduct was impermissible was in the discretion of the trial court.").

After the legislature adopted section 777.201, we again addressed the entrapment defense in State v. Hunter, 586 So. 2d 319 (Fla. 1991). However, the offenses at issue in Hunter occurred before section 777.201's enactment. Consequently, section 777.201 was not at issue before this Court and was not discussed in the Hunter opinion. Nevertheless, Hunter is still important in the evolving development of entrapment law in Florida given its application of the Cruz entrapment test and related due process considerations.

In Hunter, Ron Diamond, a convicted drug-trafficker facing fifteen years in prison, sought a sentence reduction or suspension under section 893.135(3), Florida Statutes (1985), which statute allowed the prosecutor to request a sentence reduction for a defendant who provided substantial assistance in obtaining the conviction of others. In seeking to have his sentence reduced, Diamond [*22] arranged a deal between David Hunter and Kelly Conklin as follows:

Diamond noticed that another resident of his apartment complex, Kelly Conklin, openly smoked marijuana. Conklin, a twenty-one-year-old recent graduate of an art school, had no prior criminal record. He lived with his pregnant girlfriend and worked for an advertising firm run by David Hunter. Approaching Conklin, Diamond asked for assistance in obtaining drugs, but Conklin could not provide any sources for the drugs that Diamond wanted. Diamond became more insistent and began telephoning Conklin almost daily. Eventually Conklin turned to Hunter, who agreed to help find drugs to sell to Diamond. Hunter sought out a former employee who provided the drugs but, in doing so, insisted that Hunter, not Conklin, complete the transaction. When Hunter attempted to close the transaction with the police undercover buyers, both he and Conklin were arrested.

Hunter, 586 So. 2d at 320 (footnotes omitted). At trial, both Conklin and Hunter presented the defense of entrapment to a jury, but the jury convicted them as charged. The district court of appeal, relying on our decision in Glosson [*23] , found a due process violation under article I, section 9, of the Florida Constitution, and directed that the charges against both Conklin and Hunter be dismissed.

On review by this Court, we distinguished the case from our holding in Glosson and rejected the district court's determination that a due process violation had occurred. Moreover, we stated that the due process considerations in Glosson were distinct from the objective test we established in Cruz. See Hunter, 586 So. 2d at 321 (holding that the district court should have decided the appeal on the entrapment issue rather than under the due process considerations of Glosson).

1993 Fla. LEXIS 1663, *23; 18 Fla. Law W. S 537

In Hunter, in applying our objective test from Cruz, we found that Conklin had established entrapment as a matter of law because the government knew of no ongoing drug-trafficking at the time Diamond approached Conklin. We rejected the application of the Cruz objective test to Hunter's case, however, because Hunter's involvement was voluntary and because Hunter was induced to commit the crime by Conklin rather than by the State or one of its agents. We expressly noted that "defendants cannot    [*24]    raise 'due process violations allegedly suffered by third parties.'" 586 So. 2d at 322 (quoting United States v. Valdovinos-Valdovinos, 743 F.2d 1436, 1437 (9th Cir. 1984), cert. denied, 469 U.S. 1114, 105 S. Ct. 799, 83 L. Ed. 2d 791 (1985)).

Finally, we addressed section 777.201 in Herrera v. State, 594 So. 2d 275 (Fla. 1992). In that case, defendant Herrera, as a result of a sting operation, was charged with trafficking in cocaine, conspiracy to traffic in cocaine, and obstructing an officer without violence. The sting operation had been initiated by a confidential informant, and Herrera raised entrapment as an affirmative defense. At trial, Herrera requested that the pre-section 777.201 standard jury instruction be given to the jury rather than the jury instruction written to comply with section 777.201. n2 Herrera requested the previous instruction on the grounds that the section 777.201 and the new instruction violated the due process clauses of both the federal and Florida Constitutions because they improperly placed the burden    [*25]    on a defendant to prove that the defendant was entrapped.

- - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n2 Before section 777.201 was enacted, the last paragraph of the standard jury instruction on entrapment read: "On the issue of entrapment, the State must convince you beyond a reasonable doubt that the defendant was not entrapped." After the enactment of section 777.201, the last paragraph of the instruction was changed to read: "On the issue of entrapment, the defendant must prove to you by a preponderance of the evidence that his criminal conduct occurred as the result of entrapment. "

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - -

On review, we rejected Herrera's argument. We stated that it was not unconstitutional to shift the burden to defendants to prove they were entrapped. Additionally, we stated that lack of predisposition is an essential element of the defense of entrapment as a result of section 777.201's enactment. In rendering this decision, we cited to Sorrells and Russell; however, we did not discuss the subjective, two-step burden of proof test from Sorrells or a trial court's    [*26]    ability to rule as a matter of law on the issue of entrapment. Moreover, at that time, the United States Supreme Court's decision in Jacobson had not been rendered.

District court considerations of this Court's due process pronouncements under the Florida Constitution in Glosson, and this Court's adoption of the objective standard of entrapment in Cruz and our application of that standard in Hunter, in conjunction with the legislative enactment of section 777.201 and our decision in Herrera, have created substantial uncertainty as to the status and application of the entrapment 'defense in Florida. Obviously, this uncertainty has caused the district courts of appeal to render conflicting decisions regarding the effect of section 777.201. n3 By this opinion, we attempt to set forth specific principles of Florida's entrapment defense to

1993 Fla. LEXIS 1663, *26; 18 Fla. Law W. S 537

harmonize the law and to ensure uniform application of the entrapment defense in Florida.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - -

n3 To date, at least thirty-one opinions have been released by the district courts interpreting section 777.201, some finding that section 777.201 abolished the test in Cruz, others finding that it did not.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

[*27]
Law Enforcement Officials' Conduct and Due Process

The legislature has the authority to statutorily establish entrapment as a defense in this state. However, the legislature cannot enact a statute that overrules a judicially established legal principle enforcing or protecting a federal or Florida constitutional right. Accordingly, section 777.201 cannot overrule a decision of this Court regarding entrapment in any case decided under the due process provision of article I, section 9, of the Florida Constitution.

Although the United States Supreme Court has yet to determine in a case before it that the conduct of law enforcement agents in an entrapment case has violated federal due process rights, it has determined that law enforcement agents' conduct could, in fact, violate such rights. See Russell. On the other hand, as noted above, we have determined, under the circumstances in Glosson, that the conduct of law enforcement agents violated the due process clause of the Florida Constitution. We recently reached a similar conclusion in State v. Williams, No. 79,507 (Fla. July 1, 1993). In Williams, we relied on Glosson in finding that the police conduct violated [*28] the defendant's due process rights under article I, section 9, regardless of the defendant's predisposition. This was because the conduct engaged in by law enforcement agents, i.e., the manufacture of crack for sale within 1000 feet of a school, was illegal. In making our determination, we noted that defining the limits of due process is difficult because due process is not a technical, fixed concept; rather, it is a general principle of law that prohibits prosecutions brought about by methods offending one's sense of justice. Further, although we stated that we are not unmindful of the problems faced by law enforcement agents in combatting crime, we emphasized that certain conduct would not be tolerated in light of the due process considerations mandated by our constitution. "While we must not tie law enforcement's hands in combatting crime, there are instances where law enforcement's conduct cannot be countenanced and the courts will not permit the government to invoke the judicial process to obtain a conviction." Williams, slip op. at 8. Because the legislature cannot abrogate an accused's due process rights, section 777.201 is inapplicable whenever a judge determines as a [*29] matter of law that law enforcement personnel have violated an accused's due process rights.

The Elimination of the Cruz Test for Entrapment

Although the legislature may not enact a statute limiting the application of a constitutional right, it may overrule judicially established substantive principles that do not implicate established constitutional rights. Thus, to the extent the objective test for the entrapment defense adopted by this Court in Cruz was not based on due process, the legislature had the authority to

30

overrule that judicially established standard and to establish entrapment as a defense to be evaluated under the subjective test. As we indicated in the Florida cases outlined above, it is the focus on the behavior of law enforcement officials rather than the objective test itself that implicates due process considerations. Consequently, the legislature had the authority to overrule the judicially established objective test set forth in Cruz to the extent that such objective test did not include due process concerns. As such, we find that the specific test set forth in Cruz has been eliminated by section 777.201. Additionally, we find that the subjective   [*30]   test set forth in section 777.201 is the test to be applied on the issue of  entrapment  in the absence of egregious law enforcement conduct. As noted above, however, in the presence of egregious law enforcement conduct, an  entrapment  defense is to be evaluated under the due process provision of article I, section 9, of the Florida Constitution as in Glosson and Williams.

The Subjective Test for  Entrapment  under Section 777.201

Given the history of the  entrapment  defense, we find that the legislature, in establishing a legislatively-created  entrapment  defense through section 777.201, codified the subjective test delineated by the United States Supreme Court as the means for determining the application of that defense. As indicated under the federal cases discussed above, the application of the subjective test is the test articulated by Judge Hand in Sherman, as further explained by the United States Supreme Court in Jacobson. Three principles arise under this test. The first two involve questions of fact and differing burdens of proof, and the third addresses whether the issue of  entrapment  must be submitted to the jury or whether the issue can be decided by   [*31]   the judge as a matter of law.

The first question to be addressed under the subjective test is whether an agent of the government induced the accused to commit the offense charged. On this issue, the accused has the burden of proof and, pursuant to section 777.201, must establish this factor by a preponderance of the evidence. If the first question is answered affirmatively, then a second question arises as to whether the accused was predisposed to commit the offense charged; that is, whether the accused was awaiting any propitious opportunity or was ready and willing, without persuasion, to commit the offense. On this second question, according to our decision in Herrera, the defendant initially has the burden to establish lack of predisposition. However, as soon as the defendant produces evidence of no predisposition, the burden then shifts to the prosecution to rebut this evidence beyond a reasonable doubt. In rebutting the defendant's evidence of lack of predisposition, the prosecution may make "an appropriate and searching inquiry" into the conduct of the accused and present evidence of the accused's prior criminal history, even though such evidence is normally inadmissible.   [*32]   However, admission of evidence of predisposition is limited to the extent it demonstrates predisposition on the part of the accused both prior to and independent of the government acts. Further, care must be taken in establishing the predisposition of a defendant based on conduct that results from the inducement. The United States Supreme Court, in its majority opinion in Jacobson, explained how this type of evidence may properly be used as follows:

Government agents may not originate a criminal design, implant in an innocent person's mind the disposition to commit a criminal act, and then induce commission of the crime so that the Government may prosecute. Where the Government has induced an individual to break the law and the defense of

entrapment is at issue, as it was in this case, the prosecution must prove beyond reasonable doubt that the defendant was disposed to commit the criminal act prior to first being approached by Government agents.

Thus, an agent deployed to stop the traffic in illegal drugs may offer the opportunity to buy or sell drugs, and, if the offer is accepted, make an arrest on the spot or later. In such a typical case, or in a more elaborate [*33] "sting" operation involving government-sponsored fencing where the defendant is simply provided with the opportunity to commit a crime, the entrapment defense is of little use because the ready commission of the criminal act amply demonstrates the defendant's predisposition. Had the agents in this case simply offered petitioner the opportunity to order child pornography through the mails, and petitioner--who must be presumed to know the law--had promptly availed himself of this criminal opportunity, it is unlikely that his entrapment defense would have warranted a jury instruction.

But that is not what happened here. By the time petitioner finally placed his order, he had already been the target of 26 months of repeated mailings and communications from Government agents and fictitious organizations. Therefore, although he had become predisposed to break the law by May 1987, it is our view that the Government did not prove that this predisposition was independent and not the product of the attention that the Government had directed at petitioner since January 1985.

Jacobson, 112 S. Ct. at 1540-41 (citations omitted; footnote omitted). [*34] The above quote provides guidance as to when conduct resulting from a sting operation may be used to establish predisposition and as to when using such conduct would be improper.

The third question under the subjective test is whether the entrapment evaluation should be submitted to a jury. Section 777.201 directs that the issue of entrapment be submitted to the trier of fact. Such direction is consistent with the subjective evaluation of entrapment because the two factual issues above ordinarily present questions of disputed facts to be submitted to the jury as the trier of fact. However, if the factual circumstances of a case are not in dispute, if the accused establishes that the government induced the accused to commit the offense charged, and if the State is unable to demonstrate sufficient evidence of predisposition prior to and independent of the government conduct at issue, then the trial judge has the authority to rule on the issue of predisposition as a matter of law because no factual "question of predisposition" is at issue. See, e.g., Jacobson; Sherman. Such a ruling could be proper even when the government presents evidence of prior convictions. Sherman [*35] . We reject any construction of section 777.201 that would require such an issue of law to be submitted to a jury. Under the constitution of this state, juries, as the finders of fact, decide factually disputed issues and judges apply the law to the facts as those facts are found by the jury. To construe section 777.201 as mandating that the issue of entrapment is to be submitted to a jury for determination as a matter of law would result in an unconstitutional construction that would violate article I, section 9, of the Florida Constitution. Consequently, we construe section 777.201 as requiring the question of predisposition to be submitted to a jury when factual issues are in dispute or when reasonable persons could draw different conclusions from the facts. In certain instances, however, as illustrated by Sherman and Jacobson, the trial judge and appellate courts clearly have the authority to rule on the issue as a matter of law. To hold otherwise would violate procedural due

1993 Fla. LEXIS 1663, *35; 18 Fla. Law W. S 537

process.

The Instant Case

Having thus determined the state of the entrapment defense in Florida under section 777.201, we turn to the facts of the instant case.

Manuel Munoz, the owner of "Video [*36] Den," was charged with two counts of sale or distribution of harmful materials to a person under 18 years of age, in violation of section 847.012, Florida Statutes (1989). The record reflects that those charges stemmed from the following sequence of events.

The Bay County Sheriff's Office received an anonymous complaint that minors were able to rent X-rated videotapes from a video store known as "Top Banana." In investigating whether minors were able to obtain X-rated videotapes from Top Banana, the sheriff's office decided to spread the investigation to other video stores in the Bay County area that rented X-rated movies. The names of the other video stores selling or renting X-rated videotapes were obtained by searching the Yellow Pages of the local phone book. Consequently, even though Video Den was totally unconnected to Top Banana and even though the sheriff's office had received no complaints regarding Video Den and had no independent knowledge as to whether Video Den was renting X-rated movies to minors, the sheriff's office decided to target Video Den in its investigation.

In conducting its investigation, the sheriff's office obtained a false membership card from Video Den [*37] under the fictitious name of Brian Jackson. The membership card reflected that Jackson was thirty-four years old. The sheriff's office also obtained the assistance of a sixteen-year-old girl who had recently been arrested for negotiating the purchase of a pound of marijuana. It is undisputed that the juvenile informant appeared to be at least eighteen years of age.

The Sheriff's office gave the membership card to the juvenile informant and instructed her to rent an X-rated videotape from Video Den, to lie about her age, and to lie about her relationship with Jackson. She was instructed to indicate that she was either the sister or girlfriend of Jackson.

Video Den maintained its X-rated videotapes in a separate room and posted a sign explicitly stating that no person under the age of 18 was allowed to enter the room. On her first trip to Video Den, the juvenile informant obtained an X-rated video from the "adults only" room and presented the false membership card to Munoz at the cash register. In renting the X-rated video, she explained to Munoz that she was Jackson's girlfriend. Approximately two weeks later, she again rented two X-rated movies from Video Den. On the second trip, [*38] Munoz asked her age and she lied. She explained that she had walked to the store and had forgotten her driver's license. Additionally, she insisted that she had rented these movies before and again claimed to be either the girlfriend or sister of Jackson. After Munoz allowed the juvenile to rent the videotapes, he was charged with the sale or distribution of harmful materials to a minor.

The trial judge dismissed the charges against Munoz on the basis of entrapment as a matter of law based on the objective entrapment test set forth in Cruz. The district court reversed, holding that the legislature had abolished the objective entrapment test set forth in Cruz through the enactment of section 777.201.

Given the unrefuted facts in this case, we find that we need not address whether the conduct of law enforcement personnel constitutes a due process violation under article I, section 9, because we find that, under the subjective test set forth above, Munoz was the subject of entrapment as a matter of law. First, the undisputed facts clearly establish that law enforcement agents induced Munoz to rent the videotapes to the juvenile. Second, there was no evidence whatsoever of predisposition [*39] on Munoz's part prior to and independent of the government inducement. As such, we reject the State's contention that the issue of entrapment in this case should be submitted to a jury.

Conclusion For the reasons expressed, we find that, through section 777.201, the Legislature established entrapment as a statutory defense to be evaluated under the federal subjective entrapment test and, by such action, eliminated the objective test we announced in Cruz. As such, we disapprove Bowser v. State 555 So. 2d 879 (Fla. 2d DCA 1989). We additionally find that section 777.201 neither prohibits the judiciary from objectively reviewing the issue of entrapment to the extent such a review involves the due process clause of article I, section 9, of the Florida Constitution, nor prohibits the judiciary from determining under the subjective test that, in certain circumstances, entrapment has been established as a matter of law. In this case, we find that, under the subjective test, Manuel Munoz was entrapped as a matter of law. Although the district court in this case correctly noted that section 777.201 abolished the objective entrapment test set forth [*40] in Cruz, it did not reach the conclusion that Munoz was nevertheless entrapped as a matter of law. Consequently, we quash the decision of the district court and remand this case with the direction that the trial court's order of dismissal be reinstated

It is so ordered.

BARKETT, C.J., and McDONALD, GRIMES and HARDING, JJ., concur.

KOGAN, J., concurs with an opinion, in which BARKETT, C.J., concurs.

SHAW, J., concurs in result only.

CONCURBY: KOGAN

CONCUR: KOGAN, J., concurring.

The due-process entrapment defense recognized in Cruz, Glosson, and Hunter essentially is the same as "objective entrapment." Thus, the majority appears to toss "objective entrapment" out the front door but then readmits essentially the same concept into Florida law via the rear entrance, with some minor tinkering as to analysis. Perhaps this Court in future cases will be required to state what analysis now must be used in cases of this type, but I generally agree with the majority's conclusions.

BARKETT, C.J., concurs.

```
****-------------------------        ---------------------------------------------***:

*       15 PAGES                   681 LINES
*    6:03 P.M. STARTED     6:08 P.M. ENDED
****--------------------------------------------------------------------------***:
****--------------------------------------------------------------------------***:
*                          EEEEE      N    N       DDDD
*                          E         N    N       D    D
*                          E         NN   N       D    D
*                          EEE       N N  N       D    D
*                          E         N   NN       D    D
*                          E         N    N       D    D
*                          EEEEE     N    N       DDDD

****--------------------------------------------------------------------------****

****--------------------------------------------------------------------------****
```

SEND TO: CARUSI, DANIEL
        MCRAE, MITCHELL T., P.A.
        2255 GLADES ROAD
        SUITE 405-EAST
        BOCA RATON FLORIDA 33431

# EXHIBIT  D

[X] 17th Judicial Circuit in and for Broward County
[ ] In the County Court in and for Broward County

**DIVISION:**
[X] CRIMINAL
[ ] TRAFFIC
[ ] OTHER

**ORDER**

**CLOCK IN**

Filed In Open Court.
RO
OF JUN 1 2 1996
BY

THE STATE OF FLORIDA VS.

*Fritz Maignan*

**PLAINTIFF**                **DEFENDANT**

**CASE NUMBER**

95-14021 CF10B

CHARGE  *1. Conspiracy Traffic in Cocaine*

Defense motion for Judgement of Acquittal is hereby Denied.

DONE AND ORDERED THIS *12th* DAY OF *June*, 19 *96*, IN

BROWARD COUNTY, FLORIDA

_____
                                    JUDGE

*Robert W. Tyson, Jr.*

COPIES:        BSO    -    SAO

FORM #CC-252
REVISED 10/90

41

# EXHIBIT   E

1

1    State of Florida      )       J. Robert W. Tyson, Jr.
                           :ss
2    County of Broward     )              4-0283

3              IN THE CIRCUIT COURT OF THE
4              SEVENTEENTH JUDICIAL CIRCUIT,
               IN AND FOR BROWARD COUNTY, FLORIDA

5    STATE OF FLORIDA,      )
                            )
6          Plaintiff.       )
     vs.                    )  Case No. 95-14021 CF B
7                           )
     FRITZ MAIGNAN,         )
8                           )
           Defendant.       )         COPY
9    ---------------------------------)

10

11

12         ---------------------------------------
     SUPPLEMENTAL APPEAL ON BEHALF OF THE DEFENDANT
13         ---------------------------------------

14              -------------------
                    VOLUME I                RECEIVED
15              -------------------         OFFICE OF THE
                   Pages 1-88               ATTORNEY GENERAL
16
                                            NOV 1 3 1 6
17
                                            CRIMINAL OFFICE
18                                          WEST PALM BEACH

19   APPEARANCES:                          8633

20         OFFICE OF THE STATE ATTORNEY,
           BY:  JOHN GALLAGHER, Esquire,
21         Appearing on behalf of the State of Florida.

22         HOWARD SCOTT HECKER, Esquire,
           Appearing on behalf the Defendant.

23

24                              RECEIVED
                                FROM CT. REPORTER
25                              DATE: NOV 6 1996
                                D. C. JOAN RAFALOVE

2

1                          I-N-D-E-X

2

3    PROCEEDINGS                  DATE              PAGES

4    Motion to Dismiss        06-04-96           01-88

5

6                    W-I-T-N-E-S-S-E-S

7

8    DEFENSE'S:

9    WITNESS:          DIRECT    CROSS    REDIRECT    RECROSS

10   Fritz Maignan        07       16         -           -

11

12   STATE'S

13   Heath Anderson       38       54        69          69

14

15

16

17

18

19

20

21

22

23

24

25

3

```
 1   State of Florida      )
                           :ss      J. Robert W. Tyson, Jr.
 2   County of Broward     )

 3

 4   STATE OF FLORIDA,          )
                               )
 5         Plaintiff,          )
                               )
 6   vs.                       )    Case No. 95-14021 CF B
                               )
 7   FRITZ MAIGNAN,            )
                               )
 8         Defendant,          )
     --------------------------X
 9

10

11

12          PROCEEDINGS had and taken before The Honorable

13   Robert W. Tyson, Jr., one of the Judges of said Court,

14   Room 6900, Broward County Courthouse, Fort Lauderdale,

     Broward County, Florida, on the 4th day of June,

15   1996, commencing at or about the hour of 9:30 o'clock

16   a.m.
                         C/4/96
17

18

19

20   APPEARANCES:

21          OFFICE OF THE STATE ATTORNEY,
            BY:  JOHN GALLAGHER, Esquire,
22          Appearing on behalf of the State of Florida.

23          HOWARD SCOTT HECKER, Esquire,
            Appearing on behalf of the Defendant.
24

25
```

4

```
 1              (Thereupon, the following proceedings
 2         were had in open court:)
 3            THE COURT:  Fritz Maignan.
 4            MR. HECKER:  Yes.
 5            THE COURT:  Ready?
 6            MR. HECKER:  Yes, Your Honor.  Just one
 7    matter that I'd like to go forward with today's
 8    hearing but Kaitan, the co-defendant, was to be
 9    brought over.  Mr. Holden filed a motion to
10    adopt this motion to dismiss based upon
11    entrapment, but I'm not asking for continuance.
12            Mr. Gallagher has brought the agent in, so
13    I'd like to go forward with the hearing and if
14    necessary, supplement with Mr. Kaitan's
15    testimony later.  I don't know why he wasn't
16    brought over.
17            THE COURT:  How are we supposed to know to
18    bring Mr. Maignan over this morning?
19            MR. HECKER:  Mr. Holden had filed a motion
20    to adopt the motion to dismiss based upon
21    entrapment.
22            THE COURT:  Did he set it for hearing
23    today?
24            MR. HECKER:  He should have had a
25    companion notice with mine.
```

5

1          THE COURT:  Did he set his for hearing?

2          MR. HECKER:  According to his secretary,

3     Mr. Holden is in Connecticut, Your Honor.  I

4     understood from Brenda that --

5          THE COURT:  We don't have him on the

6     docket.

7          MR. HECKER:  I understand, Your Honor.

8          What is the Court -- How does the Court

9     want to handle this?  He's in Pompano.  And

10    does the Court want to reset the entire

11    hearing?

12         THE COURT:  No.

13         MR. HECKER:  Well, then I'm ready to go

14    forward at this point, Judge.

15         MR. GALLAGHER:  Judge, let me just put two

16    things on the record.  Number one, Mr. Holden

17    is not here.

18         Number two, his client's not here.

19         Number three, Mr. Holden never set Kaitan

20    Maignan for hearing on a motion to dismiss.

21         Those are three things I want to put on

22    the record.  And whatever the Court wants to do

23    based on that, that's fine.

24         THE COURT:  Okay.  Let's go.

25         How long will this hearing take?

6

1          MR. HECKER:  Not too long, Judge.

2          MR. GALLAGHER:  An hour.

3          THE COURT:  Okay.  Who goes forward on

4     this?

5          MR. HECKER:  Your Honor, I believe I go

6     forward first.

7          Scott Hecker on behalf of Fritz Maignan,

8     standing in for Michael Holden on behalf of

9     Kaitan.

10          Your Honor, may I approach?  I have a case

11     that I'm relying upon which is a the case of

12     Munios versus State at 629 So.2nd page 90, a

13     Florida Supreme Court case from 1993.  And this

14     is the case I'll be relying upon, Judge.

15          This case basically says that --

16          MR. GALLAGHER:  Judge, I don't think we

17     should get into legal argument right now.  I

18     think we should just take the testimony and

19     then deal with the legal argument after.

20          THE COURT:  Okay.  Go right ahead.

21          MR. HECKER:  I'd like to have my client

22     sworn in, Your Honor.

23          THE COURT:  Swear the witness, please.

24          THE CLERK:  Raise your hand, please.

25               - - -

7

Thereupon,

                            FRITZ MAIGNAN,

having been first duly sworn, was examined and

testified upon his oath as follows:

                    DIRECT EXAMINATION

BY MR. HECKER:

    Q.    Please state your name for the record and

spell your last name.  And speak out loud, please.

    A.    Fritz Maignan.  Maignan, M-a-i-g-n-a-n.

    Q.    Mr. Maignan, are you the Defendant in this

case?

    A.    Yes, sir.

    Q.    And you're charged with conspiracy to

traffic in cocaine?

    A.    Yes, sir.

    Q.    Okay.  Now, you were arrested in Florida;

is that correct?

    A.    Yes, sir.

    Q.    Okay.  Prior to coming to Florida where

did you live?

    A.    I was living in New York, sir.

    Q.    Do you know what your address was up in

New York?

    A.    Yes, sir.

    Q.    Would you please tell the Court what your

8

1    address was.

2        A.    125th Street, Harlem, Building 227, 813.

3        Q.    Were you employed in New York,

4    Mr. Maignan?

5        A.    Yes, sir.

6        Q.    Where were you employed and what did you

7    do?

8        A.    I was working at Foot Locker, sir.

9        Q.    What is the Foot Locker?

10       A.    It's a clothes store, buy like clothes,

11   sneakers.

12       Q.    How long had you been working at Foot

13   Locker?

14       A.    Been working for like a year-and-a-half,

15   sir, before I come in jail before.

16       Q.    Mr. Maignan, have you ever been arrested

17   and charged with any type of drug offense?

18       A.    No, sir.

19       Q.    Either possession or trafficking, dealing

20   in drugs?

21       A.    No, sir.

22       Q.    Mr. Maignan, did there come a time when

23   somebody contacted you about coming to Florida for a

24   drug deal?

25       A.    Yes, it was this man when I was in the

1    Foot Locker.  He told me if I come down here I could

2    make a little quick money and would I come down to

3    Florida.  That's why I come down.

4         Q.   Do you know what this man's name was?

5         A.   I forgot his name.  It's been a long time,

6    sir.

7         Q.   Did this man contact you one time or more

8    than one time?

9         A.   A lot of time.

10        Q.   Can you tell the Court a number of - how

11   many times this individual contacted you?

12        A.   Contacted me like probably like four

13   times, four or five times, keep pushing me come down

14   to Florida.  I could make quick money.

15        Q.   Now, did this contact - was it face to

16   face or over the telephone?

17        A.   Face-to-face, sir, the first contact.

18        Q.   Now, prior to the first contact that this

19   man had with you, did you know this guy?

20        A.   No, I don't know him, sir, but he just

21   keep --

22        Q.   Did you know why this individual chose to

23   ask if you wanted to deal in drugs?

24        A.   I don't know, sir.

25        Q.   Did you give this individual any

10

1    indication that you were looking to do a drug deal?

2         A.    No.   The reason - I told you, the reason I

3    come down here was to tease me, keep forcing me to

4    come down, like if --

5              THE COURT:  Not so fast, sir.

6              MR. HECKER:  Mr. Maignan, the court

7         reporter has to take everything down.  With

8         your accent it's probably a little bit

9         difficult.

10             The question I asked you was, did you know

11        why this man had selected you to do the drug

12        deal or did you give him any indication that

13        you wanted to do the drug deal?

14             THE DEFENDANT:  No, I don't want to do the

15        drug deal.  He just forced me.

16             THE COURT:  You'll have to speak up so we

17        all can hear.

18             THE DEFENDANT:  All right.

19   BY MR. HECKER:

20        Q.    The first time he asked you to come to

21   Florida for the drug deal, what was your answer?

22        A.    I told him, no.

23        Q.    And how many times after the first time

24   did he contact you and you finally said, yes, I

25   assume?

11

1          A.    The last, at the end, he just told me,

2     quick money, quick money.  I ain't getting paid

3     enough from my paycheck, what I was making and

4     that's why I come down.

5          Q.    So he promised you you could make quick

6     money if you came to Florida?

7          A.    Yes.

8          Q.    Did he explain to you what type of drugs

9     he was interested in having you buy or sell?

10         A.    No.

11         Q.    Did he ever mention whether it was

12    marijuana or cocaine?

13         A.    No, he ain't tell me.  He told me if I

14    come down I'll make quick money, drug money.  That's

15    what he told me, sir.

16              THE COURT:  I can't hear you, sir.  You

17         are talking too fast and you want me to hear

18         this motion because you have filed this motion.

19         And it is impossible for me to make a decision

20         unless you speak slowly and loudly.

21              THE DEFENDANT:  All right, sir.

22              MR. HECKER:  Louder than that,

23         Mr. Maignan.

24              THE DEFENDANT:  All right.

25              THE COURT:  Go right ahead.

12

1          I did not hear what he said last time.

2     BY MR. HECKER:

3          Q.    Okay.   The question I asked you

4     Mr. Maignan, was, did this individual ever tell you

5     what type of drugs he had for you in Florida,

6     whether it was marijuana or cocaine?

7          A.    No, sir.

8          Q.    Okay.   But he did promise you could make

9     big money as you say coming down here?

10         A.    Yes, sir.

11         Q.    Now, I believe your testimony was he had

12    contacted you four times face to face; is that

13    correct?

14         A.    Yes, sir.

15         Q.    And was it during the fourth time of the

16    contact or was it a later time you finally agreed to

17    come to Florida?

18         A.    It was the last time, the fourth time he

19    told me I come down and I make quick money cause I

20    ain't make that much money I make in my paycheck.

21         Q.    So you were not making that much money

22    only in paycheck?

23         A.    Yeah.

24         Q.    Do you have any personal knowledge as to

25    whether this individual contacted your brother

13

1    Kaitan?

2          A.    Huh?

3          Q.    Do you have any personal knowledge whether

4    this individual contacted your brother Kaitan?

5          A.    No, it was me and my brother, right.  When

6    he talked to me and I told my brother about it and

7    my brother said, well, we ain't gonna do it, right.

8    And at the end I just keep telling my brother, come

9    on, let's go, let's go.  And he keep forcing me

10   also, too.

11         Q.    Do you know whether this individual

12   actually talked to your brother Kaitan?

13         A.    No, sir.

14         Q.    You don't know that?

15         A.    I don't know that.

16         Q.    Okay.  Now, eventually you and Kaitan do

17   come to Florida; is that correct?

18         A.    Yes, sir.

19         Q.    Do you meet up with this man, this

20   individual here in Florida?

21         A.    No, sir.

22         Q.    Okay.  Who did you meet in Florida?

23         A.    He called me.  When he called me he met

24   me.  I met with somebody, one of the black person I

25   met.

14

1      Q.   When you said he called you, was this the
2  man from New York that called you?
3      A.   Yeah, he was the man from New York called
4  me, sir.
5      Q.   And was he the one that told you to meet
6  this black man?
7      A.   Yes, sir.
8      Q.   Did you later find out the identity of
9  that black man?
10     A.   When I found out, that's why I'm in jail
11 right now.   When I found out it was a D.E.A. agent,
12 sir.
13     Q.   Now, did you engage in negotiations with
14 this black man, this D.E.A. agent for the purchase
15 of cocaine?
16     A.   Yes, sir.
17     Q.   Okay.  And do you know whether your
18 brother also engaged in the negotiations?
19     A.   Yes, sir.
20     Q.   And eventually a deal was set up I believe
21 in Hallandale; is that correct?
22     A.   Yes, sir.
23     Q.   Okay.  Now, did you respond to the
24 location in Hallandale where the drugs were supposed
25 to be sold to you?  Did you go to the location where

15

1    this black man told you to go?

2        A.    Yeah, I show up one time.

3        Q.    Did you leave the location?

4        A.    Yes, sir.

5        Q.    Did you leave prior to the deal happening?

6        A.    Yeah, I leave.

7        Q.    Do you have any personal knowledge as to

8    whether or not your brother Kaitan went forward with

9    the deal or what he did?

10       A.    No, I don't know.

11       Q.    Okay.  Now, this man in New York that

12   contacted you and promised you big money, did he

13   tell you how much money you could make?

14       A.    He told me we could make a lot of money.

15   That's what he told me, sir.

16       Q.    And is it also your testimony that you had

17   never been involved in drug dealing nor arrested for

18   any type of drugs?

19       A.    No, sir.

20            MR. HECKER:  Judge, I have no further

21       questions at this time.

22            THE COURT:  Cross-examination.

23            MR. GALLAGHER:  Maybe it won't take an

24       hour.

25                        - - -

16

CROSS EXAMINATION

BY MR. GALLAGHER:

Q.   How you doing?

A.   How you doing, Mr. Gallagher?

Q.   I'm doing pretty good.

Your nickname's Stizzo, right?  You call yourself Stizzo?

A.   It's like a nickname in school.

Q.   They call you Stizzo, right?

A.   Yes, they call me Stizzo.

Q.   S-t-i-z-z-o, Stizzo?

A.   Yeah.

Q.   It's a nickname for you?

A.   Yes, sir.

Q.   And this guy in New York, his name is Joseph Clarke, isn't it?  Joseph Clarke, isn't that his name, Joe?

A.   I just know -- I just remember his name by your name.

Q.   Joe, right?

A.   Yeah.

Q.   That's the guy who told you you could make some quick money down here in South Florida?

A.   Yes, sir.

Q.   And that's when you were up in Harlem, New

1  York, right?

2      A.   Yes, sir.

3      Q.   How far away is Harlem, New York from

4  South Florida?  I don't know anything about that.

5  How far is that?

6      A.   It's very far away.

7      Q.   A couple thousand miles maybe?

8      A.   I know it take three hours in a plane.

9      Q.   In a plane.  As long as you don't take

10 Value Jet I'm sure.

11         Now, listen.  You're telling the Judge

12 here, you raised your hand, you swore to God to tell

13 the truth today?

14     A.   Yes, sir.

15     Q.   You're telling the truth?

16     A.   I'm telling the truth.

17     Q.   And you told the Judge here today that you

18 traveled by jet from Harlem, New York that cost you

19 how much money?

20     A.   Probably $150, $200 ticket, sir.

21     Q.   You laid out $200, right?

22     A.   Uh-huh.

23     Q.   To fly down here to buy drugs, right?

24     A.   It's not like to buy drugs.  The man told

25 me come down here, I'll make like quick money.

18

1   That's the reason me and my brother come down here,

2   sir.

3        Q.   Wait a second.  You told your attorney you

4   were coming down here to purchase drugs.  You just

5   didn't know what type.  Isn't that what you told

6   him?

7        A.   Yes, sir.

8        Q.   All right.  So you flew a couple thousand

9   miles, right, with what you claim to be very little

10  money down to South Florida to purchase drugs,

11  right?

12       A.   Yes, sir.

13       Q.   Now, purchase means to buy drugs, doesn't

14  it?

15       A.   Yes, sir.

16       Q.   So you spend money for a jet plane to fly

17  down here and then you're gonna spend several

18  thousand dollars to buy drugs, right?

19       A.   Yes, sir.

20       Q.   And you did this all to make quick money;

21  isn't that what you just told the Judge?

22       A.   Yes, sir.

23       Q.   Now, where were you gonna get the money to

24  buy the drugs down here in South Florida?

25       A.   That's what I'm saying.  I ain't got the

19

1    money to buy the drugs.  The man was gonna put

2    somebody to buy the drugs.  That's why I was gonna

3    make the quick money cause I ain't got no money.

4         Like I was telling you before, I wasn't

5    making that much money in my paycheck.  That's why

6    when the man told me to come down, I'll make quick

7    easy money, that's why the guy told me to come down

8    here.

9         Q.   He told you to come down here?

10        A.   Yeah, he told me he knew somebody.

11        Q.   What you probably could have told him was,

12   no, I'm not interested in that?

13        A.   I did that.  I told him like several times

14   and he keep like teasing me, keep forcing me.

15        Q.   Why didn't you call the police and say, I

16   got this guy trying to get me to do a drug deal?

17        A.   I wasn't thinking about it at the time.

18        Q.   He was committing a crime, wasn't he?

19        A.   Yes.

20        Q.   When you see somebody commit a crime,

21   don't you call the police?

22        A.   Several times.

23        Q.   But you didn't do it here, did you?

24        A.   I made a mistake.

25        Q.   You decided to commit a crime, didn't you?

20

1        A.    Yes, sir.

2        Q.    Okay.

3        A.    I made a mistake.

4        Q.    All right.  So how did he force you to

5   come down here?  How did he force you to pay money

6   to get a ticket to get on a jet plane to fly a

7   couple thousand miles to come down to South Florida

8   and buy drugs?  How did he force you to do that?

9        A.    He didn't put no gun to my head, force me.

10   He just like tease me, told me if we come down here

11   we're gonna make quick money.  And at the time I

12   ain't got no -- Like I told you before, at the time

13   I was making a little check at my job, sir.

14        Q.    How old are you, man?

15        A.    I'm nineteen, sir.

16        Q.    You're nineteen years old.  Okay.  Are you

17   working for a living?

18        A.    Yes, sir.

19        Q.    You're feeding yourself, you're supporting

20   yourself?

21        A.    I don't support all myself.  I live with

22   my mom also.

23        Q.    You're living up there, but you're making

24   a living, right?  Right?

25        A.    Yes, sir.

21

1          Q.   Okay.  And he's teasing you; is that what
2     you're saying?  He's teasing you about doing a drug
3     deal?  That's what caused you to fly two thousand
4     miles and buy drugs?
5          A.   Yes.
6          Q.   Is that what you're telling the Judge here
7     today?
8          A.   Yeah, that's what I'm telling the Judge.
9          Q.   Now, when you got down here, you got
10    contacted by a D.E.A. agent, didn't you?
11         A.   Yes, sir.
12         Q.   And his name is Heath Anderson?  Remember
13    that kind of short, black fellow?
14         A.   Yes, sir.
15         Q.   Do you remember the conversation you had
16    with Heath Anderson on August 8, 1995?  Do you
17    remember the conversation you had?
18         A.   Yeah, I probably remember some of it, sir.
19         Q.   You remember telling Special Agent Heath
20    Anderson on a phone conversation on August 8, 1995
21    that you were down here to do some business?
22         A.   Yeah, a few times, too.  A few times he
23    keep telling me, yeah, come on, easy money, you
24    know, come on, get some money quick out of it.
25         Q.   All right.  So do you remember telling

22

1    Special Agent Heath Anderson that you were down here

2    doing business?

3         A.   Yeah, I told him that, sir.

4         Q.   Do you remember telling Special Agent

5    Heath Anderson that you and your brother were down

6    here to do some shopping?

7         A.   To do what?

8         Q.   Do some shopping.  Shopping.

9         A.   Shopping like what, sir?

10        Q.   Buying drugs.  Remember telling Special

11   Agent Heath Anderson that?

12        A.   I told you, like you said, Joe.

13        Q.   Told him as a joke?

14        A.   Joe, like the guy in New York bring me

15   down here.  That's why I met.

16        Q.   Wait a minute.  You paid the ticket to

17   come down here?

18        A.   I did pay the ticket.

19        Q.   No one put a gun to your head to lay out a

20   couple hundred dollars to jump on a jet, to fly from

21   Harlem, New York to South Florida to buy drugs, did

22   they?  Did anybody stick a gun to your head to do

23   that?

24        A.   No.

25        Q.   Okay.  Didn't you tell Special Agent Heath

23

1    Anderson that you were down here to do some

2    shopping?

3         A.    I don't remember I told him that, sir.

4         Q.    Okay.  Do you remember on that phone

5    conversation on August 8, 1995 that it didn't matter

6    if the cocaine was wet because you were gonna cook

7    it up anyway?

8         A.    No, I don't remember saying that, sir.

9         Q.    You don't remember saying that?

10        A.    No, sir.

11        Q.    But you might have said it; isn't that

12   correct?

13        A.    I ain't saying that at all, sir.

14        Q.    Do you remember meeting with Special Agent

15   Heath Anderson at the McDonald's restaurant off

16   Cypress Creek Boulevard here in Broward County?

17        A.    I don't know too much about down here,

18   sir.

19        Q.    Excuse me?

20        A.    I don't know too much about down here when

21   you say, Cypress.

22        Q.    Wait a minute.  Didn't you and your

23   brother meet with Heath Anderson and another big guy

24   at a McDonald's restaurant to talk about this drug

25   deal?

24

1       A.   Yes, sir.

2       Q.   And that's when you and Kaitan Maignan

3  negotiated this drug deal with Special Agent Heath

4  Anderson?

5       A.   Yes, sir.

6       Q.   And you all agreed that it was gonna be

7  $16,500 per kilogram of cocaine that you were gonna

8  purchase in this case?

9       A.   Yes, sir.

10      Q.   Okay.  And you agreed that the final price

11  was gonna be $33,000; isn't that true?

12      A.   Yes, sir.

13      Q.   And where were you gonna get that $33,000

14  to purchase that cocaine?

15      A.   What's the question again?

16      Q.   Okay.  I'll give you some more time.

17           Where were you gonna get that $33,000 to

18  purchase those two kilograms of cocaine?

19      A.   I ain't got it, sir.

20      Q.   But you negotiated to purchase it, didn't

21  you?

22      A.   I ain't got it, that's all.

23      Q.   That's not the question.

24           You negotiated to purchase two kilograms

25  of cocaine for $33,000, didn't you?

25

1     A.   Yeah.

2     Q.   Okay.  And in fact, in this case you

3  actually did get some money, didn't you?

4     A.   Get the money?

5     Q.   You actually did get the money to buy the

6  cocaine from somebody, didn't you?

7     A.   I didn't get no money.

8     Q.   Wait a minute.  Don't you have a sister

9  named Denise Maignan?

10    A.   Yes, sir.

11    Q.   Didn't she go to the bank on the date of

12  your arrest, make a withdrawal of some money and

13  give it to you and your brother?

14    A.   No, sir.

15    Q.   Are you sure about that?

16    A.   My sister - me and -- My sister give us

17  some money to get an apartment.

18    Q.   To get an apartment.  But you took that

19  money and you and Kaitan bound it up and brought it

20  to this drug deal, didn't you?

21    A.   Yes, sir.

22    Q.   That's right.  And whose gun was in the

23  car when this drug deal was going down?

24    A.   I don't know nothing about no gun, sir.

25    Q.   Wasn't there a gun in Kaitan's car?

26

```
1        A.    I don't know, sir.

2        Q.    You don't know?

3        A.    No.

4        Q.    How long you been in jail?

5        A.    Almost a year now, sir.

6        Q.    You and your brother talk about this case?

7        A.    We talk once in awhile.

8        Q.    What did he tell you about the gun?

9        A.    I don't be asking him about no gun.

10       Q.    Are you swearing to God to tell this Judge
11  the truth and you're saying you haven't talked about
12  the gun in this case?  Is that what you want this
13  Honorable Judge to believe in this case that you
14  didn't talk about the gun that was found in this
15  case?  Is that what you're saying here today?

16       A.    That's what I'm saying.

17            MR. HECKER:  Your Honor, my client is not
18       charged with having a gun.

19            MR. GALLAGHER:  He's here on a credibility
20       issue right now.

21            THE COURT:  Next question.

22            MR. GALLAGHER:  Thank you.

23  BY MR. GALLAGHER:

24       Q.    You were gonna rip off the Special Agent,
25  weren't you?
```

27

1          A.    Rip?

2          Q.    Yeah.  Oh, you know what I mean by that,

3     don't you?  What do I mean by that?

4          A.    I don't get it.

5          Q.    Oh, you don't know.  You don't know rip

6     off means to steal the drugs?

7          A.    Steal the drugs?

8          Q.    Oh, you weren't gonna do that?

9          A.    No, sir.

10         Q.    No, you weren't but you negotiated to

11    purchase two kilograms of cocaine for $33,000; isn't

12    that true?

13         A.    Yes, sir.

14         Q.    How much money did you bring to the drug

15    deal?

16         A.    I don't remember it now, sir.

17         Q.    Was it $33,000?

18         A.    No.

19         Q.    What was it?

20              MR. HECKER:  Your Honor, I would just like

21         to interpose an objection to this line of

22         questioning as to whether my client was to rip

23         off anybody or not.  He's not being charged

24         with that.  He's charged with a conspiracy to

25         traffic in cocaine and we're here on the issue

28

1          of a motion to dismiss based on entrapment.

2                MR. GALLAGHER:  Based on predisposition.

3                THE COURT:  Wait a second.  Overruled.

4     BY MR. GALLAGHER:

5          Q.   How much money did you bring to the drug

6     deal that you were gonna purchase two kilograms of

7     cocaine?

8          A.   I don't remember, sir.

9          Q.   You don't remember?

10         A.   No.

11         Q.   Can I refresh your recollection a little

12    bit?

13         A.   You can.

14         Q.   Keep in mind now you negotiated to buy two

15    kilograms of cocaine for $33,000, right?

16         A.   Yes, sir.

17         Q.   All right.  Do you remember bringing

18    $1,750 to a drug deal to buy two kilograms of

19    cocaine when you should have brought $33,000?

20         A.   Yes, sir.

21         Q.   And do you remember how the bills were

22    denominated?  I'll explain to you what I mean by

23    that.

24               You had eight one-hundred-dollar bills.

25    Remember that?  Don't look at your lawyer.  I'm

29

1    talking to you.  You had eight one-hundred-dollar

2    bills, right?

3        A.    Uh-huh.

4        Q.    And the one-hundred-dollar bills were on

5    the top and on the bottom, correct?

6        A.    If you say it.

7        Q.    No.  I'm asking you.  Were they on the top

8    and on the bottom?

9        A.    I don't remember.

10       Q.    You didn't put the money together in this

11   drug deal?

12       A.    No, sir.

13       Q.    Who put the money together in this drug

14   deal?

15       A.    I don't know.

16       Q.    Well, it was you and your brother.  If it

17   wasn't you, did your brother put the money together

18   in this drug deal?

19       A.    I didn't put the money together.

20       Q.    Did your brother?

21       A.    I don't know, sir.

22       Q.    So you don't know how that money got bound

23   together; is that what you're saying?

24       A.    Yes, sir.

25       Q.    And you had three fifty-dollar bills.  Do

30

1  you remember that?

2      A.   Like I told you before, I don't remember

3  that before.  I don't remember.

4      Q.   You don't remember that.  Okay.  And you

5  had eight hundred one-dollar bills.  Do you remember

6  that?

7      A.   I don't remember that, sir.

8      Q.   So you had a big old chunk of money stuck

9  together and you made it look like it was $33,000;

10 isn't that what you did in this case, Fritz Maignan?

11 Didn't you do that in this case?  Didn't you put

12 that money together just like that, keeping in mind

13 that you've raised your hand to swear to God to tell

14 the truth today?

15     A.   I did tell the truth.

16     Q.   Didn't you put the money together like

17 that?

18     A.   I didn't put the money.

19     Q.   If you didn't, did Kaitan?

20     A.   I don't know, sir.

21     Q.   Well, did you see the money in this case?

22     A.   No, I didn't see the money in this case.

23     Q.   You never saw the money?

24     A.   I saw the money when I come in jail.  I

25 saw a copy of the money.

31

1          Q.    Didn't you show up down at the Hallandale

2     Beach Boulevard Denny's restaurant location to do a

3     drug deal on the date of your arrest?

4          A.    Did show up.  Didn't want to do nothing no

5     more, sir.

6          Q.    You weren't gonna do nothing?

7          A.    No.

8          Q.    But you brought seventeen - what was it,

9     you brought $1750 in cash and a gun but you weren't

10    gonna do nothing; is that what you're telling His

11    Honor Judge Tyson here today?

12         A.    Yes, sir.

13         Q.    In fact, you wanted to do the drug deal

14    with just you and your brother and Special Agent

15    Heath Anderson and nobody else; isn't that the

16    truth?

17         A.    No, sir.

18         Q.    Didn't you have phone conversation with

19    Special Agent Anderson where you told Special Agent

20    Anderson that you didn't want him to bring that

21    other guy, that big guy Sam Tatum to the drug deal?

22    You didn't mention the guy's name but you said,

23    don't bring that other guy.

24         A.    I don't remember saying that.

25         Q.    You don't remember having that phone

32

1   conversation on August 10, 1995?

2        A.    Yeah, I talked to him a few times, but

3   also he want to keep calling me.  He keep calling

4   me.  We did tell him we didn't want to do no deal no

5   more, sir.

6        Q.    And then you ended up calling him back

7   saying --

8        A.    He keep calling me.

9        Q.    Who called you?

10       A.    Anderson.  Like you say, D.E.A. Anderson

11  keep calling me.

12       Q.    So he forced you to do the deal; is that

13  what you're saying?

14       A.    You could say that.

15       Q.    Excuse me?

16       A.    You could say that, too.

17       Q.    Who could say that?  You're saying he

18  forced you to do the deal?

19       A.    Most likely cause I told him I didn't want

20  to do the deal.  I got everything under the table.

21  You know, at the end early in the morning he called

22  me.  He called me and - he called me and whenever I

23  call him back he say, well, we're gonna -- Even my

24  brother also said we don't want to do nothing no

25  more.  We don't want to do the deal no more.

33

1        Q.   Wasn't it Kaitan Maignan who called back

2    Heath Anderson on August 10, 1995 and told Heath

3    Anderson that he wanted to do the drug deal?  Didn't

4    you hear that phone conversation?

5        A.   No, not that I know.

6        Q.   Weren't you in the background when Kaitan

7    was making that phone call?

8        A.   No, no, sir.

9        Q.   Let me finish the question.

10        Weren't you in the background when Kaitan

11    Maignan made that phone call to Special Agent Heath

12    Anderson telling Special Agent Heath Anderson that

13    he wanted to do the drug deal?  Weren't you standing

14    in the background when that phone call was made?

15        A.   No, sir.

16        Q.   And on the date of your arrest when you

17    and your brother showed up at that Hallandale Beach

18    Boulevard location to consummate this drug

19    transaction, it was then that Special Agent Anderson

20    told you that he was only gonna deal with one of

21    you; isn't that the truth?

22        A.   I can't hear you, sir.

23        Q.   You can't here me?  I think everybody else

24    in this courtroom can hear me.

25        On the date of your --

34

1         A.    What's the question again, sir?

2         Q.    On the date of your arrest, didn't Special

3    Agent Heath Anderson tell you and your brother

4    Kaitan that he would only deal with one of you and

5    that you had to leave?

6         A.    Yes, sir.

7         Q.    And that's why you left; isn't that true?

8         A.    He didn't tell me, leave.  I leave cause

9    he told me, just leave the area, and I did.  And I

10   leave the whole scene, sir.  I leave and went home.

11        Q.    You left, right?

12        A.    Yes, sir.

13        Q.    And you didn't care what went on at that

14   point, right?  Right?

15        A.    You say that.

16        Q.    I could say that?

17        A.    I'm saying --

18        Q.    You didn't care what happened at that

19   point?

20        A.    I knew me and my brother was gonna come

21   and say we don't want to do nothing no more.

22        Q.    That's why you left?

23        A.    That's why I left.  And my brother also,

24   he also was gonna leave, too, sir.

25        Q.    You didn't want to have anything to do

35

1   with that drug deal at that point?

2        A.    Both of us didn't.

3        Q.    I'm asking you.  I don't want you to speak

4   for your brother.  I'm asking you.  At that point

5   you didn't want to have anything to do with this

6   drug deal?

7        A.    No, sir.

8        Q.    But later on you called back and beeped

9   your brother to find out what was going on with the

10   drug deal, didn't you?

11        A.    I could beep my brother and my brother was

12   in jail all that time when I left.

13        Q.    You didn't know he was in jail.  You

14   didn't know he had been arrested.

15             And didn't you have a conversation with

16   Special Agent Anderson and then you returned back to

17   that Denny's restaurant location on Hallandale Beach

18   Boulevard and that's when you got arrested?

19        A.    When I got arrested when I returned back,

20   he called me.  He keep paging me at the time, too.

21   When he paged me, he called me back and he told me

22   my brother was locked in the car, can't come out.

23   And my brother just sat alone with him and that was

24   my brother.  And that's when I show up.

25             When I show up at the scene, right, and

36

1    that's when I got arrested.  He think I was gonna

2    come do the deal, too, and that's when I got

3    arrested at the time, too, sir.

4        Q.    Are you done?

5             Okay.  Just one more question.  It was you

6    who told your brother, let's do this deal; isn't

7    that correct?

8        A.    It was me telling my brother?

9        Q.    When you first talked to Joe Clarke, it

10   was you who told your brother, let's do this deal

11   cause we can make some quick money; isn't that

12   correct?

13       A.    Yes, sir.

14            MR. GALLAGHER:  Thank you.  No further

15       questions.

16            THE COURT:  Redirect.

17            MR. HECKER:  Your Honor, I have no

18       redirect of this, but I have a brief legal

19       argument cause I think it's necessary to

20       proceed to the next legal element.

21            MR. GALLAGHER:  Well, Judge, I have a

22       witness.  If he doesn't have any more witnesses

23       I'm ready to go.

24            THE COURT:  Wait a minute.

25            MR. HECKER:  Judge, I have a --

37

1          THE COURT:  Wait one minute.

2          You were saying?

3          MR. HECKER:  Just briefly, Your Honor.

4     The State has a next witness.  I would just

5     point out to the Court that under Munios --

6          MR. GALLAGHER:  I'm gonna make an

7     objection at this point.  This is not the time

8     for legal argument.  We're doing our testimony

9     and then we argue on the legal issues.

10         THE COURT:  You may finish up your

11    sentence.

12         MR. HECKER:  Thank you, Judge.

13         I just wanted to show that the Defendant

14    in the statutory defense of entrapment has the

15    burden by preponderance of the evidence that a

16    government agent induced him to commit the

17    offense charged and just wanted to make sure at

18    this point now they're gonna call the agent, so

19    I would assume at this point I've met my burden

20    if the State wants to proceed with the next

21    witness.

22         THE COURT:  Do you have any other

23    witnesses?

24         MR. HECKER:  No, Judge, not calling any

25    other witnesses at this time.

38

1           THE COURT:  You rest?

2           MR. HECKER:  Yes, Your Honor.

3           THE COURT:  Defense?

4           MR. GALLAGHER:  State.

5           THE COURT:  State.  Excuse me.

6           MR. GALLAGHER:  State would call Special

7     Agent Heath Anderson.

8           THE CLERK:  Raise your right hand, please.

9     Thereupon,

10           SPECIAL AGENT HEATH ANDERSON,

11    having been first duly sworn, was examined and

12    testified upon his oath as follows:

13           THE CLERK:  Please be seated.  State your

14     full name and spell your last name.

15           THE WITNESS:  My name is Heath Anderson.

16     Last name spelled A-n-d-e-r-s-o-n.

17           MR. GALLAGHER:  Judge, may I proceed?

18           THE COURT:  Yes.

19                DIRECT EXAMINATION

20    BY MR. GALLAGHER:

21     Q.    Sir, by whom are you employed?

22     A.    The Drug Enforcement Administration.

23     Q.    For how long have you been so employed?

24     A.    Approximately five years.

25     Q.    What are your duties with the Drug

39

1    Enforcement Administration?

2        A.    Mainly to enforce the federal narcotics

3    laws.

4        Q.    What's your training for that job?

5        A.    I went through a fourteen week Academy at

6    the Quantico F.B.I. Academy.

7        Q.    How many drug trafficking investigations

8    have you been involved in in your five year career?

9        A.    Hundreds.

10            THE COURT:  Pardon?

11            THE WITNESS:  Hundreds.

12   BY MR. GALLAGHER:

13       Q.    I call your attention to the month of

14   August, 1995.  Were you working during the month of

15   August, 1995?

16       A.    Yes, I was.

17       Q.    For whom were you working?

18       A.    The Drug Enforcement Administration.

19       Q.    On August 8, 1995 were you contacted by an

20   individual by the name of Joseph Clarke?

21       A.    Yes, I was.

22       Q.    Who was Joseph Clarke?

23       A.    He was previously a C.I. or cooperating

24   informant for the D.E.A.

25       Q.    What did Joseph Clarke tell you on August

40

1    8, 1995?

2         A.    Mr. Clarke travels around the country.  He

3    said that he had met some individuals --

4              THE COURT:  When was this?

5              MR. GALLAGHER:  August 8, 1995, Judge.

6              THE COURT:  Go right ahead.

7              THE WITNESS:  Mr. Clarke travels around

8         the country, said he had met several

9         individuals.  The only one he specified was

10        using the name Stizzo and that these

11        individuals were looking to develop a source in

12        Florida, source for cocaine.

13   BY MR. GALLAGHER:

14        Q.    And based on that information, what did

15   you do?

16        A.    He gave me a beeper number and informed me

17   that they were - he wasn't sure but he believed they

18   were down here at the time.  At that time I paged

19   the beeper number.

20        Q.    And was this also on August 8, 1995?

21        A.    Yes, it was.

22        Q.    And did you, in fact, get a return call

23   after you called the beeper number?

24        A.    Yes, I did.

25        Q.    Who called you back?

41

1          A.    The individual using the name Stizzo which

2    was later identified as Fritz Maignan.

3          Q.    Do you see anyone in the courtroom here

4    today who is Fritz Maignan?

5          A.    Yes, I do.

6          Q.    Who is that?

7          A.    The individual right here with the green

8    on.

9               MR. GALLAGHER:  Judge, may the record

10          reflect that the witness has properly

11          identified the Defendant, Fritz Maignan?

12              THE COURT:  I don't comment on evidence.

13              You may ask your next question.

14              MR. GALLAGHER:  Okay.  Judge, let the

15          record reflect that the witness has properly

16          identified the Defendant, Fritz Maignan.

17   BY MR. GALLAGHER:

18         Q.    All right.  Special Agent Anderson, please

19   tell the Judge what your conversation was with Fritz

20   Maignan at that time?

21         A.    We discussed what the - what Mr. Maignan

22   wanted to purchase, what quantity he wanted to

23   purchase and what price he would be purchasing it

24   for.

25              And we agreed on -- What we were talking

42

1    about was condos.  He agreed to purchase two condos,

2    which meant two kilograms of cocaine, for $16,500.

3         Q.   And in that conversation you had with

4    Fritz Maignan on August 8, 1995, did he tell you why

5    he was down in the South Florida area?

6         A.   Yes, he stated he was down to do business,

7    to shop.

8         Q.   Did you indicate to Fritz Maignan on that

9    first phone conversation a problem with some of the

10   cocaine?

11        A.   Yes, I did.  I had stated that I had two

12   different types of cocaine, two different types of

13   kilos.  I had one set at 18,500 which was of good

14   quality, and I had some second kilos which were poor

15   quality.  I explained to him that they had gotten

16   wet on the way here, on the way to Florida and they

17   would be selling for a lower price which was the

18   16,500.

19        Q.   When you told Fritz Maignan that some of

20   the kilos were wet, what was his response?

21        A.   He explained that it didn't matter if they

22   were wet or a little bit damaged because he was

23   going to cook them up anyway.

24        Q.   And based on your experience, what did

25   that mean?

43

1        A.    He was gonna cook it up into crack cocaine

2    form.

3        Q.    Did Fritz Maignan ever tell you that he

4    was down here to go shopping?

5        A.    Yes, he did.

6        Q.    Was that in that same conversation of

7    August 8, 1995?

8        A.    Yes, it was.

9        Q.    What happened after that conversation?

10       A.    We set up a meet for the -- Actually later

11   in that conversation, once we had negotiated price

12   and everything, he was ready to actually go ahead

13   and do the deal that evening.  He wanted to know if

14   I wanted to meet that evening or tomorrow.  He was

15   ready to go.

16             And I had to backtrack a little bit and

17   say, you know, I've got something to do this

18   evening, but we could meet tomorrow.

19             And he said, okay, you bring your stuff;

20   I'll bring mine.

21       Q.    So Fritz Maignan was showing you an

22   eagerness to do this deal; isn't that correct?

23       A.    That's correct.

24       Q.    So what happened?

25       A.    So I had to backtrack a little bit cause

44

1    he was ready to do the deal.

2           And I said, well, first I'd like to just

3    meet you.

4           So we set up -- He agreed and we set up a

5    meeting at which I wouldn't bring anything and he

6    wouldn't bring anything.

7    Q.    And when did that meeting take place?

8    A.    It took place on August the 9th.

9    Q.    The following day?

10   A.    Yes, sir.

11   Q.    Where was that meeting at?

12   A.    At Powerline and Cypress Creek in Fort

13   Lauderdale, McDonald's, located on the corner.

14   Q.    Now, at the point where you met Fritz

15   Maignan, had you ever talked to his brother Kaitan?

16   A.    Yes, I did.

17   Q.    When?

18   A.    During the first conversation I gave him

19   directions on how to get to the McDonald's.

20   Q.    Now, at the meeting at the McDonald's who

21   was present?

22   A.    Myself, a detective from Boca Raton Police

23   Department.  He was acting as an undercover along

24   with me.

25   Q.    Is his name Sam Tatum?

45

1          A.    Yes, it is.  And Fritz Maignan and Kaitan

2    Maignan.

3          Q.    Were you being surveilled at that time by

4    various agents of the Drug Enforcement

5    Administration?

6          A.    Yes, I was.  It was also on videotape.

7          Q.    Now, at that meeting, please tell the

8    Judge what occurred.

9          A.    At the meeting we all stood out in front

10   of the McDonald's, all four of us, both Defendants

11   and the other undercover.

12          We discussed again the price.  They wanted

13   to lower the price.  And I explained to them the

14   price was already set and we weren't gonna change

15   it, which was still the 33,000.

16          Q.    So that was gonna be for the two kilograms

17   of cocaine?

18          A.    Yes, it was.

19          Q.    What happened when you told him that?

20          A.    Like I said, we discussed it for a few

21   minutes and then I just told him, it's not gonna

22   change.

23          And they said, okay, that's fine.

24          I asked them if they had the money.

25          They said, yes, we have the money.  That's

46

1    no problem.

2        Q.   So what happened after that meeting?

3        A.   We discussed how the transaction actually

4    will take place and where it would actually take

5    place.  So we agreed on -- I gave them directions to

6    a location which was on the borderline of Boca

7    Raton, Florida and gave them directions on how to

8    get there.

9            That pretty much concluded the meeting.

10   We agreed that we would meet there the next day

11   after.

12       Q.   So you agreed to meet at that location on

13   August the 10th, 1995; is that correct?

14       A.   That's correct.

15       Q.   Now, on August the 10th, 1995 did you

16   engage in a series of phone conversations with Fritz

17   Maignan and his brother Kaitan Maignan?

18       A.   Yes, I did.

19       Q.   And had a problem arisen as a result of

20   the first meeting?

21       A.   Yes, they had stated that they had went to

22   the location that I had given him directions to in

23   Boca Raton and they did not like the location.  They

24   said it was too far away and some other reasons.  I

25   don't recall the other reasons right now, but they

47

1    did not like that location.

2        Q.    At some point did you have a conversation

3    with Fritz and Kaitan Maignan about their desire to

4    have only you present at the drug deal?

5        A.    Yes, I did.    They were adamant about not

6    having the other undercover there.

7        Q.    And that would be the person who was at

8    the first meeting by the name of Sam Tatum?

9        A.    That's correct.

10        Q.    What happened as a result of that

11    conversation that you had with the Maignan brothers?

12        A.    We went back and forth about having him

13    there and not having him there.    And eventually we

14    kind of agreed that I wasn't gonna come without him

15    and they didn't want to do it if he was there, so we

16    kind of ended the conversation saying, well, let's

17    not do it then.    We both mutually agreed.

18        Q.    So it looked like at that point, August

19    10th, 1995, that the deal might be over; isn't that

20    correct?

21        A.    Yes, that's correct.

22        Q.    And what happened that same day that

23    caused the deal to regenerate itself?

24        A.    I received a page from them.    I, in

25    return, paged them back.

48

1          And they said that they were gonna go

2     ahead and do the deal.  Actually Fritz stated that

3     he wasn't gonna be there but he was gonna give the

4     money to his brother and his brother would do the

5     deal alone.

6          Q.    That was to be set for what, the next day?

7          A.    The next day, correct.

8          Q.    So in your mind the drug deal was set for

9     August 11, 1995?

10          A.    That was the new date, yes.

11          Q.    And it was supposed to be between who?

12     Who was gonna be there for the deal?

13          A.    Myself and Kaitan, Fritz' brother.

14          Q.    Now, on August 11, 1995, what location did

15     you go to to consummate this drug transaction?

16          A.    Denny's restaurant in Hallandale, Florida,

17     located just east of I-95 on Hallandale Boulevard.

18          Q.    When you got there what happened?

19          A.    When I got there I was looking to meet

20     Kaitan only and I was surprised when Fritz showed up

21     at the restaurant.

22          Q.    So both of them were there?

23          A.    Yes, eventually both of them were there.

24          Q.    What happened when you saw both brothers?

25          A.    Like I said, at first I saw Fritz.  We

49

 1    went inside the restaurant.  We spoke for several

 2    minutes.

 3              I asked them if they had the money.  He

 4    explained he had given all his money to his brother.

 5    He was gonna do the deal.

 6              And I told them, well, one of them had to

 7    leave cause we agreed that we would do it

 8    one-on-one.

 9         Q.   So what happened?

10         A.   At that time I observed Kaitan walking

11    towards the restaurant and Fritz agreed that he

12    would leave.  And he left on foot and Kaitan came

13    in.  They kind of passed going out the door.

14         Q.   As it turns out the actual transaction of

15    you handing over two kilograms of cocaine and

16    getting $33,000 never occurred, correct?

17         A.   That's correct, it did not.

18         Q.   At some point Kaitan Maignan was arrested,

19    correct?

20         A.   That is correct.

21         Q.   Okay.  Now, after Kaitan Maignan was

22    arrested, was his car searched?

23         A.   Yes, it was.

24         Q.   And what was found inside Kaitan Maignan's

25    car?

50

1        A.    There was a firearm.  I think it was

2   located on the floor, but I'm not sure.  I did not

3   find it, but there was a firearm in the vehicle.

4   And there was also what we call a dummy roll which

5   is like hundreds wrapped around a bunch of ones.

6        Q.    In fact, it was a total of $1750 found; is

7   that correct?

8        A.    I believe that was the amount.

9        Q.    Which included eight hundred one-dollar

10  bills within the roll, correct?

11       A.    Correct.

12       Q.    The roll you refer to as the dummy roll;

13  is that correct?

14       A.    Correct.  I'm not sure of the exact

15  amounts, but yes.

16       Q.    Now, Kaitan Maignan, after his arrest, did

17  there come a time when Fritz Maignan reappeared on

18  the scene?

19       A.    Yes, there was.

20       Q.    How did that happen?

21       A.    Well, it's a long story.  In the evidence

22  or the personal property of Kaitan there was a

23  number.  We called that number.

24            Eventually I spoke to someone and during

25  the conversation we determined that there was - that

51

1    was a related person to Fritz and Kaitan, not like

2    kin but just mutual associates or whatever.

3              We went by that location, later got the

4    address.  We went by the location.  I kept paging

5    and paging Fritz.  Eventually he called back.

6              THE COURT:  Wait.  Wait one minute now.

7              When did you keep going back to what

8         location?

9              THE WITNESS:  We went to a location that

10        we got a phone number.

11             THE COURT:  What date is this now?

12             THE WITNESS:  This is the same date.  It

13        would have been the 11th, sir.

14             THE COURT:  Before or after you went to

15        the restaurant?

16             MR. GALLAGHER:  This is after the

17        restaurant.

18             THE COURT:  After you went in the car?

19             THE WITNESS:  After we had searched the

20        car, Your Honor?

21             THE COURT:  Is that right?

22             THE WITNESS:  After we had searched the

23        car.

24             THE COURT:  Then what happened?

25             THE WITNESS:  In the personal property of

52

1      Kaitan we found a number.  We called that

2      number.  We got an address to go along with

3      that number.

4           We went to that location, spoke to some

5      individuals there.  They did know the

6      individuals Kaitan and Fritz.  They stated that

7      they weren't there and they didn't know when

8      the last time they had seen them.  Earlier that

9      day I believe.

10          I then had began paging Fritz at the

11     original number that I had.  Eventually he

12     called back, asked what had happened with the

13     transaction and where was his brother.

14          I explained that his brother was sitting

15     in the car with the doors locked, with the seat

16     back.  He wasn't talking.  He wouldn't say

17     anything to me.  He just kept shaking his head

18     and motioning for me to go away.

19          I, at that time, I was on the phone.  I

20     acted like I was tapping on the window saying,

21     hey, open the window, your brother wants to

22     talk to you.

23          And I just got back on the phone and said,

24     hey, he won't open the window and won't talk.

25     What's wrong with your brother?

53

1    BY MR. GALLAGHER:

2        Q.    That, in fact, had not occurred.  You were

3    just making that story up?

4        A.    That's correct, it did not occur.

5        Q.    So what happened when you were telling

6    that to Fritz Maignan?

7        A.    He just kept wanting to talk to his

8    brother.  I said his brother won't open the door, he

9    won't let us into the car.  I said, okay, if he's

10   not gonna do this.

11              I'd also told him that I had seen the

12   money.  He said, I know I gave the brother the money

13   but if he's not gonna open the car and do the deal

14   I'm gonna leave.

15              And eventually I said, I'm getting out of

16   here.  Let's just forget the whole thing.

17              We went back by the original house that we

18   got an address to.  We didn't speak to anyone.  We

19   didn't see anybody there.  We left.

20              On the way back past the original meet

21   location, which would have been the Denny's, I

22   looked in the parking lot and I observed Mr. Fritz

23   Maignan in the parking lot.

24       Q.    And that's when he was arrested?

25       A.    After a short chase, yes, sir.

54

1              MR. GALLAGHER:  Thank you.

2              THE COURT:  Redirect - excuse me.  Cross.

3              MR. HECKER:  Thank you, Your Honor.

4                      CROSS EXAMINATION

5    BY MR. HECKER:

6         Q.   Agent Anderson, was it my understanding

7    that Joseph Clarke was a paid confidential informant

8    for the D.E.A.?

9         A.   Yes, he was.

10        Q.   And he had been used in the past and paid

11   money in the past?

12        A.   Yes, he was.

13        Q.   Do you know whether or not he was strictly

14   a paid informant or was he working off substantial

15   assistance for any crimes he may have committed?

16        A.   When he worked for me he was strictly a

17   paid informant.

18        Q.   And was he promised to be paid $840 on

19   this particular case?

20        A.   No, sir, he wasn't.

21        Q.   Was he promised to be paid any money on

22   this case?

23        A.   No, he wasn't.

24        Q.   So this was free?

25        A.   We didn't discuss any amount what he would

55

1    be paid or not be paid.  I couldn't make him any

2    promises.

3         Q.    Do you have any personal knowledge as to

4    whether Mr. Clarke expected to be paid?  Had he been

5    expected to be paid in the past?

6         A.    Yes.

7         Q.    Then he had been paid in the past,

8    correct?

9         A.    Yes, he had been paid.

10        Q.    Was Mr. Clarke paid whether or not an

11   arrest was made by the federal government?  Did it

12   matter whether an arrest was made?

13        A.    Yes, it did matter.

14        Q.    It did matter, so if somebody was not

15   arrested or not prosecuted, he was not paid; is that

16   correct?

17        A.    It would depend on the total

18   circumstances.

19        Q.    And this was a federal operation to begin

20   with; is that correct?

21        A.    To begin with, that's correct.

22        Q.    And for some reason, whatever reason, the

23   federal government passed on their and became a

24   State case, correct?

25        A.    That's correct.

56

1        Q.    Now, had this State and the federal system

2    prosecuted, to the best of your knowledge would

3    Mr. Clarke been paid for his services?

4        A.    No, I don't think so.  I don't think it

5    would have made a difference.

6        Q.    So this one would have been a free one

7    that Mr. Clarke was doing then?

8        A.    I really couldn't say.

9        Q.    I understand.  I understand.

10            Now, your first contact with Mr. Clarke

11    regarding Fritz Maignan was when he had called you

12    and said that he had contacted someone named Stizzo

13    and they were looking for a new source of cocaine,

14    correct?

15        A.    That's correct.

16        Q.    Now, do you know whether or not Mr. Clarke

17    had been documented with the D.E.A. and to C.I.?

18        A.    Yes, he had been.

19        Q.    And are you familiar with the

20    documentation process?

21        A.    Yes, I am.

22        Q.    And isn't it true that when someone is

23    documented to be a C.I. they are told that they are

24    to look for known drug dealers or target people that

25    are in the trade; is that correct?

57

1        A.    That is correct.

2        Q.    And aren't they also told that they're not

3   allowed to go out and create new crimes?

4        A.    That's correct.

5        Q.    Do you have any knowledge as to whether

6   Mr. Clarke was properly instructed when he was

7   documented to be the C.I. for the D.E.A.?

8        A.    Yes, he was.

9        Q.    Okay.  Now, when the name Stizzo was given

10  to you, that was given directly to you; is that

11  correct?

12       A.    That's correct.

13       Q.    Okay.  Did the D.E.A. then begin some type

14  of investigation to find out who Stizzo was?

15       A.    No, we did not.  We didn't have anything

16  to go on other than just the beeper number.

17       Q.    Okay.  So after you're given the name of

18  Stizzo, did you or to the best of your knowledge

19  anyone else in the D.E.A. instruct C.I. Clarke to

20  continue his contact with Stizzo?

21       A.    At that point we instructed him not to

22  contact him unless we told him to.

23       Q.    Okay.  Do you know whether or not he

24  followed those instructions?

25       A.    To my knowledge he did follow those

58

1    instructions.

2        Q.    Okay.    Do you have any knowledge regarding

3    repeated contacts by Mr. Clarke of Mr. Fritz Maignan

4    in New York?

5        A.    As of what time?

6        Q.    Well, that's what I'm gonna ask you.    I

7    think there's two time frames we're talking about.

8    The time frame prior to Mr. Clarke contacting D.E.A.

9    and letting him know he had an individual.

10            So let's talk about that time frame first.

11   Do you know how many contacts Mr. Clarke, the C.I.,

12   had with Mr. Fritz Maignan prior to him contacting

13   D.E.A. and letting him know that he had an

14   individual?

15       A.    How many contacts he had.    No, I don't

16   know exact number.

17       Q.    Okay.    And after Stizzo was given to you,

18   Mr. Clarke was then instructed, do not contact

19   Stizzo until we get some type of agent on the case

20   and set it up the proper way?

21       A.    Correct.

22       Q.    Okay.    Now, you don't know how much

23   contact happened first but how about after, after

24   Stizzo was given did the operation begin?    Did you

25   start setting up -- Your name was given to

59

1   Mr. Maignan as the contact person?

2        A.    That's correct.

3        Q.    Now, do you know how Mr. Clarke related

4   your name to Mr. Maignan as the new person to

5   contact?

6        A.    According to Mr. Clarke when he first met

7   Mr. Maignan here.  He was given the beeper number,

8   given to Fritz' beeper number and they told him that

9   they would be in the area.

10           Like I said, the only name he was given

11  was Stizzo.  And they told he would be going down to

12  Florida.  Like I said, he contacted me and told me

13  he wasn't sure but he believed they were down here.

14       Q.    Do you know whether Mr. Clarke ever

15  promised Mr. Maignan big money on a deal down here?

16       A.    Yes, I do know.

17       Q.    Okay.  And did he promise him big money?

18       A.    No.

19       Q.    He didn't?

20       A.    (Shakes head in the negative).

21       Q.    But didn't you recently just a moment ago

22  testify that you don't know how many contacts

23  happened before Stizzo was given to you?  I want to

24  make sure that we had that delineation line here.

25           So I assume that after Stizzo's name was

60

1  given to you and the investigation began, Mr. Clarke

2  had no further contact with Mr. Maignan; is that

3  correct?

4       A.   After the investigation began?

5       Q.   Yes.

6       A.   Yes, he did.  I hooked up on a call.  At

7  one point they became hesitant about doing the deal

8  because they stated that -- What happened to Joe, we

9  haven't heard from Joe.  He hasn't contacted us.

10  We're kind of worried about this.  It's making him

11  nervous.  And at that point I had to rush him

12  together so Joe could confirm, hey, everything is

13  all right.

14       Q.   So that was the contact that Mr. Clarke

15  had with Mr. Maignan after the investigation began?

16       A.   That's correct.

17       Q.   And during that conversation I would

18  assume that Mr. Clarke did not promise him big money

19  or anything else, correct?  He just said, I'm still

20  here, don't worry, deal with Mr. - whatever

21  undercover name you were using; is that correct?

22       A.   That's correct, but I'm not quite sure

23  what you mean by when you say, promised him big

24  money.

25       Q.   We're gonna get to that in one minute.

61

1          During this conversation, the one you've

2     just related to the Court, I'm sure -- The

3     conversation was basically to assure Mr. Maignan

4     that the deal was still happening and that you're

5     not the police, right?  It was basically like a

6     comfort call to the Maignans?

7          A.    Yes, sir.

8          Q.    So what I'm gonna ask you is this.

9     There's been testimony given in this case that there

10    was a number of contacts by Mr. Clarke to to give

11    Mr. Maignan in New York.  Do you have any knowledge

12    regarding those contacts prior to Stizzo's name

13    being given to the agency?

14         A.    Well, Mr. Clarke explained to me that -- I

15    mean, he met the guy.  They talked.  They partied.

16    So that would have been before.  That's when he got

17    the number and gave me a call.

18         So like I said, I don't know how many

19    times he met with him.  Obviously he had to meet him

20    to get the number and give me the number.

21         Q.    It could have been more than one time or

22    it could have been one time?

23         A.    There could have been more than one.  It

24    could have been more than one time.

25         Q.    You didn't get the impression there was

62

1   more than one time from Mr. Clarke?

2       A.   From saying that they partied together I

3   would assume it was more than one time before he had

4   given me the number.

5       Q.   Now, did the D.E.A. or the U.S. Attorneys'

6   Office do any type of background investigation on

7   the Maignan brothers to find any prior arrests they

8   may have had?

9       A.   We ran their records and we ran them

10  through our computers.  This was after their arrest,

11  after they had been identified.

12      Q.   Afterwards?

13      A.   Yes, sir.

14      Q.   What about before?  I mean, how would you

15  be able to know whether your C.I. was working under

16  his direction when he was becoming a documented C.I.

17  that he was only supposed to go after known targets

18  or known drug dealers?  How would you be able to

19  verify that if you did not run his name prior to

20  arrest?

21      A.   As far as like actually being there or

22  hearing the conversation that took place, he would

23  not know other than the instructions we gave him and

24  then just the follow-up, talking to him to find out

25  what did you explain to these individuals?  How did

63

1    you explain what would happen or whatever?  That's

2    really the only way.

3        Q.    Now, did you come -- When you finally ran

4    the criminal records of both the Maignan brothers,

5    did you discover that they have no prior drug

6    arrests?

7        A.    I don't recall what their records were.

8        Q.    Okay.  Were their records reduced to

9    writing or a printout of some sort?

10       A.    I'm sure there's a printout.

11       Q.    But you don't have possession of that

12   today?

13       A.    No, I don't.

14       Q.    Would it surprise you to know that they

15   have no prior drug arrests?

16       A.    Yes, it would.

17       Q.    Did Mr. Clarke ever mention to you that

18   they had been in the trade for any great length of

19   time or short period of time or anything?

20       A.    He didn't specify how long they had been

21   in the business.

22       Q.    Is Mr. Clarke still working with the

23   D.E.A. today?

24       A.    No, he isn't.

25       Q.    He voluntarily retired?

64

1          A.   No, his information in the cases that we

2    were working on did not pan out.  One of them did

3    and one of them did not.  And once his information

4    ran out, he was deactivated.

5          Q.   Now, that case you just discussed, was

6    that a case that occurred after the Maignan brothers

7    or before the Maignan brothers?

8          A.   Before, sir.

9          Q.   Okay.  Do you have any knowledge about how

10   much money in his entire life as a C.I. Mr. Clarke

11   had been paid?

12         A.   I can't answer that, you know, from his

13   entire life.  But I personally paid him $850 for

14   work that he did for our office in Fort Lauderdale,

15   sir.

16         Q.   But not on this case?

17         A.   Not on this case.

18         Q.   Now, my understanding, just so we're

19   clear, about what his payment was based upon whether

20   or not a prosecution was brought?

21         A.   It would depend.  I'm not trying to be

22   difficult.

23         Q.   No.  That's okay.

24         A.   It would depend on the circumstances of

25   the case.

65

1          Q.    But that was one of the criteria, right?

2     Whether the information panned out and whether

3     somebody got prosecuted and whether the case went

4     forward, right, that would be considered?

5          A.    Absolutely.

6          Q.    Okay.  Do you know whether or not

7     Mr. Clarke ever said to you that he had loaned money

8     to the Maignans to fly down here?

9          A.    Yes, he never stated that he did that.

10          Q.    Now, are you familiar with the term

11     "puffing"?

12          A.    Yes, sir.

13          Q.    Okay.  And what is your definition of

14     puffing?

15          A.    Puffing would be an individual blowing

16     themselves up to character that they're not.

17          Q.    And is that common in the drug trade where

18     you deal with these drug dealers?  Do they try to

19     make themselves bigger than what they are maybe for

20     a better price or maybe to show you who they are or

21     get some respect from you?

22          A.    It happens.  Sometimes they're actually

23     what they're saying they are, but it happens.

24          Q.    It's true.  I understand.

25               In this particular case when they came

66

1    down here and Mr. Maignan, Fritz Maignan said to you

2    that he was shopping, you've heard that term before,

3    right?

4         A.    Yes.

5         Q.    That wasn't new?

6         A.    No.

7         Q.    Did you believe that he was trying to

8    boost himself and his brother up as maybe being a

9    bigger dealer than they were?

10        A.    No, I didn't.

11        Q.    Now, you never showed any cocaine to

12   Kaitan Maignan at the parking lot at the Denny's

13   restaurant; is that true?

14        A.    That's correct.

15        Q.    Isn't it true that Kaitan Maignan

16   absolutely refused to show you any money?

17        A.    No, that's not correct.

18        Q.    When did he show you money?

19        A.    He did not show me money, but he didn't

20   refuse to show me the money.  He said he would show

21   me the money.

22        Q.    Now, have you reviewed the videotape of

23   yourself and Kaitan in the parking lot?

24        A.    Yes, I have, sir.

25        Q.    Is it a fair statement to say that

67

 1     basically Kaitan was walking in an erratic pattern

 2     around the parking lot and you were talking to him

 3     from around the side of your car, he was holding a

 4     clothe up in front of his face as he was walking

 5     around or a napkin or a tissue?

 6         A.    At first we were standing in one general

 7     location, probably within a ten yard area we were

 8     standing in.  And then once there became a problem,

 9     once he knew I was carrying a firearm, he wanted to

10     pat me down.

11              And once he found out that I was carrying

12     a firearm, that's when he started, you know, walking

13     around the lot and became --

14         Q.    But he never showed you any money though,

15     technically didn't show, not refused to show you but

16     he never --

17         A.    And he never actually showed me the money.

18         Q.    And you never actually showed him the

19     cocaine?

20         A.    Yes.

21         Q.    And the purpose of the gun was for your

22     protection?

23         A.    Yes.

24         Q.    It's not uncommon that at drug deals and

25     kilos or maybe less that someone may have a gun on

68

1     them for their protection?

2          A.    I wouldn't say for protection.  It's kind

3     of --

4          Q.    Well, let me ask you this particular case.

5     Did Kaitan Maignan ever pull out a gun that he

6     owned?  Did he ever threaten you with a gun?

7          A.    No, he never pulled out.

8          Q.    When was the first time that you learned

9     that Kaitan Maignan actually had a gun in his

10    protection?

11         A.    The gun was in the vehicle.

12         Q.    Now, Kaitan Maignan nor Fritz Maignan ever

13    displaced the gun while they were in the parking

14    lot, did they?

15         A.    That's correct.

16         Q.    In fact, did you find out later on there

17    was no bullets for the gun?

18         A.    The gun wasn't loaded.

19         Q.    Now, this roll of money that the State has

20    described with the eight hundred one-dollar bills

21    and the seven one-hundred-dollar bills and the three

22    fifty-dollar bills, that money flash was never shown

23    to you at all, was it?

24         A.    During the deal, no, it wasn't.

25              MR. HECKER:  Okay.  I have no further

69

1          questions, Judge.

2               THE COURT:  Redirect.

3               MR. GALLAGHER:  Just one question.

4                    REDIRECT EXAMINATION

5     BY MR. GALLAGHER:

6          Q.   Special Agent Heath Anderson, that dummy

7     roll that we've just been talking about and the gun

8     that was found in that car, what is that consistent

9     with in your experience as an undercover narcotics

10    special agent?

11         A.   It's consistent with individuals trying to

12    rip you off or rob you.  They try to lure you into

13    the vehicle to see the money and once you're looking

14    at the money, they usually will obviously use a gun

15    to try to rob you.

16              MR. GALLAGHER:  Thank you.  No further

17         questions.

18              MR. HECKER:  Judge, I just have one

19         follow-up question.

20                    RECROSS EXAMINATION

21    BY MR. HECKER:

22         Q.   Did Kaitan Maignan ever attempt to lure

23    you into his vehicle?

24         A.   Yes, he did.

25         Q.   Would that be on the tape in the parking

70

1    lot?

2         A.   Yes, it is, but I'm not quite sure what

3    you mean by lure.

4         Q.   It was your word.   What do you mean by

5    lure?

6         A.   He kept explaining, hey, well, why don't

7    you put your gun in the vehicle where you can do

8    this?  Come on over.  You can see the money first.

9    Just put your gun up and then you can come over, see

10   the money.  I consider that luring someone to do

11   something.

12            MR. HECKER:  Okay.  Fair enough.

13            Judge, I have no further questions.

14            MR. GALLAGHER:  Nothing else from the

15       State, Judge.  Thank you.

16            THE COURT:  You may step down.

17            Call your next witness, State.

18            MR. GALLAGHER:  We're done, Judge.  Thank

19       you very much.

20            THE COURT:  Defense rests?

21            MR. HECKER:  Yes, Your Honor.

22            THE COURT:  State rests?

23            MR. GALLAGHER:  Yes, Your Honor.

24            THE COURT:  Okay.

25            MR. HECKER:  Brief legal argument if the

71

1     Court would permit.

2          THE COURT:  Yes, sir.

3          MR. HECKER:  May it please the Court.

4     Your Honor, I had given the Court a copy of the

5     Munios case at 629 Southern Reporter 90, 1993

6     Supreme Court case, which lays out how an

7     entrapment defense should be presented.

8          As I mentioned before, we have to

9     establish by a preponderance of the evidence

10    that the government induced the accused to

11    commit the offense charged.

12         Briefly, Your Honor, it has been

13    uncontroverted, the testimony, that a

14    confidential informant - a paid confidential

15    informant by the name of Joe Clarke had contact

16    with the Maignan brothers in New York.

17         Now, Fritz Maignan's testimony was that

18    the contact was at least four face-to-face

19    contacts.  And he testified that he was

20    promised big money and in his mind was induced

21    to come to Florida.

22         The agent, Heath Anderson, called by the

23    government, did not know how many contacts were

24    made but did say that he got the impression

25    from the word "partying" that the confidential

72

1    informant used that it was more than one

2    occasion.

3        Now, the next issue here is whether or not

4    the factual circumstances are in dispute, and

5    they're not.

6        The Maignan brothers are from New York.

7    They came to Florida to do a cocaine deal for

8    two kilos of cocaine.  That is not a dispute.

9        MR. GALLAGHER:  Judge, I have an objection

10    right now.  First of all, he's here on behalf

11    of Fritz Maignan.  He's not here on behalf of

12    Kaitan Maignan.  So he can only argue with

13    regard to his client.

14        Mr. Kaitan Maignan's not here.  Mr. Kaitan

15    Maignan's lawyer's not here.  Mr. Kaitan

16    Maignan has not set a motion to dismiss for

17    hearing here today.  This case today is about

18    Fritz Maignan.  We shouldn't be talking in the

19    plural sense about the Maignan brothers.  We

20    should be referring specifically to this

21    Defendant, Fritz Maignan.

22        MR. HECKER:  By brief response, Your

23    Honor, I'm here on behalf of Michael Holden

24    who's the attorney.

25        THE COURT:  Continue on with your argument

73

1          as to your client.

2               MR. HECKER:  Thank you, Your Honor.

3               But I want to point out to the Court, if

4          the Court grants the motion as to my client, it

5          has to grant it as to Kaitan because it's

6          conspiracy charge and there are only two people

7          involved.

8               MR. GALLAGHER:  You don't have to do

9          anything, Judge.  All you have to do is hear

10         the arguments by Mr. Hecker, Judge, with regard

11         to Mr. Maignan.

12              MR. HECKER:  Judge, the facts of this case

13         are not in dispute as to Fritz Maignan, Your

14         Honor.

15              He was from New York.  He gave the Court

16         his address in Harlem.  He came down to Florida

17         pursuant to a confidential informant by the

18         name of Joe Clarke.  The name Stizzo, which was

19         his street name, he said was given to the agent

20         Heath Anderson.  And Anderson began an

21         investigation.

22              Now, if the factual circumstances are not

23         in dispute and Fritz Maignan establishes that

24         the government induced him to commit the

25         offense charged -- And let's stop there for a

74

1    minute.  There are -- Mr. Fritz Maignan has no

2    prior drug arrests or drug involvements

3    whatsoever.  The Court did not hear any

4    testimony to the contrary and therefore, it

5    would be the defense's position that he's not a

6    proper target or a known drug dealer for a

7    confidential informant to go after.

8        Now, the testimony of Heath Anderson was

9    when an individual was documented, and Joe

10   Clarke was a documented C.I., they are told and

11   given parameters of who they may target.  And

12   it's supposed to be known drug dealers, people

13   in the trade, and are not allowed to go out and

14   make new crimes.

15       Now, the State must demonstrate evidence

16   of predisposition prior to and independent of

17   the government's action in this case.  And that

18   is found in the Munios case on page - I think

19   it's headnote seven.  That would be on page one

20   hundred.

21       So Your Honor, the Court by this case is

22   not even permitted to look at the conduct that

23   happened in this particular case at all.  The

24   government must prove a predisposition prior

25   and independent.  And the government has failed

1    to do so.

2        It is allowed to bring in a prior record

3    of the Defendant.  The government has not

4    brought in a prior record of the Defendant

5    regarding this case.

6        They're even allowed to bring in what

7    would be considered Williams rule or cases not

8    even establishing Williams rule, evidence of

9    people that had seen Mr. Maignan with drugs or

10   Mr. Maignan selling drugs or anything along the

11   like.  The State has not done that.

12       What the State has done is brought in the

13   case at issue.  And clearly this case says

14   you're not allowed to do that.

15       Now, what we're arguing to the Court is

16   the fact that Fritz Maignan was not a proper

17   target, that Fritz Maignan has no disposition -

18   excuse me, predisposition to commit this crime

19   prior and independent of the actions contained

20   in this particular case.  That evidence has

21   been presented uncontroverted that a paid

22   confidential informant - an individual, Your

23   Honor, that I would point out that may or may

24   not be paid based upon whether a prosecution

25   has been done or not.

1          Anderson testified that that was one of

2     the criteria that was used, and that in this

3     particular case the confidential informant was

4     not paid and that may have been because the

5     federal government had passed on this case and

6     the prosecution was not brought.

7          But again, I don't believe the government

8     has made its required findings under the Munios

9     case.  And I believe the Defendant has properly

10    showed the case showed to the Court by a

11    preponderance of the evidence, which is a

12    rather low standard, that he was not

13    predisposed to commit this, and but for the

14    actions of the paid informant, Joe Clarke,

15    Mr. Fritz Maignan would not be before the Court

16    today.

17          Thank you, Your Honor.

18          THE COURT:  State?

19          MR. GALLAGHER:  Thank you, Judge.

20          Judge, a standard of preponderance of the

21    evidence means that it's more likely than not

22    that this is true.

23          To establish that in this case, you're

24    asked to assess the credibility of Fritz

25    Maignan.  If your assessment of his credibility

77

1     is that you do not believe him and the defense

2     has not met the first hurdle in showing to the

3     Court under the two-prong test that by a

4     preponderance of the evidence that Fritz

5     Maignan was entrapped, what do you have for

6     evidence to assess his credibility?

7          Mr. Maignan told you that four or five

8     times he was contacted by a person who on

9     direct examination he didn't even remember the

10    guy's name.  I had to refresh his recollection

11    on cross-examination.  He was contacted four or

12    five times by Joseph Clarke, that they were

13    face-to-face meetings and, according to Fritz

14    Maignan, that he was teased into doing a drug

15    deal.

16         Now, this is while Fritz Maignan was in

17    Harlem, New York.  Now, I'm no geography

18    student.  It's a couple thousand miles away.

19    And he was told that he was going to make some

20    quick money if he did this drug deal.

21         Now, that's what Fritz Maignan is claiming

22    to have you believe entrapped him into doing

23    this drug deal.

24         Now, that would make sense, Judge, if it

25    was a situation where someone was gonna pay

1       Fritz Maignan's way down to South Florida and

2       Fritz Maignan was gonna sell cocaine instead of

3       buy cocaine because, yeah, you could sell

4       cocaine and make quick money.  Well, maybe you

5       could act as a mule for someone and move

6       cocaine from point "A" to point "B" to get some

7       quick money.  That would make sense.

8           But here's what this case is about.  Fritz

9       Maignan told you he paid for a jet plane ticket

10      from New York to South Florida, not to act as a

11      mule, not to sell cocaine to make money, to

12      purchase two kilograms of cocaine for $33,000.

13          Now, he wants you to believe that he got

14      into this deal to make quick money, but on the

15      other hand, the deal requires him to come up

16      with $33,000 to buy drugs.  And the defense

17      wants you to believe that that has met their

18      burden by a preponderance of the evidence that

19      he was entrapped.

20          Well, that doesn't make any sense cause if

21      he's gonna make quick money, why would he spend

22      $33,000 to make quick money.  It should be just

23      the reverse.  He wasn't gonna make quick money.

24          So what I'm saying, Judge, is, first of

25      all, no one forced him to get on a plane.  He

1       already admitted to that.  No one held a gun to

2       his head.  No one paid for his ticket down

3       here.  He paid the money.  He got on the plane

4       voluntarily.  He traveled a couple thousand

5       miles.  He came down here to buy two kilograms

6       of cocaine.

7              So under the first prong, I don't think

8       the defense even met their burden of by a

9       preponderance of evidence showing that Fritz

10      Maignan had been entrapped.

11             Well, let's assume that you agree with

12      them, Judge, and you believe that by

13      preponderance of the evidence that the defense

14      has shown that this Defendant Fritz Maignan was

15      entrapped, induced into doing this crime.

16      Mr. Hecker totally misreads the Munios case.

17             Under Mr. Hecker's theory, unless the

18      State or the government can show that someone

19      has a prior drug involvement, well, then they

20      must obviously be entrapped because without

21      that evidence we can't show predisposition.

22      And that's not what Munios says, Judge.

23             On page ninety-nine of the Munios

24      decision, which is the Supreme Court of Florida

25      decision, the Supreme Court of Florida says, if

1          the first question is answered affirmatively,

2      that means the question of whether or not the

3      defense has met its burden, then a second

4      question arises as to whether the accused was

5      predisposed to commit the offense charged.

6          And they define that as being, that is,

7      whether the accused was awaiting any propitious

8      opportunity or was ready and willing without

9      persuasion to commit the offense.

10          Now, you've heard the testimony in this

11      case and saw the actions of Fritz Maignan in

12      this case indicate a person who was awaiting a

13      propitious opportunity to commit the offense if

14      the opportunity presented itself, that he was

15      ready and willing to commit the offense to such

16      an extent that he was gonna rip off Special

17      Agent Anderson, that he set up a dummy roll,

18      even though he claims it wasn't him, that he

19      set up a dummy roll of money to make it look

20      like he had $33,000 just so they could steal

21      the drugs from Special Agent Anderson.

22          When Mr. Hecker tells the Court that you

23      can't even look at this case to make a

24      determination as to the predisposition, I'd ask

25      the Court to take a look further down on that

81

1      page, page ninety-nine, where the Supreme Court

2      of Florida says, thus an agent deploy to stop

3      the traffic in illegal drugs may offer the

4      opportunity to buy or sell drugs and if the

5      offer is accepted, make an arrest on the spot

6      or later.

7           The entrapment defense is of little use

8      because the ready commission of the criminal

9      act aptly demonstrates the Defendant's

10     predisposition.

11          So the Supreme Court of Florida tells Your

12     Honor that in exactly this situation where the

13     agent for the federal government has presented

14     an opportunity for the Defendant to ready and

15     willingly enter into this criminal act and he

16     does so, that indicates his predisposition.

17          So if the Court makes a finding, which I

18     don't think there's evidence to support, but if

19     the Court makes a finding that the defense has

20     carried its burden by a preponderance of the

21     evidence to show that Fritz Maignan was not

22     predisposed to commit this offense, then I ask

23     the Court to assess his predisposition based on

24     the facts presented to the Court and that

25     clearly shows a readiness and a willingness to

82

1      commit this trafficking offense.  And based

2      upon that, he has not been entrapped.

3           I'm gonna ask you to deny the motion.

4           Thank you.

5           THE COURT:  If I go further --

6           MR. HECKER:  Judge, I have just one very

7      brief response.

8           This is on page one hundred.  I don't

9      believe I confused the Munios case, but I

10     believe the section that the State has cited to

11     you is absolutely different.

12          As the Court knows, entrapment is

13     something that happens prior to the crime being

14     committed and the crime that actually occurs.

15     And there's no argument that Fritz Maignan came

16     down here that the - for the two kilos of

17     cocaine, but I would point out to the Court the

18     bottom of page one hundred.  The State must

19.    demonstrate sufficient evidence of

20     predisposition prior to and independent of the

21     government's conduct at issue.

22          So what this agent did is absolutely

23     irrelevant at this particular point.  You must

24     find something outside of what happened here

25     for his predisposition.  And I don't think

83

1       that's been shown.

2            MR. GALLAGHER:  If that were the case, the

3       Supreme Court of Florida would not have put

4       what I told you in their opinion.

5            THE COURT:  Court herein finds that the

6       Defendant had a job in New York.  It wasn't a

7       high paying job so he was susceptible possibly

8       to mere earning more money somewhere else and

9       agent, apparently after several contacts with

10      the Defendant, had let him know that such is

11      available in Florida.  Exactly how this came

12      about the Court is uncertain.

13           The Defendant, Fritz Maignan, would like

14      me to believe that the agent approached him and

15      constantly induced him to go to Florida to make

16      quick money.  I will go so far as to say that

17      possibly it's believable that he presented him

18      such a situation that money is available in

19      Florida for drugs.  However, I am not convinced

20      that he was induced by Joe Clarke, the

21      confidential informant.

22           The State must get over the -- The

23      Defendant must get over the threshold to show

24      that there's a preponderance of the evidence

25      that he was induced wrongfully to commit this

84

1          crime, that he was not - had any propensity to

2          commit.

3              I can't say that because the Defendant's

4          evidence that he's presented in the surrounding

5          circumstances as well as the - certainly the

6          Defendant testifying himself, so I must view

7          that evidence from which the Defendant presents

8          that evidence himself and that is the

9          Defendant's testimony which is subject to

10         cross-examination.

11             So we have from that evidence and

12         cross-examination that he was communicated with

13         by Joe Clarke in New York.  Ultimately Joe

14         Clarke told the agent in Florida about him,

15         Stizzo, the Defendant Fritz, his beeper that he

16         would be communicated with in Florida.

17             Now, when the - when he was examined here

18         today in his first dealing with drugs, suddenly

19         we have a sophisticated deal which I find very

20         unusual that they're going to rip off not 100

21         or $200 or three or $400 but $33,000 worth of

22         drugs with a phony roll with some money on the

23         outside and eight hundred one-hundred dollar

24         bills on the inside.  This is a very unusual

25         type, sophisticated type - quote - ripoff, for

1       lack of another word, for a person first in the

2       deal or drug dealing.

3           More than that, Defendant has an absence

4       of memory of such a thing and yet this is his

5       first dealing.  I find that his absence of

6       memory regarding that puts his credibility in

7       question.

8           In fact, he has an absence of memory

9       concerning Sam Taylor.  He has an absence of

10      memory in several items.  And because of this

11      absence of memory that he has, I find his

12      absence of memory extraordinarily unusual for a

13      person whose first dealing having come to Miami

14      not even know - his absence of memory how much

15      it costs to fly to New York - to Florida, and

16      yet he knows enough to get the money from his

17      sister allegedly for rent and perhaps to

18      deceive her.  It's going to go for drugs.

19          All of this leads me to believe that the

20      Defendant's credibility is highly in question.

21      And yet it is his credibility that I must rely

22      upon in order to find by a preponderance of the

23      evidence that he was entrapped.

24          And with that credibility in question and

25      the manner of the way - and its hurry up to get

1      this done and to rip off the drugs within a day

2      or two not knowing about the phony bills or Sam

3      Taylor and a gun being used and the whole

4      surrounding circumstances leads me to believe

5      that the Defendant has not sustained its burden

6      by a preponderance of the evidence based upon

7      that as a single source of the evidence to

8      support his entrapment, other than the totality

9      of the circumstances that was presented to me

10     by both the Defendant and the agent that the

11     State presented.  So I don't believe they have

12     met the burden.

13         Now, I'll also make the observation the

14     C.I. was not on commission, getting a certain

15     amount of money to produce this man or on any

16     commission or amount of money or of deals he's

17     gonna create.  So merely because they have

18     presented an opportunity to him, the Defendant,

19     Fritz Maignan, was certainly ready, willing and

20     able to jump on this opportunity.

21         I find based upon the totality of the

22     evidence, credibility of the witnesses and that

23     he took advantage of it, came to Florida and

24     then continued on with what he wanted to do and

25     that is to rip off drugs and make a profit,

87

1    motion is respectfully denied.

2         MR. HECKER:  Thank you, Your Honor.

3         MR. GALLAGHER:  Thank you, Judge.

4         THE COURT:  Thank you for the case law in

5    that regard.

6         I'm handing it back to you in case it

7    should come up again.

8         MR. HECKER:  Thank you, Judge.

9         Would the Court like it for the file?  I

10   made extra copies.

11        THE COURT:  I may want it also for

12   purposes in the event there's a hearing on his

13   brother.

14        MR. HECKER:  Very good, Your Honor.

15        (Thereupon, the proceedings were concluded.)

16

17

18

19

20

21

22

23

24

25

88

1

2

3                          CERTIFICATE

4

5    STATE OF FLORIDA    )
                          )
6    COUNTY OF BROWARD    )

7                I, CINDY HART, certify that I was
     authorized and did stenographically report the
8    foregoing proceedings and that the transcript
     is a true record, dated this 1st day of
9    November, 1996.

10

11          _____ Cindy Hart _____
            CINDY HART
12          Registered Professional Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT    F

| [ ]  17th Judicial Circu... .n and for Broward County<br>[ ]  In the County Court in and for Broward County | CLOCK IN |
|---|---|
| **DIVISION:**<br>**APPELLATE**    RECORD-ON-APPEAL FROM THE COUNTY COURT<br>OF THE SEVENTEENTH JUDICIAL CIRCUIT<br>IN AND FOR BROWARD COUNTY. FLORIDA<br>CRIMINAL DIVISION | |

FRITZ MAIGNAN      Appellant

VS.

...ATE OF FLORIDA      Appellee

CASE NO.
95-14021CF10B
APPEAL NO. 96-2152

RECEIVED
OFFICE OF THE
ATTORNEY GENERAL

SEP 1 0 1996

CRIMINAL OFFICE
WEST PALM BEACH

RICHARD L. JORANDBY (15TH P.D.)

ATTORNEY FOR APPELLANT


GEORGINA JIMENEZ-OROSA

ATTORNEY FOR APPPELLEE

1    State of Florida )
                     : SS
2    County of Broward)

*4-0283*

3

4              IN THE CIRCUIT COURT OF THE
               SEVENTEENTH JUDICIAL CIRCUIT,
5          IN AND FOR BROWARD COUNTY, FLORIDA

6                                        COPY

7    STATE OF FLORIDA,        )
                              )
8              Plaintiff,     )
                              )
9         vs.                 ) CASE NO. 95-14021CF10B
                              )
10   FRITZ MAIGNAN,           )
                              )
11             Defendant.     )
     _____)

12

13

14

15

16

17         - - - - - - - - - - - - -
          APPEAL ON BEHALF OF THE DEFENDANT FRITZ MAIGNAN
18         - - - - - - - - - - - - -

19

20   APPEARANCES:

21        JOHN GALLAGHER, ESQUIRE,
          Assistant State Attorney,
22        Appearing on behalf of the State.

23        SCOTT HECKER, ESQUIRE,
          Appearing on behalf of the Defendant Fritz Maignan.
24
          MICHAEL HOLDEN, ESQUIRE,
25        Appearing on behalf of the Defendant Katan Maignan.

1                    I - N - D - E - X

2    DATE              PROCEEDINGS              PAGES

3    6-10-96           Opening Statement
                       State                      11
4                      Defendant Katan Maignan    20
                       Defendant Fritz Maignan    27
5

6

7    WITNESS                                    PAGE

8    6-11-96

9    HEATH ANDERSON

10
     Direct Examination by Mr. Gallagher         38
11   Cross Examination by Mr. Holden             99

12   6-12-96

13   Cross Examination by Mr. Hecker            177

14   MIKE HARRELL

15   Direct Examination by Mr. Gallagher        214
     Cross Examination by Mr. Holden            218
16
     TOMMY LONG
17
     Direct Examination by Mr. Gallagher        222
18   Cross Examination by Mr. Holden            242

19   CHRIS HOCK

20   Direct Examination by Mr. Gallagher        248
     Cross Examination by Mr. Holden            254
21
     SY LIPPMAN
22
     Direct Examination by Mr. Gallagher        257
23   Cross Examination by Mr. Holden            263

24   Charge Conference                          282

25

```
 1                    I - N - D - E - X (CONTINUED)

 2      6-13-96

 3      WITNESS                                          PAGE

 4      FRITZ MAIGNAN

 5      Direct Examination by Mr. Hecker                 294
        Cross Examination by Mr. Holden                  305
 6      Cross Examination by Mr. Gallagher               307
        Redirect Examination by Mr. Hecker               340
 7
        KATAN MAIGNAN
 8
        Direct Examination by Mr. Holden                 342
 9      Cross Examination by Mr. Gallagher               347
        Redirect Examination by Mr. Holden               362
10

11      DATE                     PROCEEDINGS             PAGE

12      6-13-96                  Closing Argument
                                 Defendant K. Maignan    381
13                               Defendant F. Maignan    397
                                 State                   410
14
        6-14-96                  Jury Instructions       439
15                               Verdict                 456

16

17

18

19

20

21

22

23

24

25
```

```
1              I - N - D - E - X (CONTINUED)

2

3                        EXHIBITS

4    STATE'S                                    PAGE

5    Exhibit No. 1          Audiotape            46

6    Exhibit No. 2          Audiotape            50

7    Exhibit No. 3          Videotape            56

8    Exhibit No. 4          Audiotape            61

9    Exhibit No. 5          Audiotape            80

10    Exhibit No. 6          Videotape            90

11    Exhibit No. 7          Document            217

12    Exhibit No. 8          Document            217

13    Exhibit No. 9          Photograph          225

14    Exhibit No. 10         Photograph          225

15    Exhibit No. 11         Photograph          225

16    Exhibit No. 12         Photograph          225

17    Exhibit No. 13         Photograph          225

18    Exhibit No. 14         Photograph          225

19    Exhibit No. 15         Photograph          230

20    Exhibit No. 16         Photograph          233

21    Exhibit No. 17         Firearm             241

22

23

24

25
```

1   State of Florida )

2                    :  SS

3   County of Broward)

4

5

                    IN THE CIRCUIT COURT OF THE
6                   SEVENTEENTH JUDICIAL CIRCUIT,
                 IN AND FOR BROWARD COUNTY, FLORIDA
7

8

    STATE OF FLORIDA,        )
9                            )
            Plaintiff,       )
10                           )
        vs.                  ) CASE NO. 95-14021CF10B
11                           )
    FRITZ MAIGNAN,           )
12                           )
            Defendant.       )
13   _____)

14

15       Proceedings had and taken before the Honorable

16   ROBERT W. TYSON, JR., one of the Judges of said Court, at

17   the Broward County Courthouse, Fort Lauderdale, Broward

18   County, Florida, on the 10th day of June, 1996, commencing

19   at or about 1:30 o'clock p.m., and being a Jury Trial.

20                                              6/10/96

21   APPEARANCES:

22       JOHN GALLAGHER, ESQUIRE,
         Assistant State Attorney,
         Appearing on behalf of the State.
23
         SCOTT HECKER, ESQUIRE,
24       Appearing on behalf of the Defendant Fritz Maignan.

25       MICHAEL HOLDEN, ESQUIRE,
         Appearing on behalf of the Defendant Katan Maignan.


                BROWARD REPORTING SERVICE   (954) 763-1382

1     Thereupon:

2          The following proceedings were had:

3          THE COURT: Counsel and accused are present.

4          State ready?

5          MR. GALLAGHER: Yes, sir, Your Honor.

6          THE COURT: Defendant ready?

7          MR. HECKER: Yes, Judge.

8          MR. HOLDEN: Throughout the discovery process,

9     and Mr. Gallagher's previous encounter with the

10    motion to reduce defendant's bond, I learned that a

11    big thrust of the State's case is that they believe

12    this was an intended rip off of the officers by my

13    client, the defendant, my client, Katan Maignan.

14          Your Honor, this kind of testimony by the

15    officer or witnesses would be incredibly prejudicial,

16    particularly where he is not charged with that crime.

17          He is only charged with one count of conspiracy

18    to traffic in cocaine and one count of carrying a

19    concealed firearm.

20          Now, the carrying a concealed firearm occurred

21    after he was arrested.  It wasn't on his body, it was

22    in the vehicle.

23          The State is going to put on all the testimony

24    it needs to as to that without trying to let the jury

25    think that the gun was going to be used in an attempt

1          to rip off the officer.

2               Now, the defendant is not charged with armed

3          robbery, he is not charged with armed trafficking in

4          cocaine. He is charged merely --

5               THE COURT: I will not entertain the argument.

6               MR. HOLDEN: I would point out to the Court he

7          is charged with conspiracy to traffic and anything

8          else is so prejudicial it would outweigh any

9          probative value.

10              THE COURT:  What say the State?

11              I heard the argument. The thrust is that he is

12         going to be ripped off by the use of a gun.  Is that

13         what you are saying?

14              MR. HOLDEN: The agent believed there is a

15         possibility this particular defendant was going to

16         rip them off of drugs and/or money.

17              THE COURT: By the use of a firearm arm.

18              MR. HOLDEN:  I believe so, yes.

19              THE COURT: That's what they were going to do,

20         point a firearm and then take the drugs and keep the

21         money?

22              MR. GALLAGHER: That's our position in this case

23         is that they made it appear as if they wanted to

24         purchase the two kilograms for $33,000 when in fact

25         what they were going to do is show a bundle of money

1        including 800 $1 bills, larger bills on the outside,

2        to make it appear as it was $33,000 and pull a gun on

3        Heath Anderson and take his cocaine.

4              That is what they are charged with, conspiring

5        to traffic in cocaine.  The way they were going to

6        traffic in cocaine was by ripping the drugs off.

7              If you disallow that kind of testimony, you are

8        cutting the guts out of our case.  That's the thrust

9        of our prosecution, that this was a drug ripoff from

10       day one and the way they were going to traffic is by

11       ripping the drugs off.

12             MR. HOLDEN: Your Honor, in response, the money

13       was never shown.  There was no money ever shown by

14       the defendant.  He never took the agent to the

15       vehicle and refused to go over to theirs.  No cocaine

16       was shown, no money was shown, no gun was found on

17       the defendant. It was up under the floor, an empty

18       firearm, no bullets or clip.  No money was found on

19       his person.  It was in the vehicle.

20             To have the defendant charged or have evidence

21       come in about a crime that he is not charged with,

22       again, he is not charged with armed trafficking.

23             THE COURT:  Motion denied.

24             Anything further?  Escort the jury in.

25             We have twenty-eight jurors they have given us,

1       gentlemen.

2              MR. HOLDEN: Before we do this, perhaps there

3       was a hearing while I was out of town last week,

4       there was a hearing in my absence as to the issue of

5       the entrapment defense which I had adopted as a

6       motion.

7              I believe the Court heard testimony on that

8       issue and ruled.  I don't know if the Court wants to

9       rule as well as to my client at this time.

10             THE COURT: Motion to suppress is respectfully

11      denied.

12             MR. GALLAGHER: Motion to dismiss.

13             THE COURT: Motion to dismiss is respectfully

14      denied pursuant to the law.  I will allow this to go

15      to the jury.

16             (Thereupon, the prospective jury entered the

17      courtroom, and the following proceedings were had

18      within the presence of the prospective jury:)

19             THE COURT:  The matter before the Court is the

20      State of Florida versus Katan Maignan and Fritz

21      Maignan.

22             Counsel for State ready proceed to trial?

23             MR. GALLAGHER: Yes, Judge, we are ready for

24      trial.

25             THE COURT: Counsel for defendant ready to

1    proceed to trial?

2         MR. HOLDEN: Yes, we are, Your Honor.

3         MR. HECKER: Yes, Your Honor.

4         THE COURT:  Defendants present?

5         MR. HOLDEN: Yes.

6         MR. HECKER: Yes.

7              *    *    *    *    *    *

8         (Thereupon, a jury was duly empaneled.)

9         THE COURT:  Members of the jury, do you have

10   any questions about your jury duty?

11        No questions.

12        Members of the jury, we are going to have

13   opening statements here.  We are then going to recess

14   for the evening, for the day, and return tomorrow at

15   1:30 tomorrow afternoon.

16        With that having been said, at this time the

17   attorneys for both parties will have an opportunity

18   to make their opening statements in which they may

19   explain the issues in this case and summarize the

20   facts that they expect the evidence will show.

21        After all the evidence has been received, the

22   attorneys will again have an opportunity to address

23   you and to make their final arguments.

24        The statements that the attorneys now make and

25   the arguments that they later make are not to be

1    considered by you either as evidence in this case or

2    as your instructions on the law.

3         Nevertheless, the statements and arguments are

4    intended to help you properly understand the issues,

5    evidence and the applicable law so you should give

6    them your close attention.

7         Mr. Gallagher, you may proceed.

8         MR. GALLAGHER: Thank you, Judge.

9         This case got started according to Special

10   Agent Heath Anderson of the Drug Enforcement

11   Administration on August 8th, 1995.  He had an

12   informant by the name of Joseph Clark who was living

13   somewhere in New York, who had met the defendant

14   Fritz Maignan in New York, and they got into some

15   conversation and Fritz at that time was known as

16   Stizzo, a nickname that he had.

17        The informant Clark notified Special Agent

18   Anderson that Stizzo would be travelling to South

19   Florida for the purpose of doing some business, some

20   drug business.

21        Special Agent Anderson inquired of how he would

22   reach out for Stizzo and he was given a beeper

23   number.

24        Upon being notified that Fritz Maignan had

25   appeared in South Florida and was ready to do some

1      drug business, Special Agent Anderson reached out for

2      him and they had a phone conversation August 8th,

3      1995.

4          In that conversation, Fritz Maignan, known as

5      Stizzo at that time, indicated to Special Agent

6      Anderson that he was seeking to purchase a large

7      amount of cocaine, that he was seeking to purchase

8      two kilograms of cocaine.  A kilogram is one thousand

9      grams of cocaine.  He wanted two of them,

10     approximately 2,000 grams of cocaine.

11         Stizzo indicated that he would be working with

12     his brother, the co-defendant in this case, Katan

13     Maignan, who later became known to Special Agent

14     Anderson as Slow.  That was his nickname.

15         Special Agent Anderson talked to Stizzo on

16     August 8th, 1995 and told him that he had the cocaine

17     but some of the cocaine was wet, it was not a good

18     quality,, and Fritz Maignan indicated it didn't

19     matter because he was going to cook it up anyway into

20     crack cocaine.

21         A price was quoted by Special Agent Anderson as

22     to what he would sell the cocaine for and it was

23     agreed upon by Fritz Maignan that they would purchase

24     the cocaine, the two kilograms of cocaine for $16,500

25     per kilogram, for a total of $33,000, and Fritz

1       Maignan agreed with Special Agent Anderson that Fritz

2       and his brother would meet with Special Agent

3       Anderson who at that point was posing as a drug

4       dealer, and that Special Agent Anderson would bring

5       his man, allegedly another guy who was the source for

6       the cocaine, a person by the name of Detective Sam

7       Tatum of the Boca Raton Police Department and Tatum

8       and Anderson would pose as the sources for the

9       cocaine for Fritz and his brother Katan.

10           That meeting took place the following day,

11      August 9th, 1995.  On August 9th, 1995, Fritz and

12      Katan Maignan met with Sam Tatum and Special Agent

13      Anderson at McDonald's Restaurant on Coconut Creek

14      Parkway or Boulevard here in Broward County, and they

15      discussed the deal.

16           There is a videotape so you will get to see the

17      four of them conversing.  Unfortunately, the audio is

18      poor.  You will not be able to hear the contents of

19      the conversation.  In fact, it's going to be a

20      problem that runs through this case.  You will see

21      that some of the audio tapes and this videotape has a

22      serious audibility problem.  It's hard to

23      understand.

24           You have to listen very carefully on some of

25      the audio tapes as to what is being said, but in this

1          videotape, you are able to see both defendants meet

2          with Special Agent Anderson and Detective Sam Tatum

3          of Boca Raton Police Department and you will hear

4          Special Agent Anderson tell you what that meeting was

5          all about.

6               Clearly there was only one purpose, because he

7          works for the Drug Enforcement Administration, and he

8          is trying to catch people who are involved in drug

9          dealing, so Special Agent Anderson will tell you that

10         the negotiations took place on August the 9th, 1995,

11         involving Katan and Fritz Maignan wherein they agree

12         to purchase two kilograms of cocaine at a price of

13         $33,000.

14              Now, the following day, August 10th, 1995, a

15         series of phone conversations ensued. At a meeting on

16         the 9th, Special Agent Anderson indicated they would

17         do the deal in Boca.

18              Well, in one of the phone conversations on the

19         10th, the Maignans indicate they are not happy with

20         the Boca Raton location to do the transaction, they

21         would feel more comfortable doing it at a different

22         location.

23              Special Agent Anderson informed them that he

24         had another location where they could consummate this

25         transaction.

1    In informed them that they can do the deal on

2    Hallandale Beach Boulevard at a Denny's Restaurant,

3    and they seemed to be pleased with that decision to

4    change the location for the drug transaction.

5    Phone calls take place back and forth, and what

6    happens is, as you will find from the evidence, is

7    that the Maignans only want to deal with Special

8    Agent Anderson.  They don't like Special Agent

9    Anderson bringing this other detective along, this

10    other alleged drug dealer, a bigger fellow than

11    Special Agent Anderson.

12    You will see that Special Agent Anderson is not

13    a particularly large fellow, and the Maignans only

14    want to deal with Special Agent Anderson, Heath

15    Anderson and they basically argue over the fact that

16    well, I tell you, I got to bring -- Special Agent

17    Anderson says I have to bring Sam.  He is my guy.  He

18    comes with the dope because he's the guy giving the

19    dope to use in the deal.

20    But they are not happy with that and at some

21    point on August 10th, 1995, because the Maignans

22    aren't able to persuade Special Agent Anderson to

23    come by himself, the deal is terminated and then

24    regenerated on a subsequent phone call from Katan

25    Maignan, where he agrees to do the deal where it is

1    going to be Katan Maignan and Special Agent Anderson

2    and Fritz Maignan would be nowhere around, as long as

3    Special Agent Anderson doesn't bring Same Tatum, and

4    the deal is set for the following day, August 11th,

5    1995.

6        On August 11th, 1995, Special Agent Anderson

7    goes to the Denny's on Hallandale Beach Boulevard in

8    Hallandale, Florida, and what he finds is that both

9    Fritz and Katan are at the location.  They show up at

10   different times, but they are both there and Special

11   Agent Anderson is saying, you know, what is going on?

12   We had a deal it would be me and Katan or Slow, which

13   is his nickname, not me and Stizzo, which is Fritz's

14   nickname and Slow, not the three of us, but one on

15   one.

16       So Special Agent Anderson convinces Katan

17   Maignan to his displeasure to have Fritz leave the

18   scene, and Fritz leaves, and that leaves Special

19   Agent Anderson and Katan Maignan in a one-on-one

20   situation to consummate a two kilogram cocaine

21   transaction in the parking lot of the Denny's

22   Restaurant on Hallandale Beach Boulevard on August

23   11th, 1995.

24       This is on video and it will have some audio

25   that you can hear.  I will turn that TV up as loud as

1       I can so you can hear it.  If you can't hear it, when

2       you go back to deliberate, you can turn it up as loud

3       as you want, but what happened is Katan Maignan is

4       now not happy with this situation even though they

5       had agreed previously that it would be one on one,

6       he's not happy that it's one on one now and he's

7       asking Special Agent Anderson do you have a gun or

8       are you wired and he starts to pat down Special Agent

9       Anderson.

10          And Special Agent Anderson says hey, I have a

11      nine millimeter. He tells Katan that he has a gun.

12      Now Katan is real nervous.  Now he truly doesn't want

13      to do the deal.

14          Why?  Why doesn't this man want to do the deal

15      that he had negotiated for?  Well, the reason is

16      folks, is that he, Katan Maignan and Fritz Maignan,

17      did not have $33,000 to purchase two kilograms of

18      cocaine.

19          They had brought to this drug deal $1,750 in

20      cash and you know how it was bound up?  Eight $100

21      bill, three $50 bills and eight hundred $1 bills.

22          Why would they bring money like that to this

23      drug deal?  Because they wanted it to appear as if

24      they had $33,000 to buy these two kilograms of

25      cocaine so when it becomes Katan and Special Agent

1    Anderson and Katan finds out that Special Agent

2    Anderson has a gun, well, what the videotape will

3    show you is a very unhappy Katan Maignan wandering

4    around the parking lot of the Denny's and Winn Dixie

5    in the area, walking away from Special Agent

6    Anderson.

7         He get in his car, starts to drive away and he

8    is arrested, not because he didn't what to traffic in

9    cocaine, which he had agreed to do with his brother,

10    Fritz, but because the way he wanted to do it was not

11    the way it was going to happen.

12         I am sure his lawyers will get up here and tell

13    you that when he walked away from the deal, he

14    abandoned his criminal purpose, his criminal intent.

15    He withdrew from the criminal intent to traffic in

16    cocaine.

17         But all this man did was walk away from the

18    situation that he didn't want to occur, that means

19    one on one where he was going to have to take Special

20    Agent Anderson over to his car which had a gun in it,

21    and this $1750 that was made to look as if it was a

22    lot more, $33,000, and when Katan realized it was one

23    on one and not he and his brother who would be able

24    to rip this special agent off for two kilograms of

25    cocaine --

1          MR. HOLDEN: I would like to object to

2     Mr. Gallagher using the expression ripped off.  He is

3     clearly trying to inflame the jury at this point.

4          THE COURT:  Objection overruled; you may

5     continue with opening statements.

6          MR. GALLAGHER: When they saw that they weren't

7     going to be able to rip this special agent off, they

8     did not abandon their criminal purpose, but they

9     delayed its consummation because it wasn't going to

10    go down the way they had it set up, because now it

11    was one on one and it's too chancey for Katan Maignan

12    to rip off Special Agent Anderson when it's just him

13    and Special Agent Anderson.

14         Well, he gets arrested when he gets in his car

15    by surveillance.

16         Now Fritz, who had taken off after Special

17    Agent Anderson says I won't deal with two of you,

18    just one of you, is then re-contacted and Special

19    Agent Anderson puts on a charade and tells Fritz

20    Maignan that hey, I don't know what is going on, your

21    brother is sitting in the car, he has the windows up,

22    he's not talking to anybody, I don't know why he

23    doesn't want to finish this deal out, whereupon

24    subsequent to that, Fritz Maignan appears back on the

25    scene where the drug deal was to be consummated and

1        when he sees that the police are going to arrest him,

2        he takes off, and they have to run him down and

3        arrest him.

4                So what this case is about, folks, is about two

5        guys, Katan and Fritz Maignan, who want to steal two

6        kilograms of cocaine.  They had the gun and they had

7        the money set up as if it were to look like $33,000,

8        when in fact it was only $1750, but it didn't work

9        because Special Agent Anderson was too smart for

10       them.

11               They agreed, and you will hear from the

12       testimony, they agreed to purchase cocaine but only

13       wanted to purchase it at their price, at their rate,

14       $1750.  They didn't have $33,000.  They were going to

15       steal it.

16               That's what this case is all about.  Thank you;.

17               THE COURT: I will leave it up to the two of

18       you.

19               MR. HOLDEN: I will go first.

20               Hi guys, we are back again and now we have a

21       situation where Mr. Gallagher has given you his

22       overview, his perception of the case.

23               He hasn't talked about reasonable doubt, which

24       is something I will talk about a little right now.

25               For you to find Katan Maignan and Fritz Maignan

1          guilty, you have to find that they completed every

2          element of the crime that the judge reads to you.

3              Mr. Gallagher must prove through his witnesses

4          and the evidence, every element of the crime.

5              Let's start with the crime of carrying a

6          concealed firearm. The evidence will show that the

7          firearm that he is speaking of was not loaded, was

8          under the floor mat of a vehicle that was nowhere

9          near Katan Maignan at the time this offense occurred.

10             In fact, when the defendant was arrested, he

11         showed no knowledge or awareness of the location or

12         of the gun itself.  He showed no knowledge.

13             That's real significant because there is no

14         evidence that they have that they can put on that he

15         had knowledge of the gun or awareness of the gun,

16         where it was, what it was, and again, this is an

17         unloaded gun with no clip in it.

18             A clip, as some of you know, is the item that

19         contains the actual bullets.  So part of the State's

20         case here is that Mr. Maignan was going to use an

21         empty gun that he didn't have with him to complete a

22         drug ripoff.  That's the State's case.

23             You know, the State really wants you to think

24         about the gun as an element of committing the crime

25         here.  What they said earlier is true.  Their whole

1          case is that the defendant ripped off or was going to

2          rip off the officer, but the defendant isn't charged

3          with that.  The defendant is not charged with grand

4          theft. He's not charged with armed robbery.  He is

5          not charged with armed trafficking.  He is charged

6          with conspiracy to traffic in cocaine.

7               Let's go back a step and look at what is a

8          conspiracy.

9               As Mr. Gallagher and the Judge will tell you,

10         conspiracy is when two people get together --

11              MR. GALLAGHER: I will object to any statement

12         of law.

13              MR. HOLDEN: The Court will tell you what a

14         conspiracy is.  When two people --

15              MR. GALLAGHER: Judge, same objection.  This is

16         not Mr. Holden's province.

17              THE COURT: I will allow some latitude.

18              MR. HOLDEN: When the State reads you the

19         instructions on what is a conspiracy, think about the

20         evidence that you heard here in the next few days.

21         Think about the evidence of an agreement, was there

22         an agreement by Mr. Maignan, by Katan Maignan, to

23         agree to do the deal with the police officer.

24              Mr. Gallagher earlier said that the State's

25         evidence will show at some point they dropped out,

1    they withdrew, but later on Katan called the officers

2    and wanted to renew the deal.

3         I believe Mr. Gallagher indicated at one point

4    the deal had been terminated.  Well, it's going to be

5    our position that Mr. Katan Maignan completely

6    withdrew.

7         In fact, you will notice on the videotape that

8    Mr. Gallagher spoke of that Mr. Maignan walked away

9    and didn't want anything to do with the police and

10   the police don't know what to do.  You will hear them

11   speaking in the background.  They don't know whether

12   to arrest him or not, what crime has he committed.

13   At that point, they make a decision to arrest him and

14   you will hear all that and see all that on the

15   videotape.

16        It's interesting that Mr. Gallagher pointed out

17   that Mr. Katan Maignan wasn't happy because it was

18   one on one.  In reality, it was much more than one on

19   one.  It was ten or fifteen on one.  The list of

20   witnesses who were surveilling and who were

21   observing, all of the DEA agents who were there, were

22   there only for Heath Anderson's protection, not for

23   my client. They were there for one reason.

24        Now, Agent Anderson will tell you he was

25   wearing a bullet-proof vest at the time.  He will

1       tell you that he carried a nine millimeter gun for

2       his own protection.

3            He will also tell you that Mr. Maignan never

4       went through with the deal, that he didn't go through

5       with it and he was walking away. In fact, the officer

6       himself was also walking away.  He will tell you that

7       he believed that the deal was not going to be

8       consummated, but that the negotiations -- the

9       negotiations are the crucial part of the State's case

10      to show here that my client agreed to do the crime.

11           Now, Katan never agreed to do it.  He never

12      went through with it. In fact, the people he was

13      talking to were the police, so he told them that he

14      wasn't going to go through with it.

15           If you will, he published it to the police. He

16      let them clearly know that he was not going through

17      with it.

18           They still came after him.  They still wanted

19      him to do it.  They knew he had never committed any

20      crime.  He had never been arrested for any felony

21      before.

22           MR. GALLAGHER: I object.

23           Can we go side bar?

24           (Thereupon, the following proceedings were had

25      at sidebar, outside the hearing of the jury:)

1          MR. GALLAGHER: Perhaps the Court can correct

2     me, but I thought there was an order in limine where

3     no attorney is supposed to talk about a lack of

4     criminal record.  I thought it was an order in limine

5     by the Court.

6          I just heard Mr. Holden get up and talk about

7     the fact his client had never been arrested before.

8     Maybe I misread -- I thought it was set out in number

9     three of your instructions.

10         THE COURT:  Is that correct?

11         MR. HOLDEN: That's correct.  I didn't realize

12    it.  Agent Anderson -- I believe the testimony

13    indicated they knew of no criminal record.

14         MR. GALLAGHER: The only thing I was concerned,

15    I believe that a lack of criminal record, he is

16    improperly introducing character evidence into the

17    courtroom.  An order in limine is very specific as to

18    that.  He just outright flagrantly went around that.

19    He just basically said I know what you said but I

20    will say it anyway.

21         MR. HOLDEN: That was not my intention. My

22    intention was to go with what the testimony of

23    Special Agent Anderson was, knowledge they had of the

24    criminal history of the defendant.

25         MR. GALLAGHER: That's not admissible.  I would

1   have objected.  The order in limine is precluding you

2   to bring it up.

3          THE COURT: Counsel is admonished.

4          MR. HOLDEN: I will strike it.

5          MR. GALLAGHER: Right, unring a bell.

6          (Thereupon, the sidebar was concluded and the

7   following proceedings were had within the hearing of

8   the jury:)

9          MR. HOLDEN: One other item that I want to

10  discuss with you is that Mr. Gallagher indicated

11  there were some aliases or names that the defendants

12  were using, street names. They sounded very scary to

13  me, Stizzo and Slow.

14         You will hear on the tape, on the video and on

15  the audio tapes, the names the different people used

16  when they are referring to each other.  Please make

17  note of that for your memory and please take very

18  careful notice of what you hear on the audio tapes

19  and see on the videotapes.

20         I believe there is a videotape of the date of

21  the arrest, of the time of the arrest I was alluding

22  to earlier.

23         At that audio tape, you will see Katan Maignan

24  walk away from the scene.  You will see with your own

25  eyes, he is not going to do the deal today.  He is

1       not going to do the deal.

2            Also you heard Mr. Gallagher say that they

3       contacted his brother, Fritz, and had him come back

4       to the scene. You will also hear testimony that that

5       occurred six hours later, that it was Agent Anderson

6       or one of the other agents who called Fritz Maignan

7       and had him come to the scene to see what was wrong

8       with his brother.

9            You will also hear that the police were in

10      control of this, that if they decided where the deal

11      would go down, that's where it would go down for

12      their own protection.

13           Last but not least is the fact the government

14      has at its disposal a vast array of resources.  They

15      have the ability to take fingerprints off of certain

16      objects, certain kinds of objects.

17           I ask you to take special note of the fact they

18      have the ability and the technology to obtain certain

19      evidence throughout the trial and I thank you for

20      your consideration.

21           THE COURT: Mr. Hecker.

22           MR. HECKER: Please the Court, counsel, ladies

23      and gentlemen of the jury.

24           I am Scott Hecker. I represent Fritz Maignan.

25           Prior to Fritz Maignan coming to Florida, he

1       was living in New York.  He was working in a clothing

2       and shoe store up there.  His brother was also in New

3       York at the same time.

4              The evidence will show they were contacted by a

5       paid federal government informant referred to as a

6       confidential informant and you may hear some of these

7       agents refer to him as a cooperating individual.

8       Same thing, that's the federal version of

9       confidential informant.

10             This is an individual who apparently was not

11      working off any of his own time, meaning he has not

12      been arrested and he was being paid for the

13      information given and he had been paid in the past

14      for information given and he was supposed to be paid

15      in this case but wasn't.

16             You will also hear evidence that evidence that

17      gave after this case caused his termination from

18      being a confidential informant because that evidence

19      did not prove to be reliable.

20             Now, there is a number of contacts between Joe

21      Clark, that's the confidential informant, and Fritz

22      Maignan in New York, to the point that Fritz Maignan

23      agreed to come to Florida.

24             Now, the evidence is not as the State presented

25      it to you, that Joe Clark called up Heath Anderson

1    and said, we have a couple guys coming down to do

2    business. Fritz Maignan's position, and the evidence

3    will show, Fritz Maignan was contacted, cajoled,

4    harassed, whatever word you want to use, but

5    eventually convinced to come Florida to do this

6    deal. But for the intervention of this cooperating

7    individual, the confidential informant, he wouldn't

8    be here.

9        That's the basis of our entrapment defense.

10       The evidence will also show that a meeting was

11   had as described by the government at McDonald's.

12   Prices were talked about, negotiated and arrived at

13   $16,500 per kilo, a total of $33,000.

14       At no time, the evidence will show, prior to

15   ever this deal occurring in Hallandale, at that

16   McDonald's, did Heath Anderson or anyone ask to see

17   the money.

18       In fact, the evidence will show that despite

19   repeated requests of Heath Anderson, and you will see

20   this on the videotape, Katan Maignan never showed the

21   money or presented this roll of money, the $1750 with

22   the eight hundred $1 bills as described by the

23   government. It was never shown.

24       The evidence will also show that at no time did

25   Katan Maignan ever display the weapon in any fashion

1         to the government.

2              Now, Fritz Maignan's involvement, and remember

3         Fritz Maignan is not charged with possession of a

4         firearm, this deal was terminated, intent, when

5         nobody could agree on how the deal was to happen.

6              There is an abandonment, a withdrawal defense

7         available at this time, which would apply.  With

8         further conversation between Katan, the deal was

9         resurrected again, but when you see the videotape,

10        the ultimate point when the deal was going to go down

11        at Hallandale Beach Boulevard, you will see Fritz

12        leaving.  Fritz has no involvement whatsoever at that

13        point.

14             As pointed out by Michael Holden in his

15        opening, you will hear when they decided to arrest

16        this man, exactly what did they do?  They are not

17        sure.

18             As you watch the videotape of Katan wandering

19        around a parking lot, at no time did he ever bring

20        Heath Anderson to the vehicle which was not there, at

21        no time did he display a gun or show any money.  It

22        got to the point where Heath Anderson is saying, show

23        me fifty bucks and I will show you the coke.

24             Heath Anderson is a government agent. The

25        government was selling the drugs in this case.

1          The evidence will show that but for the

2     intervention of this confidential informant, a

3     cooperating individual, this individual who was paid

4     money to get people arrested, the Maignan brothers

5     would not be here today and it was through that

6     individual's actions, Joe Clark's actions, that this

7     entire thing began.

8          There is no evidence the Maignans had any

9     involvement in drugs prior to this, none.  In fact,

10    Heath Anderson will discuss what is a proper, quote,

11    target, of a confidential informant.  He will let you

12    know exactly how a confidential informant is supposed

13    to approach an individual.

14         The evidence will show he's supposed to

15    approach a known drug dealer, an individual in the

16    trade so to speak, and Heath Anderson will testify he

17    had no such information.

18         He will further testify he never debriefed Joe

19    Clark, prior to even getting involved in this, even

20    run backgrounds on these individuals to see.  He

21    didn't do that.  He did it later and there is no

22    involvement.

23         Fritz Maignan was entrapped.  Katan Maignan was

24    entrapped by the use of a paid governmental

25    informant.  That's defense number one, the evidence

1     will show clearly.

2          The second defense is abandonment, two of

3     them.  One on the 10th when they withdrew and one is

4     on the videotape that you will observe.  You will

5     observe the actions.

6          As I said in voir dire, a picture speaks a

7     thousand words and you will hear it and you will see

8     it.

9          I am sure after you hear all the evidence, you

10    will come to one verdict, which is acquittal for my

11    client.

12         Thank you very much.

13         THE COURT: Members of the jury, we will be in

14    recess as to this case until 1:30 tomorrow afternoon.

15         During that interim time, you are not to

16    discuss this case amongst yourselves or with anyone

17    else or have it discussed in your presence or see,

18    read or hear any news report of this matter.

19         When you return to the court here, return to

20    the jury room.  It would be appreciated if you be

21    here about twenty after 1:00 to make sure we have a

22    punctual start at 1:30.

23         See you at twenty after 1:00.

24         Anything further.

25         MR. GALLAGHER: Nothing from the State, Your

1        Honor.

2              MR. HOLDEN: Nothing, Your Honor.

3              MR. HECKER: Nothing, Judge.

4              THE COURT: Have a very nice evening. Thank

5        you.

6              (Thereupon, the proceedings were concluded at

7        4:50 o'clock p.m., to reconvene the following day,

8        June 11, 1996, commencing at or about 1:30 o'clock

9        p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1      State of Florida )
                         :  SS
 2      County of Broward)

 3

 4                  IN THE CIRCUIT COURT OF THE
                    SEVENTEENTH JUDICIAL CIRCUIT,
 5             IN AND FOR BROWARD COUNTY, FLORIDA

 6

 7      STATE OF FLORIDA,        )
                                 )
 8               Plaintiff,      )
                                 )
 9          vs.                  )  CASE NO. 95-14021CF10B
                                 )
10      FRITZ MAIGNAN,           )
                                 )
11               Defendant.      )
        _____ )
12

13

14          Proceedings had and taken before the Honorable

15      ROBERT W. TYSON, JR., one of the Judges of said Court, at

16      the Broward County Courthouse, Fort Lauderdale, Broward

17      County, Florida, on the 11th day of June, 1996, commencing

18      at or about 1:30 o'clock p.m., and being a Jury Trial.

19

20      APPEARANCES:

21          JOHN GALLAGHER, ESQUIRE,
            Assistant State Attorney,
22          Appearing on behalf of the State.

23          SCOTT HECKER, ESQUIRE,
            Appearing on behalf of the Defendant Fritz Maignan.

24          MICHAEL HOLDEN, ESQUIRE,
            Appearing on behalf of the Defendant Katan Maignan.
25
```

1    Thereupon:

2              The following proceedings were had:

3              THE COURT: We reconvene in the State of Florida

4      versus Katan Maignan and Fritz Maignan.

5              Counsel and accused are present.  It is now

6      about twenty-three minutes to.  Have all the jurors

7      returned?

8              THE BAILIFF: Yes, Judge, they are all here.

9              THE COURT: Does either side desire the rule to

10     be invoked?

11             MR. HECKER: Yes, Your Honor.

12             MR. GALLAGHER: I just have one outside for the

13     time being, Judge.

14             THE COURT: It has been requested that the

15     exclusionary rule be invoked. I grant that request.

16             Speaking to those who are witnesses in this

17     case, the Court has invoked the rule of procedure

18     that requires your exclusion from the courtroom at

19     all times except during the time when you testify in

20     this case.

21             You are directed to remain out of the courtroom

22     except when you are called to testify and while you

23     are waiting to testify and after you have done so,

24     you are not to discuss this case or your testimony

25     among yourselves or with anyone else.

1          You may, however, discuss your testimony with

2     the attorney for either party.

3          You will now please retire from the courtroom

4     after having given your name to the court reporter.

5          MR. ANDERSON: Heath Anderson.

6          THE COURT: Thank you.

7          Counsel for each of the parties are instructed

8     to advise their prospective witnesses of the

9     directions I have given and each will be governed

10    thereby.

11         Any violation may not only subject you to

12    contempt of course but may disqualify a witness or

13    prospective witnesses.

14         MR. GALLAGHER: Judge, I have other witnesses

15    coming at 2:03 and I have the feeling at 2:30, I will

16    probably be in the middle of doing something.

17         Maybe the bailiff step outside and when they

18    see two uniformed officers, they can instruct them

19    that the rule has been invoked. I would appreciate

20    that because I won't be able to do it.

21         THE COURT: Anything further?

22         State ready?

23         MR. GALLAGHER:  Ready, Your Honor.

24         THE COURT:  Defense ready?

25         MR. HECKER: Yes, Your Honor.

1        MR. HOLDEN:  Yes.

2        THE COURT: Bring the jury in, please.

3        (Thereupon, the jury entered the courtroom at

4    1:45 o'clock p.m., and the following proceedings were

5    resumed within the presence of the jury:)

6        THE COURT: You may be seated, ladies and

7    gentlemen of the jury.

8        When you come in like this, every time you are

9    called in, just come in and sit down.

10       Concede the presence of the jury and waive its

11   polling, State?

12       MR. GALLAGHER: Yes, Your Honor.

13       THE COURT: Defense?

14       MR. HECKER: Yes, Your Honor.

15       MR. HOLDEN:  Yes, Your Honor.

16       THE COURT: Have you discussed this case amongst

17   yourselves or with anyone else or have it discussed

18   in your presence or see, read or hear news reports of

19   this matter? Yes or no?

20       THE JURY: No.

21       THE COURT: Those who said yes, raise your

22   hands. No hands. All Ready?  Okay.  You may call your

23   first witness.

24       MR. GALLAGHER: The State of Florida would call

25   Special Agent Heath Anderson.

```
 1      Thereupon:

 2                          HEATH ANDERSON,

 3      having been first duly sworn, was examined and testified

 4      upon his oath as follows:

 5              THE CLERK: Please state your name and spell

 6          your last name.

 7              THE WITNESS: My name is Heath Anderson,

 8          A-n-d-e-r-s-o-n.

 9              MR. GALLAGHER: May I proceed, Judge?

10              THE COURT: Yes, sir.

11                      DIRECT EXAMINATION

12      BY MR. GALLAGHER:

13          Q.   By whom are you employed?

14          A.   Drug Enforcement Administration.

15          Q.   What do you do for the Drug Enforcement

16      Administration?

17          A.   I'm a Special Agent Investigator.

18          Q.   For how long have you been a Special Agent

19      Investigator?

20          A.   Approximately five years.

21          Q.   What did you do before that?

22          A.   Went to college.  I came straight out of

23      college and became an agent.

24          Q.   What is your training and experience for the

25      position you now hold in the Drug Enforcement
```

1    Administration?

2         A.    I attended a fourteen week investigative course

3    which was held at Quantico, the FBI Academy there.

4         Q.    I will call your attention to the month of

5    August 1995.

6               Were you working during the month of August

7    1995?

8         A.    Yes, sir, I was.

9         Q.    With whom were you working?

10        A.    The Drug Enforcement Administration.

11        Q.    On August 8th, 1995, did you have contact with

12   a person known to you as Joseph Clark?

13        A.    Yes, I did.

14        Q.    Please tell the jury who Joseph Clark is?

15        A.    He was an informant for the Drug Enforcement

16   Administration.  He was a cooperating source.

17        Q.    Was he paid for his cooperation?

18        A.    Yes, he was.

19        Q.    On August 8, 1995, did you receive information

20   from Joseph Clark with regard to an individual who wanted

21   to purchase a large amount of drugs?

22        A.    Yes, I did.

23        Q.    In addition to this information, did you

24   receive some phone numbers or beeper numbers whereas you

25   could reach out for those people?

1          A.    Yes, I did.

2          Q.    Tell the jurors what you did with that

3     information that you received from Joseph Clark?

4          A.    I paged the number that was given to me.    It

5     was a 305 area code, which was a Florida number.    I paged

6     the number and waited for a call back.

7          Q.    Now, when Joseph Clark had called you with

8     regard to this information, was the information based on

9     people in New York -- excuse me -- in Florida?

10         A.    No, it wasn't.

11         Q.    What was it based on?

12         A.    It was based on people that he met in New

13    York.  Supposedly he wasn't sure if the people were down

14    in Florida yet or not at the time I spoke with him.

15         Q.    Tell the jurors what happened when you

16    attempted to contact these individuals.

17         A.    The name I was given by Mr. Clark was the

18    street name Stizzo, the individual that I would be paging

19    and hopefully call me back.

20              On August the 8th, I paged the number given to

21    me and waited for a return call. I received a return call

22    from the individual using the name Stizzo.

23         Q.    The person you know as Stizzo, do you see him

24    in the courtroom today?

25         A.    Yes.

1        Q.    Please point him out and describe what he is

2    wearing?

3        A.    He is sitting at the counsel table, the Afro,

4    with a vertical striped tan and white shirt.

5            MR. GALLAGHER: Judge, let the record reflect

6        that the witness has properly identified the

7        Defendant, Fritz Maignan.

8            THE COURT: Ask your next question.

9    BY MR. GALLAGHER:

10       Q.    This conversation you had with this person

11   known to you as Stizzo, please tell the jurors what

12   occurred?

13       A.    During the conversation, we negotiated a price

14   and negotiated what exactly he wanted to purchase. I

15   explained that I had two different types of products, two

16   different kilos of cocaine.

17            One was set at a price of 18,500.  That was

18   supposed to be a better quality than the second type that

19   was set at a price of 16,500.

20       Q.    Did you tell him why there was a difference in

21   price?

22       A.    Yes, I did.

23       Q.    What did you tell him?

24            MR. HECKLER: Objection as to relevancy to

25        difference in prices.

1            THE COURT: Overruled.

2            THE WITNESS: I explained to him that the

3       product set at a lower price was set because this

4       shipment was wet, it came over the water.  In that

5       process, the product had gotten wet, therefore it was

6       of less quality than the product that was set at

7       $18,500

8   BY MR. GALLAGHER:

9       Q.   When you told this person you know to be Fritz

10  Maignan also known as Stizzo, when you told him about the

11  difference in price, what did he say with regard to the

12  fact that some of the cocaine might be wet?

13      A.   He said that it didn't make a difference if the

14  product was wet or damaged because what he does is he

15  cooks the stuff up anyway, referring to crack cocaine.

16           MR. HECKER: Objection, they are not charged

17      with crack cocaine.  It's conspiracy.

18           THE COURT: Overruled, request is denied.

19  BY MR. GALLAGHER:

20      Q.   Did Stizzo tell you why he travelled from New

21  York to South Florida, what was the purpose?

22      A.   He said he was there to shop, to do business.

23      Q.   What were you holding yourself out as to the

24  person you know as Stizzo?

25      A.   As a source for cocaine, for purchasing

1    cocaine.

2        Q.   When you talked to Stizzo or Fritz Maignan in

3    this case, same person, how were you identifying the

4    cocaine.

5            Were you identifying it as two kilos of cocaine

6    or did you use another name?

7        A.   No, I was using the term condos.  I asked if he

8    wanted to -- was he looking to purchase two condos.

9        Q.   Based on your training and experience as a

10   special agent for the Drug Enforcement Administration, is

11   it common to change the name of controlled substances into

12   other items?

13       A.   Yes, usually if we are talking about cocaine,

14   usually they get off the phone.  They usually don't talk

15   about the terms, so you have to mask it like condos

16   instead of cocaine.

17       Q.   The remainder of your conversation on August

18   8th, 1995, please tell the jurors what the contents of

19   that conversation was?

20       A.   We pretty much agreed that he wanted to

21   purchase the kilos which were set at the price of $16,500

22   and he wanted to purchase two kilos.  We agreed we would

23   meet the next day at a McDonald's located in Fort

24   Lauderdale, Florida.

25           Before we completed this phone call, he said

1    okay, you are going to bring your stuff and I will bring

2    mine, referring to I was going to bring the cocaine, he

3    would bring the money.

4              I said first I want to meet you first.  At that

5    point, he was ready to do the deal that day.  I wanted to

6    do it the next day, so I had to step back and say let me

7    meet you first.  He understood and said that's fine, I

8    want to meet you first, too.

9         Q.    In the phone conversation on August 8th, 1995,

10   did you tape record this phone conversation?

11        A.    Yes, I did.

12        Q.    Can you tell the jurors about the quality of

13   that phone conversation?

14        A.    The quality is pretty poor.  The device used

15   was like a basic device you could pick up at Radio Shack.

16   Our room was being remodeled.  That's why we had this

17   little tape recorder with a little ear piece.  That's why

18   the audio is kind of weak.

19        Q.    Can you tell the jurors how you set up the

20   equipment to tape record the conversation, utilizing that

21   type of equipment?

22        A.    It's pretty simple.  You just have a basic

23   recorder, you have an ear piece to record the sound, to

24   record the audio.  Basically you plug the ear piece into

25   the mike section of the recorder and you place the

1    recorder or mike in your ear.  You put the phone to that

2    ear as you are talking.  It's a pretty simple device and

3    cheap. That's why the audio isn't that clear.

4         Q.    Special Agent Anderson, I am showing you what

5    has been marked as State's A for identification and ask

6    you if you can identify State's Exhibit A?

7         A.    Yes.

8         Q.    How can you identify State's Exhibit A?

9         A.    It has my initials on it and it's also in my

10   writing and has the date August 8, '95, and also I wrote

11   at the top original.

12        Q.    What does State's A represent?

13        A.    It represents a recording of that conversation

14   on August 8th between myself and Fritz Maignan.

15        Q.    The conversation you just recounted to the

16   jurors?

17        A.    Yes, sir.

18        Q.    Have you had an opportunity to listen to

19   State's A since the date you recorded it?

20        A.    Yes.

21        Q.    Does it fairly and accurately represent the

22   conversation you recall that day?

23        A.    Yes.

24        Q.    Is Exhibit A in the same or substantially the

25   same condition today as it was on August 8, 1995?

1          A.   Yes.

2               MR. GALLAGHER: At this time the State of

3     Florida would seek to introduce into evidence State's

4     Exhibit A.

5               MR. HOLDEN: Defense has no objection.

6               THE COURT:   State's A will be marked as State's

7     No. 1.

8               MR. GALLAGHER: May the State of Florida publish

9     State's Exhibit 1?

10              THE COURT:  Yes.

11              MR. GALLAGHER: Thank you.

12              MR. HOLDEN: This will be taken down and

13    transcribed?

14              MR. GALLAGHER: It's going to be difficult for

15    the court reporter, but if they want it.

16              THE COURT: If she's able.  Do the best you

17    can.

18              (Thereupon, State's Exhibit 1 was played to the

19    jury.)

20              MR. GALLAGHER: The audible voice, whose voice

21    is that?

22              THE WITNESS: That's my voice.

23              MR. GALLAGHER: And the voice in the background,

24    whose voice is that?

25              THE WITNESS:  That's Fritz Maignan.

```
 1            MR. GALLAGHER: That's the defendant you

 2       identified in court?

 3            THE WITNESS: Yes.

 4            MR. GALLAGHER: The person known as Stizzo?

 5            THE WITNESS: Yes.

 6            THE COURT: Do you want to get closer?  Would

 7       that help?

 8            (Thereupon, the audio tape was played.)

 9            MR. GALLAGHER: Who was the person Joe that

10       Fritz Maignan was referring to?

11            THE WITNESS: He was the cooperating source.

12            MR. GALLAGHER: Joseph Clark?

13            THE WITNESS: Joseph Clark.

14            (Thereupon, the audio tape was played, at the

15       conclusion of which the following proceedings were

16       resumed:)

17       BY MR. GALLAGHER:

18            Q.   Special Agent Anderson, the following day,

19       August 9, 1995, did you have another phone conversation?

20            A.   Yes, I did.

21            Q.   With whom did you have a phone conversation?

22            A.   On the following day, let's see -- it's on the

23       tape.  Right now I have to listen to the tape to remember

24       now.

25            Q.   Do you recall having a conversation with a
```

1    person known as Katan Maignan?

2         A.   I believe it was Katan.  Like I said, it's on

3    the tape.  I would have to listen.

4         Q.   What was the purpose of that phone

5    conversation?

6         A.   We were going to set up the meeting place or

7    just it was an initial call just to say okay, we're still

8    going to meet.  I asked where they were at. They explained

9    they were still in Miami and they were a few minutes away

10   so like twenty or thirty minutes away from the meeting

11   location.

12        Q.   The person you know as Katan Maignan, do you

13   see him in the courtroom today?

14        A.   Yes.

15        Q.   Please point him out and describe him.

16        A.   Sitting at counsel table with the brown button

17   up shirt.

18             MR. GALLAGHER:  Let the record reflect the

19        witness has properly identified the defendant, Katan

20        Maignan.

21   BY MR. GALLAGHER:

22        Q.   Special Agent Anderson, did you tape record

23   that phone conversation you had with Katan Maignan?

24        A.   Yes, I did.

25        Q.   Special Agent Anderson, I show you what has

1    been marked as B or identified as State's Exhibit B.

2              Can you identify State's Exhibit B?

3         A.    Yes, I can.

4         Q.    How can you identify State's B?

5         A.    On State's B it has again my initials, the

6    date, 8-9-95, it's in my writing and it also says between

7    Anderson and Katan.

8         Q.    What does State's Exhibit B represent?

9         A.    The conversation I just spoke about on 8-9-95.

10        Q.    The conversation you had with the defendant

11   Katan Maignan; is that correct?

12        A.    Yes.

13        Q.    Does State's Exhibit B fairly and accurately

14   represent that conversation on August 9, 1995?

15        A.    Yes, it does.

16        Q.    Is it in the same or substantially the same

17   condition today as it was on August 9th, 1995?

18        A.    Yes, it is.

19              MR. GALLAGHER: Judge, at this time, the State

20         of Florida would seek to introduce into evidence

21         State's Exhibit B.

22              MR. HOLDEN: No objection.

23              MR. HECKER: No objection.

24              THE COURT: Granted and marked as State's

25         Exhibit No. 2.

1          MR. GALLAGHER: May the State of Florida publish

2     State's Exhibit 2?

3          THE COURT:  Yes.

4          (Thereupon, State's Exhibit 2, the audio tape

5     of 8-9-95, was played.)

6          MR. GALLAGHER:  For the jurors, please identify

7     the voices, the audible voice.

8          THE WITNESS: That's mine.

9          MR. GALLAGHER: And the less audible voice?

10          THE WITNESS: Katan Maignan.

11          MR. GALLAGHER: That's the defendant here today?

12          THE WITNESS:  Yes.

13          (Thereupon, the audio tape was played.)

14          MR. GALLAGHER: By the way, when you were

15     talking to Katan Maignan, you said when I told your

16     boy I wasn't bringing nothing, who were you referring

17     to?

18          THE WITNESS: Referring to Fritz Maignan.

19          (Thereupon, the audio tape was concluded.)

20     BY MR. GALLAGHER:

21          Q.    Special Agent Anderson, after you set this

22     meeting up with Fritz and Katan Maignan at McDonald's on

23     Cypress Creek Road in Broward County Florida, what is the

24     next thing you did?

25          A.    I went to the location. Actually, we had

1     surveillance set up at McDonald's, Cypress Creek and

2     Powerline in Fort Lauderdale.  I was accompanied by a

3     second undercover, a Boca Raton police detective.

4          Q.   What is his name?

5          A.   Sam Tatum.

6          Q.   What was his role to be in this particular

7     negotiation?

8          A.   He was also acting as undercover.  He was also

9     supposed to be like somewhat my body guard.

10          Q.   He's a big guy, right?

11          A.   Yes, he is.

12          Q.   Tell the jurors about what happened at that

13     meeting.

14          A.   Okay, once myself and the other undercover

15     arrived at McDonald's, we looked around the lot. At that

16     time, we didn't have any idea what the two individuals

17     looked like, so we walked around for a while and looked

18     around. We saw them and surveillance already had informed

19     us that they believed those were our subjects.

20               We walked around for a while and eventually I

21     walked over and met with Fritz Maignan first and shook his

22     hand and then we all introduced ourselves and started

23     walking around the lot and talking.

24          Q.   Now, this particular meeting at McDonald's on

25     August 9, 1995, was it videotaped?

1          A.    Yes, it was.

2          Q.    With the videotape, did you attempt to get an

3     audio?

4          A.    Yes, we did.

5          Q.    Please tell the jurors about the videotape and

6     audio tape?

7          A.    The videotape was recorded by a detective from

8     Boca Raton Police Department using their equipment.

9                The video was supposed to have audio on it but

10    for some reason it was not able to pick up the audio that

11    was coming in during the negotiations.

12               You can hear in the background sirens going

13    off, but you can't actually pick up the conversation, so

14    they used a second, I guess someone may have had a second

15    receiver and recorded it on a cassette tape which again,

16    the audio was very poor.

17         Q.    So Special Agent Anderson, is there any audio

18    that the jurors could hear with regard to this taped

19    meeting at McDonald's on August 9, 1995?

20         A.    Yes, but it's hard to hear.

21         Q.    Tell the jurors about that meeting, what

22    transpired among the four of you at McDonald's on

23    August 9, 1995?

24         A.    We started negotiating --

25               MR. HECKER: I object.  If they play the tape,

1    the tape can speak for itself.

2           MR. GALLAGHER: Judge, as the Special Agent just

3       testified, there is no audio to speak of on the

4       video.

5           MR. HOLDEN: I object and I would just point out

6       to the Court that the witness himself has indicated

7       the quality of the tape was poor, the audio portion.

8           THE COURT: Overruled.

9    BY MR. GALLAGHER:

10      Q.    Please tell the jurors what transpired in that

11   meeting among yourself, Detective Sam Tatum of the Boca

12   Raton Police Department and the Defendants, Fritz and

13   Katan Maignan and if you can, when you refer to the

14   defendants, if you can specify what each one said or did?

15      A.    Okay.  Both of them started negotiating the

16   price.  They both wanted a change in the price and as far

17   as exactly what each said, I couldn't say but both were

18   interjecting that they wanted to reduce the price that was

19   already set at 16,500 and they were requesting that I

20   lower the price.  I stated the price was as low as I could

21   go, it was already a rock bottom price so we couldn't go

22   any lower.

23           They agreed the price was fine, so the total

24   amount was set at 33,000 for the two kilos of cocaine.

25      Q.    At the end of the meeting did you give them any

1    information?

2        A.    Yes, we also talked a little on how the

3    transaction would actually take place, as far as who would

4    do what first. Then we talked where we wanted the

5    transaction actually to take place and I told them of a

6    location in Boca Raton, Florida which was just west of --

7    excuse me -- just east of I-95 is a Denny's on the north

8    side of Palmetto Park Road in Boca Raton, Florida, so I

9    told them we could meet there and I wrote some little

10   directions down.

11           You can see on the videotape I was writing

12   something.  You can see it on the tape.

13           I wrote down directions for them and told them

14   where we should do the deal and they agreed that spot was

15   fine at that time.

16       Q.    So on August 9, 1995, both Katan and Fritz

17   Maignan were happy to do the deal at that location?

18           MR. HOLDEN: I object as happy to do the deal.

19           THE COURT: Overrule, subject to cross

20       examination.

21           THE WITNESS: Yes, they were.

22   BY MR. GALLAGHER:

23       Q.    I am showing you what has been marked as

24   State's Exhibit C and ask if you can identify State's C?

25       A.    Yes, I can.

1      Q.    How can you identify State's Exhibit C?

2      A.    It's the original tape from the surveillance on

3   8-9-95.  It was recorded by the Boca Raton Police

4   Department.

5      Q.    And does State's Exhibit C fairly and

6   accurately represent the scene as you recall it at the

7   McDonald's restaurant on August 9, 1995?

8      A.    Yes, it does.

9      Q.    Is it in the same or substantially the same

10  condition today as it was on the date that it was done?

11     A.    Same condition, yes.

12     Q.    Can you please tell the jurors what problems

13  you had with that particular tape that you ran into this

14  morning?

15     A.    Yes, as we were viewing the tape this morning,

16  myself and Mr. Gallagher, after we finished reviewing it,

17  he pushed the eject button and as it came out, the tape

18  got caught inside and we had to work it and get the tape

19  out, but we do have a copy.

20     Q.    And the copy that we are playing, have you had

21  an opportunity to look at the copy as well as the

22  original?

23     A.    Yes.

24     Q.    Does the copy fairly and accurately represent

25  the original tape?

1        A.   Yes.

2             MR. GALLAGHER: At this time, the State of

3        Florida would seek to introduce into evidence State's

4        Exhibit C and if the Court would allow us to publish

5        State's C through the use of the copy, we would

6        appreciate it.

7             THE COURT: Any objection?

8             MR. HECKER: No, Judge.

9             MR. HOLDEN: No, Judge.

10            THE COURT: Received and marked as State's

11       Exhibit No. 3.

12            (Thereupon, the item referred to was marked as

13       State's Exhibit No. 3.)

14            MR. HECKER: May we go over to review the tape

15       with the jury?

16            MR. GALLAGHER: Special Agent Anderson, could

17       you please tell the jurors whether or not we are

18       seeing the tape from the beginning or have we moved

19       it forward some?

20            Have you fast forwarded the tape to its

21       position?

22            THE WITNESS: Yes, it should be set to where it

23       started off, where we are all in a group meeting.

24            MR. GALLAGHER: Is that okay?  Let's see if we

25       can get this thing to work.

1             (Thereupon, the videotape was played.)

2     BY MR. GALLAGHER:

3         Q.    Please tell the jurors what we are looking at

4     here.  Identify these people.  Who is the gentleman here

5     with the white shirt with the print on it and hat?

6         A.    Okay, on the right corner of your screen or the

7     jurors' right, you are going to have Fritz Maignan here in

8     the white shirt with the red and blue and looks like a

9     stripe on the hat.

10            Also leaning against the phone you have Katan

11    Maignan, myself here and the other undercover Sam Tatum

12    here.

13        Q.    Now, this meeting is taking place where?

14        A.    At the McDonald's at Cypress Creek and

15    Powerline in Fort Lauderdale, Florida.

16        Q.    We are going to cut it off real quick now at

17    this point.

18            What is taking place as far as conversation?

19        A.    At this point, we are talking about adjusting

20    the price and negotiating how the deal will take place.

21        Q.    Detective Tatum, did he have any real

22    participation in the negotiations in this case?

23        A.    No, basically he was just there so I would not

24    get ripped off, just kind of like a bodyguard.

25        Q.    Thank you.  Fast forward a little bit here.

1           How long are you standing there with both

2   defendants by the way?

3           A.   Say approximately about fifteen to twenty

4   minutes.

5           Q.   At any time that you were talking to either

6   Fritz Maignan or Katan Maignan, did they ever indicate

7   that they were being pressured into doing this deal?

8           A.   Absolutely not.

9           Q.   At any time that you were talking to Fritz and

10   Katan Maignan during this meeting, did they ever indicate

11   that they didn't want to do the deal?

12           A.   No.

13           Q.   That's about as good as it gets for volume as

14   far as your ability?

15           A.   Yes, for the video, yes.

16           Q.   That's good.

17           (Thereupon, the videotape was concluded.)

18   BY MR. GALLAGHER:

19           Q.   Special Agent Anderson, after that meeting at

20   McDonald's on August 9th, 1995, when is the next time you

21   heard from either Katan or Fritz Maignan?

22           A.   The following day, August 10th.

23           Q.   Tell the jurors about that.

24           A.   Yes, I received a page or a call back on the

25   undercover phone.  They were stating that they went to the

1      location I gave them in Boca Raton and did not like the

2      location. It was too far of a drive for them to go to.

3           Q.    What did you agree to do?

4           A.    I gave them a new location in Hallandale Beach,

5      Florida at Denny's Restaurant located on Hallandale Beach

6      Boulevard which was just east of I-95.

7           Q.    Did you tape record these conversations on

8      August the 10th, 1995?

9           A.    Yes, I did.

10          Q.    Special Agent Anderson, let me show you what

11     has been marked as State's Exhibit D for identification

12     and ask you if you can identify State's Exhibit D?

13          A.    Yes, I can.

14          Q.    How can you identify State's Exhibit D?

15          A.    It has the initials of the person that acquired

16     this one, which is actually under the little sticker.

17     It's WRD.  That stands for William Dyer, Special Agent who

18     works with me.  It has the date, and says it's a UC call.

19          Q.    And when you say UC call, what does that mean?

20          A.    Undercover conversation.

21          Q.    Have you had an opportunity to listen to

22     State's Exhibit D since the date you made the tape which

23     is August 10, 1995?

24          A.    Yes, I have.

25          Q.    Is State's Exhibit D in the same or

1    substantially the same condition as it was when it was

2    recorded?

3         A.    Yes, it is.

4         Q.    The conversations contained on State's Exhibit

5    D --

6              THE COURT:  Gentlemen, you have to keep the

7         noise down while the evidence is being presented to

8         the jury.

9              Thank you.

10   BY MR. GALLAGHER:

11        Q.    Do they fairly and accurately represent the

12   conversation you recall on August 10th, 1995?

13        A.    Yes.

14             MR. GALLAGHER: At this time, the State of

15        Florida would seek to introduce into evidence State's

16        Exhibit D.

17             MR. HOLDEN: I would object to the fact that the

18        witness has testified that the initials represented

19        on the tape are not his.  There is no

20        authentication.  It's possible at this point through

21        this witness, and at this point we would object to

22        its introduction.

23             MR. GALLAGHER: All the State of Florida has to

24        do to lay a proper predicate for introduction of the

25        tape is to show it purports to be what it is, that

```
 1        the conversations are the conversations that this

 2        special agent recalls having August 10th, 1995.

 3              THE COURT: Overruled, received and marked as

 4        State's Exhibit No. 4.

 5              (Thereupon, the item referred to was marked as

 6        State's Exhibit No. 4.)

 7              MR. GALLAGHER: May the State of Florida publish

 8        Exhibit 4?

 9              THE COURT: Go right ahead.

10              MR. GALLAGHER: Thank you.

11              (Thereupon, the audio tape was played.)

12              SPECIAL AGENT ANDERSON: "9:25 a.m., 8-10-95,

13        Agent Anderson, area code 305-619-3985, subject by

14        the street name of Stizzo.  Recording time is 11:30

15        a.m."

16              (Thereupon, the audio tape was stopped.)

17              MR. GALLAGHER: Apparently you changed the

18        recording time.  Can you explain to the jurors what

19        happened with regard to that?

20              THE WITNESS: Something, usually I had to leave

21        or something and I wasn't available to actually get

22        the call so I had to re-do it at the new time.

23              MR. GALLAHGER: This is 11:30 a.m., on August

24        the 10th, 1995?

25              THE WITNESS: That's correct.
```

1           (Thereupon, the audio tape was played.)

2           KATAN MAIGNAN: "Hello, hello, who is this?

3           SPECIAL AGENT ANDERSON: Heath.

4           KATAN MAIGNAN: What's up?  What's going on?

5           SPECIAL AGENT ANDERSON: Taking it easy, huh?

6           KATAN MAIGNAN: Yeah, yeah.  You know, yeah, I

7    just paged you.  Listen man, the address that you

8    give me yesterday --

9           SPECIAL AGENT ANDERSON:  Right.

10          KATAN MAIGNAN: -- too far man, that's too far."

11          (Thereupon, the audio tape was stopped.)

12          MR. GALLAGHER: The address that the defendant

13   Fritz Maignan is referring to, what address was that

14   that you had given him?

15          THE WITNESS: The address in Boca Raton,

16   Florida.  It's a Denny's in Boca Raton, Florida.  I

17   think that's Katan's voice.  I think that's Katan's

18   voice.

19          (Thereupon, the audio tape was played.)

20          KATAN MAIGNAN: "Way, way too far, I went to

21   check it out yesterday.  I left.  It's just too far,

22   man. It's way too far.

23          SPECIAL AGENT ANDERSON; I can see.  Want me to

24   drive back down?

25          KATAN MAIGNAN: Yeah.  What's going on?

```
 1              SPECIAL AGENT ANDERSON: I talked to Joe this
 2     morning.
 3              KATAN MAIGNAN: Yeah."
 4              (Thereupon, the audio tape was stopped.)
 5              MR. GALLAGHER: Joe, you are referring to --
 6              THE WITNESS: Joseph Clark, our cooperating
 7     informant.
 8              (Thereupon, the audio tape was played.)
 9              SPECIAL AGENT ANDERSON: "I mean, I don't know
10     what you all did before, but you all told me you guys
11     did business; is that right?  You know, a little bit.
12              KATAN MAIGNAN: We did business.  Yeah,
13     (inaudible.)
14              SPECIAL AGENT ANDERSON: I don't know what it
15     was, you know, I don't know, but we up straight, you
16     know.
17              KATAN MAIGNAN: Man, (inaudible) know what I am
18     saying?
19              SPECIAL AGENT ANDERSON: Straight up now, you
20     got your stuff, right?
21              KATAN MAIGNAN: Come on, man.
22              SPECIAL AGENT ANDERSON: Know when we can come
23     up there?
24              KATAN MAIGNAN: I am not going to do it, man.
25              SPECIAL AGENT ANDERSON: Let me tell you what.
```

1      I am going to (inaudible).  Want to talk to Joe's

2      brother?  He came down.  He came down with me

3      sometime.

4              (Thereupon, the audio tape was stopped.)

5              MR. GALLAGHER: Did you really have Joseph

6      Clark's brother there?

7              THE WITNESS: No.

8              MR. GALLAGHER: To whom were you referring?

9              THE WITNESS: Special Agent William Dyer.  He

10     was in the room with me as I was recording the call.

11             (Thereupon, the audio tape was played.)

12             SPECIAL AGENT ANDERSON: I am telling you right

13     now.  I am not coming to Miami, okay.

14             KATAN MAIGNAN: But, man, like, you know, like I

15     am going to  (inaudible), like you know, you know

16     what I am saying?

17             SPECIAL AGENT ANDERSON: I know what you are

18     saying.  That's what Joe kept telling me, that I was

19     beating too hard but, I don't know (inaudible)."

20             (Thereupon, the audio tape was stopped.)

21             MR. GALLAGHER: Who are you talking to in the

22     background?

23             THE WITNESS: Special Agent William Dyer.

24             (Thereupon, the audio tape was played.)

25             KATAN MAIGNAN: Yeah, who is this?

1      SPECIAL AGENT ANDERSON: That was Sam yesterday,

2    that's my boy Sam.   This is Joey's brother, Joey's

3    brother.

4      KATAN MAIGNAN: Anyway, right now, I will call

5    you back when you decide what you want to do.

6      SPECIAL AGENT ANDERSON: I know what I want to

7    do, man.   The only thing I can tell you is I can meet

8    you (inaudible) Hallandale.   You know Hallandale,

9    right?

10      KATAN MAIGNAN:   Um —

11      SPECIAL AGENT ANDERSON: You never heard of

12   Hallandale?

13      KATAN MAIGNAN: No.

14      SPECIAL AGENT ANDERSON: Where your boy at?

15   Does he know?

16      KATAN MAIGNAN:   He's not here right now. He

17   goes somewhere.

18      Just, you know, make up your mind and let me

19   call you back, man.   All right?

20      SPECIAL AGENT ANDERSON: I mean, like I told

21   you, I will come down to Hallandale Boulevard.

22      KATAN MAIGNAN: Hallandale?

23      SPECIAL AGENT ANDERSON: That's right down near

24   Dade, right between Dade and Broward, right on the

25   line.

1           I got to drive at least twenty minutes,

2      twenty-five minutes, to get down there.

3           KATAN MAIGNAN: That's right off 95?

4           SPECIAL AGENT ANDERSON: That's like right down,

5      that's right between the both of us.

6           KATAN MAIGNAN: You said --

7           SPECIAL AGENT ANDERSON: It's right like in

8      between Dade and Broward County. It's right along

9      Hallandale Boulevard.

10          KATAN MAIGNAN: You know the place there?

11          SPECIAL AGENT ANDERSON: No.  Yeah, it's a big

12     parking lot with a Winn Dixie and a restaurant.

13          KATAN MAIGNAN: Right off 95?

14          SPECIAL AGENT ANDERSON: Yeah. (Inaudible).

15     It's like right off 95, like two, three blocks off

16     95.

17          KATAN MAIGNAN: Um-hum.  So I will go check it

18     out.  Let me call you back.

19          SPECIAL AGENT ANDERSON: Let me tell you how to

20     get there. You coming up 95?

21          KATAN MAIGNAN: Um-hum.

22          SPECIAL AGENT ANDERSON: Go up 95 and east on

23     Hallandale Boulevard.

24          KATAN MAIGNAN: East?

25          SPECIAL AGENT ANDERSON: Yeah, um-hum, east on

67

1          Hallandale Boulevard, like the first right or the

2          first right is you will see a Winn Dixie, and a

3          little Denny's Restaurant, and some -- like a little

4          shopping plaza on the south side, on the right side,

5          like as soon you get off 95 in Hallandale Boulevard.

6                  KATAN MAIGNAN: All right.

7                  SPECIAL AGENT ANDERSON: Use the cell phone or

8          something?

9                  KATAN MAIGNAN: That's my phone.

10                 SPECIAL AGENT ANDERSON: It's a cell phone?

11                 KATAN MAIGNAN: Yeah.

12                 SPECIAL AGENT ANDERSON: It sounds funny.

13                 KATAN MAIGNAN: No.

14                 SPECIAL AGENT ANDERSON: All right, then.  Don't

15         call me from your house.

16                 KATAN MAIGNAN: Hell, no.

17                 SPECIAL AGENT ANDERSON: All right.  How long

18         before you come back?  I can't wait around all day.

19         I will put it back up, you know.

20                 KATAN MAIGNAN: (Inaudible), let me check the

21         place out and call you.

22                 SPECIAL AGENT ANDERSON: About how long?

23                 KATAN MAIGNAN: Like an hour, hour and a half,

24         maybe two.

25                 SPECIAL AGENT ANDERSON: I tell you what.  Call

```
 1      me like before right around 1:00 o'clock.
 2             KATAN MAIGNAN: All right.
 3             SPECIAL AGENT ANDERSON: Because, let's see,
 4      1:00 o'clock.
 5             I tell you what.  Call me like about an hour
 6      from now because if not, I will put it up.  You have
 7      to call me like tomorrow or something, you know.
 8             KATAN MAIGNAN: Yeah.
 9             SPECIAL AGENT ANDERSON: Just call me back in an
10      hour.
11             KATAN MAIGNAN: All right."
12             SPECIAL AGENT ANDERSON: This was a phone call
13      approximately 11:40, on 8-10-95, speaking with an
14      individual using the street name Stizzo, called to
15      phone number 772-7608, area code 305."
16             MR. GALLAGHER: The person you know as Stizzo is
17      whom?
18             THE WITNESS: Fritz Maignan, but the voice on
19      that at the time when I put the little trailer at the
20      end saying who he was, again, this was in the
21      beginning, so I believe that voice is Katan Maignan,
22      not Stizzo.
23             MR. GALLAGHER: You knew Katan Maignan as what?
24             THE WITNESS: As Slow.
25             (Thereupon, the audio tape was played.)
```

1           FRITZ MAIGNAN: "Hello.

2           SPECIAL AGENT ANDERSON: Yeah.

3           FRITZ MAIGNAN: Who is it?  Who?

4           SPECIAL AGENT ANDERSON: What's up.

5     (Inaudible.)"

6           THE WITNESS: That's Stizzo, Fritz Maignan.

7           FRITZ MAIGNAN: (Inaudible.)

8           SPECIAL AGENT ANDERSON: I got a beeper and a

9     phone at my house."

10          (Thereupon, the audio tape was stopped.)

11          MR. GALLAGHER: Whose beeper number are you

12    referring to?

13          THE WITNESS: I was just -- actually, I didn't

14    have a beeper in the house, but I was referring to

15    Joseph Clark, the informant, in this investigation.

16          (Thereupon, the audio tape was played.)

17          FRITZ MAIGNAN: Hello.  Hello?  Yeah.  Who is

18    it?  Who?  What's up?

19          SPECIAL AGENT ANDERSON: Not much, man.

20    (Inaudible.) I got a beeper and a phone at my house.

21          FRITZ MAIGNAN: You told my brother (inaudible)

22    by himself -- (inaudible).  I don't know.  Know what

23    I am saying?  That's why I going to (inaudible).

24          He wants to buy it.

25          SPECIAL AGENT ANDERSON: Right.  I told you,

1    like I told you yesterday, that, you know, they can

2    come and look at the stuff and then my job got to

3    look at the money.  Know what I am saying?  Then both

4    can, you know --

5         FRITZ MAIGNAN: I am not going to be there

6    (inaudible).

7         SPECIAL AGENT ANDERSON:  You're not going to be

8    there? Who you sending?  I don't know who you're

9    sending now.

10         FRITZ MAIGNAN: He by himself.

11         SPECIAL AGENT ANDERSON: How am I going to know

12    who it is?

13         FRITZ MAIGNAN: The kid from yesterday, he by

14    himself.

15         SPECIAL AGENT ANDERSON: I thought you were

16    going to send somebody new.

17         FRITZ MAIGNAN: I don't know nobody -- I can't

18    (inaudible).

19         SPECIAL AGENT ANDERSON: What I am saying is he

20    (inaudible).  What I am saying is as long as he

21    comes, he can bring somebody else, but I am bringing

22    my boy.  I thought you was going to send somebody new

23    that I didn't meet.

24         FRITZ MAIGNAN: Right, right, right.  What's

25    up.  Listen man."

```
1              (Thereupon, the audio tape was stopped.)

2              MR. GALLAGHER: Who else was on the phone?  Who

3         got on the phone?

4              THE WITNESS: Fritz gave the phone to his

5         brother Katan.

6              MR. GALLAGHER: That's the voice we are hearing

7         now?

8              THE WITNESS: That's correct.

9              (Thereupon, the audio tape was played.)

10             KATAN MAIGNAN: Man, understand, you know what

11        you saying.  What's going on?  I would like

12        something, you know (inaudible.)

13             SPECIAL AGENT ANDERSON: I tell you, I mean,

14        that's the way it's usually done. (Inaudible.) The

15        only way I got some ties down there.  This is their

16        number.

17             KATAN MAIGNAN: No, I am saying, you know, what

18        is going on?  Been thinking about that.  I am --

19             SPECIAL AGENT ANDERSON: I wish you told

20        (inaudible) at least.  You know.

21             KATAN MAIGNAN: Right, right, right.  It's like

22        so much money (inaudible).  When you looking at it,

23        man, I know, yeah.  (Inaudible.)

24             SPECIAL AGENT ANDERSON: I tell your brother I

25        got his beeper number in my house.  I can try and
```

1       beep him or something.

2            KATAN MAIGNAN: When you get him, when you beep

3       him (inaudible).  Know what I am saying?

4            SPECIAL AGENT ANDERSON: I want to (inaudible).

5       I do tomorrow, you know, see what I am saying, today

6       or tomorrow.  I am getting it today.  (Inaudible.) I

7       can't keep messing around all day (inaudible).  I was

8       ready to go to the Keys this weekend.

9            KATAN MAIGNAN: Call him right now.

10           SPECIAL AGENT ANDERSON: I will call him.  He

11      lives north.

12           KATAN MAIGNAN: Beep him.  Put down

13      (inaudible).  What about Mark, too?

14           KATAN MAIGNAN: Mark?  I don't know him.

15           SPECIAL AGENT ANDERSON: You don't know Mark?

16      You know Mark?

17           KATAN MAIGNAN: No.

18           SPECIAL AGENT ANDERSON: Mark's not down here.

19      (Inaudible).  You know Mark.  Mark's got something up

20      there -- that's what I am telling you, man. I mean,

21      that's what I am saying.  You understand where I am

22      coming from?  You didn't do what I am doing, trying

23      to (inaudible).  You both doing the same thing.

24      That's what I was saying.  When we get down there,

25      did you go by and check the spot out?

1          KATAN MAIGNAN: Yeah, I went. I found it.

2          SPECIAL AGENT ANDERSON: I mean, that's closer

3     to you.  I can't do better than that.  That's closer

4     to you.

5          KATAN MAIGNAN: (Inaudible.)

6          SPECIAL AGENT ANDERSON: I ain't bringing nobody

7     but my boy, that's it.  I coming by myself.  I am

8     bringing my boy.  You met him.  (Inaudible.) That's

9     my boy.  I have to have my boy with me.  That's his

10    heavy, you know, to make sure I don't have no

11    problem.  (Inaudible.)

12         Like I said, looking at it, man.  I got this

13    guy.  I thought you already (inaudible.)

14         Try to see if I had his number right here or if

15    I have to go to my house.

16         KATAN MAIGNAN: Where you at?

17         SPECIAL AGENT ANDERSON: I'm at my girl's place

18    where I called you guys from.  Right now, you know,

19    right on the line, right on Boca, like Broward ――

20         KATAN MAIGNAN: Yeah, (Inaudible.) Call the

21    man.  Have him give us a call.  (Inaudible.)

22         SPECIAL AGENT ANDERSON: That's why I called

23    early this morning, to make sure everything was okay,

24    to talk to him again.  That's why I even decided to

25    come down is because of what he said but you know, I

1      got to bring my boy with me, you know.  As I said, I

2      don't care if you bring somebody else.  I thought

3      your brother was saying that he was going to send

4      somebody I didn't even know.

5           KATAN MAIGNAN: Come on.

6           SPECIAL AGENT ANDERSON: Nobody else, I mean you

7      can come with somebody else.

8           KATAN MAIGNAN: I ain't got nobody.  I ain't got

9      nobody.  I ain't got nobody.  Just me and him

10     together.

11          SPECIAL AGENT ANDERSON: Right, well, I am going

12     to bring -- my boy is going to be there. He will be

13     there.

14          But call him.  Have him give us a call.  Do

15     that right now.  You know where to call you at the

16     cell phone.

17          KATAN MAIGNAN: No I got this one, but we didn't

18     give it to them (inaudible).

19          SPECIAL AGENT ANDERSON: Right, right, don't

20     call me from home.

21          KATAN MAIGNAN: No, no, no.

22          SPECIAL AGENT ANDERSON: Let's try to get him,

23     right.  I don't know if I can get him or not if we

24     can -- go do this, man, and call us right back.  I

25     will go get his number and see what I can do.  If not

1          when I beep you, call me right back.  (Inaudible.)

2                    KATAN MAIGNAN: All right.

3                    SPECIAL AGENT ANDERSON: All right, man.

4                    This call was an incoming phone call, area code

5          305, 772-7608, and placed to area code 305, 619-3985

6          on 8-10-95 at approximately 12:15 p.m.  The call was

7          between Special Agent Anderson and two subjects, one

8          identified as Katan Maignan, M-a-i-g-n-a-n, and the

9          other subject using the street name Stizzo."

10                   (Thereupon, the audio tape was concluded.)

11    BY MR. GALLAGHER:

12         Q.   After this phone conversation, did you set up a

13    three-way phone conversation between you, yourself, the

14    defendant, Fritz Maignan and the confidential informant in

15    this case by the name of Joseph Clark?

16         A.   Yes.

17         Q.   Did Joseph Clark consent for being recorded for

18    purposes of this phone conversation?

19         A.   Yes, he did.

20         Q.   Special Agent Anderson, I am showing you what

21    has been marked as State's Exhibit E for identification

22    and ask if you can identify State's Exhibit E?

23         A.   Yes, I can.

24         Q.   How can you identify State's E?

25         A.   It's labeled.  It has my writing and initials

1   along with the date 8-10-95 and it has the name Katan

2   Maignan on it.

3          Q.    What does E represent?

4          A.    Represents conversations I had 8-10-95 and it

5   also has a breakdown of who I spoke to.

6          Q.    Do you recall which calls, how many calls are

7   on State's E if you can remember?

8          A.    There should be two calls on this tape, the

9   first call is a three-way between Joseph Clark, the C.I.,

10  Fritz Maignan and myself and then there is the second call

11  between Katan Maignan and myself.

12         Q.    Did both calls occur August 10, 1995?

13         A.    Yes, they did.

14         Q.    Does state Exhibit E fairly and accurately

15  represent the conversations that took place on that date

16  on that tape?

17         A.    Yes.

18         Q.    Is State's E in the same or substantially the

19  same condition today as it was August 10, 1995?

20         A.    Yes, it is.

21              MR. GALLAGHER: At this time, the State of

22         Florida would seek to introduce into evidence State's

23         E.

24              MR. HOLDEN: No objection other than stated

25         earlier as to authenticity.

1           THE COURT: First call is between who?

2           MR. GALLAGHER: It's a three-way conversation

3     between Fritz Maignan, the confidential informant,

4     Joseph Clark, and Special Agent Heath Anderson.

5           MR. HOLDEN: I also object to the tape being

6     admitted under the exception of hearsay.  It has a

7     party who is not a witness, not a defendant.

8           MR. GALLAGHER: It's not being offered for the

9     truth, Judge, just for the fact it was said.

10          MR. HOLDEN: Obviously, Your Honor, it is the

11    defense's position it is not being offered for the

12    truth, but for the contents therein.

13          THE COURT: Show the jury to its room.

14          (Thereupon, the jury left the courtroom and the

15    following proceedings were had outside the hearing of

16    the jury:)

17          THE COURT:  First conversation is between --

18          MR. GALLAGHER: The first three-way conversation

19    is between Fritz Maignan and a confidential informant

20    named Joseph Clark and Special Agent Heath Anderson.

21          Judge, the argument that counsel is trying to

22    propound to the Court is number one, this is hearsay,

23    that it's being offered for the truth.

24          Number one, it is not being offered for the

25    truth.

```
 1          THE COURT:  What is it being offered for?
 2          MR. GALLAGHER: The fact it was said and
 3     responses were obtained in response.
 4          In the alternative, if the Court makes a
 5     finding that it is hearsay then it would be
 6     admissible under the theory of entrapment, and it's
 7     rebuttal evidence for entrapment purposes and shows
 8     the relationship between the defendant, Fritz Maignan
 9     and the confidential informant which rebuts his lack
10     of predisposition to commit this offense.
11          MR. HOLDEN: Your Honor, it's clearly
12     prejudicial.
13          THE COURT: It's prejudicial, but is it legally
14     prejudicial?
15          MR. HOLDEN: I would assert it is, Your Honor.
16          THE COURT: Although it falls within the legal
17     realm.
18          MR. HOLDEN:  The prejudicial value clearly
19     outweighs any probative value. It is clearly being
20     offered to prejudice the jury with the contents of
21     the tape and to show the jury that there is a
22     connection between the C.I. and the defendants, but
23     candidly, Your Honor, the C.I. is probably not going
24     to be called in this case.
25          It would be appropriate if the C.I. were called
```

1    perhaps after Agent Anderson to put it in after the

2    C.I. has testified or during his testimony, but

3    without him being called, it would be inappropriate

4    at this time.

5        MR. GALLAGHER: I have a case right on point

6    which shows why this particular tape is admissible,

7    if you give me a second.

8        THE COURT:  Is it admissible --

9        MR. GALLAGHER: It is admissible, Judge, because

10   it shows the state of mind especially on entrapment.

11       THE COURT: I am saying as an exception to

12   conspiracy?

13       MR. GALLAGHER: What they are arguing about is

14   the statements made by the confidential informant and

15   under a case called Decile versus of the State of

16   Florida, Fourth District Court of Appeal case, those

17   statements by the informant are admissible because it

18   shows the state of mind of the defendants when they

19   responded to statements made by the confidential

20   informant on the tape.

21       MR. HOLDEN: Your Honor, the informant is

22   available for trial.  They could easily get their

23   testimony in through him.

24       MR. GALLAGHER: You don't have to, Judge.  Under

25   Decile, you don't have to.

1          THE COURT: Overruled.  Take a short -- how much

2     longer are you going to be?

3          MR. GALLAGHER: I have this tape with a couple

4     calls and then I have the video.

5          THE COURT: Let's take a break.

6          MR. HOLDEN: As a matter of housekeeping, Your

7     Honor, Mr. Gallagher indicated this audio tape is

8     Tape E. In my notes, I show it as being the sixth

9     tape including the video.  I could be wrong, but I

10    was under the impression this would be F.

11         MR. GALLAGHER: What do you have?

12         THE CLERK: I have it as E, number 5, last one

13    that came in was 4.

14         THE COURT:  Containing two conversations?

15         MR. GALLAGHER: I have this as State's 5.

16         THE COURT:  Received and accepted, marked as

17    State's 5.

18         Ten minute recess.

19         (Thereupon, there was a brief recess, after

20    which the following proceedings were resumed:)

21         THE COURT:  You want to put something in?

22         MR. GALLAGHER: The case that the State of

23    Florida was citing as to the admissibility of

24    conversations that included the confidential

25    informant is clearly not present here.

1           The State would cite Decile versus the State of

2      Florida, cited at 516 So.2d, page 1139, Fourth

3      District Court of Appeal.

4           It is law in this circuit with regard to

5      admissibility to those types of conversations and

6      deals specifically with tape recordings, police

7      officer testimony regarding statements he heard the

8      confidential informant make to narcotics defendants

9      while officer was monitoring the narcotic transaction

10     between the two by means of a radio transmitter were

11     admissible to prove the nature of act as opposed to

12     proof or truth of the alleged statement.

13          I will give a copy to His Honor.

14          THE COURT:  Nature of the act?

15          MR. GALLAGHER: That's our story and we're

16     sticking with it.

17          THE COURT:  Have you put that of record and

18     over the objection of defense, I will allow it in.

19          Escort the jury in, please.

20          (Thereupon, the jury entered the courtroom, and

21     the following proceedings were resumed within the

22     presence of the jury:)

23          THE COURT:  You may continue.

24          MR. GALLAGHER: May the State of Florida please

25     publish State's Exhibit 5?

```
1              THE COURT: Granted.

2              MR. GALLAGHER: Thank you, Judge.

3              THE COURT: Received and accepted.

4              (Thereupon, the audio tape was played.)

5              SPECIAL AGENT ANDERSON: " Twenty-five minutes

6      to three, on Thursday evening waiting for incoming

7      call from suspect using the name Stizzo, suspect

8      Katan Maignan, M-a-i-g-n-a-n, 305-772-7608."

9              MR. GALLAGHER:  Whose voice is that?

10             THE WITNESS: That's my voice.

11             FRITZ MAIGNAN: "Hey, man.

12             SPECIAL AGENT ANDERSON: What I will do is if

13     agree, I will get the phone and get Joe.

14             FRITZ MAIGNAN: Put him on here.  I don't know

15     how to do this, but I will try and click it in and

16     call you.

17             UNIDENTIFIED VOICE: Is he on the phone now?

18             SPECIAL AGENT ANDERSON: He's on the other line,

19     so I am going to try and click it and get him on it.

20     If I lose you, just call back.

21             FRITZ MAIGNAN: Right."

22             MR. GALLAGHER: Whose voice is that?

23             THE WITNESS: My voice and Fritz.

24             Who are you calling.

25             THE WITNESS:  Doing a three-way, calling the
```

1          C.I.

2               MR. GALLAGHER: Joseph Clark?

3               THE WITNESS: Yes.

4               JOSEPH CLARK: Hello.

5               SPECIAL AGENT ANDERSON: Hello, Joe.

6               JOSEPH CLARK: Yes."

7               (Thereupon, the tape was stopped.)

8               MR. GALLAGHER: Who is that person?

9               THE WITNESS: Joseph Clark.

10              MR. GALLAGHER: That's the confidential

11         informant in this case?

12              THE WITNESS: Yes, it is.

13              (Thereupon, the audio tape was played.)

14              (Thereupon, the tape was stopped.)

15              THE WITNESS: A lot of times I will do this so I

16         can get information from the defendant or so the

17         defendant will realize I am being cautious also.

18              MR. GALLAGHER: Cautious with regard to what?

19              THE WITNESS: This cryptic conversation using

20         codes and not actually say this is cocaine or

21         whatever.

22              MR. GALLAGHER: In this case, you are talking

23         about the location from where the phone call is being

24         made.

25              Why is that being cautious?

1          THE WITNESS: Just because usually from home

2     phones, in my experience, bad guys always think that

3     home phones are bad to call from, that they could

4     have a wire or wiretap or something.

5          MR. GALLAGHER: This is part of your role as

6     being a drug dealer?

7          THE WITNESS: That's correct.

8          (Thereupon, the audio tape was played.)

9          (Thereupon, the audio tape was stopped.)

10         MR. GALLAGHER: Who is Mark?

11         THE WITNESS: Mark is just a name that Joseph

12    Clark gave me to drop, just name dropping and these

13    guys should know him.  That's all I knew about Mark.

14         (Thereupon, the tape was played.)

15         (Thereupon, the tape was stopped.)

16         MR. GALLAGHER: What was the purpose of that?

17         THE WITNESS:  Joseph Clark is asking me --

18         MR. HECKER: Your Honor, I am going to object to

19    comments.

20         MR. GALLAGHER: He's explaining this type of

21    drug lingo that they are talking about. He can

22    certainly testify to that.

23         THE COURT:  Overruled subject to cross

24    examination.

25         THE WITNESS: Joseph Clark was asking me was I

1    going to take care of him once he got back down here.

2    I was telling him yes.

3         He talked about me paying him some money for

4    hooking this deal up. I was explaining why I dropped

5    the price a little because of what happened to it.

6         (Thereupon, the tape was stopped.)

7         MR. GALLAGHER: Who got on the phone?

8         THE WITNESS: Katan Maignan got on the phone.

9         (Thereupon, the audio tape was played.)

10        SPECIAL AGENT ANDERSON: Completed approximately

11    quarter to three on Thursday evening, 8-10-95.

12        MR. GALLAGHER: Let me ask you about the

13    informant.

14        You talked about using a three-way conversation

15    about you taking care of him after the deal went

16    down.

17        As a matter of fact, was the confidential

18    informant, Joseph Clark, paid anything in this case.

19        THE WITNESS: No, he was not.

20        MR. GALLAGHER: He had been utilized in another

21    case, is that correct.

22        THE WITNESS: That's correct.

23        (Thereupon, the audio tape was played.)

24        (Thereupon, the audio tape was stopped.)

25        MR. GALLAGHER: To whom are you talking now?

1              THE WITNESS: That's Katan Maignan.

2              (Thereupon, the tape was played.)

3              SPECIAL AGENT ANDERSON: Phone call concluded at

4         3:40 p.m. 8-10-95.

5              (Thereupon, the tape was concluded.)

6     BY MR. GALLAGHER:

7          Q.    Special Agent Anderson, in that phone call, it

8     sounded like the deal was not going through at that point;

9     is that correct?

10         A.    That's correct.

11         Q.    After that phone call which I think you said

12    was four -- excuse me -- I think you said it was 3:40 p.m.

13    on August 10th, 1995, were you contacted after that phone

14    conversation?

15         A.    Yes, I was.

16         Q.    By whom were you contacted?

17         A.    Katan Maignan.

18         Q.    Did you tape record that phone conversation?

19         A.    No, I did not.

20         Q.    Why is that?

21         A.    Since I was paged if you don't have a little

22    recorder with you at the time, obviously you can't record

23    it.  Since I was paged and while I wasn't in the office,

24    when I called back I didn't have a recorder at the time.

25         Q.    When Katan Maignan called you, can you please

1    tell the jurors what contact you had with him at the time

2    and what the time was?

3        A.    We briefly talked about, negotiated how it

4    would take place, and basically said let's go ahead and do

5    this.

6        Q.    Who did you agree to do the deal with Katan

7    Maignan?

8        A.    We agreed the same time that was agreed to on

9    the tape and at the same location in Hallandale, that he

10   would come alone and I finally agreed that I would come

11   alone since he was adamant about me not brining the other

12   undercover so that's what happened during the

13   conversation.

14       Q.    So Katan Maignan reinforced the idea he didn't

15   want you to have Sam Tatum with you?

16       A.    That's correct.

17       Q.    What date did you agree with Katan Maignan to

18   complete this transaction?

19       A.    The same date on the tape.  It would have been

20   8-11-95, should have been a Friday.

21       Q.    You were set to do this transaction for two

22   kilograms of cocaine for $33,000 with Katan Maignan on

23   August 11, 1995?

24       A.    That's correct.

25       Q.    This was supposed to take place where?

1        A.    Supposed to take place in Hallandale at

2    Denny's.

3        Q.    In preparation for this transaction, what did

4    you next do?

5        A.    On 8-11-95 my group, Fort Lauderdale DEA, we

6    had a briefing.  The briefing was probably had about

7    twelve noon and the briefing is when we all get together

8    and go over the game plan, how the particular deal is

9    supposed to unfold.

10            We had that briefing around 12:00 o'clock.  We

11    went out on surveillance, went out and set up at

12    Hallandale at the Denny's, tried to set up to make sure no

13    one else was in the area, to make sure everything was safe

14    and set up.

15        Q.    Did you actually retrieve two kilograms of

16    cocaine for the transaction that day?

17        A.    I actually had to check it out from the drug

18    laboratory, two real kilos of cocaine to use for this

19    transaction.

20        Q.    What is the next thing you did in this case?

21        A.    As I stated, our surveillance went to that

22    location, set up.  We had already -- myself and Katan had

23    agreed upon a time and place so I got into the undercover

24    vehicle which is a white Mercedes Benz. I had the two

25    kilos of cocaine and I was followed to the location by my

1    surveillance team.

2        Q.    These meetings took place August 11, 1995.

3             Was there a videotape?

4        A.    Yes, there was.

5        Q.    Special Agent Anderson, I am showing you what

6    has been marked as State's Exhibit F for identification

7    and ask you if you can identify State's Exhibit F?

8        A.    Yes, I can.

9        Q.    How can you identify State's Exhibit F?

10       A.    It's the tape from the surveillance of

11   8-11-95.  It has the date on it, and has original written

12   on it, which is what we write on the original copy and

13   it's initialed by William Dyer, special agent working with

14   me along in this investigation.

15       Q.    Have you had an opportunity to review State's

16   Exhibit F since the date it was taped?

17       A.    Yes, I have.

18       Q.    Does State's Exhibit F fairly and accurately

19   represent the scene as you recall it August 11th, 1995?

20       A.    Yes, it does.

21       Q.    Is State's Exhibit F in the same or

22   substantially the same condition today as it was on the

23   date it was taped?

24       A.    Yes, it is.

25             MR. GALLAGHER:  Judge, at this time the State of

1      Florida would seek to introduce into evidence State's

2      Exhibit F.

3              MR. HOLDEN: No objection, Your Honor.

4              MR. HECKER: No objection, Your Honor.

5              THE COURT: Granted, marked as State's Exhibit

6      6.

7              (Thereupon, the item referred to was marked as

8      State's Exhibit No. 6.)

9              THE COURT: About how long is that?

10             MR. GALLAGHER: Half hour, Judge.  It had an

11     audio with it.

12             THE COURT: You want to do this now?

13             MR. GALLAGHER: It's your call.

14             THE COURT: What was your last request?

15             MR. GALLAGHER: I was going to ask the Court to

16     allow us to publish it at this time.

17             THE COURT: Any objections?

18             MR. HOLDEN: No, Judge. No.

19             MR. HECKER:  No.

20             MR. GALLAGHER:  State's 6.

21             (Thereupon, the videotape was played.)

22             MR. GALLAGHER: Special Agent Anderson, tell us

23     what we are looking at at this point.

24             THE WITNESS: What we are doing is shooting the

25     video from a surveillance van.

1          What the van is doing right now is the video is

2     being scanned throughout the parking lot.  Once it

3     gets played, you can see the defendant's vehicle or

4     the vehicle he was driving, Katan Maignan was driving

5     the vehicle that you see in the picture, driving a

6     blue Toyota Corolla.

7          MR. GALLAGHER:  Now, before Katan Maignan

8     arrived on the scene at Denny's on Hallandale Beach,

9     had someone else arrived?

10          THE WITNESS: Yes, Fritz Maignan arrived.  I was

11     standing out in front of the Denny's on Hallandale

12     Beach Boulevard and I observed Fritz Maignan walking

13     up to the front door.

14          MR. GALLAGHER: What happened when you saw him?

15          THE WITNESS: As he came up to the front door, I

16     asked him why he showed up because in my conversation

17     with Katan Maignan, we agreed he wouldn't show up and

18     no one else would show up and I was surprised to see

19     Fritz show up at the time.

20          MR. GALLAGHER: What did he tell you.

21          THE WITNESS:  He told me that he had given

22     money to his brother and his brother was going to do

23     the deal.

24          MR. GALLAGHER: What did he tell you about his

25     involvement in the deal.

1          THE WITNESS: We went inside the restaurant. I

2     told him to come in because had ordered some food.

3          We sat down.  I said he has to leave, only one

4     will be able to do the deal. He said he would leave

5     and his brother would do it.  I said okay.

6          (Thereupon, the videotape was played.)

7          MR. GALLAGHER: The time on this is military

8     time.

9          What is that time?

10          THE WITNESS: 1:25 p.m., 8-11-95.

11          MR. GALLAGHER: Now, I notice that Katan

12     Maignan's car is going up and down each aisle in the

13     parking lot.

14          Based on your training and your experience as

15     an undercover narcotics officer involved in

16     undercover narcotics work, what is that indicative

17     of?

18          THE WITNESS: That is what most drug dealers do

19     is drive back and forth, what we call

20     counter-surveillance, just pretty much checking out

21     the area.  That's why he's going back and forth.

22          MR. GALLAGHER: Had you told Katan Maignan where

23     specifically you were to meet him.

24          THE WITNESS: Exactly, he knew we were meeting

25     at the Denny's.  As soon as you pull in, you can see

1        the Denny's in the parking lot.

2            (Thereupon, the videotape was played.)

3            MR. GALLAGHER: A person is saying we have two

4        of them here.

5            Who is that person?  Who were you talking to?

6            THE WITNESS: I was talking into the Kel. I was

7        wearing a monitoring device.  I was talking to the

8        device. I was telling him we had two of them here,

9        referring to I am now seeing Fritz walking to the and

10       I've also seen Katan driving through the lot.

11           (Thereupon, the videotape was played.)

12           MR. GALLAGHER: Whose voice was talking to you?

13           THE WITNESS: That's Fritz telling me he is

14       giving his money to his brother.

15           (Thereupon, the videotape was played.)

16           MR. GALLAGHER: Who is that getting out of the

17       car?

18           THE WITNESS: This is Katan Maignan right here.

19       He is walking to Denny's, towards the front entrance.

20           MR. GALLAGHER: Who is that individual in the

21       shirt?

22           THE WITNESS: Excuse me.  This is Fritz Maignan

23       as he is leaving the restaurant.  I am inside

24       speaking with his brother now.

25           (Thereupon, the videotape was played.)

1          MR. GALLAGHER: What is Katan saying to you?

2          MR. HECKER: I object.  The tape speaks for

3     itself.  There is an audio on this particular tape.

4          THE COURT:  Overruled, you may go ahead.

5          THE WITNESS:  At that point, he is trying to

6     get me to come over to the car.  I, at this point I

7     am kind of hesitant to even go over there because we

8     agreed that only one person would show up.  Two

9     people had shown up.

10          He said I have the money, I will show it to

11     you, just come over to my car.

12          I am hesitant because at this point, I think he

13     is going to rob me.

14          MR. HOLDEN: Your Honor, I would like to pose an

15     objection. The agent just testified to what the jury

16     heard that's on the tape. The tape is the best

17     evidence.

18          For him to testify is adding what is not on the

19     tape. The jury can hear what is on the tape.

20          MR. GALLAGHER: It is corroborative.

21          (Thereupon, the videotape was played.)

22          MR. GALLAGHER: What did you mean?

23          THE WITNESS: He asked to pat me down and I was

24     explaining to him all I had on me was a nine, a nine

25     millimeter.

1          (Thereupon, the videotape was played.)

2          MR. GALLAGHER: What are you referring to when

3     you say you have been jacked too many times?

4          THE WITNESS: What I am referring to when I say

5     I am being jacked, that's what we call being robbed.

6     I keep bringing up issues that's why I have a gun.  I

7     keep saying you have a gun, you have a pistol.

8     That's why I keep saying that.

9          (Thereupon, the videotape was played.)

10         THE COURT: Are you almost done?

11         MR. GALLAGHER: Probably a minute or so.

12         THE COURT:  Go ahead.

13         (Thereupon, the videotape was played.)

14         THE WITNESS: He's coming out behind me.  That's

15    where he wants me to go look at the money.  He wanted

16    me to go to his car first.

17         (Thereupon, the videotape was played.)

18         MR. GALLAGHER: Thank you, Special Agent

19    Anderson.

20   BY MR. GALLAGHER:

21        Q.   After you left the scene, what did Katan

22   Maignan do?

23        A.   After I got into my vehicle, I departed from

24   the scene.  I could still see him. I saw when he got in

25   his vehicle.  I had already left the lot.

1          As I was going out, he was coming out behind me

2     at that point. I lost view but through hearing

3     surveillance, I knew at that point they pulled him over in

4     the vehicle.

5          Q.   So Katan Maignan was arrested after the meeting

6     on August 11, 1995?

7          A.   That's correct, he was arrested after the

8     meeting.

9          Q.   After he was arrested, what did you do with

10    reference to finding Fritz Maignan?

11         A.   You are asking --

12         Q.   After Katan Maignan was arrested, what did you

13    do with reference to finding Fritz Maignan?

14         A.   After Katan was arrested, right after the

15    meeting, surveillance had lost Fritz.  As you remember on

16    the videotape, he was walking down Hallandale Beach

17    Boulevard.  Somehow surveillance lost eye contact with

18    him, so after we arrested Katan, I started looking through

19    the personal property of Katan.  There was a piece of

20    paper with a number and name on it so we just started

21    making some calls.

22         We had tried to page him to get him to call us

23    back.

24         Myself and a captain from Hallandale Beach

25    Police Department started riding around in his vehicle to

```
 1      see if we could find him.  At the same time, we went by

 2      the address that we had gotten, subscriber information,

 3      subscriber meaning who the number is registered to, so we

 4      got this information and went to that location which was

 5      located in Miramar, Florida.

 6              Upon arrival at that residence, we spoke to

 7      some people who said they did know Katan and Fritz, but

 8      hadn't seen them since earlier that day.

 9              Myself and the captain or agent with us left

10      the residence.

11              On our way back to the Hallandale Beach Police

12      Department, we had to pass the Denny's where we did the

13      original deal and as I looked in the lot, standing in the

14      middle of the lot was Fritz standing in the middle of the

15      lot.

16              The conversation on how I got -- you want me to

17      explain?

18          Q.   What conversation?

19          A.   There was a conversation.  As we were riding

20      around, we were waiting for him to call us back.

21      Eventually he called back.  I was on the cell phone is the

22      reason we couldn't record it.

23              During the conversation, I was telling him your

24      brother is here in the lot, you said he has your money.

25      He says yeah, he has my money.
```

1        I said, he's not doing the deal, he's sitting

2    in the car. The door is locked.  He won't open the door or

3    let me in.  What is going on?  Are we doing this deal or

4    not?

5        He said well, put my brother on the phone.  I

6    acted like I was banging on the window. I had the phone to

7    the window and I'm acting like I'm banging on it and

8    saying, open the door, your brother is on the phone.

9        I said, hey, he won't even open the door.  He

10   is sitting in the car, the seat is back and he won't talk

11   to me, won't open the door.  What is going on?

12       At that point, I said, well, if you guys aren't

13   going to do this, I will leave.  He said I don't know

14   what's wrong.  I gave him the money.

15       I said I will leave then.

16       At that point, we figured he wasn't coming

17   back, but as we went back to Denny's parking lot on

18   Hallandale Beach Boulevard and when I looked in the lot, I

19   saw Fritz Maignan was standing in the lot.

20       At that point, myself and the captain drove up

21   in the vehicle to where he was standing.

22       As soon as he looked at the vehicle, he looked

23   in my face and took off running.  There was a short foot

24   chase.  A citizen actually helped and the citizen tripped

25   him up and we put him under arrest.

1          Q.   At that time, was the Captain from

2    Hallandale Beach Police Department with you

3          A.   Yes, that's the captain that was with

4    vehicle when we arrested him.

5               THE COURT:  Cross examination.

6               MR. HOLDEN: Can we have a brief side bar?

7               (Thereupon, there was a sidebar between Court

8          and counsel, outside the hearing of the court

9          reporter and the jury, after which the following

10         proceedings were resumed:)

11                    CROSS EXAMINATION

12   BY MR. HOLDEN:

13         Q.   Afternoon.  How are you today?

14         A.   Fine, thank you.

15         Q.   A few minutes ago you testified about an

16   incident August 11th and you had indicated on return

17   passing by you went by Denny's and you noticed the

18   defendant Fritz Maignan was in fact walking by there and

19   that's when a foot chase ensued; is that correct?

20         A.   He was standing in the lot looking around.

21         Q.   How did you recognize him at the time?

22         A.   Just from seeing him up close.  I recognized

23   his face.  I think he actually changed shirts from when he

24   was actually arrested.  That's why I don't know exactly

25   what he had on.  I saw his face and recognized him.

1      Q.    You are saying he changed shirts from what

2   point to what point?

3      A.    I believe he changed shirts; I am not sure.    I

4   am saying I recognized him from the face.    From the

5   meeting to the time he was arrested, he may have changed

6   shirts.

7      Q.    When you saw him earlier when he left to run

8   away, do you recall what he was wearing at that time?

9      A.    He had black sweat pants and what I would call

10   maroon short sleeved shirt hanging out of the black sweat

11   pants.

12      Q.    When he was arrested, what was he wearing?

13      A.    I don't recall. It sticks in my mind he had on

14   a different shirt.    That's why I said I am not positive I

15   remember.

16      Q.    Earlier on we saw the videotape and saw what

17   you pointed out at one point was ostensibly was Fritz

18   walking away from the scene?

19      A.    Yes, that was Fritz walking away with what I

20   described him wearing.

21      Q.    You were not operating the surveillance,

22   correct?

23      A.    That's correct.

24      Q.    You don't know if the camera that we saw, the

25   video we saw was actually Fritz walking away; is that

1      correct?

2            A.    I don't understand your question.

3            Q.    How do you know what we just saw on tape, the

4      gentlemen with the red shirt, who you identified as being

5      Fritz, was in fact Fritz?

6            A.    I know where the van was set up, the angle, and

7      I know according to the time on the video that Fritz had

8      just exited the restaurant wearing exactly the same thing,

9      walking in exactly the same direction.

10           Q.    Now, also earlier you testified that Katan

11     Maignan had asked you to come to his vehicle ostensibly to

12     look at money; is that correct?

13           A.    That's correct.

14           Q.    When did this occur on the tape?  Do you recall

15     what time that was?

16           A.    No, I don't.  It's right after we walked out of

17     Denny's Restaurant, telling me I can come to his vehicle.

18     He is trying to get me to the vehicle to look at the

19     money.

20           Q.    Was that something that we could hear on this

21     tape just now?

22           A.    Yes, I heard it.  I can't say who else heard

23     it.

24           Q.    Do you know what time you heard the tape?  Was

25     it the same time it said on the time portion of the

1    videotape?

2         A.   I couldn't say without looking at it again.

3              MR. GALLAGHER: If you want to show the tape,

4         feel free to utilize the machine.

5              MR. HOLDEN: Thank you.

6    BY MR. HOLDEN:

7         Q.   Prior to that, you had requested several times

8    for Katan Maignan to show you some form of money; is that

9    correct?

10        A.   No, that's not correct.

11        Q.   Correct me if I am wrong.  I thought you said

12   show me a couple fifties, show me some fifties.

13             In fact, I counted no less than ten times in

14   this six minute period you had done that; is that correct?

15        A.   Yes, that's correct.  What happened is he asked

16   me was that before he tried to get me over to his vehicle

17   and no, I didn't ask him over and over before that.  I did

18   ask him after he tried to get me over to the vehicle.

19             I didn't want to go to the vehicle because I

20   felt he was going to rob me or had a gun in the vehicle

21   and that's why I was hesitant.  I didn't know where his

22   brother was at that time.

23        Q.   At one point, did you offer to put your gun in

24   your vehicle and have him look at the cocaine that was in

25   your vehicle?

1        A.    No, I did not.

2        Q.    I thought that is what I saw on the video.

3        A.    No, he was asking me -- at one point he stated

4    I tell you what -- I heard on the videotape, and I don't

5    know who else heard it -- he said put the gun in your car

6    and then we can go ahead and do this, something to that

7    effect is what he said and I said no.

8        Q.    You didn't volunteer to put your gun in the

9    car?

10       A.    Absolutely not.  It's on the tape.

11       Q.    In fact, isn't it true Mr. Maignan kept saying,

12   no, I don't want to do this, no, I don't want to do this,

13   at that point when you kept saying approximately ten

14   times, just show me fifty dollars, just show me a hundred

15   dollars. He didn't want to show you the money?

16       A.    He never said no, I don't want to do this.

17       Q.    Did he say I don't want to show you the money?

18       A.    No.

19       Q.    Did he just ignore you?

20       A.    In the beginning he tried to get me over to the

21   vehicle.  At the point to where the video, where he

22   reaches behind his back and says do you mind if I do this,

23   he's referring to patting me down.

24             At the point where I said okay and I patted him

25   down, I told him I had a nine.

1          At that point, he kind of started like wait a

2    minute, because I had gun on.

3          Q.   He said even before that he didn't want to show

4    you the money, that you requested him to show you money

5    prior to the pat down and he indicated at that point he

6    wouldn't show you the money?

7          A.   We have to look at the tape.  I don't recall

8    him saying he would not show me money.  He wanted me to

9    put the gun up.

10          Q.   At that point prior to the pat down, it's your

11    assertion he was totally active and wanted to do the deal?

12          A.   Yes.

13          Q.   So if on the videotape it appears he is

14    hesitant and didn't want to do it, that would be

15    inconsistent to your recollection?

16          A.   Up to the point where we did the pat down,

17    that's correct.

18          Q.   Towards the end of the videotape, you are

19    talking to surveillance; is that correct?

20          A.   At that point, yes, that's correct.

21          Q.   When you are talking to surveillance, isn't it

22    true you are saying to them you all call it, you all call

23    it?  In fact, did you say that a few times?

24          A.   Yes, I did. What happens is if you are on

25    surveillance, you are always conscious of how much time

1    you are spending during negotiations.

2            At one point, he asked me to go back in the

3    restaurant.  Kels sometimes don't work in the restaurant.

4    That's why I didn't want to go back in, so I said, you

5    call it.  Do you want me to take more time to negotiate?

6    Just to get an idea of how they wanted to negotiate.

7        Q.    Now, the word negotiate is an interesting word.

8            When you say negotiate, had you completed an

9    agreement?  Had you come to a final agreement, or were you

10   still in fact negotiating?

11       A.    We were negotiating how the deal would take

12   place. Obviously we had agreed that we were going to do

13   it, but we had to come to an agreement how it would take

14   place.

15           That's why he said put the gun up.  I said no.

16       Q.    Is how it takes place part of doing the deal?

17   When you say we had agreed to the deal, we were

18   negotiating how to do it, isn't that the nature of

19   negotiations, how to do it?

20       A.    At that point, the deal was already in progress

21   as far as I am concerned and the way I looked at it.  We

22   already met there and agreed on a price and everything, so

23   it's just a matter of actually making the exchange.

24           Maybe I am not answering your question.

25       Q.    When you say that there was an agreement, in

1    your mind, what was agreed to besides the price?

2         A.    Agreed to where we would meet, when we would

3    meet, who would meet and basically how the transaction

4    would take place.

5         Q.    Well, that was one of the items, how the

6    transaction would take place so, that had to be agreed on,

7    correct?

8         A.    Yes.

9         Q.    How about the fact that Mr. Maignan brought

10   Fritz. Was that something you had agreed not to do?

11        A.    No, that's something he agreed not to do.

12        Q.    So he breached the agreement, correct?

13        A.    Of course he said he didn't know why he was

14   there.

15        Q.    But you didn't believe that, did you?

16        A.    No, I didn't believe that.

17        Q.    When you are talking on the listening device to

18   the surveillance agent and you said you all call it, do

19   you recall asking if you should take the time to negotiate

20   or if we should do the take down at this point?

21        A.    Kind of a double sided thing. I am looking for

22   some guy, hoping they would call, say go ahead and take

23   more time, plus I didn't know at that time whether -- I am

24   thinking about safety.

25             At that point, I don't know whether the brother

1    went to the car, whether he was in the car or what was

2    going on. I am looking for a little guidance.

3         Q.   Now, as we all saw, this whole incident on the

4    11th occurred in the day time; is that correct?

5         A.   That's correct.

6         Q.   It was pretty bright out in fact, right?

7         A.   Yes.

8         Q.   The defendant, Katan, while the negotiations

9    with you were going on, was nowhere near his vehicle, was

10   he?

11        A.   No, he was not.

12        Q.   In fact, he was walking away from his vehicle

13   at the very time when you claimed that he had told you to

14   come over to the vehicle; is that correct?

15        A.   No, that's not correct.

16        Q.   Was he walking towards Denny's at that time?

17        A.   No, when we said come over to the vehicle, he

18   was walking towards the vehicle.  We were both walking

19   towards the vehicle and away from Denny's.

20        Q.   Weren't you walking towards the vehicle towards

21   the end of the conversation?

22        A.   Towards the end of the conversation, we were

23   walking towards his vehicle.  At what point, if you could

24   be a little more specific.

25        Q.   When you first got there.

1          A.    It didn't seem as if --

2          Q.    The camera was scanning towards the Denny's

3     when the videotape began?

4          A.    When the videotape began, he was in his car

5     riding back and forth through the lot.

6          Q.    Then he arrived?

7          A.    Correct.

8          Q.    And at that point, he got out off his vehicle

9     and walked towards Denny's?

10         A.    That's correct.

11         Q.    And at no point did he walk back to his vehicle

12    until almost the end; is that correct?

13         A.    That's correct.

14         Q.    So at what point was it that he was asking you

15    to come over to the vehicle?

16         A.    On the tape, as soon as we came out of the

17    restaurant, as soon as we came out, you see the truck

18    blocking the view and at that point, we are walking right

19    towards the vehicle.  I am kind of lagging back.  He's

20    still walk towards the vehicle saying come on over to the

21    vehicle, you can see the money.

22              I am saying wait a minute. Where is your

23    brother?  You no, I am trying to lean back from going to

24    the vehicle.

25         Q.    All of what you said is clearly on that

1    videotape?

2        A.    Correct, I think so, yes.

3        Q.    You say he's walking towards his vehicle when

4    he's passing by the UPS truck, right?  You said when he

5    came out from the truck and into view, he was walking

6    towards his vehicle?

7        A.    That's correct.

8        Q.    Isn't it true he was actually walking next to

9    the Denny's and at that point, he was not even close to

10    him vehicle at that point?

11        A.    That's exactly what I said.  He was walking

12    from the Denny's and he was walking towards the vehicle.

13        Q.    Were you at that point in your mind going over

14    to the vehicle?

15        A.    Yes.

16        Q.    How come you didn't go over?

17        A.    I didn't know where his brother was and I was

18    thinking, when I get to the vehicle, whether he was going

19    to pull a gun out or what was taking place, but I was

20    afraid that his brother would be waiting and it would be a

21    robbery.

22        Q.    In fact, weren't there at least ten officers or

23    agents in surveillance at that time?

24        A.    There were probably about that, that's correct.

25        Q.    Were you wearing a bulletproof vest at that

1    time?

2              A.    That's correct.

3              Q.    You had your nine millimeter with you?

4              A.    That's correct.

5              Q.    And you patted down the defendant; isn't that

6    correct?

7              A.    That's correct.

8              Q.    You knew he didn't have a gun?

9              A.    I knew he didn't have a gun on him, at least in

10    the area I patted him, that's correct.

11             Q.    You had offered to have him come over to your

12    car to look at the cocaine?

13             A.    That's correct.

14             Q.    He never did that, did he?

15             A.    No, he did not. He wanted me to put the gun up.

16             Q.    Did you offer to put the gun up?

17             A.    No, I did not.

18             Q.    So he never looked at the cocaine?

19             A.    That's correct.

20             Q.    You never saw his money?

21             A.    I saw money later, yes, but not during the

22    first part.

23             Q.    In fact, the money you saw later was after he

24    was arrested; isn't that correct?

25             A.    Yes.

1       Q.    The money was in his vehicle?

2       A.    Yes, it was.

3       Q.    Several times on the tape I thought I heard the

4    defendant when the deal seemed to be falling apart, saying

5    I'm gone, I'm gone; is that correct?

6       A.    I am going, I am gone. That should have been my

7    voice you were hearing.  He never said he was leaving.  He

8    just kept walking around, not saying anything, just not

9    saying anything.  That was me saying I am going to leave.

10      Q.    But he did answer your direct questions or

11    statements, didn't he?

12      A.    I would say no. You can look at it again, but

13    he kept walking around not saying anything, not walking

14    towards his vehicle and he was just walking around the lot

15    and eventually as you can see on the tape, i will say

16    something and he will wave me over.  I waved him over, and

17    then we'll talk again and at one point, you can hear where

18    he says, well, what I am worried about is that your 5-0,

19    and you can hear that on the tape.

20      Q.    I don't recall that. What time did he say that,

21    do you recall?

22      A.    I couldn't give you a time.

23      Q.    I made notes of the times. I would like to go

24    over that with you for a moment.

25            It seems that looking at the videotape and of

1    course, the jury can see for themselves, that 1:36 you are

2    saying the only way it's going to work is if he shows you

3    the money.

4            What did you mean by that?

5        A.    At that point, I think I said it several times

6    on there, I wanted to see the money but I was not willing

7    to go to the vehicle.  I was asking him several times if

8    you have the money, just like when I originally stated we

9    were walking out from the restaurant towards his vehicle

10    and I stopped and said, what do you have?  Do you have it

11    in a bag? Why not just bring it over here?  Why don't you

12    show me a hundred, a fifty or whatever.  I can't recall

13    exactly the words, but I wanted him to bring me some

14    money, show me some money, so I would not have to walk

15    over to his vehicle which is where I felt the robbery

16    would take place.

17        Q.    Did you in fact say to him that the only way it

18    would work is if he showed you the money?

19        A.    I think I stated that a couple times.  I don't

20    know if I said those exact words. I think I probably said

21    you're going to have to show me some money or something

22    like that because I was also willing to show him the

23    cocaine but he wanted me to put the gun up.

24        Q.    At 1:36, I made some notes showing that you

25    said that the only way it's going to work is if you show

1    me the money.  He never did show you any money, correct?

2         A.    That's correct.

3         Q.    So if in fact that was your statement, the deal

4    was not to work, isn't that correct?

5         A.    No, I'd say no, for the fact that he was still

6    walking around the lot. That's why you hear me saying to

7    him, hey, what are you going to do, what's going on, that

8    type of thing, and then he doesn't say anything. He's just

9    kind of looking around. You can see it on the tape.

10        At that point, I still wasn't sure if it was

11   going to go or not.  At some point you can see where I

12   obviously say okay, you have to do something else.

13        Q.    At 1:38 on the videotape, you again said I

14   believe for the eleventh time, just show me some money,

15   you can go look at it.

16        Did you say if you show me the money, he could

17   go look at it or he go look at it irrespective of showing

18   you the money?

19        A.    I don't recall the exact words I used. I do

20   remember telling him to look at my stuff and I do remember

21   like I said asking him several times, well, you know, just

22   bring me the money, show me something, but again as you

23   can see, he eventually says you brought a pistol, you

24   brought a gun.  He's still harping on that issue.

25        Q.    He had no gun on him, correct?

1          A.    He had no gun on him, that's correct.

2          Q.    He had no money on him that he showed you;

3     isn't that correct as well?

4          A.    That's correct.

5          Q.    Did Fritz show you any money?

6          A.    No, he did not.

7          Q.    Do you know if Fritz was armed at the time when

8     he left the Denny's?

9          A.    I don't know.

10          Q.    When Fritz was arrested there were no weapons

11     found; is that correct?

12          A.    When he was arrested, there were no weapons

13     found on him, correct.

14          Q.    When you were telling the defendant to show you

15     the money and asking him to go look at your car to see the

16     cocaine, isn't he walking away from his vehicle in the

17     direction of walking away?

18          A.    It depends on what time you are talking about,

19     but there is a point in time which I am saying you know, I

20     will show you the drugs. There is a point in which he was

21     walking away from the vehicle and we are walking towards

22     my vehicle.

23          Q.    Why do you ask so many times for the defendant

24     to show you the money?  What is a so significant about him

25     showing you the money?

1          A.   Why am I asking him that?  The reason I keep

2     asking him to show me the money and not show me the money

3     in the car, like I said, I didn't want to go to the car

4     because I felt that's where a robbery would take place is

5     at his vehicle, so I am asking him to show me the money so

6     I can see that he does want to actually do a deal or if he

7     brought any money or is it just a ripoff.  I am trying to

8     distinguish that myself.

9          Q.   In terms of a ripoff, he's not heading over to

10     the car to -- go back.

11          You know there is no weapon on him at the

12     scene, correct?

13          A.   I know there was no weapon where I patted him

14     down, that's correct.

15          Q.   He's not heading back to the car if there were

16     a weapon he could use in his car. He's not going back in

17     that direction; isn't that correct?

18          A.   That depends at what point you are talking

19     about not going to his vehicle.

20          Q.   Even if he turned around, he's not within fifty

21     feet of his vehicle until he leaves the scene; is that

22     correct?

23          A.   I don't know exactly the distance, but at the

24     point we were walking out, I would say we were about that

25     distance, maybe a little less from his vehicle at the

1    point I said hold up.

2         Q.   Now, going back a little further before the

3    tape, you had surveillance at the Denny's prior to the

4    arrival of either defendant; is that correct?

5         A.   That's correct.

6         Q.   Did you or the surveillance that you know of

7    personally observe the defendant arrive at the scene at

8    any time prior to the time when they were on the

9    videotape?

10        A.   I was not advised of anyone arriving prior to

11   myself seeing them on the scene.

12        Q.   Did you see Fritz arrive on the scene?

13        A.   Yes, I did see Fritz.

14        Q.   He arrived on foot?

15        A.   I saw him approaching the door on the north

16   side of the Denny's is the first time I saw him, and he

17   was walking up on foot there.

18        Q.   You had testified earlier that the defendant,

19   Katan, was driving through the parking lot; is that

20   correct?

21        A.   Yes, that's correct.

22        Q.   On the videotape, did you notice if there were

23   any empty spaces in the rows that he was driving down?

24        A.   Yes, there were a lot of spaces.

25        Q.   But on the videotape, it showed there were

1    not.  Would that be a more accurate representation than

2    your recollection?

3         A.   No, you can clearly see there are spots in

4    several areas that are actually closer to the Denny's than

5    where we were going to meet.

6         Q.   That's a good point. If he were going to do a

7    ripoff, wouldn't he want a weapon if he had one in his

8    vehicle, closer to the Denny's?

9         A.   Excuse me?

10        Q.   Let's assume your statement about a ripoff is

11   significant and a weapon would be relevant to a ripoff.

12             First of all, let's go back a second.

13             Were you concerned about him trying to rip you

14   off without a weapon?

15        A.   Yes.

16        Q.   In what sense?

17        A.   In the sense that he is a much bigger guy than

18   I am, a bigger guy.

19        Q.   But you did have ten agents as you testified

20   very close by as you testified, didn't you?

21        A.   Not as close as his vehicle.

22        Q.   In fact, in your training at Quantico, one

23   thing you were trained in was hand to hand self-defense;

24   is that correct?

25        A.   That's correct.

1        Q.   Do you have any personal knowledge about any

2    martial arts or working out or any physical training that

3    either of the defendants have done?

4        A.   Just obvious they work out.  They have a

5    muscular build.

6        Q.   Well, the fact that they have a muscular build

7    in and of itself doesn't mean they are skilled at all in

8    any self-defense or hand-to-hand combat?

9        A.   No, it doesn't, but at the academy, what we go

10   through is very, very basic defense techniques.

11       Q.   Have you had any other hand-to-hand combat

12   training or self defense?

13       A.   Yes, I have very limited.

14       Q.   What would that be?

15       A.   In college I took a couple basic martial arts

16   classes.

17       Q.   Was that karate?

18       A.   Basic karate.

19       Q.   How far did you get in that?

20       A.   Well, they didn't have a belt system.

21       Q.   Do you know what style of karate that was?

22       A.   No, it was very basic, just general like to

23   give you an idea of what martial arts is all about.

24       Q.   You never had training in any other forms of

25   self defense whatsoever?

1     A.   Not really.

2     Q.   No boxing?

3     A.   No.

4     Q.   You also indicated that when you arrived at the

5     scene, I believe at some point, and I don't know if this

6     was at McDonald's or at the Denny's, that you were driving

7     a white Mercedes; is that correct?

8     A.   That's correct.

9     Q.   Why did you chose a white Mercedes?

10    A.   We have basically two vehicles that we use a

11    lot for undercover in our office.

12         The one vehicle had a bunch of stuff in it at

13    the time.  It would have been a hassle to take everything

14    out like, police identifying information, a radio, things

15    like that.

16         This vehicle was a vehicle that was stripped of

17    those things, so it was a vehicle that was just ready and

18    available at the time.

19    Q.   This vehicle wasn't used at all because it was

20    a flashy vehicle and would go along with the idea that you

21    were a drug dealer?

22    A.   I think we keep that in mind when we have

23    vehicles that are available for that.  We have junk

24    vehicles, junk trucks and we have nice vehicles.

25    Q.   What about the fact that both you and Officer

1     Tatum are black? What that chosen as any reason knowing

2     that both defendants were black?

3           Was the fact both of you were black chosen

4     specifically?

5           A.   I would say not, because I was making those

6     decisions.  At first I was going to use Special Agent

7     William Dyer who was in the room during some of the

8     conversations.

9           Eventually we worked down to using Officer Sam

10    Tatum.

11          Q.   Is that because he's black and the defendants

12    would feel more comfortable with a black officer?

13          A.   That would be a consideration, yes.

14          Q.   You say you brought two kilos of cocaine to the

15    arrest scene; is that correct?

16          A.   That's correct.

17          Q.   Those two kilos of cocaine, did you personally

18    field test it to see if it was in fact cocaine in the

19    kilos?

20          A.   We don't actually cut into them at all.

21          What happens is we write up a memo requesting

22    the use of real kilos of cocaine from our lab.  The lab

23    will test them and have a write-up on them that will

24    accompany the cocaine, so when the cocaine is picked up by

25    us, it's already sealed in a bag.  It's weighed to get the

1    exact amount and it has the lab results of the purity on

2    it, so there is no need for us to cut into it or verify

3    what it is.

4        Q.    These documents you were referring to were in

5    fact on the kilos of cocaine?

6        A.    They weren't on the kilos.  They were with the

7    kilos so when we pick it up, it tells you what they are.

8        Q.    Do you have those labels or wrappers with you

9    today?

10        A.    No, I don't.

11        Q.    At the time, you say you did not cut into the

12    kilos; is that correct?

13        A.    That's correct.

14        Q.    So do you have any personal knowledge other

15    than what you already stated that in act that was even

16    cocaine in those alleged kilos?

17        A.    Yes, I would consider that personal knowledge.

18    The fact that any time we seize narcotics, it's sent off

19    to our lab in Miami, Florida and they in turn test it and

20    they will come to court and testify that this is what it

21    is. They will write us a letter back saying it was

22    cocaine.

23        Q.    But do you know if in fact it had been cocaine

24    that had been seized that was being used?

25        A.    Yes, I believe it was cocaine that had been

1    seized and was being reused.  It comes out of our stock

2    pile.

3         Q.    How do you know it was cocaine already seized

4    as opposed to cocaine made by the agency?

5         A.    In our stock pile, they usually don't keep

6    cocaine that is made by the agency.  It's a stock pile of

7    seized cocaine.

8         Q.    When you say usually, is there a policy on

9    this?

10        A.    I can't quote you any policy or anything like

11   that.  It's pretty much given knowledge.

12        Q.    As far as actually the cocaine in this case

13   goes, you never did any test to personally determine

14   whether or not there was the presence of cocaine in this?

15        A.    I personally did not.

16        Q.    Isn't it true you wanted to control the

17   situation, that you wanted to control the buy, so that you

18   felt safe?

19        A.    That's true.

20        Q.    Isn't it also true that by doing that, you

21   exerted all the control over the defendant as to how much,

22   the when, the where and the how.

23             Wasn't that all at your discretion?

24        A.    No, it was not.

25        Q.    Let's go through it piece by piece if we can.

1            The location of the bust originally was

2     supposed to be in Boca Raton; is that correct?

3        A.   That's correct.

4        Q.   You had indicated that the defendant felt that

5     was too far for them to drive; isn't that correct?

6        A.   That's correct, they decided they did not like

7     that location.

8        Q.   You didn't refuse to drive to Miami; is that

9     also correct?

10       A.   At my -- yeah, as I said, I am not going way

11    down to Miami.

12       Q.   You chose Hallandale, correct?

13       A.   We agreed on Hallandale.

14       Q.   Wasn't it you who said that Katan should come

15    by himself and bring no one with him?

16       A.   Initially it would not have been me. I probably

17    on tape said that, but initially on several or a couple

18    points on tape, you will hear me saying the only person

19    I's bringing with me is my boy, the guy I brought the

20    other day at the meeting and then you will hear the

21    defendant say why do you have to do that and at one point,

22    you hear Katan saying how come we can't do it one on one,

23    how come we can't do it alone? Why are you bringing this

24    other guy?

25       Q.   In fact, it was you who had chosen the amount

1    of cocaine, the price, that is?

2        A.    The price, that's correct.  I had two different

3    prices and they actually picked the one that they

4    preferred.

5        Q.    I would like to go back as long as we are on

6    that subject.  Briefly, you mentioned earlier about the

7    word cooking, hadn't you?

8        A.    That's correct, true.

9        Q.    About the defendant cooking cocaine?

10       A.    Yes.

11       Q.    Isn't it true before that ever occurred, that

12   you had said to them that they would have to know what to

13   do with the wet cocaine, that they would have to do

14   something with it.

15           Did you in fact say that to them on the tape?

16       A.    I think you can hear something to that extent.

17   I said if someone knows what to do with it or something to

18   that extent.

19           I am not sure if I said that before or

20   afterward.  We have to listen to the tape to see if they

21   said that first or did I say that.

22       Q.    Now, you testified that at the McDonald's that

23   Sergeant Tatum was there for your protection; isn't that

24   correct?

25           Isn't it correct that you had said that today?

1          A.    Yeah, I said that he was there for that and

2     other reasons.

3          Q.    Didn't you also say today that the purpose of

4     that meeting at McDonald's was for an introduction and

5     that no cocaine was to change hands at that point?

6          A.    That's correct.  During our conversation, the

7     first conversation they wanted to at the time I was

8     speaking to Fritz, was willing to actually do the deal the

9     next day.  They were ready, said are you going to bring

10    yours, I will bring mine.

11          I said no, I just wanted to do a meeting

12    first.  He said okay, we will just do a meeting first.

13          Q.    Why were you afraid of being ripped off at that

14    introductory meeting?

15          If you were not intending to bring cocaine,

16    wouldn't it be logical that the defendants were not

17    intending to bring money?

18          A.    Are you saying the reason I brought Tatum along

19    with me?

20          Q.    No, the reason that you said today that you

21    were afraid of being ripped off at that meeting?

22          A.    I never said that I was afraid of being ripped

23    off at that meeting. I said he was brought as somewhat

24    protection and somewhat just to have another person

25    there.

1              It's good when you are dealing with more than

2    one bad guy to not be outnumbered, so it's a good practice

3    to bring someone else with you.

4         Q.   Not meaning to argue with you, but I was

5    writing down verbatim the words that you said, and of

6    course we can have the court reporter go back, but I

7    thought your testimony was specifically that quote, Tatum

8    was there so I wouldn't get ripped off, unquote.

9              Isn't that what you said today?

10        A.   That's professionally, yes, but like I said, I

11   really wasn't afraid that day of actually being ripped

12   off.

13        Q.   But why did you say that today?

14        A.   I actually have to listen back to see if it was

15   actually said that way.

16        Q.   If in fact you did say that today, would it be

17   for the purpose of making the jury believe this was an

18   intended ripoff?

19        A.   No, it would just be because that's the way I

20   felt at the time.

21        Q.   In fact, on one of the occasions and there have

22   been several occasions, audio tapes that we listened to

23   today, you indicated that the defendant backed out, that

24   they didn't want to do the deal or Katan told you forget

25   it; isn't that correct?

1         A.    I was asked by Mr. Gallagher at that point was

2    the deal going to continue and I said at that point, it

3    was put off, at the end of one of the conversations.

4         Q.    In fact, on the audio tape that we heard, he's

5    saying forget it and you're saying forget it; isn't that

6    correct?

7         A.    Yes, that's correct.

8         Q.    At that point in time, would you have arrested

9    the defendant?

10         MR. GALLAGHER: Judge, that's irrelevant what

11         they would have done at that point.  It's not the

12         issue for the trier of fact.

13         THE COURT:  Sustained.

14    BY MR. HOLDEN:

15         Q.    At that point in time, had the defendants

16    committed a crime?

17         MR. GALLAGHER: Same objection; that's for the

18         jury to decide if a crime was committed.

19         THE COURT: Objection sustained.

20    BY MR. HOLDEN:

21         Q.    Why didn't you take the defendant down at that

22    point?

23         MR. GALLAGHER: Judge, it's irrelevant what he

24         might have done, should have done, could have done.

25         It's irrelevant to this case.

1              THE COURT: Sustained.

2    BY MR. HOLDEN:

3         Q.   The defendants are charged with conspiracy to

4    traffic; is that correct?

5         A.   That's correct.

6         Q.   And in your investigation of this case, did you

7    run into any prior drug involvement of the defendants?

8         A.   Yes.

9         Q.   You did?  Which defendant?

10        A.   Well, just through their conversations, they

11   brought up the point that they had did business with Joe

12   before, referring to the C.I., just during the

13   conversations, the statements that they made.

14        Q.   And at that time, did you confirm that at all?

15        A.   No, I didn't confirm it.

16        Q.   Did you attempt to confirm it?

17        A.   It was just said in conversation.  We ran the

18   records once we had their names, but we didn't have the

19   names until later.

20        Q.   Later on when you did get their names, you ran

21   them?

22        A.   Yes, we did.

23        Q.   What was that?

24        A.   The results that we pulled up were negative.

25        Q.   So no prior drug related history that they had

1     been arrested for?

2          A.    No.

3          Q.    You also indicated that the confidential

4     informant -- what is his name?

5          A.    Joseph Clark.

6          Q.    -- that Mr. Clark normally was paid for this

7     kind of situation; is that correct?

8          A.    That's correct.

9          Q.    But that he wasn't paid here?

10          A.    That's correct.

11          Q.    Do you know why he wasn't paid here?

12          A.    Probably a couple different reasons.

13          Q.    Could you tell me what those are, if you know?

14          A.    For one thing, at the time that this deal took

15     place, he was not a registered DEA informant.

16          Q.    Had he been prior to this case?

17          A.    Yes, he had been prior to this case.

18          Q.    The reason he was not paid on this case was

19     because one of the reasons was he was not a registered DEA

20     informant at the time of this case?

21          A.    That was probably part but not the sole reason.

22          Q.    Did he work on a contingency basis?  In other

23     words, did he make his fee based on the amount of money

24     that was seized or was it a set fee in each case?

25                MR. GALLAGHER: Objection, what the informant

1          may have done in the past is irrelevant.  What he did

2          in this case might be important.  If he wants to ask

3          that question, it would be relevant.

4                    THE COURT: Overruled.

5                    Can you repeat your question?

6     BY MR. HOLDEN:

7          Q.   Was the defendant normally paid a contingency

8     fee or was he paid a specific set fee on any case?

9          A.   It all depends.

10         Q.   Sometimes contingent, sometimes set fee?

11         A.   No, it just depends on the totality of the

12    circumstances.

13         Q.   In this case, do you know, going into it, if

14    there was any plan how he would be paid, whether it would

15    be a set fee or a contingent fee?

16         A.   I don't remember speaking about whether it

17    would be a set fee or contingent fee.  Like I said, it's

18    all -- I think he expected probably to get paid because

19    like I said, we never really got into that conversation.

20         Q.   In fact, when you say expected to be paid, how

21    would you know that?

22         A.   He had been paid before so I can only assume.

23    I can't really say.

24         Q.   And he was the one who first brought to your

25    attention the existence of these two individuals; correct?

1         A.    That's correct.

2         Q.    He did this at the time knowing that in the

3    past, he had been paid for bringing defendants to your

4    attention?

5              MR. GALLAGHER: Judge, I object, asking this

6         witness to speculate what is the mind of some other

7         person.  It's impossible to testify to that.

8              THE COURT:  Sustained.

9    BY MR. HOLDEN:

10        Q.    Now, getting back to this time when the

11   defendant Katan had said forget it. I believe you also on

12   the tape said forget it.

13             At that time, there became a lack of

14   communication between the two of you for some length of

15   time.

16             How long was it before you next spoke to Katan

17   or Fritz Maignan after Katan said forget it?

18        A.    I have to get the exact time of that last call,

19   but probably a couple hours because it was -- I think that

20   call ended around three something, after 3:00 p.m., and it

21   was probably a couple hours later that I received a beep

22   from him.

23        Q.    After Katan said forget it and you said the

24   same thing, were you still planning to take him down, to

25   arrest him?

1           MR. GALLAGHER: Same objection, it's irrelevant

2       what he intended to do at that point.

3           THE COURT:  Sustained.

4   BY MR. HOLDEN:

5       Q.    After Katan said forget it and you said the

6   same thing, when did you next speak to him?

7       A.    Like I said, it would have been couple hours

8   later when he paged me.

9       Q.    Did he page you first or you paged him first?

10      A.    No, he paged me.

11      Q.    That was a few hours after saying forget it or

12  was it the next day?

13      A.    A few hours later I believe.

14      Q.    When he paged you, you immediately called him

15  back?

16      A.    I don't recall how much time.

17      Q.    Was that the one where you called him back at

18  11:00 rather than at 9:00?

19      A.    No, it was not on the tape.

20      Q.    It was not on tape?

21      A.    No.

22      Q.    But he beeped you?

23      A.    That's correct.

24      Q.    Did you have the ability to call him back once

25  you got back to the tape recorder?

1        A.    No, because I was not at the office at that

2    time.

3        Q.    How far away were you, time-wise?  At the time

4    when you received the beep, how far away were you in the

5    time sense, from your office I mean?

6        A.    I don't recall, ten minutes, twenty minutes, I

7    don't recall.

8        Q.    Could you have waited to get back to your

9    office and returned the call recorded?

10       A.    Yes, I probably could have.  I don't know if he

11   still would have been at the number, but usually when

12   someone pages you, you try to call him right back.

13       Q.    You don't have any technology available to

14   record a conversation when you are not in your office?

15       A.    Yes, the technology is available, but I didn't

16   have anything with me at the time.

17       Q.    Which vehicle were you in at the time if you

18   could tell me?

19       A.    I was in my usual vehicle, Acura Legend.

20       Q.    That's your only vehicle?

21       A.    No.

22       Q.    Or the vehicle you normally use?

23       A.    That's correct.

24       Q.    There is nothing in that vehicle that you could

25   use, no tape recording device that would allow you to have

1    recorded that conversation from either a pay phone or

2    public phone?

3        A.    That's correct.

4        Q.    You didn't have the ability at that time to go

5    to a public phone and call to headquarters and have them

6    tape the conversation from where he would be calling back?

7        A.    We cannot do that through our base number which

8    is the number to call 24 hours a day because when someone

9    uses Caller ID, it will automatically say DEA is calling

10   you.  There's no way to get by.  You can't do this.

11       Q.    Now, when you met at McDonald's before the

12   arrest, was any money shown to the defendants?

13       A.    No, it was not.

14       Q.    Was any cocaine shown to the defendants at that

15   time?

16       A.    No, it was not.

17       Q.    In reality, you never intended to sell cocaine

18   to the defendants; is that correct?

19       A.    Yes, we did intend to sell cocaine.

20       Q.    Well, as a law enforcement officer, isn't it

21   correct that you would not actually have allowed him to

22   leave the scene with cocaine?

23       A.    That's correct.

24       Q.    You could have prevented them from leaving the

25   scene; correct?

1     A.   You would like to think so.  There have been

2     times when people have gotten away.

3     Q.   Interestingly you said at one point you told

4     the defendants to go, or you told Katan Maignan to go to

5     the car to look at the cocaine; isn't that correct?

6     A.   On the 11th, yeah, I made that statement to

7     him, that he could come look at the cocaine.

8     Q.   One of your concerns is that the defendant was

9     going to rip you off of the cocaine; is that what you

10    testified to earlier?

11    A.   At that point, no.  At this point, he made the

12    statement that he didn't want to go look at it because he

13    still wanted me to get rid of my gun.

14    Q.   But you offered to let him look at it?

15    A.   Correct.

16    Q.   You said you would stand away while he did

17    that; is that correct?

18    A.   I believe so.

19    Q.   If he was going to rip you off, why not just

20    take the cocaine and run at that point?

21    A.   First of all, I don't know that.  He just

22    wanted to --

23    Q.   No surveillance was there, correct?

24         MR. GALLAGHER: Objection to the question.  This

25    witness can't testify what was in the mind of Katan

```
 1              Maignan and certainly he shouldn't be allowed to
 2              answer the question just asked by Mr. Holden.
 3      BY MR. HOLDEN:
 4              Q.   Let me go back to the previous question, if the
 5      court reporter can read it back, please.
 6                   (Thereupon, the question referred to was read
 7              back by the court reporter.)
 8                   THE WITNESS: Yes, at that point, still the same
 9              concern that he had the whole time.  I still have the
10              gun.  That's why I don't think he went to the vehicle
11              in the first place because he knew I still had the
12              firearm.
13                   THE COURT:  Next question.
14                   MR. HOLDEN: Thank you.
15                   THE COURT: How much longer do you think you
16              will be?
17                   MR. HOLDEN: About at least another half hour,
18      Your Honor.
19                   THE COURT: This court will be in recess until
20      1:30 tomorrow afternoon.
21                   The jury is admonished not to discuss the case
22      amongst themselves or with anyone else or have it
23      discussed in their presence and neither see, read nor
24      hear any news reports of this matter.
25                   Have a nice evening.  Be back about twenty
```

1    after one.  Walk right into the room here.  Go right

2    back in the jury room until we call you out.

3         Have a nice evening.

4         If this interrupts your testimony, you should

5    not discuss anything with any party at this point or

6    with the attorneys.

7         Anything further?  State?

8         MR. GALLAGHER: Not from the State.

9         THE COURT: Defendant?

10        MR. HOLDEN: Nothing, Your Honor.

11        THE COURT: See you tomorrow.

12        Have a nice evening.

13        (Thereupon, the proceedings were adjourned at

14   5:00 o'clock p.m., to reconvene the following day,

15   June 12, 1996, commencing at or about 1:30 o'clock

16   p.m.)

17

18

19

20

21

22

23

24

25

138

```
 1      State of Florida )
                         :  SS
 2      County of Broward)

 3

 4                  IN THE CIRCUIT COURT OF THE
                   SEVENTEENTH JUDICIAL CIRCUIT,
 5              IN AND FOR BROWARD COUNTY, FLORIDA

 6

 7      STATE OF FLORIDA,        )
                                 )
 8              Plaintiff,       )
                                 )
 9          vs.                  ) CASE NO. 95-14021CF10B
                                 )
10      FRITZ MAIGNAN,           )
                                 )
11              Defendant.       )
        _____)

12

13

14          Proceedings had and taken before the Honorable

15      ROBERT W. TYSON, JR., one of the Judges of said Court, at

16      the Broward County Courthouse, Fort Lauderdale, Broward

17      County, Florida, on the 12th day of June, 1996, commencing

18      at or about 1:30 o'clock p.m., and being a Jury Trial.

19

20      APPEARANCES:

21          JOHN GALLAGHER, ESQUIRE,
            Assistant State Attorney,
22          Appearing on behalf of the State.

23          SCOTT HECKER, ESQUIRE,
            Appearing on behalf of the Defendant Fritz Maignan.
24
            MICHAEL HOLDEN, ESQUIRE,
25          Appearing on behalf of the Defendant Katan Maignan.
```

BROWARD REPORTING SERVICE   (954) 763-1382

1    Thereupon:

2        The following proceedings were had:

3        THE COURT:  We reconvene in the matter of the

4    State of Florida versus Fritz and Katan Maignan.

5        Counsel and accused are present.  It is now

6    twenty to two.

7        State ready?

8        MR. GALLAGHER: Yes, Judge, we put a copy of the

9    proposed instructions in front of Your Honor, if you

10    want to peruse at your leisure.

11        We haven't done the verdict form.  I haven't

12    had definite confirmation.

13        THE COURT: Do you have a copy?

14        MR. HECKER: Yes, Judge, we do.

15        THE COURT: Look at them.  If there are any

16    changes, work them out.

17        Have all the jurors returned?  Okay.  Escort

18    the jury in, please.

19        (Thereupon, the jury entered the courtroom at

20    1:40 o'clock, and the following proceedings were had

21    within the presence of the jury:)

22        THE COURT:  Concede the presence of the jury

23    and waive polling, State?

24        MR. GALLAGHER: Yes, Your Honor.

25        THE COURT:  Defense?

```
 1              MR. HOLDEN: Yes, Your Hono
 2              MR. HECKER:  Yes.
 3              THE COURT: Good after
 4      this case amongst yoursel
 5      have it discussed in your prese
 6      news reports about this matter since
 7      recessed?
 8              Yes or no?  Those who said yes, raise you
 9      hands.  No hands.
10              Ready?  State ready?
11              MR. GALLAGHER: Yes, Your Honor.
12              The witness is still under oath.  Do you
13      understand that?
14              MR. HOLDEN: Yes, I do, Your Honor.
15              THE COURT: You may continue on with cross
16      examination.
17   Thereupon:
18                      HEATH ANDERSON,
19   having been previously duly sworn, was examined and
20   testified upon his oath as follows:
21                      CROSS EXAMINATION
22   BY MR. HOLDEN:
23      Q.   Good afternoon, Agent. How are you today?
24      A.   Good, thank you.
25      Q.   Yesterday when we left, we talked about the
```

1    things on cross examination but one thing we spoke about

2    was the confidential informant, Joseph Clark.

3              When you had testified yesterday, you spoke

4    about your previous contact with Joseph Clark.

5              As related to this case, did Joseph Clark and

6    you discuss whether or not he had spoken with the

7    defendant Katan Maignan?

8         A.   We didn't discuss whether he spoke with him or

9    not.  He never mentioned his name.  He first mentioned the

10   name Stizzo, which was Fritz.

11        Q.   Did he ever mention Slow?

12        A.   No.

13        Q.   Did he ever mention the name Katan?

14        A.   No.

15        Q.   Any other name in addition to Stizzo that he

16   did mention?

17        A.   I don't believe any other names other than

18   Stizzo.

19        Q.   Now, the C.I. in this particular case, you had

20   indicated earlier had not been paid in this case, correct?

21        A.   That's correct.

22        Q.   But he had been a documented confidential

23   informant for DEA; is that correct?

24        A.   That's correct.

25        Q.   In fact, this was a DEA or federal operation?

1          A.    That's correct.

2          Q.    You work for the federal government, don't you?

3          A.    Yes, I do.

4          Q.    And as stated a moment ago, this was a federal

5     operation.

6                Was the case prosecuted on a federal basis?

7                MR. GALLAGHER: What happened at the federal

8          level with regard to prosecution is irrelevant.

9                THE COURT: Sustained.

10    BY MR. HOLDEN:

11         Q.    Did you speak with any prosecutor ——

12               MR. GALLAGHER: Same objection, same area.

13               MR. HOLDEN: I haven't asked the question.

14               MR. GALLAGHER: He is going to ask about federal

15         prosecution.  I object to what happened at the

16         federal level with regard to prosecution.

17               MR. HOLDEN: I am requesting any personal

18         knowledge he had.

19               MR. GALLAGHER: Can we go side bar?

20               THE COURT:  Please show the jury to its room.

21               (Thereupon, the jury left the courtroom, and

22         the following proceedings were resumed outside the

23         presence of the jury:)

24               THE COURT:  You can ask the question now.

25               MR. HOLDEN: Agent, did you have any discussion

1    with any federal prosecutors with respect to the

2    decline for filing charges in this case?

3    MR. GALLAGHER: My objection is regardless of

4    what happened at the federal level, it's irrelevant

5    to this prosecution.

6    THE COURT:  Overruled for the moment for

7    proffer purposes of what is before the Court.

8    You may answer the question.

9    MR. HOLDEN: Did you talk to anyone?

10    THE WITNESS: Yes, I did.

11    MR. HOLDEN: My next question would be did you

12    say anything to any federal officer as input for them

13    to decline charges?

14    THE WITNESS: To decline charges?  Basically I

15    just gave them the facts, what we had at that time,

16    which was the amount of cocaine we were dealing with

17    and basically gave those facts and the individuals

18    that we were dealing with.

19    MR. HOLDEN: My next question would relate

20    directly to the crack cocaine issue.

21    THE COURT: Ask the question.

22    MR. HOLDEN: Did you mention anything to any

23    federal prosecutor regarding the possibility of crack

24    cocaine?

25    THE WITNESS: No, I did not.

1          MR. HOLDEN: Did you mention anything to any

2     federal prosecutor about the fact this would be

3     cooked?

4          THE WITNESS: No, I did not.

5          MR. HOLDEN: Did you tell federal officers

6     everything that you knew about the case?  When I say

7     officers, I mean federal prosecutors?

8          THE WITNESS: Yes, to the best of my knowledge,

9     yeah.

10          MR. HOLDEN: That would be it.

11          MR. GALLAGHER: My objection for him to get into

12     this area of inquiry or this particular witness about

13     the federal government's decision to decline the

14     prosecution of this case is only going to lead the

15     jury to believe this case is not worthy of

16     prosecution and therefore they should not give it any

17     credence.  That's why he is asking this line of

18     question, no other reason.

19          In order for him to be asking this line of

20     questions, it's totally irrelevant to state what the

21     federal prosecutor decided to do or this particular

22     special agent told the federal prosecutor with regard

23     to federal prosecution that never took place.

24          MR. HOLDEN: I would state what he said to the

25     federal officers is germane.  If they decided to file

1       charges, they had enough made available to them and

2       they chose to decline prosecution.

3               I am not saying the State is improper.  I

4       haven't alluded to that.  I am saying the federal

5       government is a separate body with a separate set of

6       laws, not bound by our state laws and has voluntarily

7       declined to prosecute based on information provided

8       by this same witness.

9               THE COURT: With is the relevance as to the

10      guilt or innocence of these defendants?

11              MR. HOLDEN: The relevance is that since this

12      witness gave input whether or not these defendants

13      should be charged in a federal information, or

14      federal indictment, that same testimony that he gave

15      to those federal prosecutors should be made available

16      for us to inspect.  It should be made available for

17      the jury to hear as it --

18              THE COURT:  That's not what this is.  For

19      purposes of trial, what they are hearing, what the

20      relevance is, for purposes of trial?

21              MR. HOLDEN: As to the trial, Your Honor, the

22      elements here are that the defendants specifically

23      conspired with one another.  If I can't elicit

24      testimony from the agent that is conflicting with the

25      defendants that we already heard -- for example, the

```
 1          issue of cooking, the issue of crack inflames the

 2          jury.  The issue of cooking is an inflammatory fact.

 3          The federal prosecutor has not charged them in this

 4          information and still declines.  I believe this is

 5          significant as to their guilt or innocence.

 6              THE COURT:  Objection sustained, shall not be

 7          used.  Precludes both defense counsel from getting in

 8          any inquiry with regard to federal prosecution, both

 9          or not to get into it unless outside the presence of

10          the jury.  Then I will rule whether it's relevant or

11          not.

12              Escort the jury in, please.

13              (Thereupon, the jury entered the courtroom,

14          after which the following proceedings were had within

15          the presence of the jury:)

16              THE COURT: Ask your next question.

17              MR. HOLDEN: Thank you, Your Honor.

18     BY MR. HOLDEN:

19          Q.   Agent, earlier I asked if you had personal

20     knowledge of any conversations between Katan Maignan and

21     Joseph Clark and what was your response to that, please?

22          A.   It was no.

23          Q.   That you didn't know of any contact between

24     them?

25          A.   No.
```

1          Q.    The confidential informant, did he work under

2     you?  Was he your confidential informant so to speak?

3          A.    Yes.

4          Q.    Had you ever arrested him before?

5               MR. GALLAGHER: Can we go side bar?

6               (Thereupon, the following side bar was held

7     outside the hearing of the jury:)

8               MR. GALLAGHER: Judge, I am noticeably concerned

9     because I have no idea where Mr. Holden is going with

10    this improper questioning about the confidential

11    informant.  I don't like constantly objecting in

12    front of the jury.  That's not my tact, however,

13    Mr. Holden is asking questions about the arrest of a

14    confidential informant and unrelated incidents about

15    the confidential informant.

16          I am asking the Court to please limit

17    Mr. Holden's cross examination with regard to the

18    informant to include those incidents related to this

19    case and not any unrelated incidents.

20          THE COURT: Shall we exclude the jury and find

21    out where he is going?

22          Please show the jury to the jury room.

23          (Thereupon, the jury left the courtroom, after

24    which the following proceedings were resumed outside

25    the presence of the jury:)

1          THE COURT: Ask your question.

2          MR. HOLDEN: Agent, you had arrested the

3    confidential informant before?

4          THE WITNESS: No.

5          MR. HOLDEN: Had the confidential informant ever

6    been convicted of a felony as far as you know?

7          THE WITNESS: I couldn't say for sure.

8          MR. HOLDEN: Do you recall ever having been to a

9    deposition?

10          THE WITNESS: Yes.

11          MR. HOLDEN: In this case?

12          THE WITNESS: Yes.

13          MR. HOLDEN: At the time of your deposition,

14    were you placed under oath?

15          THE WITNESS: Yes.

16          MR. HOLDEN: And represented by counsel at the

17    time?

18          THE WITNESS: I am not sure if they were there

19    or not; I don't recall.

20          MR. HOLDEN: I hand you what is a true copy of a

21    transcript of deposition of yours, the date of which

22    is on the cover of that deposition, I believe.

23          THE WITNESS:  What page.

24          MR. HOLDEN: Page five.

25          Does that change your recollection as to your

1    testimony a few moments ago?

2         THE WITNESS: No, it doesn't because what I said

3    was I am really not sure.  I would have to look at

4    his file in our office to tell you if it was a felony

5    or not.

6         MR. HOLDEN: That's why I am saying you did

7    indicate in your deposition he served prison time.

8         THE WITNESS: I can look right here and tell

9    you.

10        MR. HOLDEN: If you would, thank you.

11        If you could keep reading beyond that page, it

12   may clear it up.

13        THE WITNESS: Okay, yeah, it says you asked --

14   whoever was asking the questions at that time, do you

15   know if he served time?  I said I don't know what the

16   charges.  Let's see -- I believe it was stated he had

17   served time again here.  Like it says, I wasn't sure

18   what the charges were.

19        MR. HOLDEN: Did you indicate it was state

20   prison time he served?

21        THE WITNESS: I said I believe it was state.  I

22   am not sure.

23        MR. HOLDEN: Thank you.

24        That's where my proffer is headed, directly to

25   the credibility of the C.I. It's kind of important

1          here.

2                    THE COURT:  Sustained.

3                    MR. GALLAGHER: Judge, the question posed to

4          this witness about a prior record of a confidential

5          informant, number one, is hearsay.  This witness

6          would only be testifying to things that he had heard

7          or that he may know something about.  That could only

8          be brought into the courtroom by authenticating those

9          documents properly or bringing in a witness who

10         testifies to personal knowledge of the arrest.

11                   Asking anyone about an arrest is improper.

12         Under the Evidence Code you can't ask about arrests.

13         This is still a pending case.  The only thing is

14         questions about the informant that are unrelated to

15         this case.  This is just irrelevant, flat and simple.

16                   All he is trying to do is paint a picture of

17         someone who is not here to defend themselves and

18         bring out improperly through this witness, basically

19         to denigrate the character of a nonexistent person

20         here today and that serves no probative value at all

21         in this case and is improper and irrelevant and we

22         don't want him to get into that area because it's

23         misleading the jury and focusing on someone totally

24         unrelated to the background of the case.

25                   If they can tie his background into the case,

1    they need to call a witness as to background.   My

2    client is not the one to do it, since he only knows a

3    hearsay account of what is going on as far as the

4    confidential informant is concerned.

5         MR. HOLDEN: This is a situation where the pot

6    is calling the kettle black.

7         Mr. Gallagher in opening remarks indicated

8    about the use of a confidential informant, but he is

9    now here seeking to use the cloak here of the

10   truthfulness to verify the fact that these defendants

11   were not entrapped or any other defendants

12   whatsoever, yet he is trying to deny me the same

13   opportunity.   He is using it at trial to keep me from

14   using the same thing.

15        THE COURT:  Granted, objection sustained.   It

16   shall not be used in front of the jury.

17        MR. HECKER: We have no knowledge where Joseph

18   Clark is or any ability to subpoena him.   The

19   government never listed him as a witness in this

20   matter.   That should be brought out.

21        THE COURT: Objection sustained.

22        (Thereupon, the jury entered the courtroom, and

23   the following proceedings were resumed within the

24   presence of the jury:)

25        MR. HOLDEN: Same objection.

1          THE COURT:  Ask your next question.

2          MR. HOLDEN: Thank you, Your Honor.

3    BY MR. HOLDEN:

4          Q.   Agent Anderson, do you know who trained the

5    confidential informant in this case?

6          A.   Trained as far as what, sir?

7          Q.   In terms of being a confidential informant,

8    what is required, what is to be done, what's not to be

9    done?

10         A.   The cooperating informant in this case was

11   signed up even before I got him and I re-signed him up,

12   which we call re-establishing him.

13              When I signed him up, I gave him the rules and

14   regulations as far as what he is to do and what he is not

15   to do while he is signed up with us.

16              Other than that, just explaining don't go out

17   and try to find someone not in the drug business, don't

18   try to bring them into it, period, things like that is

19   what we explained to him.

20         Q.   Were any rules in writing or were they all

21   verbal?

22         A.   No, it's in writing, it was in writing.

23         Q.   You don't have a copy with you by any chance?

24         A.   No.

25         Q.   Did you keep a record of the times that you

1    spoke to the confidential informant about this case, any

2    notes?

3         A.   If there are any, I don't remember any notes

4    other than what would have been in the actual case file as

5    a matter of business or when you are speaking with a C.I.,

6    and they are bringing you business so to speak.  I do

7    thoroughly make notes of that.

8         Q.   Is that a normal course of business practice

9    for you?

10        A.   Usually we make some type of notes.

11        Q.   You don't recollect any specific notes as to

12   your conversations with Mr. Clark regarding this?

13        A.   Other than just writing down like the suspect's

14   name and number, that would probably be about it.

15        Q.   You say sometimes he has worked for a set fee

16   and sometimes a contingent fee; is that correct?

17        A.   No.

18        Q.   What was that?

19        A.   It all depends.  It depends.  What I said

20   yesterday was like total circumstances.

21        Q.   Who determines those total circumstances?

22        A.   Usually as far as how much they will get paid?

23        Q.   Yes.

24        A.   Usually it's a combination of the control agent

25   and the controlling agents and supervisor.

1          Q.   Now, in this case you indicated the

2     confidential informant was not paid; is that correct?

3          A.   That's correct.

4          Q.   Did you have any input on that?

5          A.   Yes, I did.

6          Q.   Do you know what the reason is the confidential

7     informant was not paid?

8          A.   I don't think the issue of pay came up.  Like I

9     stated, I never discussed with Mr. Clark, you know, about

10    how much we would get paid or whatever.

11         Q.   But in the past, in other cases, you discussed

12    with him how he would be paid or what point and how much,

13    correct?

14         A.   We may have mentioned it, but we make it a

15    practice, at least I did, not to sit down with the

16    informant and say I will pay you $50 for this or a hundred

17    for that because that way it's kind of like they assume

18    it's a promise.  I cannot make promises to him, so I make

19    it a practice not to do this.

20         Q.   But it is understood, as far as you are

21    concerned, that he is to be paid for bringing you business

22    resulting in arrests; is that correct?

23         A.   Pretty much, yeah.  Sometimes we have it that

24    we bring cases and he's not even expected to get paid

25    anything.  That happens also.

```
 1          Q.   For this confidential informant or generally

 2     for confidential informants at large?

 3          A.   Both.

 4          Q.   Do you have anything in writing or anything to

 5     reflect that this confidential informant didn't expect

 6     anything in this case?

 7          A.   No, I don't.

 8          Q.   I would like to move on if I could to the

 9     conversations between you and the defendants on the

10     telephone as we heard yesterday.

11              Several times you indicated yesterday that you

12     used deceptive language to get them to feel comfortable

13     with dealing with you.

14              Could you give me an example of some of those

15     terms or language that you used to make them feel that you

16     are not an agent and are in fact a drug dealer?

17          A.   For example, I used condo in reference to

18     cocaine instead of saying want to purchase, or what did

19     you want.  Instead of saying two kilos of cocaine, I said

20     two condos.

21          Q.   Did you use any other words that would lead

22     them to believe that you were not an agent and were in

23     fact in the drug dealing business?

24          A.   Words?  I really don't recall any, other than

25     just like saying, you know, what type of phone are you
```

1    on.  I mean, that's not the words, but a phrase.

2        Q.    Several times in fact you asked what type of

3    phone they are on; is that correct?

4        A.    Couple times, yes.

5        Q.    And you asked several people if they were on a

6    cell phone, am I correct?

7        A.    Yes.

8        Q.    You had mentioned yesterday something about how

9    drug dealers don't like to use their house phone.

10            Again, what is a house phone, please?

11        A.    A residential phone, a phone in a residence.

12        Q.    The reason that people are afraid to use their

13    house phone is they were afraid of having their

14    conversations recorded; is that correct?

15        A.    I am not sure why drug dealers do that.  It's

16    just a common thing I picked up, that a lot of times when

17    you are talking to them and they are on a home phone, they

18    say don't talk like that or don't say those say words.

19            A lot of times they want to go to a pay phone

20    or use cell phones, stuff like that.

21        Q.    When you are working a case and you want to

22    hear someone's telephone conversation at their home, out

23    of their house phone, you have to obtain a warrant to do

24    that, don't you?

25        A.    If I want to listen on their home phone?

```
 1        Q.   Yes, if you want to hear the conversations that
 2   are coming from their home phone?
 3        A.   If you are going to listen to conversations and
 4   there are no consenting parties, you have to get a Title 3
 5   or file for Title 3.
 6        Q.   Which is essentially getting permission from
 7   the court to do that?
 8        A.   That's correct.
 9        Q.   Is that also true for cell phones?
10        A.   Yeah, any type of -- now, I am not the
11   authority on this, but from what I know, any type of
12   communication that there is no consenting party to, then I
13   believe you would have to have a Title 3.
14        Q.   But isn't it true that cell phones are not
15   private communication and are not subject to the same
16   rules in terms of obtaining a warrant to listen to those
17   unconsented to conversations?
18             MR. GALLAGHER: He is asking questions requiring
19        a legal opinion of this particular witness.  He is
20        not qualified to answer those questions.  He is an
21        officer of the law.  He is not a judge, he is not a
22        lawyer, so he doesn't have the capability to respond
23        to these questions.  He is asking search and seizure
24        questions.
25             MR. HOLDEN: I am asking if he knows, Your
```

1          Honor.

2                    THE COURT: Do you know?

3                    THE WITNESS: Repeat your question, please.

4                    MR. HOLDEN:  I apologize. Could I have it read

5          back?

6                    (Thereupon, the question referred to was read

7          back by the court reporter.)

8                    THE COURT: Do you know the answer, yes or no?

9                    THE WITNESS: To my knowledge they are not under

10         the same rules.

11                   THE COURT:  Do you know the answer?

12                   THE WITNESS: No.

13                   THE COURT: Next question.

14    BY MR. HOLDEN:

15         Q.    You indicated on these various tapes that we

16    were listening to yesterday that on one of the occasions

17    you were unable to tape record it because they had called

18    you when you were in your car and you spoke to them from

19    your car phone; is that essentially correct?

20         A.    No, but I was in my car.  It didn't have a

21    device to record. I didn't make the call from my car.

22         Q.    Where did you make that call from?

23         A.    I don't recall but it wasn't from my car.

24         Q.    It wasn't from the office either?

25         A.    No, it was not.

1          Q.   Do you have any equipment that is not in the

2    office that you used for recording from any other

3    location?

4          A.   Occasionally I will have something in my car.

5          Q.   But on this occasion, you didn't?

6          A.   No, I did not.

7          Q.   And the items you would have in your car would

8    be something that hooks up to your portable phone; is that

9    correct, when you have it with you?

10         A.   That's correct.

11         Q.   It runs on batteries?

12         A.   That's correct.

13         Q.   Now, you were actively investigating this case

14   at this time; isn't that correct as well?

15         A.   That's correct, even, though at this point, you

16   know, we both got off the phone and said okay, just forget

17   it.

18         Q.   At that point, you said forget it, both of you?

19         A.   At the point to where the last conversation had

20   taken place, then I had gotten beeped later, at that

21   point, the last phone call, it was said —— he said forget

22   about it and so did I, maybe not in those words.

23         Q.   Now, you didn't arrest the defendants at that

24   point, did you?

25         A.   No.

1    Q.   You say you didn't have the portable device

2    with you to make a tape of the conversation on that

3    particular occasion when he said forget it, just to

4    refresh, that's correct, right?

5    A.   You said when he said forget it I didn't have

6    anything to record it?

7    Q.   When he said forget it, did you have anything

8    to record that?

9    A.   We were in the office.  That was on the tape

10   yesterday.

11   Q.   That was one of the tapes we heard, right?

12   A.   Yes, sir.

13   Q.   After he said forget it and before he called

14   you back, isn't it true that you had beeped him several

15   times between the time when he said forget it and the time

16   he called you back to see if you could work it out?

17   A.   I don't recall.  I may have, but I don't

18   recall.

19   Q.   Isn't it true that you called him at least half

20   a dozen times between the time he said forget it and the

21   time that he called you back?

22   A.   I don't recall.  Could have, but I don't

23   recall.

24   Q.   Going back to the confidential informant,

25   trying to tie that in here, when you did the three—way

1       call, wasn't that after Mr. Maignan said forget it, I

2       don't want to do it?

3           A.   No.

4           Q.   That was before?

5           A.   The three-way call was before yes, sir.

6           Q.   The purpose of the call was to do what?

7           A.   To my knowledge, it was just to reassure them

8       that there were no problems.

9           Q.   Well, at that point, there was no agreement,

10      was there, as to doing the deal?

11              MR. GALLAGHER: The jury is here to determine if

12          there is an agreement.  That's the basis of a

13          conspiracy charge.

14              MR. HOLDEN: Also what this agent specifically

15          testifies to bears on whether or not there was an

16          agreement.

17              THE COURT:  What is the question?

18              MR. GALLAGHER: Whether or not there was an

19          agreement at this point with regard to the drug

20          deal.  That's the ultimate issue of fact for the

21          trier of fact to decide.

22              That's why they charged them with conspiracy.

23              THE COURT: Objection overruled.

24              MR. HOLDEN: I am sorry.

25              Could you state whether at the time of the

1          three-way call, there was --

2               THE COURT:  Wait one minute.  I am

3          interrupting.  Go ahead.

4     BY MR. HOLDEN:

5          Q.   Going back to my question a moment ago, was the

6     purpose of the three-way call to perfect an agreement or

7     what was the purpose of that?

8               Start with what was the purpose of the

9     three-way call?

10         A.   Just to reassure them that there were no

11    problems.  They wanted to hear from Mr. Clark because they

12    said, you know, in the call he even says, I think it was

13    Fritz, but we have to listen to it again, he said I am

14    definitely going to deal with you, but I want to hear from

15    Mr. Clark.

16         Q.   Now, the purpose of Mr. Clark was to assuage

17    any fears the defendant may have had.  Is that what you

18    are saying?

19         A.   Yes.

20         Q.   Did Mr. Clark help perfect the agreement, if

21    you will?

22         A.   Perfect the agreement?  I would say no.

23         Q.   When did you learn the actual identities of the

24    defendants as opposed to their names that you referred to

25    here?

1          A.    I believe we learned the last name from the

2    vehicle tag on the vehicle that was driven to the first

3    meeting location and that was the last name of Maignan.

4          Q.    But the vehicle wasn't registered to either of

5    the defendants; is that correct?

6          A.    I don't believe it was registered to either

7    one, but the last name, I would have to look at the

8    records, but the last name on the vehicle was Maignan.

9          Q.    I believe later on you came to learn the

10   vehicle was registered to their sister; is that correct?

11         A.    I am not sure who it was registered to, same

12   last name.

13         Q.    Coming forward on the tapes, several times I

14   recall having heard you say on the August 10th tape that

15   the deal must be now, that if we have to wait for

16   tomorrow, forget it.

17              Is that your recollection?

18         A.    August 10th?

19         Q.    That was I believe the day before the

20   take-down?

21         A.    I don't recall those exact words.  I don't

22   recall even saying like it has to be now, but we kept

23   negotiating.  I was trying to figure out why they wanted

24   to wait.

25              At first they were ready to go, if you remember

164

1    from the first time.  I had to back up because they said

2    bring your stuff, I will bring my stuff and I had to step

3    back and say, wait a minute, let's meet.

4            Talking about on the 10th, I remember saying a

5    couple times what is the problem, and they said they

6    didn't have a vehicle at the time.

7        Q.   Just a moment ago in answer to the previous

8    question, you indicated it was part of the negotiations;

9    is that correct?

10       A.   What was part of the negotiations?

11       Q.   Saying we need to do it soon, we need to do it

12   tomorrow?

13       A.   I wouldn't consider that part of the

14   negotiations.

15           At that point, we already decided what we were

16   going to do.  It's just a matter of actually getting

17   together and doing it.

18       Q.   I thought I heard you say you were still

19   negotiating; I am sorry.

20           Did you say at any time point if it wasn't

21   tomorrow, forget it, the deal was off?

22       A.   I think in one part on the tape is like a

23   mutual agreement.  I told them if we have the same

24   problems tomorrow or if this same thing happens again

25   tomorrow, as far as making an agreement and then changing

1    it or doing whatever, it probably wasn't going to happen.

2            I think it is on tape and the defendants

3    agreed.

4        Q.   I don't recall hearing that on tape, but I do

5    recall hearing you say if it didn't happen tomorrow, you

6    were going to the Keys, and to forget it.

7            Do you recall that statement?

8        A.   I recall saying I have to go to the Keys but as

9    far as saying it has to be tomorrow, I have to go to the

10   Keys, I don't know if that type of term was used.

11       Q.   Did the defendants ever -- let me strike that.

12           You've had many occasions to deal with people

13   who are involved in drugs; is that correct?

14       A.   Yeah, I would say that's correct.

15       Q.   Is it pretty common for someone who is a drug

16   dealer to ask for a taste or advance of the product before

17   they actually purchase it?

18       A.   Sometimes that's true.

19       Q.   Isn't it in fact true that any experienced drug

20   dealer who doesn't want to get bogus products, would in

21   fact ask for and receive a taste of the product prior to

22   purchasing large quantities such as two kilos?

23       A.   It happens but sometimes right when they are

24   actually looking at the kilos.

25       Q.   That didn't happen here, did it?

```
1          A.   No, it did not.

2          Q.   In fact, they never got a taste of any cocaine;

3     is that correct?

4          A.   In this case, that's correct.

5          Q.   Never saw any cocaine in their presence; is

6     that correct?

7          A.   That's correct.

8          Q.   They never offered you any, did they?

9          A.   No, they did not.

10         Q.   Did they ever offer you any marijuana?

11         A.   No.

12         Q.   Did you ever offer them any marijuana?

13         A.   No.

14         Q.   Now, originally you indicated that as far as

15    setting up the actual purchase, that you wanted Sam Tatum

16    to come with you; isn't that correct?

17         A.   For the actual deal when it took place, that's

18    correct.

19         Q.   And subsequently you and acquiesced and changed

20    your mind and said, it's okay if I come alone; is that

21    also correct?

22         A.   I think that was the final agreement was that I

23    would be there by myself and that they would come by

24    themselves or he would come by himself.

25         Q.   Now, I believe yesterday you indicated that one
```

1    of the reasons that you had Sam Tatum there was because he

2    was black isn't that correct?

3         A.   No, I stated that may have been a part of the

4    reason.

5         Q.   In this case, you believed that the defendants

6    would bring 433,000 to the scene; isn't that correct?

7         A.   That's correct.

8         Q.   In fact, nothing near that amount was ever

9    found on them; is that correct?

10        A.   That's correct.

11        Q.   In fact, no money was found on their person to

12   speak of, the money if any that was found was found in the

13   vehicle; is that correct?

14        A.   I don't recall whether any money was found on

15   them or not, but a large amount was found in the vehicle.

16        Q.   As far as you recall, it was less than $2,000?

17        A.   That's correct.

18        Q.   I believe on the 10th, the day before the

19   arrest, when both of you said forget it, you indicated a

20   few minutes ago that you also said forget it, is that

21   correct?

22        A.   Something to that extent, that's correct.

23        Q.   When you said forget it, what did you mean?

24        A.   Basically that it wasn't going to happen, that

25   we weren't going to do it is what I remember.

1        Q.   Did you believe that they were just people

2    blowing or puffing if you will?

3        A.   No, I was hoping he would call back and

4    thinking that they would call back.  Most of the time when

5    you came to an agreement on something and then there is

6    like a little problem, people call and try to work it out.

7        Q.   But both of you said forget it at that point,

8    right?

9        A.   That's correct.

10       Q.   At that point, before he called you back, you

11   beeped him a few times, right?

12       A.   I beeped him but when I actually spoke with

13   him, he had beeped me first.

14       Q.   Yes, but that was in response to your beeping

15   him, wasn't it?

16            MR. GALLAGHER:   I object.  That calls for the

17       witness to speculate as to why Katan Maignan beeped

18       this particular witness.

19            MR. HOLDEN: Your Honor --

20            THE COURT: Sustained, you may rephrase the

21       question.

22   BY MR. HOLDEN:

23       Q.   Earlier on when you testified about both of you

24   saying forget it, I had asked you as to whether or not

25   before he called you back you beeped him several times.

```
 1              Do you recall that question earlier today?

 2         A.   Yes, I do.

 3         Q.   Your response was you had beeped him several

 4    times; is that correct?

 5         A.   I don't know.  I don't recall beeping him.  I

 6    may have.

 7         Q.   When you testified yesterday, you spoke about

 8    an intelligence meeting or a meeting prior to setting up

 9    surveillance; is that correct?

10         A.   That's correct.

11         Q.   You called it a briefing, didn't you?

12         A.   I believe so.

13         Q.   At that meeting, was there a take-down signal

14    that was discussed?

15         A.   Yes, there would have been an arrest signal.

16         Q.   Do you recall what that arrest signal was?

17         A.   No, I do not.

18         Q.   You never issued an arrest signal, did you?

19         A.   No.

20         Q.   Why didn't you issue the arrest signal?

21         A.   The arrest signal that would have been planned

22    would have been given only if a couple things had

23    occurred.  That was that the actual deal take place.

24    That's what that signal was set for, the actual deal as

25    far as the transfer took place.
```

1    Q.    So there was no take-down signal prepared if

2  the deal did not go through?

3    A.    There is no take-down signal -- I could have

4  used probably the same signal, but that's why I called on

5  the phone to get some guidance from senior agents or

6  supervisors.

7    Q.    Was that Agent Armitage (phonetic)?

8    A.    I believe I spoke with Agent Armitage.  I was

9  speaking with a couple different people so --

10    Q.    Going back to the words that you used, you said

11  you used the word condo as a deceptive term to make him

12  believe you were in the drug trade, correct?

13    A.    That's correct.

14    Q.    The white Mercedes, did you say it had gold

15  rims or not?

16    A.    I didn't mention anything.

17    Q.    Do you recall if it had gold on the Mercedes?

18    A.    If it has any gold on it, it would be very

19  small because I don't recall seeing any gold on the

20  vehicle.

21    Q.    After you and Mr. Maignan both said forget it

22  on the 10th, you spoke to him subsequent to that.

23         Did you ever tell him that you needed to do the

24  deal, that you needed the money?

25    A.    No, I did not.

1          Q.    Would that have been improper in any sense as

2    far as your training goes, to have said to him, I need the

3    money, please let's do the deal?

4          A.    I think it would have been improper.

5          Q.    In what way?

6          A.    Just as far as I really don't know how to

7    explain what way, but I would say it's improper because

8    you are kind of like begging to do something, you know.

9                The only statement I remember saying was just

10   that I am just trying to make a little money off of it.

11         Q.    That is what you said?

12         A.    I think it's on the tape where I stated I am

13   just trying to make some money.

14         Q.    Would you characterize Katan's behavior at the

15   scene of the arrest as indecisive?

16         A.    As far as what?

17         Q.    Whether or not to do the deal?

18               MR. GALLAGHER: Once again, he is asking this

19         witness to say what was in the mind of this

20         particular defendant.  Asking for a characterization

21         doesn't change it.  He is asking him to decide what

22         was in the mind of this man at the time this deal was

23         supposed to consummate.

24               He's not capable of doing that.  It's pure

25         speculation.

1           THE COURT: He asked about behavior.

2           MR. GALLAGHER:  He asked about characterization

3      of his behavior.

4           THE COURT: Overruled, I will allow him to

5      answer if you can.

6           MR. GALLAGHER:  Can he rephrase the question.

7      That's not what he asked.

8           THE COURT: Can you answer the question?

9           THE WITNESS: Yes, I can answer the question.

10          His behavior, up to the point where when we

11     originally walked out of Denny's, he was set and

12     ready to do the deal, he was ready to go.

13          At the point where he realized I had a firearm

14     and a vest, is the point to where he was like kind of

15     indecisive, like I don't know.

16     BY MR. HOLDEN:

17          Q.   But he became indecisive?

18          A.   He wasn't, and yes, he became indecisive after

19     finding out I had a firearm.

20          Q.   And again, just to refresh my recollection, you

21     found when you patted him down, you found no firearm on

22     him, correct?

23          A.   In the area I patted down. I didn't do a

24     thorough search.

25          Q.   As far as you know, no firearm was found on his

1    person; is that correct?

2         A.    On his person, that's correct.

3         Q.    I will finish asking you a few questions about

4    the videotape that we saw yesterday, the second videotape,

5    the one of the arrest scene.

6              Now, I had a hard time hearing some of that, so

7    I would like if you can, to fill in the blanks that I

8    could not hear about.

9              Several times I recall you saying to him, just

10   show me some money, show me some money.

11             What was the purpose of you trying to get him

12   to show you some money?

13        A.    The purpose of me trying to get him to show me

14   some money was two-fold. I was requesting him to show me

15   the money, but not at his vehicle. Again, I did not want

16   to go to his vehicle because that's where I thought a

17   robbery would take place.

18             What I also wanted to do was confirm he

19   actually had the money to do the deal and it wasn't just a

20   ripoff.

21             That is why I requested him to show me money.

22        Q.    As far as the robbery of yourself, you

23   indicated there was approximately ten officers in very

24   close proximity?

25        A.    They were in the area, that's correct.

1          Q.   As far as you know, all of these agents had

2     been trained at least the way you had at Quantico with

3     self-defense and such?

4          A.   Yeah.

5          Q.   At the very least?

6          A.   At the very least.

7          Q.   Were any agents armed, if you know?

8          A.   Yes, they were armed.

9          Q.   In fact, isn't it required by policy that they

10    are all armed at the scene?

11         A.   Yes, they should have all been armed at the

12    scene.

13         Q.   So you were still afraid of being ripped off?

14         A.   It only takes a second for someone to pull a

15    gun out and shoot you in the head.

16              I mean, it happens.

17         Q.   Out of curiosity, why did you state to the

18    defendant that he should go to your car to look at the

19    cocaine without you there?

20         A.   Go over to look at my car?  That was to get him

21    to go along with what I wanted to do.

22              Again, he did not want to do that unless I put

23    my gun up.  He was willing to go along with the deal as

24    long as I put my firearm up.

25         Q.   All that would be on the tape if it occurred?

1      A.    If what had occurred?

2      Q.    If the items you are referring to now actually

3    occurred, we would see them on the tape, correct?

4      A.    To actually tell him to go look at it?

5      Q.    As far as putting the gun away and I am looking

6    at it?

7      A.    That would be on tape.  Yes, he did say on the

8    tape, put the gun away, but I don't think he said I will

9    go look at it if you put the gun away but basically he was

10    saying put the gun away, we can do the deal.

11      Q.    At 1:36 in the afternoon on the videotape,

12    didn't you say to him the only way it's going to work is

13    if you show me some money, that's the only way it's going

14    to work?

15      A.    Again, the time, I couldn't give you the time.

16    Also whether I said that's the only way it's going to

17    work, we have to look at it again, as far as the wording.

18    I remember telling him I need to see some money, just show

19    me something to keep everything going there, because we

20    also, like I said, I was also offering to let him go to my

21    vehicle to look at the cocaine but --

22      Q.    But by saying to him that the only way it's

23    going to work, does that show that if you decide it's not

24    going to happen, it's not going to happen and if you

25    decide if he follows your directions, that the deal will

1    happen?

2         A.    Again, I said I didn't recall.  We have to look

3    at the tape about me saying that is the only way it's

4    going to happen is to do that.  I don't believe it was on

5    there.

6         Again, we were both trying to -- he wanted the

7    some thing accomplished in order to do the deal and that

8    was for me to put my gun up there.  If I put the gun up,

9    then he was willing to do the deal.

10        Q.    No cocaine ever changed hands, right?

11        A.    That's correct.

12        Q.    No deal ever actually occurred; isn't that

13   correct?

14        A.    The transaction never took place.

15        Q.    The defendants are not charged with trafficking

16   in cocaine, are they?

17        A.    No, conspiracy.

18             MR. HOLDEN: Could I have one moment, Your

19        Honor?

20             THE COURT: Yes.

21   BY MR. HOLDEN:

22        Q.    At the end of the videotape where before it

23   cuts off is your voice saying, you call it, you call it.

24             Is that you?

25        A.    Should have been my voice.

1        Q.    Who were you speaking to?

2        A.    I think I would have been speaking to Armitage

3    because I stated to him also in not so nice words to go

4    ahead and lock him up or arrest him.

5        Q.    Do you recall your exact language?

6        A.    Not exactly, but it's on the tape.

7        Q.    And did you say let's take that blank blank

8    down anyway?

9        A.    I don't know anyway, but the blank blank was in

10   there and take him down or arrest him, something to that

11   effect.

12       Q.    Do you say on the tape just before you said

13   let's take that blank blank down, did you state that we

14   ain't got nothing?  Was that your voice saying that?

15       A.    It was my voice, but not saying that.  I was

16   saying that he didn't have anything, as far as thinking he

17   was just going to rip me off.  That's why he doesn't,

18   because he knew I had a gun.

19            MR. HOLDEN: I have nothing further.

20            Thank you.

21                      CROSS EXAMINATION

22   BY MR. HECKER:

23       Q.    Afternoon Agent.

24       A.    Afternoon.

25       Q.    I want to start back in the beginning with you

1     and try not to go through the same questions that Mr.

2     Holden.

3              During your fourteen week course that you took

4     at Quantico, Virginia, did you have classes on the use and

5     control of a confidential informant?

6         A.   Yes, we did.

7         Q.   As well as you have been an agent for five

8     years so you had practical experience as well, correct?

9         A.   That's correct.

10        Q.   Now, would it be a fair statement to say that

11    confidential informants are a very important commodity for

12    DEA?

13        A.   They are important.

14        Q.   It's one of your main ways of getting to bad

15    guys so to speak?

16        A.   One of the ways, that's correct.

17        Q.   Without mentioning what the reasons are, there

18    are many reasons why someone would be a confidential

19    informant, correct?

20        A.   That's correct.

21        Q.   One of the reasons would be to get paid, not as

22    a living, but to earn money, correct?

23        A.   That's correct.

24        Q.   Now, can you please tell the jury when you use

25    the term documented C.I., and I know the government refers

1    to them as cooperating individuals and the State refers to

2    them as confidential informants, but they are really the

3    same thing, right?

4        A.    That's correct.

5        Q.    Can you explain to the jury what a documented

6    C.I. is?

7        A.    Documented C.I. would be an individual that has

8    come into our office, agreed to cooperate with us and give

9    information or work with us as far as cooperate with us,

10   to do investigations.

11            It is someone who has been set down, been

12   explained all the rules and regulations again as far as

13   what they can do or can't do, what their role actually is

14   and again, what he can and cannot do.

15            Then as far as being documented, when it's one

16   that is active at the time because you sign him up.  They

17   are active during that point.  You can deactivate them and

18   then reactivate them.

19       Q.    At some time, Mr. Clark was a documented C.I.?

20       A.    That's correct.

21       Q.    At the time of this case he was de—certified or

22   de—activated?

23       A.    That's correct.

24       Q.    You would reactivate him up again, correct?

25       A.    No, I did not reactivate him.

1      Q.   He brought information to you regarding this

2    case and you used him on this case?

3      A.   He just called and gave me the information,

4    just name, number, basic stuff and then he did the call

5    later, the three-way call and that was it.

6      Q.   When you received the call on this case from

7    Joseph Clark, when in time earlier had you heard from Mr.

8    Clark regarding anything? What is the gap of time between

9    the time you heard from him?

10      A.   Couldn't give you an exact time, probably a

11    couple months I would say.

12      Q.   Were you surprised to hear from Mr. Clark?

13      A.   Not really.

14      Q.   Was he in waning days of being a confidential

15    informant for your agency?

16      A.   Excuse me?

17      Q.   Was he in his last days of being a confidential

18    informant?

19      A.   I would say not.

20      Q.   Had he been terminated from the office

21    subsequent to this deal?

22      A.   He was never signed back up.

23      Q.   He was never signed back up?

24      A.   He was never reassigned by me or my office. He

25    was not signed back up since deactivation.

1        Q.   Was there a reason for him not being signed up,

2   re-signed up?

3        A.   Reason for not being re-signed up?  I don't

4   think there was ever an issue of ever signing him back

5   up.  He was deactivated. Like I said, he called with some

6   information and really at the time I don't think there was

7   a consideration of re-signing him back up.

8        Q.   Is it true after he had worked on this deal, he

9   had given you additional information about something else

10  and it proved to be unreliable, after this case and that's

11  why you decided not to use him anymore?

12       A.   After this case?

13       Q.   After this case?

14       A.   No.

15       Q.   Now, there are many rules and regulations that

16  a confidential informant must abide by, correct?

17       A.   That's correct.

18       Q.   I am interested in the one regarding

19  entrapment.

20            Were they specifically told they are not to

21  entrap people?

22       A.   Specifically told.

23       Q.   Now, basically that means that whoever he gets

24  information from, that individual has to be known in the

25  drug trade so it speak and be an active participant in the

1    drug trade?

2         A.    I would say an active participant, yes.

3         Q.    A confidential informant is not permitted to

4    create a new crime, right?

5         A.    That's correct.

6         Q.    When the confidential informant in this case

7    contacted you and gave you the information regarding the

8    Maignan brothers, what steps did you take to investigate

9    on your own that the Maignan brothers had prior drug

10   involvement?

11        A.    Okay.  At the time I had only a street name, so

12   I had nothing to look into to find out whether they were

13   active in the business or not.

14        Q.    You are a federal agent, correct?

15        A.    That's correct.

16        Q.    You have access to the FBI records and other

17   federal computer system, correct?

18        A.    Limited access, yes.

19        Q.    Now, isn't it true that street names or

20   nicknames are often put into the federal system, sometimes

21   given numbers and there are ways of finding them, correct?

22        A.    There are ways.

23        Q.    Did you ever run Stizzo through the federal

24   computer to see if he came up prior to you going forth

25   with this?

1          A.    No, I did not.  I didn't have an exact

2    spelling.  All I had was just someone explaining the guy's

3    name was Stizzo and not giving a spelling or anything.

4          Q.    Now, did Mr. Clark, the confidential informant,

5    relay to you how many contacts he had with Fritz Maignan?

6          A.    Exact number, no.

7          Q.    Did you get the impression it was more than

8    one?

9          A.    Yes.

10         Q.    Why did you have that impression?

11         A.    Basically he just said that he had met these

12   guys and they had partied or something to that extent.

13         Q.    Did he talk about meeting them at the Foot

14   Locker shoe store in Harlem?

15         A.    No, he did not.

16         Q.    Did he relate that Fritz Maignan worked in that

17   store?

18         A.    No, he did not.

19         Q.    But he did relate to you that he had contact

20   with both the Maignan brothers, right?

21         A.    No.

22         Q.    Did he relate they were brothers coming down

23   here to do business?

24         A.    I don't recall him saying whether they were

25   brothers or not.  I know I used that term, too, but I am

1    still not sure if they are actually blood brothers.

2         Q.   Let me ask you this.

3              After you got this information from Mr. Clark,

4    were you anticipating one or two individuals coming down

5    from New York?

6         A.   More than one.

7         Q.   Then why did you feel more than one was coming?

8         A.   Like I stated earlier, he had given me the name

9    of Stizzo and he was just saying these guys would be down

10   in that area and they were going to be in contact with

11   them because they were doing business down here.

12        Q.   Then what type of questioning did you do of Joe

13   Clark in line with his rules and regulations about being a

14   cooperating individual to make sure the Maignan brothers

15   were proper targets in this case?

16        A.   I asked him -- again, the exact wording I

17   couldn't tell you -- but basically I would have asked him

18   what type of violators they are, what tape of drugs they

19   are into.

20        Q.   Do you remember the answers he gave you?  I

21   would like to ask the question and you tell me what the

22   answer was as well if you remember, so let's back up

23   again.

24             You asked what type of violator they were and

25   what was the answer Mr. Clark gave you?

1          A.    He said he wasn't sure but he just knew the

2    guys were in the business, didn't really give me a

3    definite answer.

4          Q.    And what kind of drugs?

5          A.    He said mainly coke.  He didn't say whether it

6    was cooked or powder, he just used coke.

7          Q.    Did he gave you the quantity that the Maignan

8    brothers were allegedly using?

9          A.    Kilos.

10          Q.    Now, how did Mr. Clark gather this information?

11          A.    From partying with him is what he said.

12          Q.    Did Mr. Clark relate to you that he had

13    actually seen kilos in the possession of the Maignan?

14          A.    No, he did not.

15          Q.    Did Mr. Clark ever relate to you that he ever

16    saw any cocaine in the presence of the Maignan brothers?

17          A.    No, he didn't.

18          Q.    Did you ask him?

19          A.    Yes.

20          Q.    Did you have any concern at that point that

21    perhaps the Maignan brothers were not proper targets under

22    the rules and regulations of DEA?

23          A.    No.

24          Q.    Was that based upon Joseph Clark and your

25    relationship with Mr. Clark and your belief that he would

186

1    follow the rules?

2        A.   Whether I was considering whether they were not

3    really targets or not?

4        Q.   What I am asking is this. I think you already

5    answered the question.  I am not here to confuse you.

6             It appears to me, and stop me if I am wrong,

7    you had the confidential informant, Joseph Clark, that

8    contacted you and said I have a guy that's moving in New

9    York by the name of Stizzo and he's coming to Florida to

10   shop.

11            My question to you was, what did you do to

12   verify the information? You basically told me you didn't

13   do anything.

14            Now, I asked did you question Mr. Clark and you

15   answered that you did.  Mr. Clark related to you he never

16   saw kilos in the presence of the Maignan brothers and he

17   never saw any drugs in the presence of the Maignan

18   brothers.

19            My next question is, did you have a concern at

20   that point that they were not a proper target?

21       A.   No, I didn't.

22       Q.   Why?

23       A.   Because a lot of times we get calls that come

24   in or the informant will give us information on someone,

25   and they may not have seen the person with drugs in their

1    hand or whatever, but if people are talking about what

2    they are doing or whatever, as far as their business, then

3    you have to take that into consideration.

4         It wasn't like we were going to go out and

5    arrest them based on what Mr. Clark has told us, so at

6    that point, it was still an investigation. We were still

7    taking steps to find out who they are and if they are

8    valid targets.

9         Q.   Tell me what those steps were you took to

10   determine if they were valid targets?

11        A.   We only had a name and with that name, I did

12   not run it.  The first step would probably have just been

13   making contact with him and actually talking to the

14   people.

15        Q.   Did Mr. Clark tell you what state or city they

16   were coming from?

17        A.   It was either New York or Connecticut, I don't

18   recall exactly which one right now.

19        Q.   Did you make any contact with your field office

20   in either New York or Connecticut to verify whether they

21   had the name of Stizzo in their files?

22        A.   No, I did not.

23        Q.   Then again that was because you were waiting to

24   get contact from the Maignan brothers from down here?

25        A.   I wanted to get some definite identified

1    information on them because, first of all, I wanted to

2    make sure there was someone that actually showed up down

3    here and then make contact with them and that way it's

4    easy to, usually easy to find out some identifying

5    information on a person.

6        Q.    Now, DEA maintains files on individuals that

7    they believe are in the drug trade, correct?

8        A.    That's correct.

9        Q.    These individuals may or may not have been

10    arrested in the past or charged with anything, correct?

11        A.    That's correct.

12        Q.    So sometimes during investigations when people

13    are arrested, information regarding other people or other

14    names come into your hands or DEA's hands, right?

15        A.    That's correct.

16        Q.    Phone numbers or addresses, that's all put into

17    some type of investigative stockpile, correct?

18        A.    Sometimes, yes.

19        Q.    So had Mr. Clark given you more detailed

20    information regarding where they were coming from and what

21    they were doing, you perhaps would have been able to look

22    into some other field offices to see if the name Stizzo

23    and Slow had been documented as somebody in the trade?

24        A.    I wouldn't have.

25        Q.    You wouldn't have done that or you wouldn't

1   have had the ability?

2       A.   I wouldn't have done that.  With just a street

3   name like that, I would not have done that.

4           If it was related that this guy is something

5   monstrous like Pablo Escobar, if you mention a name like

6   that, or someone who is well known or talking about a

7   murder or homicide or something, we probably would have

8   tried to find something out.

9       Q.   You basically treated this as another tip from

10  one C.I. and you were going to wait to see what happened?

11      A.   Basically yes.

12      Q.   Fair enough.

13          Now, when you had mentioned to the Maignan

14  brothers that you had two different prices and I think you

15  said $18,500 for good stuff and $16,500 for wet, did that

16  raise concern in the Maignan brothers that the cocaine may

17  have been defective in some manner?

18      A.   I don't think it raised any concerns because

19  they said the sixteen five would be just fine because they

20  were going to cook it up anyway.

21      Q.   You first made the remark on tape you have to

22  know how to fix it up and I believe Fritz answered our

23  stuff is cooked, correct?

24      A.   As I stated yesterday, we have to listen to the

25  tape again because I don't recall whether I said you have

1    to know how to fix it up first or they said we are going

2    to sell ours in whatever form, so we have to listen to the

3    tape again.

4         Q.   Now, I believe you also mentioned that on the

5    tape, Fritz said that they are here to shop and to do

6    business, correct?

7         A.   That's correct.

8         Q.   You had referred to cocaine as condos, right?

9         A.   That's correct.

10        Q.   You never told them you were with DEA, did you?

11        A.   No, I did not.

12        Q.   You were playing the role of a drug dealer,

13   right?

14        A.   That's correct.

15        Q.   What made you believe these two guys were not

16   playing the role of a drug dealer, saying the right words

17   just like you were?

18        A.   Saying the right words just like I was?

19   Frankly, I don't know anyone that would get on the phone

20   other than like a law enforcement person talking to a drug

21   dealer and play drug dealer on the phone.

22        Q.   Let me ask you this question.

23             Do you know whether or not Joseph Clark

24   promised Fritz and Katan Maignan that they could make big

25   money coming down here by contacting you?

1          A.   Big money -- I would say he did not promise

2    anything like that other than just normal drug business,

3    the money one would make.  He wouldn't have promised

4    anyone big money.  That's kind of a little catch thing we

5    practice to tell them don't say you are going to make big

6    money or, you know.

7          Q.   Did you ask Mr. Clark if he said this or are

8    you just assuming based on his training as a C.I., he

9    would not have said that?

10         A.   No, I asked him did you make any promises.

11    It's just like I didn't make him any promises and make

12    sure he doesn't make promises.

13         Q.   He didn't promise that you had the best prices,

14    best quality?

15         A.   Something like that would be a little bit

16    difficult.  That's something that maybe I would say also,

17    that hey, man, I tell you, this is the best stuff you can

18    get, but that's different than telling them you are going

19    to make big money.

20         Q.   Now, as far as you know, kilos of cocaine are

21    available either in New York or Connecticut?

22         A.   They are available.

23         Q.   Higher prices than down here in Florida?

24         A.   Yes.

25         Q.   Significantly higher prices than up there?

1        A.    There is a difference, yeah.  I wouldn't say

2   significant, but there is a couple thousand, several

3   thousand.

4        Q.    Is it worth a trip to Florida to save the

5   money?

6        A.    It depends.  You also have the risk of trying

7   to get it back up there.  Some people would prefer to buy

8   there to avoid the risk of trying to transport it from

9   there, from Florida back to New York or Connecticut.

10       Q.    Let me ask you this question.

11             If the Maignan brothers were in the business so

12   to speak, then obviously they had connections here where

13   they lived or somewhere else to be in the business,

14   correct.

15             MR. GALLAGHER: He's asking the witness to

16        testify about the knowledge of these defendants.

17             He doesn't have that qualification to do that.

18        He would be speculating at best.

19             MR. HECKER: I was going to ask whether Mr.

20        Clark had related information that they had sources.

21             THE COURT:  All right.

22   BY MR. HECKER:

23       Q.    Did Mr. Clark relate to you that the Maignan

24   brothers had sources of cocaine up in the northeast area?

25       A.    He didn't relate one way or the other.

193

1       Q.    He didn't tell you it dried up and they needed

2   to shop elsewhere?

3       A.    No.

4       Q.    But it's not uncommon for drug dealers in the

5   northeast to come to Florida to buy drugs, correct?

6       A.    That's correct.

7       Q.    It's just the added risk of trying to get it

8   back to your home town?

9       A.    Sure.

10      Q.    Did Mr. Clark ever obtain any cocaine from the

11  Maignan brothers to show you that they were in the trade?

12      A.    To my knowledge, no.

13      Q.    Did he ever ask you for seed money from the DEA

14  to set up some type of preliminary deal up there?

15      A.    No.

16      Q.    Had he wanted to do something along those

17  lines, would you have related him to a field office in the

18  area, in Connecticut or New York?

19      A.    If he wanted to do business in another area?

20      Q.    Regarding the Maignan brothers, if he needed to

21  do something with them up there, to round this deal up,

22  would you have been able to send Mr. Clark up to a field

23  office where the Maignan brothers lived to allow him to do

24  that?

25      A.    I could have hooked him up with an office up

1    there if they were going to do business up there, that's

2    correct.

3        Q.   Was there any particular reason why it was

4    necessary to bring the Maignan brothers to Florida to do

5    this deal?

6        A.   To bring them down to Florida?  They came down

7    to Florida.  I didn't ask them to come down.  I just

8    assume they came at their own will.

9        Q.   Do you know whether Mr. Clark had worked for

10   any other DEA agent outside of your office?

11       A.   Yeah, I believe he has.

12       Q.   Has he worked for people in New York before?

13       A.   I don't know.

14       Q.   Any other northeast state?

15       A.   I don't know.

16       Q.   Now, you have a lot of experience in the last

17   five years dealing with drug dealers, correct?

18       A.   Yes.

19       Q.   Probably more than you really want to imagine,

20   right?

21       A.   Yes.

22       Q.   You heard a lot -- you had a lot of

23   conversations with drug dealers, right?

24       A.   Yes.

25       Q.   The language used by the Maignan brothers, was

1    that the proper type of language to be used as drug

2    dealers?

3          A.    I would say so.

4          Q.    And they were wary like a drug dealer would be?

5          A.    Yes.

6          Q.    Do you remember on one occasion, Fritz saying

7    he was scared about doing the deal or Katan relating to

8    you his brother was scared and wouldn't be there?

9          A.    Yes.

10         Q.    Did you get the impression Fritz had withdrawn

11   or left at that point or wasn't going to be involved in

12   this anymore?

13         A.    No.

14         Q.    Later on he shows up at the Denny's, but at

15   that point, did you get the impression he was leaving?

16         A.    No, because he stated I will give my money to

17   my brother, he will do it.

18         Q.    That was one of the telephone conversations on

19   the tape?

20         A.    I recall hearing that on the tape.

21         Q.    The jury will be able to hear that as well,

22   correct?

23         A.    Yeah.

24         Q.    Now, how much training did it take you to get

25   conversant in the drug lingo?

196

1      A.   It's just something that as far as training,
2  just something you kind of pick up as you go along.
3      Q.   From other agents?
4      A.   From other agents, yes.
5      Q.   From other drug dealers you listened to on the
6  phone?
7      A.   Correct.
8      Q.   Kind of like learning on-the-job experience,
9  like when they say something to you, you kind of respond
10  accordingly?
11      A.   Yeah, obviously we have basic training, but a
12  lot is picked up once you are out on the street.
13      Q.   Can you tell me today whether or not the
14  response that you received from the Maignan brothers were
15  merely in response to your questioning and they were
16  trying to play a role of drug dealer as well?
17      A.   Some of it yes; some of it no.
18      Q.   Now, Mr. Holden asked you whether or not a
19  taste or a sample of the drug was something common and you
20  said yes or no, sometimes samples are given at the time.
21           Let me ask you about wet cocaine.
22           Have you had experience selling wet cocaine
23  before?
24      A.   No.
25      Q.   This was the first time?

197

1      A.   That's correct.

2      Q.   Now, the three-way telephone conversation that

3   you heard between Joe, Fritz and yourself, who contacted

4   Mr. Clark in order to get that conversation started?

5      A.   I did.

6      Q.   What did you tell Mr. Clark?  Why did you tell

7   Mr. Clark that he needed to participate in that

8   conversation?

9      A.   Basically I explained to him that I had talked

10   to the guy who made contact with him.  Actually I spoke

11   with him even before the three-way call was done and just

12   explained to him at this point don't contact, don't talk

13   to him, so at the time we were getting ready to make the

14   three-way call, right before we did the call, I explained

15   to him that I will call you back, I am going to have one

16   of the Maignan brothers on the phone. Basically everything

17   is set, everything looks good.  They just want to hear

18   from you so --

19      Q.   Who asked to hear from Mr. Clark?

20      A.   Actually both of them did.  It's on the tape.

21      Q.   Now, do you recall that conversation?  Do you

22   remember I believe it was Katan, my notes are not clear,

23   saying something like I come down here, I don't know

24   anybody, and then Joe Clark saying, well, I put you with

25   good people, they will treat you right, or something along

1    those lines?

2        A.    I think that was said, yes.

3        Q.    In fact, even in that conversation, Joe Clark I

4    guess playing the role of drug dealer said, are you going

5    to take care of me, to you, meaning money.

6            You testified that would have been his little

7    part of the deal?

8        A.    That's what he's saying, playing the drug

9    dealer role.

10        Q.    In fact, you said Stizzo, don't worry about it.

11    He's good people, he'll even get you a lady if you want.

12            Do you remember him saying that?

13        A.    Yes, I do remember that.

14        Q.    You didn't ask him to say that?

15        A.    No.

16        Q.    It was kind of impromptu on his own?

17        A.    Yes.

18        Q.    Is that proper procedure?

19        A.    Proper procedure as far as what?

20        Q.    Well, is that playing the role of a drug dealer

21    or trying to make him feel comfortable?  What was the

22    purpose of saying that?

23        A.    Just playing the role, trying to sound like a

24    drug dealer, just basically -- like I said, I explained to

25    him that the deal was set, he just needed to be kind of

1      relaxed a little bit.

2           Q.   By saying the deal was set, did you mean the

3      price was negotiated for sixteen five and there would be

4      two kilos, right?

5           A.   We agreed we were going to do the deal, that

6      was the price and to me everything was set.  It was a

7      matter of the meeting.

8           Q.   And the location had not been set, just the

9      price and the amount had been set?

10          A.   The location was set.

11          Q.   Okay, the location was set in Hallandale at the

12     Denny's?

13          A.   I believe so.

14          Q.   Did you feel some hesitation on behalf of the

15     Maignan brothers? Is that why you brought Joe Clark in, to

16     kind of push the deal along?

17          A.   A little bit, yes.  Like I said, they said they

18     were definitely going to do the deal and I believe it was

19     Fritz saying on the tape, I am going to deal with you, but

20     I need to hear from Joe.  We haven't heard from Joe since

21     he called us.

22          Q.   Now, one thing you said when you initiated the

23     conversation with Joseph Clark, you told him not to

24     contact the Maignan brothers at all, right?

25          A.   Originally when he first contacted me and gave

1   me information, I said okay, let me try to contact them

2   here because he was not sure if they were here or not.

3          At that point I told him okay, don't contact

4   him any more, don't talk to him.

5      Q.   I am confused because that would have been the

6   initial contact before Stizzo ever got a hold of you.

7          What I meant was when you did the three-way

8   conversation, you testified that before the three-way you

9   called Joe Clark.

10         In that conversation, did you tell him not to

11  contact the Maignan brothers also?

12         What did you tell him in that conversation?

13     A.   Before the three-way, I would have probably

14  said -- I don't recall exactly, but I probably would have

15  reiterated basically what he is to do and what he is not

16  to do.

17     Q.   Did you tell him in that conversation that the

18  Maignan brothers were getting cold feet and needed a

19  little help with this, they wanted to be reassured?

20     A.   Just that they needed to hear from him. That's

21  exactly what they asked, we need to hear from Joe.

22     Q.   Did you get the feeling that if you didn't get

23  Mr. Clark on the phone, that the Maignan brothers would

24  have went home?

25     A.   I couldn't answer that.

| [ ] 17th Judicial Circuit in and for Broward County<br>[ ] In the County Court in and for Broward County | CLOCK IN |
|---|---|

| DIVISION:<br>APPELLATE | RECORD-ON-APPEAL FROM THE COUNTY COURT<br>OF THE SEVENTEENTH JUDICIAL CIRCUIT<br>IN AND FOR BROWARD COUNTY. FLORIDA<br>CRIMINAL DIVISION | |
|---|---|---|

FRITZ MAIGNAN                    Appellant
VS.

TATE OF FLORIDA                    Appellee

CASE NO.
95-14021CF10B
APPEAL NO. 96-2152

RECEIVED
OFFICE OF THE
ATTORNEY GENERAL

SEP 1 0 1996

CRIMINAL OFFICE
WEST PALM BEACH

RICHARD L. JORANDBY (15TH P.D.)
ATTORNEY FOR APPELLANT


GEORGINA JIMENEZ-OROSA
ATTORNEY FOR APPPELLEE

201

```
 1    State of Florida )
                       :  SS
 2    County of Broward)                        4-0283

 3
                  IN THE CIRCUIT COURT OF THE
 4                SEVENTEENTH JUDICIAL CIRCUIT,
                IN AND FOR BROWARD COUNTY, FLORIDA
 5
      STATE OF FLORIDA,        )
 6                             )               COPY
                Plaintiff,     )
 7                             )
           vs.                 ) CASE NO. 95-14021CF10B
 8                             )
      FRITZ MAIGNAN,           )
 9                             )
                Defendant.     )
10    _____)

11

12         Proceedings had and taken before the Honorable

13    ROBERT W. TYSON, JR., one of the Judges of said Court, at

14    the Broward County Courthouse, Fort Lauderdale, Broward

15    County, Florida, on the 12th day of June, 1996, commencing

16    at or about 1:30 o'clock p.m., and being a Jury Trial.

17

18    APPEARANCES:

19
           JOHN GALLAGHER, ESQUIRE,
20         Assistant State Attorney,
           Appearing on behalf of the State.
21
           SCOTT HECKER, ESQUIRE,
22         Appearing on behalf of the Defendant Fritz Maignan.

23         MICHAEL HOLDEN, ESQUIRE,
           Appearing on behalf of the Defendant Katan Maignan.
24
                          VOLUME II
25                    Pages 201- 400
```

1                    I - N - D - E - X
        WITNESS                                    PAGE
2
        HEATH ANDERSON
3       Cross Examination by Mr. Hecker (Continued)    203

4       MIKE HARRELL

5       Direct Examination by Mr. Gallagher        214
        Cross Examination by Mr. Holden            218
6
        TOMMY LONG
7
        Direct Examination by Mr. Gallagher        222
8       Cross Examination by Mr. Holden            242

9       CHRIS HOCK

10      Direct Examination by Mr. Gallagher        248
        Cross Examination by Mr. Holden            254
11
        SY LIPPMAN
12
        Direct Examination by Mr. Gallagher        257
13      Cross Examination by Mr. Holden            263

14      Charge conference                          282

15      FRITZ MAIGNAN

16      Direct Examination by Mr. Hecker           294
        Cross Examination by Mr. Holden            305
17      Cross Examination by Mr. Gallagher         307
        Redirect Examination by Mr. Hecker         340
18
        KATAN MAIGNAN
19
        Direct Examination by Mr. Holden           342
20      Cross Examination by Mr. Gallagher         347
        Redirect Examination by Mr. Holden         362
21

22      DATE                    PROCEEDINGS        PAGE

23      6-13-96                 Closing Argument

24                              Defendant K. Maignan    381
                                Defendant F. Maignan    397
25

1           THE COURT: Let's take a ten-minute recess.

2           You are not to discuss the case with anyone.

3           Please show the jury to its room.

4           (Thereupon, there was a brief recess, after

5       which the following proceedings were resumed outside

6       the presence of the jury:)

7           THE COURT:  Ready?

8           MR. HECKER: Yes, Your Honor.

9           THE COURT: Escort the jury in.

10          (Thereupon, the jury entered the courtroom at

11      3:10 o'clock p.m., and the following proceedings were

12      resumed within the presence of the jury:)

13          THE COURT: You may be seated.

14          Mr. Hecker, continue on with cross

15      examination.

16  BY MR. HECKER:

17      Q.    Agent Anderson, I want to bring your attention

18  back to August 10th.   That was the conversation you had

19  where both you and Katan Maignan agreed the deal would be

20  off, I believe that's correct?

21      A.    That's correct.

22      Q.    Now, up to that point, can you estimate how

23  much time you had invested in this case?

24      A.    Like I said, we had been working on it since

25  the 8th, so three days and then just whatever.  As far as

1    time, actual time, I couldn't say.

2        Q.   Can you tell me how long in time it was, and

3    you testified when Mr. Holden asked you that you could

4    have, you weren't quite sure, but you may have beeped

5    Katan after the 10th.

6        Do you know how much time elapsed before you

7    may have beeped him?

8        A.   No.

9        Q.   The telephone call you received from Katan, was

10   that some time after you beeped him?

11       A.   Like I said, I don't recall if I paged him or

12   not afterwards.  As far as how much time was in between, I

13   couldn't say.

14       Q.   Do you recall that conversation was not

15   recorded?  Do you remember what basically occurred in that

16   conversation?

17       A.   Yes.

18       Q.   Tell me what was in that conversation?

19       A.   Basically we just kind of went a little bit

20   back over what we said in the previous call, as far as we

21   wanted, both obviously wanted to do this.  He was saying

22   he definitely wanted to go there.  I think he was saying

23   knock this out, let's go ahead and do it.

24       I said okay.  What I did at first was kind of

25   impressed the point to him that you come alone, like he

1    did to me earlier because he was so adamant about me.  I

2    wanted to make sure now that he actually came alone, so I

3    impressed this point and agreed that I would do the same.

4         Q.    When you got to the Denny's and saw the

5    individual on the videotape, the second videotape that we

6    saw, that was some discussion in cross examination by Mr.

7    Holden as to whether or not Katan was heading in or not

8    heading in the direction of the vehicle.

9              I believe you testified there was some

10   occasions where he was heading in the direction of his

11   vehicle, correct?

12        A.    Yes, in the beginning, that's correct.

13        Q.    How close did he get to the vehicle?

14        A.    I would say within twenty, twenty or thirty

15   feet I would say.  I can't be sure.

16        Q.    Again, at that point, in the area in which you

17   patted him down, you did not find any weapons, correct?

18        A.    That's correct.

19        Q.    But you didn't know what was in the car, you

20   didn't want to go over there?

21        A.    That's correct.

22        Q.    Any time within the twenty or thirty feet, did

23   he make any movements towards the vehicle, such as

24   grabbing the door or running to the vehicle?

25        A.    No.

1          Q.    Now, near the end of the tape, you made a

2    remark, you don't have money, you don't even have five

3    dollars, show me twenty, show me a couple of fifties.

4          Do you remember making some remarks along those

5    lines?

6          A.    Yes, I do.

7          Q.    And the purpose of that was what, for him to

8    reveal to you that he actually had the necessary cash to

9    do the deal?

10         A.    Like I said, two reasons.  I actually wanted

11   him to bring money from his vehicle so I would not have to

12   actually go over to his vehicle.

13         Q.    Did he ever mention to you that's where the

14   money was?

15         A.    Yeah, yes, he did.

16         Q.    He told you it was in the vehicle?

17         A.    When we walked out of the Denny's, he was like,

18   I am not sure of the exact words, we can listen to the

19   tape, but I said, do you have your stuff?  He said yeah,

20   it's in the car.  I said, well, what do you have it, in a

21   bag? He said, yes, it's in a bag. I said, well, bring it

22   over here.

23         That's when we are walking towards the

24   vehicle.  I said if it's in a bag, just bring it out to

25   the parking lot.

1        Q.   That portion of the conversation regarding

2    where the money was kept, is that part of the conversation

3    where we are kind of looking at a truck until you come

4    around?  Is that the part of the conversation?

5        A.   At that point I think we are beyond the truck

6    and we are already off to the sidewalk, like a little

7    raised curb there. I think we were already off that and we

8    were walking directly towards his vehicle at that point.

9        Q.   Did Katan ever tell you that he had a gun with

10   him or near him or on him, in the car?

11       A.   No.

12       Q.   And he never displayed that gun to you, right?

13       A.   That's correct.

14       Q.   I know you testified in direct that you liked

15   to use locations that are near I-95.  In fact, you on one

16   tape, you say you don't want to get involved with the

17   locals.

18            Were you referring to local cops, when you

19   started heading away from 95?

20       A.   Something to that extent.

21       Q.   Now, have you used this site before for busts

22   that you participated in?

23       A.   I don't believe so.

24       Q.   Do you have knowledge of it being used before?

25       A.   No, I don't.

1          Q.    How did you come to chose this spot?

2          A.    Just it was a good location as far as you could

3    -- it was populated, where cars could fit in, because

4    obviously we have several people out there.  We need to

5    have cars where they fit in and not stand and kind of look

6    around to see if there are any other people in the area.

7          Q.    So it was a good place for surveillance?

8          A.    Pretty good, yes.

9          Q.    How did you know that?  Did you take a look at

10   the site or one of the other agents told you about using

11   it before?

12         A.    I knew about the area but I was also asking

13   Special Agent William Dyer.  Remember on the tape I kind

14   of covered the phone up and talked to him.

15             Some of the information I already knew but some

16   of it I was asking.

17         Q.    Did you consider and decide not to use the

18   Denny's at Sheridan and I-95?

19         A.    Never considered it.

20         Q.    Now, yesterday on the tape at the very

21   beginning, I believe Agent Dyer is the one on the video

22   camera, he is running the video camera?

23         A.    Are you talking about the final day of the

24   deal?

25         Q.    The final day.

1       A.    No, he is not.

2       Q.    I thought he was.

3             He's coming out of a van though, right?

4       A.    That's correct.

5       Q.    The individual who walked by in a bright orange

6    shirt, you identified as being Fritz Maignan?

7       A.    I don't remember a bright orange shirt.  I

8    remember kind of a maroon shirt.

9       Q.    I may have the color wrong, but the black

10   gentleman who was walking from the right side of the

11   screen to the left and the camera just kind of trails off

12   until he disappears?

13      A.    That's correct.

14      Q.    Now, you also testified that the shirt that he

15   was wearing when he was arrested was different than the

16   shirt that he was wearing when he left Denny's?

17      A.    I said I believe he may have changed shirts.  I

18   was not sure.

19      Q.    What prompted you to make that remark? I don't

20   remember there was a question asking you about the

21   clothes, but you made that remark yesterday that it

22   appeared his shirt was changed?

23      A.    I remember kind of seeing a different shirt.

24      Q.    Did you ever respond to the Miramar address

25   that you received from the run on the tag?

1          A.    Run on the tag -- I am not sure if that address

2     was the one that we came up with after Katan was arrested

3     or not and we responded to one address.

4               I am not sure if that was the same address.

5          Q.    Were you one of the officers responding?

6          A.    Yes.

7          Q.    Now, the individual in that home said they had

8     not seen Fritz or Katan the whole all day, correct?

9          A.    Something to that extent, correct.

10         Q.    Did you have any other knowledge of whether

11    Fritz had another locale near the Denny's, apartment or

12    hotel or anything else that he could have gone to change?

13         A.    I didn't have any information one way or the

14    another.

15         Q.    Now, did you ever -- after Katan had been

16    arrested, you wanted to find Fritz, right?

17         A.    That's correct.

18         Q.    You had that phone number that you had

19    discovered when you searched Katan's car?

20         A.    When we searched his car?  I think it was on

21    Katan's personal property.

22         Q.    Was it a beeper --

23         A.    I didn't find it.

24         Q.    You didn't find it, but --

25         A.    No, I didn't find it.

1      Q.   Do you have knowledge whether it was a beeper

2   number or whether it was a land line or cellar line?

3      A.   I believe it was a residence, that they tracked

4   it down. I didn't do that.  The information was given to

5   me but the information I received was that it was a

6   residence.

7      Q.   Did you call that?

8      A.   Yes, we did.

9      Q.   Were you able to get Fritz on the other line?

10      A.   I believe we were.

11      Q.   Did you ever tell Fritz that his brother had

12   been hurt and he needed to come back to Denny's?

13      A.   Absolutely not.

14      Q.   I believe you testified that you made a

15   pretextual call claiming that Katan had locked himself in

16   the vehicle and was not doing the deal?

17      A.   That's correct.

18      Q.   Is that the call you made to Fritz?

19      A.   Yes, I was explaining to him that he was in the

20   car, the seat was laying back and the doors were locked

21   and he was not saying anything.

22           I even told him that I know he has the money,

23   he showed me the money, but he is not doing the deal.

24      Q.   Did Fritz ask to speak to his brother?

25      A.   Yes, he did.

1          Q.   But you couldn't let that happen, right,

2     because Katan was already arrested?

3          A.   Yes, I could not let that happen.

4          Q.   What excuse did you give Fritz for not allowing

5     him to talk to his brother?

6          A.   What I did was I held the phone out, actually

7     myself and Captain Hawk (phonetic) from Hallandale Beach

8     Police Department was in the vehicle and I held the phone

9     by the window and acted like I was banging on a window,

10    which I was banging on that car window and I was saying,

11    banging on the window, and I screamed, open the door, I

12    have your brother on the phone, open the door and I got

13    back on the phone and said, he won't even open the door.

14    I don't know what's wrong, what's going on.

15         Q.   Did Fritz agree to respond to the area?

16         A.   I don't recall whether he said he was coming or

17    not.  I don't think he did because if not, we'd have been

18    set up on the area if we thought he was coming back.

19         Q.   You testified you showed up and there he was

20    standing in the parking lot and you were surprised that he

21    was there?

22         A.   I did not show up like I was looking.  We were

23    going back to the P.D. thinking, okay, he's taken off and

24    we were going back and I looked over and there he was

25    standing there in the lot.

```
1          Q.    Did Fritz say if his brother is not going to do

2     the deal, the deal is off?

3          A.    No, he did not.

4               MR. HECKER: May I have just one moment.

5               THE COURT:  Yes.

6               MR. HECKER: Thank you.

7               I have no further questions of this witness.

8               Thank you, Agent.

9               THE COURT:  Redirect?

10              MR. GALLAGHER: Nothing, Judge.

11              THE COURT: Thank you very much.

12              You may step down. Thank you.

13              (Thereupon, the witness left the stand.)

14              THE COURT: Call your next witness.

15              MR. GALLAGHER: The State would call Officer

16        Mike Harrell.

17    Thereupon:

18                   MICHAEL HARRELL,

19    having been first duly sworn, was examined and testified

20    upon his oath as follows:

21              THE CLERK: Please state your name and spell

22        your last name for the record.

23              THE WITNESS: Michael Harrell, H-a-r-r-e-l-l.

24              THE COURT:  Take your seat.

25
```

```
 1                    DIRECT EXAMINATION

 2      BY MR. GALLAGHER:

 3           Q.   By whom are you employed?

 4           A.   City of Hallandale.

 5           Q.   In what capacity are you so employed?

 6           A.   Police officer.

 7           Q.   How long have you been so employed?

 8           A.   Twelve and a half years.

 9           Q.   Prior to that, what did you do?

10           A.   I worked for an x-ray company.

11           Q.   What?

12           A.   An x-ray company.

13           Q.   Tell the jurors what your training and

14      experience is for the position you now hold with

15      Hallandale Police Department?

16           A.   Where do you want me to start?

17           Q.   What do you do?

18           A.   I am police officer, road patrol right now.

19           Q.   What did you do as a road patrol officer?

20           A.   I patrol streets, answer calls.

21           Q.   Do you give us tickets?

22           A.   I don't like to write tickets but occasionally

23      I have to.

24           Q.   What else have you done for Hallandale Police

25      Department?
```

1          A.    I was in the detective bureau a year.  I was in

2     street crimes for five and a half years and I was on the

3     SWAT team for ten years.

4          Q.    Let me call your attention to August the 11th,

5     1995.

6                Were you working on that date?

7          A.    Yes, I was.

8          Q.    Where were you working on that date?

9          A.    I was actually working road patrol.

10         Q.    On that date, were you called to a location on

11    Hallandale Beach Boulevard to effectuate a traffic stop on

12    another individual?

13         A.    Yes, I was.

14         Q.    Did you in fact do that?

15         A.    Yes, I did.

16         Q.    Were you with anyone when you performed that

17    traffic stop?

18         A.    I was with Sergeant Tar (phonetic) and I

19    believe Officer Care (phonetic).

20         Q.    Were you in an unit with a police car with one

21    of them or were you by yourself?

22         A.    I was by myself.  We were all by ourselves in

23    marked police cars.

24         Q.    Please tell the jurors about the circumstances

25    of that traffic stop?

1          A.    We were advised that there was going to be a

2     narcotics transaction and we were to effect a take-down

3     basically on a vehicle involved.

4          Q.    Can you tell the jurors what you did with

5     regard to the take-down?

6          A.    We were advised of the vehicle's description

7     and where it was located and we were a short distance

8     away, at which time myself and the other two officers in

9     marked units moved in and effected the stop.

10          Q.    I am going to show you what has been marked as

11     State's Exhibits M and N for identification and ask you if

12     you can identify what is contained within State's Exhibits

13     M and N?

14          A.    That's the vehicle we stopped at Southwest 10th

15     Terrace and Hallandale Beach Boulevard.

16          Q.    You are looking at what exhibit?

17          A.    Exhibit M.

18          Q.    How about State's N?

19          A.    That's the same vehicle.

20          Q.    Does State's M and N fairly and accurately

21     represent the vehicle that you effectuated a traffic stop

22     on August 11th, 1995?

23          A.    Yes, it does.

24               MR. GALLAGHER: Judge, at this time, the State

25          of Florida would seek to introduce into evidence

```
 1          State's Exhibits M and N.

 2               MR. HOLDEN: No objection, Your Honor.

 3               MR. HECKER:  No objection.

 4               THE COURT: Received and accepted and marked as

 5          State's Exhibit Nos. 7 and 8.

 6               (Thereupon, the documents referred to were

 7          marked as State's Exhibit Nos. 7 and 8,

 8          respectively.)

 9     BY MR. GALLAGHER:

10          Q.    Officer Harrell, was there someone inside that

11     car which you have identified which is now contained in

12     State's 7 and 8?

13          A.    There was an individual driving, yes, sir.

14          Q.    Do you see that person in the courtroom today?

15          A.    Yes, I do.

16          Q.    Please point him out and describe what he is

17     wearing?

18          A.    The gentleman in the green.

19          Q.    The green shirt?

20          A.    Yes.

21               MR. GALLAGHER:  Judge, let the record reflect

22          that the witness has properly identified the

23          defendant, Katan Maignan.

24     BY MR. GALLAGHER:

25          Q.    Please tell the jurors what you did with
```

1    respect to Mr. Maignan on this date?

2          A.    Basically we did the stop and like I said, we

3    took him out of the vehicle and that was basically my

4    involvement.

5          Q.    That's the vehicle that is on State's 7 and 8?

6          A.    Yes.

7                MR. GALLAGHER: Judge, can we publish it to the

8          jury, State's 7 and 8?

9                THE COURT:  Yes.

10   BY MR. GALLAGHER:

11         Q.    Officer Harrell, was there anyone else in the

12   car that's on State's 7 and 8 other than Katan Maignan?

13         A.    No.

14         Q.    And did you conduct any type of search of that

15   vehicle?

16         A.    No, I did not.

17               MR. GALLAGHER: Thank you.

18               No further questions.

19               THE COURT: Can I have 7 and 8, please?

20               Cross examination?

21                        CROSS EXAMINATION

22   BY MR. HOLDEN:

23         Q.    Good afternoon, Officer Harrell?

24         A.    Good afternoon.

25         Q.    Did you effect the arrest of Katan Maignan?

1      A.    What do you mean the arrest?

2      Q.    Did you put him in handcuffs and put him in

3   your squad car and take him to the police station?

4      A.    I did not take him to the police station. I

5   believe I helped Officer Care place him in handcuffs.

6      Q.    And the pictures that we just looked at,

7   Exhibits 7 and 8, reflects I believe open doors on the

8   vehicle, is that correct?

9      A.    That's correct.

10      Q.    When you first came on the vehicle, the doors

11   weren't open, correct?

12      A.    No.

13      Q.    The defendant Katan was driving the vehicle?

14      A.    Correct.

15      Q.    You didn't see the defendant Fritz go by, did

16   you?

17      A.    No, I did not.

18      Q.    In fact, did you have any contact whatsoever

19   with the defendant Fritz?

20      A.    No, I did not.

21      Q.    Now, you testified a moment ago that you were

22   radioed to perform an arrest on a narcotic transaction; is

23   that correct?

24      A.    On a vehicle supposedly involved, yes.

25      Q.    Did the dispatch that you received say anything

1    about the narcotics transaction being completed or not?

2        A.    We weren't actually using a dispatch system.

3    We were from car to car between certain people involved,

4    other investigators.

5        Q.    Had you been at the briefing earlier prior to

6    the arrest in this case?

7        A.    I believe it was the briefing, yes.

8        Q.    You had been present at that?

9        A.    I don't know if we had a formal briefing to be

10   honest with you, but I remember we were advised that there

11   was going to be a take-down unit.

12       Q.    Do you recall if there was any specific

13   take-down signal that was to be used at that time?

14       A.    I don't recall.

15       Q.    Do you recall any of the specifics of the

16   formal or informal meeting that was a briefing, if you

17   will?

18       A.    Just that it was supposedly a narcotics

19   transaction and that we were going to need the take-down

20   unit and police car.

21       Q.    But as you made the stop in this case, did you

22   have any knowledge whether or not at this time the

23   narcotics transaction had been completed?

24       A.    I don't believe so, no.

25       Q.    When you say I don't believe so, you don't have

1    knowledge at the time?

2         A.    No, we had no knowledge whether the transaction

3    had been completed or not.

4         Q.    Now, you weren't using a dispatch system, were

5    you?

6         A.    No, we weren't.

7         Q.    It was car-to-car basically?

8         A.    Yes.

9         Q.    Do you recall who it was who advised you to

10   effect the stop?

11        A.    If might have been Investigator Tamer

12   (phonetic).

13        Q.    Were you in direct radio contact with

14   Investigator Tamer?

15        A.    I believe, yes, we were.

16        Q.    She works for Hallandale Police as well,

17   correct?

18        A.    Correct.

19        Q.    Did you ever see any cocaine in this case?

20        A.    No, I did not.

21        Q.    Did you see any money in this case?

22        A.    No, I did not.

23        Q.    Did you see any firearms in this case?

24        A.    No, I did not.

25             MR. HOLDEN: I have nothing further.

1           MR. HECKER: No questions, Your Honor.

2           THE COURT:  Redirect?

3           MR. GALLAGHER: Nothing else.  Thank you.

4           THE COURT: You may step down.

5           (Thereupon, Officer Harrell left the stand.)

6           THE COURT: Call your next witness.

7           MR. GALLAGHER: The State will call Officer

8       Tommy Long.

9       Thereupon:

10                      TOMMY LONG,

11      having been first duly sworn, was examined and testified

12      upon his oath as follows:

13          THE CLERK: Please state your name and spell

14      your last name for the record.

15          THE WITNESS: Tommy Long, L-o-n-g.

16                   DIRECT EXAMINATION

17      BY MR. GALLAGHER:

18          Q.   By whom are you employed?

19          A.   City of Hallandale Police Department.

20          Q.   In what capacity are you so employed?

21          A.   I am presently assigned to road patrol.

22          Q.   How long have you been assigned to road patrol?

23          A.   The last two years.

24          Q.   Prior to that, what did you do?

25          A.   I was assigned to the detective bureau for

1    seven years and prior to that, seven years on road patrol.

2         Q.   How long have you been a law enforcement

3    officer?

4         A.   Fifteen and a half years.

5         Q.   Let me call your attention to the date of

6    August 11th, 1995.

7              Were you working on that date?

8         A.   Yes, sir.

9         Q.   On that date, were you called to a location in

10   Hallandale, Florida?

11        A.   Yes, sir.

12        Q.   Were you asked to perform a task?

13        A.   Yes, I was.

14        Q.   Please tell the jurors about that?

15        A.   I was called to 1021 West Hallandale Beach

16   Boulevard to photograph a vehicle and obtain some evidence

17   from inside a vehicle.

18        Q.   That's here in Broward County, Florida,

19   correct?

20        A.   Correct.

21        Q.   What happened?

22        A.   I photographed a 1987 gray Toyota Corolla

23   two-door sedan -- I am sorry -- two-door coupe.  I took

24   photographs of the driver's floor board which I took

25   photographs of a firearm which was a Loren 380 automatic,

1    blue in color and I took pictures of a white Sun Bank

2    deposit bag that was lying on the passenger floor board of

3    the vehicle in front.

4         Q.   Let me stop you there for a second.

5              I am going to show you some exhibits marked as

6    G, H, I, J, K, and L and I am going to ask you if State's

7    G through L fairly and accurately represent the scene as

8    you recall this on August 11th, 1995?

9         A.   Yes, sir.

10        Q.   Did you take those photographs, G through L?

11        A.   Yes, sir, I did.

12        Q.   Does State's G through L represent the

13    photographs that you recall taking specifically at the

14    location in Hallandale, Florida, Broward County, Florida,

15    and later at your station?

16        A.   Yes, sir.

17             MR. GALLAGHER: Judge, at this time the State of

18        Florida would seek to introduce into evidence State's

19        G through L.

20             THE COURT: Any objection?

21             MR. HOLDEN: No objection, Your Honor.

22             MR. HECKER: No objection.

23             THE COURT: Received and marked accordingly.  G

24        through L should be numbered consecutively 9 through

25        14.

```
 1                 (Thereupon, the documents referred to were

 2          marked as State's Exhibit Nos. 9 through 14,

 3          respectively.)

 4    BY MR. GALLAGHER:

 5          Q.    Officer Long, I am going to show you State's

 6    Exhibits 7 and 8 and ask you to take a look at 7 and 8.

 7                Did you take those photographs, Exhibits 7 and

 8    8?

 9          A.    Yes, sir, I did.

10          Q.    What do those exhibits represent?

11          A.    They are photos of the 1987 Toyota Corolla,

12    gray in color, two-door coupe with the license plate SJW

13    116.

14          Q.    Who asked you to take those photographs?

15          A.    Investigator Tamer.

16          Q.    Of the Hallandale Beach Police Department?

17          A.    Yes.

18          MR. GALLAGHER:  Judge, I would like to publish

19          State's 9 through 14.  If you would allow the witness

20          to step down and publish it to the jury and explain

21          what they represent, I appreciate it.

22          MR. HOLDEN: I would like to object to the

23          witness getting down and describing to the jury what

24          these pictures are.  These pictures are self-evident.

25          They are the best evidence, and they speak very
```

1          clearly as to what they contain.

2                  THE COURT:  Denied.

3      BY MR. GALLAGHER:

4          Q.   Explain to the jurors, State's 9 through 14,

5      where these items came from.

6                  Let me ask you this.  Did State's 9 through 14

7      come from the vehicle in 7 and 8?

8          A.   Yes.

9          Q.   Now, using 8, 9 through 14 starting with

10     State's 9 on the back it's marked, right here in the

11     middle, hold it up and explain what that represents?

12         A.   This is the driver's door of the vehicle.  This

13     is the door jamb.  The firearm is in the corner on the

14     floor board.

15         Q.   Can you point specifically where that firearm

16     is located in the photograph, State's 9, up in the corner

17     here, what's in the car?

18         A.   If this vehicle was equipped with a dimmer

19     switch, which the older vehicles used to have a dimmer

20     light at night, it would be basically where your foot

21     would be resting if you had to push this button to change

22     the light.

23         Q.   Up in the corner out of view of someone looking

24     down in the window?

25         A.   Yes, sir.

1    Q.   State's 10, please tell the jurors what that

2    represents, holding that up to the jurors?

3    A.   This is a photograph taken from the driver's

4    door facing in, with a small photograph of the driver's

5    cushion.  Here is the passenger seat, and on the floor

6    board of the passenger side is the white Sun Bank bag that

7    contained the currency.

8    Q.   State's 11, please tell the jurors what that

9    represents?

10    A.   This one was taken from the driver's - I am

11    sorry -- the passenger's side door being open.  This

12    cushion right here is the passenger seat cushion, and

13    right there is the white Sun Bank bag sitting on the floor

14    board.

15    Q.   State's 12, please tell the jurors what that

16    represents?

17    A.   Six bundles of U.S. currency, which was removed

18    from the white Sun Bank bag on the floor board. On the

19    outside of those bundles are $100 bills and on the inside,

20    was 800 ones --

21    Q.   Eight hundred $1 bills?

22    A.   Yes.

23    Q.   And what else?

24    A.   Three fifties.

25    Q.   They are bundled up so that the hundreds are on

1    the outside?

2         A.    That's correct.

3         Q.    That's State's 12. Does that represent the way

4    those bundles were inside the bank bag when you found them

5    on August 11, 1995?

6              MR. HECKER: Objection, asked and answered, Your

7         Honor.

8              THE WITNESS:  Yes.

9    BY MR. GALLAGHER:

10        Q.    State's 13, please tell the jurors what State's

11   13 represents?

12        A.    This is the same photograph of the six bundles

13   of money.  It's just a closer photograph where you can see

14   the hundred dollar bills wrapped.

15        Q.    State's 14, please explain what that

16   represents?

17        A.    These are the larger denominations of money

18   when it was unbundled.  There is eight $100 bills and

19   three $50 bills.

20        Q.    In addition to those bills, there was a total

21   of 800 $1 bills --

22        A.    That's right.

23        Q.    -- contained in the bundles?

24        A.    Yes.

25              MR. GALLAGHER: Would the Court allow me to pass

```
 1            this out to the jurors and let them look at them
 2            individually, please?
 3                 THE COURT:  Yes.
 4      BY MR. GALLAGHER:
 5            Q.   Now, Officer Long, after you took the
 6      photographs of these items that were taken from within
 7      that car you talked about on State's 7 and 8, did you
 8      secure the items?
 9            A.   Yes, sir, I did.
10            Q.   Officer Long, I am showing you what has been
11      marked as State's Exhibit O for identification, if you can
12      take a look inside State's O tell me if you can identify
13      it?
14            A.   Yes, sir, I can.
15            Q.   How can you identify State's Exhibit O?
16            A.   I placed this bag into evidence and the Sun
17      Bank bag had a serial number on it and I recorded the
18      number in my police report and this item has not been
19      opened until it's been brought to court.
20            Q.   State's Exhibit O, the items you are referring
21      to, where did you first see State's Exhibit O?
22            A.   The floor board of the passenger side of the
23      vehicle.
24            Q.   That you inspected and photographed on August
25      11th, 1995.
```

1          A.    I photographed all the items before I touched

2     them.

3          Q.    Is State's Exhibit O in the same or

4     substantially the same condition as it was on August 11th,

5     1995?

6          A.    Yes, sir.

7          Q.    Contained within State's Exhibit O is what

8     else?

9          A.    The currency.

10         Q.    The money?

11         A.    Yes, sir.

12              MR. GALLAGHER: At this time, the State of

13         Florida would seek to introduce into evidence State's

14         Exhibit O.

15              MR. HOLDEN: No objection, Judge.

16              MR. HECKER: No objection.

17              THE COURT:  Received, accepted and marked as

18         State's Exhibit 15.

19              (Thereupon, the document referred to was marked

20         as State's Exhibit No. 15.)

21              THE COURT: What is it for the record?

22              MR. GALLAGHER:  15, Judge, the bank bag.

23    BY MR. GALLAGHER:

24         Q.    Officer Long, I show you what has been marked

25    as State's Exhibit Q for identification and ask if you can

1      identify State's Q?

2          A.    Yes, sir.

3          Q.    How can you identify State's Q?

4          A.    This is the money that I retrieved from the

5      bank bag that you just showed.

6          Q.    How do you know that?

7          A.    How do I know that?

8          Q.    How do you know that is the money?

9          A.    Inside the evidence bag is a three by five card

10     with my handwriting.  It lists the denominations of

11     currency, eight $100, three $50 and 8 $1.  It is signed by

12     myself and Captain Hock and the evidence seal has not been

13     broken.

14         Q.    When was the first time you saw State's Exhibit

15     Q?

16         A.    August 11th, 1995.

17         Q.    Where was State's Q when you saw it?

18         A.    Inside the white Sun Bank plastic bag on the

19     floor board of the passenger side of the vehicle.

20         Q.    How was it put together?

21         A.    It was bundled into six bundles, wrapped by

22     $100 bills.

23         Q.    That would be illustrated by State's Exhibit 12

24     which is in evidence?

25         A.    Yes, sir.

1          Q.    What did you do with State's Q after you found

2    it?

3          A.    I took the bag and the money out of the

4    vehicle.  I put it in the rear of my police car.  At that

5    time it would was separated.

6                Investigator Tamer was present.  We basically

7    separated the large bills from the small bills, finding

8    eight $100 and the three fifties and the remainder was

9    ones.

10         Q.    Did you count the money?

11         A.    Right then, no.

12         Q.    Did you ever count it?

13         A.    Yes.

14         Q.    When?

15         A.    At the station with Captain Hock.

16         Q.    The amount of money that is contained within

17   State's Exhibit Q, is how much?

18         A.    $1750.

19         Q.    How do you know that?

20         A.    The denominations equal $1750.

21         Q.    Did you count it with the Captain?

22         A.    Yes, sir.

23         Q.    Would you say that State's Exhibit Q is in the

24   same condition or substantially the same condition as it

25   was on August 11th, 1995?

1        A.    Yes, sir, it is.

2              MR. GALLAGHER: Thank you.

3              Judge, at this time the State of Florida would

4        seek to introduce into evidence State's Exhibit Q.

5              MR. HOLDEN: No objection.

6              MR. HECKER: No objection.

7              THE COURT:  Granted, marked as No. 16.

8              (Thereupon, the item referred to was marked as

9        State's Exhibit No. 16.)

10   BY MR. GALLAGHER:

11        Q.    Just so there is no confusion, what is now

12   State's 16, this money, was contained within this bank

13   bag, which is State's 15 the first time you saw it,

14   correct?

15        A.    Yes, sir.

16        Q.    It was wrapped up in six bundles with hundreds

17   on the outside?

18        A.    Yes.

19              MR. HOLDEN: Objection, asked and answered.

20   BY MR. GALLAGHER:

21        Q.    Officer Long, I will show you what has been

22   marked as P for identification.

23              Can you identify State's Exhibit P?

24        A.    Yes, it's the firearm that was located inside

25   the vehicle.

1          Q.    How do you know that?

2          A.    I put it into evidence on the 16th.  It was

3    signed for and it's basically in the same condition as it

4    was when I put it in evidence.

5          Q.    Is there any indication what the serial number

6    is of State's Exhibit P?

7          A.    Yes, sir.

8          Q.    What is that serial number?

9          A.    370310.

10          Q.    Would you please open up the bag containing

11    State's Exhibit P.

12          Do you need a knife?  Just put it in your lap

13    and examine the items that are contained within State's P

14    and tell me if those are the two items that you found

15    contained within State's Exhibit 7 and 8, that Toyota that

16    you photographed and inspected on August 11, 1995?

17          A.    Yes.

18          Q.    How do you know that?

19          A.    The serial number on the firearm is the same

20    one as listed at the time on the outside of the bag.

21          Q.    Where did you find that firearm specifically?

22          A.    On the floor board of the driver's side of the

23    vehicle.

24          Q.    As illustrated in State's Exhibit 9?

25          A.    Yes, sir.

1           Q.   Would you say that State's Exhibit P is in the

2      same or substantially the same condition today as it was

3      on August 11th, 1995?

4           A.   Yes, sir.

5                MR. GALLAGHER: Judge, at this time, the State

6           of Florida would seek to introduce into evidence

7           State's Exhibit P.

8                THE COURT:  Check to make sure the weapon is

9           clean.

10               Is the weapon clear?

11               THE WITNESS: Yes, sir.

12               THE COURT: Voir dire?

13               MR. HOLDEN: Yes.

14                         VOIR DIRE EXAMINATION

15     BY MR. HOLDEN:

16          Q.   Officer, you just indicated a moment ago that

17     the arrest occurred on August 11th; is that correct?

18          A.   Yes, sir.

19          Q.   On the bag I believe that you indicated there

20     is a date showing when it was entered into evidence; is

21     that correct?

22          A.   Yes, sir, the 11th.

23          Q.   Earlier a moment ago you testified it went into

24     evidence on the 16th.

25               Do you recall saying that?

1    A.   No, I don't.

2    Q.   Could we just check back and see if that was

3    what you had said?

4    A.   Sure.

5    Q.   Was it correct?

6    A.   I entered it into evidence on the 11th of

7    August.

8    Q.   The date August 16th has no relevance for you?

9    A.   Not that I recall.

10    Q.   Did you ever see the defendant in possession of

11    this firearm?

12        MR. GALLAGHER: This goes to admissibility of

13        this particular weapon, whether or not a proper

14        predicate has been laid, not for the purpose of this

15        voir dire. It's not cross examination of the witness.

16        THE COURT: Sustained as to this point.

17    BY MR. HOLDEN:

18    Q.   Agent -- I am sorry -- officer, you just

19    indicated that on the bag it says August 11th?

20    A.   When I sealed the bag, my seal says August

21    11th, 1995.

22    Q.   Is this your seal here, Officer?

23    A.   No, sir, it's not.

24    Q.   What is the date on that?

25    A.   8-17-95.

1      Q.   What is that, please?

2      A.   That is the crime lab technician Sy Lippman's

3   signature.

4      Q.   And you signed the top evidence slip; is that

5   correct?

6      A.   Yes, sir.

7      Q.   Do you recall ever having taken this out of

8   evidence?

9      A.   No, I did not.

10      Q.   You didn't get this through the technician?

11      A.   No, the property clerk did.

12      Q.   You of course tendered it to the property

13   clerk; is that correct?

14      A.   Yes, sir.

15      Q.   The wrapping, the brown paper bag, was that in

16   substantially the same condition then as it is now?

17      A.   Yes, sir.

18      Q.   Subject to being opened?

19      A.   Correct.

20      Q.   When you found this particular piece of

21   evidence, you found it in the defendant's vehicle?

22      A.   I found it in that vehicle, yes.

23      Q.   But he wasn't in there at the time?

24      A.   No.

25      Q.   Did you indicate you found it under the floor

1    board or on top right next to the gas pedal?

2         A.    I found it on the left corner of the vehicle.

3         Q.    When you say left corner, was it under anything

4    or open?  What was the status?

5         A.    The photograph that Mr. Gallagher entered into

6    evidence is how I found the firearm when I arrived.

7         Q.    When you found it, which photo was that,

8    State's 9?

9         A.    I don't recall sir.

10        Q.    May I?

11              Now, when you arrived, the defendant had

12   already been taken out of the vehicle; is that correct?

13        A.    I arrived there approximately five minutes

14   after.

15        Q.    In fact, other officers had told you where the

16   firearm was; is that correct?

17        A.    Investigator Tamer told me where the firearm

18   was.

19        Q.    She indicated to you that it was in the

20   defendant's vehicle on the left side by the driver's

21   portion?

22        A.    Yes.

23        Q.    Did she indicate to you whether or not she had

24   touched the firearm?

25        A.    No, she did not.

1      Q.   You didn't indicate to us that you touched the

2   firearm, did you?

3      A.   Not before photographing it.

4      Q.   When you do that, how do you touch it?

5      A.   Very carefully.

6      Q.   What I mean is, did you pick it up through the

7   muzzle?  Did you pick it up with a pencil or  --

8           MR. GALLAGHER: I object.  This is not the voir

9       dire necessary for the admissibility of this

10      particular piece of evidence.

11          It goes to cross examination of a witness.

12          THE COURT:   Sustained.

13   BY MR. HOLDEN:

14      Q.   Would you couch where the weapon was found as

15   being under the driver's seat?

16      A.   Pardon?

17      Q.   Would you state that the weapon as related in

18   picture number nine was in fact under the driver's seat?

19      A.   No.

20      Q.   Do you have any knowledge why Agent Tamer --

21          MR. GALLAGHER: Judge, I am going to object, if

22      he is going to ask questions about somebody else's

23      testimony.

24   BY MR. HOLDEN:

25      Q.   Do you have any knowledge as to where the piece

1    of evidence was when the defendant was pulled over?

2         A.   No, sir, I do not know.

3         Q.   Do you have any knowledge how the weapon made

4    it on to the floor board of the defendant's car?

5         A.   No, sir.

6         Q.   Do you have any idea if any other officers

7    touched the weapon prior to your arrival?

8         A.   No, sir.

9              MR. HOLDEN: I have nothing further.

10             MR. GALLAGHER: I would move to introduce into

11        evidence State's Exhibit P.

12             THE COURT: Marked as State's Exhibit No. 17.

13             The package itself together with the contents.

14             MR. GALLAGHER: Yes, Judge, composite, thank

15        you.

16             THE COURT: How many bags do you have, three

17        bags.

18             THE CLERK: We have three bags, Your Honor, and

19        an envelope, a small brown paper bag, and a larger

20        brown paper bag.

21             THE COURT: And --

22             THE CLERK: A firearm and one clip.

23             THE COURT: Any ammunition?

24             THE CLERK: No, Your Honor.

25             THE COURT: Thank you.  That's 17.

```
 1              (Thereupon, the items referred to were marked
 2         as State's Exhibit No. 17.)
 3              MR. GALLAGHER:  Judge, would you allow the
 4         witness to step down and publish it to the jury?
 5              THE COURT:  Go right ahead.
 6    BY MR. GALLAGHER:
 7         Q.   Officer Long, please tell the jurors what
 8    State's 17 represents.
 9              Please stand in the middle so they can all see
10    it.
11         A.   380 automatic pistol brand name Lorcin,
12    L-o-r-c-i-n.  The serial number is 370310.
13         Q.   Where did you find that weapon on August 11th,
14    1995?
15         A.   On the floor board of the driver's side of the
16    vehicle.
17         Q.   As illustrated in State's Exhibit 9; is that
18    correct?
19         A.   Yes.
20         Q.   What is that other portion of State's Exhibit
21    17?
22         A.   This is a magazine that is inserted into the
23    bottom of the firearm.
24         Q.   Were there any bullets in that magazine?
25         A.   No.
```

```
 1          Q.    When you first saw that magazine, where was it?

 2          A.    Inside the gun.

 3          Q.    Can you show the jurors how it was positioned

 4     when you found that gun on August 11th, 1995?

 5          A.    (Indicating).

 6          Q.    Is that the proper position for that clip to be

 7     in if there were bullets there to fire the gun?

 8          A.    Yes, sir.

 9                MR. GALLAGHER: Thank you, sir.

10                No further questions.  Thank you.

11                THE COURT:  Cross examination?

12                      CROSS EXAMINATION

13     BY MR. HOLDEN:

14          Q.    You indicated a few minutes ago that Kelly

15     Tamer had asked you go to the vehicle to obtain evidence

16     from the vehicle, is that correct?

17          A.    Yes.

18          Q.    Did Kelly Tamer discuss with you any evidence

19     that she found in the vehicle?

20                MR. GALLAGHER: I object; it's hearsay.

21                THE COURT: Overruled.

22                MR. HOLDEN: Thank you.

23                THE COURT: It only requires a yes or no

24          answer.

25     BY MR. HOLDEN:
```

1          Q.   Did you ever discuss with Kelly Tamer what she

2     found in the vehicle prior to your arrival?

3          A.   I didn't discuss it.

4               THE COURT: Next question.

5     BY MR. HOLDEN:

6          Q.   As a result of that discussion, did you

7     determine from your discussions with her where the gun was

8     upon her entering the vehicle?

9          A.   No.

10         Q.   So you have no idea if it was under the floor

11    board, under the mat, under the seat or anywhere else in

12    the vehicle for that matter; is that correct?

13         A.   That's correct.

14         Q.   There were no bullets in the gun; is that

15    correct?

16         A.   Yes, sir.

17         Q.   There were no bullets in the chamber; is that

18    also correct?

19         A.   Yes.

20         Q.   Now, for the gun to be loaded and have a bullet

21    put in the chamber, you would have to remove the clip; is

22    that correct?

23         A.   No, sir.

24         Q.   How would you place a bullet in the chamber

25    without removing the clip, if the clip was already in the

1     gun?

2          A.   If the magazine was already in the gun and

3     there were bullets in the magazine, to chamber around, you

4     have to pull the slide back.

5          Q.   But for that to happen, there would have to be

6     some rounds in the magazine, correct?

7          A.   Yes.

8          Q.   So if there are no rounds in the magazine and

9     none in the chamber, then to place a round into the

10    chamber, you would first have to place bullets into the

11    magazine; isn't that correct?

12         A.   Yes.

13         Q.   No bullets were ever found as to your

14    inspection of the vehicle; is that correct?

15         A.   I didn't locate any rounds, no.

16         Q.   Did you do any inspection of the defendant

17    himself?

18         A.   I don't recall seeing the defendant there.

19         Q.   So you found no rounds in the gun, correct?

20         A.   Correct.

21         Q.   None in the clip per se?

22         A.   Magazine, no.

23         Q.   None in the vehicle?

24         A.   No.

25         Q.   There was none by the money, was there?

```
 1            A.    No.
 2            Q.    The money that you found was originally inside
 3      the bag; isn't that correct?
 4            A.    Yes.
 5            Q.    It wasn't on the seat as displayed in the
 6      picture, correct?
 7            A.    It's on the floor board.
 8            Q.    In the back but when it's taken out and laid
 9      out, it's on the seat in one of the photographs?
10            A.    On the passenger side.
11            Q.    But that's not how you originally found it, is
12      it, the money?
13            A.    I found the money in the bag.
14            Q.    Right, on the floor board?
15            A.    Right.
16            Q.    But not on the seat?
17            A.    No, I took it out to get a better picture of
18      it.
19            Q.    Did you submit the gun to the lab for any
20      prints?
21            A.    Yes, I did.
22            Q.    What was the result of that?
23            A.    I don't know that.
24            Q.    Did you ever learn if there were any prints on
25      the gun?
```

```
 1         A.    I don't believe there were any prints on the

 2    gun.

 3         Q.    Do you know if there were any prints of the

 4    defendant on the gun, even more important?

 5         A.    Not to my knowledge.

 6         Q.    How about the co-defendant?  Do you know if any

 7    prints of his were found on the gun?

 8         A.    No.

 9         Q.    You didn't get to see the defendants prior to

10    the arrest, did you?

11         A.    No.

12         Q.    When you touched the gun and picked it up, and

13    again, you indicated a moment ago that you touched it

14    gingerly?

15         A.    Very carefully.

16         Q.    You didn't know if it was loaded at that point,

17    correct?

18         A.    Correct.

19         Q.    Did you ever determine if it was loaded at the

20    scene?

21         A.    Yes.

22         Q.    How did you do that?

23         A.    I took the firearm, put it in the trunk of my

24    vehicle, took the magazine out, pulled the slide back, to

25    determine there was no way that gun would go off.
```

1           Q.    But you did it in your trunk?

2           A.    Yes.

3           Q.    Again, you determined there were no bullets in

4      the clip or the chamber?

5           A.    Correct.

6                 MR. HOLDEN: If I could have one moment, Your

7      Honor.

8                 THE COURT:  Yes.

9      BY MR. HOLDEN:

10          Q.    Officer, did you ever make a determination or

11     find out whose vehicle it was?

12          A.    No, sir, I didn't.

13          Q.    So your total job task in this case was to

14     obtain evidence and photograph it?

15          A.    Correct.

16          Q.    And the only items that you removed from the

17     car was the money and the firearm; am I correct about

18     that?

19          A.    Yes, sir.

20          Q.    You had no other involvement --

21          A.    The bank bag.

22          Q.    That contained the money?

23          A.    Yeah.

24                MR. HOLDEN: I have nothing further.

25                MR. HECKER: No questions, Your Honor.

1           THE COURT: You may step down.

2           MR. GALLAGHER: Thank you, Officer Long.

3           THE COURT: You may call your next witness.

4           MR. GALLAGHER: The State would call Captain

5      Chris Hock.

6    Thereupon:

7                   CHRISTOPHER HOCK,

8    having been first duly sworn, was examined and testified

9    on his oath as follows:

10          THE CLERK: Please state your name and spell

11      your last name.

12          THE WITNESS: Christopher Hock, H-o-c-k.

13          MR. GALLAGHER: May I proceed, Judge?

14                  DIRECT EXAMINATION

15   BY MR. GALLAGHER:

16      Q.   By whom are you employed?

17      A.   City of Hallandale.

18      Q.   What capacity are you so employed?

19      A.   Captain, special operations division, police

20   department.

21      Q.   How long have you been with the Hallandale

22   Police Department?

23      A.   Approximately fourteen years now.

24      Q.   How long have you been a captain?

25      A.   Three years.

1          Q.   What is your training and experience for the

2     position you now hold?

3          A.   Graduate, University of Maryland and I also

4     have a Bachelor's Degree in criminology from there.

5               I came to the City of Hallandale.  I was

6     detached to the Broward Sheriff's Office in I think '83

7     where I was assigned to the narcotics unit there.

8               I attended various narcotics schools, DEA basic

9     training schools.  I was assigned to their narcotics unit

10    for several years, took promotional exams and from

11    sergeant to lieutenant to captain now.

12         Q.   Captain Hock, were you working on August 11th,

13    1995?

14         A.   I was.

15         Q.   Can you tell us what your involvement was with

16    regard to the investigation that led to the arrest of two

17    individuals, Fritz Maignan and Katan Maignan?

18         A.   I was notified by one of my detectives, Kelly

19    Tamer. She is dispatched to the DEA task group in Fort

20    Lauderdale.

21              She previously advised me of a possible

22    narcotics transaction transpiring somewhere in the area of

23    the Denny's on West Hallandale Beach Boulevard on the day

24    in question.

25         Q.   That's here in Broward County, Florida?

1          A.    Correct, City of Hallandale.

2          Q.    What did you do?

3          A.    Basically from my recollection, I instructed

4     some of the road patrol supervisors as well as some of my

5     detectives in the special operations bureau to assist

6     Kelly Tamer if they were needed.

7               I believe Sergeant Tar and Officer Mike Harrell

8     were going to stand by in a marked unit capacity, which is

9     sometimes routine, that the marked unit presence be

10    brought in at the end of a transaction or whenever

11    somebody is taken into custody.

12         Q.    The special agent in the Drug Enforcement

13    Agency, basically the control agent, is that Heath

14    Anderson?

15         A.    That's correct.

16         Q.    On August 11th, 1995, what physical

17    participation did you have in this investigation at that

18    location?

19         A.    At one point I was called on the phone by

20    Sergeant Tar.  We had very limited participation as far as

21    any surveillance or anything like that, other than what

22    Detective Tamer and her group was.

23              Our unit, the special operations unit at the

24    City of Hallandale had really no contact at all with

25    Detective or Special Agent Anderson before this date at

1    all.

2        Q.    What did you do specifically?

3        A.    Specifically I got a call from the sergeant

4    stating that --

5            MR. HECKER: Objection, hearsay, what was said.

6    BY MR. GALLAGHER:

7        Q.    What did you do based upon what Sergeant Tar

8    asked you?

9        A.    I went to the Mobil station on Hallandale Beach

10    Boulevard and met with them right there in the parking

11    lot.  He already had one of the subjects in custody.

12        Q.    Was that the defendant Katan Maignan?

13        A.    I believe it was.

14        Q.    What did you do after that?

15        A.    At that time, detective or excuse me, Agent

16    Heath Anderson got into my car and -- excuse me, let me

17    back up.

18            At that time, I went back to the station and

19    verified some money that Officer Long had brought in.

20        Q.    That's Officer Tommy Long, the gentleman who

21    just testified?

22        A.    That's correct.

23        Q.    I am showing you what has been introduced into

24    evidence as State's Exhibit 16.

25            Is that the money you took a look at on August

1    the 11th, 1995?

2         A.    That's correct.

3         Q.    What did you do with regard to State's Exhibit

4    16 on August 11th, 1995?

5         A.    I verified the amount here by signing it with

6    my initials and name on the bottom.

7         Q.    What was the amount of money in question?

8         A.    $1750 I believe.

9         Q.    $1,750?

10        A.    Correct.

11        Q.    After you verified the amount of money that was

12   seized in this case, what is the next thing that you did?

13        A.    Special Agent Anderson and myself got back into

14   my unmarked police unit.  We went back to the area over

15   behind the Denny's area to look for a second subject he

16   thought might still be in the area.

17        Q.    Is that Fritz Maignan?

18        A.    That's correct.

19        Q.    Did you see Fritz Maignan at that time?

20        A.    No.

21        Q.    What did you do?

22        A.    For approximately three hours we were driving

23   around in my car.  He was being paged several times by the

24   subject I later know to be Fritz, and he spoke to him a

25   couple times on the cell phone inside my car.

1          We called Detective Tamer to look at a book or

2    something, look up a telephone number. I had the number

3    cross referenced by BSO dispatch.  They gave us an address

4    right off Miramar Parkway in the City of Miramar.

5          We proceeded to that location.  I did not get

6    out of the car.  Special Agent Anderson went and spoke

7    with the occupants of the house and we stayed there for

8    quite a while also with the Miramar Police Department.

9    They accompanied us to the house also.

10   Q.   Did you find Fritz Maignan at that address?

11   A.   No, we did not.

12   Q.   When you didn't find him at that address, what

13   did you do next?

14   A.   We then proceeded to head back to the City of

15   Hallandale.  I believe it was after seven that evening.

16         On the way back, coming under 95, on Hallandale

17   Beach Boulevard, Special Agent Anderson looked over in the

18   parking lot and saw Fritz Maignan standing there.

19         He advised me to drive right to him.  I drove

20   to him and he began to run.

21   Q.   The defendant Fritz Maignan started to run?

22   A.   Correct.

23   Q.   What happened next?

24   A.   Special Agent Anderson got out of my car and

25   chased him down.

1          Q.    And arrested him?

2          A.    Correct.

3          Q.    Where was that location where Fritz Maignan was

4     arrested in relationship to where the drug deal was to

5     take place that day?

6          A.    I believe it was pretty much the same area.

7                Like I said, I got there to the Mobil station

8     after the first subject was taken into custody, but it was

9     the spot where Special Agent Anderson stated that he was

10    to meet with the subject.

11               MR. GALLAGHER: Thank you.

12               No further questions.

13               THE COURT:  Cross examination.

14               MR. HOLDEN: Yes, Your Honor.

15                         CROSS EXAMINATION

16    BY MR. HOLDEN:

17         Q.    You had direct contact with Kelly Tamer in this

18    case?

19         A.    At which point?

20         Q.    At the point after the first defendant was

21    arrested?

22         A.    Correct.

23         Q.    Prior to that, did you have any contact with

24    Kelly Tamer?

25         A.    Correct.

1        Q.    You did?

2        A.    Correct.

3        Q.    Was that at the briefing?

4        A.    It was not.

5        Q.    When were you first advised of this case?

6        A.    The morning before -- excuse me -- the morning

7    of the day of the transaction.

8        Q.    Your first contact with the case came by way of

9    what, please?

10       A.    Just that we were notified.  It's pretty much

11   basic procedure.  If another agency is operating in the

12   city, that it would be just more of a mutual contact, but

13   since we did have an agent that is assigned full time to

14   DEA, she was asking for some support at that point as far

15   as marked units and stuff.

16       Q.    Now, Kelly Tamer first got in contact with you

17   after the arrest occurred?

18       A.    You already asked me. That was the morning.

19       Q.    And later on after Katan Maignan was arrested,

20   she contacted you again; is that correct?

21       A.    I spoke to her at the station.

22       Q.    Were you at the scene of the arrest where Katan

23   Maignan was?

24       A.    Correct.

25       Q.    And were you there when Katan Maignan was

```
 1   removed from the vehicle?

 2        A.   No, sir.

 3        Q.   He had already been taken out?

 4        A.   Correct.

 5        Q.   Did you do anything regarding the obtaining of

 6   evidence in this case?

 7        A.   Just the money.  Like I explained, the

 8   counting, verify it, correct.

 9        Q.   You had nothing to do with the firearm in this

10   case?

11        A.   No, sir.

12        Q.   So you don't know if any firearm was found or

13   where it was originally located?

14        A.   Personally no.

15             MR. HOLDEN: I have nothing further, Your Honor.

16             Thank you.

17             MR. HECKER: No questions.

18             THE COURT: You may step down.

19             You may call your next witness.

20             MR. GALLAGHER: The State of Florida would call

21        I.D. Technician Sy Lippman.

22   Thereupon:

23                        SY LIPPMAN,

24   having been first duly sworn, was examined and testified

25   upon his oath as follows:
```

1           THE CLERK: Please state your full name and

2      spell your last name for the record.

3           THE WITNESS: My name is Sy Lippman,

4      L-i-p-p-m-a-n.

5           MR. GALLAGHER: May I proceed, Judge?

6           THE COURT: Yes.

7                    DIRECT EXAMINATION

8      BY MR. GALLAGHER:

9      Q.   By whom are you employed?

10     A.   Hallandale Police Department.

11     Q.   In what capacity are you so employed?

12     A.   Identification technician.

13     Q.   How long have you been an identification

14     technician with the Hallandale Police Department?

15     A.   This is my fifteenth year in that capacity.

16     Q.   Prior to working for the Hallandale Police

17     Department, for whom did you work?

18     A.   I was with the City of Miami Beach for

19     twenty-two years.

20     Q.   In what capacity did you work for the City of

21     Miami Beach?

22     A.   Pretty much the same work in the forensics

23     field, crime scene investigation.

24     Q.   What is your training and your experience for

25     that particular position?

1          A.    Much of my training had been on-the-job

2     training, however, I did attend numerous courses held by

3     the FBI at the Dade Community College and various seminars

4     conducted by the International Association for

5     Identification.

6          Q.    And you are a crime scene technician; correct?

7          A.    That's correct.

8          Q.    What exactly do you do as a crime scene

9     technician?

10          A.    Well, I do a little of that at the present time

11     but in the past, I collected the evidence, took

12     photographs.

13          Q.    Are you ever asked to process items that are at

14     crime scenes for fingerprints?

15          A.    Not at crime scenes, but evidence that is

16     brought to the lab.

17          Q.    So items found at the crime scenes are brought

18     to the lab and then you process them?

19          A.    That's correct.

20          Q.    How many times have you done that in your

21     career as an identification technician?

22          A.    Hundreds of times in the many years I have done

23     it.

24          Q.    I am going to call your attention to an

25     investigation that led to the arrest of two individuals,

1     Fritz Maignan and Katan Maignan.

2          Were you asked to perform any task as a crime

3     scene technician with regard to that investigation?

4     A.    Yes, I was asked to process a weapon, an

5     automatic pistol, and a magazine that belonged to it.

6     Q.    That was part of the investigation?

7     A.    I am sorry?

8     Q.    That was part of that investigation?

9     A.    Yes.

10    Q.    I am going to show you what is in evidence as

11    State's Exhibit 17.

12          Can you take a look at the items contained in

13    State's Exhibit 17 and tell me if those are the items that

14    you processed?

15    A.    Yes, this is the weapon that I processed and

16    the magazine that went with it.

17    Q.    You processed both those items for

18    fingerprints?

19    A.    Yes, sir.

20    Q.    Can you please explain to the jurors the

21    technique you used to process those two items that are

22    contained within that State's exhibit to determine whether

23    or not there are latent fingerprints?

24    A.    The process that I used and it's currently used

25    in many other police agencies and the Sheriff's office, is

1      to use a substance cyanoacrylate which in simple terms is

2      super glue.

3            We put a portion of super glue in a container

4      along with the object that we want to process and then

5      seal that.

6            The fumes from the super glue then create a

7      vapor which will crystallize on any fingerprint that may

8      be on that particular object and that crystallization

9      becomes evident in the form of a gray or white substance

10     and if a fingerprint is on that, it would develop the

11     fingerprint that would be visible.

12     Q.    Those types of fingerprints are referred to as

13     what type?

14     A.    I am sorry?

15     Q.    What is the technical term for those types of

16     prints? What do you call that?

17     A.    Usually referred to as latent prints which is

18     invisible but is referred to as latent fingerprints.

19     Q.    Those two items that are contained in State's

20     Exhibit 17, the clip from the gun and the gun itself, were

21     you able after you did your processing technique, were you

22     able to determine if there were any usable fingerprints

23     that were found on those items?

24     A.    I was able to determine that in this case,

25     there were no prints on the object.

1    Q.   Ius that unusual to not be able to find

2    fingerprints on an item that had obviously been touched by

3    someone?

4    A.   Not at all.  I process many weapons and other

5    objects from which I do not determine latents.

6    Q.   For instance, what are some of the things that

7    would cause you not to find fingerprints on a particular

8    item?

9    A.   Well, any number of reasons, might have been

10   recently cleaned before the police got access to it.

11        MR. HOLDEN:  Your Honor, I would like to pose

12        an objection at this time.  He hasn't even been

13        qualified as an expert at this point and he's

14        speculating as to his answers.

15        MR. GALLAGHER: Judge, I'll offer him if you

16        want.

17   BY MR. GALLAGHER:

18   Q.   How many times have you testified as an expert

19   in I.D. technician fingerprint processing techniques?

20   A.   Perhaps hundreds of times both in Dade County

21   and Broward County.

22   Q.   Have you ever been rejected as an expert in

23   that area?

24   A.   Not ever.

25        MR. GALLAGHER:  Judge, at this time, I offer

1          I.D. Technician at this time Sy Lippman as an expert

2          in fingerprint processing techniques that he's

3          testifying about.

4                    MR. HOLDEN: No objection.

5                    THE COURT:  Granted.

6     BY MR. GALLAGHER:

7          Q.   If you could please tell the jurors some of the

8     reasons why a particular item would not have a fingerprint

9     on it?

10         A.   As I mentioned earlier, perhaps the item was

11    recently cleaned and polished.  Most people who own

12    weapons like to keep them in good condition.

13                   Weather could be a factor.  If it had been

14    exposed to weather for any length of time through rain or

15    heat or prints that are barely placed on there could have

16    easily been eradicated, or brushing them or wiping them in

17    any manner could eliminate fingerprints.

18         Q.   In this particular case, Mr. Lippman, did you

19    perform any other task other than the task of examining

20    State's Exhibit 17 and the two items contained in State's

21    Exhibit 17 for latent prints?

22         A.   The only thing was to accept a roll of color

23    film taken by another officer and have that processed.

24         Q.   That would be the photographs in this case?

25         A.   I am sorry?

1        Q.    For photographs in this case?

2        A.    Yes, they were in reference to this particular

3    case.

4        Q.    Now, Mr. Lippman, based upon your examination

5    of the items contained within State's Exhibit 17, can you

6    say whether or not a person by the name of Katan Maignan

7    ever touched those particular items?

8        A.    There is no way we can conclude one way or

9    another whether items had been touched simply because we

10   couldn't find latent prints on them.

11           MR. GALLAGHER: Thank you very much; I

12       appreciate it.

13           MR. HOLDEN: If I may, briefly.

14                    CROSS EXAMINATION

15   BY MR. HOLDEN:

16       Q.    You indicated you had much experience over the

17   years; is that correct?

18       A.    Yes.

19       Q.    If fact, you know of many methods to obtain

20   fingerprints; is that correct?

21       A.    Yes.

22       Q.    Approximately how many accepted methods are

23   there to obtain fingerprints that you know of?

24       A.    Well, there are a number of methods and a

25   number of chemicals that are used to process.

1        Q.   Is the one that you used in this case the one

2   that is most commonly accepted as the best if you will for

3   obtaining fingerprints?

4        A.   The use of super glue cyanoacrylate is

5   generally the best and most accepted in this particular

6   case.

7        Q.   If a person had touched a firearm with a

8   metallic finish, and by the way, the gun had a metallic

9   finish, didn't it?

10       A.   It has both plastic and metallic.

11       Q.   Let me step back a second.

12            Is there any difficulty or greater degree of

13   difficulty with plastic as opposed to a metal finish?

14       A.   Only if it would depend on the nature of the

15   particular substance, that is the make-up of the object.

16   Some of the metals or plastics are very smooth and others

17   are corrugated or striated in different fashions so that

18   no amount of touching could leave a fingerprint.

19       Q.   You are saying the striated ones would be more

20   difficult to leave a print; is that correct?

21       A.   It would be more difficult to detect a print.

22       Q.   Now, in this case, is the firearm mostly smooth

23   over most of its surface or is it more corrugated over

24   most of its surface?

25       A.   That would depend on the firearm; they vary.

```
1          Q.   Right, and in this case, the firearm, what
2     would you -- you can look at it?
3          A.   Do you have a question?
4          Q.   Yes, is it smooth or is it corrugated for the
5     majority of the firearm?
6          A.   On the grip --
7          THE COURT: Would you point that in another
8          direction?
9          THE WITNESS:  I'm sorry.
10         THE COURT: The question is?
11    BY MR. HOLDEN:
12         Q.   Yes, the firearm that's in front of you now,
13    other than the grip, is it smooth or is it corrugated?
14         A.   It's smooth for the most part along the barrel
15    and the slide, but at the rear end it's striated for a
16    firmer grip.
17         Q.   Now, a lot of times we hear about dusting for
18    prints.
19              Would dusting for prints have made any
20    difference in this case?
21         A.   Not particularly, for a number of reasons.
22    That is the striation to begin with and I generally would
23    not dust until after I have used the super glue method.
24         Q.   If the super glue method didn't reveal
25    anything, then it's basically your testimony that the
```

1    dusting would not either?

2        A.    It's possible that it would but generally it's

3    not true.

4        Q.    Now, if someone had touched this firearm on the

5    smooth part, let's say within twelve hours, and there had

6    been no intervening weather factor that would come into

7    place, what would you say as an expert would be the

8    probability of being able to pick up a latent on that?

9        A.    Time is not a factor.

10       Q.    Go ahead.

11       A.    A person handling a weapon five minutes before

12   I process it, and if no latents were left, no prints were

13   left, for whatever reasons I described, then I couldn't

14   get any.

15           On the other hand, it could have been a year

16   since it was touched and processed and I could find

17   something.

18       Q.    So it's theoretically possible that if a

19   defendant had touched a particular firearm anywhere up to

20   a year earlier, you would be able to detect the

21   fingerprints?

22       A.    I am sorry; would you repeat the question?

23       Q.    Is it possible that a person has touched a

24   firearm and you are able to pick that up up to a year

25   later?

1      A.   Oh, yes.

2      Q.   So if in this case the defendant had touched

3   the firearm within a year, it is possible that you would

4   have been able to pick up latents?

5      A.   It's possible.

6      Q.   But you didn't in this case?

7      A.   I did not.

8      Q.   You also didn't pick up any latents of any

9   officers, isn't that correct?

10     A.   No latents at all on this particular weapon.

11     Q.   Were there any partials that you are able to

12   pick up?

13     A.   Not that I recall.  Chances are there would

14   still be some indication of it on here, but there is not.

15     Q.   How about the clip?  Did you take a look at the

16   clip or just tell me if you recollect if there were any

17   latents observed on the clip?

18     A.   I handle a good many, so it's difficult to

19   remember exactly.  If there were any partial prints, and

20   there were insufficient detail in the prints, I would

21   indicate that the prints were of no value.

22     Q.   Now, I would like to pose a hypothetical to you

23   if I could.

24          Let's say we have a particular individual who

25   places a firearm in the floor board of a car, and several

1    months later this firearm is removed from the car.

2              Can you assess any probability or possibility

3    if there has been no intervening factors of being able to

4    obtain a latent at that point?

5         A.   I am not sure.  Would you rephrase that.

6         Q.   Sure.

7              As a hypothetical, someone touches a firearm.

8         A.   Yes.

9         Q.   Six months later, the firearm is recovered.

10             The firearm is recovered from a floor board of

11   a car between let's say the carpet and the floor board of

12   the car itself.

13             Would you still be able to theoretically pick

14   up a print at that point?

15        A.   Theoretically it's possible.

16        Q.   Now, in that case, there is no real intervening

17   factors of weather, are there?  The firearm has been

18   inside the vehicle?

19        A.   As you indicated, there is none.

20             MR. HOLDEN: I have nothing further.

21             Thank you.

22             THE COURT:.  You may step down.

23             MR. GALLAGHER: Thank you, Mr. Lippman.

24             THE COURT: Redirect?

25             MR. GALLAGHER: No, thank you.

1          THE COURT:  You may step down; call your next

2     witness.

3          MR. GALLAGHER: Judge, the People of the State

4     of Florida respectfully rest their case.

5          THE COURT: Please show the jury to its room.

6          (Thereupon, the jury left the courtroom, after

7     which the following proceedings were resumed outside

8     the presence of the jury:)

9          THE COURT: Defense?

10         MR. HECKER: Yes, Your Honor.  I would move for

11    a judgment of acquittal renewal of the original

12    motion to dismiss that was filed before this Court.

13    The Court has a copy of that and it's also in the

14    file.

15         This is the leading case of entrapment.  In

16    this case, from the Florida Supreme Court, that

17    discusses the entrapment defense and what burden each

18    party has.

19         The initial burden is by preponderance of the

20    evidence for the defendant to show he had no

21    predisposition.  This can be shown through a lack of

22    a prior record or a lack of criminal activity and can

23    even be shown by evidence that would not normally be

24    admissible at trial.

25         The testimony we heard today from Special Agent

1      Heath Anderson which would be considered the lead

2      agent and the agent with the majority of contact with

3      my client, was basically as follows:  He gets a tip

4      from an individual who at one time was a documented

5      confidential informant but at this point had been

6      reactivated.

7           The tip merely is an individual by the name of

8      Stizzo is coming to Florida to shop.

9           Now, as Agent Anderson testified, he took no

10     further steps on his own, no independent

11     investigation, no running of the record, no further

12     inquiry to discover whether or not Stizzo who he

13     later learned to be Fritz Maignan, was actually

14     involved in the drug trade.

15          When asked specifically had the confidential

16     informant Joe Clark informed Agent Anderson of ever

17     seeing kilos in the possession of Fritz Maignan or

18     ounces or any drug whatsoever, the answer was no, he

19     was never given any information that drugs were

20     around Fritz Maignan.

21          The burden then shifts to the State to show

22     that Fritz Maignan was a proper target in this

23     matter, and this also can be shown by evidence.

24          The State did not proffer nor was any testimony

25     drawn out from Special Agent Anderson or some of the

1    other witnesses, that there is independent evidence

2    over and above and separate from the evidence

3    presented here regarding the instant case which is

4    before the Court.

5        In fact, the specific evidence that was

6    presented was that the confidential informant Joseph

7    Clark had no other independent evidence of them, had

8    never seen any drugs with them or had never observed

9    any deals, never participated in any deals, so the

10   Munoz case prevents this Court from utilizing the

11   facts and circumstances in this case in determining

12   that entrapment had not occurred as a matter of law.

13       Therefore, I renew my motion to dismiss based

14   upon the issue of entrapment as a matter of law and I

15   move for judgment of acquittal at this time.

16       Thank you, Your Honor.

17       MR. HOLDEN: Your Honor, I would be moving for a

18   judgment –– I of course join in counsel's statement

19   and I also move for judgment of acquittal as to the

20   firearm charges.

21       Defendant Katan Maignan is charged before the

22   Court with carrying a concealed firearm.

23       There is no testimony of any witness that the

24   firearm that was seized had his fingerprints on it.

25       There is no testimony of any witness that he

1    had any knowledge of any firearm.

2         There is no testimony of any witness saying

3    that he bent over and in any way exhibited knowledge

4    or awareness of the firearm, which is an element that

5    he knew of the existence of the firearm.

6         To the contrary, he is never seen, there is no

7    testimony saying that he is reaching for it or going

8    to it, nothing at all regarding the firearm.

9         In fact, just the opposite.  There is evidence

10   that the vehicle that the firearm was in was not Mr.

11   Maignan's.

12        There is evidence that the vehicle I believe

13   belonged to his sister, not to himself.

14        There is no evidence that the gun was capable

15   of being fired, Your Honor, absolutely none.  We

16   don't even know if it was a working firearm at this

17   point. Absolutely nothing came in about that.

18        If I could just have a moment.

19        THE COURT: Take your time.

20        MR. HOLDEN: There is also no evidence as to the

21   origination of the firearm.  There is no claim whose

22   name it was under.  There is no claim that it wasn't

23   registered to the defendant or in fact that it was

24   registered to anyone.

25        There is absolutely no evidence whatsoever in

1      this case that the defendant had any knowledge or

2      awareness of the firearm, merely that one was seized

3      from the vehicle in this case.

4           In fact, there has been testimony, I believe,

5      that the co-defendant was in the vehicle at some

6      point, so there is certainly a question of any

7      constructive possession in this case, but clearly,

8      Your Honor, there is no actual possession by the

9      defendant and it's our position that there was no

10     constructive possession either as shown by the items

11     -- no prints, no partials attributable to the

12     defendant, no visible objective signs of awareness by

13     the defendant of the existence of the firearm,

14     certainly no admissions by the defendant of the

15     existence of the firearm.  That's it.

16          THE COURT: State?

17          MR. GALLAGHER: Judge, with regard to the

18     motions for judgment of acquittal based upon

19     entrapment defense, there has been no evidence put

20     forth in the past couple days, just theories.

21          In fact, all the evidence is just the opposite,

22     that these two gentlemen, Katan Maignan and Fritz

23     Maignan were ready, willing and able to consummate a

24     drug transaction with regard to conspiracy as

25     demonstrated through Special Agent Anderson's

1    testimony and that they agreed to purchase two

2    kilograms of cocaine at the price of $33,000, and in

3    an attempt to consummate that transaction, showed up

4    at the scene of the Denny's on Hallandale Beach

5    Boulevard on August 11th, 1995, to consummate that

6    transaction, so there is an agreement and an intent

7    to commit a criminal act and that's all that is

8    required under the theory.

9         There is absolutely no evidence whatsoever that

10   anyone was entrapped in this case, at least at this

11   point.

12        With regard to the firearm, that all the

13   evidence in the case on the date that Katan Maignan

14   is charged with carrying a concealed firearm on

15   August 11th, 1995, never point to Katan Maignan as

16   being in the car, that's illustrated in State's

17   Exhibits 7 and 8.

18        The only person in that car is Katan Maignan.

19   The gun that is State's 17, the gun and the clip that

20   is State's Exhibit 17, by way of photographs by

21   Officer Tommy Long, show that gun and clip to be in a

22   position in the car, to be out of the normal sight of

23   the other citizens if they were to look in the car,

24   to be in a concealed position in the car, because

25   Katan Maignan was the only person in that car at any

1      time on August 11th, 1995, but that subsequent to the

2      arrest he is exclusively in possession of that

3      vehicle and under the law of possession, if you are

4      in exclusive possession of an item, in this

5      particular case, a firearm contained within the

6      vehicle, the court -- the jurors can assume that he

7      had knowledge and in taking the evidence in the light

8      most favorable to the State, which is where we are at

9      now, I ask you to deny the motion judgment of

10     acquittal on the conspiracy count and carrying a

11     concealed firearm count.

12          THE COURT:  The Court herein finds that there

13     has been sufficient evidence to go before the jury as

14     to this case, that there is evidence to, certainly

15     evidence that could find that the government did not

16     induce the accused to commit the crime and that the

17     defendants were predisposed to commit the offense to

18     which they are charged, and there is factually a

19     determination by a jury that a reasonable person can

20     draw different conclusions or even conclude that the

21     defendants were not entrapped or that they were not,

22     that they were predisposed to commit the crime and

23     not induced by the government to do that, and there

24     is sufficient evidence as a matter of law.

25          Anything further by the defendants?

1          MR. HECKER: No.

2          THE COURT: The Court finds that there has been

3     sufficient evidence presented to the jury, that they

4     should be able to make this decision and consider and

5     it is not insufficient pursuant to the rule, and that

6     there has been a prima facie case presented.

7          MR. GALLAGHER: As to Counts I and II.

8          THE COURT: As to Counts I and II, considered in

9     the light most favorable to the State, motion for

10    judgment of acquittal at the close of the State's

11    case as to both counts are denied respectfully.

12         Defense ready to proceed?

13         MR. HECKER: Yes, Judge.

14         It is ten minutes to five.  We anticipate the

15    defendants testifying.

16         THE COURT: Okay.  Should we take a break for

17    the evening?

18         MR. GALLAGHER: Your call, Judge.

19         MR. HECKER: We should finish tomorrow.

20         THE COURT: Did you get a copy of the

21    instructions that were tentatively prepared by the

22    State?

23         MR. HECKER: Yes, Judge.  I didn't see any

24    particular problems.  They were the ones we

25    requested.  They seem to be okay.

 1              We will make up a verdict form, if we could

 2      find out as charged or not, guilty of any lessers and

 3      what the lessers may be, so we could make up the

 4      verdict form for Your Honor.

 5              You can dismiss the jury and we can discuss

 6      with our client the lessers.

 7              (Thereupon, the jury entered the courtroom, and

 8      the following proceedings were resumed within the

 9      presence of the jury:)

10          THE COURT: Members of the jury, we will be in

11      recess as to this case until 1:30 tomorrow afternoon.

12              Please go about your business and pleasure as

13      you see fit.

14              Until that time, again, you are admonished not

15      to discuss this case amongst yourselves or with

16      anyone else or have it discussed in your presence or

17      see, read or hear news reports of this matter.

18              Return about ten minutes before 1:30.

19              Have a nice evening.  Don't forget anything you

20      have of a personal nature that are at your feet or in

21      the jury room.

22              Anything further?  We are in recess.

23              Thank you.  Have a nice evening.

24              (Thereupon, the jury left the courtroom, and

25      the following proceedings were resumed outside the

```
 1          presence of the jury:)

 2               THE COURT: As to Count I, gentlemen, how would

 3          you like that to read?  Guilty of --

 4               MR. HECKER: May we have one moment to explain

 5          what a lesser is?

 6               THE COURT: Yes.

 7               MR. HECKER: The defendant wants in this

 8          particular case no lesser included offenses, straight

 9          up, either guilty or not guilty as charged.

10               MR. GALLAGHER: As to both counts?

11               MR. HECKER: As to my client, we only have one

12          count.

13               MR. GALLAGHER: All or nothing or what?  Let me

14          know.

15               MR. HECKER: Going straight up on that.

16               THE COURT: Let me ask the defendants a

17          question.

18               MR. GALLAGHER: I have to re-do the verdict

19          form.  I put some lessers on the conspiracy count.

20               THE COURT:  Where was that?  All right.

21               Now, Mr. Katan Maignan and Fritz Maignan, as to

22          Count I, you are charged with trafficking in

23          cocaine --

24               MR. GALLAGHER: Conspiracy to traffic in

25          cocaine.
```

BROWARD REPORTING SERVICE  (954) 763-1382

1           THE COURT: Conspiracy to traffic in cocaine in

2      an amount of 200 grams or more but less than 400

3      grams.

4           MR. GALLAGHER: No, the charge is conspiracy to

5      traffic in cocaine in an amount of 400 grams or more

6      but less than 150 kilograms.

7           THE COURT: Less than 150 kilograms?

8           MR. GALLAGHER: Yes.

9           THE COURT:  That will be submitted to the jury

10      if you are guilty or not as charged, both of you.

11           Now, you are entitled if you want to have

12      lesser included offenses for the jury to consider,

13      trafficking in cocaine in an amount of 200 grams or

14      less, next one, trafficking in cocaine in the amount

15      of 28 grams or more but less than 200 grams.

16           MR. GALLAGHER: Judge, that is conspiracy.

17           THE COURT: Conspiracy to purchase cocaine in

18      the amount of 28 grams, conspiracy to purchase

19      cocaine in an amount less than 28 grams.

20           Now, those are some of the lesser included

21      offenses that the jury may consider or any other

22      lessers you may present to the Court for

23      consideration or submit to the jury if it's

24      appropriate.

25           My understanding is that each of you have

1      talked this over with your lawyer, as to whether you

2      do want any lesser included offenses; is that

3      correct, Katan Maignan?

4           DEFENDANT KATAN MAIGNAN: Yes.

5           THE COURT: Is that correct, Fritz Maignan?

6           DEFENDANT FRITZ MAIGNAN: Yes.

7           THE COURT: My understanding is having talked

8      this over with your lawyer, and having considered

9      this, it us your desire that you do not want any

10     lesser included offenses submitted to the jury for

11     consideration other than charged in the information

12     and no other crimes for them to consider as to Count

13     I, no other lessers; is that correct, Katan Maignan?

14          DEFENDANT KATAN MAIGNAN: Yes.

15          THE COURT: Is that correct, Fritz Maignan?

16          DEFENDANT FRITZ MAIGNAN: Yes, sir.

17          THE COURT:  There are no other charges as to

18     Count II as to lesser included offenses as to Count

19     II, is that correct?

20          MR. GALLAGHER: I am unaware of any other lesser

21     included.

22          THE COURT: I am not asking for lesser included

23     as to Count II, is that correct?

24          MR. GALLAGHER: Yes.

25          THE COURT:  Is that correct, the lawyers?

```
1              MR. HOLDEN: I am not aware of any lesser
2       included of carrying a concealed firearm.
3              If there were, I would relate it to my client.
4              The only thing I can think of would be
5       attempted, carrying a concealed firearm and
6       apparently there is one, which is category two.
7              Can I have one second to speak to the defendant
8       about that?
9              MR. HECKER: That charge does not relate to
10      Fritz Maignan, Judge.
11             MR. HOLDEN: Your Honor, the defendant would not
12      like a less included on Count II.
13             THE COURT: Is that correct, sir?
14             DEFENDANT KATAN MAIGNAN: Yes, sir.
15             THE COURT: Gentlemen, looking at the charges
16      for the moment, do you have them before you.
17             MR. HOLDEN: The first unnumbered page appears
18      to be okay as a tentative final instruction.
19             The second payment is blank on mine.
20             The next page is statement of charge, which
21      appears to be correct; is that right?
22             MR. HECKER: Yes, Your Honor.
23             THE COURT:  Mr. Holden?
24             MR. HOLDEN: Yes, Your Honor.
25             THE COURT:  The next page, the lastly for
```

1    conspiracy --

2         MR. GALLAGHER:  Your Honor --

3         THE COURT: The next page will be deleted in its

4    entirety; is that correct?

5         MR. HECKER: Yes.

6         MR. HOLDEN: Yes, Your Honor.

7         THE COURT: Omit.  Put it on there, omit, so you

8    have you it, gentlemen.

9         The next one appears to be an order; is that

10   correct?

11        MR. HECKER: Yes, Your Honor, a plea of not

12   guilty.

13        THE COURT:  Yes, 2.03.

14        2.04 appears to be okay, however, do you want

15   -- let's go through this.  Let's start after five.

16        Six, does that belong?

17        MR. HECKER: No, Your Honor.

18        THE COURT: Omit?

19        MR. HECKER: Yes.

20        MR. GALLAGHER: That's fine.

21        THE COURT: Seven.

22        MR. GALLAGHER: Omit, Your Honor.

23        THE COURT: Is that right, both defendants?

24        MR. HOLDEN: Yes, Your Honor.

25        MR. HECKER: Yes, Your Honor.

1          THE COURT:  State?

2          MR. GALLAGHER: Fine, Judge.

3          THE COURT: Eight?

4          MR. HECKER: I don't know if there is

5   impeachment. I didn't see any impeachment.

6          I think eight should be omitted as well.

7          THE COURT:  Omit?

8          MR. HOLDEN: Omit.  There was no impeachment

9   that I can recall.

10          THE COURT: Omit?

11          MR. HOLDEN: Yes.

12          MR. HECKER: Yes.

13          THE COURT: State?

14          MR. GALLAGHER: That's correct.

15          THE COURT: Nine?

16          MR. HECKER:  Judge, as far as we know, both of

17   our clients are first time offenders and at this

18   point both are taking the stand. I would request it

19   be omitted.

20          THE COURT:  State?

21          MR. GALLAGHER: I don't have any other

22   information.

23          THE COURT: Omit.  Ten.

24          I will reconsider upon your request later if

25   you want.  For the moment it appears to be omitted.

1              Ten.

2              MR. HECKER: Again, Your Honor, I would ask that

3       be omitted also.

4              MR. HOLDEN: I would join that.

5              THE COURT:  State?

6              MR. GALLAGHER: That's fine.

7              THE COURT: Last paragraph is included, 2.04(a);

8       is that all right?

9              MR. HECKER:  Yes, Judge.

10             MR. HOLDEN:  Yes, Judge.

11             MR. GALLAGHER:  Yes.

12             THE COURT: 2.04(b).

13             MR. GALLAGHER: Don't need it.

14             THE COURT: Omit?

15             MR. HECKER:  Yes, Judge.

16             MR. HOLDEN:  Yes.

17             MR. GALLAGHER:  Yes.

18             THE COURT: 2.04(c), defendant testifying and

19      defendant not testifying.

20             If the defendant testifies, do you want that.

21             MR. HECKER:  Yes, Judge.

22             MR. HOLDEN:  Yes.

23             THE COURT: If the defendant does not testify,

24      does the defendant Katan want either one or both of

25      those?

 1          MR. HOLDEN: No, Your Honor, if the defendant

 2    does not testify, he does not want that.  Oh, 204(b)?

 3    Owe for B.  I am sorry.

 4          THE COURT: Would you want either one or both of

 5    those?

 6          MR. HOLDEN: Yes, I would want both of those in

 7    the event that he doesn't testify.

 8          THE COURT:  Mr. Hecker?

 9          MR. HECKER: Yes, Your Honor.

10          THE COURT: So we leave that there for the

11    moment and determine at that time whether it should

12    or should not be given.

13          2.04(e) is omitted; is that correct?

14          MR. HECKER:  Correct, Your Honor.

15          MR. HOLDEN: Correct, Your Honor.

16          THE COURT: State?

17          MR. GALLAGHER: Correct, Your Honor.

18          THE COURT: Omit.

19          2.05 rules for evidence, they appear to be in

20    order.

21          What about -- they do not appear in order.

22    Let's go ahead and talk about seven.  Do you want

23    that?

24          MR. GALLAGHER: I would, Judge.

25          THE COURT:  It wasn't brought up as such.

1           MR. GALLAGHER: But the jurors have seen me

2    talking to witnesses outside the courtroom.

3           THE COURT: Any objection?

4           MR. HECKER: I have no objection, Judge.

5           MR. HOLDEN:  No objection.

6           THE COURT:  2.08 is not in accordance with the

7    rules.  Are you familiar with the new rule?

8           MR. GALLAGHER: No.

9           MR. HECKER: You mean the verdict one, Judge?

10          THE COURT: Gentlemen, step forward, please.

11          2.05 is okay and 2.07 cautionary instruction is

12    okay, is that correct?

13          MR. HECKER:  Yes, Judge.

14          MR. GALLAGHER: Yes.

15          THE COURT:  And the verdict seems to be -- top

16    left.

17          2.08, let me read it.

18          THE COURT:  Multiple defendants, correct?

19          MR. GALLAGHER: Right.

20          THE COURT: Submitting case to jury, correct?

21          MR. GALLAGHER: Yes, Judge.

22          Something else is wrong here.

23          THE COURT: Let's see.  If you look at as to

24    rules for deliberation, just before the cautionary

25    instructions, do you have that?

1          MR. GALLAGHER: Yes.

2          THE COURT: Number 8, I did mark.

3          MR. GALLAGHER: You want to read it that way?

4          THE COURT: The Supreme Court does.

5          MR. GALLAGHER: As long as you want to do it

6     that way.

7          THE COURT: GALLAGHER: Eight has to be changed.

8          MR. GALLAGHER: Do it the way you feel is

9     appropriate.

10          THE COURT: What the rule provides.

11          MR. GALLAGHER: Okay.

12          THE COURT: Take it with you and bring it back.

13          Submitting the case to the jury.

14          Now we get to the last one, carrying a

15     concealed firearm.  Is that all right, gentlemen?

16          MR. HOLDEN: That's fine, Your Honor.

17          THE COURT: Want me to read the whole definition

18     of firearm?

19          MR. HOLDEN: I don't need it.

20          THE COURT: You want me to stop after

21     explosives, projectiles or action of an explosive or

22     the frame or receiver of any such weapon or firearm?

23     I will give the whole thing if you want.

24          MR. HOLDEN: I would request if the Court could

25     stop at explosives.

1          THE COURT: Any objection, State?

2          MR. GALLAGHER: You don't want to read frame or

3     receiver.

4          THE COURT: I don't care.  I'll stop after

5     explosive.  Okay.

6          Entrapment.  Let's go to the other first.

7          Let's go the to the other crime, criminal

8     conspiracy.  Is that sufficient gentlemen? State?

9          MR. GALLAGHER: Yes.

10          THE COURT:  Defendants?

11          MR. HOLDEN: Your Honor, I just have a query.

12          Are all four under number two, all four within

13     parentheses to be read?

14          THE COURT: Here is your information, if you

15     would like to look at it. Look at the information.  I

16     want to make sure you see it.

17          MR. HOLDEN: Thank you, Judge.

18          Yes, Your,, Honor that's all right.

19          THE COURT: Otherwise ways it is appropriate to

20     give that one?

21          MR. HECKER: Yes, Your Honor.

22          THE COURT:  That will be included right after

23     the statement of the charge, understand?

24          MR. HECKER: Yes.

25          MR. HOLDEN: Yes, Judge.

1          THE COURT: I think, gentlemen, as to criminal

2     conspiracy, before you can find -- you ought to put

3     in a name -- before you can find the defendant Katan

4     Maignan or Fritz Maignan -- top paragraph -- criminal

5     conspiracy.

6          MR. GALLAGHER: If you want to put their names

7     in, that's fine. I have no problem.

8          THE COURT: Katan Maignan, and/or --

9          MR. GALLAGHER: If you want you can put

10    defendants Katan Maignan and Fritz Maignan.

11         MR. HOLDEN: You indicated a moment ago, Katan

12    and Fritz Maignan, the Court indicated the option of

13    and slash or -- that's good.

14         THE COURT: You want me to put and/or? Is that

15    correct? Both defendants asking for that? I will put

16    and/or.

17         MR. HOLDEN: Yes, sir.

18         THE COURT: Carrying a concealed firearm.

19         MR. GALLAGHER: You already went over that.

20         THE COURT: In order to find the defendant,

21    Katan Maignan, guilty of carrying a concealed

22    firearm --

23         Now, entrapment. Where was that? That would

24    come before --

25         MR. GALLAGHER: Let me pose this to the Court.

1          Right now, there is absolutely no evidence of

2     entrapment so if the defense rests at this point, the

3     position of the State will be that they are not

4     entitled to an entrapment instruction, because there

5     has been absolutely no evidence whatsoever to show

6     that anyone, either a government agent or someone

7     acting for a government agent, has induced, lured or

8     persuaded someone to commit an act they were not

9     ready, willing and able to commit.

10          There is no evidence right now in court on that

11     matter.

12          Unless they testify to it, they are not going

13     to be entitled to entrapment.

14          THE COURT: In the event the defendants are

15     entitled to entrapment, in the event that they are,

16     is that in order?  State?

17          MR. GALLAGHER: Yes.

18          THE COURT:  Defendants?

19          MR. HOLDEN: What was the query?

20          THE COURT: Entrapment, in the event that you

21     are entitled to the entrapment, are they in order?

22          MR. HECKER: Yes, Judge.

23          MR. HOLDEN: Yes.

24          THE COURT: I will be hearing argument at the

25     end as to whether you are entitled to have the

```
 1      entrapment.

 2              MR. HECKER: Thank you, Judge.

 3              THE COURT: Is there anything further you would

 4      like to present?

 5              MR. HECKER: Nothing from the defense.

 6              THE COURT:  See you tomorrow, gentlemen.

 7              (Thereupon, the proceedings were concluded at

 8      5:25 o'clock p.m., to reconvene the following day,

 9      June 13, 1996, commencing at or about 1:30 o'clock

10      p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1      State of Florida )
                         :  SS
 2      County of Broward)

 3

 4                  IN THE CIRCUIT COURT OF THE
                    SEVENTEENTH JUDICIAL CIRCUIT,
 5              IN AND FOR BROWARD COUNTY, FLORIDA

 6

 7      STATE OF FLORIDA,        )
                                 )
 8              Plaintiff,       )
                                 )
 9          vs.                  )  CASE NO. 95-14021CF10B
                                 )
10      FRITZ MAIGNAN,           )
                                 )
11              Defendant.       )
        _____ )
12

13

14          Proceedings had and taken before the Honorable

15      ROBERT W. TYSON, JR., one of the Judges of said Court, at

16      the Broward County Courthouse, Fort Lauderdale, Broward

17      County, Florida, on the 13th day of June, 1996, commencing

18      at or about 1:30 o'clock p.m., and being a Jury Trial.

19

20      APPEARANCES:

21

22              JOHN GALLAGHER, ESQUIRE,
                Assistant State Attorney,
                Appearing on behalf of the State.
23
                SCOTT HECKER, ESQUIRE,
24              Appearing on behalf of the Defendant Fritz Maignan.

25              MICHAEL HOLDEN, ESQUIRE,
                Appearing on behalf of the Defendant Katan Maignan.
```

1    Thereupon:

2              The following proceedings were had:

3              THE COURT:  We reconvene in the State of

4    Florida versus Katan and Fritz Maignan.

5              THE COURT: State ready?

6              MR. GALLAGHER: Yes, Your Honor.

7              THE COURT:  Defendants ready?

8              MR. HOLDEN: Yes, Your Honor.

9              MR. HECKER: Have all the jurors returned?

10             THE BAILIFF: Yes, Your Honor.

11             THE COURT:  Escort the jury in, please.

12             (Thereupon, the jury entered the courtroom, and

13   the following proceedings were had within the

14   presence of the jury:)

15             THE COURT: Concede the presence of the jury and

16   waive its polling?

17             MR. HECKER: Yes.

18             MR. HOLDEN:  Yes.

19             THE COURT: State?

20             MR. GALLAGHER: Yes, sir.

21             THE COURT: Did you see, read or hear any news

22   report of this matter or discuss this case or have it

23   discussed in your presence, yes or no?

24             Those who said yes, raise your hands.  No

25   hands.

1           State ready?

2           MR. GALLAGHER: Yes.

3           THE COURT:  Defense ready?

4           MR. HOLDEN:  Yes.

5           MR. HECKER:  Yes.

6           THE COURT: Jury ready?

7           The State has rested its side of the case.  The

8     defense may proceed.

9           MR. HECKER: We would call Fritz Maignan, Your

10    Honor.

11  Thereupon:

12                    FRITZ MAIGNAN,

13  having been first duly sworn, was examined and testified

14  upon his oath as follows:

15          THE CLERK:  Please state your full name and

16    spell your last name for the record.

17          THE WITNESS:  Fritz Maignan, M-a-i-g-n-a-n.

18                  DIRECT EXAMINATION

19  BY MR. HECKER:

20      Q.   Good afternoon.

21           Where is your place that you live?  Where do

22  you live?

23      A.   New York, sir.

24      Q.   What is the address?

25      A.   I live in 227 Harlem.

1        Q.   How old are you?

2        A.   Nineteen.

3        Q.   Now, when you are in New York, do you go to

4   school or work?

5        A.   Go to school and work.

6        Q.   What grade is that?

7        A.   I think is my last year.

8        Q.   What type of school?

9        A.   High school.

10        Q.   You also said you work?  Where do you work?

11        A.   Foot Locker.

12        Q.   What you do at Foot Locker?

13        A.   Shoe man, like when you come in store, ask what

14   size you wear and go get for you.

15        Q.   You are a salesman and stock boy?

16        A.   Yes, sir.

17        Q.   Did there come a time you met an individual by

18   the name of Joseph Clark?

19        A.   Yes.

20        Q.   When you met him, did he use the name Joseph

21   Clark?

22        A.   Yes.

23        Q.   Where did you meet him?

24        A.   On my job, sir.

25        Q.   At Foot Locker?

1          A.    Yes.

2          Q.    That would be in New York?

3          A.    Yes.

4          Q.    Can you tell me how that meeting came about?

5    How did you meet Mr. Clark?

6          A.    When he come in for it, for shoes, he come up

7    to me and ask like in New York because he figure I am --

8    he come up to me and say where you could find drugs,

9    marijuana, stuff.  I told him I don't know.

10         Q.    Mr. Clark asked you if you could find him

11   marijuana?

12         A.    Yes.

13         Q.    Did Mr. Clark ask if you could find any other

14   type of drugs?

15         A.    Coke and stuff.

16         Q.    When he asked you for cocaine, did he ask

17   specifically powder cocaine or crack cocaine?

18         A.    All kinds of drugs when he asked me that

19   question.

20         Q.    Was that during the first meeting that you had

21   with Mr. Clark?

22         A.    The first time I met him, he started talking to

23   him, making business.  I told him what kind of business.

24         Q.    You met with him several times.  We will go

25   through that, but the first time you met him at the Foot

1    Locker, you say he came in to buy shoes?

2         A.    Yes.

3         Q.    You had a conversation with him and he asked

4    you for drugs?

5         A.    Yes, sir.

6         Q.    Were you able to get the drugs he wanted?

7         A.    No.

8         Q.    Did he continue to ask you for drugs at further

9    meetings?

10        A.    Yeah, he keep asking for drugs and came up to

11   me.

12        Q.    How much in time after that first meeting at

13   the Foot Locker did you see Mr. Clark again?

14        A.    Like several, four, five times — four, five

15   times.

16        Q.    Face to face?

17        A.    Yes, sir.

18        Q.    After the first meeting, when did you have the

19   next meeting, a day or days later?

20        A.    Few days later.

21        Q.    Was that also at the Foot Locker?

22        A.    At the store.  He don't know where I live.

23   That's where he always meet me.

24        Q.    I know you are really nervous, so talk slow,

25   all right, so the court reporter would appreciate it.

1             Where were you born?

2        A.    Born in Haiti, sir.

3        Q.    Now, do you recall a second meeting that was

4    also at Foot Locker?

5        A.    Yes.

6        Q.    What was the purpose of that meeting?  What did

7    Mr. Clark want?

8        A.    He wanted to buy drugs, sir.

9        Q.    What type of drugs did he ask for at the second

10   meeting?

11       A.    Same kind of drugs -- marijuana, cocaine.

12       Q.    You said you had several meetings.

13             Can you give a number of how many meetings you

14   had?

15       A.    For the last one was like the fifth one --

16   four, five was the last one, was last meeting.

17       Q.    Four or five of what.  You say the last meeting

18   was four or five?

19       A.    I met several times, like four times.

20       Q.    Now, did there come a time when Mr. Clark said

21   to you that he had a source of cocaine in Florida?

22       A.    Yes, sir.

23       Q.    Why did Mr. Clark tell you he had a source of

24   cocaine in Florida?

25       A.    Because he figure like when he tell me, he told

299

1    me like at the time we started talking, he told me if I

2    come down here I could get easy money, if I come down for

3    drugs.

4        Q.    Did he explain that you could get quick or easy

5    money?

6        A.    He got friend.

7        Q.    Did he explain how you would be able to turn

8    the cocaine into money?

9        A.    No, sir.

10       Q.    Did he tell you how much cocaine would cost in

11   Florida?

12       A.    He just told me meet with this guy, he got good

13   stuff for me.

14       Q.    Did there come a time Mr. Clark said that the

15   source now has cocaine in Florida?

16             Did there come a time when Mr. Clark said that

17   to you, that his source, the person in Florida, now had

18   cocaine available?

19       A.    Yes, sir.

20       Q.    Which one of the meetings was that?

21       A.    It was the last one.  He told me that twice.

22   The last one was like month later.  He told me if he come

23   down there, you will make more money than you make in

24   paycheck. At that time, I was making only hundred fifty

25   dollars.  I ain't got that much hours.  He told me if I

1    come down here, I make more money. That's the reason I

2    come down here, sir.

3         Q.   Did he ever tell how much money you can make?

4         A.   A lot of money.

5         Q.   He referred to it as a lot of money?

6         A.   Yeah.

7         Q.   Now, who bought the ticket for you to fly to

8    Florida?

9         A.   I bought the ticket on my own.

10        Q.   How much was the ticket?

11        A.   Like hundred and change.

12        Q.   Was it roundtrip or one way?

13        A.   One way ticket.

14        Q.   Down here?

15        A.   Down here.

16        Q.   Why did you buy only a one-way ticket?

17        A.   He told me when I met with the guy, only take

18   you, keep talking, going to keep talking, he's going to

19   take care of you.  Know what I am saying?

20             When he told me to come down, he told me, ask

21   him, just tell him Joe sent me and he going to take care

22   of you, got good stuff for you.

23        Q.   How did Joseph Clark tell you to get a hold of

24   his source in Florida?

25        A.   He told me he was going to give the person my

 1    number, sir.

 2            Q.    Did he also give you a phone number?

 3            A.    No, sir, he didn't give me nobody's number.

 4            Q.    He did not give you a phone number?

 5            A.    No, sir.

 6            Q.    Did there come a time you were contacted by

 7    Heath Anderson, the agent who was testifying?

 8            A.    Yes, sir.

 9            Q.    How many days after you arrived in Florida did

10    Heath Anderson contact you?

11            A.    After couple days later, Mr. Anderson come and

12    page me and told me that's the guy Joe Clark was talking

13    about.

14            Q.    Now, before you met Mr. Clark, did you have any

15    plans to come to Florida?

16            A.    No, sir.

17            Q.    But do you have family in Florida?

18            A.    I got my sister lives here.

19            Q.    What is her name?

20            A.    Denise Maignan.

21            Q.    You had no plan to come visit her?

22            A.    No, sir.

23            Q.    Now, would it be a fair statement that the

24    reason you came to Florida was because Mr. Clark --

25                 MR. GALLAGHER: I have an objection.

1          Counsel continues to ask questions in a leading

2      fashion.  He has to ask in a non-leading fashion.

3          That is my objection.

4          THE COURT: Granted.

5   BY MR. HECKER:

6      Q.   What was the purpose of you coming to Florida?

7          THE COURT:  Objection sustained.

8   BY MR. HECKER:

9      Q.   What was the purpose of you coming to Florida?

10     A.   So I could meet with the guy Joe Clark put me

11  on to.

12     Q.   The guy Joe Clark put you on to?

13     A.   Maybe we talk.

14     Q.   Which you later learned was DEA Agent Heath

15  Anderson?

16     A.   Yeah.

17     Q.   Did you have telephone conversation with Agent

18  Anderson?

19     A.   Yes, when he paged me.

20     Q.   We heard tapes today.  Is that your voice on

21  the tape occasionally?

22     A.   Yes.

23     Q.   Now, did there come a time when you decided how

24  you were going to handle that deal with Heath Anderson?

25          Did you decide to do the deal or not to do the

1    deal? Did you make that decision?

2         A.   I make that decision. Joe told me I will talk

3    to the good guys and also I --

4         Q.   Slow down.

5         A.   I also say on tape it's kind of scary, I don't

6    want to doing nothing.  I never been in the drug business

7    before, sir.

8         Q.   But at first you did agree to the deal,

9    correct?

10        A.   Yes.

11        Q.   Do you know what time in the few days you were

12   down here you decided not to do the deal?

13        A.   I don't remember that, what time.  I know at

14   the end when we finished talking to Anderson, I told him,

15   you heard on the tape, I am scared, I don't want to do

16   nothing no more.

17        Q.   Now, the State introduced into evidence $1750.

18             Is any of that money yours?

19        A.   No.

20        Q.   Do you know where the source of that money is?

21        A.   What happened?

22        Q.   Do you know who owns the money?

23        A.   I don't know who owns the money but they say my

24   brother's money they said.

25        Q.   Talk slow because the court reporter is having

1    difficulty with your accent. I know you are nervous, but

2    slow down.

3              The $1750 belongs to you is what you are

4    saying?

5         A.    No, sir.

6         Q.    When you came to the Denny's Restaurant, you

7    saw the tape of yourself?

8         A.    No, sir.

9         Q.    The last videotape that was played for the

10   jury, there was a black man that walked across the street.

11             Was that you?

12        A.    No, sir.

13        Q.    Were you at the Denny's?

14        A.    No, sir.

15        Q.    Were you at the Denny's later in the day?

16        A.    Later in the day I was at Denny's because

17   that's when Heath Anderson called me and told me my

18   brother got hurt, he was in the car and can't get out,

19   he's hurt. He said come help your brother.

20             That's the reason I showed up and looked for my

21   brother. That's when they see me in the parking lot, sir.

22        Q.    Is that when you got arrested?

23        A.    Yes, sir.

24        Q.    Can you tell the jury how many times you told

25   Heath Anderson that you did not want to do this deal?

1          A.   Several times.

2          Q.   Were there certain times you told him that were

3    not on tape?

4          A.   Yes, sir.  Some ain't on tape because he said

5    -- I don't know if he taped it, but he said he ain't got

6    tape.

7          Q.   Do you know how many conversations totally you

8    had with Heath Anderson?

9          A.   I don't remember.

10         Q.   Were they more than what was played in court on

11   the tape?

12         A.   Yeah, more than the tape, sir.

13         Q.   Can you tell the jury the reason why you came

14   to Florida?

15         A.   The reason I come to Florida, I come to Florida

16   because Joe Clark sent me to down to meet with Heath

17   Anderson, sir.

18              MR. HECKER: No further questions, Judge.

19              THE COURT:  Cross examination.

20                         CROSS EXAMINATION

21   BY MR. HOLDEN:

22         Q.   How old were you when you were arrested in this

23   case?

24         A.   How old was I when I was arrested in this

25   case?  I was eighteen.

1          Q.   I am sorry, I didn't understand when you were

2     speaking, did you say that you had or had not completed

3     high school yet?

4          A.   Not yet.

5          Q.   So as we sit here today, you still have not

6     completed high school?

7          A.   Not yet, sir.

8          Q.   At the time you met Mr. Clark, was your brother

9     with you at all?

10         A.   Mr. Clark?

11         Q.   When you met Mr. Joseph Clark --

12         A.   One time my brother was not with me.  One day

13    when my brother show up in the store, that's when Mr.

14    Clark showed up, too.

15         Q.   There was an occasion, at least one occasion

16    that you know of when Mr. Clark and your brother met?

17         A.   What is the question?

18         Q.   Let me think of an easier way of saying that.

19              Were you ever there when Joseph Clark met your

20    brother?

21         A.   Yeah.

22         Q.   How many times did you with your own eyes see

23    Mr. Clark meet your brother?

24         A.   Only time Mr. Clark meet my brother, it was

25    always at my store I been working at.

1        Q.    You saw that happen?

2        A.    Yes, sir.

3        Q.    Was your brother Katan with you when Mr. Clark

4    was talking to you about these items?

5        A.    Yes.

6        Q.    Telling you to make a lot of money through the

7    drug trade?

8        A.    Yes, sir.

9        Q.    Did your brother -- was there any conversation

10   that you were aware of between Mr. Clark and your brother?

11       A.    Well --

12       Q.    Let me try it a different way.

13             Was your brother present when Mr. Clark was

14   talking to you about getting involved in the drug trade?

15       A.    He wasn't present at the time because I had to

16   tell him.

17       Q.    Did you have any personal knowledge as to

18   whether or not Mr. Clark and your brother Katan spoke

19   directly regarding the drug trade?

20       A.    No.

21             MR. HOLDEN: I have nothing further.

22             Thank you.

23                        CROSS EXAMINATION

24   BY MR. GALLAGHER:

25       Q.    Do you have a street name?  Do you have a

```
 1    street name?

 2           A.   Yes, sir.

 3           Q.   What is it?

 4           A.   Call me Stizzo.

 5           Q.   Stizzo?

 6           A.   Yes, sir.

 7           Q.   Is that what we heard on the tape?

 8           A.   Yes.

 9           Q.   Your brother has a street name by the name of

10    Slow; is that correct?

11           A.   Yes.

12           Q.   Is the S-l-o-w, like moving slow?

13           A.   Yes.

14           Q.   It's my understanding that you came down to

15    Florida to purchase drugs; is that correct?

16           A.   Yes, sir.

17           Q.   And you were going to purchase two kilograms of

18    cocaine; is that correct?

19           A.   Yes, sir.

20           Q.   You were going to have to pay $33,000 to

21    purchase the cocaine; is that correct?  You have to put up

22    $33,000 to purchase two kilograms of cocaine?

23           A.   Yes, sir.

24           Q.   You paid for a plane ticket to come down here

25    to purchase two kilograms of cocaine?
```

1     A.   Yes.

2     Q.   You did that of your own free will?

3     A.   The reason I came down was Joe Clark told me to

4  come down to talk to Heath Anderson.  He got a friend who

5  put me on so I could make quick money is the reason I come

6  down.

7          To say I want to come down, I don't have that

8  when I come to Florida before.  I come to Florida buy

9  drugs.  Mr. Joe put me like talk to this person.

10          I don't know anyone from New York anyway, sir.

11     Q.   Let's see if I understand this.

12          You met Joe Clark for the first time in the

13  Foot Locker store that you worked?

14     A.   Yes.

15     Q.   That was in Harlem?

16     A.   Yes.

17     Q.   You never met this guy before in your life?

18     A.   No, sir.

19     Q.   He walked into your store?

20     A.   Um-hum.

21     Q.   Is that right?

22     A.   Yes, sir.

23     Q.   Out of the blue, he starts asking if you want

24  to deal drugs?

25     A.   He buy a pair, I get sneakers.  He asked can I

1    get any discount, like get less price.

2         Q.   On the shoes?

3         A.   Yeah, so I say yeah, I figure like if he like,

4    I give him discount.  I figure I am kind of one person, he

5    asked me --

6         Q.   You are what?

7         A.   I am kind of one person, he trying to figure if

8    you go ask me for like -- know what I'm saying, if I got

9    drugs to sell him.

10        Q.   You are sizing up his shoes?

11        A.   Yes, sir.

12        Q.   Let me ask the question.

13             You are sizing up the shoes at the Foot Locker,

14   never met this guy before in your life, is that right?

15        A.   No, sir.

16        Q.   As you are putting the shoes on his feet, I

17   guess or sizing up his feet --

18        A.   I --

19        Q.   Let me ask the question. I will give you all

20   the opportunity you want to answer.  Let me ask the

21   question.

22             As you are getting shoes for this guy, someone

23   you never met before in your life, he starts asking you

24   about a discount for shoes and in the next breath says by

25   the way, would you be interested in selling me some drugs?

1          A.   Yes, sir.

2          Q.   That's how it happened?

3          A.   That's how it happened, sir.

4          Q.   Now, your brother, Katan Maignan, never talked

5     to Joseph Clark about doing a drug deal, did he?

6          A.   He saw him in my store, sir.

7          Q.   That wasn't the question.

8               Your brother, Katan Maignan, never talked to

9     Joseph Clark about doing a drug deal, did he?

10         A.   No, sir.

11         Q.   In fact, it was you who talked your brother

12    Katan Maignan into doing the drug deal, isn't it?

13         A.   What happens, that's what happens.

14         Q.   Is that a yes?  Is your answer a yes?

15         A.   I will answer your question.

16              MR. GALLAGHER: Judge, please ask the witness to

17         either say yes or no, then he can explain.

18              THE COURT: Can you answer the question or not,

19         then explain.

20              THE WITNESS: What is the question?

21    BY MR. GALLAGHER:

22         Q.   The question was, it was you who talked your

23    brother Katan Maignan into doing the drug deal, isn't that

24    true?

25         A.   I ain't talking --

1          Q.   Say yes or no.

2               THE COURT: Is it true or not?

3               THE WITNESS: Not true, sir.

4     BY MR. GALLAGHER:

5          Q.   Who talked Katan Maignan into doing the drug

6     deal?

7          A.   Joe.

8          Q.   You just told us, you told your attorney on

9     direct examination, that you are unaware of drug

10    conversation between your brother and Joseph Clark, so

11    what's the truth here, Fritz Maignan?

12         A.   The truth is --

13         Q.   Let me ask the question.

14              Did Joseph Clark talk your brother into doing

15    this drug deal or did you tell your brother let's go,

16    let's go, let's do the deal?

17         A.   Joe Clark met both of us at the store where I

18    was working.  That's when I explained to him, I said, me

19    and my brother, we come down, we could get -- know what I

20    am saying?  He could put me in to get quick money is the

21    reason I came down. That's why my brother got involved.

22         Q.   Wasn't it you who told your brother, let's go,

23    let's go, let's do the deal?

24         A.   Joe Clark said that.

25         Q.   You didn't say that?

1          A.    No, if it wasn't for Joe, me and my brother

2    never would have been here.

3          Q.    Ever remember saying anything different?

4          A.    Like what?

5          Q.    Were you in the courtroom on the 4th day of

6    June 1996 ——

7          A.    Yes, sir.

8          Q.    —— with your attorney present?

9          A.    Yes.

10         Q.    Do you remember being asked this question?

11         A.    What question?

12         Q.    Do you have any personal knowledge whether this

13    individual, meaning Joe Clark, contacted your brother

14    Katan, and your answer was no, it was me and my brother,

15    right.  When he talked to me and I told my brother about

16    it and my brother said, well, we ain't going to do it, at

17    the end I just keep telling my brother, come on, let's go,

18    let's go. He keep forcing me also, too.

19              Do you remember saying that?

20         A.    I didn't say it like that, sir.

21         Q.    You didn't say it like that?

22         A.    No.

23         Q.    May I approach the witness?

24              Page ten, lines 4 through 9, if you can read

25    lines 4 through 9 and tell me if that's exactly what you

1    said, what I just read to you?

2          A.    Like I said —

3          Q.    Did you read lines 4 through 9 of page 10 of

4    that document I just handed you?

5          A.    I am not saying it like that, sir.

6          Q.    What I just read to the Court, is that not on

7    that document that is in front of you right now?

8          A.    That's what you are saying but that's —

9          Q.    Is that in the document?

10          A.    That's not what I said.

11          Q.    You want to read exactly what I just read?  Is

12    that what I said from the podium?

13          A.    But that's not what I said.

14          Q.    That's not what you said?

15          A.    No.

16          Q.    So whoever took this down, a court reporter who

17    took this down, took this down wrong.

18                Is that what you are saying?

19          A.    I am not saying that.

20          Q.    You want to look at it again?

21          A.    You just showed me it.

22          Q.    Did it refresh your recollection about saying

23    it?

24          A.    Like I tell you, my brother seen Joe with me at

25    the shoe store, sir.

1          Q.    That's not the question.

2                The question is if you made those statements in

3     court on June 4th, 1996 that I just read to the jury.

4                Is that true?

5          A.    Not true to me.

6          Q.    So if it's in here, it's not true?

7          A.    Like I just told you before, me and my brother

8     and Joe, when my brother showed up at my job, like I keep

9     telling you, Mr. Gallagher, when my brother showed up at

10    my job is when we met Joe Clark and Joe Clark said he

11    talked to Fritz already, we might as well come down and

12    take care of me, Mr. Anderson.

13         Q.    Mr. Maignan, do you remember being in this

14    courtroom June 4th, 1996, with a court reporter present?

15    Remember your attorney was present, Mr. Hecker.

16                His Honor Judge Tyson was present.   You raised

17    your hand on that date just as you raised your hand today

18    and swore to God to tell the truth that day; is that

19    correct?

20         A.    Um—hum.

21         Q.    You said exactly what I just told you, no, it

22    was me and my brother, right, when he talked to me and I

23    told my brother about it, my brother said well, we ain't

24    going to do it, right, and at the end I just keep telling

25    my brother, come on, let's go, let's go.   He keep forcing

1    me also, too.

2              Do you remember saying that on June 4th, 1996?

3         A.    I didn't say nothing about my brother forcing

4    me.

5         Q.    So you are saying this transcript of that

6    proceeding where you swore to God to tell truth is

7    incorrect?

8         A.    Like I just told you, sir, I don't remember

9    saying that.

10        Q.    Now, Mr. Maignan, you are the type of person

11   obviously if you saw a crime occurring or someone involved

12   in criminal activity, you would certainly notify the

13   police; wouldn't you?

14             MR. HECKER: Objection, improper question;

15        beyond the scope.

16             THE COURT: Overruled.

17   BY MR. GALLAGHER:

18        Q.    You would certainly do that, wouldn't you?

19        A.    What?

20        Q.    You would notify the police if you saw someone

21   involved in criminal activity, you would certainly notify

22   the police, wouldn't you?

23        A.    Depends.

24        Q.    You just said yes.  Did you change your mind

25   since your lawyer stood up?

1       A.   I am telling you what I feel.

2       Q.   So when allegedly Joe Clark, the confidential

3  deposit informant in this case, walked into your Foot

4  Locker store, out of the blue, never met the man before in

5  your life and says, do you want do deal drugs, did you

6  think maybe he was involved in criminal activity?

7       A.   Like I said --

8       MR. GALLAGHER: Would you ask the witness to say

9       yes or no, then explain.

10      THE COURT:  Answer the question.  You may

11      explain your answer.

12  BY MR. GALLAGHER:

13      Q.   Did you think maybe Mr. Clark was involved in

14  criminal activity when he asked you do deal drugs?

15      A.   No, sir.

16      Q.   You didn't think so?

17      A.   I wasn't thinking like he was a bad guy.  Like

18  I was telling you before, sir, anybody make a mistake one

19  time in life, so I just made --

20      Q.   I will get to your mistakes later. I am talking

21  about right now when this man walked into this Foot Locker

22  store and you are sizing up his feet to sell some shoes,

23  how the next breath he says to you, hey, want to sell me

24  drugs.

25           Did you think maybe he was involved in criminal

1    activity at that point, yes or no?

2        A.   Yes, sir.

3        Q.   You certainly wouldn't involve yourself in

4    criminal activity, would you?

5        A.   No, sir.

6        Q.   Yet you chose to put yourself on an airplane

7    and travel what, 1500, 2,000 miles from New York to South

8    Florida to buy two kilograms of cocaine; is that correct?

9        A.   All the time --

10       Q.   Is that correct?

11       A.   Yes, sir, but the reason I come down there

12   because Joe Clark told me to come down here.

13       Q.   Wait a minute. He told you to come down here?

14       A.   Yeah, I could make some good friends.

15       Q.   Take a gun and stick it to your head and tell

16   you get on a plane and travel 2,000 miles and buy two

17   kilograms of cocaine for $33,000.

18            Is that what Joe Clark did to you?

19       A.   He ain't pulled a gun, but he told me I could

20   make easy money.

21       Q.   How in the world are you going to make easy

22   money when the first thing you have to do to involve

23   yourself in a drug deal is to come up with $33,000?

24            Where were you going to get the $33,000 to

25   involve yourself in drug dealing?  Where?

1           A.    I had the money, sir.

2           Q.    But that's what you negotiated for in this

3      case; isn't that correct?

4           A.    Yes.

5           Q.    So with your theory, before you could make this

6      quick, easy money you, were going to have to first of all

7      buy a plane ticket for a couple hundred dollars, right,

8      and come down here and hand over $33,000 to buy two

9      kilograms of cocaine; is that correct?

10          A.    That's not correct, sir.

11          Q.    What is correct?

12          A.    Like I told you before, it was Joe told me to

13     come down here, he got some good friends.

14          Q.    To sell you drugs?

15          A.    Some good friends.

16          Q.    To sell you drugs?

17          A.    I could make quick money with friends right

18     here.

19          Q.    Quick money. What I am asking is in this case,

20     this case, the first thing you were going to have to do

21     was hand over $33,000?

22          A.    But --

23          Q.    Let me ask my question.

24                -- hand over $33,000 before you could get the

25     drug to sell; is that correct?

1        A.   That's correct but also saying, the tape record

2   said too, we say we don't want to do nothing, sir.

3        Q.   I am not talking about later.  I am talking

4   about when you got on that jet plane and flew from Harlem,

5   New York to South Florida, in your mind, you were coming

6   down to buy two kilograms of cocaine; right?

7        A.   I said I don't want to do nothing.  Like I told

8   Heath Anderson, I chicken out, I am scared.

9        Q.   On the tape I played for the jury, you said I

10  don't want to do nothing no more, I am chickening out, I

11  am scared, I don't want to do nothing no more?

12            Tell me which tape to play for the jury right

13  now?

14        A.   They heard it.

15        Q.   You tell me where on any of the tapes you say I

16  am chickening out, I am scared, I'm not doing this no

17  more, I don't want to do this no more?

18        A.   I ain't got the tape to show.  If you play all

19  the tapes, they heard for themselves, they heard my voice.

20        Q.   Who came up with the money in this case to hand

21  over to Heath Anderson?

22        A.   I don't know.

23        Q.   It was your sister, wasn't it?

24        A.   No.

25        Q.   Didn't your sister hand you and Katan Maignan

```
 1      $1750 allegedly for you guys to get an apartment?

 2           A.   Didn't hand me money.  They give my brother

 3      money to get apartment.

 4           Q.   Gave it to Katan?  Did your sister, Denise

 5      Maignan, give Katan Maignan, the $1750 to use in this drug

 6      deal?

 7           A.   Not the drug deal.

 8           Q.   She gave it to you thinking she was giving it

 9      to you to get an apartment, didn't she?

10           A.   Yes, sir.

11           Q.   She got it from a bank, didn't she?  She got it

12      from a bank, didn't she?

13           A.   No, sir.

14           Q.   She didn't get it from a bank?

15           A.   No, sir.

16           Q.   Where did she get it from?

17           A.   From saving money at her house.

18                MR. GALLAGHER: Judge, just give me a second.

19      BY MR. GALLAGHER:

20           Q.   Didn't your sister, Denise, go to a Barnett

21      Bank on Miramar Parkway and take out $1750 and give it to

22      your brother, Katan Maignan, which she believed to be used

23      to rent an apartment?

24           A.   I don't remember that.  My sister don't go to

25      banks.  She was in the house and she said we go -- she was
```

1    in the house.

2        Q.    Which one of you put the money together for

3    this drug deal?

4        A.    I don't know, not me.

5        Q.    It wasn't you?

6        A.    No, sir.

7        Q.    Give me a second, Judge.

8              Have you ever said anything different from

9    that?

10       A.    No, sir.

11       Q.    Remember being in the courtroom on June 4th,

12   1996 --

13       A.    Um-hum.

14       Q.    -- with His Honor Judge Tyson present, the court

15   reporter present, yourself, myself and your attorney Scott

16   Hecker present?

17       A.    Um-hum.

18       Q.    Remember raising your hand and swearing to God

19   to tell the truth on that date just as you have done here

20   today?

21       A.    Um-hum.

22       Q.    Remember being asked this question?

23       A.    What question, sir?

24       Q.    I will read it to you right now.

25             Page 23, line 18.  The question: To get an

1        apartment -- but you took that money -- this question I

2        asked of you June 4th, 1996 -- but you took that money and

3        you and Katan bound it up and brought it to this drug

4        deal, didn't you?

5               Do you remember what your answer was to that

6        question?

7        A.     I don't remember saying that.

8        Q.     I asked that question.

9               Do you remember what your answer was that day?

10       A.     What is my answer?

11       Q.     Yes, sir.  Want to take a look at it to refresh

12       your recollection a little bit?

13       A.     Where?

14       Q.     Line 18?

15       A.     No, I don't remember saying that.

16       Q.     You don't remember saying it?

17       A.     No.

18       Q.     So that transcript taken down --

19       A.     I --

20       Q.     Let me ask the question, then you can answer.

21               So that transcript of that hearing on June 4th,

22       1996, that court reporter, just like this one, took down

23       that information.

24               Are you saying you didn't say that?

25       A.     Like I just said, I ain't got nothing to do

1    with this money.

2         Q.    That's not the question. Are you saying you

3    didn't answer yes, sir, to the question I asked of you?

4         A.    I don't remember saying that.

5         Q.    So instead of calling the police on Joseph

6    Clark who out of the blue comes up to you at the Foot

7    Locker and asked you to do a drug deal, instead of calling

8    the police and telling the police about this, you decided

9    to do a crime; is that correct?  Is that correct?

10        A.    Yes, sir.

11             Like I was saying --

12        Q.    There is no pending question?

13             MR. HOLDEN: Objection, he's trying to explain

14        after answering as Mr. Gallagher said he could do.

15             THE COURT:  You may explain.

16             THE WITNESS: Like I was telling you, sir, the

17        reason I didn't call the cops is the man told me, you

18        know, don't worry about it, you can't make that much

19        money in your job.  If you come down here, I put you

20        with my friend, my man, he's going to take care of

21        you.

22             That's the reason I come down and that's the

23        reason I didn't call the cops.

24    BY MR. GALLAGHER:

25        Q.    Didn't you tell the jury a few minutes ago that

1    when I see criminal activity occurring --

2         A.   Yeah.

3         Q.   -- or when you see someone committing a crime,

4    that you call the police?

5              Didn't you just tell the jury that a few

6    minutes ago?

7         A.   Um-hum.

8         Q.   Well, in this case, when a man comes up to you

9    and asks you if you can sell him some drugs, don't you

10   think he is committing a crime?

11        A.   Yes, sir.

12        Q.   But in this case, you didn't call the police

13   like you said you always do; is that right?

14        A.   But --

15        Q.   Is that a yes or no?

16        A.   I ain't tell the man right away. I told him

17   first, I told him, you know, Joe I don't know drugs.  Some

18   people might have some, but I don't know nobody.

19             That's when he keep coming up to me and asking

20   me at the end, at the last minute, at the end told me, you

21   know, if you come down, there is quick money in Florida,

22   man, you ain't make that much.

23             That's when I come down here.

24        Q.   You don't know anything about doing a drug

25   deal, right?

1         A.    No, sir.

2         Q.    What's it mean to cook the cocaine?

3         A.    That he said, he talked to us. He told me, you

4    know, fix it up, know what I am saying?  If you got the

5    tape, you heard it on tape.

6              Heath Anderson told me that's how you going to

7    do this.

8         Q.    He asked you flat out on the tape on August the

9    8th, 1995, the first time you and he spoke, he asked you

10   flat out when he said he had some wet cocaine, he said you

11   can cook yours up.

12             Do you remember what your answer was?

13        A.    That wasn't my voice.

14        Q.    Heath Anderson asked you, you can cook yours

15   up.

16             Do you remember what your response was to that

17   question?  Remember what your answer was?

18        A.    Refresh my memory.

19        Q.    On the tape you said yeah, when he asked if you

20   can cook yours up, you said yeah?

21        A.    Heath Anderson always says, you know, how to

22   fix it.  I say, I tell you how to fix it, too.

23        Q.    When he asked if you are going to cook yours

24   up, you didn't say, well, what do you mean by cooking it

25   up?  You didn't say that.  You said yeah, I am going to

1    cook it up, like you knew what he was talking about,

2    didn't you?

3           Do you remember yourself on the tape saying

4    that?

5        A.    I remember the tape, sir.

6        Q.    When he asked if you were going to get two

7    condos, you knew he was talking about two kilos of

8    cocaine, didn't you?

9        A.    No.

10       Q.    You didn't?

11       A.    No, he had to explain.  We talked to Heath

12   Anderson before, if he put everything in the tape like if

13   he had another tape, I don't know if you got everything on

14   tape, when he explain to us that he was going on, before

15   when we started talking about two condos, I am trying to

16   find out what condos is anyway.

17       Q.    Remember on the tape, August 8th, 1995, same

18   conversation as the cooking up tape, that tape of Heath

19   Anderson said you want to get two condos, right?

20           Do you remember what your answer was?  Do you

21   remember?

22           Do you remember what your answer was to that

23   question?

24       A.    No, I don't know, because Heath Anderson said

25   that he had two condos.

1          Q.    What was your answer to the question from Heath

2     Anderson on August 8th of 1995 when he asked you, you want

3     to get two condos, right?

4               What was your answer on that date?

5          A.    Refresh my memory.  That was a long time ago.

6          Q.    Your answer was yeah, not what do you mean by

7     condos?  Do you remember that?

8          A.    Um-hum.

9          Q.    When he asked if you wanted two condos, you

10    didn't say I don't know what you mean by condos.  You said

11    yeah, as if you knew the two condos meant the two

12    kilograms of cocaine?

13         A.    He got to explain it to me.

14         Q.    He didn't explain it on the tape?

15         A.    I met with him before though.

16         Q.    So you had another meeting that we are not

17    aware of.  Is that what you are saying?

18              We have another meeting Heath Anderson never

19    testified about before this phone call?  Is that what you

20    are saying?

21         A.    If anything being taped, if you were to tape

22    everything on tape, if you record every conversation from

23    day one --

24         Q.    You remember what you said when Heath Anderson

25    told you that he had cocaine at eighteen five that was

1    good cocaine, and then he had some cocaine that was

2    cheaper because it was wet.

3                Remember him saying that to you?

4        A.   Um-hum.

5        Q.   You said it didn't matter because I don't sell

6    mine like that.  Remember saying that to him on the tape

7    on August the 8th, 1995?

8        A.   I never sell drugs, sir.

9        Q.   Do you remember saying I don't sell mine like

10   that, when he referred to the kilo of cocaine that was

11   wet?

12               Do you remember saying that to him on the tape

13   that we all heard you say on August 8th, 1995, remember

14   that?

15       A.   I said I don't sell mine like that?

16       Q.   Yes, sir?

17       A.   No.

18       Q.   What you meant by that was you cook it up, you

19   don't sell it in powder form.  Isn't that what you meant?

20       A.   No, I never sell drugs before.  That was the

21   first time I been involved in the drug game, sir.

22       Q.   When you came down here and on August the 8th,

23   1995, you are talking to Heath Anderson and you tell him I

24   come to shop, man, I come to shop.  Know what I am saying?

25       A.   That is how Joe told me, when he met with his

1    man, just let him -- as soon as I tell him my name, he's

2    going to understand what is going on, what I come here

3    for.

4              Joe must talk to Heath Anderson also, so I

5    don't know.

6         Q.   Joseph Clark was not involved in that phone

7    conversation on August the 8th, 1995.  It was just you and

8    Heath Anderson, wasn't it? It's a yes or no.

9         A.   Can I let you know what is going on.

10        Q.   Sure, as soon as you answer yes or no, you can

11   explain your answer.

12             Joseph Clark was not a participant in that

13   phone conversation on August 8th, 1995, between yourself

14   and Heath Anderson, was he?

15        A.   No.  But listen, Joe, that's how I met him,

16   through Heath Anderson, was by Joe.

17             If it wasn't for Joe, I wouldn't see Heath

18   Anderson.  I could have been home or school if it wasn't

19   for Joe.

20        Q.   Well, it's plain and simple here, Mr. Maignan.

21             I mean, you flew down from New York to South

22   Florida specifically to do a drug deal; isn't that

23   correct?

24        A.   Joe sent me.

25        Q.   And you weren't down here doing anything

```
 1    legitimate.  You weren't working, right?  You had a

 2    cellular phone, didn't you?

 3         A.   Um-hum.

 4         Q.   You remember talking on the tape about being on

 5    the cell phone; do you remember that?

 6         A.   Listen what I am saying.

 7         Q.   Do you remember that?  Remember telling Special

 8    Agent Anderson that you are on your cell phone.

 9              Remember telling that on the tape that we all

10    heard?

11         A.   It's on the tape?

12         Q.   It's on several tapes.

13         A.   Let the tape play.

14         Q.   You bet. You will hear it over and over again.

15              Do you remember saying that on the tape, that

16    you are on your cell phone?

17         A.   I got a cell phone.

18         Q.   We saw you on the videotape at the McDonald's

19    making phone calls from your cell phone, didn't we?

20    Didn't we?

21              The first time you met Special Agent Anderson

22    up on Cypress Creek Road you are standing there with your

23    brother, Katan, waiting for Special Agent Anderson to show

24    up so that you could negotiate the two kilogram

25    transaction of cocaine and you're sitting there making
```

1    calls on your cellular phone.

2              Do you remember that?

3        A.   I wasn't calling Heath Anderson though.

4        Q.   I am not asking who you're calling. I'm saying

5    you are standing there with a cell phone, right, making

6    phone calls, right?

7        A.   Um-hum.

8        Q.   You weren't working. You were down here just to

9    buy drugs; isn't that correct?

10       A.   I was working up north.  I ain't been down here

11   for months. I was coming down here in a couple weeks.

12       Q.   To buy drugs?

13       A.   Yeah, but Joe sent me down here to, sir.

14       Q.   You keep saying Joe sent you down?

15       A.   That's the reason I come down here. Like if it

16   wasn't for Joe, I probably wouldn't have been here.

17       Q.   I want to know what pressure, physical pressure

18   forced you to go to a ticket counter at the airport, hand

19   over a couple hundred dollars of your hard earned money

20   from the Foot Locker, take the ticket, get on a plane, and

21   travel 2,000 miles to buy drugs.

22              How did Joe Clark force you to do that?

23       A.   Joe tell me if I come down I could get quick

24   money, more money than I made from my paycheck and that's

25   the reason I come down here, sir.

1         Q.    To do that, the first thing you were going to

2    have to do was hand over $33,000 to someone, right.

3    Right?

4         A.    Yeah, right, but that's when I found out,

5    that's when I went out there, I don't want that, I am

6    chickening out.  I don't want to get involved in this.  I

7    am chickening out.

8         Q.    How did you get to the Denny's Restaurant on

9    August 11th, 1995?

10        A.    How I get to Denny's Restaurant?

11        Q.    Yes.

12        A.    The day I got arrested?

13        Q.    Yes, that day?

14        A.    I took a cab, sir.

15        Q.    Which cab is that?

16        A.    The cab I take from my sister's house and go

17   over there.

18        Q.    What is the name of the cab company?

19        A.    I don't know, sir.

20        Q.    What is the name of the driver?

21        A.    I don't know.

22        Q.    What time did you call the company?

23        A.    What time I call the company?

24        Q.    To get a cab to your house?

25        A.    I don't remember.  It was a long time, sir.

1          Q.   Wasn't this the most important day in your

2     life, August 11, 1995, the day you were arrested?  Wasn't

3     this an important day to you?

4               What this an important day in your life?

5          A.   Can't be that important; I'm in jail.

6          Q.   It wasn't that important that you got

7     arrested?  That wasn't an important day for you?

8          A.             Baddest day that happened to me in my

9     life.

10         Q.   It's a very important day in your life that you

11    got arrested; isn't it?

12         A.   It's not important, it's a bad day to me,

13    baddest day that ever happened to me in my life, sir.

14         Q.   You are able to recall specific instances in

15    New York before you came down here, but you can't recall

16    today, swearing to God to tell the truth, the name of the

17    cab company or the time that you called the cab company to

18    travel from a cab from your house in Miami, right?

19         A.   Um-hum.

20         Q.   Up to Hallandale Beach Boulevard to do a drug

21    deal.  You can't remember that, right?

22         A.   I don't remember that.

23         Q.   Isn't it a fact here, Mr. Maignan, that you and

24    your brother were going to steal two kilograms of cocaine

25    from Special Agent Anderson?

1      A.   Wasn't going to do the deal.  That's when we

2   told him we don't want to do nothing.

3           We said we don't want to do nothing no more.

4      Q.   You don't want to doing nothing, but both of

5   you showed up on the day of the arrest?

6      A.   I wasn't there, sir.

7      Q.   That wasn't you on the tape?

8      A.   That wasn't me.

9      Q.   Let me ask a question.

10          You had a pager number for Special Agent

11   Anderson, didn't you?

12     A.   Um—hum.

13     Q.   You had a phone number for Special Agent

14   Anderson, didn't you?

15     A.   No.

16     Q.   Just a pager?

17     A.   A pager.

18     Q.   So if you didn't want to do this deal, all you

19   would have had to do was page Special Agent Anderson and

20   say we are not going to do the drug deal, Special Agent

21   Anderson?

22     A.   We did tell him that a couple times on the tape

23   and he keep saying come down, come down, it's quick.  Know

24   what I am saying?  I wouldn't need the money.

25     Q.   You wouldn't need the money?

1          A.   Saying come down.

2          Q.   Are you saying Special Agent Anderson was going

3     to hand you over two kilograms of cocaine for free?

4          A.   I don't know.  That's when we said we don't

5     want to do nothing, sir.

6          Q.   When you saw Special Agent Anderson and Captain

7     Hock at the location of this drug deal, you ran, didn't

8     you?

9          A.   I didn't ran. I stood still.  I didn't run.

10         Q.   You didn't run?

11         A.   No, sir.  I was in the parking lot.  Somebody

12    came down and said don't move, DEA.  I am kind of shocked,

13    what is going on.

14              When they saw me, I was looking for my brother

15    at the time.  He told me to come down, my brother got hurt

16    and when he was over the phone, that's when I come down.

17    I was looking for my brother.  I was looking all over the

18    parking lot.  That's when Heath Anderson come up and

19    somebody else I don't know his name.

20         Q.   That would be Captain Hock?

21         A.   He arrest me, sir.

22         Q.   You heard the testimony in court yesterday?

23         A.   Yes, sir.

24         Q.   Are you sure you didn't run?

25         A.   Positive I didn't ran.

1      Q.   Do you remember a phone conversation you had

2   with Heath Anderson on August the 10th, 1995 at 2:35 p.m.,

3   where you told Heath Anderson Joe was on the phone, Joe

4   Clark was on the phone.

5          We had you, the informant Joseph Clark and

6   Heath Anderson.

7          Do you remember telling Joseph Clark in that

8   phone conversation on that date and time, I told you I was

9   coming down to Florida, to put me on to somebody.

10          Remember saying that on the tape?

11      A.   I didn't say none of that, sir.  All I am

12   saying is Joe know I was coming down because he sent me

13   down here.

14      Q.   Do you remember saying that on the tape?

15      A.   No, I don't remember saying that, sir.

16          MR. GALLAGHER: If the Court would allow me, I

17       ask to send the jury out and have an opportunity to

18       find the spot on the tape and show Fritz Maignan how

19       he said it on the tape.

20          MR. HECKER: We would object.  The tape is in

21       evidence.  The jury can listen.

22          MR. GALLAGHER: If he doesn't want to

23       acknowledge that --

24          THE COURT:  Show the jury to its room.

25          (Thereupon, a brief recess was had, after which

1          the following proceedings were resumed within the

2          presence of the jury:)

3              THE COURT:  You may continue on with cross

4          examination.

5    BY MR. GALLAGHER:

6         Q.   Mr. Maignan, the question I posed to you is do

7    you remember saying on August 10th, 1995, on the videotape

8    involving yourself, Joseph Clark, and Heath Anderson, at

9    2:35 p.m., on that date, do you remember saying to Joseph

10   Clark in that phone conversation, "I told you I was coming

11   down to Florida, put me on to somebody."

12              Do you remember saying that?

13        A.   Like I was telling you, I don't remember saying

14   that, sir.

15        Q.   Would it refresh your recollection to hear that

16   tape recording?

17        A.   Yes.

18        Q.   May I play that tape?

19        A.   If it's me, I am going to say it's me, sir, I

20   already told you.

21        Q.   You are not going to change your mind now, are

22   you?

23        A.   Yes, sir.  Go ahead, play the tape.

24        Q.   The person on here is identified at Stizzo.

25   That's you, isn't it?

1          A.    Yes, sir.

2          Q.    You want to sit so you can hear real clearly?

3     Can you hear?

4          A.    I hear.

5          Q.    The speaker is here if you have a problem.

6                I'm coming down here, put me on to somebody.

7                Did you hear yourself say that?

8          A.    Let me hear it again.

9          Q.    Sit over here.  You have the speaker right

10    here.

11                (Thereupon, the tape was played.)

12          Q.    I told you I was coming down here to Florida.

13    Put me on to somebody.

14                Did you hear yourself just say that?

15          A.    Yes, sir.

16          Q.    So, sir, you are coming down to Florida and you

17    tell Joseph Clark to put you on to somebody.  Is that what

18    you said on that tape on August 10th, 1995?

19          A.    That's what I say on the tape.  Like I was

20    saying, I spoke to Joe, before that, Joe the one that told

21    me when I coming down, come with me, I'm going to take

22    care of me and put me with somebody so he could take care

23    of me, I could make a lot of quick money.

24                MR. GALLAGHER:  I have no further questions,

25          Judge.

1            THE COURT: Mr. Hecker.

2            MR. HECKER: Yes, sir.

3                    REDIRECT EXAMIN.

4      BY MR. HECKER:

5            Q.    Mr. Maignan, regarding the June 4t.

6      motion we had here in court, you were asked the q.

7      about whether or not you -- excuse me -- whether or n.

8      Joe Clark had contact with your brother, and your answer

9      was no, correct?

10           A.    Yes, sir.

11           Q.    Can you please explain to the jury why you said

12     no at that time?

13           A.    Why I said no at that time?  I think when at

14     that time we was talking if Joe met me and my brother down

15     here.

16           Q.    Down here in Florida?

17           A.    Down here in Florida.

18           Q.    Did Joe Clark to the best of your knowledge

19     meet your brother Katan in New York?

20           A.    Yes, sir.

21           Q.    Do you know how many times he met in New York?

22           A.    Two times.

23           Q.    Where was that meeting at?

24           A.    My job.

25           Q.    At Foot Locker?

1        A.    Foot Locker.

2        Q.    Did Joe Clark talk to you, both you and your

3    brother, about coming to Florida for a drug deal?

4        A.    Yes.

5              MR. HECKER: Let me have one moment, Judge.

6    BY MR. HECKER:

7        Q.    I have one more question regarding Mr. Clark.

8              Did Mr. Clark make representations to you and

9    tell you in front of your brother Katan that you could

10    make big money down here in Florida?

11        A.    Yes, sir.

12              MR. HECKER: No further questions, Judge.

13              THE COURT:   Anything else by anyone?

14              MR. HOLDEN: No, Your Honor.

15              MR. GALLAGHER: Nothing from the State.

16              THE COURT: You may step down.   Thank you.

17              (Thereupon, Fritz Maignan left the stand.)

18              THE COURT: You may call your next witness.

19              MR. HECKER: Your Honor, on behalf of Fritz

20    Maignan, we have no other witnesses to call.

21              THE COURT: You may proceed.

22              MR. HOLDEN: The defendant would call Katan

23    Maignan to the stand.

24    Thereupon:

25                        KATAN MAIGNAN,

1    having been first duly sworn, was examined and testified

2    upon his oath as follows:

3            THE CLERK:  Please state your full name and

4        spell your last name for the record.

5            THE WITNESS:  Katan Maignan, M-a-i-g-n-a-n.

6                    DIRECT EXAMINATION

7    BY MR. HOLDEN:

8        Q.    Katan, have you ever testified in court

9    before?

10            Let me rephrase that.

11            Have you ever testified as a defendant at any

12    hearing in court other than a bond hearing?

13        A.    No.

14        Q.    You are a little nervous now, aren't you?

15        A.    A little.

16        Q.    Please relax and answer the questions as slowly

17    as possible.  I am not trying to trick your or fool you.

18    I want you to relax and answer the question, please.

19            How old were you when you were arrested in this

20    case, Mr. Maignan?

21        A.    Nineteen.

22        Q.    Had you graduated high school at that point?

23        A.    Um-hum.

24        Q.    Just so it's easier for the court reporter to

25    get your answer, answer out loud yes or no.  It makes it a

1    little easier for her to take down what you are saying.

2         So once again, you had graduated from high

3    school at the time you were arrested?

4         A.   Yeah.

5         Q.   Were you working or going to college or

6    anything like that at the time you were arrested?

7         A.   Um-hum.

8         Q.   You have to say yes or no.

9         A.   Yes, yes.

10        Q.   Where were you working or going to school at

11   that time?

12        A.   I was a bouncer.  At that time I was going to

13   Miami Dade.

14        Q.   Now, up in New York, you had a brother who

15   lived there, Fritz, is that correct?

16        A.   Yes.

17        Q.   You didn't live there, did you?

18        A.   Yeah, I did.

19        Q.   You did live in New York?

20        A.   Yeah.

21        Q.   When you lived in New York, there came an

22   occasion where you met a Joseph Clark; is that correct?

23        A.   At that time, I was living down here.

24        Q.   But you were in New York to visit with your

25   brother?

1        A.   Yeah, yeah, yeah.

2        Q.   Were you going to school or working up there at

3   all?

4        A.   No, I was living down here at that time.

5        Q.   But a couple weeks before you were arrested,

6   you met Mr. Clark in New York; didn't you?

7        A.   Yes, sir.

8        Q.   What if anything did Mr. Clark promise you by

9   way of a drug deal?

10       A.   One time I went to see my brother in a job and

11  I met Mr. Clark, right, and he was with my brother and we

12  started talking.  He asked, he said he got a connection in

13  Miami, because he hook us up, you know.

14       Q.   He told you that through the connection you

15  would make a lot of money?

16       A.   Yes.

17       Q.   Did he tell you that you have to come up with a

18  lot of money to make a lot of money?

19       A.   No.

20       Q.   Did he tell ever tell you that --

21            MR. GALLAGHER: I have an objection to the

22       continuing leading nature of this examination.  This

23       is direct examination.  He has to ask a question in a

24       non-leading fashion.

25            THE COURT: Sustained.

1    BY MR. HOLDEN:

2        Q.    After meeting and speaking with Joseph Clark,

3    what if anything did you do as relates to this case?

4              After meeting with Mr. Clark, what did you do

5    as a result of your conversation with him?

6        A.    I met him like three times.

7        Q.    Up in New York?

8        A.    Yeah, yeah, yeah.

9        Q.    And on those three occasions, on each of those

10   occasions did he tell you that you could make money?

11       A.    Yeah, that was the main thing, you know.

12       Q.    Did he ever offer you marijuana or cocaine to

13   taste or try?

14       A.    No, but at one point he was asking where can we

15   get some marijuana.

16       Q.    He wanted marijuana?

17       A.    Yeah.

18       Q.    Large amount, small amount?

19       A.    Just to smoke.

20       Q.    Did you provide him with any marijuana?

21       A.    No, sir.

22       Q.    Did you ever use marijuana or cocaine with Mr.

23   Clark?

24       A.    No, sir.

25       Q.    Now, Mr. Gallagher pointed out when your

1    brother was on the stand about how no gun was ever held to

2    your head.

3              No one ever held a gun to your head; is that

4    correct?

5         A.   No, sir.

6         Q.   But you were under the impression somehow --

7              MR. GALLAGHER: I have an objection.  This is

8         leading in nature.

9              MR. HOLDEN:  I will rephrase the question.

10   BY MR. HOLDEN:

11        Q.   Were you under the impression as a result of

12   your conversation --

13             MR. GALLAGHER: It's the same type of question.

14        It's still leading form and improper on direct

15        examination.

16             THE COURT: Sustained.

17   BY MR. HOLDEN:

18        Q.   What impression, if any, were you left with

19   after speaking with Mr. Clark?

20        A.   In my mind from what he told me, I was looking,

21   you know, making a lot of money, you know, fast.  That was

22   the main thing.

23        Q.   This was to purchase cocaine, correct?

24        A.   Yeah.  At that time, he didn't tell us to come

25   up with money.  He told us he got friend down in Miami, he

1    got connections, he could hook us up from the

2              MR. HOLDEN: One moment, Your Honor

3              No further questions, Your Honor.

4              MR. HECKER: No questions, Judge.

5                        CROSS EXAMINATION

6    BY MR. GALLAGHER:

7         Q.   Now, Mr. Maignan, you were living down here

8    with your sister Denise, is that correct?

9         A.   Yes, sir.

10        Q.   You had been living with her approximately four

11   years; is that correct?

12        A.   Yes, sir.

13        Q.   Was it her car that you used for this drug

14   transaction on August 11th, 1995?

15             MR. HOLDEN: I would like to object.  It's

16        beyond the scope of any testimony I elicited on

17        direct.

18             MR. GALLAGHER:  He asked him about a drug

19        transaction.

20             MR. HOLDEN:  I did not ask about a drug

21        transaction.  I asked about a confidential informant

22        in New York and his contact with him, not about any

23        transaction.

24             THE COURT: Show the jury to its room.

25             (Thereupon, the jury left the courtroom, and

1    the following proceedings were had outside the

2    presence of the jury:)

3        THE COURT:  Mr. Gallagher.

4        MR. GALLAGHER: When Mr. Holden inquired of his

5    client with regard to why he got involved in this

6    drug deal and how he was pressured by the informant,

7    he opened up the entire scope of the examination that

8    should be allowed with the entire transaction.

9        Just because he's asking questions about

10   incidents that never occurred in New York on not down

11   here does not preclude my cross examination on the

12   entire transaction, if his questioning brings out

13   details related to that transaction.  This is cross

14   examination and the Court has discretion to allow the

15   person crossing the witness to ask very wide

16   questions with regard to questions that were posed on

17   direct examination.

18       Clearly the questions posed by Mr. Holden are

19   related to the transaction that took place in South

20   Florida and I am allowed to inquire about it.

21       Just because the thing happened in New York

22   doesn't preclude me from asking questions.

23       MR. HOLDEN: Clearly, Your Honor, those items I

24   spoke of are not related at all to the charges before

25   the defendant.

1          The things that I spoke of related to the state

2     of mind.

3          THE COURT:  If they weren't related --

4          MR. HOLDEN: They were directly relevant to the

5     entrapment defense and to the inducement and state of

6     mind of the defendant as to why he came down here.

7          I didn't ask the defendant anything about a

8     vehicle, about money, about a gun. I asked him about

9     no contact with any agents down here.

10          I asked him nothing about Florida.  I didn't

11     mention Florida except he stated that he lived here

12     and that in and of itself doesn't open the door.

13          MR. GALLAGHER: When he asked the question about

14     entrapment, he is asking about entrapment on this

15     case.  This case is a South Florida case.  He can't

16     ask about entrapment and then say, well, now you

17     can't ask any questions about the drug deal even

18     though that's going to be my defense in this entire

19     case.

20          MR. HOLDEN: Of course we know the entrapment

21     defense is one that occurs as a result of events

22     prior to the crime. All.

23          Of the events occurred prior to the crime.

24     None of the events of the crime itself were spoken

25     of. That's why I did it that way.

```
1                THE COURT:  Objection is overruled.

2                Escort the jury in, please.

3                (Thereupon, the jury entered the courtroom, and

4           the following proceedings were had within the

5           presence of the jury:)

6                THE COURT: You may be seated. Thank you.

7                Ask your next question.

8      BY MR. GALLAGHER:

9           Q.   The car you used to drive to this drug deal on

10      August 11th, 1995, was that your sister's?

11           A.   Yeah, my sister's car.

12           Q.   You had borrowed the car from her that day; is

13      that correct?

14           A.   Um-hum, yes, sir.

15           Q.   She had given you money to take to the drug

16      deal; is that correct?

17           A.   No, sir.

18           Q.   Isn't it correct your sister went to Barnett

19      Bank on Miramar Parkway and withdrew $1750?  In her mind

20      she was giving it to you for a rental apartment?

21           A.   Yes.

22           Q.   The money that she gave you, in that stack of

23      money that was taken from that bank teller at the Barnett

24      Bank on Miramar Parkway, there were no $1 bills --

25           A.   She --
```

1          Q.   Let me ask the question.

2               There were no $1 bills in that stack of money,

3     was there?

4          A.   No, sir.

5          Q.   At what point did you or your brother convert

6     the 1700 that was given to you by your sister allegedly to

7     rent an apartment?  At what time did you and your brother

8     convert that $1700 into eight hundred $1 bills, eight $100

9     bills and three $50 bills?

10              At what point did you and your brother do that?

11         A.   First of all, it wasn't me and my brother.  It

12    was just me.

13         Q.   You were doing the drug deal yourself; is that

14    true?

15         A.   What do you mean?

16         Q.   Were you doing the drug deal by yourself?  Is

17    that what you are telling the jury today?

18              MR. HECKER: The question is who converted the

19         money into one dollar bills, not who did the drug

20         deal.

21              THE COURT: You may ask your next question.

22    BY MR. GALLAGHER:

23         Q.   Were you doing the drug deal by yourself?

24         A.   We don't do no drug deal.

25         Q.   Were you at the Denny's Restaurant on

```
 1    Hallandale Beach Boulevard on August 11th, 1995?

 2         A.   Yes, I was.

 3         Q.   Was that you we saw on the videotape in this

 4    case?

 5         A.   Yeah, that was me.

 6         Q.   Was that you talking to Special Agent Heath

 7    Anderson?

 8         A.   Some of that was me.

 9         Q.   Was that your car that we saw or your sister's

10    car that we saw at the Denny's Restaurant on August 11th,

11    1995?

12         A.   That was my sister's car.

13         Q.   You were the only one driving that car at that

14    time on that date; is that correct?

15         A.   Yes, sir.  At that time when we there, I was

16    there by myself but before that my sister used the car all

17    the time.  Her boyfriend be using the car.

18         Q.   Her boyfriend?

19         A.   I mean her husband.

20         Q.   But it was your sister who gave you the money;

21    is that right?

22         A.   Yeah.

23         Q.   She gave you the money?

24         A.   Yeah.

25         Q.   There weren't any $1 bills in that money as you
```

1    testified to, correct?

2         A.    Correct.

3         Q.    So you changed the $1700 that she had in

4    twenties and tens and fifties, you changed it into eight

5    hundred $1 bills; is that correct?

6         A.    I did, sir.

7         Q.    It was you who bound up the money into separate

8    bundles with hundreds on top and ones in between; is that

9    correct?

10        A.    Yes, sir.

11        Q.    It was you who put the gun in the car; isn't

12   that correct?

13        A.    I didn't have a gun, sir.  I don't know nothing

14   about a gun.

15        Q.    You don't know nothing about a gun?

16        A.    No, sir.

17        Q.    You were the only one in the car on August

18   11th, 1995?

19        A.    Yeah, I was the only one.

20        Q.    I want you to take a look at something.

21   State's Exhibit 9, take a look at it.

22             Up there in the corner on the driver's side up

23   out of the way where you can't really see it, crammed up

24   in the corner on the driver's side, see that gun lying on

25   the floor of that floor board?

1          A.    Yes, sir.

2          Q.    You have no idea how the gun got there on

3    August 11th, 1995, right?

4          A.    When I was driving the car, I wasn't looking at

5    the floor board.

6          Q.    Are you saying the police put it there?

7          A.    When I was in the car, even when I got

8    arrested, they didn't mention no gun.

9          Q.    Are you saying somebody put the gun there

10   without you knowing about it?

11         A.    I am not saying that but to my knowledge, there

12   was no gun in the car.

13         Q.    You heard the testimony of Officer Long,

14   correct?

15         A.    I don't know which one you talking about.

16         Q.    The gentleman who took the photographs in this

17   case?

18         A.    Yes.

19         Q.    You heard the testimony of Officer Mike Harrell

20   who arrested you at the scene that day?  Do you recall

21   that?

22         A.    Yes.

23         Q.    You heard Officer Harrell saying he arrested

24   you with another officer, put you in handcuffs and took

25   you away.

1            Do you remember that testimony?

2       A.    I don't recall that.

3       Q.    It was yesterday.  You don't remember?

4       A.    Yes.

5       Q.    Okay, and you heard Officer Long say that

6   within five minutes, within five minutes of that

7   happening, he was on the scene to take the photographs of

8   that car --

9            MR. HOLDEN: I would like to object, Your Honor.

10            MR. GALLAGHER: What is the objection?

11            MR. HOLDEN: The objection is he is

12       characterizing it as five minutes.

13            Whether or not Officer Harrell -- I am sorry,

14       Officer long said that is in his testimony.

15            Mr. Gallagher is characterizing his testimony

16       and in my opinion mischaracterizing it.

17            MR. GALLAGHER: That's argument.

18            THE COURT:  You may ask your next question.

19   BY MR. GALLAGHER:

20       Q.    Within five minutes of you being taken out of

21   the car by Officer Harrell and another officer, Officer

22   Tommy Long was there to take photographs as set forth in

23   State's Exhibit 8, that car?

24       A.    Yes, sir, that was the car.

25       Q.    So you are saying that somewhere between the

1    time that you got arrested and the time that Officer Long

2    got there, within five minutes, somebody put a gun up in

3    the corner of the driver's side floor board of that car?

4         A.    I am not saying somebody put it there. It could

5    have been there.

6              At that time when I was driving the car, I

7    wasn't looking at the car.

8              To my knowledge, I wasn't looking in the car.

9         Q.    You just don't know how that gun got there; is

10   that what you are saying?

11        A.    I don't know.

12        Q.    That gun slides like any other gun, doesn't

13   it?  If you hit a bump, it will slide?  You don't know?

14        A.    I don't know.

15        Q.    You don't think you'd notice it if your foot

16   was hitting the gas pedal and the brake pedal, you don't

17   think you'd notice the gun up in the left-hand corner of

18   that car?

19        A.    To my knowledge, I don't know no gun in the

20   car.

21        Q.    Just so we are clear, the bundles as set forth

22   in State's Exhibit 12, those are the bundles you put

23   together of the money, correct?

24        A.    Suppose so; I suppose so.

25        Q.    You suppose so?  Is that a yes or no?

1          A.   Yeah, but the money wasn't like that though.

2          Q.   How was the money?

3          A.   The money was in the bag.

4          Q.   It is taken out of the bag at this point to get

5     photographs, but you bundled the money up like as set

6     forth in State's Exhibit 12 and put it in the bag, didn't

7     you?

8          A.   Yes, I did.

9          Q.   Now, you had talked to Special Agent Anderson

10    prior to August 11th, 1995, correct?

11         A.   Yes, I did.

12         Q.   You had met with him on August 9th, 1995 at the

13    McDonald's Restaurant on Cypress Creek Road; is that

14    correct?

15         A.   I met with him but I don't recall the day

16    exactly.

17         Q.   You saw the videotapes, correct?

18         A.   Yes.

19         Q.   The first videotape, remember you and your

20    brother, Fritz Maignan, at the McDonald's Restaurant on

21    Cypress Creek Road?

22         A.   I remember.

23         Q.   We didn't hear the audio but we heard the

24    testimony of Special Agent Anderson; isn't that correct?

25         A.   Yes, sir.

1          Q.    You were there to negotiate for two kilograms

2    of cocaine at $33,000; isn't that correct?

3          A.    At that time --

4          Q.    Yes or no, then explain your answer.  Is that

5    correct?

6          A.    What is the question?

7          Q.    Were you there at the McDonald's Restaurant on

8    Cypress Creek Road on August the 9th, 1995, you and your

9    brother Fritz, with Special Agent Anderson and another

10   detective by the name of Tatum, were you there and

11   negotiating a two kilogram cocaine transaction for

12   $33,000?

13         A.    Yes, sir.

14         Q.    Do you recall the phone conversation you had

15   with Special Agent Anderson on August the 10th, 1995?  Do

16   you recall those phone conversations?

17         A.    Yes.

18         Q.    The next day?

19         A.    The next day, yes.

20         Q.    The day after the McDonald's meeting?

21         A.    Um-hum.

22         Q.    Do you remember telling Special Agent Anderson,

23   your exact words are -- let me make sure I get this right

24   -- give me a second -- when you come, and this is August

25   10th, 1995 -- when you come -- you are talking to Special

1    Agent Anderson -- when you come, I'll show you my shit and

2    then you know what I am saying, you will show me your

3    shit.

4              Remember that phone conversation?

5        A.    Yeah, I remember that.

6        Q.    And the shit you are referring to I am assuming

7    must be the money to buy the two kilograms of cocaine; is

8    that correct?

9        A.    I don't recall everything that I said that day

10   because it's been a while.

11       Q.    You just said you remember that phone

12   conversation?

13       A.    Yeah, I remember that.  I listened to it the

14   other day.

15       Q.    And when I just refreshed your recollection,

16   you said you remember it, right?

17             What did you mean when you said you show me

18   your shit, I will show you my shit.

19             What was the shit you were referring to?

20       A.    I guess the money.

21       Q.    Do you remember on that same phone conversation

22   when you told Special Agent Anderson if you want, you can

23   bring your shit and drive over to my car.

24             You remember that, right?  We all heard it in

25   court.

1        A.    Like I say, it's been a while.   I don't

2    remember what I said, you know?

3        Q.    You want to hear it again on tape?

4        A.    If it's on the tape, but I am saying right now,

5    you are asking me, I don't remember word by word what I

6    said exactly because it's been a while.

7        Q.    When you said that, when you were telling

8    Special Agent Anderson he could bring his shit over to

9    your car, you were talking about him bringing two

10   kilograms of cocaine to your car; is that correct?

11           Isn't that what you meant when you said he

12   could bring his shit to your car?

13       A.    Like I said, it's been a while.   I don't

14   remember --

15       Q.    Do you remember that same phone conversation

16   when you told Special Agent Anderson make sure it's just

17   me and you.  If I see any faces I don't like, you were

18   going to take off. Do.

19           You remember telling him that?

20       A.    I remember, sir.

21       Q.    You said if I see anybody, I am not even going

22   to say anything.

23           Do you remember telling him that?

24       A.    I don't recall that.

25       Q.    On the tape you said it, right?

1          A.   Like I say, if it's on the tape, I said it,

2     right.  It's been a while.  I can't tell you exactly what

3     I said.  It's over a year ago.

4          Q.   Just give me a second, please.

5               In the 2:15 p.m. phone conversation on August

6     10th, 1995 that you had with Special Agent Anderson, do

7     you remember telling him if we are going to do it, don't

8     bring nobody, man. Remember telling him that?

9          A.   Yeah, I remember that.

10         Q.   Do you remember saying to him, can't we just do

11    it one on one?

12              Remember telling him that?

13         A.   I remember saying something like that.

14         Q.   So what you wanted was yourself alone with

15    Special Agent Anderson.  Isn't that what you meant by all

16    those questions that I just told you on August 10th, 1995,

17    just you and Special Agent Anderson?  That's how you

18    wanted it to go down; isn't that correct?

19         A.   On the --

20         Q.   Is that a yes or a no?

21         A.   Say the question again.

22         Q.   Didn't you just want it to be you and Special

23    Agent Anderson at that drug deal on August 11th, 1995?

24              Isn't that what you meant when you asked him

25    all those questions we just went over, yes or no?

1          A.    Yeah, yeah, yeah.

2                MR. GALLAGHER: Thank you.

3                I have no further questions.

4                MR. HOLDEN: Redirect.

5                          REDIRECT EXAMINATION

6     BY MR. HOLDEN:

7          Q.    Mr. Maignan, Mr. Gallagher just asked if that

8     was you in the parking lot that day.  You said it was you,

9     wasn't it?

10         A.    That was me.

11         Q.    Was that you walking away?

12               MR. GALLAGHER: I have an objection to the

13               leading question.  Those are leading.  He has to ask

14               them in a non-leading form.

15    BY MR. HOLDEN:

16         Q.    Did you in fact, Mr. Maignan --

17               MR. GALLAGHER: Same objection, Judge. This is a

18               leading question.  The form is improper.  Ask a

19               non-leading question on redirect examination.

20               MR. HOLDEN: Your Honor, I didn't ask any

21               questions.

22               THE COURT: What is the next question.

23    BY MR. HOLDEN:

24         Q.    Did you agree to do the deal?  Did you refuse

25    to do the deal?

```
1              MR. GALLAGHER: Same question.  Did you agree to

2         do the deal. He's telling the witness what he wants

3         him to answer. That is a leading question.  It's

4         improper on redirect examination.

5              THE COURT:  May be rephrased.

6    BY MR. HOLDEN:

7         Q.   Did you tender any money to any officer at the

8    scene of the arrest?

9              MR. GALLAGHER: Same objection, calls for a yes

10        or no response. That's a leading question on

11        redirect.  He has to ask a non-leading question.

12             THE COURT:  Sustained.

13   BY MR. HOLDEN:

14        Q.   Did you ever purchase any cocaine in this case?

15        A.   No, sir.

16             MR. GALLAGHER: Can we go side bar, Judge?

17             (Thereupon, the following proceedings were held

18        at side bar, outside the hearing of the jury:)

19             MR. GALLAGHER: Respectfully, I don't want to

20        continually object to his questions.

21             Clearly any questions that call for a yes or no

22        is a leading question.  Every question Mr. Holden is

23        asking on redirect is of a leading nature.

24             I have a continuing objection to those types of

25        questions.
```

1          MR. HOLDEN: The last series of questions, did

2      you purchase any cocaine is not a leading question.

3      There is already plenty of evidence on the record, in

4      fact, that no cocaine changed hands here.

5          It's not leading in that I am not putting

6      answers in his mouth.  The nature of the question is

7      not such that it tells the witness the answer that is

8      sought.

9          MR. GALLAGHER: Did you purchase cocaine calls

10     for a yes or no response.  That's a leading

11     question.

12         THE COURT: Objection overruled.  Not all

13     questions or answers yes or no are not necessarily

14     improper leading questions.

15         I will allow that.

16  BY MR. HOLDEN:

17     Q.    Officer Long testified yesterday, didn't he?

18     A.    I don't remember which one but I heard all of

19  them.

20     Q.    Did you hear Officer Long state yesterday that

21  he had no idea how the gun got under the front seat?

22     A.    Yes.

23     Q.    Did you hear him indicate he was not the first

24  officer on the scene at the vehicle?

25     A.    Yes.

1          Q.    Did you hear him state that Agent Tamer was the

2     first one there and directed that he go there?

3          A.    Yes.

4          Q.    Do you have any knowledge how the gun got where

5     it did?

6          A.    Not at all.

7          Q.    Was that you on the videotape?  Let's go back.

8                Prior to Officer Long, there was Agent Anderson

9     who you heard testify; is that correct, Agent Heath

10    Anderson, you heard him testify?

11         A.    Yes.

12         Q.    He indicated that at one point even though

13    there was no tape on it, that you had told him to forget

14    the deal, is that correct?

15         A.    Yes.

16         Q.    You heard him say that on the tape?  Was that

17    truthful, that he said that in fact on the tape?

18                MR. GALLAGHER: I object. The witness is

19           commenting on testimony of another witness.

20                MR. HOLDEN: I am asking if that was him that

21           the agent was speaking of as opposed to Fritz.

22                MR. GALLAGHER: Asking about another witness'

23           testimony.

24                MR. HOLDEN: You heard testimony in open court

25           yesterday --

```
 1              THE COURT: You are asking if he was telling the
 2         truth or not? What are you asking?
 3              MR. HOLDEN: If he heard the agent speaking the
 4         truth on the tape?
 5              THE COURT: Did he hear.
 6              MR. HOLDEN: I don't recall his answer. What is
 7         your answer.
 8              THE WITNESS: Yes, I did.
 9              THE COURT: Ask your next question.
10    BY MR. HOLDEN:
11         Q.   Was in fact the agent's testimony truthful as
12    far as you know?
13              THE COURT: Objection sustained.
14    BY MR. HOLDEN:
15         Q.   At some point on August 10th, did you have a
16    conversation with Agent Anderson?
17         A.   Yes, I did.
18         Q.   That was the day before the deal, wasn't it?
19         A.   Yes.
20         Q.   At that time, was there any indication from
21    Agent Anderson that the deal would fall through or
22    wouldn't go?
23         A.   On that date?  The last conversation we had,
24    you know, we agreed that we could forget about
25    everything.  That was the last one.
```

1          Q.    In fact, after that, didn't you receive several

2    beeps from Agent Anderson --

3                THE COURT: Objection sustained.  You had a

4          continuing objection and the answer is objection is

5          sustained to the continuing objection of leading.

6                MR. GALLAGHER: Thank you, Judge.

7    BY MR. HOLDEN:

8          Q.    As to that last question, on the date of your

9    arrest prior to your walking over to the vehicle, at the

10   point where you are arrested, what was the closest you

11   were to your vehicle while you were in the parking lot of

12   I believe Denny's?

13               What was the closest, prior to walking away to

14   leave, what was the closest you were to your vehicle from

15   where you were?

16         A.    It was real far.

17         Q.    To where, to the back of the room?

18         A.    Way beyond that.

19         Q.    Was there any occasion when you asked Agent

20   Anderson to come over to your vehicle?

21         A.    I don't recall that.

22         Q.    Did you show -- did you have any money on your

23   body at the time you met Agent Anderson?

24         A.    Yes, I did.

25         Q.    How much money did you have on your body?

```
 1        A.   I don't remember.  It wasn't that much.

 2        Q.   Less than a hundred dollars?

 3        A.   Less than that.

 4        Q.   Did you have a firearm on your body at the time

 5   you met Agent Anderson?

 6        A.   No, sir.

 7        Q.   Do you own a firearm?

 8        A.   No, sir.

 9             THE COURT:  Side bar, please.

10             (Thereupon, the following proceedings were had

11        at side bar, outside the hearing of the jury:)

12             THE COURT:  You are habitually leading the

13        witness.  Stop it.  The State has asked me to stop

14        you from leading the witness.

15             The State has put me such that you are putting

16        him into the untenable position of having to object

17        to every leading question.

18             I have given latitude to you, however, do you

19        own a gun, what if any weapon do you own, didn't you

20        have it, and did you have a gun in your pocket, what

21        if anything did you have in your possession.

22             I granted some latitude with you, but not to

23        the extent you are doing it.

24             (Thereupon, the side bar was concluded, and the

25        following proceedings were resumed within the hearing
```

1          of the jury:)

2                    THE COURT: Next question.

3     BY MR. HOLDEN:

4          Q.   On the day you were arrested, what did you have

5     in your pocket, if anything?

6          A.   My pocketbook, little money, that should be it.

7          Q.   And on the date immediately preceding your

8     arrest, did you receive any beep from Agent Anderson?

9          A.   On the date --

10         Q.   On the date immediately before the date of the

11    arrest, before the arrest, did you receive any beeps from

12    Agent Anderson?

13         A.   A lot.

14         Q.   How many?

15         A.   Ten of them, like ten of them.

16         Q.   And did you return the first one?

17         A.   No.

18         Q.   Did you return the second one?

19         A.   No.

20         Q.   At what point did you return the beeps?

21              In fact, did you return the beeps?

22         A.   One time I called back, right, and I told him

23    that we spoke yesterday and agreed we could forget

24    everything and he said, yeah, but he told me that, you

25    know, we need to talk.  I told him I have to go.  Then we

1    said bye.

2        Q.   Is that the conversation that was not recorded

3    as far as you know?

4        A.   (Affirmative nod.) Yes.

5        Q.   These beeps that you are referring to now,

6    occurred after, just to be sure sequentially, after you

7    already said forget it?

8        A.   Yeah, after.

9        Q.   One moment, please.

10            Mr. Maignan, yesterday I believe we saw a

11   videotape, is that correct?

12       A.   Yes.

13       Q.   That was of the date of the arrest, the

14   videotape, representing the scene?

15            THE COURT: Who, what, where, when, why.

16   BY MR. HOLDEN:

17       Q.   Yesterday afternoon I believe that we saw a

18   videotape --

19            THE COURT: Did you see a videotape, what, when,

20       who, not putting words in his mouth.

21   BY MR. HOLDEN:

22       Q.   Did you see a videotape yesterday?

23       A.   Yes.

24       Q.   What was on that videotape?

25       A.   The day when I got arrested.

1          Q.    Where was the videotape taking place, if you

2     know?

3          A.    In the parking lot.

4          Q.    In the videotape, you did see it, right,

5     yesterday?

6          A.    Yes, I did.

7          Q.    What if anything are you doing in the

8     videotape?

9          A.    What I was doing?

10         Q.    Yeah.

11         A.    I was just talking to the agent.

12         Q.    Did you ever have any occasion to be in the

13     agent's car?

14         A.    Yeah, I think so.

15         Q.    But that wasn't my question.

16               Were you actually in the car or he in yours?

17         A.    No.

18         Q.    Was there any money shown on the videotape to

19     your recollection?

20         A.    Not at all.

21               MR. HOLDEN: I have nothing further, Your

22          Honor.

23               MR. GALLAGHER: Nothing from the State.

24               THE COURT: You may step down.

25               Thank you.  Call your next witness.

1          MR. HOLDEN: No witnesses, Judge.

2          THE COURT: Rebuttal?

3          MR. GALLAGHER: Nothing, Judge, thank you very

4     much.

5          State rests.

6          THE COURT: Show the jury to its room.

7          (Thereupon, the jury left the courtroom, and

8     the following proceedings were had outside the

9     presence of the jury:)

10          THE COURT: Motions?

11          MR. HECKER: On behalf of Fritz Maignan, I would

12     be moving for a judgment of acquittal supported by

13     the testimony the Court took in the motion to dismiss

14     based upon entrapment, the testimony the Court has

15     heard during the State's case and now, the testimony

16     that has been heard from both of the Maignan

17     brothers.

18          The defendants have raised the defense of

19     entrapment which must be shown to the Court by a

20     preponderance of the evidence, not beyond a

21     reasonable doubt.

22          It is uncontroverted that the defendant, Fritz

23     Maignan, and at some point Katan Maignan, were

24     contacted by a paid confidential informant by the

25     name of Joseph Clark, working for DEA.

1          The testimony today was at least four, perhaps

2     five meetings took place in New York at the Foot

3     Locker where Fritz Maignan worked.

4          Fritz Maignan testified that he was induced to

5     come to Florida to make big money.

6          Now, Mr. Gallagher, the prosecutor in this

7     matter, elicited there was no gun placed to his head

8     or anything else but I would direct the Court to the

9     instruction that merely says that an individual must

10     be induced or encouraged to engage in conduct

11     constituting a crime of conspiracy to traffic.

12          I would suggest we at least have encouragement

13     here on behalf of Joe Clark.  We have further

14     encouragement on behalf of Special Agent Anderson and

15     further when we have a three-way conversation with

16     Joe Clark, at which point Agent Anderson testified

17     that the deal, he is having concerns about the deal.

18          Now, the three-way conversation took place

19     prior to August 10th when both sides decided the deal

20     would be off, but again we have a continuing pattern

21     on behalf of the government here about the use of the

22     paid confidential informant Joseph Clark, as well as

23     the actions of Anderson himself, and respectfully, I

24     move for a judgment of acquittal for entrapment as a

25     matter of law and I am moving at this point that we

1       be allowed if the Court denies the motion for

2       judgment of acquittal, that entrapment be presented

3       as a defense to the jury.

4              Thank you, Your Honor.

5              MR. HOLDEN: Not only would I join in counsel's

6       motion but I also make a subjective motion to

7       dismiss, judgment of acquittal at this time on the

8       subjective entrapment argument, Your Honor.

9              Under the State versus Munoz case, there is the

10      objective entrapment argument.

11             Through the testimony of the defendants today,

12      they have indicated, which was clearly unopposed by

13      any evidence or testimony, neither evidence nor

14      testimony came in to oppose Katan Maignan or Fritz

15      Maignan having no prior record, having no prior drug

16      involvement, not making the initial contact. The

17      initial contact coming from the C.I., who furthers

18      his own contact as is testified to by Katan and Fritz

19      Maignan, who furthers it by assuaging their feelings

20      and letting them think things are going to go okay,

21      they are covered, they are safe and that they can do

22      the deal with protection -- not protection, but with

23      the protection of knowing that they will be taken

24      care, I believe is the exact phrase used by Mr.

25      Clark.

1          He even induces them further by offering to

2     provide them with sex. He offered to provide them, to

3     I believe the testimony was, to get laid was their

4     exact phraseology.

5          In addition, Your Honor, on the objective

6     argument of entrapment, we also have no evidence

7     presented nor testimony presented.  In fact, we have

8     the contrary of any prior activity by the defendants

9     whatsoever.

10         Agent Anderson indicated that while originally

11    he didn't have an opportunity to run anything of that

12    nature on them, that subsequently he did and was

13    unable to come up with any information whatsoever as

14    to any prior drug history or any indication of such

15    on the defendants.

16         Does Your Honor want me to go through all the

17    motions.

18         THE COURT: Yes, you can.  You may continue on.

19         MR. HOLDEN: Additionally, Your Honor, we move

20    for a JOA at this point as the defendants testified

21    and the evidence was pretty clear, that the

22    defendants withdrew from the conspiracy if there was

23    in fact any conspiracy, they left the scene.

24         The agents were specifically discussing on the

25    tape whether or not to take them down, do we make a

1    decision to do anything, has there been a crime

2    committed.

3         At that point, Your Honor, they are still not

4    sure.  They are still figuring out what to do.  That

5    would be my second motion for JOA.

6         Lastly, Your Honor, as to the gun charge, there

7    is absolutely no evidence whatsoever, zip, that the

8    defendant had any knowledge of the existence of the

9    gun.

10        No objective standards, no bending down

11   testified to, no objective or even subjective

12   interpretation showing the gun was known by the

13   defendant.

14        Additionally, there is absolutely no evidence

15   that the gun was where it was when the defendant was

16   pulled over.  We do not have the testimony of Agent

17   Tamer, who the other officer, Officer Long, indicated

18   arrived at the scene first.

19        There is absolutely no evidence before the

20   Court as to where the gun was located.

21        I'm sorry.  There's one last item.

22        Finally, Your Honor, that was absolutely no

23   testimony elicited whatsoever as to any weight of any

24   cocaine being brought to the scene or of any belief

25   that there was any actual cocaine.

1          The agent testified that he hoped there was the

2     presence of cocaine and that he believed there would

3     be, but he didn't test it and he had no personal

4     knowledge as to whether or not.

5          He also never testified as to any weight of any

6     cocaine that they he brought to the scene.

7          That's it, Your Honor.

8          MR. GALLAGHER: First all, Judge, there is no

9     longer objective entrapment as a matter of law.  That

10    was done away with.

11         The only thing left is due process violation

12    and subjective entrapment.

13         The issue here is subjective in nature.  It's

14    an issue for the trier of fact on the issue of

15    entrapment.

16         It is something that needs to go to the jury.

17         With regard to conspiracy, there was no showing

18    that either defendant abandoned their criminal

19    intent.  In conspiracy, all the State has to prove is

20    there was an agreement, number one, and also intent

21    to commit a crime.

22         There has been plenty of testimony with regard

23    to the fact there was an agreement here for these two

24    gentlemen to purchase two kilograms of cocaine.

25    That's the amount that Mr. Holden keeps referring to,

1      two kilograms, for the price of $33,000.

2           In conspiracy, you don't need a chemist to say

3      what two kilograms is.  You don't need a chemist to

4      bring in the cocaine.

5           Conspiracy is merely an agreement or words or

6      actions so the surplus by Mr. Holden is unnecessary

7      for a conspiracy conviction.

8           With regard to the gun charge, as we stated

9      yesterday, the only person in that car at the time

10     that gun was in that car was, at least what the

11     evidence showed, was Katan Maignan.  Although he says

12     someone may have put it in there, that is up to the

13     trier of fact on all issues and I ask the Court to

14     deny the motion and allow the case to proceed to the

15     jury.

16          THE COURT: Motion for judgment of acquittal at

17     the close of all the evidence, first of all, there

18     has been sufficient evidence presented to the jury

19     now for them to decide the question as to entrapment.

20          The State has carried their burden. I find this

21     certainly by a preponderance of the evidence says

22     certain question of predisposition and other

23     questions of -- whether it was a government

24     inducement, there was ample evidence presented to

25     show this was not governmental inducement or that

1    they were predisposed, the defendants. These are

2    questions of fact to be determined by the jury.

3        I find that by a preponderance of evidence the

4    State has carried its burden in that regard.

5        The evidence has been sufficient.  Entrapment

6    shall be read to the jury, otherwise the State has

7    otherwise carried its burden as to both counts as to

8    both defendants.  There has been sufficient evidence

9    presented that the evidence is not insufficient as

10   3.380 indicates and that there has been sufficient

11   evidence to warrant a conviction in both cases, if in

12   the event that is submitted to the jury and if in the

13   event that jury should find them guilty as to both

14   counts, there is sufficient evidence to sustain that

15   to go to the jury, and otherwise looking at Rule

16   3.380, the motion for judgment of acquittal at the

17   close of all the evidence as to both defendants in

18   both cases, as to both cases, and the motion is

19   respectfully denied.

20       What now?  Closing argument.

21       How long do you want at the beginning?

22       MR. HOLDEN: Ten minutes.

23       MR. HECKER: We'd like to close thirty minutes a

24   piece.  I will take fifteen minutes.  About fifteen,

25   twenty minutes.

```
 1                THE COURT: How much in the beginning, ten?

 2                MR. HECKER: Ten.  Okay.

 3                THE COURT: We are not going to notify you

 4       because it gets out of hand.

 5                Do you want to know after about fifteen

 6       minutes?

 7                MR. HECKER: I won't even take that long.

 8                THE COURT: After fifteen, I will let you know.

 9                (Thereupon, the jury entered the courtroom, and

10       the following proceedings were had within the

11       presence of the jury:)

12                THE COURT: You may be seated.  Thank you.

13                Members of the jury, both the State and defense

14       has now rested their case.

15                The attorneys will now present final argument.

16                Please remember that what the attorneys say is

17       not evidence, however do listen closely to their

18       argument. They are intended to aid you in

19       understanding the case.

20                Each side will have equal time but the

21       defendants are entitled to divide their time between

22       an opening argument and a rebuttal argument.

23                The order is going to be as follows:  Mr.

24       Holden will address you, then Mr. Hecker will address

25       you, then Mr. Gallagher will address you, then Mr.
```

1      Holden will address you, any concluding argument,

2      then Mr. Hecker will have his concluding argument

3      then the instructions on the law that you are to

4      apply to the facts as you find them, then retire to

5      deliberate as to your verdict.

6          However, you will be instructed on the law at

7      8:30 tomorrow morning.  You are to return at twenty

8      after eight tomorrow so I can instruct you on the law

9      at 8:30 for approximately a half hour.

10         You will retire to deliberate while I will be

11     attending to some other items.  That's the schedule

12     for the moment.

13         In light of those remarks now, Mr. Holden, you

14     may proceed with your final argument.

15         MR. HOLDEN: Thank you Your Honor, members of

16     the jury, counsel.

17         That wasn't too long a trial, I hope, and this

18     is my last opportunity to speak with each of you and

19     try and convince you of the merits of the defendant's

20     case.

21         You know, you heard a lot of testimony. You

22     heard the defendants testify today and before that

23     you heard Agent Anderson testify. In fact, he was the

24     first witness that the State put on.

25         It's important to know that he is the first

1    witness that the State put on because he is the lead

2    agent in the case.  He's a federal employee, as he

3    indicated, and part of his job as a federal employee

4    I believe he indicated was to have people out there

5    being deceptive to find crime, if you will.  I

6    believe that was pretty much how he characterized it,

7    and an important distinction is not to create crime,

8    but to find crime and of course there were many

9    techniques that were used as part of that deception,

10   to pretend to be a drug dealer, to try and make the

11   people feel comfortable.

12        There were many things that your own memory

13   will help you to recall those different things.

14        I think he indicated at one point that a

15   consideration was that he and Sergeant Tatum were

16   black and that that might make the defendants feel

17   more comfortable in terms of dealing with them.

18        He also indicated, if I am not mistaken, that

19   very often they use deceptive techniques -- posing as

20   drug dealers, driving a Mercedes, using the words

21   that are necessary to entice someone into it.

22        Now, the reason I mention that he is a federal

23   employee goes hand in hand with the ability to obtain

24   evidence.

25        Let's jump forward for a second. You also heard

1          the officer testify about how there were no

2          fingerprints on the gun, no fingerprints on the gun

3          that had been retrieved if I am not mistaken, as far

4          as we could tell, from the evidence that we heard,

5          from the car driven by Katan Maignan.

6               There was no testimony by that agent or by any

7          other officer or agent that they saw this defendant

8          bend over and touch the gun.

9               You will see the videotape.  There is no

10         indication whatsoever that he knew the gun was

11         there.  There is no indication from any witness that

12         the State put on that he knew the gun was there.

13              In fact, you heard one officer, I believe it

14         was Officer Long, testify that he didn't know how the

15         gun had gotten there.  He was just told to photograph

16         it.

17              Well, you heard Katan Maignan say that there

18         was no gun there, that when he was driving, there was

19         no gun, but more important, more important, there was

20         no gun on his person.

21              Now, you heard Heath Anderson say that he

22         frisked him and patted him down and was of the

23         belief, he said many times, that there was no weapon,

24         firearm, on this defendant.

25              Now, what I find interesting is that the same

1          agent indicated that at the first meeting when he had

2          Sergeant Tatum there, that he was concerned for his

3          safety and that's why Sergeant Tatum was there.

4               Now, this is really important because the State

5          wants you to believe that these two defendants are

6          liars and that what they tell you and what they say

7          is not true.

8               Now, I find that very interesting in light of

9          the fact that Agent Anderson indicated that at the

10         first meeting, he was concerned for his safety.  When

11         he, having been in control of the situation, set up

12         the meeting, set up the location of the meeting, and

13         more to the point, he had many, many officers around

14         him that he knew of and he knew they were armed,

15         performing surveillance, yet he got up here and said,

16         he wanted you to believe he was concerned for his

17         safety.

18              Why did he do that?  You have to ask

19         yourselves, why is he try trying to put in my mind

20         that I am not safe. That's part of his whole theory

21         of the case, that this was supposed to be a drug

22         ripoff. They want you to believe that my client was

23         conspiring to, my client was conspiring with his

24         brother, to perform a drug ripoff, to try and steal

25         the drugs from the officers.

1              Well guess what?  That is not what they are

2     charged with.  They are charged with conspiracy to

3     traffic in cocaine.  They are not charged with

4     attempted armed robbery or armed robbery.  They are

5     not charged with attempted armed trafficking in

6     cocaine.  They are charged simply with conspiracy to

7     traffic in cocaine, and I ask you to use your common

8     sense as the Judge will ask you to do in the

9     instructions tomorrow, to use that common sense and

10    try and figure out, you know, the government had all

11    of these agents and officers come in and basically

12    what they are talking about is they are talking about

13    a ripoff.  They are trying to convince you that my

14    client was dangerous.

15             The first way they did that was by using the

16    nickname of Stizzo and Slow.  Now, it's interesting

17    that my clients don't proffer these names.   Who

18    does?  Agent Anderson asks them do you use a name.

19    He wanted that to come out because he wants you to

20    hear it just like he is constantly asking people

21    like, are you on a cell phone.  He wants you to think

22    and hear that these are notorious drug dealers who

23    are in the normal course of events, just doing

24    another deal.

25             Well, you know, along with the government

1    resources goes their ability to investigate.  He also

2    indicated that he did not have any evidence that

3    there was any prior drug activity by those

4    defendants.  He indicated when he had an opportunity

5    to check later, that he could find no evidence of any

6    prior drug activity of these defendants.  No prior

7    drug activity.

8         Not one witness testified that there was any

9    prior drug activity.  To the contrary, they testified

10   there was no prior drug deals by them and that's

11   really important because one of the instructions that

12   the Judge is going to read you is the instruction for

13   entrapment and before I get into that instruction of

14   entrapment, I would like to talk briefly once again

15   about the ability that the government had to

16   investigate this case.

17        I said earlier about the lack of any

18   fingerprints.  You know, it's really interesting that

19   the officer who testified could not find any

20   fingerprints when Officer Long indicated that he

21   himself had touched the gun.

22        So let's assume that everyone was being

23   truthful from the government's perspective in that

24   regard.  As to the fingerprints, there were none of

25   Katan Maignan and that would certainly show you that

1    he had touched the gun, that he had knowledge of the

2    gun's existence, but there were no prints.

3        He did not know there was a gun in the vehicle

4    and he testified that there was none when he was

5    driving it up in the front of the floor board.

6        Now, I don't know where any agent or officer

7    got the gun from, but even if it was in that car, it

8    what unloaded, and he didn't know of its existence.

9        Now, there is no testimony to show that the

10   firearm was on his body at the time of this event. In

11   fact, the testimony is to the opposite, it's to the

12   contrary.

13       There is no indication that when he got in the

14   vehicle, that he put the firearm down. No testimony

15   to that. He was being observed because there was so

16   many agents around performing surveillance.

17       You heard Agent Heath Anderson say there were

18   at least ten people around performing surveillance.

19       Now, the Court will read you the entrapment

20   defense.  He will read you the instruction that you

21   are to listen as to whether or not the defendants

22   were entrapped.

23       I ask you to spend very close attention

24   listening to those instructions by the Judge as to

25   the entrapment defense, because it's very consistent

1       with both the facts that you heard from the

2       defendants and the State, and you know, even if you

3       don't believe the defendants and want to believe the

4       State, believe their witnesses.  We still have the

5       entrapment defense.  They still had no prior drug

6       activity. Nothing at all to indicate there was any

7       desire by them to do the deal until their contact by

8       Joseph Clark, who promises them a large sum of money.

9            Now, there has also been no evidence proposed

10      by the State here to show that the defendants are

11      required to come up with the full $33,000 at any one

12      time.

13           In fact, to the contrary.  There has been

14      absolutely a lack of evidence as to any testimony

15      regarding how much money was necessary for the down

16      front transaction other than by Katan Maignan who

17      indicated that as far as he knew, all they had to

18      bring was 1600 or 1700, 1750.

19           Now, what is really important here, taking a

20      step back from that, is that even with all its

21      resources to put the deal together, and even with the

22      prodding, the phone calls, the beeps by the agent,

23      Katan Maignan and Fritz Maignan on the day before the

24      arrest say forget it, we don't want to do it.

25           Both Agent Anderson and Katan Maignan testified

1    the same as to the next issue and again, if you think

2    I am wrong, use your recollection, listen to the

3    tapes, watch the videotapes.

4          They both testified, if I am not mistaken, that

5    after Katan Maignan had said they didn't want to do

6    the deal, that he beeped Katan several times and that

7    it was only after those many beeps -- I think I asked

8    was it at least a half dozen, and he indicated yeah,

9    he thought it was.

10         Well, those beeps, those subsequent beeps after

11   Katan Maignan didn't want to do it, again are facts

12   that you are able to consider when you are

13   considering the entrapment defense.

14         Did these defendants have a clear disposition,

15   predisposition to commit this offense?

16         When the Judge reads you the instructions on

17   entrapment, I will ask you to please use your

18   recollection as to the defendants about what occurred

19   in New York on the entrapment issue, because that's

20   where the entrapment occurred, not here.  By then it

21   already happened.  They'd already been lured here.

22         Of course, entrapment can take many forms. You

23   don't have to hold a gun to someone's head to force

24   them to do something. There is a lot of different

25   ways to coerce people.

1           One is by promising them a large sum of money,

2       and anyone who has ever been in financial difficulty

3       knows --

4           MR. GALLAGHER: Judge, I have an objection. It's

5       improper to place the jurors in the place of the

6       defendants.

7           THE COURT: Rephrase.

8           MR. HOLDEN: Any person who knows what it's like

9       to be in a financial bind, knows what it's like to

10      respond to someone who's offering to help you out

11      financially.  You don't have to be poor to understand

12      that.

13          An important thing also is the government was

14      trying to make it sound as if Katan did not live

15      here, that he lived in New York. That was part of

16      their opening from Agent Anderson, that he believed

17      that Katan lived in New York, when in fact at that

18      time, Katan testified that he lived down here at the

19      time that this whole event occurred, that he was

20      visiting his brother in New York.

21          Now, going back to Agent Anderson, we have

22      Agent Anderson testifying under oath that he was a

23      government employee who received a salary, and

24      whether or not there is a bust, he gets paid. He does

25      not work on a contingency fee.  He is an agent, but

1      we have a confidential informant who sometimes works

2      on a contingent basis, sometimes doesn't got a set

3      fee, but in this case, after the bust went down, and

4      after the State of Florida picked up the charge, at

5      that point, the confidential informant is not paid.

6           Isn't it coincidental that at that point there

7      is only 1300 -- I'm sorry --- $1700 in the possession

8      of the defendant.

9           Now, that might have some relationship and

10     that's for you to decide whether or not that was a

11     factor for the government to pay the C.I.

12          In fact, you can also consider that the

13     government here was fishing for money, that the

14     government wanted to obtain $33,000 from these

15     defendants which they could then use for government

16     purposes, or for whatever purpose, but to obtain

17     money.

18          They indicated they were never have left the

19     defendant leave the scene with the cocaine.  That was

20     never their plan.  They were there to get $33,000 and

21     that was purpose of this whole charade.

22          Very quickly, up in New York, we had Katan

23     Maignan testify that he spoke with Joe Clark three

24     times. Fritz Maignan had indicated that he spoke to

25     Joe Clark four or five times.

1           They both indicated and uncontroverted, you

2     haven't heard anything to the contrary, that they

3     were promised big money to do the deal.

4           Of course, pretending to be a drug dealer, as

5     is the government's job, or so they perceived it.

6           The interesting thing for me is that you never

7     got to hear the conversation from Fritz where he said

8     I don't want to do it. Isn't it amazing that every

9     tape that was made, except for that one, was here.

10          You know, I queried the agent on that because

11    that really concerned me. The agent specifically said

12    that he didn't have the machine, the device with him

13    in the vehicle at the time that this occurred, but

14    later on when I queried him on it, he indicated he

15    didn't have it in the vehicle, but when he returned

16    the call, he wasn't in the vehicle.  He was somewhere

17    else.  He didn't say where he was, but again, he

18    still didn't go to the place where the device was and

19    make a copy of that tape.

20          You know, if there was a copy of that tape, we

21    didn't get to hear it. That much is clear, and that's

22    the tape where he admits that Katan stated I don't

23    want to do this any more, that's it.

24          In fact, if I am not mistaken, they both said

25    it.  You can hear it for yourself.  At one point on

1    one of the tapes I think they are saying forget it.

2    You can hear both Agent Anderson say it and Katan

3    Maignan said that.

4        I also find it interesting the fact that the

5    government lowered the price.  It was originally

6    18,000, but when the defendants barked at that, the

7    government was acquiescing and again, is offering

8    them a lower price, sixteen five.  That's below

9    street value according to what Agent Anderson

10    testified to if in fact he testified to that and you

11    can use your recollection on that.

12        The three-way call to Clark.  Now, I can't

13    think of a better example of the government trying to

14    trick and fool these defendants into doing a deal

15    than to get Joseph Clark on the phone, telling my

16    client that they will, quote, he will do anything you

17    want, he'll even get you laid, he said.  That was a

18    specific expression that they used to try to induce

19    my client into doing the deal.

20        Now, ultimately you saw on the videotape Katan

21    Maignan walk away and got in the vehicle and was

22    later arrested. You never saw him asking for a taste

23    of cocaine.

24        You heard Agent Anderson say that happens very

25    often. Well, I'd put it to use.  Use your common

1    sense.  Is anybody who is an experienced drug dealer

2    going to purchase cocaine without knowing that it's

3    cocaine.

4        And if this were to be a ripoff as the State

5    would have you believe, even more to the point,

6    wouldn't they want to know it's real cocaine and they

7    are not getting ripped off.

8        If these guys were really experienced drug

9    dealers, they would have done that. They would have

10   tasted it. They would have asked for a taste before

11   this.  They would have probably done it at the

12   McDonald's, but that's for you to use your common

13   sense to apply here.

14       It's real interesting that the government

15   indicated it was Katan's idea or Fritz's idea that

16   only one of them should come to the scene.  If you

17   listen carefully, it was a mutual idea and using your

18   recollection, which you can do, you can remember

19   Agent Anderson saying that same thing, that it was a

20   mutual idea.

21       Keep in mind the government was in control

22   here.  The government was pretending to be a drug

23   dealer, pretending to have cocaine.  If they didn't

24   want to do the deal, the deal wouldn't be done.

25       Now, I come forward quickly to the gist of the

1        conspiracy charge.  The gist of the conspiracy charge

2        is that the defendants, Fritz and Katan Maignan,

3        conspired with each other or agreed and confederated

4        with each other to do a certain act which is illegal,

5        but the action was never done here.

6            In fact, there was no drug deal that ever

7        occurred. What there was was discussion about it,

8        negotiations about it, and you heard Agent Anderson

9        say that negotiations were still going on.

10            Well, when I think of negotiations still going

11        on, I haven't got an agreement yet.  If I am still

12        negotiating, I am still trying to knock things out.

13            When I sell my house, I put in that agreement

14        to sell that house everything that I want in my house

15        because if I leave something out, I am stuck with

16        it.  Okay?  That's an agreement. If you don't have an

17        agreement, you are not ready to go.

18            They didn't do the deal.  They had no agreement

19        to do the deal.

20            Now, quickly on concealed firearm. The

21        defendant is charged with carrying a concealed

22        firearm knowingly on or about his person.

23            Nowhere on the videotape, nowhere in his

24        testimony was there a firearm on or about his person.

25            Yeah, there was one in his car later on when he

1    was arrested down the road.  Not at the scene, not at

2    any time.

3         Of course, if the firearm was concealed from

4    ordinary sight of another person.  Well, it could

5    also be argued that the firearm was not concealed.

6    Where the State shows it in the pictures, it is not

7    concealed.  You can see it, if that's where it was,

8    but more to the point, that's not where it was and

9    Katan testified to that.

10        You never heard one officer, not one say they

11   found the gun under the seat as Katan was in the car.

12   You had an officer who came ten minutes later, who

13   stated under oath that the gun was on the floor

14   board.  It could have been under the seat, on the

15   other seat, it could have been in the back seat. We

16   have no way of knowing how it got to where it was.

17        The cocaine itself.  There was no cocaine.

18   There was no cocaine that the defendant ever saw. The

19   State says, or the agent says that he brought the

20   cocaine, but we never heard any testimony whatsoever

21   as to whether or not it really was cocaine.

22        In fact, the officer, the agent, indicated that

23   he hoped it was cocaine. Use your recollection. He

24   said I believe it's cocaine because it should be. We

25   checked it out from the lab.  So he doesn't know how

1    much it weighs, if it was two kilos or one gram.  He

2    doesn't know if there was any cocaine in there.

3        What he is trying to do is take money from

4    those defendants.  Of course, they want you to

5    believe it's the opposite, that the defendants were

6    there to take the money from them, but again, that's

7    not what they are charged with.  They are not charged

8    with attempted armed robbery.

9        You may not like what they did, you may not

10   like they way things happened, but what they are

11   charged with is not the same thing as what the State

12   is trying to tell you.

13       The State is trying to tell you they were going

14   to do an armed robbery.  Then where is the attempted

15   armed robbery charge? Don't you think if the State

16   could prove that, that they would have charged them

17   with that?  Use your common sense.

18       Your Honor, I am finished right now, if I could

19   reserve the rest.

20       Thank you; I will be back.

21       MR. HECKER: Your Honor, counsel, ladies and

22   gentlemen.  Good afternoon.

23       We have been here all week.  One more day to

24   go, and we hope you will do your job.

25       As we mentioned in opening, there are two

1    defenses presented.  One is entrapment, one is

2    withdrawal.

3        The basis of entrapment is the crime was

4    committed.  You heard the crime was committed.  You

5    heard the evidence and you heard Special Agent

6    Anderson testify and you heard my client Fritz

7    Maignan testify that he came to do a drug deal.  It's

8    all well and good. That's what was supposed to

9    happen.

10        The entrapment defense occurred prior.  The

11    entrapment instruction which the Judge will read to

12    you, a lot of questions to it.

13        They were entrapped if one, they were for the

14    purpose of obtaining evidence of the commission of a

15    crime, induced or encouraged to engage in conduct

16    constituting a crime of conspiracy to traffic in

17    cocaine.

18        Induced or encouraged.  That does not require

19    as the prosecution suggests, holding a gun to your

20    head.  They engaged in such conduct as a direct

21    result of such inducement or encouragement.

22        Let's stop there.  You heard no evidence that

23    either individual was involved in any drug

24    transaction involve in previously.  You did not hear

25    from the confidential informant.  You heard from

1    Fritz and Katan Maignan they had spoken to them and

2    that he promised them big money, quick money.  He was

3    working I think for $150 a week in a shoe store in

4    Harlem.

5        The person who induced or encouraged them was a

6    law enforcement officer or a person engaged in or

7    cooperating with or acting as an agent of a law

8    enforcement officer.  Clearly Joe Clark was a paid

9    confidential informant.  Special Agent Anderson

10   testified to that, so we have Joe Clark agreeing to

11   induce them and encourage them to come here.

12       I will get to this in a minute, but we have

13   Special Agent Anderson continuing with the inducement

14   and encouragement.

15       The person who induces or encourages them

16   employed methods of persuasion or inducement or

17   created a substantial risk that the crime would be

18   committed by a person other than the one who was

19   ready to commit it, and that Katan and Fritz Maignan

20   were not the persons ready to commit the crime.

21       Let's go back to the point where the prosecutor

22   makes, where are you going to get the $33,000?  Good

23   question.  Were they ready to commit this crime?

24   No.  You have two nineteen year olds, one still in

25   high school, one out of high school, going to

1      college, and they are supposedly big drug dealers.

2          It is not entrapment -- it is not entrapment if

3      Fritz and Katan has the predisposition to commit

4      conspiracy to traffic, if Katan and Fritz had a

5      predisposition if before any law enforcement officer

6      persuaded, induced or lured Katan and Fritz, he had a

7      readiness or willingness to commit conspiracy to

8      traffic in cocaine and the opportunity presented

9      itself.

10          Did you hear any evidence?  As a matter of

11     fact, you heard the evidence to the contrary.

12          Remember when I spoke to Special Agent

13     Anderson.  I made a point of asking him did you ever

14     do any investigation to find out if either of the

15     Maignan brothers were involved in the drug trade.

16          All he had to do was run the street name,

17     Stizzo, Slow.  He didn't do that either.

18          I asked did you ever have any evidence that

19     drugs were ever found in the possession or around or

20     used or even associated with these defendants and the

21     answer was no. Even his own confidential informant

22     said no.

23          Now, Special Agent Anderson testified they

24     were, quote, partying, but again, that was never

25     brought out what that meant.

17th Judicial Circuit in and for Broward County
In the County Court in and for Broward County

CLOCK IN

VISION:
PPELLATE

RECORD-ON-APPEAL FROM THE COUNTY COURT
OF THE SEVENTEENTH JUDICIAL CIRCUIT
IN AND FOR BROWARD COUNTY. FLORIDA
CRIMINAL DIVISION

KATAN MAIGNAN          Appellant

VS.

STATE OF FLOIRDA          Appellee

CASE NO.
95-014021CF10A

APPEAL NO. 96-2397

RECEIVED
OFFICE OF THE
ATTORNEY GENERAL

SEP 1 1 1996

CRIMINAL OFFICE
WEST PALM BEACH

RICHARD L. JORANDBY (15TH P.D.)
ATTORNEY FOR APPELLANT

GEORGINA JIMENEZ-OROSA
ATTORNEY FOR APPPELLEE

4-0283

COPY

1    State of Florida )
                     :  SS
2    County of Broward)

3              IN THE CIRCUIT COURT OF THE
               SEVENTEENTH JUDICIAL CIRCUIT,
4           IN AND FOR BROWARD COUNTY, FLORIDA

5    STATE OF FLORIDA,        )
                              )
6              Plaintiff,     )
                              )
7        vs.                  ) CASE NO. 95-14021CF10A
                              )
8    KATAN MAIGNAN,           )
                              )
9              Defendant.     )
     _____)

10

11

12          Proceedings had and taken before the Honorable

13   ROBERT W. TYSON, JR., one of the Judges of said Court, at

14   the Broward County Courthouse, Fort Lauderdale, Broward

15   County, Florida, on the 13th day of June, 1996, commencing

16   at or about 1:30 o'clock p.m., and being a Jury Trial.

17                                    6|13|96

18   APPEARANCES:

19
          JOHN GALLAGHER, ESQUIRE,
20        Assistant State Attorney,
          Appearing on behalf of the State.
21
          SCOTT HECKER, ESQUIRE,
22        Appearing on behalf of the Defendant Fritz Maignan.

23        MICHAEL HOLDEN, ESQUIRE,
          Appearing on behalf of the Defendant Katan Maignan.
24                          VOLUME III
                        Pages 401 - 473
25

```
 1                        I - N - D - E - X

 2

 3      DATE                   PROCEEDINGS                PAGE

 4
        6-13-96                Closing Argument
 5                             State                      410

 6      6-14-96                Jury Instructions          439

 7                             Verdict                    457

 8                             Sentencing                 462

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          The State failed to bring out any specifics of
2     the partying at the time.

3          Agent Anderson did say that he had no evidence
4     of any drug being associated with them.

5          You also heard Special Agent Anderson tell you
6     the confidential informant instructed -- he explained
7     what a documented confidential informant was and he
8     testified Joe Clark was documented.

9          There was a process.  I asked him flat out, are
10     you allowed to entrap people, and he said absolutely
11     not. You are not allowed to create crime.  You are
12     allowed to use secretive, underhanded types of deals
13     to detect crimes and you are allowed to do this to
14     stop ongoing crime, but you may not create crime and
15     that's what occurred in this case.

16          Don't be fooled by the government's argument
17     that the money was bundled in a certain fashion, that
18     they were talking on cellar phones and using the word
19     condo or street names. Absolutely irrelevant to the
20     charge and defense of entrapment.

21          Entrapment tells you that a crime was
22     committed.  We know that we have elements presented
23     here.  We have a second defense I will get to in a
24     minute, but if you believe in your mind through your
25     deliberations and your common sense that Fritz and

1       Katan Maignan agreed, conspired, and confederated to

2       commit the crime of conspiracy to traffic, then you

3       have to step back and say why.  That's where the

4       entrapment defense comes in.

5              You will have the instructions read to you, but

6       remember, it is inducement or encouragement.  You

7       heard no evidence of prior drug involvement, large

8       sums of money, abilities to do this.  No, you heard

9       two kids that were fed a line by a five-year agent.

10      How did you learn to do this? He said you kind of

11      pick it up from the street. You have to make drug

12      dealers feel comfortable so you have to talk their

13      lingo.

14             I remember Mr. Holden asking you think these

15      guys were also puffing.  Well, when you are put in

16      these types of situations, you are going to respond

17      accordingly.

18             You're not going to say, well, yes, sir, it's

19      very nice for you to do that.  It doesn't fit. These

20      defendants did not know what they were doing.  They

21      were not predisposed in any sense to do this crime,

22      but for Joe Clark coming up there and inducing them.

23             The second defense that we have here and you

24      will get the instruction as well -- by the way, what

25      I wanted to show you was, the burden of proof to

1    prove them guilty of conspiracy to traffic is beyond

2    a reasonable doubt.  It's the highest standard we

3    have.

4        In the issue of entrapment, the defendant must

5    prove to you by a preponderance of the evidence that

6    his criminal conduct occurred as a result of the

7    entrapment, not beyond a reasonable doubt.

8        Preponderance of the evidence is sometimes

9    referred to as a scale. One grain of sand on the

10    other side and it tips, we win.

11        That's not beyond a reasonable doubt. That's

12    not the standard here. Preponderance is just a mere

13    tipping of the scales and I suggest to you based upon

14    the testimony we have here, we have shown you by a

15    preponderance of the evidence, that a paid informant

16    induced and encouraged these two individuals to come

17    down here and commit the crime of conspiracy.

18        Now, another defense is contained in criminal

19    conspiracy, which will be read to you.  I am not

20    going to read the entire instruction. I will read the

21    defense as contained here.

22        It is a defense to the charge of criminal

23    conspiracy if Katan Maignan and Fritz Maignan, after

24    conspiring with one or more persons to commit the

25    trafficking in cocaine, persuaded each other not to

1    do so or otherwise prevented the commission of the

2    trafficking in cocaine.

3        Persuaded each other not to do it.  There has

4    been a lot of talk regarding the audio tapes and

5    videotapes. They are all in evidence.  If you wish,

6    you can request them and they will be sent back and

7    you can listen to them as many times as you like.

8        No matter what we said or the prosecution says,

9    we are not evidence. The evidence is what is

10    introduced.  Listen to the tapes.  You will hear

11    through my client's rather thick accent. He was

12    scared.

13        Agent Anderson said on the 10th of August, the

14    deal was off as far as he knew, off at that point.

15    Because remember, you have to get all your ducks in a

16    row, you have to know what the price is, what you are

17    buying and where you are going to do it, how the

18    transaction will occur.

19        It never really developed that way.  The thing

20    that tells you that is the last videotape at the

21    Denny's Restaurant, where Katan Maignan, you see him

22    in there, he's wandering around the parking lot and

23    at one point holding up some type of kerchief or

24    handkerchief in front of his face.

25        You heard Special Agent Anderson say you ain't

1          got nothing, you ain't got five bucks, show me

2          twenty, show me a couple of fifties. He holds the

3          keys out and says, here, go to my car and look at the

4          cocaine.  I'll stay over here.  You go look at the

5          cocaine.

6               Watch the video.  Did Katan Maignan ever do

7          that? Did he do anything other than walk away and

8          continue walking and really have nothing to do with

9          this and eventually, he left.

10               Listen to what Special Agent Anderson says

11          after he leaves.  They are confused. They don't know

12          what occurred.  They don't know whether a crime was

13          committed.  They go and pick him up.

14               The government has placed a red herring in

15          front of you.  What I mean by that is, the government

16          wants you to look in some direction that is not

17          important in this matter.  Be careful about that.

18          They could not have been charged in trafficking in

19          cocaine because possession of cocaine was never

20          taken.  No money was ever transferred, so the crime

21          of trafficking in cocaine could not be presented

22          because it didn't occur.

23               At best all the government could present to you

24          is a conspiracy case, which is what was presented.

25          This required you to become the mind police.  I know

1          that you heard some objections about speculating as

2          to what is in the mind of another defendant. It's a

3          proper objection. But unfortunately as the trier of

4          fact, that's exactly what you have to do.  You are

5          going to have to get into the mind of Fritz and Katan

6          Maignan and decide was an agreement reached.  Was

7          it?

8               Remember, there are two defenses here.  If you

9          believe an agreement was reached, you can then step

10         back and say, well, were they entrapped or induced or

11         entrapped by a governmental agent to do it, and

12         secondly, did they persuade each other not to do it.

13         There comes a time both back out.

14              Fritz testified that was not him walking across

15         the video. The clothing was different.  Even the

16         agent testified that when he arrested him, he thought

17         he was wearing a different shirt.

18              Watch the video. You have been here for four

19         days now.  Look at the defendants.  Take a look.  You

20         can see his face, his hair.  Look at the video and

21         see if that's him. He claims he was not there. They

22         don't have him on tape or anything at Denny's.

23              He claims he was induced to come back and

24         tricked when he was told his brother was hurt.

25         That's why he came back. Agent Anderson testified he

1       was knocking on the window saying don't know what's

2       wrong with your brother, I'm trying to get him to

3       come back.

4              But remember, he didn't show up at that time.

5       Captain Hock said he drove around three hours trying

6       to find Fritz, three hours looking for him.

7              In they were really going to do the deal, Fritz

8       wanted to do the deal and suddenly Katan gets cold

9       feet and the agent is on the phone.

10             Three hours to find him. I suggest to you the

11      testimony of Fritz as to why he was induced is more

12      reliable than the agent.

13             Now, reasonable doubt -- I will read it to you

14      and the Judge will read it to you.

15             Reasonable doubt is not a possible doubt, a

16      speculative, imaginary or forced doubt.  Such a doubt

17      must not influence you to return a verdict of not

18      guilty if you have an abiding conviction of guilt.

19             Abiding is a very strong word. Abiding

20      conviction of guilt.

21             On the other hand if, after carefully

22      considering, comparing and weighing all of the

23      evidence, there is not an abiding conviction of guilt

24      or if having a conviction, it is one which is not

25      stable but one which wavers and vacillates, then the

1       charge is not proven beyond every reasonable doubt

2       and you must find the defendant not guilty because

3       the doubt is reasonable.

4              It is to the evidence introduced upon this

5       trial and to it alone that you are to look for that

6       proof.

7              Reasonable doubt as to the guilt of a defendant

8       may arise from the evidence, a conflict in the

9       evidence or the lack of evidence.

10             If you have a reasonable doubt, you should find

11      the defendant not guilty.  If you have no reasonable

12      doubt, you should find the defendant guilty.

13             Thank you.  I will be able to address you after

14      Mr. Gallagher.

15             MR. GALLAGHER: This is my last opportunity to

16      speak to you.

17             These two guys were up to no good August 11th,

18      1995. That's simple.  They were up to no good at all.

19             They raise the entrapment defense and put forth

20      this evidence in the case of entrapment, and Joseph

21      Clark out of the blue buying sneakers at the Foot

22      Locker starts talking to Fritz Maignan about doing a

23      drug deal in South Florida, a man he never met before

24      in his life.

25             That is what they are going for in entrapment.

1    This is what persuaded, induced and lured them to

2    commit this transaction and that's what you are asked

3    to believe that testimony.

4         Now, just because they say it doesn't mean you

5    have to believe it.

6         On voir dire we talked about defenses being

7    presented, but if the evidence is not believable to

8    support this defense, then you do not have to accept

9    that defense.

10         So just because Katan and Fritz Maignan say the

11   informant induced, lured, persuaded them to

12   committing an act, doesn't mean you have to believe

13   them.

14         If you don't believe them, you can summarily

15   dismiss that defense and say we don't believe you, we

16   don't believe your entrapment defense.

17         When you hear the instruction on entrapment,

18   you will hear about being induced, lured and

19   persuaded, but you will also hear that it's not

20   entrapment if someone is ready and willing to commit

21   a criminal act if the opportunity simply presents

22   itself to them.

23         Now, in this case, these guys didn't have

24   $33,000.  We all know that. They didn't have it. The

25   money that they had they got from their sister so no

1    way were they going to be able to buy two kilograms

2    of cocaine for $33,000, so their only other way to

3    commit this crime was to steal it.

4         For some reason, Mr. Holden keeps talking about

5    well, they are not charged with attempted armed

6    robbery.  They are charged with conspiracy to traffic

7    in cocaine, and the trafficking in cocaine in this

8    case is charged by either purchasing the drug or

9    possessing the drug, and they are charged with

10    conspiring to purchase or possess cocaine in an

11    amount of 400 grams or more but less than 150

12    kilograms.  That means we have to prove to you all

13    which I believe the evidence has shown, that these

14    two individuals, Katan and Fritz Maignan agreed to

15    either purchase or possess, agreed between the two of

16    them, to purchase or possess in excess of 400 grams

17    or cocaine or less than 150 kilograms.

18         You heard two kilograms -- 2,000 grams so the

19    amount is not even an issue.  The question is, did

20    they agree to possess it and yes, they agreed to

21    possess it.  They are trying to say they were going to

22    purchase it, but they did not have the money to do

23    that, but they were going to possess it how? How were

24    they going to take two kilograms of cocaine into

25    their possession? They were going to steal it.

1       When a burglar breaks into your house and he

2   takes the TV, it's now in his possession.  He has

3   stolen it from you.  In this case, Fritz and Katan

4   Maignan were going to steal the cocaine, because they

5   didn't have $33,000.

6       What they had in State's Exhibit No. 12 was six

7   bundles of money, with hundreds on top and eight

8   hundred $1 bills in between the stacks.

9       Why would Katan Maignan bundle up the money

10  that was given to him by his sister, Denise Maignan?

11  Why would he bundle up that money like that?  Why

12  would he convert $1750 from fifties, twenties and

13  tens and convert it into eight hundred $1 bills,

14  eight $100 bills and three $50 bills. Why would he do

15  that unless he wanted to make it look like he had

16  $33,000?

17      And if you don't leaf through these bills in

18  State's Exhibit 12, if you just look at it, you dig

19  into a bank bag and see six bundles, State's 12, you

20  will think that's a lot of money, a bunch of hundreds

21  in there.  There's got to be $33,000 there.

22      Now, he made it look like it was $33,000. Why?

23  Like I told you in opening statement, he wanted to

24  get Special Agent Anderson over to that car, get

25  Special Agent Anderson to look in that bank bag, see

1    the bundles of money, and at the point when Special

2    Agent Anderson would start to take the rubber bands

3    off one of the bundles to check it to see if there

4    were hundreds, what else was in the car?  What else

5    was in the car?  A gun that Katan Maignan could reach

6    and grab and stick in the face of Special Agent

7    Anderson and then steal his cocaine.

8         Why do you think Katan Maignan on all those

9    phone calls on August 10th, 1995, told Special Agent

10    Anderson why can't we do this one on one?  Why don't

11    you take your shit and bring it over to my car and

12    I'll give you my shit. Why can't you bring your shit

13    over to my car? Why did he continue to say that? Why

14    did Katan Maignan want to get Special Agent Anderson

15    by himself at Katan Maignan's car?  Why?  What other

16    reason could he have other than he was up to no good,

17    to flash the bundles that looked like a lot of money,

18    looked like $33,000, pull the gun, steal the

19    cocaine.

20         Why did Katan and Fritz Maignan only want

21    Special Agent Anderson at this deal?  They didn't

22    want Sam Tatum, the big guy you saw on the first

23    videotape.  Special Agent Anderson said that's my

24    weight.

25         They didn't want Sam Tatum there, this big guy.

1    They wanted Special Agent Anderson, a smaller person

2    without a gun.  Now what's the problem here?

3         Watch the videotape.  Watch it.

4         Listen as closely as you can to it, because

5    when Katan Maignan sees that Special Agent Anderson

6    has a nine millimeter on him, all of a sudden the

7    plans are all going awry.

8         Now he can't pull the ripoff because he's got

9    an empty gun.  He can't stick a gun in the guy's face

10   and not worry about getting shot.  Now he knows that

11   Special Agent Anderson can pull his nine millimeter

12   out and blow his brains out, so he doesn't want to do

13   the deal that way.

14        Yes, he wants to steal the cocaine.  Certainly

15   he hasn't withdrawn from his criminal intent to take

16   it, to possess two kilograms of cocaine, but now it's

17   not going to happen the way he had it all planned

18   out, the way Fritz and Katan Maignan wanted it from

19   day one, to rip this special agent off.

20        You will never hear on that videotape on August

21   11th, 1995, you will never hear this man, Katan

22   Maignan, tell anyone I don't want to do this deal any

23   more.  In fact, instead of saying I don't want to do

24   this deal anymore, and walking directly over to his

25   car, getting in his car, what does this man do? When

1    he finds out that Special Agent Anderson has a nine

2    millimeter and a vest, he starts wandering around the

3    parking lot because he's trying to formulate how can

4    I get that cocaine now when I find out this guy has a

5    gun.  I'm sitting here in my car with my bogus rolls

6    and an unloaded weapon.

7        He tries to figure out how to do it. Watch him

8    on the videotape.  He gestures to Special Agent

9    Anderson two or three times to come over, to talk

10   about it.

11       Now, the problem with Katan Maignan is you

12   can't hear him that well on the tape, but listen very

13   closely. You'll be allowed to take all the evidence

14   back.   Listen as many times as you want to, watch

15   the evidence, whatever you want to do. You have that

16   ability.

17       At no time does this man say I do not want to

18   do this deal. At no time.  When he finally realizes

19   that he's not going to get that cocaine the way he

20   planned it by stealing it and sticking a gun in

21   Special Agent Anderson's face, that's when he wanders

22   towards his car.  I think it takes about thirty

23   minutes. We sat for thirty minutes the other day and

24   watched it.

25       Were they entrapped?  Do you really believe

1    that Joseph Clark went into a Foot Locker, sat down

2    in a chair, give me sneakers. Hey, by the way, do

3    you want to sell me some drugs? I mean, is that what

4    you believe honestly? That's it. Because that's

5    what they're asking you to believe.

6         Fritz Maignan is sizing up shoes at the Foot

7    Locker and every now and then someone walks in and

8    says, hey, want to sell me some drugs? That's what

9    he's saying happened in this case.  That's what

10   they're asking you to believe.

11        As Mr. Holden and Mr. Hecker said, use your

12   common sense. Does your common sense tell you that

13   that happened? Does your common sense tell you that

14   Fritz Maignan was sizing up these shoes and someone

15   said hey, want to sell me some drugs?

16        Entrapped? The man is living in New York.  He

17   paid for a ticket to fly to Florida to buy drugs, not

18   to make quick money like he said. How can you make

19   quick money if you have to come up with thirty-three

20   grand to buy two kilograms of cocaine? It wouldn't

21   make sense.

22        It would make sense if he said I was coming to

23   Florida, I was going to run some cocaine from Point A

24   to Point B, and they were going to pay me for it.

25   That would make sense. But when they're coming to

1       Florida and they have to spend $33,000, how is that

2       quick money?

3               You're asked to believe that Fritz Maignan

4       doesn't know what he's talking about.  What is he

5       saying on the tape on August 8th, 1995? He's talking

6       about cooking up the cocaine, talking about it didn't

7       matter if it was wet because he didn't sell it like

8       that anyway, talking about coming down here to shop.

9       You heard the tape on August 10th when there is a

10      three-way between Fritz Maignan, and the informant

11      and Heath Anderson where Maignan says hey, remember

12      when I told you I was going to Florida and to put me

13      on to somebody.  That's what this is all about.

14              The two of them working together in concert,

15      confederated, conspiring, combining, agreeing to

16      steal cocaine, to take it into their possession,

17      conspire to traffic by possession. That's what this

18      crime is all about.

19              The gun? Do you believe Katan Maignan?  Do you

20      believe that somehow that gun magically appeared

21      within five minutes of his arrest? Someone slid it

22      into the car while he was not looking.  He was the

23      only one in the car on August the 11th, 1995 until

24      the police got there, and you saw it, State's Exhibit

25      9.  Here it is.  Out of the ordinary sight of the

1    citizen.  Look at this.  You can't see it.  It's

2    crammed up in the corner on the driver's side. You

3    cannot see it if you look in the car. There it is.

4    It is concealed from ordinary view.  That gun could

5    be used to steal cocaine.

6        Now, I don't know why Fritz Maignan took the

7    stand today and told you he wasn't at the scene,

8    because I think if you all recall that videotape on

9    August 11th, 1995, when we watched Katan Maignan go

10    walking down each aisle in the parking lot.

11    We overhear the voice of Fritz Maignan inside the

12    Denny's as Special Agent Anderson testified saying I

13    gave the money to my brother.

14        If you don't believe me, just listen to the

15    tape again and listen closely as Katan Maignan is

16    traversing up and down those aisles of that parking

17    lot.  You listen and you overhear distinctively the

18    voice of Fritz Maignan telling Special Agent Anderson

19    I gave the money to my brother.

20        You decide whether or not he was there or not.

21    Of course, he said he wasn't there and just caught a

22    cab later.  He didn't remember when it happened, but

23    take his word for it because that's what he wants you

24    to.

25        Withdrawal from the conspiracy.  Did either one

1    of these gentlemen persuade each other not to commit

2    the crime?  No evidence of that.  The only evidence

3    you have that they did anything was this crime didn't

4    go down the way they wanted it to.

5        The agreement to take the cocaine was still

6    there between the two of them.  They still wanted to

7    steal the cocaine but now they were in a tough

8    situation.  They couldn't pull it off the way they

9    wanted to because the agent had a gun and he wasn't

10   going to go to the car for Katan to flash the bundles

11   and pull the gun on him.

12       Listen to the tape on August 10th, 1995, very

13   important tape, when you focus on the issue of why

14   Katan Maignan was there by himself with the car.  He

15   tells Special Agent Anderson that he wants to do this

16   one on one.

17       Why do you have to bring the other guy?  Why?

18   He doesn't want Sam Tatum there.  He doesn't want

19   anyone else there when he wants to do this ripoff.

20       As Special Agent Anderson testified, he's not

21   that big a fellow.  And when you're a big guy and you

22   have a gun, the odds are even better you can take

23   something. And Katan Maignan was counting on that

24   fact.  He was counting on the fact that Special Agent

25   Anderson would be by himself.

1          But Special Agent Anderson being a skilled

2     undercover special agent, was suspicious. He knew if

3     he went to that car, there was going to be a problem.

4          For some reason, Mr. Holden and Mr. Hecker

5     through cross examination, were bringing out there

6     were there a lot of people around, real close, a lot

7     of other agents.  Sure.  There were a lot of agents

8     around, and what did Special Agent Anderson say? It

9     only takes a second for someone to pull a gun and

10    shoot you in the head.  That's the reality of what is

11    going on.

12         You listen closely to the instructions of

13    entrapment in this case and ask yourselves the

14    question, were Katan and Fritz Maignan ready to

15    commit a crime if the opportunity presented itself to

16    them.  The evidence points specifically to that.

17         That's when the opportunity to get their hands

18    on two kilograms of cocaine presented itself, they

19    jumped at it. They were ready and they were willing

20    to commit that crime and listening to that

21    instruction, that instruction says that if they're

22    ready and willing to commit the crime, if the

23    opportunity presents itself, that is not entrapment

24    and they are guilty.

25         Between the dates of August 8th, 1995 and

1    August 11th, 1995, as I said before, Fritz and Katan

2    Maignan were up to no good.  They wanted that

3    cocaine, they were going to do whatever it took to

4    get that cocaine and thankfully due to the efforts

5    and the skill of Special Agent Anderson, they were

6    not able to, but they were clearly in agreement to

7    commit the crime.  They clearly were not, entrapped,

8    and they clearly did not withdraw.

9        On the count of conspiracy to traffic in

10    cocaine, I ask you to find them guilty as charged

11    because in this case, you have to find them either

12    guilty as charged or not guilty because those are

13    your choices.  The evidence points clearly to guilt.

14        The issue of carrying a concealed firearm as to

15    Katan Maignan, I don't know how the gun got in

16    there.  He's the only one in the car.

17        Unless you speculate, unless you somehow

18    formulate some idea that somebody slid that gun

19    there, some police officer for some unknown reason

20    stuck a gun in that car, he's guilty of that crime as

21    well.

22        Thank you very much.

23        THE COURT:  Mr. Holden.

24        MR. HOLDEN:  The last time I spoke, I said that

25    I would be back.  I didn't mean it as a threat.  I

1     was trying to say we come back and talk one more

2     time.

3          Mr. Gallagher's argument is somewhat compelling

4     if you give it the credence that he would like you

5     to, but he really wants you to think this was a

6     definite ripoff.  He wants you to get inflamed about

7     that and not pay attention to the evidence.

8          I am going to beg you and I don't do that

9     often, not beg but please, pay attention as best you

10    are able to the evidence you take back, listen to the

11    tape as Mr. Gallagher said and if there is any

12    inference that you are going to make from what you

13    saw on the tape, in combination with the testimony

14    that you heard either from Katan or Fritz Maignan or

15    from Agent Anderson, if there is any question that

16    you have, I am sure you are allowed to come back and

17    ask us about that question.

18         Most important here is that a person like you

19    or I can't conspire with the police.  For us to

20    conspire, we have to conspire with each other. If we

21    conspire with the police, that does not count.

22         The only conspiracy that matters is a

23    conspiracy between two non—police members.  That's

24    really significant here because the State would like

25    you to think that Fritz or Katan conspired with their

1       agent or conspired with their C.I. to do that.

2              Well, the whole gist is that they conspired

3       with each other, but what happened here is when one

4       of the people at the scene where it's supposed to go

5       down says, I'm not going to do it and walks away.

6              Even if he didn't say the words, which I think

7       he did, but even if he didn't say I'm not going to do

8       it, he walked away.

9              Now, you have to take this in the whole context

10      of things because wasn't it just the day before that

11      Agent Anderson had said to Fritz or Katan on the

12      phone that if we don't do it tomorrow, it's not going

13      to happen. To me, that's a sort of finality. It's

14      going to happen tomorrow or not at all.  I'm going to

15      the Keys tomorrow, forget it.

16             Then they're at the scene at Denny's and of

17      course, Katan doesn't go through with it so you hear

18      Agent Anderson saying forget it.

19             Well, to me that's over.  That's forgotten.

20      It's a done non-deal.  I don't want to say it's a

21      done deal because there was no deal. No deal ever

22      happened, never went on.

23             The judge tomorrow is going to read you some

24      instructions, some of which you heard from Mr. Hecker

25      and maybe Mr. Gallagher spoke to the things that the

1    Judge will read, but one of the things the Judge is

2    going to read to you is about reasonable doubt and

3    one of the things he's going to say about reasonable

4    doubt is that it is the evidence introduced at this

5    trial and to it alone that you are to look.

6         The evidence is the tangible evidence, the

7    videotape and the testimony. You can look to that

8    evidence and make your own determination.

9         Now, you heard Fritz say that that wasn't him

10   on the videotape in the red shirt. You heard Special

11   Agent Anderson say that he believes when he was

12   arrested, he had a different shirt on. Look closely

13   and see if that in fact was Fritz.

14        Now, I said a moment ago that the individual

15   defendants can't conspire with the police, they must

16   conspire with each other, but once again, it brings

17   us back to the initial issue of did the police in

18   this particular case, engender or try to engender a

19   feeling in the defendants of safety and that they

20   should do this, that it would be financially

21   advantageous for them.

22        You're talking about a guy who's making I

23   believe he said $150 a week at a shoe store who is

24   now all of a sudden offered an opportunity to make

25   thousands and thousands of dollars very quickly.

1        In applying the law to the facts, you are able

2    to come up, you are allowed to come up with the idea

3    that this was in fact, because of those facts,

4    entrapment.

5        Mr. Gallagher stated in closing that it only

6    takes a second for a gun to be pulled and for an

7    accident or an incident to happen.

8        He said that even though nothing happened here,

9    even though no gun was ever shown, pulled or used by

10   my client. He's saying that to inflame you.

11       You must please pay attention to the thing, the

12   undercurrent here. If the defendant wanted to do the

13   ripoff, he had many opportunities to do so.

14       Agent Anderson offered to have him go over to

15   the car and look at the cocaine.  He could have run

16   with the cocaine right there. If he had a gun, he

17   could have pulled the gun there.

18       There are so many different things that don't

19   add up for the State's case here.  It just doesn't

20   make sense.

21       The detective said that unfortunately you are

22   put in the position here of being inside somebody's

23   head.  Well, he's right about that.  Mr. Gallagher

24   wants you to put yourself inside the head of Katan

25   Maignan and say I am still going to do the deal. My

1    intent is we are still going to do the deal.  I'm

2    walking away, told you once before I don't want to do

3    it, you beeped me a few times, I called you back.

4    I'm walking away now. He wants you to think Mr.

5    Maignan is still saying to himself at that point, I

6    am still going to do the deal.

7         Well, there is no way in heck that you guys can

8    come up with that if you apply the facts that you

9    heard to the law because there is no evidence to that

10   effect.  There is no evidence that Katan still wanted

11   to do it and you know, when you get to the issue that

12   the Judge is going to read you, about the criminal

13   conspiracy, once again, the final sentence is it is a

14   defense of the charge of criminal conspiracy that

15   Katan and Fritz Maignan, after agreeing or conspiring

16   with one or more persons, that's with each other,

17   prevented commission of the trafficking in cocaine.

18        Well, guess what? There was no charge of

19   trafficking in cocaine.  That's not what they're

20   charged with. I can't think of a better way of

21   preventing it than saying by walking away, I'm not

22   going to do it.

23        Now, it's interesting on top of this to note

24   that the agent is asking for instructions at this

25   point.  He's saying, what do we do?  Do we take them

1      down or do we not? You hear all sorts of discourse

2      between the various agents.

3          Pay attention to that because at that point,

4      they themselves don't believe that this defendant has

5      committed a crime.  They believe he should be

6      questioned further, and that in and of itself is not

7      a conspiracy to commit an offense at that point.

8          Nothing else occurred because the defendant was

9      arrested.

10         Briefly, on the gun. I ask you again to use the

11     objective standard, the evidence you've got.  There's

12     absolutely not one shred of evidence to say that this

13     defendant, Katan Maignan, knew there was a gun in his

14     car.  We've got about a ten-minute gap.

15         As I said earlier, that car I believe was

16     testified by either Katan or Fritz and certainly by

17     Agent Anderson, didn't belong to them.  It belonged

18     to their sister.  The testimony came up that they had

19     borrowed the car.

20         There is no testimony about whether the gun

21     belonged to the husband, to the sister, or to anyone

22     else who might have had the car, but yet Mr.

23     Gallagher wants you to make that incredible belief

24     that, oh, Katan put it there. He knew it was there.

25     Huh-uh.  He wants you to make that belief in your own

1    head, putting yourself in the shoes of Katan Maignan

2    once again at the scene of the arrest.  He wants you

3    to put yourself in the shoes of Katan Maignan and

4    say, I'm still going to do the deal.  We are still

5    going to do this another time, because that's his

6    whole thing, that the criminal intent was still

7    there.

8        Well, if you think about it and you think about

9    what Agent Anderson said that on the day before they

10   backed out and at the scene Katan walked away, I

11   can't think of a better way of preventing commission

12   of their trafficking in cocaine.

13       He is not charged with it.  Again, he's not

14   charged with attempted robbery.  What would the

15   robbery be?  Attempted armed robbery of the officers.

16       If they felt that they were able to prove up

17   that case, it's very likely that they would have

18   charged that offense, but you can make an inference

19   here, that because he wasn't charged with that, that

20   he was not in fact guilty of that.

21       The State in effect is trying to back door

22   here.  They're trying to say that yeah, well, he's

23   guilty of armed robbery, but we won't charge him with

24   that or attempted armed robbery. We're going to

25   charge him with attempted conspiracy to traffic in

1    cocaine.

2        Whether or not you believe the testimony of the

3    two defendants today that you heard, there is certain

4    irrefutable things that are facts that you see in

5    evidence, the videotape.  You see Katan not doing the

6    deal.  You see him not doing the trafficking in

7    cocaine.

8        And you're going to get an instruction strictly

9    on point with that, saying did either of the

10   defendants withdraw from the conspiracy by preventing

11   trafficking in cocaine.  That is what Katan did.  He

12   withdrew. He prevented the trafficking in cocaine,

13   and you know, as I said earlier, you can't conspire

14   by yourself. You have to conspire with another person

15   who is not a police officer.

16       Well, if Katan withdrew, that leaves Fritz

17   alone.  You know, one person alone can't conspire.

18   It has to be two civilians.

19       Last issue, we didn't see one civilian witness

20   here. Every witness you saw is a paid government

21   officer or agent, whether they work for the state or

22   the federal government.

23       You are also allowed to take that into

24   consideration when you are determining the position,

25   the truthfulness, the motive for saying certain

1      things.

2          For example, you didn't hear any agent or

3      officer cover that five-minute gap for the gun.  Now,

4      we all know that there was a ton of officers on the

5      scene and there sure as heck could have been one

6      agent or officer to testify, yet we saw him from the

7      moment he was here to the moment he was here.  You

8      didn't see that.  That's because they want you to get

9      the false imprint that Katan knew that the gun was

10     there, when in fact he didn't.

11         He testified that he didn't know the gun was

12     there.  You are allowed to take the evidence and

13     apply it to the law.

14         Mr. Hecker spoke of entrapment and what they

15     have to prove by a preponderance of the evidence.

16     Well, that's as to the entrapment defense, but on its

17     case in chief, the State has to prove he's guilty to

18     the exclusion of every reasonable doubt.

19         They will tell you that they were in agreement

20     to go ahead and do this drug deal.  You saw the

21     evidence.  You know they weren't in agreement.  You

22     know the deal didn't happen.  You saw that.  You saw

23     Katan leave the scene.  You heard the officer testify

24     that Katan was in the car leaving the scene.

25         They can't deny what's on the tape.  Frankly, I

1    was surprised we got to see that tape, that tape

2    that's the scene of the arrest, shows you clearly

3    that Katan intended to walk away.

4        You can hear it yourself when you go back into

5    the room. Any evidence you want to hear -- the tape,

6    videotape, all you have to do is ask for it and it

7    will be yours to look at.

8        I think I covered everything. I hope you give

9    every consideration of fairness and after having

10   listened to the evidence, apply the law that the

11   Judge gives you.  I think you will come up not guilty

12   to both counts.

13       As to the firearm, Mr. Katan Maignan, there is

14   no proof that he knew the firearm was there and it

15   was not on his body. They knew that.  They knew it

16   wasn't on his body.  It wasn't on his body, ever on

17   his body, he wasn't even in the vehicle and after he

18   was arrested, they never said they found it on his

19   body.

20       That's never been brought out.  Listen to the

21   rules the Judge gives you when he explains the law.

22       Thank you very much for your consideration.

23       THE COURT: Mr. Hecker, your concluding

24   argument.

25       MR. HECKER: I don't intend to go back over

1    everything. We are to understand that out of the blue

2    somebody walks into a shoe store.  The problem with

3    that remark is we don't know how many shoe stores he

4    walked into. Could have been a hundred or a thousand.

5    Could have been the first.

6        How many coffee shops did he walk into, record

7    stores do we know he was cruising Harlem, looking for

8    someone we don't know because Clark was not here,

9    because the case agent didn't have control of the

10    C.I., clearly did not have control of the C.I.

11        That's the problem here.  This is a thought

12    crime.  The government is trying to say to you that

13    the agent was in danger and this was a ripoff, bullet

14    in the head, all the risks, but it's a thought crime.

15    People thought about doing something that was illegal

16    and got in trouble, but how does this get to the

17    point of thinking about it?

18        The Judge will read to you the instruction

19    about weighing the evidence.  Number one says did the

20    witness seem to have an opportunity to see and know

21    the things about which the witness testified?

22        Fritz testified he was in the shoe store

23    helping with shoes and this guy is asking if he wants

24    to sell him some drugs. Fritz told him no.

25        To induce or entrap somebody for any reason --

1          we don't know exactly what Clark did because Clark

2          was not here.

3               Fritz is not a native American, doesn't have

4          the best English, explains the best way he could.  He

5          was promised big, quick money if he came to Florida.

6          What if Joseph Clark said my source in Miami is

7          stupid and dumb and you can perhaps rip him off. We

8          don't know that happened either. You didn't hear from

9          Joe Clark.  We do know you had a paid informant that

10         was not paid for services in this case. For whatever

11         reason, they decided not to pay Clark. We don't know

12         where Clark is and shortly after Mr. Clark was

13         de-certified, he no longer gives this type of

14         information, but that's the problem in this

15         particular case.

16              Remember, step back.  We have to decide why

17         were the Maignan brothers down here.  Don't be misled

18         by the prosecution regarding burden of proof.  We

19         have no obligation, none, to proffer anything.  We

20         had no obligation to put our clients on the stand. We

21         had no obligation to cross examine, we had no

22         obligation to engage in discovery, none, because it's

23         not our burden to prove that our clients are innocent

24         until proven guilty.

25              Remember also we had multiple defendants and

1    multiple charges.  I asked you in voir dire did you

2    have the ability to separate facts and apply to each

3    individual.  You told me you did.  That's what you

4    agreed here.

5        My client is not charged with a gun. He was not

6    in the car.  There is also no indication there was

7    any words expressed or anything passed between the

8    defendants that this was going to be a ripoff.

9        You didn't hear secret telephone conversations,

10   nothing was intercepted, nothing.  I suggest to you

11   that it's not unreasonable for Joe Clark out of the

12   blue as the State would like to say, came to the shoe

13   store because we don't know the history.  That's not

14   our job, not our job to know what the history is, to

15   show that he stopped at Fritz's Foot Locker until he

16   hit a person willing to do this.

17       We also don't have any evidence contradicting

18   what Fritz Maignan said regarding what Joe promised

19   him.  We have some statements by Agent Anderson

20   saying well, he was a trained agent, he knows better

21   than to do that. But we go back to the same point and

22   this is the last thing.

23       I am saying to you that the government bungled

24   the investigation of this case from day one.  They

25   took the word of a snitch and that's what Joe Clark

1    is.  You can call him a cooperating source or

2    informant, confidential informant.

3         The bottom line is he's a snitch.  That's what

4    he is, okay.

5         They took the word of a snitch, didn't

6    investigate, not known drug dealers, no drug

7    involvement with them.  He tricks them, he induces

8    them and pressures them to come down here. Whatever

9    fact Fritz said, he told him you can earn quick

10   money.

11        This is a kid working in a shoe store in

12   Harlem, New York, makes a buck fifty a week. We don't

13   know that Clark said I have imbeciles in Florida, you

14   can rip them off. We don't know that, but again, it's

15   not our burden to prove that.  It's the government's

16   burden.  It would have been nice, but we didn't have

17   Clark's testimony.

18        Please go back and review the evidence, listen

19   to the tapes, watch the videotape, keep in mind the

20   entrapment defense and keep in mind it is a mere

21   tipping of the scales.

22        I believe we have more than tipped the scales

23   in our favor. That's because of the lack of

24   evidence.  Reasonable doubt can arise from lack of

25   evidence.  I suggest to you that there is a lot of

1    reasonable doubt in this case with regard to whether

2    or not two kids were going to commit the crime of

3    trafficking in cocaine let alone conspiracy.

4         I am sure after you review the evidence, you

5    will come to the proper decision, which is acquittal

6    on the charge of conspiracy to traffic in cocaine.

7         Thank you very much.

8         THE COURT: Time to go home.

9         We are going to recess until twenty after eight

10   tomorrow.  We will be in recess as to this case until

11   8:20 tomorrow morning.

12        Please return to the jury room.  Don't discuss

13   this case amongst yourselves or with anyone else or

14   have it discussed in your presence or see, read, or

15   hear any news reports.

16        When you return, return right back to the jury

17   room there, and try to get a punctual start about

18   8:30.

19        It will hopefully take half an hour and then

20   you will retire to deliberate.

21        I will be in the courtroom here unconnected

22   with this case.

23        Have a nice evening.  Don't forget anything at

24   your feet or in the jury room to take home with you.

25        Anything further, gentlemen?

1           MR. GALLAGHER: Nothing from the State.

2           THE COURT: Anything?

3           MR. HECKER:  No.

4           MR. HOLDEN:  No.

5           THE COURT: Have a nice evening, everyone.

6      Thank you.

7           (Thereupon, the proceedings were adjourned, to

8      reconvene the following day, June 14, 1996,

9      commencing at or about 8:30 o'clock a.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1    State of Florida )
                      :  SS
 2    County of Broward)

 3

 4              IN THE CIRCUIT COURT OF THE
                SEVENTEENTH JUDICIAL CIRCUIT,
 5         IN AND FOR BROWARD COUNTY, FLORIDA

 6

 7    STATE OF FLORIDA,        )
                               )
 8            Plaintiff,       )
                               )
 9       vs.                   ) CASE NO. 95-14021CF10A
                               )
10    KATAN MAIGNAN,           )
                               )
11            Defendant.       )
      _____ )
12

13

14          Proceedings had and taken before the Honorable

15    ROBERT W. TYSON, JR., one of the Judges of said Court, at

16    the Broward County Courthouse, Fort Lauderdale, Broward

17    County, Florida, on the 14th day of June, 1996, commencing

18    at or about 8:30 o'clock a.m., and being a Jury Trial.

19

20    APPEARANCES:

21

22          JOHN GALLAGHER, ESQUIRE,
            Assistant State Attorney,
            Appearing on behalf of the State.
23
            SCOTT HECKER, ESQUIRE,
24          Appearing on behalf of the Defendant Fritz Maignan.

25          MICHAEL HOLDEN, ESQUIRE,
            Appearing on behalf of the Defendant Katan Maignan.
```

1   Thereupon:

2          The following proceedings were had:

3          THE COURT:  Good morning, ladies and gentlemen,

4   we have criminal matters set this morning.  We are

5   finishing up a trial here, the State of Florida

6   versus Katan and Fritz Maignan.

7          Counsel and the accused are present.  We are

8   outside the presence of the jury. We have

9   instructions and conference, and the following

10  instructions and verdicts have been agreed upon; is

11  that correct, State?

12         MR. GALLAGHER:  Yes.

13         THE COURT:  Defendants?

14         MR. HOLDEN:  Yes, Your Honor.

15         MR. HECKER:  Yes, Judge.

16         THE COURT:  Anything to be said before the jury

17  comes in and we begin the final instructions?

18         Remind me, now, if they're going to take all

19  these tapes back in, they need something to play

20  those on, the video and all that.

21         MR. GALLAGHER:  They have the boom box, and

22  they have the TV, Judge.

23         THE COURT:  Okay. Escort the jury in, please.

24         (Thereupon, the jury entered the courtroom and

25  the following proceedings were had within the

```
1    presence of the jury:)
2         THE COURT: Concede the presence of the jury and
3    waive its polling?  State?
4         MR. GALLAGHER: Yes, Your Honor.
5         THE COURT:  Defendants?
6         MR. HECKER:  Yes, Your Honor.
7         MR. HOLDEN:  Yes, Your Honor.
8         THE COURT:  Did you discuss this case among
9    yourselves or with anyone else or have it discussed
10   in your presence or see, read or hear any news
11   reports of this matter from the time you left until
12   now?  Yes or no.  Anybody said yes, raise their hand.
13   No hands.
14         This is the State of Florida versus Katan
15   Maignan and Fritz Maignan.
16         Charge of the Court:   Members of the jury, I
17   thank you for your attention during the trial. Please
18   pay attention to the instructions I am about to give
19   you.
20         Katan Maignan and Fritz Maignan, the defendants
21   in this case, have been accused of the crime of
22   conspiracy to traffic in cocaine.
23         Katan and Fritz Maignan, the defendants in this
24   case, have been accused of Count I of the
25   Information, conspiracy to traffic in cocaine.
```

1          Fritz Maignan, the defendant in this case, has

2     been accused of Count II --

3          MR. GALLAGHER:  Judge, that's Katan Maignan.

4          THE COURT:  Excuse me.  Katan Maignan, the

5     defendant in this case, has been accused of Count II

6     of the Information, with the crime of carrying a

7     concealed firearm.

8          Gentlemen, as I do read this, if I do make an

9     error in reading these, immediately interrupt me so I

10    can cure my instruction.

11         Before you can find the defendants Katan

12    Maignan and/or Fritz Maignan guilty of criminal

13    conspiracy, the State must prove the following two

14    elements beyond a reasonable doubt:

15         One, the attempt of Katan Maignan and Fritz

16    Maignan was that the offense of trafficking in

17    cocaine would be committed.  Two, in order to carry

18    out the attempt, Katan Maignan and Fritz Maignan

19    agreed, conspired, combined, or confederated with

20    each other or others unknown to the State's

21    Attorney's Office to cause trafficking in cocaine to

22    be committed, either by them or one of them or by

23    some other person, or one, it is not necessary that

24    the agreement, conspiracy, combination, confederation

25    to traffic in cocaine be expressed in any particular

1          words or that words passed between the conspirators.

2                It is not necessary for the defendants to act

3          in furtherance of the offense conspired.

4                It is a defense to the charge of criminal

5          conspiracy that Katan Maignan or Fritz Maignan had a

6          conspiracy with one or more persons to commit to

7          trafficking in cocaine, persuaded each other not to

8          do so or otherwise prevented the commission of

9          trafficking in cocaine.

10         Carrying a concealed firearm.   Before you can

11         find the defendant, Katan Maignan, guilty of carrying

12         a concealed firearm, the State must prove the

13         following two elements beyond a reasonable doubt.

14               One, Katan Maignan knowingly carried on or

15         about his person a firearm.   Two, the firearm was

16         concealed from the ordinary sight of another person.

17               A concealed firearm is any firearm which is

18         carried on or about a person in such a manner as to

19         conceal the firearm from ordinary sight of another

20         person.   A firearm is a weapon, including a starter

21         gun, which is designed to or ready to expel a

22         projectile by the action of an explosive.

23               The defense of entrapment has been raised.

24         Katan Maignan and Fritz Maignan were entrapped if,

25         one, they were, for the purpose of obtaining evidence

BROWARD REPORTING SERVICE   (954) 763-1382

1          of the commission of a crime, induced or encouraged

2          to engage in conduct constituting the crime of

3          conspiracy to traffic in cocaine.

4               And two, they engaged in such conduct as a

5          direct result of such inducement or encouragement,

6          and three, the person who induced or encouraged them

7          was a law enforcement officer or a person engaged in,

8          cooperating with or acting as an agent of a law

9          enforcement officer, and four, the person who induced

10         or encouraged them and employed methods of persuasion

11         or inducement or created a substantial risk that the

12         crime would be committed by a person other than the

13         one who was ready to commit it.

14              Five, Katan Maignan and Fritz Maignan were not

15         persons who were ready to commit the crime.

16              It is not entrapment if Katan Maignan and Fritz

17         Maignan had the predisposition to commit conspiracy

18         to traffic -- Katan Maignan and Fritz Maignan had the

19         predisposition if before any law enforcement officer

20         acting for the officer persuaded, induced or lured

21         Katan Maignan and Fritz Maignan, he had a readiness

22         and willingness to commit conspiracy to traffic in

23         cocaine and the opportunity presented itself. It is

24         also not entrapment merely because a law enforcement

25         officer in good faith attempted to commit the crime.

1           A, provided the defendant with the opportunity,

2      means and facilities to commit the offense which the

3      defendants attempted to commit or would have

4      committed otherwise.

5           B, used decoys or subterfuge to expose the

6      defendants' criminal acts.

7           C, was present to aid and assist in the

8      commission of the offense.

9           On the issue of entrapment, the defendants must

10     prove to you by a preponderance of the evidence that

11     the criminal conduct occurred as a result of the

12     entrapment.

13           A plea of not guilty, reasonable doubt and

14     burden of proof.

15           The defendant has entered a plea of not guilty,

16     which means you must presume or believe that the

17     defendant is innocent.  The presumption stays with

18     the defendant as to each material allegation in the

19     Information through each stage of the trial until it

20     has been overcome by the evidence to the exclusion of

21     and beyond a reasonable doubt.

22           To overcome the defendant's presumption of

23     innocence, the State has the burden of proving the

24     following two elements:  One, the crime with which

25     the defendant was charged was committed.

1           Two, the defendant is the person who committed

2       the crime.

3           The defendant is not required to prove

4       anything.

5           Whenever the words reasonable doubt are used,

6       you must consider the following.  A reasonable doubt

7       is not a possible doubt, a speculative, imaginary or

8       forced doubt.  Such a doubt must not influence you to

9       return a verdict of not guilty if you have an abiding

10      conviction of guilt.

11          On the other hand, if after carefully

12      considering, preparing and weighing all the evidence,

13      there has not been an abiding conviction of guilt, or

14      having a conviction is one which is not stable or one

15      which wavers and vacillates, then the charge is not

16      proved beyond a reasonable doubt and you must find

17      the defendant not guilty because the doubt is

18      reasonable.

19          It is to the evidence introduced upon this

20      trial and to it alone that you are to look for that

21      proof.

22          A reasonable doubt as to the guilt of the

23      defendant may arise from the evidence, a conflict in

24      the evidence or the lack of evidence.

25          If you have a reasonable doubt, you should find

1        the defendant not guilty.  If you have no reasonable

2        doubt, you should find the defendant guilty.

3            Weighing the evidence.  It is up to you to

4        decide what evidence to rely on.   You should use

5        your common sense in deciding which is the best

6        evidence and which evidence should not be relied upon

7        in considering your verdict.

8            You may find some of the evidence not reliable

9        or less reliable than other evidence.

10            You should consider how the witnesses acted as

11        well as what they said.  Some things you should

12        consider are, one, did the witness seem to have an

13        opportunity to see and know the things about which

14        the witness testified.

15            Two, did the witness seem to have an accurate

16        memory.

17            Three, was the witness honest and

18        straightforward in answering the attorney's

19        questions.

20            Four, did the witness have some interest in how

21        the case should be decided.

22            Five, does the witness' testimony agree with

23        other testimony and other evidence in the case.

24            You may rely upon your own conclusion about the

25        witness.  A juror may believe or disbelieve all or

1    any part of the evidence or the testimony of any

2    witness.

3         Expert witnesses.   Expert witnesses are like

4    other witnesses with one exception.  The law permits

5    an expert witness to give his opinion.  However, an

6    expert's opinion is only reliable when given on the

7    subject about which the witness is an expert.

8         Like other witnesses, you may believe or

9    disbelieve all or any part of the expert's testimony.

10        The Constitution requires the law to prove its

11   accusations against the defendant.  It is not

12   necessary for the defendant --

13        MR. GALLAGHER:  Judge, may we approach?

14        THE COURT:  Yes.

15        (Thereupon, there was a discussion at side bar,

16   outside the presence of the court reporter and the

17   jury, after which the following proceedings were

18   resumed within the presence of the jury:)

19        The defendant in this case has become a

20   witness.  You should apply the same rules in

21   consideration of his testimony that you apply to the

22   testimony of other witnesses.

23        The Constitution requires the State to prove

24   the accusations against the defendant.  It is not

25   necessary for the defendant to disprove anything, nor

1        is the defendant required to prove his innocence.  It

2        is up to the State to prove the defendant's guilt by

3        the evidence.

4              Rules of deliberation.  These are some general

5        rules that apply to your discussions.  You must

6        follow these rules in order to return a lawful

7        verdict.

8              One, you must follow the law as set out in

9        these instructions.  If you fail to follow the law,

10       your verdict will be a miscarriage of justice.  There

11       is no reason for failing to follow the law in this

12       case.  All of us are depending upon you to make a

13       wise and legal decision in this matter.

14             Two, this case must be decided only upon the

15       evidence that you have heard and the answers of the

16       witnesses and the exhibits and evidence and these

17       instructions.

18             Three, this case must not be decided for or

19       against anyone because you feel sorry for anyone or

20       are angry at anyone.

21             Four, remember, the lawyers are not on trial.

22       Your feelings about them should not influence your

23       decision in this case.

24             Five, your duty is to determine if the

25       defendant is guilty or not guilty in accordance with

1       the law.  It is the Judge's job to determine what a

2       proper sentence would be if a defendant is guilty.

3            Six, whatever verdict you render must be

4       unanimous.  That is, each juror must agree to the

5       same verdict.

6            Seven, it is entirely proper for a lawyer to

7       talk to a witness about the testimony the witness

8       will give if called to the courtroom.  The testimony

9       should not be discredited by talking to a lawyer

10      about his testimony --

11           MR. GALLAGHER:  That should say the witness,

12      Your Honor.

13           THE COURT: The witness should not be

14      discredited by talking to a lawyer about his

15      testimony.

16           Eight, the verdict should not be influenced by

17      any prejudice, bias or sympathy.  Your verdict must

18      be based on the evidence and the law contained in

19      these instructions.

20           Deciding the verdict is exclusively your job.

21      I cannot participate in that decision in any way.

22      Please disregard anything I may have said or done

23      that made you think I preferred one verdict over

24      another.

25           Only one verdict may be returned as to the

1     crime charged.    Each verdict must be unanimous, that

2     is, all of you must agree to the same verdict.

3          The verdict must be in writing and for your

4     convenience, the necessary forms of verdict have been

5     prepared for you.  They are as follow:

6          The heading of each of the verdicts, the

7     captions:  In the Circuit Court of the Seventeenth

8     Judicial Circuit, in and for Broward County, Florida,

9     Case No. 95-14021CFA for Katan Maignan and CFB for

10    Fritz Maignan, Judge Tyson, State of Florida,

11    Plaintiff versus Katan Maignan, defendant.

12          Verdict:  Count I, we the jury find as follows

13    as to the defendant in this case, check only one.

14          The defendant is guilty of conspiracy to

15    traffic in cocaine in the amount of 400 grams or more

16    but less than 150 kilograms as charged in the

17    Information.

18          B, the defendant is not guilty.

19          So say we all, this blank day of June, 1996, at

20    Fort Lauderdale, Broward County, Florida, and a place

21    for the foreman on behalf of all of you to sign and

22    date it and check the appropriate form of verdict.

23          Case No. 95-14021CFA, State of Florida,

24    Plaintiff, versus Katan Maignan, defendant.

25          Verdict.    Count II.  We the jury find as

1    follows as to the defendant in this case.  Check only

2    one.

3        The defendant is guilty of carrying a concealed

4    firearm as charged in the Information.

5        B, the defendant is not guilty.  So say we all,

6    this blank day of June, 1996, in Fort Lauderdale,

7    Broward County, Florida, and a place for the

8    foreperson to sign and date and check the appropriate

9    form of verdict on behalf of all of you.

10        In Case No. 95-14021CFB, State of Florida,

11   Plaintiff, versus Fritz Maignan.   Verdict.   Count I,

12   we the jury find as follows as to the defendant in

13   this case.  Check only one.

14        A, the defendant is guilty of conspiracy to

15   traffic in cocaine in the amount of 400 grams or more

16   but less than 150 kilograms as charged in the

17   Information.

18        B, the defendant is not guilty. So say we all

19   this blank day of June, 1996, in Fort Lauderdale,

20   Broward County, Florida, and a place for the

21   foreperson to sign and date and check the appropriate

22   form of verdict on behalf of all of you.

23        A separate crime has been charged against each

24   defendant in each count of the Information.   The

25   defendants have been tried together, however, the

1          charges against each defendant and the evidence

2          particular to it must be considered separately.

3              Your finding of guilty or not guilty as to one

4          or both of the defendants must not affect your

5          verdict as to the other matters or any other crime

6          charged.

7              In just a few moments, you will be taken into

8          the jury room by the bailiff.  The first thing you

9          should do is to elect a foreman.  The foreman

10         presides over your deliberations like a chairman at a

11         meeting.  It is the foreman's job to sign and date

12         the verdict form after all of you have agreed on a

13         verdict in this case. Either a man or a woman may be

14         foreman of the jury.

15             Your verdict finding the defendant either

16         guilty or not guilty must be unanimous.  Your verdict

17         must be the verdict of each juror as well as the jury

18         as a whole.

19             In closing, let me remind you that it is

20         important that you follow the law spelled out in

21         these instructions in deciding your verdict.   There

22         are no other laws that apply to this case.   Even if

23         you do not like the laws that must be applied, you

24         must use them.  For centuries we have agreed to a

25         Constitution and to live by the law.   No one of us

1           has the right to violate the rules that we all share.

2                 Now, do any one or more of you desire to take

3           any of the exhibits and the Information, the exhibits

4           which are admitted into evidence and the Information,

5           which is not evidence, back to the jury room when you

6           retire, will you please raise your hands now.  Many

7           of the jurors have so raised their hands.  It would

8           be appreciated if you would accompany the jurors when

9           they retire to the jury room and the lawyers will

10          oversee this to see that they get no more and no less

11          than which they are entitled.

12                There is also, to view some of these exhibits,

13          the videotapes, there is a --

14                MR. GALLAGHER:  The TV is over here, Judge.

15                THE COURT:  That can accompany you also.  There

16          is something to play the tapes on and that can

17          accompany you as well.

18                Does anyone know how to work those things,

19          raise your hands.  Okay.  If you have any problems,

20          let us know and we will send the bailiff in there and

21          he will help you.

22                Counsel approach the bench for a moment.

23                (Thereupon, there was a conference at the bench

24          between court and counsel, outside the hearing of the

25          court reporter and the jury, after which the

1    following proceedings were resumed within the

2    presence of the jury:)

3         THE COURT:  Did you hear everything, juror

4    number three?

5         JUROR NUMBER THREE:  Yes.

6         THE COURT: Okay, thank you.  And the Court

7    having observed that those jurors seated in seats

8    seven and eight, Ms. Polito and Mr. Stafford, you

9    have not replaced the principal jurors.  You are now

10   released from jury duty, but wait for one moment,

11   please.

12        The remaining jurors seated in seats one

13   through six, you may now retire to deliberate.

14        (Thereupon, the jurors left the courtroom to

15   deliberate, and the following proceedings were had

16   outside the presence of the jury:)

17        THE COURT:  Thank you very much, Ms. Polito and

18   Mr. Stafford.  I hope you enjoyed it.  I've signed

19   some certificates of appreciation on behalf of all of

20   the judges.

21        Do you have any questions about your jury duty,

22   any complaints, any criticism you have?  So you do

23   know that I do arrive sometimes in the morning.

24        Please return now to the jury assembly room.  I

25   don't know where the assembly room is anymore.  It

 1      could be most anyplace.  Where were you assembled,

 2      which room?  I guess it's still there; I don't know.

 3           You will be paid this large amount of money

 4      that the Legislature has decided that you should get.

 5      Thanks a lot, everybody.  Have a nice weekend.

 6           (Thereupon, the alternate jurors were excused

 7      and left the courtroom.)

 8           (Thereupon, the following proceedings were had

 9      outside the presence of the jury:)

10           THE COURT: State of Florida versus Katan

11      Maignan and Fritz Maignan, counsel and accused are

12      present.

13           MR. HOLDEN:  Your Honor, as far as I

14      understand, I have been beeped several times, and I

15      apologize.  I was in front of Judge Robinson.  When I

16      turned it from volume to vibrate, it must have gone

17      off completely.  It is working.  I just checked it,

18      and I apologize.  I had no way of knowing that it was

19      turned off, Your Honor.

20           THE COURT: I understand that the jury has

21      reached a verdict; is that correct?

22           THE BAILIFF:  Yes, Your Honor.

23           THE COURT:  Escort the jury in, please.

24           Anything to be said before the jury comes in?

25           MR. GALLAGHER: Nothing, Judge.

1          THE COURT:  Defense?

2          MR. HOLDEN: No, Your Honor.

3          MR. HECKER:  No, Judge.

4          THE COURT:  Escort the jury in, please.

5          (Thereupon, the jury entered the courtroom and

6     the following proceedings were had within the

7     presence of the jury:)

8          THE COURT:  You may be seated, ladies and

9     gentlemen of the jury.

10         I apologize for my tardiness.  It was

11    unavoidable.

12         Do you concede the presence of the jury and

13    waive its polling, State?

14         MR. GALLAGHER:  Yes, Your Honor.

15         THE COURT:  Defendants?

16         MR. HOLDEN:  Yes, Your Honor.

17         MR. HECKER:  Yes, Judge.

18         THE COURT:  Members of the jury, have you

19    elected or selected the foreman?   Who is that?

20    Juror number four, Mr. Cole.

21         Mr. Cole, I understand that the jury has agreed

22    upon a verdict.  Has the jury agreed upon a verdict?

23         THE FOREMAN:  Yes, sir.

24         THE COURT: Would you please deliver the

25    verdicts to the clerk?

1           Mr. Cole, I see you have -- would you please

2       date the verdicts and do these in ink as well.

3           Read the verdict to the jury and publish the

4       same.

5           THE CLERK:  In the Circuit Court of the

6       Seventeenth Judicial Circuit, in and for Broward

7       County, Florida, Case No. 95-14021CF10A, Judge Robert

8       W. Tyson, Jr., State of Florida, Plaintiff, versus

9       Katan Maignan, Defendant.

10          Verdict:  Count I.  We the jury find as follows

11      as to the defendant in this case.  The defendant is

12      guilty of conspiracy to traffic in cocaine in an

13      amount of 400 grams or more but less than 150

14      kilograms as charged in the Information.

15          So say we all this June 14th, 1996, Fort

16      Lauderdale, Broward County, Florida, Foreperson

17      Frank M. Cole.

18          Count II.  We the jury find as follows as to --

19          THE COURT:  Is that your verdict, yes or no?

20          THE JURY:  Yes.

21          THE CLERK:  Count II.  We the jury find as

22      follows as to the defendant in this case. The

23      defendant is guilty of carrying a concealed firearm

24      as charged in the Information.

25          So say we all this 14th day of June, 1996, Fort

1                Lauderdale, Broward County, Florida.

2                        THE COURT:  Is that your verdict?

3                        THE JURY:  Yes.

4                        THE CLERK:  State of Florida, Plaintiff, versus

5                Fritz Maignan, Defendant.

6                        Count I.  We the jury find as follows as to the

7                defendant in this case.

8                        The defendant is guilty of conspiracy to

9                traffic in cocaine in the amount of 400 grams or more

10               but less than 150 kilograms as charged in the

11               Information.

12                       So say we all this 14th day of June, A.D.,

13               1996, Fort Lauderdale, Broward County, Florida,

14               Foreperson Frank M. Cole.

15                       THE COURT:  Is that your verdict?

16                       THE JURY:  Yes, it is.

17                       THE COURT:  Does either the State or the

18               defense desire the jury to be polled?

19                       MR. GALLAGHER: No, Your Honor.

20                       MR. HECKER: Yes, sir.

21                       THE COURT:  Poll the jury as to their verdict.

22                       THE CLERK:  Juror number one, are these your

23               verdicts?

24                       JUROR NUMBER ONE:  Yes.

25                       THE CLERK:  Juror number two, are these your

1          verdicts?

2                    JUROR NUMBER TWO:  Yes.

3                    THE CLERK:  Juror number three, are these your

4          verdicts?

5                    JUROR NUMBER THREE:  Yes.

6                    THE CLERK:  Juror number four, are these your

7          verdicts?

8                    JUROR NUMBER FOUR:  Yes.

9                    THE CLERK:  Juror number five, are these your

10         verdicts?

11                   JUROR NUMBER FIVE: Yes.

12                   THE CLERK:  Juror number six, are these your

13         verdicts?

14                   JUROR NUMBER SIX:  Yes.

15                   THE COURT:   Defendant Katan Maignan, the Court

16         having presided over the trial and received the

17         verdict finding you guilty as to both Count I and

18         Count II of the information, the Court herein

19         adjudges you guilty of Count I, criminal conspiracy

20         to traffic in cocaine in the amount of 400 grams or

21         more but less than 150 kilograms.  I adjudge you

22         guilty also as to Count II as charged in the

23         Information, carrying a concealed firearm.

24                   As to Fritz Maignan, the Court herein adjudges

25         you guilty as to trafficking in cocaine --

1          MR. GALLAGHER: Conspiracy.

2          THE COURT:  Conspiracy to traffic in cocaine in

3    an amount of 400 grams or more but less than 150

4    kilograms as charged in the Information.

5          I defer decision as to sentencing until the

6    date of --

7          THE CLERK:  August  21st.

8          MR. GALLAGHER:  Do you want to excuse the

9    jurors first?  We could do sentencing if you want.

10          THE COURT: Will I need a presentence

11    investigation report?

12          MR. HOLDEN:  No, Your Honor.

13          MR. GALLAGHER:  A presentence investigation

14    will not affect the penalty.

15          THE COURT:  Thank you very much, members of the

16    jury, for your patience and courtesy.  I've signed a

17    certificate of appreciation from all of the judges.

18          Do you have any questions about your jury duty,

19    not specifically about this case, but any question

20    about jury duty?

21          All right, please return now to the jury

22    assembly room to receive this money for your jury

23    duty for the last week now.  We all appreciate it.

24          Don't forget anything you might have in the

25    jury room or at your feet.  Thanks again.  Have a

1        nice weekend everybody.

2                (Thereupon, the jury left the courtroom, and

3        the following proceedings were had outside the

4        presence of the jury:)

5                MR. HOLDEN: Your Honor, the defendant, Katan

6        Maignan, has one request as to religious situation

7        he's got while in the Department of Corrections'

8        custody and I just wanted to bring it to the Court's

9        attention.

10               His dred locks are part of his religious

11       outlook on life, and he has requested that they not

12       be forced to cut them while he's in prison.  I have

13       been advised from DOC that some sort of letter or

14       order from the Court permitting him to maintain those

15       would be considered by DOC.

16               THE COURT:  State?

17               MR. GALLAGHER:  The Department of Corrections

18       ought to be able to do whatever they want to do with

19       these defendants.

20               THE COURT:   The request is respectfully

21       denied.  I leave that up to the Department of

22       Corrections.

23               MR. GALLAGHER: Judge, we're ready for

24       sentencing.

25               THE COURT:  Defendant Katan Maignan, do you

1      have legal cause to show why sentencing should not be

2      entered or anything to say or present?

3           Will I need a presentence investigation?

4           MR. HECKER:  Your Honor, on behalf of Fritz

5      Maignan, there is no mandatory in this case for a

6      presentence investigation, although we show the

7      individuals' priors would not affect the Court's

8      sentence in this matter.

9           If the Court would allow, I would make a motion

10     for a new trial at this time, Your Honor, based upon

11     the fact that this is an entrapment case.  The

12     greater weight of the evidence doesn't support the

13     conviction.  We believe that the Court has misapplied

14     basically the test from Munoz and allowed the State

15     to use the factors in this particular case, the

16     instant case before the Court on the issue of

17     entrapment, and it's our position that the Munoz case

18     says that the State must prove independent acts

19     separate from what happened here to show that they

20     were not a proper target.

21          THE COURT:  Do you have any motions, also?

22          MR. HOLDEN:  I would join in that motion.  Of

23     course, I would also request a new trial on that, as

24     the greater weight of the evidence does support the

25     fact that there should have been a not guilty verdict

1     by the jury, and that there was insufficient evidence

2     as a matter of law for the jury to return the verdict

3     as it was.

4          THE COURT:  State?

5          MR. GALLAGHER:  Judge, I ask you be consistent

6     with your prior rulings, Judge, and deny these

7     motions.

8          THE COURT:  Motions are respectfully denied,

9     motion for new trial.  Denied as to both defendants.

10          Do you have legal cause to show why sentencing

11     should not be entered or anything to say or present

12     as to either of the defendants?

13          MR. GALLAGHER:  No, Judge.

14          THE COURT:  Will I need a presentence

15     investigation report?

16          MR. HECKER:  That would be unnecessary.  We

17     would be willing to waive the presentence

18     investigation.

19          MR. HOLDEN: Your Honor, Defendant Katan Maignan

20     has advised that he's waiving his PSI.

21          THE COURT:  I would be more than happy to order

22     a presentence investigation, Katan Maignan, but I

23     understand you are waiving the necessity of that; is

24     that correct?

25          MR. HECKER:  Fritz would also waive it, Your

1      Honor.

2              THE COURT:  Is that correct?

3              MR. HOLDEN:  Yes.

4              THE COURT: You would prefer that I sentence you

5      without the necessity of a presentence investigation

6      report; is that correct?

7              MR. HOLDEN:  Yes, Judge.

8              THE COURT:  Fritz Maignan, you are entitled to

9      have a presentence investigation report and I would

10     be more than happy to order one and consider that,

11     but I understand you waive the necessity of the Court

12     having that and prefer to be sentenced at this time,

13     without the Court having considered a presentence

14     investigation report.  Is that correct, Fritz

15     Maignan?

16             DEFENDANT FRITZ MAIGNAN:  Yes, sir.

17             THE COURT:  Do you have legal cause to show why

18     sentencing should not be entered or anything to say

19     or present, Katan Maignan?

20             MR. HOLDEN:  No, Your Honor.

21             THE COURT:  Fritz Maignan?

22             MR. HECKER:  No, Your Honor.

23             THE COURT:  Any recommendations from the State?

24             MR. GALLAGHER:  Judge, there is a mandatory

25     minimum in this case as to the conspiracy to traffic

1        in cocaine.  As to both defendants, I am going to ask

2        you to adjudicate them guilty on the conspiracy to

3        traffic in cocaine charge, the fifteen year mandatory

4        minimum sentence that accompanies that particular

5        charge be assessed against each defendant. There's

6        also a fine in the amount of $250,000, that's also

7        mandatory and must be assessed against each

8        defendant.

9             As to Count II of the Information with regard

10       to Katan Maignan, Judge, if you just adjudicate him

11       guilty on carrying a concealed firearm, I believe the

12       time he's already served in Broward County Jail would

13       be sufficient.

14            THE COURT:  Is that the sentencing guidelines?

15            MR. GALLAGHER:  Yes, sir.

16            THE COURT: Anything further?

17            MR. HOLDEN:  Nothing, Your Honor.

18            THE COURT:  As to Fritz Maignan, Count I.  You

19       want to talk to him for a moment?  As to Katan

20       Maignan, do you want to talk to him for a moment?

21            MR. HECKER:  I've explained that to him.

22            THE COURT:  The Court herein sentences Katan

23       Maignan, as to Count I, fifteen years in the Florida

24       State Prison, mandatory minimum sentence as required

25       by law.

1          As to Count II, I sentence the defendant to

2     time served -- time served as to Count I in the

3     number of days of --

4          THE CLERK:  309 days.

5          THE COURT:  And I sentence the defendant to 309

6     days -- credit for time served 309 days as to Count

7     I, to run concurrent and not consecutive to Count I.

8          THE COURT:  As to Fritz Maignan --

9          MR. GALLAGHER: Judge, as to Count I on Katan

10     Maignan, let's get that $250,000 fine in.

11          THE COURT:  Also fined $250,000.

12          As to Fritz Maignan, Count I, I sentence the

13     defendant to fifteen years Florida State Prison,

14     minimum mandatory sentence.  The law requires a

15     statutory minimum mandatory sentence for this

16     offense, credit for time served of --

17          THE CLERK:  309 days.

18          THE COURT:  309 days.

19          THE COURT:  You have thirty days to appeal and

20     I appoint the Public Defender to help you appeal if

21     you cannot afford your own attorney.  Do you

22     understand your rights of appeal, Katan Maignan?

23          MR. GALLAGHER:  Judge, Fritz Maignan also has a

24     $250,000 fine also.

25          THE COURT:  And Fritz Maignan has a $250,000

1          fine.

2                 Do you understand your rights of appeal, Katan

3          Maignan?

4                 MR. HOLDEN:  Your Honor --

5                 THE COURT:  Do you understand your rights of

6          appeal?

7                 DEFENDANT KATAN MAIGNAN:  Yes, sir.

8                 THE COURT:  Fritz Maignan, do you understand

9          your rights of appeal?

10                DEFENDANT FRITZ MAIGNAN:  Yes, sir.

11                THE COURT:  You were saying?

12                MR. HOLDEN:  They both desire to appeal, Your

13         Honor.  I just want to make sure.  We will go ahead

14         and file the application pursuant to the Court's

15         ruling.  I just want to make sure they are here next

16         week and they're not going to be shipped off

17         somewhere, unless the Court wants to do it ore tenus

18         right now.  They are both indigent.

19                THE COURT:  Swear the defendants.

20                (Thereupon, the defendants, Fritz Maignan and

21         Katan Maignan were duly sworn.)

22                THE COURT:  Your name.

23                DEFENDANT FRITZ MAIGNAN:  Fritz Maignan.

24                THE COURT:  What do you own?

25                DEFENDANT FRITZ MAIGNAN:  Nothing, sir.

1              THE COURT:  Do you own a car or gold chains,

2     anything?

3              DEFENDANT FRITZ MAIGNAN:  No, sir.

4              THE COURT:  What was your work and pay before

5     your recent arrest?

6              DEFENDANT FRITZ MAIGNAN:  I get $260 since I

7     was working.

8              THE COURT:  Do you own a car?

9              THE COURT:  No, sir.

10             THE COURT:  Home?

11             DEFENDANT FRITZ MAIGNAN:  Can't hear you.

12             THE COURT:  Do you own a home, real estate?

13             DEFENDANT FRITZ MAIGNAN:  No, sir.

14             THE COURT:  Do you own anything?

15             DEFENDANT FRITZ MAIGNAN: I don't own nothing,

16     sir.

17             THE COURT:  Have a savings, a bank account, or

18     anything?

19             DEFENDANT FRITZ MAIGNAN:  No, sir.

20             THE COURT:  Have any money owed to you by

21     anyone?

22             DEFENDANT FRITZ MAIGNAN:  No, sir.

23             THE COURT:  Fritz, do you own anything?

24             MR. HECKER:  That was Fritz.

25             THE COURT:  Katan, do you own anything?

1           DEFENDANT KATAN MAIGNAN:  No, sir.

2           THE COURT: A car, gold chains?

3           DEFENDANT KATAN MAIGNAN:  Nothing at all.

4           THE COURT:  What was your work and pay?

5           DEFENDANT KATAN MAIGNAN:  One fifty a week.

6           THE COURT: Doing what?

7           DEFENDANT KATAN MAIGNAN:  Barber shop.

8           THE COURT:  Where?

9           DEFENDANT KATAN MAIGNAN:  The club.

10          THE COURT: What club?

11          DEFENDANT KATAN MAIGNAN:   Miami.

12          THE COURT:  Where?

13          DEFENDANT KATAN MAIGNAN:  In Miami.

14          THE COURT:  And does anybody owe you any money?

15          DEFENDANT KATAN MAIGNAN: No, sir.

16          THE COURT:  Do you own any real estate?

17          DEFENDANT KATAN MAIGNAN: No, sir.

18          THE COURT: Bank account?

19          DEFENDANT KATAN MAIGNAN:   No, sir.

20          THE COURT:  Do you have any money hidden

21     anyplace?

22          DEFENDANT KATAN MAIGNAN:  No, sir.

23          THE COURT:  The Court herein declares the

24     defendants indigent for purposes of appeal.

25          MR. HECKER:  I'll file the appropriate order

1          for the Court and also notice of appeal on behalf of

2          the defendant.

3                    THE COURT:  Anything further?

4                    MR. HECKER:  Thank you, Judge.

5                    THE COURT:  Thank you.

6                    Sign an affidavit as well, gentlemen.

7                    (Thereupon, the proceedings were concluded.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

472

```
 1                           CERTIFICATE

 2

 3      STATE OF FLORIDA     )
                             )  ss:
 4      COUNTY OF BROWARD    )

 5

 6

 7              I, LESLEY FUJARCZYK, Shorthand Reporter and

 8      Notary Public within and for the State of Florida at

 9      Large, duly commissioned and qualified, do hereby certify

10      that the foregoing, Pages 1 to and including 438, is a

11      true and correct transcription of my stenographic notes of

12      proceedings had at Broward County Courthouse, Fort

13      Lauderdale, Broward County, State of Florida, on the 10th,

14      11th, 12th and 13th days of June, 1996, commencing at or

15      about 1:30 o'clock a.m.

16              IN WITNESS WHEREOF, I have hereunto affixed my

17      hand this 24th day of July, 1996.

18

19

20                              _____
                                LESLEY FUJARCZYK
21                              Shorthand Reporter

22

23

24

25
```

413

CERTIFICATE

STATE OF FLORIDA    )
                    :  SS
COUNTY OF BROWARD    )

I, Gary Sobel, Court Reporter and Notary Public
in and for the State of Florida at Large, do
hereby certify that I reported in shorthand the
proceedings held before the Honorable Judge
Robert W. Tyson, Jr., in the case of STATE OF
FLORIDA versus FRITZ MAIGNAN Case Number
95-14021v CF 10-B; that the foregoing pages
numbered one through 474 , constitute a true
record thereof.
I FURTHER CERTIFY that I am not of counsel; I am
not related to or employed by an attorney to this
cause, and I am not financially interested in the
outcome thereof.
The foregoing certification does not apply to any
reproduction of this transcript by any means
unless under the direct control and/or direction
of the certifying shorthand reporter.
Dated at Fort Lauderdale, Broward County,
Florida, this 24 day of July, 1996.

                              GARY SOBEL



GARY J SOBEL
My Commission CC546321
Expires Apr. 22, 2000

ASSOCIATES/CERTIFIED REPORTING, INC.    (305) 763-1382