IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

FRITZ MAIGNAN,
  Petitioner,          :
                       : CASE NO. 00-6043-CIV-JORDAN
vs.                : MAGISTRATE JUDGE SORRENTINO
                       :
MICHAEL L. MOORE, et. al.,  :
  Respondent.         :



# 2 OF 2



# EXHIBIT   G

IN THE CIRCUIT COURT OF THE SEVENTEENTH JUDICIAL CIRCUIT,
IN AND FOR BROWARD COUNTY, FLORIDA

CASE NO:     95-14021 CF10B

JUDGE:     TYSON

STATE OF FLORIDA,          :

        Plaintiff,     :

vs.          :          VERDICT

FRITZ MAIGNAN,          :

    Defendant.     :

_____

Filed in Open Court,
ROBERT E. LOCKWOOD,
         CLERK
ON__JUN 1 4 1996____
BY__Beth Kessler____

COUNT I

WE, THE JURY, find as follows as to the Defendant in this
case:  (Check only one)

    __X__ A.  The Defendant is Guilty of Conspiracy to Traffic
in Cocaine in an amount of 400 grams or more but
less than 150 kilograms, as charged in the
Information.

    _____ B.  The Defendant is Not Guilty.

SO SAY WE ALL, this _6-14-96_ day of June, A.D. 1996, at Fort
Lauderdale, Broward County, Florida.

_FRANK M. COE_
FOREPERSON

_Frank M. Coe_

46

# EXHIBIT   H

## 17th Judicial Circuit in and for Broward County

### Criminal Division

# UNIFORM COMMITMENT TO CUSTODY OF DEPARTMENT OF CORRECTIONS

THE Circuit Court of BROWARD County in the   SPRING   Term,  199_6_     in the case of

### STATE OF FLORIDA

### VS.

_Fritz Maignan_                           95- 14021 CF8

(DEFENDANT)                              (CASE NUMBER)

**IN THE NAME AND BY THE AUTHORITY OF THE STATE OF FLORIDA, TO THE SHERIFF OF SAID COUNTY AND THE DEPARTMENT OF CORRECTIONS OF SAID STATE, GREETINGS:**

The above named defendant having been duly charged with the offense specified herein in the above styled Court, and he having been duly convicted and adjudged guilty of and sentenced for said offense by said Court, as appears from the attached certified copies of indictment/information, Judgment and Sentence, and Felony Disposition and Sentence Data form which are hereby made parts hereof;

Now therefore, this is to command you, the said Sheriff, to take and keep and, within a reasonable time after receiving this commitment, safely deliver the said defendant, together with any pertinent investigation Report prepared in this case, into the custody of the Department of Corrections of the State of Florida; and this is to command you, the said Department of Corrections, by and through your Secretary, Regional Directors, Superintendents, and other officials, to keep and safely imprison the said defendant for the term of said sentence in the institution in the state correction system to which you, the said Department of Corrections, may cause the said defendant to be conveyed to thereafter transferred. And these presents shall be your authority for the same. Herein fail not.



WITNESS the Honorable _Robert W. Tyson Jr_
Judge of said Court, as also
ROBERT E. LOCKWOOD, Clerk , and the
Seal thereof, this _14_ day of _June_ , 19_96_

ROBERT E. LOCKWOOD, Clerk

BY _Dith Kesler_

Deputy Clerk                            4 7

FORM 180P092
REVISED 1094

| [✓] 17th Judicial Circuit in ... for Broward County | CLOCK IN |
|---|---|

| DIVISION: Criminal | as to Count **SENTENCE** _I_ | |
|---|---|---|

| THE STATE OF FLORIDA VS. _Fritz Maysian_ | CASE NUMBER |
|---|---|
| PLAINTIFF          DEFENDANT | _95-14021 CRB_ |

The Defendant, being personally before this Court, accompanied by his attorney, _H. Scott Hecker_
and having been adjudicated guilty herein, and the Court having given the Defendant  an opportunity to be heard and to offer matters in mitigation of sentence, and to show cause why he sentenced as provided by law, and cause shown,

(Check One)
[ ]  and  the Court having on _____ deferred  imposition of sentence until this date.
[ ]  and the Court having previously entered a judgment in this case on the defendant now re sentences the defendant.
[ ]  and the Court having placed the Defendant on Probation/Community Control and having subsequently revoked the Defendant's Probation/Community Control.

IT IS THE SENTENCE OF THE COURT that:
The Defendant pay a fine of $ _____ , pursuant to F.S. 775.063, plus $ _____ at the 5% surcharge required by F.S. 960.25

[✓]        The Defendant is hereby committed to the custody of the Department of Corrections.

[ ]        The Defendant is hereby committed to the custody of the Sheriff of Broward County, Florida.

[ ]        The  Defendant is hereby sentenced as a youthful offender in accordance with F.S. 958.04.

TO BE IMPRISONED (check one: unmarked sections are inapplicable)

[ ]        For a term of Natural Life.

[✓]        For a term of _____ Fifteen (15) years _____

[ ]        Said SENTENCE IS SUSPENDED for a period of _____ subject to conditions set forth in this Order.

If "split" sentence, complete either paragraph.

_____   Followed by a period of _____ on Probation/Community Control under the supervision of the Department of Correction according to the terms and conditions of supervision set forth in separate order entered herein.

_____   However, after serving a period of _____ imprisonment  in

the balance of such sentence shall be  suspended and the  defendant shall be placed on Probation/Community  Control for a period of _____
under supervision of the Department of Corrections according to the terms  and conditions of Probation/Community Control set forth in a separate order entered herein.

FORM 180P070
REVISED 9/93

48

| DIVISION:<br>CRIMINAL | SENTENCE<br><br>( AS TO COUNT _____I_____ ) | CASE NUMBER<br><br>95- 14021 470 |
| --- | --- | --- |

In the event the defendant is ordered to serve additional split sentences, all incarceration portions shall be satisfied before the defendant begins service of the supervision terms.

### SPECIAL PROVISIONS
### ( As to Count _____I_____ )

By appropriate notation, the following provisions apply to the sentence imposed:

MANDATORY/MINIMUM PROVISIONS:

FIREARM —————It is further ordered that the three year minimum imprisonment provision of Florida Statute 775.087(2) are hereby imposed for the sentence specified in this count.

DRUG TRAFFICKING —————It is further ordered that the ___15 yr.___ mandatory minimum imprisonment provisions of Florida Statute 893.135(1) are hereby imposed for the sentence specified in this court.

CONTROLLED SUBSTANCE WITHIN 1000 FEET OF SCHOOL ————— It is further ordered that the three year minimum imprisonment provision of Florida Statute 893.13(1)(e) 1, are hereby imposed for the sentence specified in this court.

HABITUAL FELONY OFFENDER —————The Defendant is adjudicated a habitual felony offender and has been sentenced to an extended term in this sentence in accordance to the provisions of Florida Statue 775.084(4). The requisite findings by the court are set forth in a separate order or stated on the record in open court.

HABITUAL VIOLENT OFFENDER _____ The Defendant is adjudicated a habitual violent felony offender and has been sentenced to an extended term in accordance with the provision of Florida Statute 775.084(4). A minimum term of _____ year(s) must be served prior to release. The requisite findings by the court are set forth in a separate order or stated on the record in open court.

LAW ENFORCEMENT PROTECTION ACT _____ It is further ordered that the defendant shall serve a minimum of _____ years before release in accordance with Florida Statute 775.0823.

CAPITAL OFFENSE _____ It is further ordered that the Defendant shall serve no less than 25 years in accordance with the provisions of Florida Statute 775.082(1)

SHORT-BARRELED RIFLE, SHOTGUN, MACHINE GUN _____ It is further ordered that the five-year minimum provisions of Florida Statute 790.221(2) are hereby imposed for the sentence specified in this court.

CONTINUING CRIMINAL ENTERPRISE _____ It is further ordered that the 25 year mandatory minimum sentence provisions of Florida Statute 893.20 are hereby imposed for the sentence specified in this count.    49

FORM 180P100
REVISED 9/93

| DIVISION:<br>Criminal | SENTENCE<br>(AS TO COUNT ____T____ ) | CASE NO.<br>95 - 14021 CF13 |

**OTHER PROVISIONS**

**RETENTION OF JURISDICTION** _____ The Court retains jurisdiction over the defendant pursuant to Florida Statutes 947.16(3).

**JAIL CREDIT** ✓ It is further ordered that the Defendant shall be allowed a total of ___305___ days as credit for time incarcerated prior to imposition of this sentence.

**PRISON CREDIT** _____ It is further ordered that the Defendant be allowed credit for all time previously served on this count in the Department of Corrections prior to resentencing.

**CONSECUTIVE/ CONCURRENT AS TO OTHER COUNTS** _____ It is further ordered that the sentence imposed by this count shall run _____ consecutive to _____ concurrent with (check one) the sentence set forth in count _____ of this case.

**CONSECUTIVE/ CONCURRENT AS TO OTHER CONVICTIONS** _____ It is further ordered that the composit term of all sentences imposed for the courts specified in this order shall run
_____ consecutive to _____ concurrent with (check one) the following:
_____ Any active sentence being served.
_____ Specific sentences: _____
_____
_____
_____

PSI ORDERED     YES [ ]     NO [ ]

In the event the above sentence is to the Department of Corrections, the Sheriff of Broward County, Florida, is hereby ordered and directed to deliver the Defendant to the Department of Corrections at the facility designated by the Department together with a copy of this Judgment and Sentence and any other documents specified by Florida Statutes.

The Defendent in Open Court was advised of his right to appeal from this Sentence by filing notice of appeal within thirty days from this date with the Clerk of this Court, and the Defendant's right to the assistance of counsel in taking said appeal at the expense of the State upon showing of indigency.

In imposing the above sentence, the Court further recommends _____
_____
_____
_____

DONE AND ORDERED in Open Court at Broward County, Florida, this 14 day of June, 1996

5 l:

FORM 180P101
REVISED 1/95

JUDGE

17th Judicial Circuit in and ~ ~ ward County

**DIVISION:**
**CRIMINAL**

# JUDGEMENT    DIV: _FH_

CLOCK IN

96-308481   T#021
06-26-96 · 11:27AM

THE STATE OF FLORIDA VS:

_Fritz Maignan_

**PLAINTIFF**          **DEFENDANT**

**CASE NUMBER**

_95- 14021 CFS_

[ ] PROBATION VIOLATOR          STATE ATTORNEY   _John Gallagher_
( Check if Applicable )          COURT REPORTER   _Gary Sobel_

The Defendant, _Fritz Maignan_ _____ being personally before this Court represented
by: _H. Scott Hecker_ _____, his attorney of record, and having:
(Check Applicable Provision)   [ ] Been tried and found guilty of the following crime(s).
                               [X] Entered a plea of guilty to the following crime(s).   25056PG0098
                               [ ] Entered a plea of nolo contendere to the following crime(s).

| COUNT | CRIME | OFFENSE STATUTE NUMBER(S) | DEGREE OF CRIME | ADD'L MONIES IMPOSED |
|-------|-------|---------------------------|-----------------|----------------------|
| I | Consp Traff Cocaine | 853.135151 | 1F | $262,500 |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

and no cause having been shown why the Defendant should not be adjudicated guilty, IT IS ORDERED THAT the Defendant is hereby ADJUDICATED GUILTY of the above crime(s)

The Defendant is hereby ordered to pay the sum of Fifty Dollars ($50.00) pursuant to F.S. 960.20 (Crimes Comp. Trust Fund). The defendant is further ordered to pay the sum of Five Dollars ($5.00) as court costs pursuant to F.S. 943.25(4).

(Check if Applicable)   [ ] The Defendant is further ordered to pay a fine in the sum of $ _____ pursuant to F.S. 775.0835.
                        (This provision refers to the optional fine for the Crimes Compensation Trust Fund, and is not applicable unless checked and completed. Fines imposed as part of a sentence pursuant to F.S. 775.083 are to be recorded on the Sentence page(s).

Restitution to State   [ ] The defendant shall make payment of any debt due and owing to the State under section 960.17, 948.03 (1)(9) and 775.089, Florida Statutes. The amount of such debt shall not exceed $10,000 and has already been determined to be $ _____ or if not yet determined shall be determined by the Court at a later date upon final payment by the Crimes Compensation Trust Fund on behalf of the victim(s).

                       [ ] The Court hereby imposed additional court costs in the sum of $ _____

Imposition of Sentence   [ ] The Court hereby stays and withholds the imposition of sentence as to count(s) _____ and places the Defendant
Stayed and Withheld          on probation for a period of _____
                             under the supervision of the Department of Corretions (condition of probation set forth in separate order.)

Sentence Deferred   [ ] The Court hereby defers imposition of sentence until _____
Until Later Date                                                                    (Date)
(Check if Applicable)
                    [ ] Pay $100.00 Trust Fund pursuant to F.S.27.3455

The Defendant in Open Court was advised of his right to appeal from this Judgment by filling notice of appeal with the Clerk of Court within thirty days following the date sentence is imposed or probation is ordered pursuant to this adjudication. The Defendant was also advised of his right to the assistance of counsel in taking said appeal at the expense of the State upon showing of indigence.

COUNT(S) _____ DAYS BROWARD COUNTY JAIL W/CREDIT FOR _____ DAYS TIMES SERVED

FORM 180P074  REVISED 10/94          PAGE I OF 2

| DIVISION CRIMINAL | [ ] **ADJUDICATION WITHHELD**<br>[X] **ADJUDICATED GUILTY** | CASE NUMBER<br><br>95-14051 CAS |
|---|---|---|

### FINGERPRINTS OF DEFENDANT

| 1. R. THUMB | 2. R. INDEX | 3. R. MIDDLE | 4. R. RING | 5. R. LITTLE |
|---|---|---|---|---|
| | | | | |

| 6. L. THUMB | 7. L. INDEX | 8. L. MIDDLE | 9. L. RING | 10. L. LITTLE |
|---|---|---|---|---|
| | | | | |

Fingerprints taken by:

RECORDED IN THE OFFICIAL RECORDS BOU
OF BROWARD COUNTY, FLORIDA
COUNTY ADMINISTRATOR

ANDREW PANICO #7386 _____ Court Deputy

Name and Title

     DONE AND ORDERED in Open Court at Broward County, Florida this 14 day of June A.D., 19 96 I HEREBY CERTIFY that the above and foregoing fingerprints are the fingerprints of the Defendant Fritz Mayner , and that they were placed thereon by said Defendant in my presence in Open Court this date.

_____ JUDGE

52

## IN THE COUNTY/CIRCUIT COURT OF THE SEVENTEENTH JUDICIAL CIRCUIT,
## IN AND FOR BROWARD COUNTY, FLORIDA

CASE NO. 95 – 14021 CF 10 B

JUDGE Tyson

STATE OF FLORIDA,

           Plaintiff,     :

vs.     :

Fritz Macyan     :

           Defendant(s).     :

**JUDGMENT AND**
**RESTITUTION ORDER**
(F.S. 775.089)

THIS CAUSE having come on to be heard on the __14__ day of __June__, A.D. 19__96__,

upon the State's motion for an Order requiring that the Defendant herein, pursuant to §775.089, Florida Statutes, pay

restitution costs for the benefit of the aggrieved party herein:

(Name) _____

(Address) _____

(City, State ZIP) _____

and the Court being fully advised in the premises, it is thereby

    ORDERED AND ADJUDGED as follows:

☑ Restitution is not applicable in this case because __There are no identifiable victims__

_____

☐ The State's Motion is hereby granted and the Defendant shall pay restitution for the benefit of the above-named

aggrieved party, in the total sum of _____

_____

_____ _____ ($ _____ ).

1.   Payment shall be made to  ☐ Clerk of Circuit Court (felony)

                           ☐ Clerk of County Court (misdemeanor)

                           ☐ Parole & Probation (State - felony)

                           ☐ County Probation (misdemeanor)

2.   Payment Schedule [Check applicable instruction(s)]

    Total shall be paid in installment payments of $ _____, payable during the term of probation
on a ☐ weekly   ☐ monthly basis.

53

Jdgment and Restitution Order, continued

The Department of Corrections is ordered to collect any monetary payments made directly to the prisoner and any compensation for work performed in community programs and pay the money to the aggrieved party until restitution is paid in full. See §946.002(2)(a)(b)(c), Florida Statutes.

The Department of Corrections or County Probation Officer is ordered to determine if the victim has received an award from the Bureau of Crimes Compensation (Tel: 904/488-0848). If an award has been made to the victim the Department of Corrections or County Probation Officer is ordered to collect from the prisoner and pay to the "CRIMES COMPENSATION TRUST FUND" an amount of money equal to the award. See §§960.16, 960.17, and, specifically, 960.17(4), Florida Statutes.

The Department of Corrections, and Parole & Probation Commission are ordered to make restitution payable to the victim a special condition of any work release or any kind of early release program for the Defendant. See §§947.181, Florida Statutes.

Other, specified conditions: _____

_____

_____

_____

IT IS FURTHER ORDERED AND ADJUDGED that the Clerk of the Court shall provide to the aggrieved party named herein a certified copy hereof, in order for the aggrieved party to record this judgment as a lien, pursuant to §55.10, Florida Statutes.

DONE AND ORDERED at Fort Lauderdale, Broward County, Florida, this ___ day of _____, A.D. 19__.

_____
HONORABLE
Judge of the County/Circuit Court

Copies to:

State Attorney          [ ]
Defense Counsel         [ ]
Victim                  [ ] (Certified copy)
Probation Officer       [ ]
Dept. of Corrections    [ ]

Filed in Open Court,
ROBERT E. LOCKWOOD,
CLERK

ON __6/14/96__
BY _____

54

# EXHIBIT  I

IN THE CIRCUIT COURT OF THE
17TH JUDICIAL CIRCUIT IN AND
FOR BROWARD COUNTY, FLORIDA.

FRITZ MAIGNAN,               CASE NO.: 95-14021CF10B

    Defendant/Appellant,    JUDGE: TYSON

v.

STATE OF FLORIDA,

    Plaintiff/Appellee.
_____/

<u>NOTICE OF APPEAL</u>

NOTICE IS GIVEN that FRITZ MAIGNAN, Defendant/Appellant, appeals to the Fourth District Court of Appeals, the Order of this Court rendered June 14, 1996. The nature of the Order is a Final Order of jury verdict convicting Defendant of conspiracy to traffick in cocaine in excess of 400 grams.

I HEREBY CERTIFY that a copy hereof has been furnished by U.S. Mail to: State Attorney's Office, on this 20 day of JUNE, 1996.

LAW OFFICES OF H. SCOTT HECKER, P.A.

_____

H. SCOTT HECKER, ESQUIRE
Florida Bar Number 602530
517 Southwest First Avenue
Fort Lauderdale, FL 33301
(954) 523-3811
Attorney for Defendant/Appellant

57

# EXHIBIT  J

# IN THE DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA

## FOURTH DISTRICT

*4-0283*

FRITZ MAIGNAN,

      Appellant,

vs.                                                                    CASE NO. 96-2152

STATE OF FLORIDA,

      Appellee.

_____/

RECEIVED
OFFICE OF THE
ATTORNEY GENERAL

FEB 24 1997

CRIMINAL OFFICE
WEST PALM BEACH

## INITIAL BRIEF OF APPELLANT

On appeal from the Circuit Court of the Seventeenth
Judicial Circuit In and For Broward County, Florida
[Criminal Division]

RICHARD L. JORANDBY
Public Defender
15th Judicial Circuit

*State's pleadings
(Brief) due
March 12, 1997*

MARCY K. ALLEN
Assistant Public Defender
Attorney for Fritz Maignan
Criminal Justice Building
421 Third Street, 6th Floor
West Palm Beach, Florida 33401
(407) 355-7600
Florida Bar No. 332161

<u>Fritz Maignan v. State of Florida</u>

Case No. 96-2152

## <u>CERTIFICATE OF INTERESTED PERSONS</u>

Counsel for defendant/appellant certifies that the following persons and entities have or may

have an interest in the outcome of this case:

1.  Honorable Robert Butterworth
    Attorney General for the State of Florida
    By Assistant Attorney General Georgina Jimenez-Orosa
    (Counsel for Appellee)

2.  H. Scott Hecker, Esq.
    (Trial Counsel for Defendant)

3.  Honorable Richard L. Jorandby
    Public Defender, 15th Judicial Circuit
    By Assistant Public Defender Marcy K. Allen
    (Counsel for Appellant)

4.  Fritz Maignan
    (Defendant/Appellant)

5.  Honorable Michael J. Satz
    State Attorney, 17th Judicial Circuit
    By Assistant State Attorney
    (Trial Counsel for Plaintiff)

6.  Honorable Robert W. Tyson, Jr.
    17th Judicial Circuit
    (Trial Judge)

# **TABLE OF CONTENTS**

**Page**

CERTIFICATE OF INTERESTED PERSONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF THE FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

ARGUMENT

POINT I

THE TRIAL COURT ERRED IN FAILING TO GRANT A JUDGE-
MENT OF ACQUITTAL WHERE THE STATE DID NOT ESTAB-
LISH THAT APPELLANT COMMITTED CONSPIRACY TO
TRAFFIC IN COCAINE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

POINT II

REVERSIBLE ERROR OCCURRED WHERE THE TRIAL
COURT INCORRECTLY INSTRUCTED THE JURY ON AN
ELEMENT OF CONSPIRACY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

POINT III

THE TRIAL COURT ERRED IN FAILING TO GRANT A
JUDGMENT OF ACQUITTAL ON ENTRAPMENT AT THE
CLOSE OF THE EVIDENCE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

## POINT IV

THE CONVICTION VIOLATES DUE PROCESS OF LAW BECAUSE THE JURY WAS NOT INSTRUCTED THAT THE STATE HAD THE BURDEN OF PROVING PREDISPOSITION BEYOND A REASONABLE DOUBT. ............................... 24

CONCLUSION ......................................................... 27

CERTIFICATE OF SERVICE ................................................ 27

## TABLE OF AUTHORITIES

<u>Cases</u>                                                                    <u>Page</u>

<u>Bennett v. State</u>, 173 So. 817
    (Fla. 1937) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

<u>Carter v. State</u>, 469 So. 2d 194
    (Fla. 2d DCA 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

<u>Cristian v. State</u>, 272 So. 2d 852
    (Fla. 4th DCA 1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

<u>Doyle v. State</u>, 483 So. 2d 89
    (Fla. 4th DCA 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

<u>Fruetel v. State</u>, 638 So. 2d 966
    (Fla. 4th DCA 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 26

<u>Gray v. State</u>, 526 So. 2d 1020
    (Fla. 5th DCA 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 17

<u>Herrera v. State</u>, 594 So. 2d 275
    (Fla. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

<u>Jacobson v. United States</u>, ___ U.S. ___, 112 S. Ct. 1535,
    118 L. Ed. 2d 174 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 24, 25

<u>Kocol v. State</u>, 546 So. 2d 1159
    (Fla. 5th DCA 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

<u>Mickenburg v. State</u>, 640 So. 2d 1210
    (Fla. 2d DCA 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 17

<u>Motley v. State</u>, 155 Fla. 545, 20 So. 2d 798
    (1945) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

<u>Munoz v. State</u>, 629 So. 2d 90
    (Fla. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21, 22, 24, 25

Nadeau v. State, 683 So. 2d 504
        (Fla. 4th DCA 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23

O'Connor v. State, 590 So. 2d 1018
        (Fla. 5th DCA 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Pennington v. State, 526 So. 2d 87 (Fla. 4th DCA 1987),
        approved 534 So. 2d 393 (Fla. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 17

Pickover v. State, 580 So. 2d 287
        (Fla. 4th DCA 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 18

Rotenberry v. State, 468 So. 2d 971
        (Fla. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Russell v. United States, 369 U.S. 749, 82 S. Ct. 1038,
        8 L. Ed. 2d 240 (1962) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Saint Louis v. State, 561 So. 2d 628
        (Fla. 2d DCA 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 17, 18

Screws v. United States, 325 U.S. 91, 107, 65 S. Ct. 1031,
        89 L. Ed. 1495 (1945) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Sorrells v. United States, 287 U.S. 435, 53 S. Ct. 210,
        77 L. Ed. 2d 413 (1932) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Sorrells v. United States, 287 U.S. 435, 53 S. Ct. 210,
        77 L. Ed. 2d 413 (1932) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Sparkman v. State, 528 So. 2d 497
        (Fla. 2d DCA 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

State v. Delva, 575 So. 2d 643
        (Fla. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

State v. Finno, 643 So. 2d 1166
        (Fla. 4th DCA 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

State v. Howell, 629 So. 2d 213 (Fla. 2d DCA 1993),
        rev. den. 639 So. 2d 981 (Fla. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

State v. Ramos, 632 So. 2d 1078
    (Fla. 3d DCA 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21-23

The Florida Bar re: Standard Jury Instructions -- Criminal, 508 So. 2d 1221
    (Fla. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Yohn v. State, 476 So. 2d 123
    (Fla. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

## OTHER AUTHORITIES

    Fla Std. Jury Instr. (Crim.) at page 1214 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

## Florida Statutes

    777.04(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
    777.201 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 25

## PRELIMINARY STATEMENT

Appellant was the defendant in the trial court.  He will be referred to as appellant in this brief.

The record on appeal is consecutively numbered.  All references to the record will be by the symbol "R" followed by the appropriate page number in parentheses. The trial transcripts are consecutively numbered independently of the record on appeal.  All references to the trial transcripts will be by the symbol "T" followed by the appropriate page number in parenthesis.  The supplemental record on appeal consists of a transcript of the pretrial hearing on appellant's motion to dismiss.  It is consecutively numbered independently of the record on appeal and trial transcripts. All references to the supplemental record will be by the symbol "SR" followed by the appropriate page number in parenthesis.

All emphasis has been added by appellant unless otherwise noted.

## STATEMENT OF THE CASE

Appellant and co-defendant, Katan Maignan, were charged in a single information filed in the Seventeenth Judicial Circuit with conspiracy to traffic in cocaine by purchase or possession (count I) (R-1). Katan Maignan was separately charged in count II with carrying a concealed firearm (R-2).

Pretrial, appellant moved in writing to dismiss the charge based upon entrapment as a matter of law (R-19-20). After an evidentiary hearing, the circuit court denied the motion (SR-7-87).

Appellant and co-defendant Katan Maignan proceeded to jury trial. At the close of the state's case in chief and at the close of the evidence, appellant moved for judgment of acquittal and renewed his motion to dismiss (T-269-271,372-374). The trial court maintained its ruling (T-275). At the close of the evidence, counsel for the co-defendant moved for judgment of acquittal since the evidence established that the "the defendants withdrew from the conspiracy if in fact there was any conspiracy, they left the scene." (T-375-376). The court denied the motion (T-378).

Without objection, the trial court instructed the jury on conspiracy in pertinent part as follows:

> Before you can find the defendants Katan Maignan and/or Fritz Maignan guilty of criminal conspiracy, the State must prove the following two elements beyond a reasonable doubt:
>
> One, the **attempt** of Katan Maignan and Fritz Maignan was that the offense of trafficking in cocaine would be committed. Two, in order to carry out the **attempt**, Katan Maignan and Fritz Maignan agreed, conspired, combined, or confederated with each other or others unknown to the State's Attorneys Office to cause trafficking in cocaine to be committed, either by them or one of them or by some other person, or one.

- 2 -

(T-442).

Also, without objection, the trial court instructed the jury on entrapment in pertinent part as

follows:

> On the issue of entrapment, the defendants must prove to you by a
> preponderance of the evidence that the criminal conduct occurred as
> a result of the entrapment.

(T-445).

The jury found appellant guilty of conspiracy to traffic in cocaine by purchase or possession

as charged in the information.  Appellant was adjudicated guilty accordingly (T-459-461, R-46,51-

52). Appellant was sentenced to serve a mandatory 15 year term of imprisonment and ordered to pay

a $250,000.00 fine (T-467, R-48-50).

## STATEMENT OF THE FACTS

Appellant, Fritz Maignan, and co-defendant Katan Maignan, were jointly tried on the charge of conspiracy to traffic in cocaine by purchase and possession (count I)[1]. The state presented the testimony of 5 witnesses. Appellant and Katan testified in support of their defenses. A non-cumulative recitation of the evidence follows:

Appellant and Katan are brothers. Appellant was 18 years old and in his last year of high school when he was arrested (T-295,305). He was born in Haiti and lived in Harlem, New York where he worked as a salesman at a Footlocker Store (T-294-295,298). Katan was 19 years old (T-342). Katan and their sister lived in Florida (T-301,343-344). Appellant had the nickname "Stizzo" and Katan's nickname was "Slow" (T-308).

Joseph Clark[2] was a documented confidential informant for the federal Drug Enforcement Administration (DEA) (T-39,129,141,179). Although he was not paid for this case, he had been paid in the past (T-39,153-155).

Appellant met Clark when Clark came into the Footlocker store to purchase sneakers (T-297,309). Prior to this meeting, the DEA did not have any information that appellant was involved with narcotics (T-128). Appellant did not have a narcotics related criminal history (T-128-129).

According to appellant, over a period of a month, appellant saw Clark 4 or 5 times at the store (T-297). Clark kept asking for drugs (T-297,299). Clark told appellant that appellant could

_____

[1]Co-defendant Katan Maignan was charged in count II of the information with carrying a concealed firearm (R-1-2).

[2]Joseph Clark did not testify at trial or at the pretrial hearing.

- 4 -

go to Florida to make easy money (T-299).  Clark told appellant that he had a friend that appellant

should meet that had good stuff for appellant (T-299).  Clark did not tell appellant how much it

would cost (T-299).  At the last meeting, Clark told appellant that if he came down to Florida he

would make more money than he made in a paycheck (T-299).  Appellant was only making $150.00

(T-299). Appellant came to Florida because Clark told appellant he could make alot of money (T-

300).

During cross-examination by the co-defendant and the prosecution, appellant testified that

Katan met Clark at the store once (T-306, 312).  Clark and Katan did not speak directly about the

drug trade (T-307).  On cross-examination by the prosecution, appellant stated that Clark mentioned

the deal to Katan.  Katan became involved to make quick money (T-309-312).  However, appellant

did not remember stating at a prior court proceeding that appellant told his brother about the drug

deal (T-312-316).  On redirect examination, appellant stated that his prior testimony referred to Clark

and Katan having never met each other in Florida (T-340).  Clark and Katan met twice at Footlocker

(T-340-341).  Clark spoke to both brothers about coming to Florida for a drug deal and represented

that they could make big money (T-341).

Katan testified that he was visiting appellant in New York when he met Clark at the

Footlocker store (T-344).  He spoke with Clark on 3 occasions (T-345).  Clark told them that he had

a connection in Miami and they could make alot of money (T-344).  Clark did not tell them that they

had to come up with money (T-346).

Appellant bought a one-way plane ticket to Florida for approximately one-hundred dollars

and change (T-300).  Appellant did not buy a return ticket because Clark told appellant that the guy

would take care of him (T-300).  Clark told appellant that he would give appellant's number to the guy (T-301).

According to state witness, Heath Anderson, a special agent with the Drug Enforcement Administration, on August 8, 1995, Clark telephoned Anderson and advised that he met people in New York who wanted to purchase a large amount of drugs (T-39-40).  When asked, Clark stated he did not know what kind of drugs they wanted (T-184-185).  They were in the business, mainly cocaine (T-185).  Anderson did not verify this information (T-186-187).  Clark did not say that he had ever seen them with cocaine (T-185).  Anderson had no knowledge of Clark purchasing cocaine from appellant (T-193).  Anderson conceded that Clark had more than one contact with appellant (T-183).  Clark provided the name "Stizzo" and a beeper number (T-40).

Anderson, acting as a cocaine dealer, paged the number (T-40).  Appellant returned the call (T-40-41,42).  Using the term "condos," Anderson and appellant discussed prices for two different cocaines, one wet and one dry (T-41-42,43).  Anderson testified that appellant replied that it did not matter if the cocaine was wet because he would cook it (T-42).

On cross-examination, Anderson acknowledged that he stated that it would not matter if it was wet cocaine if someone knew what to do with it before appellant mentioned cooking it (T-124).  This was the first time Anderson ever sold wet cocaine (T-196).

Anderson testified that appellant stated he came to Florida to "shop"(T-42).  A price of $16,500 per kilogram was set for a 2 kilogram cocaine deal (T-43).  They agreed to meet the following day at McDonald's in Fort Lauderdale (T-43-44).  A tape recording of this conversation which Anderson testified was of poor quality was played for the jury (state exhibit 1).  It was not

- 6 -

contemporaneously transcribed (T-44-46).

On August 9, 1995, Anderson spoke with Katan by telephone and confirmed that the meeting would occur at McDonald's (T-48). A tape recording of this conversation was played for the jury (state exhibit 2). It was not contemporaneously transcribed (T-49-50).

Undercover surveillance was present at the McDonald's on August 9, 1995, and a videotape without audio was made (state exhibit 3) (T-50,52,56). In addition, an audio cassette tape was made (T-52). Anderson accompanied by Officer Sam Tatum acting as a body guard arrived at the McDonald's (T-51). Eventually, Anderson and Tatum found appellant and Katan (T-51). Introductions were made (T-51). According to Anderson, appellant and Katan attempted to negotiate a lower price but Anderson remained firm (T-53). Anderson suggested that the transaction occur at Denny's in Boca Raton and wrote down the directions for the Maignans (T-54). According to Anderson, they were happy to do the deal (T-54).

On August 10, 1995, Anderson was paged (T-58). Anderson testified that "they" did not like the Boca Raton location (T-59). Anderson provided a new location, Denny's in Hallandale Beach (T-59). State Exhibit 4, a tape recording of this call, was played for the jury and contemporaneously transcribed (T-62). Katan advised Anderson that the location was too far (T-62). Anderson stated that he spoke to Joe (the confidential informant). Anderson stated, "I mean, I don't know what you all did before, but you all told me you guys did business; is that right? You know, a little bit." (T-63). Katan responded "We did business, yeah, (inaudible)." (T-63). Anderson asked, "Know when we can come up there?" Katan responded "I am not going to do it, man." (T-63). Anderson asked if he wanted to talk to Joe's brother (special agent William Dyer) and stated that he would not go

- 7 -

to Miami (T-64). Anderson suggested the Hallandale Denny's and provided directions (T-64-67). Anderson instructed Katan to check this location then call him back in an hour (T-68).

At approximately 11:40 on August 10, 1995, Anderson spoke with appellant by telephone (T-68). The tape recorded telephone conversation was played for the jury (T-68-69). Appellant stated that he was not going to go to the meeting (T-70). Katan would go alone (T-70). Anderson replied that he was bringing his boy (T-70). Appellant gave the phone to Katan (T-71). Anderson insisted that he intended to bring someone with him (T-71-74).

On August 10, 1995, at 3:40 p.m., Anderson arranged a three way telephone conversation between himself, Joseph Clark (the confidential informant) and appellant (T-75). The purpose of the call was to reassure appellant because the Maignan's were hesitant (T-161-162,199). During this conversation, Clark stated that Anderson was "good people, he'll even get you a lady if you want." (T-198).

A cassette recording of this conversation was played for the jury; it was partially transcribed (T-82-85). Joseph Clark asked Anderson if he intended to pay him for arranging the transaction (T-85). Anderson explained that he dropped the price (T-85). Katan picked up the phone (T-85).

On cross-examination by counsel for the co-defendant, Anderson testified that referring to the deal, Katan said to forget it (T-126-127,160). At this point, the deal was off (T-86,159). The deal was not going to happen (T-167).

On cross-examination, Anderson agreed that during one conversation he learned that appellant was afraid to do the deal (T-195).

Anderson claimed that Katan paged him several hours after the 3:40 p.m. conversation (T-

86,131-132). Anderson could not recall if he beeped Katan first (T-204). Anderson called back, however, the conversation was not tape recorded (T-86,132). Anderson explained that he was not at his office when he returned the call (T-133,158). According to Anderson, they agreed to do the transaction alone at the Hallandale location (T-87).

A briefing occurred (T-88). Anderson obtained 2 kilograms of cocaine (T-88). Surveillance was sent to the Hallandale Denny's and a videotape was made (State exhibit) (T-88-90). Anderson arrived in a white Mercedes (T-119).

According to Anderson, he saw appellant walking up to the front door of the restaurant (T-91). Appellant told him that he gave the money to his brother to do the deal (T-92). Anderson had appellant accompany him inside the restaurant (T-92). They sat down (T-92). Anderson stated only one person could do the deal (T-92). Appellant said he was going to leave (T-92).

Katan Maignan drove around the parking lot (T-92). Anderson advised surveillance that appellant and Katan were present (T-93). Katan met Anderson inside Denny's (T-93). Appellant left the restaurant (T-93).

Katan and Anderson went to the parking lot (T-94). Approximately 10 times in less than 6 minutes, Anderson asked Katan to show him the money (T-102). Katan did not comply (T-110). Katan asked Anderson to come to his car to see the money (T-94). Anderson hesitated because he was afraid he would be robbed (T-94,102). Katan asked to pat-down Anderson. Anderson responded that he had a .9mm with him (T-94-95). Upon learning that Anderson had a gun, Katan became indecisive about doing the deal (T-103-104,172). Katan would not go through with the deal unless Anderson put his gun up (T-174-176). The transaction did not occur (T-176). Anderson and Katan

- 9 -

left in their separate vehicles (T-95).

Anderson testified that it is common for drug dealers to ask to see a sample of the cocaine. However, that did not occur in this instance (T-165-166). Katan never looked at the cocaine (T-110). He never obtained a taste of it (T-166).

Katan was stopped and arrested (T-96). A gun was found on the driver's side floor board near the dimmer switch of the vehicle driven by Katan (T-226,240). The gun was not loaded (T-241,243). Although the gun and magazine were processed, no fingerprints were obtained (T-245-246,259-260). During his meeting with Anderson, Katan did not make any attempt to get into the car (T-205). He did not display the gun (T-207).

A bank deposit bag was located on the passenger side front floorboard of the vehicle (T-224). The bag contained 6 bundles of currency. Each bundle was wrapped in a one hundred dollar bill (T-228). The bundles included 800 one dollar bills, 3 fifty dollar bills and 8 one hundred dollar bills totaling $1750.00 (T-232).

Anderson attempted to locate appellant (T-96). He telephoned a number he found in Katan's property and paged appellant (T-96). As Anderson and Chris Hock, a Hallandale police captain, rode around looking for appellant, appellant returned the page (T-97,212,251-252). Anderson told appellant that Katan had locked himself inside his car with the money and refused to do the deal (T-98,212). Anderson made banging noises and told appellant that Katan would not open the window (T-98). Anderson advised appellant that he was leaving (T-98 ).

Anderson drove past the Denny's lot and appellant was there (T-98,253). According to Anderson, when appellant saw him, appellant ran and was apprehended after a short foot chase (T-

98,253-254). Anderson thought appellant had changed his shirt (T-101).

Appellant testified that during one of the tape recorded phone conversations, he told Anderson that he was scared and did not want to do anything anymore (T-303). Appellant had other conversations with Anderson which were not played in court (T-305). On several occasions, appellant told Anderson that he did not want to do this deal; he was chickening out (T-304,320). Appellant did not know that he needed $33,000.00 until he came to Florida (T-333).

On cross-examination by the prosecution, appellant testified that he did not know what "condos" meant (T-327). Anderson explained it to him before the first tape recorded conversation (T-327-328).

The $1750.00 that was found in the car was not appellant's money (T-303-304,320). On cross-examination by the prosecution, appellant testified that his sister gave Katan the money to get an apartment (T-321). Appellant did not remember testifying at a prior court hearing that he and Katan bound the money and brought it to the drug deal (T-322-324).

On cross-examination by the prosecution, Katan testified that his sister gave him the money to rent an apartment (T-350). She did not give him any one-dollar bills (T-351-352). Katan alone changed the money and made the bundles (T-351,353).

On direct examination, Appellant testified that he did not go to Denny's for the meeting and did not appear on that video tape (T-304). The black man that walked across the street was not him (T-304). Later, appellant went to Denny's to look for his brother (T-304). Anderson had told appellant that his brother was hurt and could not get out of the car (T-304). When appellant went to help his brother, appellant was arrested (T-304). On cross-examination, appellant testified that

- 11 -

he did not run (T-336).

On cross-examination by the prosecution, appellant testified "If it wasn't for Joe [Clark], I wouldn't see Heath Anderson. I could have been home or school if it wasn't for Joe [Clark]"(T-330). Appellant came to Florida because Joe told him that he could make "quick money, more money than [he] made from [his] paycheck" (T-332).

## SUMMARY OF ARGUMENT

Point I: To prove conspiracy, the state must establish that 2 or more persons agreed to commit an offense and that the defendant had the intent to commit the offense. In this case, it was the state's theory that appellant and Katan Maignan conspired to possess cocaine by stealing it from an undercover DEA agent. However, the state wholly failed to prove that there was an agreement between appellant and Katan to steal the cocaine. Thus, appellant's conviction for conspiracy to traffic in cocaine is not supported by the evidence and must be set aside.

Point II: The trial court misstated the law in charging the jury on conspiracy to traffic in cocaine. The court substituted the word "attempt" for the "intent." This changed the entire meaning of the charge and resulted in fundamental error.

Point III: The trial court should have dismissed the charge where the evidence established entrapment as a matter of law. The unrebutted testimony showed that appellant was induced to commit the offense by a confidential informant for the Drug Enforcement Administration. The informant promised appellant that he would make quick easy money if he met the undercover officer. Appellant was not otherwise predisposed to engage in a narcotics transaction. Thus, his conviction must be set aside.

Point IV: The instructions failed to inform the jury that the burden is on the state to prove predisposition beyond a reasonable doubt. Though there was no objection, a fundamental shift in the law has occurred excusing the need for an objection; alternatively, failure to instruct on reasonable doubt is fundamental error.

# ARGUMENT

## POINT I

### THE TRIAL COURT ERRED IN FAILING TO GRANT A JUDGEMENT OF ACQUITTAL WHERE THE STATE DID NOT ESTABLISH THAT APPELLANT COMMITTED CONSPIRACY TO TRAFFIC IN COCAINE.

Appellant and Katan Maignan were jointly charged with conspiracy to traffic in cocaine by purchase or possession (R-1). The offense is comprised of two elements. First, the state must establish that there was an agreement between two or more persons to commit an offense. Second, the state must establish the intent to commit the offense. Pickover v. State, 580 So. 2d 287,289 (Fla. 4th DCA 1991); Saint Louis v. State, 561 So. 2d 628 (Fla. 2d DCA 1990).

Agreement is the gravamen of the charge. Sparkman v. State, 528 So. 2d 497,498 (Fla. 2d DCA 1988). The state must demonstrate that there was some prearrangement, some prior discussion, some plans or anything done in preparation to commit the offense. Gray v. State, 526 So. 2d 1020, 1021 (Fla. 5th DCA 1988) .

Where the state relies upon circumstantial evidence, it must be both consistent with guilt and inconsistent with any reasonable hypothesis of innocence. Kocol v. State, 546 So. 2d 1159,1160 (Fla. 5th DCA 1989). A defendant's presence at the scene of the offense is insufficient to prove conspiracy. Pennington v. State, 526 So. 2d 87 (Fla. 4th DCA 1987), approved 534 So. 2d 393 (Fla. 1988); Mickenburg v. State, 640 So. 2d 1210 (Fla. 2d DCA 1994). Likewise, presence coupled with flight will not support a conviction. Saint Louis v. State, 561 So. 2d at 628. As the appellate court recognized in Mickenburg v. State, 640 So. 2d at 1211, "One danger that lurks in the criminal charge

of conspiracy is the tendency to make the crime so elastic, sprawling and pervasive as to defy meaningful definition."

Below, the state conceded that it did not prove that appellant conspired to purchase cocaine (T-411-412). Instead, the state claimed that appellant conspired to possess cocaine by stealing it from the DEA agent.[3] (T-412-413). However, the state wholly failed to introduce any evidence that an agreement to steal the cocaine existed between appellant and Katan Maignan.

Preliminarily, although this precise argument was not presented to the trial court below, this Court may nonetheless reach merits of this issue. This Court must set aside a conviction where there is a complete lack of proof to support the charge. O'Connor v. State, 590 So. 2d 1018 (Fla. 5th DCA 1991).

Viewing the evidence in the light most favorable to the state, the proof showed that DEA agent Anderson contacted appellant because a confidential informant advised Anderson that appellant wanted to purchase a large amount of drugs (T-39-40). During their first telephone conversation, Anderson proposed selling two kilograms of wet cocaine for $33,000.00 to appellant (T-40-43). The following day, Anderson met appellant and Katan for the first time (T-43-44). Price as well as a tentative meeting location were discussed (T-44-46,53-54). The next morning, Anderson spoke with Katan by telephone and suggested a new location for the alleged transaction (T-59-68). Later that morning, Anderson and appellant discussed who would be present for the alleged

_____

[3] On appeal, the state is bound by the theory it advanced in the trial court. See, Russell v. United States, 369 U.S. 749,763-65, 82 S. Ct. 1038, 8 L. Ed. 2d 240 (1962)(The charging document may not be so written as to let the prosecution "shift its theory of criminality so as to take advantage of each passing vicissitude of the trial and appeal"; See the discussion in Russell, 369 U.S. at 768.)

- 15 -

transaction (T-68-74). That afternoon, Anderson, the confidential informant and appellant spoke by telephone after which Katan and Anderson spoke (T-75-85). Katan told Anderson that he did not want to go through with the transaction (T-126-127). The deal was off (T-86,159,167). At some point, Anderson knew that appellant was afraid to do the deal (T-195).

Several hours later, Anderson spoke to Katan again (T-86,131-132). Katan and Anderson agreed to conduct the transaction alone at Denny's (T-87). The following day, Anderson saw appellant at Denny's (T-91). According to Anderson, appellant stated he gave the money to his brother to do the deal and then left (T-91-92).

Katan arrived (T-92-94). Anderson advised Katan that Anderson had a firearm on his person (T-94-95). Despite numerous requests by Anderson, Katan refused to show Anderson any money (T-102,110). Katan refused to conduct the transaction while Anderson carried the firearm (T-174-176). Katan and Anderson parted and the transaction never occurred (T-95,176). Shortly thereafter, Katan was arrested. Inside the vehicle he drove, law enforcement recovered an unloaded firearm from the driver's side floorboard. In addition, a bag containing 6 bundles of currency each of which was wrapped in a $100.00 bill was seized (T-228). A total of $1750.00 was recovered (T-232).

After Katan's arrest, Anderson contacted appellant (T-97,212,251-252). Appellant returned to the Denny's lot because Anderson told appellant that Katan had locked himself inside his vehicle and refused to do the deal (T-98,212). According to the state witnesses, appellant fled upon sight of Anderson and was apprehended (T-98,253-254).

This evidence establishes appellant initial presence at the scene of the aborted transaction. It shows his return to the scene hours later and his flight upon the sight of law enforcement. It in no

way shows that he had any discussions, made any prearrangements or had any plans with Katan to steal the cocaine from Anderson.  <u>Pennington v. State</u>, 526 So. 2d at 87; <u>Saint Louis v. State</u>, 561 So. 2d at 628; <u>Mickenberg v. State</u>, 640 So. 2d at 1210.  Absent any evidence of an agreement, the record does not contain a scintilla of proof to support appellant's conspiracy conviction upon the theory advanced by prosecution.  <u>Gray v. State</u>, 526 So. 2d at 1021.  Thus, this Court must set aside his judgment and sentence for conspiracy to traffic in cocaine.

### POINT II

**REVERSIBLE ERROR OCCURRED WHERE THE TRIAL COURT INCORRECTLY INSTRUCTED THE JURY ON AN ELEMENT OF CONSPIRACY.**

Appellant was charged with conspiracy to traffic in cocaine by purchase or possession (R-1). The offense consists of two elements. First, the state must establish that there was an agreement between to or more persons to commit an offense. Second, the state must establish the intent to commit the offense. Pickover v. State, 580 So. 2d 287,289 (Fla. 4th DCA 1991); Saint Louis v. State, 561 So. 2d 628 (Fla. 2d DCA 1990).

At bar, without objection, the trial court instructed the jury on conspiracy in pertinent part as follows:

> Before you can find the defendants Katan Maignan and/or Fritz Maignan guilty of criminal conspiracy, the State must prove the following two elements beyond a reasonable doubt:
>
> One, the **attempt** of Katan Maignan and Fritz Maignan was that the offense of trafficking in cocaine would be committed. Two, in order to carry out the **attempt**, Katan Maignan and Fritz Maignan agreed, conspired, combined, or confederated with each other or others unknown to the State's Attorneys Office to cause trafficking in cocaine to be committed, either by them or one of them or by some other person, or one.

(T-442). The trial court should have used the word **"intent"** instead of **"attempt"**. Fla Std. Jury Instr. (Crim.) at page 1214. By substituting the word "attempt" for "intent" the trial court omitted an essential element of the crime and thus, misstated the law in a material respect. § 777.04(3) Fla. Stat. Even in the absence of objection, it is fundamental and reversible error to give misleading instructions to a jury. Cristian v. State, 272 So. 2d 852 (Fla. 4th DCA 1973); Carter v. State, 469

So. 2d 194 (Fla. 2d DCA 1985). Appellant is entitled to a new trial. <u>Doyle v. State</u>, 483 So. 2d 89

(Fla. 4th DCA 1986) (substitution of the word "commission" for the phrase "immediate scene" in

the third degree murder instruction constituted fundamental error).

## POINT III

### THE TRIAL COURT ERRED IN FAILING TO GRANT A JUDGMENT OF ACQUITTAL ON ENTRAPMENT AT THE CLOSE OF THE EVIDENCE.

By pretrial motion to dismiss and by judgment of acquittal at the close of the evidence, Appellant presented a corroborated and unrebutted subjective entrapment defense both because the state failed to prove predisposition beyond a reasonable doubt, and because the defense had shown entrapment by a preponderance of the evidence.

In Munoz v. State, 629 So. 2d 90 (Fla. 1993), the Florida Supreme Court described the relative burdens of proof on a subjective entrapment defense:

> The first question to be addressed under the subjective test is whether an agent of the government induced the accused to commit the offense charged. On this issue, the accused has the burden of proof and, pursuant to section 777.201, must establish this factor by a preponderance of the evidence. If the first question is answered affirmatively, then a second question arises as to whether the accused was predisposed to commit the offense charged; that is, whether the accused was awaiting any propitious opportunity or was ready and willing, without persuasion, to commit the offense. On this second question, according to our decision in Herrera, the defendant initially has the burden to establish lack of predisposition. However, as soon as the defendant produces evidence of no predisposition, the burden then shifts to the prosecution to rebut this evidence beyond a reasonable doubt.

Munoz v. State, 629 So. 2d at 99.

While Munoz holds the case can be submitted to a jury "when factual issues are in dispute or when reasonable persons could draw different conclusions from the facts," trial and appellate courts retain the authority to rule on subjective entrapment as a matter of law:

> ... if the factual circumstances of a case are not in dispute, if the accused establishes that the government induced the accused to commit the offense charged, and if the State is unable to demonstrate

> sufficient evidence of predisposition prior to and independent of the
> government conduct at issue, then the trial judge has the authority to
> rule on the issue as a matter of law because no factual "question of
> predisposition" is at issue.  See, e.g., Jacobson; Sherman.  Such a
> ruling could be proper even when the government presents evidence
> of prior convictions.  Sherman.

Munoz v. State, 629 So. 2d at 100.

On the initial question, the defense showed unrefuted evidence of inducement.  At the

evidentiary hearing and at trial, appellant testified he met Joseph Clark while appellant was working

as a salesman at a New York Footlocker (SR-8-9, T-297,309).  Clark went to the store 4 or 5 times

(SR-12, T-299).  On several occasions, Clark told appellant that he had friends in Florida (T-299).

Clark told appellant that he could make quick and easy money ( SR-11, T-299).  Clark told appellant

that he would make more money than he made working at Footlocker (T-299).  At Clark's urging,

appellant came to Florida (T-300).  Appellant, however, did not have the money to do a large

cocaine transaction (SR-24-25).  Within days of his arrival, appellant was contacted by DEA special

agent Heath Anderson (SR-21, T-40,301).

The DEA did not have any information that appellant was involved in illegal drug activity

prior to Clark's instigation of the instant case (T-128).  Appellant did not have a record of drug

related convictions or arrests (T-128-129).  Moreover, prior to communicating with appellant,

Anderson did nothing to confirm the information he received from Clark (SR-57,62, T-186-187).

This unrebutted evidence established inducement and lack of predisposition by a preponderance of

the evidence.  State v. Ramos, 632 So. 2d 1078 (Fla. 3d DCA 1994) (defendant met initial burden

where unrebutted evidence showed that confidential informant contacted defendant 15 times to

convince him to engage in transaction).

Having met his initial burden of proving inducement and lack of predisposition, the state was required to prove predisposition beyond a reasonable doubt. Munoz v. State, 629 So. 2d at 95. In Munoz, the court repeatedly stressed that the state must prove the predisposition existed both "prior to and independent of the government conduct at issue." 629 So. 2d at 95,100 (citing Jacobson v. United States, ___ U.S. ___, 112 S. Ct. 1535, 118 L. Ed. 2d 174 (1992)). That burden was not met at bar. To the contrary, the prosecution wholly failed to adduce any evidence of predisposition **prior to and independent of** the government's conduct here. Nadau v. State, 683 So. 2d 504 (Fla. 4th DCA 1995); State v. Howell, 629 So. 2d 213 (Fla. 2d DCA 1993), rev. den. 639 So. 2d 981 (Fla. 1994); State v. Ramos, 632 So. 2d at 1079.

Rather, the prosecution relied upon appellant's telephone conversations with Anderson to show appellant's familiarity with cocaine. However, it was Anderson, not appellant that used the drug jargon "condos" to refer to cocaine (T-43). Similarly, it was Anderson that first suggested that wet cocaine could be sold if someone knew what to do with it, inferring it could be manufactured into crack (T-124). Under Munoz and Jacobson, such evidence cannot be considered in determining predisposition since it is coextensive with the government conduct which is being challenged. Fruetel v. State, 638 So. 2d 966 (Fla. 4th DCA 1994).

In Fruetel, this Court considered the sufficiency of the proof against an entrapment defense in a Munoz-remanded cocaine trafficking case. This Court rejected the defendant's sufficiency claim, finding sufficient evidence of predisposition. However, in so holding, this Court specifically found that the defendant's use of drug jargon during the deal, knowledge of how to test and mix the

cocaine which was demonstrated during the course of the deal, and agreement to take a discount on a future deal "does not demonstrate appellant's predisposition prior to and independent of the government acts." Fruetel, 638 So. 2d 969; see also, State v. Finno, 643 So. 2d 1166 (Fla. 4th DCA 1994).

As the state wholly failed to prove predisposition beyond a reasonable doubt, appellant's motion for judgment of acquittal should have been granted. Nadeau v. State, 638 So. 2d 504 at 969; State v. Finno, 643 So. 2d at 1170; State v. Ramos, 632 So. 2d at 1079. This case should be reversed with instructions to discharge.

## POINT IV

**THE CONVICTION VIOLATES DUE PROCESS OF LAW BECAUSE THE JURY WAS NOT INSTRUCTED THAT THE STATE HAD THE BURDEN OF PROVING PREDISPOSITION BEYOND A REASONABLE DOUBT.**

In Munoz v. State, 629 So. 2d 90,99 (Fla. 1993), the Florida Supreme Court thoroughly

discussed the law of objective and subjective entrapment in Florida in light of Section 777.201,

Florida Statutes (1987). In Munoz, the Court held that in a subjective entrapment case tried to a jury,

once the defendant shows some evidence of a lack of predisposition, the burden shifts to the state

to prove predisposition beyond a reasonable doubt:

> The first question to be addressed under the subjective test is whether an agent of the government induced the accused to commit the offense charged. On this issue, the accused has the burden of proof and, pursuant to section 777.201, must establish this factor by a preponderance of the evidence. If the first question is answered affirmatively, then a second question arises as to whether the accused was predisposed to commit the offense charged; that is, whether the accused was awaiting any propitious opportunity or was ready and wiling, without persuasion, to commit the offense. On this second question, according to our decision in Herrera, the defendant initially has the burden to establish lack of predisposition. **However, as soon as the defendant produces evidence of no predisposition, the burden then shifts to the prosecution to rebut this evidence beyond a reasonable doubt....**

Munoz, 629 So. 2d at 99 (emphasis supplied).

In adopting the shifting burden of proof and reasonable doubt standard in Munoz, the Florida

Supreme Court relied heavily on the previous year's decision in Jacobson v. United States, _ U.S.

_, 112 S. Ct. 1535, 118 L. Ed. 2d ___ (1992). Jacobson is the entrapment case involving obscene

literature. The jury rejected the entrapment defense at trial, but the Court found it a matter of law,

- 24 -

holding the government had failed to meet its burden of proving predisposition. This burden, the

Court held, is that the state must prove predisposition beyond a reasonable doubt. 112 S. Ct. at 1540.

The instruction in this case never informed the jury the state had the burden of proving

predisposition beyond a reasonable doubt. In fact, it inaccurately told them just the opposite: that

the burden was on the defense to show entrapment by a preponderance of the evidence:

> **On the issue of entrapment, the defendant must prove to you by
> a preponderance of the evidence that the criminal conduct
> occurred as a result of entrapment.**

(T-445) (Emphasis supplied). This instruction is plainly improper according to Munoz and

Jacobson.

The standard instruction given here follows the language of Section 777.201, Florida Statutes

(1991), and was upheld in Herrera v. State, 594 So. 2d 275 (Fla. 1992). But Herrera is no longer

good law on this issue, because the law was changed in Munoz. As the Florida Supreme Court noted

in Munoz, in Herrera the same court "did not discuss the subjective, two-step burden of proof test

from Sorrells[4] or a trial court's ability to rule as a matter of law on the issue of entrapment.

Moreover, at that time, the United States Supreme Court's decision in Jacobson had not been

rendered." Munoz, 629 So. 2d at 97-98. According to Jacobson and Munoz, now it could not be

clearer that "as soon as the defendant produces evidence of no predisposition, the burden then shifts

to the prosecution to rebut this evidence beyond a reasonable doubt." Munoz, 629 So. 2d at 99. The

jury here was not told that critical information, and reversal is required. Yohn v. State, 476 So. 2d

---

[4] Sorrells v. United States, 287 U.S. 435, 53 S. Ct. 210, 77 L. Ed. 2d 413 (1932).

123 (Fla. 1985) (reversed where standard instruction stated improper burden of proof on sanity).[5]
See Fruetel v. State, 638 So. 2d 966,970 n. 1 (Fla. 4th DCA May 25, 1994) (finding entrapment instruction that "the state must convince you beyond a reasonable doubt that [defendant] was not entrapped" "coincided with the standard for subjective entrapment as codified in section 777.201, Florida Statutes (1987)").

Here, there was no objection. However, the failure to give the burden of proof and reasonable doubt instruction on this vigorously disputed predisposition element is a fundamental error. State v. Delva, 575 So. 2d 643 (Fla. 1991) (error in instruction not fundamental where element not in dispute); Motley v. State, 155 Fla. 545, 20 So. 2d 798, 800 (1945) (reversal of conviction where incorrect instruction on self defense); Bennett v. State, 173 So. 817 (Fla. 1937) (approved reaching merits of reasonable doubt instruction even though not preserved). See Screws v. United States, 325 U.S. 91, 107, 65 S. Ct. 1031, 89 L. Ed. 1495 (1945) (willfully depriving person of civil rights, but jury not instructed on meaning of "willfully": "where the error is so fundamental as not to submit to the jury the essential ingredients of the only offense on which the conviction could rest, we think it is necessary to take note of it on our own motion. Even those guilty of the most heinous offenses are entitled to a fair trial"). Reversal is required.

---

[5] But see Rotenberry v. State, 468 So. 2d 971 (Fla. 1985) (no error under predecessor statute in refusing to instruct on burden of proof regarding entrapment defense). The Supreme Court later replaced the Rotenberry instruction with one allocating the burden of proof in The Florida Bar re: Standard Jury Instructions -- Criminal, 508 So. 2d 1221 (Fla. 1987).

## CONCLUSION

As to points I and III, based upon the arguments and authorities cited above, appellant requests that this Court vacate his conviction and sentence for conspiracy to traffic in cocaine and order his discharge.

As to points II and IV, based upon the arguments and authorities cited above, appellant requests that this Court reverse his conviction and sentence and remand the cause for a new trial.

Respectfully Submitted,

RICHARD L. JORANDBY
Public Defender
15th Judicial Circuit

MARCY K. ALLEN
Assistant Public Defender
Attorney for Fritz Maignan
421 Third Street, 6th Floor
West Palm Beach, Florida 33401
(407) 355-7600
Florida Bar No. 332161

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true copy hereof has been furnished by courier, to GEORGINA JIMENEZ-OROSA, Assistant Attorney General, 1655 Palm Beach Lakes Boulevard, Third Floor, West Palm Beach, Florida 33401, this 20 day of FEBRUARY, 1997.

MARCY K. ALLEN
Assistant Public Defender

- 27 -

# EXHIBIT  K

IN THE DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

CASE NO.96-2152

**FRITZ MAIGNAN,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.



96-1-5331

4-0289

DOCKETED
MAR 26 1997
R.B.
ATTORNEY GENERAL

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
ON APPEAL FROM THE CIRCUIT COURT OF THE 17TH JUDICIAL CIRCUIT, IN
AND FOR BROWARD COUNTY, FLORIDA, (Criminal Division)
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

<u>ANSWER BRIEF OF APPELLEE</u>

**ROBERT A. BUTTERWORTH**
Attorney General
Tallahassee, Florida


**ETTIE FEISTMANN**
Assistant Attorney General
Florida Bar No. 892930
1655 Palm Beach Lakes Boulevard
Suite 300
West Palm Beach, FL 33401-2299
Telephone: (561) 688-7759

Counsel for Appellee

F:\USERS\APPEALS\ETTIE\9615331.AB

CASE NO. 96-2152

Fritz Maignan v. State Of Florida

CERTIFICATE OF INTERESTED PERSONS

Counsel for the State of Florida, appellee herein, certifies that the following additional persons or entities have or may have an interest in the outcome of this case.

Ettie Feistmann, Assistant Attorney General
(Appellate counsel for the State of Florida, Appellee)

## TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . iv

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE AND FACTS . . . . . . . . . . . . . . 2

SUMMARY OF THE ARGUMENT . . . . . . . . . . . . . . . . . 7

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . 8

POINT I . . . . . . . . . . . . . . . . . . . . . . . . 8

> THE TRIAL COURT CORRECTLY DENIED
> APPELLANT'S MOTION FOR JUDGMENT OF
> ACQUITTAL WHERE THERE WAS SUBSTANTIAL
> COMPETENT EVIDENCE TO SUPPORT THE VERDICT
> OF CONSPIRACY TO TRAFFIC IN COCAINE.

POINT III . . . . . . . . . . . . . . . . . . . . . . . 19

> THE TRIAL COURT CORRECTLY DENIED
> APPELLANT'S MOTION FOR JUDGMENT OF
> ACQUITTAL ON ENTRAPMENT.

POINT IV . . . . . . . . . . . . . . . . . . . . . . . 25

> THE ISSUE HAS NOT BEEN PRESERVED FOR
> APPELLATE REVIEW. NONETHELESS, THE TRIAL
> COURT DID NOT ERR IN INSTRUCTING THE JURY
> WITH THE STANDARD JURY INSTRUCTION ON
> ENTRAPMENT.

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . 33

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . 33

F:\USERS\APPEALS\ETTIE\9615331.AB                ii

TABLE OF AUTHORITIES

**FEDERAL CASES**

Jacobson v. United States, 503 U.S. 540 , 112 S. Ct. 1535, 118 L.
       Ed. 2d 174 (1992)      . . . . . . . 22, 23, 24, 25, 31

U.S. v. Camargo-Verfara, 57 F.3d 993 (11th Cir. 1995)      . . . 18

U.S. v. King, 73 F.3d 1564 (11th Cir. 1996)      . . . . . . . . 30

U.S. v. Lluesma, 45 F.3d 408 (11th Cir 1995)      . . . . . . . 17

U.S. v. Marx, 635 F.2d 436 (5th Cir. 1981)      . . . . . . . . 18

U.S. v. Miller, 71 F.3d 813 (11th Cir. 1996)      . . . . . . . 26

United States v. Perez-Tosta, 36 F.3d 1552 (11th Cir. 1994)      14

**STATE CASES**

Barwick v. State, 660 So. 2d 685 (Fla. 1995)      . . . . . . . 14

Bedford v. State, 589 So. 2d 245 (Fla. 1991), cert. denied, 503
       U.S. 1009 (1992) . . . . . . . . . . . . . . . . 18

Bolin v. State, 297 So. 2d 317 (Fla. 3d DCA 1974)      . . . . . 32

Booker v. State, 514 So. 2d 1079 (Fla. 1987)      . . . . . . . 32

Borders v. State, 312 So. 2d 247 (Fla. 3d DCA 1975)      . . . . 15

Butler v. State, 493 So. 2d 451 (Fla. 1986)      . . . . . . . . 32

Clark v. State, 379 So. 2d 97 (Fla. 1979)      . . . . . . . . . 13

Cochran v. State, 547 So. 2d 928 (Fla. 1989)      . . . . . . . 18

Crump v. State, 622 So. 2d 963 (Fla. 1993)      . . . . . . . . 12

Darty v. State, 161 So. 2d 864 (Fla. 2d DCA), cert. denied, 168 So.
       2d 147 (Fla. 1964) . . . . . . . . . . . . . . . 32

<u>Delvalle v. State</u>, 653 So. 2d 1078 (Fla. 5th DCA 1995) . . . 27

<u>Finney v. State</u>, 660 So. 2d 674 (Fla. 1995) . . . . . . . . 19

<u>Gonzalez v. State</u>, 525 So. 2d 1005 (Fla. 3d DCA 1988) . . . 23

<u>Gonzalez v. State</u>, 571 So. 2d 1346 (Fla. 3d DCA 1990), <u>review
       denied</u>, 584 So. 2d 998 (Fla. 1991) . . . . . . . 20

<u>Herrera v. State</u>, 594 So. 2d 275 (Fla. 1992). . . . 12, 20, 29, 30

<u>Holton v. State</u>, 573 So. 2d 284 (Fla. 1990), <u>cert. denied</u>, 500 U.S.
       960 (1991) . . . . . . . . . . . . . . . . . . 19

<u>I.R. v. State</u>, 385 So. 2d 686 (Fla. 3d DCA 1980) . . . . . . 14

<u>In the Interest of T.M.M.</u>, 560 So. 2d 805 (Fla. 4th DCA 1990) 13

<u>Johnson v. State</u>, 478 So. 2d 885 (Fla. 3d DCA 1985), <u>dismissed</u>, 488
       So. 2d 830 (Fla. 1986) . . . . . . . . . . . . . 11

<u>King v. State</u>, 104 So. 2d 730 (Fla. 1957) . . . . . . . . 15

<u>Lacy v. State</u>, 387 So. 2d 561 (Fla. 4th DCA 1980). . . . . . .32

<u>LaPolla v. State</u>, 504 So. 2d 1353 (Fla. 4th DCA 1987) . . . 14

<u>Lewis v. State</u>, 634 So. 2d 207 (Fla. 3d DCA 1994) . . . . . 23

<u>Lusby v. State</u>, 507 So. 2d 611 (Fla. 4th DCA 1987) . . . . . 23

<u>Lynch v. State</u>, 293 So. 2d 44 (Fla. 1974) . . . . . . . . . 13

<u>Moyer v. State</u>, 558 So. 2d 1045 (Fla. 5th DCA 1990) . . . . 12

<u>Munoz v. State</u>, 629 So. 2d 90 (Fla.1993) . . . . . . . . 21, 22

<u>Peterka v. State</u>, 640 So. 2d 59 (Fla. 1994) . . . . . . . . 18

<u>Pinder v. State</u>, 396 So. 2d 272 (Fla. 3d DCA 1981) . . . . . 12

<u>Pino v. State</u>, 573 So. 2d 151 (Fla. 3d DCA 1991) . . . . . . 14

F:\USERS\APPEALS\ETTIE\9615331.AB                    iv

<u>William v. State</u>, 531 So. 2d 212 (Fla. 1st DCA 1988)  . . . . 11

<u>Wilson v. State</u>, 577 So. 2d 1300 (Fla. 1991)  . . . . . . . . 24

<u>Winkfield v. State</u>, 601 So. 2d 1261 (Fla. 3d DCA 1992)  . . . 23

<u>Wyant v. State</u>, 659 So. 2d 433 (Fla. 2d DCA 1995)  . . . . . 15

## MISCELLANEOUS

§ 777.201, <u>Fla. Stat.</u> (1987)  . . . . . . . . . . . . . . 20

Fla. R. Crim. P. 3.380(b)  . . . . . . . . . . . . . . . . . 11

Fla. R. Crim. P. 3.390(c) . . . . . . . . . . . . . . . . . 27

Fla. Std. Jury Instr. (Crim.) 39(a)  . . . . . . . . . . . 28

<u>PRELIMINARY STATEMENT</u>

Appellant was the Defendant and Appellee was the prosecution in the Criminal Division of the Circuit Court of the 17th Judicial Circuit, in and for Broward County, Florida.   In this brief, the parties shall be referred to as they appear before this Honorable Court of Appeal except that Appellee may also be referred to as the State.

In this brief, the following symbols will be used:

"R" = Record on appeal;

"T" = Transcript of the hearing.

All emphasis in this brief is supplied by Appellee unless otherwise indicated.

<u>STATEMENT OF THE CASE AND FACTS</u>

Appellee accepts appellant's statement of the case and facts for purposes of this appeal, subject to the following additions, corrections, and/or clarifications:

1.    Special Agent Anderson from the drug enforcement administration testified that on August 8, 1995, an informant, Joseph Clark,[1] informed him that appellant, who flew to Florida from New York, was willing to purchase a large amount of cocaine (T 39-40). Clark provided Anderson with appellant's pager number (T 40). Pursuant to this information Anderson paged appellant's pager on August 8, 1995; Anderson acted as a drug dealer (T 39). Appellant responded to the page, and the two had a telephone conversation regarding the price of cocaine appellant intended to purchase (T 39-42). Appellant told Anderson that he came to Florida "to shop" and to "do business" (T 42). Anderson explained to appellant that he could sell him two kinds of cocaine, the expensive and better quality or the less expensive of wet shipment (T 41). Appellant told Anderson that it did not matter to him that the cocaine was wet, because "what he [appellant] does is he cooks the stuff up anyway, referring to the crack cocaine" (T 42).

---

[1]Clark, whom the drug enforcement administration used for other cases, was not paid for this operation (T 85).

Anderson used the word "condos" instead of "cocaine" to mask some of the terms during their conversation (T 43). During their conversation that day, appellant and Anderson set the price and amount of cocaine (T 43). They also agreed to meet each other in person prior to executing the deal (T 44).

The following day on August 9, 1995, Anderson spoke on the phone with appellant's co-defendant, Katan Maignan, and they set a meeting place between Anderson, appellant and his co-defendant at a McDonald's restaurant in Fort Lauderdale (T 48, 50). Anderson went to the agreed on location accompanied by another undercover, Sam Tatum, acting as his bodyguard (T 51).

Anderson met with appellant and his co-defendant (T 52-53). After shaking hands and introducing each other, they further negotiated the price of the product that appellant and his co-defendant were going to purchase (T 52-53). They negotiated how and at what location the transaction would take place; appellant and his co-defendant tried to reduce the price offered by Anderson (T 53, 54). They then agreed to purchase two kilograms of cocaine at $33,000 (T 53). At no point did appellant or his co-defendant express any pressure from Anderson to continue the transaction, nor did they express any reluctance (T 50).

It took several telephone conversations for appellant, his co-

defendant and Anderson to agree upon a location for their next meeting (T 59-71). During their conversation about the deal drug lingo was used (T 75-76, 84, 85). Later that day Katan contacted Anderson, and the two had another telephone conversation, during which Katan and Anderson in a final negotiation set the time and location of their meeting (T 84, 87). The defendants were happy to do to do the deal at the location agreed on (T 54). Katan and Anderson promised each other that they would both show up by themselves (T 84, 87). The meeting was set to August 11, 1995, at Denny's restaurant in Boca Raton, to exchange two kilos of cocaine at $33,000 (T 87-88).

The meeting on August 11, 1995 at 1:25 p.m. was video-taped and published to the jury (T 89-92). As Anderson was standing in front of Denny's, he saw appellant approach the front door of the restaurant (T 91). Anderson was surprised to see appellant come to the meeting after Anderson and Katan had agreed on showing up by themselves (T 91). Appellant told Anderson that he had given Katan the money, and Katan would "do the deal" (T 91). Anderson wanted only one person to do the deal (T 92). Appellant told Anderson that he was going to leave (T 92). Shortly afterwards Anderson noticed Katan in his car counter-surveilling the area (T 92).

After appellant left the restaurant Katan invited Anderson to

come to his car to see the money (T 93-95). Anderson hesitated, because Katan showed up with his brother, and because Anderson was afraid Katan would rob him (T 94). Katan asked to pat down Anderson (T 94). Anderson said that he had a gun on him, because he had been robbed many times (T 95).[2] As Katan realized that Anderson was armed by a nine millimeter caliber pistol Katan got back to his car (T 95). There was no exchange of money or cocaine between Anderson and Katan. When leaving the scene each in his separate car, Anderson saw Katan behind him until at one point he lost sight of him (T 96).

Shortly afterwards Katan was arrested (T 96). A search of Katan's car revealed six bundles of U.S. currency totaling $1,750.00 (T 227, 228, 252). It consisted of 800 bills of $1.00 wrapped by $100 bills and $50.00 bills (T 227). Also, a gun without bullets but with a magazine inserted was found on the floor board of the driver's side (T 233, 241).

Anderson and another captain drove around for a few hours in an attempt to find appellant (T 97). Subsequently appellant paged Anderson, and during their telephone conversation after Anderson responded to the page, Anderson told appellant that Katan refused

_____

[2]The video tape of the meeting between Anderson and appellant was published to the jury (T 95).

to go along with their deal (T 97-98). Appellant was surprised to hear that, claiming that he had given Katan the money for the deal (T 98). Later that day, Anderson saw appellant standing in the parking lot of Denny's restaurant (T 97). Anderson drove to meet appellant (T 98). As appellant looked at Anderson's face, he took off (T 98). After a short chase appellant was arrested (T 98).

Appellant testified that his brother put the money together for the deal (T 322). During deposition, appellant testified that he and his brother bound the money up and brought it to the drug deal (T 323). Appellant explained that he was in the parking lot looking for his brother (T 335-336).

Appellant's co-defendant testified that he bundled up the money for the deal (T 357). He also testified that he and his brother came to McDonald for the purpose of negotiating the deal (T 358).

## SUMMARY OF THE ARGUMENT

1. This issue has not been preserved for appellate review. When making the argument for his motion for judgment of acquittal defense counsel did not even mention the argument appellant is making now in this appeal. But, even assuming *arguendo* the issue was preserved, the trial court correctly denied appellant's motion for judgment of acquittal on conspiracy to traffic in cocaine. The state presented competent substantial evidence from which the jury could infer that appellant and his co-defendant agreed to purchase or possess the cocaine by stealing it. The state published tapes of telephone conversations and video tape of all the negotiations to purchase cocaine. Both appellant and his co-defendant were involved and well apprised of all the details of the deal. They both participated in the negotiations, arrangements and meetings.

3. The trial court correctly denied appellant's judgment of acquittal on entrapment. Entrapment is generally a jury question. Here, appellant's predisposition was disputed.

4. This issue has not been preserved for appellate review. Appellant never raised any objection to the alleged error he is now claiming in this appeal. Even assuming it was preserved, there was no error in instructing the jury with the standard jury instruction of entrapment.

7

ARGUMENT

POINT I

THE TRIAL COURT CORRECTLY DENIED
APPELLANT'S MOTION FOR JUDGMENT OF
ACQUITTAL WHERE THERE WAS
SUBSTANTIAL COMPETENT EVIDENCE TO
SUPPORT THE VERDICT OF CONSPIRACY TO
TRAFFIC IN COCAINE.

Appellant contends that the trial court erred in denying his

motion for judgment of acquittal. Appellant asserts that the state

failed to introduce any evidence that an agreement to possess the

cocaine exited. The state disagrees.

This issue has not been preserved for appellate review. After

the state rested, defense counsel moved for judgment of acquittal,

arguing the following:

> I would move for a judgment of acquittal
> renewal of the original motion to dismiss that
> was filed before this court. The court has a
> copy of that and it's also in the file.
> This is the leading case of entrapment.
> In this case, from the Florida supreme court,
> that discusses the entrapment defense and what
> burden each party has.
> The initial burden is by preponderance of
> the evidence for the defendant to show he has
> no predisposition. This can be shown though a
> lack of a prior record or a lack of criminal
> activity and can even be shown by evidence
> that would not normally be admissible at
> trial.
> ***
> ...Therefore, I renew my motion to
> dismiss based upon the issue of entrapment as

> a matter of law and I move for judgment of
> acquittal at this time.

(T 269-271). At the close of the evidence defense counsel renewed

his motion for judgment of acquittal and argued the following:

> On behalf of Fritz Maignan, I would be moving
> for a judgment of acquittal supported by the
> testimony the court took in the motion to
> dismiss based upon entrapment, the testimony
> the court has heard during the state's case
> and now, the testimony that has been heard
> from both the Maignan brothers.
>     The defendants have raised the defense of
> entrapment which must be shown to the court by
> a preponderance of the evidence, not beyond a
> reasonable doubt.
>     * * *
>     ... I am moving at this point that we be
> allowed if the court denied the motion for
> judgment of acquittal, that entrapment be
> presented as a defense to the jury.

(T 372-374). After listening to the parties' arguments, the trial

court denied both motions for judgment of acquittal (T 275, 378-

379).

Appellant for the first time in this appeal raises the issue

of insufficiency of the evidence. In State v. Barber, 301 So. 2d

7, 9 (Fla. 1974), our supreme court stated the following:

> An appellate court must confine itself to a
> review of only those questions which were
> before the trial court and upon which a ruling
> adverse to the appealing party was made
> [c.o.].
>     * * *
>     Respondents also contends that appellate

review of sufficiency of the evidence was
proper under F.A.R. 3.7(i) which provides
that, in the interests of justice, the
appellate court may notice fundamental error
apparent in the record even if it has not been
made the subject of an assignment of error;
their position is that the state failed to
prove a *prima facie* case, and that this
constitutes fundamental error. To accept this
contention would be to disregard entirely the
holdings in Mancini v. State[, 273 So. 2d 371
(Fla. 1973], State v. Owens[, 233 So. 2d 389
(Fla. 1970], State v. Wright[, 224 So. 2d 300
(Fla. 1969)], *supra*, all standing for the
proposition that sufficiency of the evidence
must be raised by appropriate motion in order
to be reviewable on direct appeal.
Accordingly, we reject this contention. Were
we to distinguish in this regard between
claims that the evidence failed to establish a
*prima facie* case, and claims that the evidence
was insufficient in some other regards (as,
for example, that it was speculative in
nature), we would have to emasculate the
principle of the above-cited cases; we find no
reason to do so. The issues here raised can
be reviewed in appropriate pos-conviction
proceedings under Cr.P.R. 3.850.

301 So. 2d at 9-10. <u>See also</u> <u>Showers v. State</u>, 570 So. 2d 377, 378

(Fla. 1st DCA 1990)(defendant failed to preserved the- issue of

sufficiency of the evidence, where defendant did not bring the

issue to the attention of the trial court, and the motion for

judgment of acquittal made by defendant was deficient for failing

to set out argument made on appeal, and failing to set out any

grounds whatsoever or to make any supporting argument).

A motion for judgment of acquittal (JOA) must fully set the grounds upon which it is based. Fla. R. Crim. P. 3.380(b). Even if appellant's counsel made a "boilerplate" motion for JOA, it would not have been enough to preserve the issue for appellate review. See Rodriguez v. State, 22 Fla. L. Weekly D578 (Fla. 3d DCA March 5, 1997); William v. State, 531 So. 2d 212, 216 (Fla. 1st DCA 1988). In Johnson v. State, 478 So. 2d 885, 886 (Fla. 3d DCA 1985), dismissed, 488 So. 2d 830 (Fla. 1986), the Court held:

> Although the defense counsel moved for a judgment of acquittal at trial, he did not do so based upon the ground now urged on appeal. Instead, he employed a general "boilerplate" motion in which he asserted, without explanation or argument, that the state had failed to prove a "prima facie case" of the crime charged in the indictment, which counsel then tracked as to each element, including age. In so doing counsel failed to comply with Fla.R.Crim.P. 3.380(b) which requires that the motion for judgment of acquittal "must fully set forth the grounds upon which it is based." (e.s.) Had counsel complied with the rule and specifically brought the ground now urged to the trial court's attention, the error, if any, might have been cured by allowing the state to re-open its case and supply the missing, technical element of age.

See also Pinder v. State, 396 So. 2d 272 (Fla. 3d DCA 1981) ("We are unable to reach the merits of this question because the issue was not properly preserve for review by any objection or motion

which asserted this particularized contention below"); <u>Pope v. State</u>, 646 So. 2d 827, 828 (Fla. 5th DCA 1994)(Pope's alleged error in denying his motion for judgment of acquittal was not preserved for appeal, because although there was an objection, it was not on the issue that has been argued before the appellate court); <u>Reed v. State</u>, 603 So.2d 69 (Fla. 4th DCA 1992).  Appellant's failure to argue insufficiency of the evidence precludes him from complaining about it now on appeal, because the error was not fundamental. <u>See</u> <u>Crump v. State</u>, 622 So. 2d 963 (Fla. 1993).[3]

But, even assume the issue has been preserved for appellate review, entry of judgment of acquittal is appropriate only in those rare instances in which no evidence exists to support entry of a conviction. <u>In the Interest of T.M.M.</u>, 560 So. 2d 805 (Fla. 4th DCA 1990).  In <u>Lynch v. State</u>, 293 So. 2d 44, 45 (Fla. 1974), our

---

[3]Entrapment is an affirmative defense and, as such, is in the nature of an avoidance of the charges. <u>Herrera v. State</u>, 594 So. 2d 275, 277 (Fla. 1992).  Thus, by raising an affirmative defense appellant generally *concedes* the elements of the offense. <u>Id.</u>, n. 6.  Here, appellant raises an affirmative defense by which he implicitly concedes the elements of the offense while at the same time argues insufficiency evidence of the offense. <u>Cf.</u> <u>Moyer v. State</u>, 558 So. 2d 1045 (Fla. 5th DCA 1990) (as to a defendant's claim of an alibi and that he used his force justifiably, that court said: "How could he not be there and yet justifiably have used deadly force?").  Here, how could appellant be entrapped to commit conspiracy to possess cocaine if he did not agree to do it?

supreme court set the standard for rulings on motions for judgment

of acquittal as follows:

> A defendant, in moving for a judgment of
> acquittal, admits not only the facts stated in
> the evidence adduced, but admits every
> conclusion favorable to the adverse party that
> a jury might fairly and reasonably infer from
> the evidence. The courts should not grant a
> motion for judgment of acquittal unless the
> evidence is such that no view which the jury
> may lawfully take of it favorable to the
> opposite party can be sustained under the law.
> *Where there is room for a difference of
> opinion between reasonable [people] as to the
> facts from which an ultimate fact is sought to
> be established, or where there is room for
> such differences, the Court should submit the
> case to the jury for their finding*, as it is
> their conclusion, in such cases, that should
> prevail and not primarily the views of the
> judge [e.s.].

An appellate court may not retry a case or reweigh the

evidence. Clark v. State, 379 So. 2d 97, 101 (Fla. 1979). In State

v. Law, 559 So. 2d 187, 188 (Fla. 1989), our supreme court stated

the following

> A motion for judgment of acquittal should be
> granted in a circumstantial evidence case if
> the state fails to present evidence from which
> the jury can exclude every reasonable
> hypothesis except that of guilt. [c.o.].
>         * * *
> *The state is not required to "rebut
> conclusively every possible variation"*
> [footnote omitted] *of events which could be
> inferred from the evidence, but only to
> introduce competent evidence which is*

> *inconsistent with the defendant's theory of events. See Toole v. State*, 472 So. 2d 1174, 1176 (Fla. 1985). Once that threshold burden is met, it becomes a jury duty to determine whether the evidence is sufficient to exclude every reasonable of hypothesis of innocence beyond a reasonable doubt [e.s.].

559 So. 2d at 189; <u>Barwick v. State</u>, 660 So. 2d 685, 695 (Fla. 1995); <u>I.R. v. State</u>, 385 So. 2d 686, 687-88 (Fla. 3d DCA 1980)(the testimony of a single witness, is sufficient to sustain a conviction); <u>Thomas v. State</u>, 512 So. 2d 1099, 1101 (Fla. 5th DCA 1987)(circumstantial evidence which contradicts the defendant's theory of innocence should go the jury).

Further, it is important to note that "direct proof of the criminal agreement is not necessary to establish a conspiracy; the jury may infer from all the surrounding circumstances that a common purpose to commit a crime existed." <u>Pino v. State</u>, 573 So. 2d 151, 153 (Fla. 3d DCA 1991); <u>LaPolla v. State</u>, 504 So. 2d 1353, 1357 (Fla. 4th DCA 1987)(intent to agree may be inferred from circumstantial evidence); <u>United States v. Perez-Tosta</u>, 36 F. 3d 1552, 1553, 1557 (11th Cir. 1994)(guilt of participation in criminal activity may even exist when the defendant plays only a minor role and does not know all the details of the conspiracy; circumstantial evidence suffices to show participation in the conspiracy); <u>Borders v. State</u>, 312 So. 2d 247 (Fla. 3d DCA 1975);

<u>Wyant v. State</u>, 659 So. 2d 433 (Fla. 2d DCA 1995)(direct proof of the criminal agreement is not necessary to establish a conspiracy).

To prove conspiracy the state had to present evidence of agreement and intent to purchase or possess the cocaine. <u>Spera v. State</u>, 656 So. 2d 550, 551 (Fla. 2d DCA 1995); <u>King v. State</u>, 104 So. 2d 730 (Fla. 1957). Appellant takes issue with the agreement to possess. Appellant claims that the state did not present sufficient evidence to prove the agreement between appellant and his co-defendant to possess the cocaine. The state respectfully disagrees.

Here, Special Agent Anderson testified that he, appellant and his co-defendant had series of telephone conversations during which they negotiated the purchase of two kilograms of cocaine at $33,000 (T 40-41). Anderson was to sell to appellant and his co-defendant one of two kinds of cocaine (T 41). Appellant told Anderson that he would not mind to take the less expensive wet shipment of cocaine, because he (appellant) cooked the cocaine anyway (T 42). Throughout the entire transaction both appellant and his co-defendant participated in negotiating the deal. They both negotiated with Anderson the price, the amount of cocaine, the kind of product, the location of their meeting, and the conditions attached to the deal (T 43). Appellant told Anderson that he had

provided his brother with the money for the deal (T 91). They actively participated in all the telephone conversations with Anderson (T 67, 70-71). Both of them were apprised of the details of the deal (T 54). And most importantly, after setting a location for the meeting, they both showed up to the meeting with Anderson (T 50).

At the meeting between Anderson, appellant and his co-defendant during which all shook hands with each other, they negotiated the terms of the deal (T 52-53). Both appellant and his co-defendant negotiated the price, in an attempt to reduce the price of the cocaine (T 53). They then agreed to purchase two kilos at $33,000 from Anderson (T 53).

Appellant and his brother worked together, and made decisions regarding the deal together. On August 10, 1995, appellant called Anderson, spoke to him for a while, and then transferred the telephone to his brother (T 70-71). It was Katan who contacted Anderson to set the time and location of their meeting, during which they decided that each one of them would show up by himself.

Nonetheless, both appellant and his co-defendant showed up at Denny's at the scheduled time for the deal (T 91). Appellant told Anderson that he (appellant) gave Katan the money for the deal (T 91, 94-95, 98). Appellant was surprised to hear that the deal fell

through (T 98). Appellant was sufficiently involved in the meetings, arrangements, and negotiations. The state presented ample of evidence from which the jury could infer that appellant and his co-defendant agreed to possess the cocaine. The state did not have to present direct evidence of every detail of the agreement. See U.S. v. Lluesma, 45 F. 3d 408, 409 (11th Cir 1995)(the government needs only demonstrate that the defendant knew the essential nature of the conspiracy not of all details of the phases of conspiracy); Rouse v. State, 583 So. 2d 1111, 1113 (Fla. 4th DCA 1991)(circumstantial evidence of prearrangement such as the negotiation of price, and assuring the legitimacy of the supplier, is more than minimal involvement of the defendant and thus correctly was sent to the jury).

Although appellant was not present when Katan was about to consummate the deal with Anderson, appellant played a role in the entire exchange in furtherance of the conspiracy. From the evidence introduced at trial the jury could infer appellant's agreement. See U.S. v. Marx, 635 F. 2d 436, 439 (5th Cir. 1981). Agreement can be inferred from acts that furthered the conspiracy's purposes. U.S. v. Camargo-Verfara, 57 F. 3d 993, 1000 (11th Cir. 1995); Romani v. State, 542 So. 2d 984, 986 (Fla. 1989).

A judgment should not be reversed if there is competent

evidence which is substantial in nature to support the fact finder's conviction. See Welty v. State, 402 So. 2d 1159 (Fla. 1981). The jury did not have to believe appellant's theory of defense. See Peterka v. State, 640 So. 2d 59, 68 (Fla. 1994)("the circumstantial evidence standard does not require the jury to believe the defense version of the facts"). Accord Cochran v. State, 547 So. 2d 928, 930 (Fla. 1989); Bedford v. State, 589 So. 2d 245 (Fla. 1991), cert. denied, 503 U.S. 1009 (1992)(the jury free to reject defendant's version of events as unreasonable); Holton v. State, 573 So. 2d 284, 289-90 (Fla. 1990)(jury not required to believe defendant's version of events where state produced conflicting evidence), cert. denied, 500 U.S. 960 (1991); Finney v. State, 660 So. 2d 674, 680 (Fla. 1995). Appellant has failed to present any reasonable theory which exculpates him.

## POINT III[4]

THE TRIAL COURT CORRECTLY DENIED
APPELLANT'S MOTION FOR JUDGMENT OF
ACQUITTAL ON ENTRAPMENT.

Appellant contends that the trial court erred in denying his motion for judgment of acquittal on entrapment. The state disagrees.

Entrapment is an affirmative defense and, as such, is in the nature of an avoidance of the charges. Herrera v. State, 594 So. 2d 275, 277 (Fla. 1992). See Gonzalez v. State, 571 So. 2d 1346, 1351 (Fla. 3d DCA 1990)(defendant in criminal case has burden of proving affirmative defense), review denied, 584 So. 2d 998 (Fla. 1991). Here, there were factual disputes as to predisposition, and thus the trial judge correctly submitted the case to the jury.

The entrapment defense and the subjective test are codified by § 777.201, Fla. Stat. (1987), as follows:

777.201 Entrapment.--

> (1) A law enforcement officer, a person engaged in cooperation with a law enforcement officer, or a person acting as an agent of a law enforcement officer perpetrates an entrapment if, for the purpose of obtaining evidence of the commission of a crime, he induces or encourages and, as a direct result, causes another person to engage in conduct

---

[4]Appellant's Point II became moot after the court reporter certified that he had transcribed the record with a mistake.

constituting such crime by employing methods of persuasion or inducement which create a substantial risk that such crime will be committed by a person other than one who is ready to commit it.

(2) A person prosecuted for a crime shall be acquitted if he proves by a preponderance of the evidence that his criminal conduct occurred as a result of an entrapment. *The issue of entrapment shall be tried by the trier of fact.* [e.s.]

As summarized in State v. Dawson, 21 Fla. L. Weekly D2317

(Fla. 3d DCA October 30, 1996), three questions must be addressed

pursuant to Munoz v. State, 629 So.2d 90, 99 (Fla.1993):

(1) "The first question ... is whether an agent of the government induced the accused to commit the offense charged." Id. The accused must establish this element by a preponderance of the evidence. Id.

(2) "If the first question is answered affirmatively, then a second question arises as to whether the accused was predisposed to commit the offense charged; that is, whether the accused was awaiting any propitious opportunity or was ready and willing, without persuasion, to commit the offense." Id. The defendant must initially produce proof on lack of predisposition. Id. If he does so, "the burden then shifts to the prosecution to rebut this evidence beyond a reasonable doubt." Id.

(3) "The third question ... is whether the entrapment evaluation should be submitted to a jury." Id. at 100. The first two questions ordinarily present factual issues to be decided by the jury, and should be submitted to the jury "when factual issues are in dispute or when reasonable persons could draw

different conclusions from the facts." <u>Id.</u>  If
the material facts are undisputed and
reasonable persons could not disagree, then
the trial court may rule on the entrapment
issue as a matter of law.  <u>Id.</u>; *State v.
Ramos*, 632 So.2d 1078, 1079 (Fla. 3d DCA
1994).

In <u>Munoz v. State</u>, 629 So. 2d 90, 99-100, our supreme court

said the following:

> Given the history of the entrapment defense,
> we find that the legislature, in establishing
> a legislatively-created entrapment defense
> through section 777.201, codified the
> subjective test delineated by the United
> States Supreme Court as the means for
> determining the application of that defense.
> As indicated under the federal cases discussed
> above, the application of the subjective test
> is the test articulated by Judge Hand in
> *Sherman*, as further explained by the United
> States Supreme Court in *Jacobson[v. United
> States*, --- U.S. ----, 112 S.Ct. 1535, 118
> L.Ed.2d 174 (1992)].  Three principles arise
> under this test.  The first two involve
> <u>questions of fact</u> and differing burdens of
> proof, and the third addresses whether the
> issue of entrapment must be submitted to the
> jury or whether the issue can be decided by
> the judge as a matter of law. [e.s]
>
> ***
>
> ... we construe section 777.201 as requiring
> the <u>question of predisposition to be submitted
> to a jury when factual issues are in dispute
> or when reasonable persons could draw
> different conclusions from the facts</u>.[e.s.]

In the instant case, there were factual disputes as to both

inducement and predisposition. First, appellee contends that there was no police conduct which would indicate a violation of due process and there was evidence of predisposition of appellant to commit the crimes of conspiracy to purchase or possess cocaine; thus, the issue of entrapment was properly submitted to the jury.

INDUCEMENT

The fact that Anderson contacted appellant first, and the fact that Clark promised appellant financial gain from the deal does not establish an outrageous government conduct. Neither Anderson nor Clark ever made personal threats to appellant's personal safety, nor were there promises of outrageous gains. See Lusby v. State, 507 So. 2d 611 (Fla. 4th DCA 1987) (conduct of confidential informant, who contacted defendant 10-14 times over a ten day period with promises of financial gain attempting to persuade defendant to enter into a drug deal, did not fall below the standards set in Cruz); Sallomi v. State, 629 So. 2d 969, n. 1 (Fla. 5th DCA 1993) (defendant had not been entrapped even though there was sufficient testimony to the effect that the informant had called the defendant numerous times regarding drugs); Gonzalez v. State, 525 So. 2d 1005 (Fla. 3d DCA 1988) (defendant was not entrapped despite the fact that confidential informant called defendant 10-15 times to arrange transaction); Lewis v. State, 634

So. 2d 207 (Fla. 3d DCA 1994). See Also Winkfield v. State, 601

So. 2d 1261 (Fla. 3d DCA 1992) (entrapment is not established by

the fact that confidential informant is sent out into the community

with instructions to respond to any inquiry regarding the sale or

purchase of narcotics). Appellant did not establish that the

government encouraged him to commit a crime which he had *never*

contemplated before and that he resisted the temptation. See Wilson

v. State, 577 So. 2d 1300, 1300 (Fla. 1991) (Citing W. LaFave and

J. Israel, Criminal Procedure section 5.3, at 254-55 (1985)).

PREDISPOSITION

Even assuming the government induced appellant to commit the

crime of conspiracy to traffic in cocaine, the state proved beyond

a reasonable doubt appellant's predisposition. In establishing the

predisposition of a defendant based on conduct that results from

the inducement, the United States Supreme Court in Jacobson v.

United States, 503 U.S. 540, 112 S. Ct. 1535, 118 L. Ed. 2d 174

(1992), explained what conduct may be used to establish

predisposition as follows:

> Where the Government has induced an individual
> to break the law and the defense of entrapment
> is at issue,...,the prosecution must prove
> beyond reasonable doubt that the defendant was
> disposed to commit the criminal act prior to
> first being approached by Government agents.
> Thus, an agent deployed to stop the

> traffic in illegal drugs may offer the opportunity to buy or sell drugs, and, if the offer is accepted, make an arrest on the spot or latter. In such a typical case, or in a more elaborate "sting" operation involving government-sponsored fencing where the defendant is simple provided with the opportunity to commit a crime, the entrapment defense is of little use because the ready commission of the criminal act amply demonstrates the defendant's predisposition.

Jacobson, 112 S. Ct. at 1540-41.

Here, appellant and his co-defendant flew from New York to Florida to "do business" and "to shop." Appellant responded to Anderson's paging on the same day. Appellant and his co-defendant in several telephone conversations discussed with Anderson the deal about the purchase of cocaine. Appellant was apparently familiar with the drug lingo, and did not have any difficulties understanding Anderson. Appellant was also familiar with the wet cocaine product, as he stated that he cooks wet cocaine. Appellant had direct access to large sums of money to fly to Florida and to buy cocaine; appellant and his co-defendant were able to come up with at least $1,750 instantly as soon as they agreed upon the terms of the deal. Although appellant did not have $33,000, he pretended to have it by wrapping bills of $100 and $50 around $1.00 bills. Appellant manifested a skill and experience as a negotiator when he actually set a date, carefully picked a location, tried to

negotiate a lower price, and chose a wet shipment of cocaine, to execute the deal. Appellant was equipped with the know how to deal in drugs. Appellant was ready and willing to commit the crime when he showed up to all the meetings, and participated in all the negotiations. The evidence presented was sufficient for a reasonable jury to conclude that appellant was predisposed to take part in the conspiracy, independent of the government's role in assisting such commission, and that appellant did not have an innocent mind prior to his contact with Clark and Anderson. Appellant was not entrapped as a matter of law. See U.S. v. Miller, 71 F. 3d 813, 814-815 (11th Cir. 1996)(the prompt commission of the crime at the first opportunity is enough to show predisposition). All these factors plus appellant's ready assent to the proposed drug deal amply demonstrates his predisposition.

<u>POINT IV</u>

> THE ISSUE HAS NOT BEEN PRESERVED FOR APPELLATE REVIEW. NONETHELESS, THE TRIAL COURT DID NOT ERR IN INSTRUCTING THE JURY WITH THE STANDARD JURY INSTRUCTION ON ENTRAPMENT.

Appellant contends that the trial court erroneously instructed the jury on entrapment. Appellant argues that the standard jury instruction is unconstitutionally improper because it

F:\USERS\APPEALS\ETTIE\9615331.AB                25

shifts the burden of proof to the defendant. The state disagrees.

This issue has not been preserved for appellate review. Appellant failed to object after the judge charged the jury (T 454-457). Also, appellant did not request any special entrapment jury instruction (T 437-438, 440, 289-291). Thus, appellant agreed with the instructions as read to the jury by not objecting. See Watson v. State, 651 so. 2d 1159 (Fla. 1994)(On Rehearing)(Watson failed to object to the jury instructions after the judge instructed the jury and failed to submit a specific jury instruction, which was denied by the court; therefore, issue was not preserved for appellate review); Fla. R. Crim. P. 3.390(c)("... any party may file written requests that the court instruct the jury on the law as set forth in the requests..."). Cf. Delvalle v. State, 653 So. 2d 1078 (Fla. 5th DCA 1995)(defendant not only failed to preserve any objection to the omission in the verdict forms by timely objection below, but invited the error by expressing his satisfaction with the verdict forms on two separate occasions prior to their submission to the jury).

Even assuming arguendo this issue has been preserved, it was correctly charged to the jury. The instruction read to the jury by the trial judge coincides with the standard jury instruction on entrapment (T 443-444). See Fla. Std. Jury Instr. (Crim.)

3.04(c)(2), 39(a).[5]

---

[5] FLORIDA STANDARD JURY INSTRUCTIONS IN CRIMINAL CASES

3.04(c)(2) Entrapment

The defense of entrapment has been raised. (Defendant) was entrapped if

1.  he was, for the purpose of obtaining evidence of the commission of a crime, induced or encouraged to engage in conduct constituting the crime of (crime charged), and
2.  he engaged in such conduct as the direct result of such inducement or encouragement, and
3.  the person who induced or encouraged him was a law enforcement officer or a person engaged in cooperating with or acting as an agent of a law enforcement officer, and
4.  the person who induced or encouraged him employed methods of persuasion or inducement which created a substantial risk that the crime would be committed by a person other than one who was ready to commit it, and
5.  (Defendant) was not a person who was ready to commit the crime.

It is not entrapment if (defendant) had the predisposition to commit the (crime charged). (Defendant) had the predisposition if before any law enforcement officer or person acting for the officer persuaded, induced, or lured (defendant), he had a readiness or willingness to commit (crime charged) if the opportunity presented itself.

It is also not entrapment merely because a law enforcement officer in a good faith attempt to detect crime
    (a)  [provided the defendant the opportunity, means and facilities to commit the offense, which the defendant intended to commit and would have committed otherwise.]
(b)  [used tricks, decoys or subterfuge to expose the defendant's

In <u>Herrera v. State</u>, 594 So. 2d 275 (Fla. 1992), our supreme court addressed this question and said:

> For the first time the State, through the <u>legislature, has decided that the burden is on defendants claiming entrapment to prove that they were entrapped.</u> Sec. 777.201(2). <u>We hold that allocating this burden to a defendant is not unconstitutional.</u> Cf. *Patterson*, 432 U.S. at 210, 97 S.Ct. at 2327 (the Court refused "to adopt as a constitutional imperative, operative countrywide, that a State must disprove beyond a reasonable doubt every fact constituting any and all affirmative defenses related to the culpability of the accused" because "[p]roof of the nonexistence of all affirmative defenses has never been constitutionally required.")
>
>      \*\*\*
>
>     ... [T]he lack of predisposition to commit the crime charged is an essential element of the defense of entrapment. <u>The predisposition to commit a crime, however, is not the same as the intent to commit that crime.</u> As explained by the New Jersey Supreme Court in its consideration of this issue, "<u>predisposition</u> is <u>not</u> the <u>same as mens rea</u>. The former involves the defendant's character and criminal inclinations; the

---

criminal acts.]
(c) [was present and pretending to aid or assist in the commission of the offense.]

On the issue of entrapment, the defendant must prove to you by a preponderance of the evidence that his criminal conduct occurred as the result of entrapment.

latter involves the defendant's state of mind while carrying out the allegedly criminal act." *State v. Rockholt*, 96 N.J. 570, 476 A.2d 1236, 1242 (1984). <u>Requiring a defendant to show lack of predisposition does not relieve the State of its burden to prove that the defendant committed the crime charged. The standard instructions require the State to prove beyond a reasonable doubt all the elements of the crime, and we find no violation of due process in requiring defendants to bear the burden of persuading their juries that they were entrapped.</u> [e.s.]

594 So. 2d at 277-278. <u>See also</u> <u>In re Standard Jury Instructions in Criminal Cases</u>, 543 So. 2d 1205, 1209 (Fla. 1989).

The case of <u>U.S. v. King</u>, 73 F. 3d 1564, 1569 (11th Cir. 1996), is right on point and instructive on this issue. In <u>King</u>, the defendant *requested* an additional instruction charging the jury "that when the defendant shows government inducement existed, the burden shifts to the government to prove beyond a reasonable doubt that the defendant was not entrapped." The trial judge denied King's request, and on appeal King argued that <u>Jacobson</u> is no longer good law. The 11th Circuit disagreed with King, and responded as follows:

> First, the government contends that *Jacobson* [ *v. United States*, 503 U.S.\_\_, 112 S. Ct.\_\_, 118 L. Ed. 2d 174 (1992)] did not alter the well-established law that when government inducement exists, the burden is on the government to prove predisposition beyond reasonable doubt. We agree.

\* \* \*

>We <u>hold that our pre-*Jacobson* decisions
>upholding the pattern entrapment instruction
>against challenges that it fails to adequately
>address the burden and standard of proof</u>, see
>*Davis*, 799 F.2d 1490; *Sonntag*, 684 F.2d 781;
>*Vadino*, 680 F.2d 1329, **are still good law.** <u>No
>additional instruction that the burden is on
>the government to prove predisposition beyond
>a reasonable doubt is required to comply with
>*Jacobson*</u>. Our conclusion is the same as that
>of the *Vadino* Court: although it may "have
>been better to include within the entrapment
>instruction itself an instruction on burden of
>proof, the jury instruction considered as a
>whole was sufficient." 680 F.2d at 1337.

As explained in <u>King</u>, the standard jury instructions on entrapment were proper. The trial judge instructed the jury that appellant was entrapped if he was for the purpose of obtaining evidence of the commission of a crime, was induced or encouraged to engage in conduct constituting the crime of conspiracy to traffic in cocaine (T 443-444); that appellant was not required to prove anything (T 446); and that the state had the burden to prove the offense of conspiracy beyond a reasonable doubt (T 442). The jury was also given the reasonable doubt instruction (T 446-447). Clearly, <u>King</u> instructs us that the burden of proof as spelled out in the standard jury instruction on entrapment is proper, and thus no error occurred in this case. <u>Cf. Lacy v. State</u>, 387 So. 2d 561, 563 (Fla. 4th DCA 1980)("[w]here standard jury instructions are

F:\USERS\APPEALS\ETTIE\9615331.AB

30

involved, having been approved by the supreme court ..., we are understandably reluctant to find grounds for reversal absent a clear showing that the rights of the accused have been meaningfully prejudiced by the instruction under review").

Further, it is well settled that the trial judge should not give instructions which are confusing, contradictory, or misleading, Butler v. State, 493 So. 2d 451 (Fla. 1986), and a trial court's failure to give a specific instruction even if requested will not result in a reversal where, taken as a whole, the instructions actually given are clear, comprehensive, and correct. Darty v. State, 161 So. 2d 864 (Fla. 2d DCA), cert. denied, 168 So. 2d 147 (Fla. 1964); Bolin v. State, 297 So. 2d 317, 319 (Fla. 3d DCA 1974)("A conviction will not be reversed because a particular jury instruction has not been given where, on the whole, the charges as given are clear, comprehensive, and correct"). Additionally, trial judges have wide discretion regarding jury instructions, and the appellate courts will not reverse a decision regarding an instruction in the absence of prejudicial error that would result in the miscarriage of justice. Shepard v. State, 659 So. 2d 457, 459 (Fla. 1995); Booker v. State, 514 So. 2d 1079, 1085 (Fla. 1987)(defining "abuse of discretion" -- discretion is abused only where no reasonable man could take view

adopted by the trial court).

The error, if at all, was harmless beyond a reasonable doubt, because the burden of proving the elements of the crimes was not shifted to appellant.   The burden of adducing evidence of his affirmative defense was correctly on appellant. <u>See</u> § 777.201(2). <u>Cf.</u> <u>Smiley v. State</u>, 641 So. 2d 976 (Fla. 4th DCA 1994)(the error of instructing the jury on the inference arising from proof of possession of recently stolen property was harmless).   Thus, appellant's conviction must be affirmed.

CONCLUSION

Wherefore, based on the foregoing arguments and the

authorities cited therein, appellee respectfully requests this

Court AFFIRM the trial court's judgment and sentence.

Respectfully submitted,
ROBERT A. BUTTERWORTH
Attorney General
Tallahassee, Florida

ETTIE FEISTMANN
Assistant Attorney General
Florida Bar No. 892830
1655 Palm Beach Lakes Boulevard
Suite 300
West Palm Beach, FL 33401-2299
(561) 688-7759

Counsel for appellee

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing

"Answer Brief of Appellee" has been furnished by Courier to:

MARCY ALLEN, Assistant Public Defender, Criminal Justice Building,

6th Floor, 421 Third Street, West Palm Beach, FL 33401, this

26th day of March, 1997.

Counsel for appellee

F:\USERS\APPEALS\ETTIE\9615331.AB

33

# EXHIBIT   L

# IN THE DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA

## FOURTH DISTRICT

FRITZ MAIGNAN,

       Appellant,

vs.

STATE OF FLORIDA,

       Appellee.

_____/

RECEIVED
OFFICE OF THE
ATTORNEY GENERAL

MAR 2 4 1997

CRIMINAL OFFICE
WEST PALM BEACH

CASE NO. 96-2152

4-0283

## NOTICE TO THE COURT

    Appellant, FRITZ MAIGNAN, by and through undersigned counsel gives notice to the Court

that he is withdrawing the argument set forth in Point II of the initial brief based upon the Court

Reporter's Certificate of Correction which this Court has accepted as a supplemental record.

              Respectfully Submitted,

              RICHARD L. JORANDBY
              Public Defender
              15th Judicial Circuit

              MARCY K. ALLEN
              Assistant Public Defender
              Attorney for Appellant
              Criminal Justice Building
              421 Third Street, 6th Floor
              West Palm Beach, Florida 33401
              (407) 355-7600
              Florida Bar No. 332161

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true copy hereof has been furnished by courier, to CELIA

TERENZIO, Assistant Attorney General, 1655 Palm Beach Lakes Boulevard, Third Floor, West

Palm Beach, Florida 33401, this 21st day of MARCH, 1997.

MARCY K. ALLEN
Assistant Public Defender

# EXHIBIT  M

IN THE DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT                          JULY TERM 1997


FRITZ MAIGNAN,

Appellant,

v.

STATE OF FLORIDA,

Appellee.

---

CASE NO. 96-2152

---

Decision filed   October 1, 1997

Appeal from the Circuit Court for the Seventeenth Judicial Circuit, Broward County; Robert W. Tyson, Jr., Judge; L.T. Case No. 95-14021CF10B.

Richard L. Jorandby, Public Defender, and Marcy K. Allen, Assistant Public Defender, West Palm Beach, for appellant.

Robert A. Butterworth, Attorney General, Tallahassee, and Ettie Feistmann, Assistant Attorney General, West Palm Beach, for appellee.

PER CURIAM.

AFFIRMED.

STONE, C.J., POLEN and STEVENSON, JJ., concur.

**NOT FINAL UNTIL THE DISPOSITION OF ANY TIMELY FILED MOTION FOR REHEARING.**

# EXHIBIT   N

# IN THE DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA

## FOURTH DISTRICT

RECEIVED
OFFICE OF THE
ATTORNEY GENERAL

OCT 16 1997

CRIMINAL OFFICE
WEST PALM BEACH

FRITZ MAIGNAN,

      Appellant,

vs.                                      CASE NO. 96-2152    *4-0283*

STATE OF FLORIDA,                    *96-1-5331*

      Appellee.

_____/

## MOTION FOR REHEARING

    Appellant, FRITZ MAIGNAN, by and through undersigned counsel pursuant to Florida Rule of Appellate Procedure 9.330 requests that this Court grant rehearing in the above styled case and as grounds states:

    1. On October 1, 1997, this Court per curiam affirmed appellant's conviction for conspiracy to traffic in cocaine and sentence to a 15 year mandatory minimum term of incarceration.

    2. The undersigned is well aware that a motion for rehearing is generally inappropriate where an appeal has been per curiam affirmed without written decision. The instant cause presents an exception.

    3. In point IV of his initial brief, appellant maintained that the fundamental error occurred where the jury was inaccurately instructed on the defense of entrapment. Specifically, the trial court failed to advise the jury that the state was required to prove predisposition beyond a reasonable doubt.

4. Subsequent to the filing of briefs, this Court issued a decision in Vazquez v. State, 22 Fla. L. Weekly D1630 (Fla. 4th DCA July 2, 1997), question certified 22 Fla. L. Weekly D2254 (Fla. 4th DCA Sept. 24, 1997). Vazquez was furnished as supplemental authority by the state and should have controlled disposition of this cause.

5. In Vazquez, this Court reversed a defendant's conviction for trafficking in cocaine where the court erred by declining his request to reopen cross-examination of the lead detective to facilitate the introduction of tape recorded conversations into evidence. This Court chose to reach the issue of whether the standard jury instruction on entrapment is a correct statement of law. This Court concluded that the instruction is "inaccurate or incomplete" in light of Munoz v. State, 629 So. 2d 90 (Fla. 1993), because it does not inform the jury that the burden to prove predisposition beyond a reasonable doubt returns to the prosecution where the defense shows some evidence of lack of predisposition. 22 Fla. L. Weekly at 1633. On rehearing this Court certified the following question as one of great public importance to the Florida Supreme Court:

> Does the inaccuracy or incompleteness of the current standard jury instruction for the defense of entrapment reflect a fundamental change in the law requiring retroactive application to all cases after Munoz, or is it instead an evolutionary change in the law requiring only prospective application?

22 Fla. L. Weekly at D2254. On September 25, 1997, the state filed its notice to invoke the discretionary jurisdiction of the Supreme Court.

6. At bar, the trial court gave the same inaccurate or incomplete instruction on entrapment which this Court disapproved in Vazquez. Based upon the timing of the issuance of the Vazquez opinion it is conceivable that this Court may have overlooked the application of Vazquez to the instant cause. Consequently, appellant requests that this Court reconsider its per curiam affirmance of appellant's conviction and sentence.

-2-

WHEREFORE, appellant requests that this Court grant rehearing and issue a decision which reverses his conviction and sentence and remands the cause for a new trial based upon the trial court's inaccurate or incomplete instruction to the jury on the law of entrapment.

Respectfully Submitted,

RICHARD L. JORANDBY
Public Defender
15th Judicial Circuit

MARCY K. ALLEN
Assistant Public Defender
Attorney for Appellant
Criminal Justice Building
421 Third Street, 6th Floor
West Palm Beach, Florida 33401
(407) 355-7600
Florida Bar No. 332161

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true copy hereof has been furnished by courier, to ETTIE FEISTMANN, Assistant Attorney General, 1655 Palm Beach Lakes Boulevard, Third Floor, West Palm Beach, Florida 33401, this 15 day of OCTOBER, 1997.

MARCY K. ALLEN
Assistant Public Defender

and issued a mandate on November 13, 1995. Thereafter, Edwards filed a motion to amend the judgment. She argued entitlement to the full amount of the punitive damage award due to the repeal of section 768.73(2), Florida Statutes (1993), by operation of law effective July 1, 1995. On January 17, 1996, the trial court granted Edwards' motion and amended the final judgment to provide her with the full amount of the punitive damage award.

The trial court apparently entered the amended final judgment pursuant to Florida Rule of Civil Procedure 1.540(b) (1993). Edwards correctly asserts that the trial court had jurisdiction pursuant to rule 1.540(b) to consider her motion to amend the final judgment. *See Ohio Cas. Group v. Parrish*, 350 So. 2d 466 (Fla. 1977). However, no substantive change was made to the statute between the time the claim accrued in 1992 and the rendition of the original final judgment.[1] Therefore, we hold that the repeal of section 768.73(2) did not constitute a valid reason for relief under rule 1.540(b).

We also hold that because the verdict and final judgment awarding the Department a portion of the punitive damages were both rendered before the repeal of the statute, the award vested subject to appellate review. *See Division of Worker's Comp., Bureau of Crimes Comp. v. Brevda*, 420 So. 2d 887 (Fla. 1st DCA 1982). After this court affirmed the judgment, in the absence of a valid ground for relief from judgment pursuant to rule 1.540(b), the trial court did not have authority to divest the Department of its entitlement to the punitive damage award.

Accordingly, we reverse the amended final judgment. We remand this cause and direct the trial court to reinstate the original final judgment.

REVERSED AND REMANDED. (GLICKSTEIN and SHAHOOD, JJ., concur.)

_____

[1] The amendment to section 768.73(2) provided that it "shall take effect [April 8, 1992] and apply to pending cases and causes of action in which a judgment has not been entered." § 768.73(2)n.1, Fla. Stat. (1992).

\* \* \*

**Criminal law—Trafficking in cocaine—Entrapment—Abuse of discretion to refuse to permit defendant to reopen cross-examination of lead detective for purpose of introducing into evidence additional tape recording relating to dealings with confidential informant who allegedly persuaded defendant to sell cocaine by offering to give defendant a substantial amount of marijuana free—Fact that defendant could have introduced evidence by calling detective as his own witness not basis for refusal to reopen cross-examination which had as its purpose the weakening of testimony given by the witness on direct examination by the state—Because portions of tape recordings of conversations between defendant and informant were admitted on direct examination, additional tape recording which defendant sought to admit was proper subject of cross-examination under rule of completeness—Tape on which informant said he would "give" defendant marijuana was crucial to defendant's theory of the case—Jury instructions—Standard jury instruction does not fairly and correctly present the current state of the law on entrapment—If on remand, trial court determines that evidence is sufficient to submit issue of entrapment to jury, instruction given must adequately reflect current state of the law**

RAUL VAZQUEZ, Appellant, v. STATE OF FLORIDA, Appellee. 4th District. Case No. 96-0072. Opinion filed July 2, 1997. Appeal from the Circuit Court for the Seventeenth Judicial Circuit, Broward County; Carole Y. Taylor, Judge; L.T. Case No. 94-21177CF10A. Counsel: Richard L. Jorandby, Public Defender, and Steven H. Malone, Assistant Public Defender, West Palm Beach, for appellant. Robert A. Butterworth, Attorney General, Tallahassee, and Diana K. Bock, Assistant Attorney General, Tampa, for appellee.

(FARMER, J.) In this case where entrapment was a defense, the trial judge refused to reopen cross examination of a detective for the purpose of admitting additional parts of tape recordings relating to dealings with a confidential informant. Defendant also argues that the standard jury instruction on entrapment failed,

under the facts of this case, to give a fully accurate instruction on the current state of the law. We reverse.

Defendant was charged with trafficking in cocaine after he sold the drug to an informant. A number of conversations leading up to this transaction were recorded and adduced as evidence at trial. Defendant claimed that, to persuade him to sell the informant cocaine, the informant offered to give him a substantial amount of marijuana for free. He also alleged, and evidence was adduced at trial to support the contention, that he had not been in the business of selling drugs for a substantial number of years before being approached by the informant.

*I. Re-Opening Evidence for Cross-Examination*

Defendant argues that the trial judge erred in refusing to allow him to reopen cross-examination of the lead detective for the purpose of introducing into evidence additional tape recordings of the conversations between the contact and the informant. The state argues that defendant could have called the detective as his own witness, and thereby offered the tapes into evidence. He did not do so because he did not wish to assert a defense and thus lose the right to open and close final argument. *See* Fla. R. Crim. P. 3.250.

In *Louisy v. State*, 667 So. 2d 972 (Fla. 4th DCA 1996), we reversed a trial court's refusal to reopen the defense to present crucial evidence, saying that:

"Although the decision to allow a case to be reopened involves sound judicial discretion not usually interfered with on the appellate level [c.o.] a denial will be reversed where the request is timely made and the jury will be deprived of evidence which might have had a significant impact upon the issues to be resolved. *Delgado v. State*, 573 So. 2d 83, 86 (Fla. 2d DCA 1990). . . ."

667 So. 2d at 974. The rationale behind *Louisy* and other such cases is that in some circumstances the refusal to re-open a case is "to enforce a rule of procedure almost to the point of a denial of justice." *Steffanos v. State*, 80 Fla. 309, 86 So. 204, 205 (1920); *see also State v. Ellis*, 491 So. 2d 1296, 1297 (Fla. 3d DCA 1986). The state argues in effect that there is no denial of justice where the defendant could so easily have adduced the same evidence during his own defense.

In *Hahn v. State*, 58 So. 2d 188 (Fla. 1952), where the charge was first degree murder and defendant claimed self-defense, the state called a witness who testified that the victim had not threatened defendant just before the killing. Although defendant cross-examined the witness, he failed to lay the necessary foundation for impeachment with a hearsay statement he had intended to introduce through another witness. When counsel later realized the error, he unsuccessfully sought to recall the state's witness to lay the proper foundation. After the court offered to allow defense counsel to call the witness as his own witness, counsel declined the offer. The supreme court held that the trial judge had abused his discretion in refusing to allow defendant to recall the witness, saying that:

"Rules of practice and their employment in the conduct of trials are not inflexible. Their strict or technical enforcement cannot straight jacket the justice of the cause. Primarily, they are formulated and employed so that the Court may regulate and keep within legal bounds the general conduct of the trial. This Court has always recognized that a trial Court has wide latitude in regulating the conduct of trials in order that the administration of justice be speedily and fairly achieved in an orderly, dignified manner and befitting the gravity of the business in hand. In this function the trial Judge exercises the sound discretion with which he is vested. This discretion may be invoked and its exercise reasonably required for many reasons. It may be invoked when counsel in the stress of trial overlooks or fails to offer proof of a material matter or otherwise fails in his duty to his client in the conduct of his case. In a grave case, as here, where defendant's life was in jeopardy his ineptitude alone is enough."

58 So. 2d at 191. Aside from the fact that the charges here do not involve a capital offense, it is difficult to find any meaningful difference with *Hahn*.

The distinction between cross examination of a state witness and calling the same person as a defense witness to lay a predicate for a defensive matter was also the basis for the decision in *Coco v. State*, 62 So. 2d 892 (Fla. 1953). There, defendant was also charged with first degree murder, but the jury ultimately convicted him of the lesser included offense of second degree murder. The state had called a police officer to authenticate two fingerprint cards as a predicate for later testimony of the state's fingerprint expert. On cross-examination, defense counsel sought to question the officer regarding a comparison made between the fingerprints on the murder weapon and defendant's fingerprints. The state objected, and the trial court sustained the objection, ruling that the cross-examination exceeded the scope of direct. More importantly for our purposes, in order to present the same testimony to the jury, the trial judge felt that defense counsel could call the witness as defendant's own. In reversing the supreme court stated that:

"In the recent case of Hahn v. State [c.o.] we had the almost identical question before us and without equivocation we held that it was fatal error for the trial court to deny defense counsel the right of cross-examination for the purpose of laying a predicate for impeachment. The vital question in that case was not one of identity but was whether the defendant killed the deceased while acting in self-defense. However, the analogy between that case and the instant suit is so clear-cut as to be unquestioned authority for a reversal herein.

"Moreover, the distinction between the two criminal actions consists of a difference which is more favorable to a reversal in the instant, than in the Hahn v. State, case. The propriety of recalling a witness for the State for further cross-examination after the State has rested its case for the purpose of laying a predicate for impeachment is a matter which rests in the sound judicial discretion of the court. On the other hand, the right of a full and fair cross-examination of a witness upon subjects the door to which is pushed ajar on the examination in chief is an absolute right which has as its genesis Section 11 of the Florida Declaration of Rights. This Section provides that an accused shall have the right 'to meet the witnesses against him face to face' in open court before an impartial jury."

62 So. 2d at 896.[1] In our opinion, the circumstances in *Coco* are essentially identical to this case. They involve the defendant's right to introduce a defensive matter through cross-examination, rather than by direct examination in his own case. In other words, although the court has discretion in determining whether a case should be re-opened, under *Hahn* and *Coco* this discretion is abused when it touches upon the right to cross-examination that has its purpose the weakening of the testimony given by the witness on direct examination by the state.

There is one difference between this case and *Coco*, however, but it strengthens defendant's argument. It involves the rule of completeness, which allows an adverse party—*at the time* a portion of a writing or recorded statement is introduced—to have another portion or another statement or writing introduced that should, in fairness, be considered *contemporaneously*. § 90.108, Fla. Stat. (1995). It has thus been noted that:

"If counsel for the adverse party does not seek to invoke section 90.108 at the time the writing or document is offered, the provision may not be utilized during cross-examination or during the party's own case. However, section 90.108 does not prohibit evidence of the remainder of the writing or document; the evidence would have to be subjected to proper cross-examination or meet the usual test of admissibility if offered during counsel's case."

Charles W. Ehrhardt, FLORIDA EVIDENCE § 108.1 at 34 (1995). Despite this, it has generally been held that the rule of complete-

ness allows the admission of otherwise inadmissible evidence during cross-examination, if fairness so requires.

Thus, in *Christopher v. State*, 583 So. 2d 642 (Fla. 1991), the court rejected the state's argument that, because statements sought to be admitted on cross-examination were hearsay, they were inadmissible, the court explaining as follows:

"When the state offers in evidence a part of a confession or admission against interest, the defendant is entitled to bring out on cross-examination the entire confession or admission. *Louette v. State*, 152 Fla. 495, 12 So. 2d 168 (1943). In *Eberhardt v. State*, 550 So. 2d 102, 105 (Fla. 1st DCA 1989), *review denied*, 560 So. 2d 234 (Fla. 1990), the rule was applied as follows:

'Because portions of the defendant's conversation with the officer were admitted on direct examination, the rule of completeness generally allows admission of the balance of the conversation as well as other related conversations that in fairness are necessary for the jury to accurately perceive the whole context of what has transpired between the two. Ehrhardt, *Florida Evidence*, §108.1 (2d Ed. 1984). Once the officer testified on the state's case-in-chief about one portion of Eberhardt's statements to him, the court erred in sustaining the state's hearsay objection for the reason that his statements he was 'high' or intoxicated were self serving. *Heathcoat v. State*, 430 So. 2d 945 (Fla. 2d DCA), *aff'd*, 442 So. 2d 955 (Fla. 1983).'"

583 So. 2d at 646. Again, we find this rationale directly applicable to the present case.

When entrapment is an issue, there are essentially two elements involved: whether the police or one of their agents induced the defendant to commit the crime charged, and whether the defendant was predisposed to commit the crime anyway. *Munoz v. State*, 629 So. 2d 90 (Fla. 1993). The tape sought to be admitted was one of many conversations between the defendant and the informant. It is thus indisputably relevant to the defense of entrapment, particularly in light of the statement on the tape that the contact hadn't seen defendant in a long time, and that the informant would let defendant "have" the marijuana. We therefore conclude that the rule of completeness is directly applicable.

Thus, because the tape was a proper subject for cross-examination under the rule of completeness, *Hahn* and *Coco* even more strongly required the trial judge to permit cross-examination to be reopened to allow their admission during the state's case. Under the holdings in those cases, it does not matter that the same evidence could have been admitted in the defendant's own case, as long as it was in the nature of impeachment or weakening of the state's direct testimony.

Moreover, in light of the evidence in this case, we can not say that exclusion of the tape was harmless. First, the tape on which the informant said he would "give" defendant the marijuana was crucial to defendant's theory of the case. While there were a number of other tapes that indicated that the informant was going to sell the marijuana to defendant, such conflicts are the very purpose of trial by jury. *Munoz* 629 So. 2d at 100 ("Such direction is consistent with the subjective evaluation of entrapment because the two factual issues above ordinarily present questions of disputed facts to be submitted to the jury as the trier of fact."). And while it is for the trial judge to determine in the first instance whether there is sufficient evidence to allow the defense of entrapment to go to the jury, we cannot say on this record that even with the omitted evidence having been included that the evidence was clearly insufficient.

We stress that we are not making any decision as to the sufficiency of the evidence to support defendant's entrapment theory. In fact, we note that the evidence of an inducement with an offer of an illegal drug would seem to negate defendant's allegation that he was not predisposed to commit the crime. At the same time, however, we understand defendant to claim that the informant was offering a substantial sum of money significantly greater than what defendant might otherwise have realized from a sale

of the cocaine. In other words, if the jury believed that the informant was offering free marijuana, a jury might find that the value of the marijuana served as the inducement. We leave all of this, however, to the trial judge and, if sufficient, to the jury to sort out in the retrial. We merely hold for now that, under *Hahn* and *Coco*, it was error to deny defendant the opportunity to re-open the cross-examination to introduce the additional tape recordings.

### II. Jury Instruction on Entrapment

Defendant also argues that the trial judge erred in giving the standard jury instruction on entrapment, contending that part of the instruction addressing predisposition is now incorrect in light of our supreme court's recent opinion in *Munoz v. State*, 629 So. 2d 90 (Fla. 1993).[2] The pertinent text of the current standard jury instruction on entrapment is as follows:

"[Defendant] was entrapped if

1. he was, for the purpose of obtaining evidence of the commission of a crime, induced or encouraged to engage in conduct constituting the crime of [crime charged], and

2. he engaged in such conduct as the direct result of such inducement or encouragement, and

. . .

4. the person who induced or encouraged him employed methods of persuasion or inducement which created a substantial risk that the crime would be committed by a person other than one who was ready to commit it, and

5. [Defendant] was not a person who was ready to commit the crime.

It is not entrapment if [defendant] had the predisposition to commit the [crime charged]. [Defendant] had the predisposition if before any law enforcement officer or person acting for the officer persuaded, induced, or lured [defendant], he had a readiness or willingness to commit [crime charged] if the opportunity presented itself.

. . .

"*On the issue of entrapment, the defendant must prove to you by a preponderance of the evidence that his criminal conduct occurred as a result of entrapment.*" [e.s.]

Fla. Std. Jury Instr. (Crim.) 39a–39b (1989). Before the adoption of this amended instruction in 1989, the final paragraph of the standard instruction on entrapment had read: "On the issue of entrapment, the State must convince you beyond a reasonable doubt that the defendant was not entrapped." When the drafting committee transmitted the proposed new instruction to the court, it specifically called the court's attention to this change in the instruction on burden of proof for entrapment. *In re Standard Jury Instr. in Criminal Cases*, 543 So. 2d 1205 (Fla. 1989). The court adopted the change without comment, however.[3]

Entrapment as a theory of defense originated in *Sorrells v. United States*, 287 U.S. 435 (1932). The theory adopted came to be called the "subjective" theory of entrapment, and there was general agreement that it involved two separate elements: "inducement" and "predisposition of the accused to commit the crime." *Sherman v. United States*, 356 U.S. 369 (1958). In *Cruz v. State*, 465 So.2d 516 (Fla.), *cert. denied*, 473 U.S. 905 (1985), the Florida Supreme Court specifically rejected the subjective test for entrapment, however, and adopted instead the basic principles of the "objective" standard of entrapment.

When the legislature enacted section 777.201 in 1987, it overruled *Cruz* to the extent that *Cruz* was not founded on a constitutional basis, and specifically adopted the subjective test for entrapment as the substantive law in Florida. In *Herrera v. State*, 594 So.2d 275 (Fla. 1992), the court considered a certified question from this court as to whether section 777.210 unconstitutionally shifted the burden of proof to the defendant to prove entrapment.[4] The court held that the statute was not unconstitutional on that ground, explaining as follows:

"*Herrera* argues that this Court's decisions on previous versions of the entrapment instruction, e.g., *State v. Wheeler*, 468

So.2d 978 (Fla. 1985), demonstrate that the new instruction and subsection 777.201(2) violate the due process clauses of the United States and Florida Constitutions. The State, on the other hand, contends that the instruction and statute are constitutional because they shift only the burden of persuasion of an affirmative defense, not the burden of proving the elements of the crime charged and the defendant's guilt. The two district courts that have considered this issue have agreed with the State. *E.g.*, *Krajewski v. State*, 587 So.2d 1175 (Fla. 4th DCA 1991); *Gonzalez v. State*, 571 So.2d 1346 (Fla. 3d DCA 1990), *review denied*, 584 So.2d 998 (Fla. 1991). We do likewise.

"Entrapment is a judicially created affirmative defense designed to prevent the government from contending a defendant 'is guilty of a crime where the government officials are the instigators of his conduct.' *Sorrells v. United States*, 287 U.S. 435, 452, 53 S.Ct. 210, 216, 77 L.Ed. 413 (1932). To this end, '[t]he predisposition and criminal design of the defendant are relevant.' *Id.* at 451, 53 S.Ct. at 216. If the defendant 'is a person otherwise innocent whom the government is seeking to punish for an alleged offense which is the product of the creative activity of its own officials . . . . common justice requires that the accused be permitted to prove it.' *Id.* Thus, we have defined the 'essential element of the defense of entrapment' as 'the absence of a predisposition of the defendant to commit the offense.' *State v. Dickinson*, 370 So.2d 762, 763 (Fla. 1979). Subsection 777.201(1) now provides that lack of predisposition is an element of the defense.

"Over the years Florida courts have gone back and forth on which side must produce evidence regarding the defendant's having been entrapped. Some cases hold that defendants must show entrapment by proving their lack of predisposition toward criminal activity. . . . Other cases have held that the State must disprove entrapment by showing the defendant's predisposition to commit the offense. . . . Subsection 777.201(2) evidences the legislature's intent that the defendant should prove entrapment instead of requiring the State to disprove it."

594 So. 2d at 277. After noting that the burden of proving the elements of a crime may not, under the Due Process Clause, be shifted to the defendant, *Sandstrom v. Montana*, 442 U.S. 510 (1979), the court held:

"For the first time the State, through the legislature, has decided that the burden is on defendants claiming entrapment to prove that they were entrapped. § 777.201(2). We hold that allocating this burden to a defendant is not unconstitutional. *Cf. Patterson* [v. *New York*, 432 U.S. 197, 210, (1977)] (the Court refused 'to adopt as a constitutional imperative, operative countrywide, that a State must disprove beyond a reasonable doubt every fact constituting any and all affirmative defenses related to the culpability of the accused' because '[p]roof of the nonexistence of all affirmative defenses has never been constitutionally required.')

"As stated earlier, the lack of predisposition to commit the crime charged is an essential element of the defense of entrapment. The predisposition to commit a crime, however, is not the same as the intent to commit that crime. As explained by the New Jersey Supreme Court in its consideration of this issue, 'predisposition is not the same as mens rea. The former involves the defendant's character and criminal inclinations; the latter involves the defendant's state of mind while carrying out the allegedly criminal act.' *State v. Rockholt*, 96 N.J. 570, 476 A.2d 1236, 1242 (1984). Requiring a defendant to show lack of predisposition does not relieve the State of its burden to prove that the defendant committed the crime charged."

594 So. 2d at 278. Thus, the court explicitly recognized that section 777.201 was not unconstitutional in requiring a defendant to prove lack of predisposition to commit the crime charged.

Exactly two months after *Herrera* was decided by the Florida Supreme Court, the United States Supreme Court handed down its own entrapment decision, which also addressed the defendant's burden of proof in establishing this defense. In *Jacobson v. United States*, 503 U.S. 540 (1992), the Court set aside a convic-

tion upon a conclusion that the defendant was entrapped as a matter of law. The Court said:

> "In their zeal to enforce the law, however, Government agents may not originate a criminal design, implant in an innocent person's mind the disposition to commit a criminal act, and then induce commission of the crime so that the Government may prosecute. [c.o.] Where the Government has induced an individual to break the law and the defense of entrapment is at issue, as it was in this case, *the prosecution must prove beyond reasonable doubt that the defendant was disposed to commit the criminal act prior to first being approached by Government agents.*" [e.s.]

> "[2]Inducement is not at issue in this case. The Government does not dispute that it induced petitioner to commit the crime. *The sole issue is whether the Government carried its burden of proving that petitioner was predisposed to violate the law before the Government intervened. The dissent is mistaken in claiming that this is an innovation in entrapment law and in suggesting that the Government's conduct prior to the moment of solicitation is irrelevant. See post,* at 1544-1545. *The Court rejected these arguments six decades ago in Sorrells.* . . . Indeed, the proposition that the accused must be predisposed prior to contact with law enforcement officers is so firmly established that the Government conceded the point at oral argument, submitting that the evidence it developed during the course of its investigation was probative because it indicated petitioner's state of mind prior to the commencement of the Government's investigation." [e.s.]

503 U.S. at 508–509. Hence, under *Jacobson* it is the prosecution rather than the defendant that has the burden of proving predisposition beyond a reasonable doubt.

In *Munoz v. State,* 629 So. 2d 90 (1993), where the court next confronted the issue, the court faced conflicting decisions among the district courts of appeal as to whether section 777.201 had abolished objective entrapment in Florida. It began by noting that its previous decisions, coupled with the enactment of section 777.201, had created substantial uncertainty. Its basic holding in *Munoz* is that while the legislature did in fact eliminate objective entrapment, the legislature could not prohibit the judiciary from reviewing the application of entrapment in any individual case for possible violations under the Due Process Clause; and, further, that the courts have the power to conclude in any case that entrapment was established as a matter of law.

During the course of its opinion in *Munoz,* the court canvassed the history of entrapment in both supreme courts. The court summarized the federal holding on entrapment thus:

> "In summary, under the subjective test set forth by the United States Supreme Court, *once a defendant raises entrapment as a defense, the defendant has the burden to establish that the government induced the defendant to commit the offense charged. However, once that burden is met, the burden shifts to the government to establish the defendant's predisposition to commit the offense.* [c.o.] In proving a defendant's predisposition, the government must establish that the defendant was predisposed to commit the offense both prior to and independent of the government's inducement. [c.o.] In doing so, the government may make an appropriate and searching inquiry into the conduct of the defendant and present evidence of the defendant's prior criminal history so long as that history is relevant to the issue of the defendant's predisposition." [e.s.]

629 So. 2d at 95. Later, after discussing the Florida decisions, the court noted that when *Herrera* was decided "at that time, the United States Supreme Court's decision in *Jacobson* had not been rendered." 629 So. 2d at 97. It was at this point that the court candidly acknowledged the uncertainty of the entrapment law in Florida.

Turning its attention to section 777.201, the court stated:

> "The first question to be addressed under the subjective test is whether an agent of the government induced the accused to commit the offense charged. On this issue, the accused has the burden of proof and, pursuant to section 777.201, must establish this

factor by a preponderance of the evidence. If the first question is answered affirmatively, the second question arises as to whether the accused was predisposed to commit the offense charged; that is, whether the accused was awaiting any propitious opportunity or was ready and willing, without persuasion, to commit the offense. On this second question, according to our decision in *Herrera,* the defendant initially has the burden to establish lack of predisposition. *However, as soon as the defendant produces evidence of no predisposition, the burden then shifts to the prosecution to rebut this evidence beyond a reasonable doubt.* In rebutting the defendant's evidence of lack of predisposition, the prosecution may make 'an appropriate and searching inquiry' into the conduct of the accused and present evidence of the accused's prior criminal history, even though such evidence is normally inadmissible. However, admission of evidence of predisposition is limited to the extent it demonstrates predisposition on the part of the accused both prior to and independent of the government acts. . . .

> "The third question under the subjective test is whether the entrapment evaluation should be submitted to the jury. Section 777.201 directs that the issue of entrapment be submitted to the trier of fact. Such direction is consistent with the subjective evaluation of entrapment because the two factual issues above ordinarily present questions of disputed facts to be submitted to the jury as the trier of fact. However, if the factual circumstances of a case are not in dispute, if the accused establishes that the government induced the accused to commit the offense charged, and if the State is unable to demonstrate sufficient evidence of predisposition prior to and independent of the government conduct at issue, then the trial judge has the authority to rule on the issue of predisposition as a matter of law." [e.s.]

629 So. 2d at 99-100. It is apparent from *Munoz* that the court has now aligned the law of entrapment in Florida and the shifting burden of proof with that of the United States Supreme Court in *Jacobson.*

Under this new formulation set forth in *Munoz,* it seems clear that the following text from the current standard jury instruction is inaccurate or incomplete:

> "the defendant must prove to you by a preponderance of the evidence that his criminal conduct occurred as a result of entrapment."

*Munoz* held that the defendant has the burden of proving inducement. Moreover, once defendant presents any evidence showing a lack of predisposition, the burden of proving predisposition then shifts back to the prosecution to overcome the defendant's showing beyond a reasonable doubt. Thus, we agree that the standard jury instruction does not fairly and correctly present the current state of the law on this issue. The trial judge should therefore have given an instruction that complies with *Munoz. State v. Bryan,* 287 So. 2d 73 (Fla. 1973), *cert. denied,* 417 U.S. 912 (1974) (despite the supreme court's approval of the standard jury instructions, the trial judge is not relieved of his or her responsibility under the law to correctly charge the jury).

It should be noted that the judge is not necessarily required to submit the issue of entrapment to the jury. *Munoz* held that the judge may decide the issue as a matter of law where the facts are not in dispute. Accordingly, we leave this option open to the trial judge in this case; if she submits the issue to the jury, however, we think the instruction given must adequately reflect the current state of the law.

REVERSED. (GLICKSTEIN and GROSS, JJ., concur.)

---

[1]*See* § 16(a), Art. I, Fla. Const. (as amended 1988) (accused shall have right "to confront at trial adverse witnesses").

[2]Ordinarily, because of mootness, we would not now address this jury instruction issue. The parties have fully briefed the issue, and it is material to the issues tried. Moreover, it is very probable that the issue will remain unsettled throughout the retrial, and so we address it now in the interests of justice and to facilitate the ultimate disposition of this case.

This amended instruction, in turn, copied the text of the applicable statute, which reads:

"(1) [An officer] perpetrates an entrapment if, for the purpose of obtaining evidence of the commission of a crime, he induces or encourages and, as a direct result, causes another person to engage in conduct constituting such crime by employing methods of persuasion or inducement which create a substantial risk that such crime will be committed by a person other than one who is ready to commit it.

"(2) A person prosecuted for a crime shall be acquitted if he proves by a preponderance of the evidence that his criminal conduct occurred as a result of an entrapment. The issue of entrapment shall be tried by the trier of fact."

§ 777.201, Fla. Stat. (1995).

[4]See Herrera v. State, 580 So.2d 653, 654 (Fla. 4th DCA 1991).

*    *    *

**Torts—Action against corrections officers by plaintiff who, while incarcerated, was assaulted by fellow inmate—Allegations that defendants ignored repeated pleas for protection, that assault occurred in presence of one of defendants, that defendants had prior knowledge of or reason to anticipate danger to plaintiff, and that defendants acted in bad faith and with malicious purpose in failing to take protective action sufficient to state cause of action—Error to grant motion to dismiss**

JOHN W. HARRIS, Appellant, v. ANTHONY MONDS and KENNETH MITCHELL, Appellees. 4th District. Case No. 96-1382. Opinion filed July 2, 1997. Appeal from the Circuit Court for the Nineteenth Judicial Circuit, Martin County; Cynthia G. Angelos, Judge; L.T. Case No. 94-174-CA. Counsel: John W. Harris, Defuniak Springs, pro se. Karen M. Nissen of Vernis & Bowling of Palm Beach, P.A., Jupiter, for appellees.

(PARIENTE, J.) This is an appeal from the dismissal of appellant's seventh amended complaint. In considering a motion to dismiss, we are obligated to accept all factual allegations in the complaint as true. See Laganella v. Boca Grove & Tennis Club, Inc., 690 So. 2d 705, 706 (Fla. 4th DCA 1997); Hollywood Lakes Section Civic Ass'n v. City of Hollywood, 676 So. 2d 500, 501 (Fla. 4th DCA 1996). In accordance with this principle, we are compelled to reverse.

Appellant's cause of action arises out of injuries he claims he sustained while incarcerated. Because appellant was in custody at the time of his alleged injuries, he was owed a common law duty of reasonable care by the corrections officers charged with his supervision. See Department of Health & Rehabilitative Servs. v. Whaley, 574 So. 2d 100, 103 (Fla. 1991); Hutchinson v. Miller, 548 So. 2d 883, 885 (Fla. 5th DCA 1989); Dunagan v. Seely, 533 So. 2d 867 (Fla. 1st DCA 1988). This duty is an operational level function not protected by sovereign immunity. See Whaley, 574 So. 2d at 103; Hutchinson, 548 So. 2d at 886; Dunagan, 533 So. 2d at 868.

In the cases relied on by appellees, either the plaintiffs were not incarcerated or no special relationship existed giving rise to the common law duty of reasonable care. See, e.g., George v. Hitek Community Control Corp., 639 So. 2d 661 (Fla. 4th DCA 1994). Because appellant was in custody at the time of the alleged injuries, these cases are inapposite.

Appellant alleges a breach of appellees' duty to protect him from assault by a fellow inmate. The gist of the factual allegations of appellant's seventh amended complaint is that appellees ignored his repeated pleas for protection, and that the assault in fact occurred in the presence of one of the appellees. Appellant further alleges that appellees had prior knowledge of or reason to anticipate the danger to appellant.

Appellant also alleges that appellees, by failing to take action to protect him from this known danger, acted in bad faith and with malicious purpose. Because appellees have been sued in their individual capacities, this additional allegation must be proved in order to exempt them from the protective cloak of sovereign immunity.[1] See § 768.28(9)(a), Fla. Stat. (1995).

If appellant is unable to establish facts sufficient to support a finding that appellees acted in bad faith, with malicious purpose, or in a manner exhibiting a wanton and willful disregard of his safety, appellees will be entitled to a judgment in their favor. At this stage of the proceedings, however, the allegations of appellant's seventh amended complaint state a cause of action. Accordingly, we reverse and remand with directions to reinstate the seventh amended complaint.

REVERSED (GLICKSTEIN and KLEIN, JJ., concur.)

[1]Our court has held that the duty to protect a prisoner from injuries caused by a third party arises only if there is knowledge of the danger or at least reason to anticipate such danger. See Spann v. State Dep't of Corrections, 421 So. 2d 1090, 1091 (Fla. 4th DCA 1982), petition for review denied, 430 So. 2d 452 (Fla. 1983). Spann has been followed by the fifth district in Hinson v. Miller, 681 So. 2d 1213 (5th DCA 1996). Concerned that Spann imposed an "exceptional element" to establish foreseeability, the first district declined to follow Spann in Jackson v. Milner, 654 So. 2d 1045 (Fla. 1st DCA), review denied, 662 So. 2d 932 (Fla. 1995). Spann and Jackson both involved suits against the governmental agency and not against the individual employees.

*    *    *

**Criminal law—Trial court's restriction on defense counsel's direct examination of defendant was harmful error—Questioning concerning substance of defendant's prior convictions would have revealed that prior convictions concerned credit card fraud, not sexual assault type offenses—If defendant was permitted to explain that he pled guilty in prior case because he was guilty, implied assertion would have been that he was not guilty in instant case because he chose to go to trial—Where only eyewitness testimony as to what happened was conflicting testimony of victim and defendant, credibility of defendant was significant issue**

JOHN ZIERMANN, Appellant, v. STATE OF FLORIDA, Appellee. 4th District. Case No. 96-2701. Opinion filed July 2, 1997. Appeal from the Circuit Court for the Seventeenth Judicial Circuit, Broward County; Mark A. Speiser, Judge; L.T. Case Nos. 93-18039 CF10A & 95-22043 CF10A. Counsel: John H. Pelzer and Allyson D. Goodwin of Ruden, McClosky, Smith, Schuster & Russell, P.A., Fort Lauderdale, for appellant. Robert A. Butterworth, Attorney General, Tallahassee, and Patricia Ann Ash, Assistant Attorney General, West Palm Beach, for appellee.

(PER CURIAM.) While we are not persuaded by appellant's first point on appeal, we are as to his second; therefore, we reverse and remand for new trial.

It was harmful error for the trial court to refuse to permit appellant's counsel to conduct direct examination of his client in accordance with Lawhorne v. State, 500 So. 2d 519, 521 (Fla. 1986); Johnson v. State, 679 So. 2d 791 (Fla. 3d DCA 1996), rev. denied, 689 So. 2d 1070 (Fla. 1997); and Vann v. State, 666 So. 2d 176 (Fla. 5th DCA 1995).

The only eyewitness testimony as to what happened was the conflicting testimony of the victim and appellant. Thus, the credibility of appellant was significant in this case. If the defense had been permitted to ask appellant about the substance of his prior convictions, the jury would have learned that appellant's prior convictions concerned credit card fraud, i.e., not sexual assault type offenses. Furthermore, if appellant had been permitted to explain that he pled guilty in the prior case because he was guilty, the implied assertion would be that he was not guilty in this case because he chose to go to trial. Under these circumstances, it cannot be said beyond a reasonable doubt that the trial court's error did not contribute to appellant's conviction. (GLICKSTEIN, KLEIN and PARIENTE, JJ., concur.)

*    *    *

**Criminal law—Juveniles—Judges—Disqualification—Prohibition—Allegation that presiding judge had been prosecuting attorney in prior prosecution of juvenile supported juvenile's claim of well founded fear that he would not receive fair trial before judge—Judge's voluntary disclosure of friendship with juvenile's case worker not legally sufficient in and of itself to require disqualification**

W.I., a child, Petitioner, v. STATE OF FLORIDA, Respondent. 4th District. Case No. 97-1395. Opinion filed July 2, 1997. Petition for writ of prohibition to the Circuit Court of the Nineteenth Judicial Circuit, Okeechobee County; Shirley M. Brennan, Judge; L.T. Case No. 97-142CJ. Counsel: Karen L. Johnson, Stuart, for petitioner. Robert A. Butterworth, Attorney General, Tallahassee,

# EXHIBIT O

IN THE DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT, P.O. BOX 3315, WEST PALM BEACH, FL 33402

FRITZ MAIGNAN                           CASE NO. 96-02152

  Appellant(s),

vs.

STATE OF FLORIDA                        L.T. CASE NO. 95-14021 CF10B
                                        BROWARD

  Appellee(s).

November 14, 1997
_____

BY ORDER OF THE COURT:

      ORDERED that appellant's motion filed October 16, 1997,
for rehearing is hereby denied.

I hereby certify the foregoing is a
true copy of the original court order.

MARILYN BEUTTENMULLER
CLERK

cc:    Public Defender 15
       Attorney General-W. Palm Beach

       /CH

RECEIVED
OFFICE OF THE
ATTORNEY GENERAL

NOV 17 1997

CRIMINAL OFFICE
WEST PALM BEACH

# EXHIBIT   P

# M A N D A T E

4-0283

from

## DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA

### FOURTH DISTRICT

This cause having been brought to the Court by appeal, and after due consideration the Court having issued its opinion;

YOU ARE HEREBY COMMANDED that such further proceedings be had in said cause as may be in accordance with the opinion of this Court, and with the rules of procedure and laws of the State of Florida.

WITNESS the Honorable Barry J. Stone, Chief Judge of the District Court of Appeal of the State of Florida, Fourth District, and seal of the said Court at West Palm Beach, Florida on this day.

DATE:                December 5, 1997

CASE NO.:            96-2152   96-1-5331

COUNTY OF ORIGIN:    Broward

T.C. CASE NO.:       95-14021 CF10B

STYLE:               Fritz Maignan v. State

RECEIVED
OFFICE OF THE
ATTORNEY GENERAL

DEC 8 1997

CRIMINAL OFFICE
WEST PALM BEACH

## A TRUE COPY

Marilyn Beuttenmuller, Clerk
District Court of Appeal
Fourth District

ORIGINAL TO:  Hon. Robert E. Lockwood, Clerk

cc:  Public Defender #15
     Attorney General - W. Palm Beach

     /CR

# EXHIBIT  Q

IN THE CIRCUIT COURT OF THE SEVENTEENTH JUDICIAL CIRCUIT
IN AND FOR BROWARD COUNTY FLORIDA.

STATE OF FLORIDA,                    :

Plaintiff,

v.                                   :          L.T. CASE NO: 95-14021CF10B

FRITZ MAIGNAN,                       :

Defendant.                           :

_____     :

## MOTION FOR POSTCONVICTION RELIEF

Comes Now, the Defendant, **FRITZ MAIGNAN**, Pro Se, in the above-styled cause, and pursuant to **Fla.R.Crim.P. 3.850**, and moves this Honorable Court for an order vacating the judgment of conviction entered in this action. In support thereof, Defendant would avers the following:

(1).  The conviction under attack were entered in the Circuit Court of the Seventeenth Judicial Circuit, in and for, Broward County, Florida.

(2).  The date the judgment of conviction were entered is June 14, 1996.

(3).  The nature of the offense involved is one count of conspiracy to traffic in cocaine.

(4).  The length of the sentence imposed is fifteen years in prison for the conspiracy to traffice in cocaine conviction.

(5).  The Defendant plead not guilty to the charge.

(6).  A jury trial was held on June 14,1996.

ailing professional standards, and the clear and substantial deficiencies shown must be further demonstrated to have so affected the fairness and reliability of the proceedings that confidence in the outcome is undermined. **Maxwell v. Wainwright**, 490 So.2d 927, 932(Fla.1986). The claims raised in the foregoing motion for postconviction relief and more fully analyzed here set forth specific acts and omissions of trial counsel that do undermine the confidence of this judgment of conviction.

## THE STANDARD OF FUNDAMENTAL ERROR.

**Rule 90.104(3)** of the Florida Evidence Code states that "...Nothing shall preclude a court from taking notice of fundamental errors affecting substantial rights, even though such errors were not brought to the attention of the trial judge." Fundamental error is defined as "error which goes to the foundation of the case or goes to the merits of the cause of action, and must be basic to judicial decision under review and equivalent to a denial of due process." **Hopkins v. State**, 632 So.2d 963 (Fla.1994). Finally, fundamental error may be raised for the first time at any point, including in postconviction proceedings. **Patel v. State**, 679 So.2d 850(Fla.1st DCA 1996).

## LAW AND ANALYSIS

**ISSUE ONE: TRIAL COUNSEL PROVIDED INEFFECTIVE ASSISTANCE BY FAILING TO CALL JOSEPH CLARK, THE CONFIDENTIAL INFORMANT IN THIS CASE, TO TESTIFY AT TRIAL.**

When the defense of entrapment is raised by the accused in a criminal trial, he has the burden of proving by a preponderance of the evidence the government or one of its agents improperly induced him to commit the offense charged. If this burden is met, the state, in order to defeat the

affirmative defense and have the cause sent to the jury, must prove beyond a reasonable doubt the accused was predisposed to commit the offense. **Munoz v. State**, 629 So.2d 90,99(Fla.1993).

In this case, the only evidence offered by defense counsel to prove improper inducement was the trial testimony of the codefendants. Had **Joseph Clark** been called, his testimony would not only have corroborated their otherwise self-serving statements, but since he was the creator of the alleged conspiracy, his testimony that yes, he initiated the contact with the codefendants even though he knew they were <u>not</u> involved in the drug trade, and that yes, he had on several occasions promised the co-defendants big, easy money in the drug trade even though they were initially unwilling to cooperate, would have provided first-hand, determinitive evidence of improper inducement. It logically follows that in the very least this testimony would have positively influenced the jury's consideration of **Fritz's** entrapment defense. There is also a reasonable probability **Mr.Clark's** testimony would have convinced the trial court to grant **Fritz's** request for judgment of acquittal on the conspiracy to traffic cocaine charge.

In **Palmer v. State**, 683 So.2d 678(Fla.4th DCA 1997) the Fourth District Court of Appeal adopted the test set forth by the First District in the case of **Highsmith v. State**, 617 So.2d 825(Fla.1st DCA 1993) for determining what constitutes a facially sufficient claim of ineffective assistance of counsel based on failing to call a witness at trial. Pursuant to **Highsmith** and **Palmer**, a facially sufficient claim under these circumstances is made **a)** the witness is identified; **b)** the substance of the witness' testimony is alleged; and **c)** the prejudicial impact of the

omission of the witness' testimony is explained. Defendant meets this test and is thus entitled to an evidentiary hearing to more fully develpoe this claim. **Saunders v. State**, 23 Fla.L.Weekly D266(Fla.4th DCA, Jan.21, 1998).

**ISSUE TWO: THE TRIAL COURT COMMITTED FUNDAMENTAL ERROR IN ADMITTING INTO EVIDENCE, OVER DEFENSE OBJECTION, THE RECORDED THREE-WAY TELEPHONE CONVERSATION BETWEEN THE CODEFENDANTS, THE D.E.A. AGENT, AND THE INFORMANT.**

In the case of **Aneiro v. State**, 674 So.2d 913(Fla.4th DCA) review denied, **686 So.2d 582(Fla.1996)** the Fourth District Court of Appeal was confronted with a virtually indistinguishable case. There, the state sought to introduce the tape-recorded hearsay of a confidential informant. On this tape, the informant spoke with **Jose Aneiro** to arrange a cocaine delivery. The state's theory of admissibility was that the tape recording served to prove the nature of the act, thus admissible as verbal acts evidence. The appellant, at trial, objected on the basis the tape recording was hearsay as the informant was not testifying. The trial court overruled the objection and admitted the tape which was then published to the jury.

It wasn't until the closing arguments in the **Aneiro** trial that the prosecutor's true purpose in seeking admission of the tape came to light. During the summation, the prosecutor argued the tape proved **Jose Aneiro's** testimony he didn't even know what kind of car the informant would be delivering the cocaine in (which implied **Mr.Aneiro** could not have been involved in a conspiracy) was false. **Aneiro v. State**, 674 So.2d at 914.

On direct appeal appellant argued this ulterior motive was in fact the true intent of the prosecutor in seeking the tape's admission. He

-4-

further argued the tape was used to prove the truth of the matter asserted, that being the state's position **Mr.Aneiro's** statements denying knowledge of the type of vehicle the cocaine would be delivered in was false. The Fourth District agreed and reversed and while the court did not specifically hold the appellant's one objection to the admission of the tape as it was introduced was sufficient to preserve the issue for review, the court did comment on the sole objection and proper preservation was implied. Id., at **913**.

**Aneiro** is on all fours with this case. Here, the state attorney argued during trial the telephone conversation between the co-defendants, the agent, and the informant, was admissible as verbal acts evidence in response to the defense hearsay objection. (Trial Transcript, **pp. 77-80**). The trial court agreed with the state, admitted the tape, and published it to the jury. Then, in closing argument, the prosecutor argued to the jury the tape proved          **Maignan** was preparing to rob the undercover D.E.A. agent. (Trial Transcript, p.414). And the prosecutor did not stop with this one improper reference. He also argued the three-way conversation proved the more general allegation of conspiracy when he stated "You heard the tape on August 10th when there is a three way between **Fritz Maignan,** [the defendant] and the informant, and Heath Anderson where Maignan says hey, remember when I told you I was going to Florida and to put me on to somebody. That's what this is all about." (Trial Transcript.p.418) (Emphasis supplied). There is simply no other way to characterize the purpose this hearsay served other than proving the truth of the matters asserted; conspiring to possess cocaine by stealing it.

Since the true purpose behind the admission of the tape was imperm-

-5-

issible and because defense counsel made a timely and specific hearsay
objection to the admission of this tape, the trial court did err in
allowing its admission. Because the erroneously admitted hearsay was used
to both support the state's theory of prosecution and impeach the credi-
bility of the defendant who denied trying to steal the cocaine, the error
is fundamental in nature. Thus, a new trial must be ordered.

**Aneiro v. State**, 674 So.2d at 913.

**ISSUE THREE: TRIAL COUNSEL PROVIDED
INEFFECTIVE ASSISTANCE BY FAILING
TO INCORPORATE A SUFFICIENCY OF
THE EVIDENCE ARGUMENT IN HIS
MOTION FOR JUDGMENT OF ACQUITTAL
ON THE CONSPIRACY TO TRAFFIC COCA-
INE CHARGE.**

In this case, there was no evidence presented by the state to even
suggest a conspiracy between Fritz and Katan Maignan to rob the D.E.A.
agent of his cocaine. Pursuant to Rule 3.380(b) of the Florida Rules of
Criminal Procedure defense counsel should have incorporated this parti-
cular argument in his motion for judgment of acquittal in order to have
both the trial and appellate courts entertain it.  He did not and instead
argued the issue of subjective entrapment.

**Strickland v. Washington, supra,** states an attorney renders ineff-
ective assistance when his acts or omissions prejudice his client's
interests and there is a reasonable probability that but for counsel's
error, the outcome of the proceedings would have been different. Id.,
**104 S.Ct. at 2068.**  In this case. That means Defendant has to both prove
counsel's decision to pursue the entrapment argument and ignore the
sufficiency of the evidence argument was erroneous and prejudicial.  He

believes is was.

Defendant does not dispute there were colorable claims of entrapment and abandonment here to be amde. However, the sufficiency of the evidence claim was at least as meritorious as these other claims, if not more. Counsel simply had to ask the court to conisder the absence of any evidence establishing Fritz's [Defendant] knowledge of Katan's alleged plan to rob the agent. Had he done so, the motion then would have been granted. Thus, under **Strickland,** counsel was ineffective and as a result, the conviction for conspiracy to traffic cocaine should be vacated and the charge dismissed.

**ISSUE FOUR: TRIAL COUNSEL PROVIDED
INEFFECTIVE ASISTANCE BY FAILING
TO OBJECT TO AN INCOMPLETE JURY
INSTRUCTION ON THE STATE'S BURDEN
OF PROOF AS TO PROVING THE PREDIS-
POSITION OF THE DEFENDANT BEYOND A
REASONABLE DOUBT.**

In **Vazquez v. State,** 700 So.2d 5 **(Fla.4th DCA 1997),** the court held the standard jury instructions on entrapment, the very same jury instructions given in this case, do not accurately and completely present the state of the law on this issue. **Vazquez,** 700 So.2d at 13.

The court there reversed appellant's convictions and remanded for a new trial because the jury was not instructed that the state carries the burden of proving beyond a reasonable doubt the defendant was predisposed to commit the offense charged. Id. Because Fritz Maignan received the identical instructions in his trial and because the law was already well-established, defense counsel was ineffective for failing to object and request the complete entrapment intsruction.

While it seems this Defendant is claiming his trial attorney should have predicted the court's opinion in **Vazquez,** as previously stated, the

underlying principles of the **Vazquez** decision were already in place at the time of Fritz's trial.

In **State v. Bryan**, 287 So.2d 73 (Fla.1973) <u>cert. denied</u>, 417 U.S. 912, 94 S.Ct. 2611, 41 L.Ed.2d 216(1974) our State Supreme Court held that despite its approval of the standard jury instructions, trial judges should still deviate from them when it becomes necessary. With this in mind, and considering the recent case of **Munoz v. State**, 629 So.2d 90 **(Fla.1993)**, the **Vazquez** court held it was error for the trial court to fail to include in its instruction on entrapment a statement that the government, not the defendant, has to prove predisposition beyond a reasonable doubt. <u>Id</u>.

In this case, the same standard the appellate court in **Vazquez** imposed upon the trial court, should be imposed upon trial counsel. That the state be required to prove predisposition beyond a reasonable doubt was a well-settled principle of law in Florida at the time of Fritz's trial. Thus, counsel had a duty to ensure his client's jury was presented with the correct law. It wasn't the improper instruction concerned the critical area of reasonable doubt, and counsel failed to object to this. As there is a reasonable probability the jury's verdict would have been different had it received the correct instruction, counsel was ineffective and a new trial must be ordered.

**ISSUE FIVE: TRIAL COUNSEL PROVIDED INEFFECTIVE ASSISTANCE BY FAILING TO MOVE TO DISMISS THE CONSPIRACY TO TRAFFIC COCAINE CHARGE BASED ON THE D.E.A. AGENT'S IMPROPER SUPERVISION OF THE CONFIDENTIAL INFORMANT WHICH IN TURN VIOLATED DEFENDANT'S RIGHT TO DUE PROCESS OF LAW AND HIS RIGHT TO PRIVACY.**

The Fifth and Fourteenth Amendments to the United States Constitu-

-8-

tion prohibit government sponsored criminal investigations that amount
to nothing more than fishing expeditions. See, **U.S. v. HUNT**, 749 F.2d
1078,1087 (4th Cir.1984). Furthermore, if the government's conduct
in one of these fishing expeditions, or a sting operation is so active
that its conduct fabricated elements of the offense ultimately charged,
it might be considered a violation of due process to prosecute the
defendant. See, **U.S. v. Steinhorn**, 739 F.Supp.268 (D.Md.1990).

Thus, it logically follows that the unsupervised actions of a
confidential informant can give rise to due process and privacy challenges
to a conviction when the informant's conduct, due to the government's
failure to supervise, was so outrageous as to create an otherwise non-
existant proclivity in the accused to commit the offense charge.

In this case, it is an undisputed fact Joseph Clark initiated the
contact with the defendants. (Trial Transcript, p.299). It is also
undisputed Mr. Clark never saw the Defendants selling, buying. or using
cocaine--ever. (Trial Transcript,p.345).  Therefore, this Court should
find there was no on--going criminal endeavors on the part of the Defen-
dants.  In essence, the government agents here created crime where none
existed. There is impermissible. **Lewis v. State**, 597 So.2d 842 (Fla.3d
DCA 1992). And, as the government's quest for a conviction in this case
led to the apprehension  of Fritz Maignan, an otherwise law-abiding
citizen who, if left to his own devices, likely would never have run
afoul of the law, this court could have, and should have, interfered by
granting a motion to dismiss.  **Jackson v. U.S.**, 503 U.S. 540,553-54, 112
S.Ct.1535,1543,118 L.Ed.2d 174 (1992). Consequently, the conviction for
conspiracy must be vacated and the charge dismissed.

<u>OATH</u>

STATE OF FLORIDA)
                : SS
COUNTY OF DESOTO)

Under the authority of section **92.525, Fla.Stat.,** and <u>State v. Shearer</u>, **628 So.2d 1102(Fla.1994),** the defendant makes the following oath under the penalties of perjury:

**UNDER PENALTIES OF PERJURY, I DECLARE THAT I HAVE READ THE FOREGOING MOTION FOR POSTCONVICTION RELIEF AND THAT THE FACTS STATED IN IT ARE TRUE.**

/S/ _Keigasan fritz_____,
DATED___June 19,_____1998.

-10-

IN THE CIRCUIT COURT OF THE SEVENTEENTH JUDICIAL CIRCUIT
IN AND FOR BORWARD COUNTY FLORIDA.

STATE OF FLORIDA,

      Plaintiff,        :

v.                   :

FRITZ MAIGNAN,

      Defendant.      :

_____:

                                  L.T. CASE NO: 95-14021CF10B

## STATEMENT OF GROUNDS AND SUPPORTING FACTS

**ISSUE ONE: TRIAL COUNSEL PROVIDED
INEFFECTIVE ASSISTANCE BY FAILING
TO CALL JOSEPH CLARK, THE CONFID-
ENTIAL INFORMANT IN THIS CASE, TO
TESTIFY AT TRIAL.**

      Trial counsel was ineffective for failing to call as a witness at
this trial **Joseph Clark. Mr. Clark,** who was the confidential informant in
this case, would have testified he initiated the contact between himself
and **Fritz Maignan,** [the defendant]. In addition to this, Mr. Clark would
have also testified he **a)** was paid on a contingency basis for his infor-
ming services; **b)** had promised <u>both</u> **Fritz** and **Katan** "his brother and co-
defendant" big, easy money dealing the cocaine he was setting up for them
to purchase; **c)** that he was relentless in trying to bring the **Maignans**
into the drug trade by making numerous, uninvited appearences at **Fritz's**
job, and by making unsolicited telephone calls to both **Maignans;** and **d)**
that he had never seen either of the **Maignan** brothers selling, dealing,
or using cocaine. His testimony was crucial in establishing an independ-
ent source of credible evidence  to show the **Maignans** were in fact objec-

tively entrapped by government agents. While it is true some of this proffered testimony was given by **Fritz** and **Katan** at trial, no such testimony was elicited from any state witness which left the jury to evaluate the co-defendants' uncorroborated statements. Had the jury heard this testimony from one of the state's own, especially from the man responsible for creating the underlying events, there is a reasonable probability their verdict would have been different as the entrapment defense would have been much easier to believe. Defendant has identified the name of this witness, the witness was available to testify, and his testimony would have changed the outcome of the trial. Therefore, defense counsel was ineffective for failing to call **Joseph Clark** to testify. Thus, a new trial must be ordered.

**ISSUE TWO: THE TRIAL COURT COMMITTED FUNDAMENTAL ERROR IN ADMITTING INTO EVIDENCE, OVER DEFENSE OBJECTION, THE RECORDED THREE-WAY TELEPHONE CONVERSATION BETWEEN THE CODEFENDANTS, THE D.E.A. AGENT, AND THE INFORMANT.**

In this case, the state's theory of conspiracy was premised on the notion the **Maignans** intended to possess cocaine which they would steal from the undercover D.E.A. agent. The state's entire case was based on two trial developments: **1)** the D.E.A. agent's testimony he _believed_ the **Maignans** would try to rob him once he showed them the cocaine; and **2)** a three-way telephone conversation between the **Maignans'**, the agent, and the informant. It was this call the prosecutor referred to as proving both his theories that the **Maignans** revived the once-cancelled drug deal and that they intended to rob the agent during the new deal. Specifically, the prosecutor stated the **Maignans'** statements during the conversation "Why can't we do this [the drug deal] one on one" indicated the **Maignans'**

-2-

plan to get the agent alone which would make him an easier target.

The problem is that when the prosecutor sought to introduce the recorded conversation, he stated he wanted the tape admitted simply to prove the conversation did in fact take place, as opposed to proving the validity of his theory. This position is belied by the prosecutor's closing arguments to the jury. The tape was in fact used to prove the truth of the matter asserted, that being the **Maignans'** intended to obtain the agent's cocaine by stealing it. This renders the tape inadmissible hearsay because the informant never testified at trial. Furthermore, the error was reversible because the hearsay was used as the cornerstone of the state's case against the **Maignans.**

Trial counsel properly objected to the tape as it was being admitted. The court overruled and it was published to the jury. However, once the prosecutor revealed his true motive by asking the jury to question the **Maignans'** request for a one on one deal, the trial court committed fundamental error when it failed to revisit counsel's objection and order the jury to disregard all testimony heard on the tape and the prosecutor's argument, or order a mistrial.

Defendant is not unmindful that this claim, at first blush, presents an issue which could have been raised on direct appeal. However, this error is fundamental in nature, and a fundamental error can be raised at any time, including postconviction proceedings.

In sum, the prosecutor misled the court as to his reasons for seeking admission of the taped conversation. The prosecutor then evinced his true purpose for admitting the tape in closing arguments and the error was fundamental. As such, a new trial must be ordered.

-3-.

ISSUE THREE: TRIAL COUNSEL PROVIDED
INEFFECTIVE ASSISTANCE BY FAILING
TO INCORPORATE A SUFFICIENCY OF
THE EVIDENCE ARGUMENT IN HIS
MOTION FOR JUDGMENT OF ACQUITTAL
ON THE CONSPIRACY TO TRAFFIC COCA
INE CHARGE.

In arguing his motion for judgment of acquittal at the close of the state's case-in-chief, defense counsel only made mention of the fact the Maignans' were entrapped. There was absolutely no discussion whatsoever on the sufficiency of the evidence set forth by the state to prove a conspiracy. Nor was there any discussion whatsoever on whether the plan to steal the cocaine was solely the Maignans'.

At the close of all evidence, defense counsel again moved for judgment of acquittal on the conspiracy charge and again failed to assert the plan to steal the cocaine--the method in which possession of the cocaine was to be obtained--was exclusively the Maignans'.

The following facts are not in dispute. The only evidence presented by the state on the possession element of conspiracy was that Fritz and Katan met with the D.E.A. agent and negotiated a price for two kilograms of cocaine. However, shortly thereafter, all parties agreed the deal was off. Then, on his own initiative and with no further involvement from Fritz, Katan decided to revive the deal. There was no evidence presented Fritz had any knowledge of this last agreement between Katan and the agent. Consequently, there was no evidence presented by the state, because none existed, that there was a conspiracy between the Maignans' to rob the agent. Thus, the state's chosen theory of prosecution was not proven. However, defense counsel chose to argue Fritz's [Defendant] abandoment of the drug deal implied a unilateral act of Katan as opposed to a

-4-

conspiracy. While this could be considered a sound strategy had no other argument existed, an even more meritorious argument did exist and counsel failed to utilize it.

Had counsel used the lack of a sufficient amount of evidence to prove a conspiracy to rob the agent instead of, or as an alternative to, the abandonment argument, there is a reasonable probability his motion for judgment of acquittal would have been granted as there was simply more evidence proving the plan to rob the agent was exclusively the Maignans'. At the very least, this sufficiency of the evidence argument would have been preserved for appellate review. In light of these facts, counsel must be found to have rendered ineffective assistance and a new trial ordered.

**ISSUE FOUR: TRIAL COUNSEL PROVIDED INEFFECTIVE ASSISTANCE BY FAILING TO OBJECT TO AN INCOMPLETE JURY INSTRUCTION ON THE STATE'S BURDEN OF PROOF AS TO PROVING THE PREDISPOSITION OF THE DEFENDANT BEYOND A REASONABLE DOUBT.**

During its instructions to the jury, the trial court told them the Defendant had to prove beyond a preponderance of the evidence the Defendant was entrapped. The court was then required to further state the prosecution had the burden of proving beyond a reasonable doubt the Defendant was predisposed to commit the offense charged. It did not and counsel failed to object to the incomplete instruction.

The state of the law in this regard was clear at the time of Defendant's trial. The burden of proof was on the state to prove predisposition beyond a reasonable doubt. However, the intsruction as given in this case improperly shifted this burden to the Defendant and this was

-5-

reversible error.  As this was an incomplete and misleading instruction on reasonable doubt, counsel must be found to have rendered ineffective assistance by failing to object to it and by failing to request the complete instruction. As such, a new trial is necessary in which Defendant's jury is _properly_ instructed on the state's burden of proof as the entrapment defense.

**ISSUE FIVE: TRIAL COUNSEL PROVIDED INEFFECTIVE ASSISTANCE BY FAILING TO MOVE TO DISMISS THE CONSPIRACY TO TRAFFIC COCAINE CHARGE BASED ON THE D.E.A. AGENT'S IMPROPER SUPERVISION OF THE CONFIDENTIAL INFORMANT WHICH IN TURN VIOLATED DEFENDANT'S RIGHT TO DUE PROCESS OF LAW AND HIS RIGHT TO PRIVACY.**

Joseph Clark approached Fritz Maignan [Defendant] in New York and after several, uninvited appearences and numerous attempts, finally convinced Fritz and Katan Maignan to enter the drug trade with promises of big, easy money.  At this point in time, neither Fritz or Katan had any drug related criminal history and Mr. Clark had _never_ seen either of the Maignans' selling, using, or buying cocaine.

Once Mr. Clark advised his superior, _Heath Anderson_, of his contact with the Maignans', Mr. Anderson ran a criminal history check on both the brothers and again, no drug related history was discovered. (Trial Transcript, pp.128-129).  Thus, it is undisputed there was no criminal activity in this case _until Joseph Clark created it_.  The police activity _after_ Mr. Clark's initial meetings with the Maignans' then, did _not_ have at its end the interruption of specific on-going criminal activity and did _not_ utilize means reasonably tailored to apprehend those involved in on-going criminal activity.

With all of these undisputed facts in mind, and considering these facts were not in dispute even _before_ trial, defense counsel was ineffective for failing to move to dismiss the conspiracy to traffic cocaine charge on this very theory. Had he done so, due to the outrageousness of the police conduct here, there is a reaosnable probability the motion to dismiss would have been granted. Therefore, the conspiracy charge should be dismissed on this reason alone.

<u>OATH</u>

STATE OF FLORIDA)
                : SS
COUNTY OF DESOTO)

          Under the authority of section **92.525, Fla.Stat.,** and **<u>State v. Shearer</u>, 628 So.2d 1102(Fla.1994),** the defendant makes the following oath under the penalties of perjury:

          **UNDER PENALTIES OF PERJURY, I DECLARE THAT I HAVE READ THE FOREGOING MOTION FOR POSTCONVICTION RELIEF AND THAT THE FACTS STATED IN IT ARE TRUE.**

/S/ _Morgan Frij_ ,

DATED _JUNE 11,_ 1998.

-8-

IN THE CIRCUIT COURT OF THE SEVENTEENTH JUDICIAL CIRCUIT
IN AND FOR BROWARD COUNTY FLORIDA.

STATE OF FLORIDA,

Plaintiff,                          :

                                    :        L.T. CASE NO: 95-14021CF10B

v.                                  :

FRITZ MAIGNAN,

                                    :
Defendant.

_____ :

## MEMORANDUM OF LAW IN SUPPORT OF
## MOTION FOR POSTCONVICTION RELIEF

### INTRODUCTION

In the preceding motion for postconviction relief, Fritz Maignan
has made allegations concerning both the constitutional effectiveness of
his trial attorney, and fundamental error by the trial court. Here,
Defendant will provide a legal analysis of each of his claims in order to
more fully prove his entitlement to a new trial.

### THE STANDARD OF COMPETENT ATTORNEY PERFORMANCE.

The test for determining whether counsel in a criminal case provided
ineffective assistance was established in the case of **Strickland v.
Washington**, 466 U.S. 688, 104 S.Ct. 2052, 80 L.Ed.2d 674(1984) and adopted
by the Florida Supreme Court in the case of **Jackson v. State**, 452 So.2d
533(Fla.1984).

For the defendant to prevail in his claims of ineffective assistance,
he must prove that particular acts or omissions of his trial counsel are
outside the broad range of reasonably competent performance under prev-

(7). The Defendant did testify at the trial.

(8). The Defendant appealed the judgments of conviction to the Fourth District Court of Appeal, West Palm Beach, Florida, on July 1,1996. The judgments were affirmed by the appellate court on November 14,1997. See, **Maignan(Fritz) v. State**, 701 So.2d 882(Fla.4th DCA 1997).

(9). The Defendant has not filed any petitions, applications, motions, etc., challenging the validity of these judgments of conviction in this or any other court, state or federal.

(10). Due to their extensive factual content and legal analysis, the grounds the Defendant relies on are more fully set forth in the accompanying Statement of Facts and supporting Memorandum of Law. In sum, Defendant was denied His Constitutional right to the effective assistance of counsel. Further, the trial court committed fundamental error in giving an incomplete jury instruction on reasonable doubt. These errors, either collectively or individually, served to render Defendant's trial unfair.

(11). The attorneys that represented Defendant are: at all pretrial, trial, and sentencing proceedings, **Michael Holden, 212 SE 8th Street, Suite 103, Ft.Lauderdale, Florida 33316-1014;** and on direct appeal, **Samuel Halpern, 629 SE 5th Ave., Ft.Lauderdale, Florida 33301.**

**WHEREFORE,** Defendant prays this court will grant all relief to which He may be entitled to, including, but not limited to, the dismissal of all charges, or, a new trial.

RESPECTFULLY SUBMITTED,

_fritz Maignan_

FRITZ MAIGNAN, PRO SE,
DESOTO CORRECTIONAL INST.
#196119-MN-4017
P.O. DRAWER 1072
ARCADIA, FLORIDA 34265

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY, that a true and correct copy of the foregoing
has been furnished via U.S. Mail to the: **The State Attorney Office,**
**201 SE 6th Street, Ft. Lauderdale, Florida 33301,** this___//___day of
___JUNE_____1998.


/S/ _Maignan fritz_

# EXHIBIT  R

IN THE CIRCUIT COURT OF THE 17TH
JUDICIAL CIRCUIT, IN AND FOR
BROWARD COUNTY, FLORIDA

STATE OF FLORIDA,                          CASE NO. 95-14021-CF-10B

      Plaintiff,
v.                                         JUDGE:  MARC H. GOLD
FRITZ MAIGNAN,

      Defendant.
_____/

### ORDER REQUIRING THE STATE TO RESPOND TO
### DEFENDANT'S MOTION FOR POST CONVICTION RELIEF AND
### DEFENDANT'S MOTION FOR STATUS QUO

    **THIS COURT** having considered the Defendant's Motion for Post Conviction Relief,

certified June 11, 1998,  and Defendant's Motion for Status Quo, undated, hereby orders the

State Attorney's Office to file a response no later than 30 days from the date of this Order, with a

courtesy copy sent to the undersigned Judge.

    **DONE AND ORDERED** in Chambers at Fort Lauderdale,  Broward County,  Florida

this 24th day of  November, 1998.

                                     MARC  H.  GOLD
                                     CIRCUIT COURT JUDGE

Copies furnished:
Mr. Fritz Maignan, DOC # 196119
Desoto Correctional Institution
P.O. Drawer 1072
Arcadia, FL 34265

State Attorney's Office, Broward County,  FL

# EXHIBIT  S



IN THE CIRCUIT COURT OF THE
SEVENTEENTH JUDICIAL CIRCUIT
IN AND FOR BROWARD COUNTY,
FLORIDA

CRIMINAL DIVISION

CASE NO. 95-14021 CF 10B
JUDGE: MARC  H. GOLD

STATE OF FLORIDA,

     Plaintiff,

vs.

FRITZ MAIGNAN,

     Defendant.

_____/

DEFENDANT'S MOTION FOR EVIDEN-
TIARY HEARING PURSUANT TO
FLA.R.CRIM.P. RULE 3.850

     COMES NOW, THE Defendant in pro se, pursuant to Fla.R.Crim.P.
Rule 3.850, and moves this Honorable Court to grant him an eviden-
tiary hearing on his Rule 3.850 Motion which is presently pending
before this Honorable Court, and states the following:

     1. Defendant has a Rule 3.850 Motion that has been pending
before this Honorable Court since about June of 1998.

     2. On November 24,1998, this Honorable Court ordered the State
Attorney's Office to file s response no later than thirty(30) days
from the date of the entry of said order. This order was signed by
the Honorable Marc H. Gold, Circuit Court Judge. The State's Attorney
has failed to comply with this Court's order. Nor has the State
Attorney obtained an extension of time.

     3. The Defendant's Rule 3.850 MOtion states a prima facie case
of ineffective assistance of counsel, demonstrating counsel specific
acts and omissions, which were measurably below that of competent
counsel trial tactice and judgment; and but for counsel's ineffect-

iveness there is a reasonable prossibility that the outcome of the
proceedings would have been different. See **Strickland V. Washington**,
104 S.Ct. 2052 (1984).

4. When a defendant brings such a claim the Florida Supreme
Court encourage the trial courts to hold plenary evidentiary hear-
ing. See **Jones V. State**, 446 So.2d 1059-62 (Fla.1984).

5. The rules governing Rule 3.850 provide in pertinent part:

> Unless the motion and the files and records of
> the case conclusively shows that the prisoner is
> entitled to no relief, the court **shall cause**
> **notice thereof to be served upon the prosecuting**
> **attorney of the court, grant a prompt hearing**
> thereon, determine the issues and make findings
> of facts and conclusion of law with respect there-
> to. If the court finds that ... there has been
> such a denial or infringement of constitutional
> rights of the  prisoner as to render the judg-
> ment vulerable to collateral attack, the Court
> shall vacate and set aside, and shall discharge
> the prisoner or resentence him or grant him a
> new trial or correct the snetence as may appear
> appropriate. Id.

See **Morgan V. State**, 475 So.2d at 682 (Fla.1985).

6. In the instant case the Court is contemplating considering
a response by the State and the files and records of this case can
not conclusively show that the Defendant is entitled to no relief.
An evidentiary hearing is mandated. Id. at 682.

7. The Fourth District Court of Appeal have recognized that
"while defense counsel is entitled to broad discretion regarding
tiral strategy. Where the trial court is confronted with a claim of
ineffective assistance of counsel, a finding that some action or
inaction by defense counsel was tactical is generally inappropriate
without the benefit of an evidentiary hearing. Compare **Anthony V.**
**State**, 660 So.2d 375,376 (Fla. 4th DCA 1995).

Wherefore, because of the herein mentioned facts and authorit-

2.

ies. The Defendant respectfully request that this Honorable Court grant his requset for an evidentiary hearing.

Respectfully submitted,

Fritz Maignan, DC#096119
DeSoto Correctional Inst.
P.O. Drawer 1072
Arcadia, FL. 34265

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing **Motion For Evidentiary Hearing** has been furnished by regular U.S. Mail to: The Office of the State Attorney, (**Michael Satz**), 201 S.E. 6th Street, 6th Floor, Ft. Lauderdale, Florida 33301 on this 25th day of January, 1999.

Respectfully submitted,

Fritz Maignan, DC#196119

3.

# EXHIBIT   T

IN THE CIRCUIT COURT OF
THE SEVENTEENTH JUDICIAL
CIRCUIT IN AND FOR
BROWARD COUNTY, FLORIDA

STATE OF FLORIDA              )          CASE NO.: 95-14021 CFB
                             )
                             )          JUDGE: GOLD
                             )
vs.                          )
                             )
FRITZ MAIGNAN                )
                             )
                             )
            Defendant        )
_____)

### RESPONSE TO DEFENDANT'S MOTION FOR

### POST-CONVICTION RELIEF

**COMES NOW**, the State of Florida, by and through the
undersigned Assistant State Attorney, and responds to the
Defendant's Motion for Post-Conviction Relief pursuant to Rule
3.850 of the Florida Rules of Criminal Procedure and the Order of
this Honorable Court as follows:

1. The allegation of ineffective assistance of counsel for
failure to call Joe Clark, the confidential informant, is without
merit. The motion is legally insufficient in that the defendant has
not shown that this witness was available; that the witness would
have testified consistently as alleged in the motion; and that
there was a prejudicial impact by the omission of this testimony.
*Higsmith v. State*, 617 So.2d 825 (Fla. 1st DCA 1993). Additionally,
there was no basis to call this witness since counsel was able to

1

cross-examine Agent Anderson about the fact that Clark was a paid informant, and about the control, or lack of control, of this informant (Exhibit I, pp. 128-131, 141-155, 162, 178-202). Additionally, the defendant testified about allegedly being unlawfully induced to be involved in this deal (Exhibit II). Since the facts that the defendant wished to present to the jury were brought out in testimony, this ground must be summarily denied.

2. The allegation of the defendant that the trial court erred in admitting the tape of the three way conversation between Joe Clark, Agent Anderson, and defendant Fritz Maignan is not a ground upon which relief can be granted. As admitted in the motion, the issue was preserved by objection at trial, and, therefore, was or could have been reviewed by the appellate court on direct appeal. Consequently, this issue is not cognizable in a motion for post-conviction relief, and must be summarily denied. *Koon v. Dugger*, 619 So.2d 246 (Fla. 1993); *Medina v. State*, 573 So.2d 293 (Fla. 1990).

3. The allegation of ineffective assistance of counsel for failing to incorporate a sufficiency of the evidence argument in the judgment of acquittal is refuted by the record. The judgment of acquittal motions at the end of the State's case (Exhibit III) and at the end of all evidence (Exhibit IV) clearly incorporated all arguments, including sufficiency of the evidence. The Court denied both motions finding that the evidence was sufficient to present the case to the jury (Exhibits III and IV). Furthermore, issues regarding sufficiency of the evidence were raised on appeal, and,

2

therefore, are not cognizable in a motion for post-conviction relief (Exhibit V). Since the record refutes the arguments of the defendant, and the issue of sufficiency of the evidence was raised on appeal, this ground must be summarily denied.

4. The allegation of the defendant that the case of *Vazquez v. State*, 700 So.2d 5 (Fla. 4th DCA 1997) provides a basis for relief is without merit. This issue was raised on appeal (Exhibit V) and on rehearing (Exhibit VI), therefore, preventing this issue from being raised as a ground for post-conviction relief. *Koon, supra; Medina, supra.* Consequently, this ground must be summarily denied.

5. The allegation of the defendant that trial counsel was ineffective for failing to move to dismiss the information based on the lack of supervision of the confidential informant is without merit. Trial counsel filed a motion to dismiss based on a due process violation committed (Exhibit VII), which was heard and rejected by Judge Tyson (Exhibit VIII). Since trial counsel did move to dismiss this matter, and had the motion heard by this Court, this ground must be summarily denied.

**WHEREFORE**, the State of Florida respectfully requests this Honorable Court to deny the Defendant's Motion for Post-Conviction Relief.

**I HEREBY CERTIFY** that a copy of the foregoing was furnished by U.S. Mail to Fritz Maignan, Defendant, Pro Se, Inmate #196119, DeSoto Correctional Institution, P.O. Drawer 1072, Arcadia, Florida 34265, this 16th day of February, 1999.

                              MICHAEL J. SATZ
                              STATE ATTORNEY


                    By: _____
                         JOEL SILVERSHEIN
                         Assistant State Attorney
                         Florida Bar No: 608092
                         Room 675
                         201 S.E. 6th Street
                         Fort Lauderdale, FL 33301
                         Telephone: (954)831-7913

4

1          Q.    At that time, was the Captain from the

2     Hallandale Beach Police Department with you?

3          A.    Yes, that's the captain that was with me in the

4     vehicle when we arrested him.

5                THE COURT:  Cross examination.

6                MR. HOLDEN: Can we have a brief side bar?

7                (Thereupon, there was a sidebar between Court

8           and counsel, outside the hearing of the court

9           reporter and the jury, after which the following

10          proceedings were resumed:)

11                     CROSS EXAMINATION

12     BY MR. HOLDEN:

13          Q.    Afternoon.  How are you today?

14          A.    Fine, thank you.

15          Q.    A few minutes ago you testified about an

16     incident August 11th and you had indicated on return

17     passing by you went by Denny's and you noticed the

18     defendant Fritz Maignan was in fact walking by there and

19     that's when a foot chase ensued; is that correct?

20          A.    He was standing in the lot looking around.

21          Q.    How did you recognize him at the time?

22          A.    Just from seeing him up close.  I recognized

23     his face.  I think he actually changed shirts from when he

24     was actually arrested.  That's why I don't know exactly

25     what he had on.  I saw his face and recognized him.

BROWARD REPORTING SERVICE  (954) 763-1382

*EXHIBIT I*

100

1     Q.   You are saying he changed shirts from what

2     point to what point?

3     A.   I believe he changed shirts; I am not sure.  I

4     am saying I recognized him from the face.  From the

5     meeting to the time he was arrested, he may have changed

6     shirts.

7     Q.   When you saw him earlier when he left to run

8     away, do you recall what he was wearing at that time?

9     A.   He had black sweat pants and what I would call

10    maroon short sleeved shirt hanging out of the black sweat

11    pants.

12    Q.   When he was arrested, what was he wearing?

13    A.   I don't recall. It sticks in my mind he had on

14    a different shirt.  That's why I said I am not positive I

15    remember.

16    Q.   Earlier on we saw the videotape and saw what

17    you pointed out at one point was ostensibly was Fritz

18    walking away from the scene?

19    A.   Yes, that was Fritz walking away with what I

20    described him wearing.

21    Q.   You were not operating the surveillance,

22    correct?

23    A.   That's correct.

24    Q.   You don't know if the camera that we saw, the

25    video we saw was actually Fritz walking away; is that

1       correct?

2           A.   I don't understand your question.

3           Q.   How do you know what we just saw on tape, the

4       gentlemen with the red shirt, who you identified as being

5       Fritz, was in fact Fritz?

6           A.   I know where the van was set up, the angle, and

7       I know according to the time on the video that Fritz had

8       just exited the restaurant wearing exactly the same thing,

9       walking in exactly the same direction.

10          Q.   Now, also earlier you testified that Katan

11      Maignan had asked you to come to his vehicle ostensibly to

12      look at money; is that correct?

13          A.   That's correct.

14          Q.   When did this occur on the tape?  Do you recall

15      what time that was?

16          A.   No, I don't.  It's right after we walked out of

17      Denny's Restaurant, telling me I can come to his vehicle.

18      He is trying to get me to the vehicle to look at the

19      money.

20          Q.   Was that something that we could hear on this

21      tape just now?

22          A.   Yes, I heard it.  I can't say who else heard

23      it.

24          Q.   Do you know what time you heard the tape?  Was

25      it the same time it said on the time portion of the

1        videotape?

2            A.    I couldn't say without looking at it again.

3                  MR. GALLAGHER: If you want to show the tape,

4        feel free to utilize the machine.

5                  MR. HOLDEN: Thank you.

6    BY MR. HOLDEN:

7            Q.    Prior to that, you had requested several times

8        for Katan Maignan to show you some form of money; is that

9        correct?

10           A.    No, that's not correct.

11           Q.    Correct me if I am wrong.  I thought you said

12       show me a couple fifties, show me some fifties.

13                 In fact, I counted no less than ten times in

14       this six minute period you had done that; is that correct?

15           A.    Yes, that's correct.  What happened is he asked

16       me was that before he tried to get me over to his vehicle

17       and no, I didn't ask him over and over before that.  I did

18       ask him after he tried to get me over to the vehicle.

19                 I didn't want to go to the vehicle because I

20       felt he was going to rob me or had a gun in the vehicle

21       and that's why I was hesitant.  I didn't know where his

22       brother was at that time.

23           Q.    At one point, did you offer to put your gun in

24       your vehicle and have him look at the cocaine that was in

25       your vehicle?

1        A.    No, I did not.

2        Q.    I thought that is what I saw on the video.

3        A.    No, he was asking me -- at one point he stated

4    I tell you what -- I heard on the videotape, and I don't

5    know who else heard it -- he said put the gun in your car

6    and then we can go ahead and do this, something to that

7    effect is what he said and I said no.

8        Q.    You didn't volunteer to put your gun in the

9    car?

10       A.    Absolutely not.  It's on the tape.

11       Q.    In fact, isn't it true Mr. Maignan kept saying,

12   no, I don't want to do this, no, I don't want to do this,

13   at that point when you kept saying approximately ten

14   times, just show me fifty dollars, just show me a hundred

15   dollars. He didn't want to show you the money?

16       A.    He never said no, I don't want to do this.

17       Q.    Did he say I don't want to show you the money?

18       A.    No.

19       Q.    Did he just ignore you?

20       A.    In the beginning he tried to get me over to the

21   vehicle.  At the point to where the video, where he

22   reaches behind his back and says do you mind if I do this,

23   he's referring to patting me down.

24            At the point where I said okay and I patted him

25   down, I told him I had a nine.

1         At that point, he kind of started like wait a

2    minute, because I had gun on.

3         Q.    He said even before that he didn't want to show

4    you the money, that you requested him to show you money

5    prior to the pat down and he indicated at that point he

6    wouldn't show you the money?

7         A.    We have to look at the tape.  I don't recall

8    him saying he would not show me money.  He wanted me to

9    put the gun up.

10        Q.    At that point prior to the pat down, it's your

11   assertion he was totally active and wanted to do the deal?

12        A.    Yes.

13        Q.    So if on the videotape it appears he is

14   hesitant and didn't want to do it, that would be

15   inconsistent to your recollection?

16        A.    Up to the point where we did the pat down,

17   that's correct.

18        Q.    Towards the end of the videotape, you are

19   talking to surveillance; is that correct?

20        A.    At that point, yes, that's correct.

21        Q.    When you are talking to surveillance, isn't it

22   true you are saying to them you all call it, you all call

23   it?  In fact, did you say that a few times?

24        A.    Yes, I did. What happens is if you are on

25   surveillance, you are always conscious of how much time

105

1    you are spending during negotiations.

2              At one point, he asked me to go back in the

3    restaurant.  Kels sometimes don't work in the restaurant.

4    That's why I didn't want to go back in, so I said, you

5    call it.  Do you want me to take more time to negotiate?

6    Just to get an idea of how they wanted to negotiate.

7         Q.   Now, the word negotiate is an interesting word.

8              When you say negotiate, had you completed an

9    agreement?  Had you come to a final agreement, or were you

10   still in fact negotiating?

11        A.   We were negotiating how the deal would take

12   place. Obviously we had agreed that we were going to do

13   it, but we had to come to an agreement how it would take

14   place.

15             That's why he said put the gun up.  I said no.

16        Q.   Is how it takes place part of doing the deal?

17   When you say we had agreed to the deal, we were

18   negotiating how to do it, isn't that the nature of

19   negotiations, how to do it?

20        A.   At that point, the deal was already in progress

21   as far as I am concerned and the way I looked at it.  We

22   already met there and agreed on a price and everything, so

23   it's just a matter of actually making the exchange.

24             Maybe I am not answering your question.

25        Q.   When you say that there was an agreement, in

BROWARD REPORTING SERVICE   (954) 763-1382

1    your mind, what was agreed to besides the price?

2         A.    Agreed to where we would meet, when we would

3    meet, who would meet and basically how the transaction

4    would take place.

5         Q.    Well, that was one of the items, how the

6    transaction would take place so, that had to be agreed on,

7    correct?

8         A.    Yes.

9         Q.    How about the fact that Mr. Maignan brought

10   Fritz.  Was that something you had agreed not to do?

11        A.    No, that's something he agreed not to do.

12        Q.    So he breached the agreement, correct?

13        A.    Of course he said he didn't know why he was

14   there.

15        Q.    But you didn't believe that, did you?

16        A.    No, I didn't believe that.

17        Q.    When you are talking on the listening device to

18   the surveillance agent and you said you all call it, do

19   you recall asking if you should take the time to negotiate

20   or if we should do the take down at this point?

21        A.    Kind of a double sided thing.  I am looking for

22   some guy, hoping they would call, say go ahead and take

23   more time, plus I didn't know at that time whether -- I am

24   thinking about safety.

25             At that point, I don't know whether the brother

1    went to the car, whether he was in the car or what was

2    going on. I am looking for a little guidance.

3         Q.   Now, as we all saw, this whole incident on the

4    11th occurred in the day time; is that correct?

5         A.   That's correct.

6         Q.   It was pretty bright out in fact, right?

7         A.   Yes.

8         Q.   The defendant, Katan, while the negotiations

9    with you were going on, was nowhere near his vehicle, was

10   he?

11        A.   No, he was not.

12        Q.   In fact, he was walking away from his vehicle

13   at the very time when you claimed that he had told you to

14   come over to the vehicle; is that correct?

15        A.   No, that's not correct.

16        Q.   Was he walking towards Denny's at that time?

17        A.   No, when we said come over to the vehicle, he

18   was walking towards the vehicle.  We were both walking

19   towards the vehicle and away from Denny's.

20        Q.   Weren't you walking towards the vehicle towards

21   the end of the conversation?

22        A.   Towards the end of the conversation, we were

23   walking towards his vehicle.  At what point, if you could

24   be a little more specific.

25        Q.   When you first got there.

BROWARD REPORTING SERVICE  (954) 763-1382

1      A.    It didn't seem as if --

2      Q.    The camera was scanning towards the Denny's

3   when the videotape began?

4      A.    When the videotape began, he was in his car

5   riding back and forth through the lot.

6      Q.    Then he arrived?

7      A.    Correct.

8      Q.    And at that point, he got out off his vehicle

9   and walked towards Denny's?

10      A.    That's correct.

11      Q.    And at no point did he walk back to his vehicle

12   until almost the end; is that correct?

13      A.    That's correct.

14      Q.    So at what point was it that he was asking you

15   to come over to the vehicle?

16      A.    On the tape, as soon as we came out of the

17   restaurant, as soon as we came out, you see the truck

18   blocking the view and at that point, we are walking right

19   towards the vehicle. I am kind of lagging back. He's

20   still walk towards the vehicle saying come on over to the

21   vehicle, you can see the money.

22           I am saying wait a minute. Where is your

23   brother? You no, I am trying to lean back from going to

24   the vehicle.

25      Q.    All of what you said is clearly on that

BROWARD REPORTING SERVICE  (954) 763-1382

1      videotape?

2         A.   Correct, I think so, yes.

3         Q.   You say he's walking towards his vehicle when

4      he's passing by the UPS truck, right?  You said when he

5      came out from the truck and into view, he was walking

6      towards his vehicle?

7         A.   That's correct.

8         Q.   Isn't it true he was actually walking next to

9      the Denny's and at that point, he was not even close to

10     him vehicle at that point?

11        A.   That's exactly what I said.  He was walking

12     from the Denny's and he was walking towards the vehicle.

13        Q.   Were you at that point in your mind going over

14     to the vehicle?

15        A.   Yes.

16        Q.   How come you didn't go over?

17        A.   I didn't know where his brother was and I was

18     thinking, when I get to the vehicle, whether he was going

19     to pull a gun out or what was taking place, but I was

20     afraid that his brother would be waiting and it would be a

21     robbery.

22        Q.   In fact, weren't there at least ten officers or

23     agents in surveillance at that time?

24        A.   There were probably about that, that's correct.

25        Q.   Were you wearing a bulletproof vest at that

BROWARD REPORTING SERVICE  (954) 763-1382

1    time?

2         A.    That's correct.

3         Q.    You had your nine millimeter with you?

4         A.    That's correct.

5         Q.    And you patted down the defendant; isn't that

6    correct?

7         A.    That's correct.

8         Q.    You knew he didn't have a gun?

9         A.    I knew he didn't have a gun on him, at least in

10   the area I patted him, that's correct.

11        Q.    You had offered to have him come over to your

12   car to look at the cocaine?

13        A.    That's correct.

14        Q.    He never did that, did he?

15        A.    No, he did not. He wanted me to put the gun up.

16        Q.    Did you offer to put the gun up?

17        A.    No, I did not.

18        Q.    So he never looked at the cocaine?

19        A.    That's correct.

20        Q.    You never saw his money?

21        A.    I saw money later, yes, but not during the

22   first part.

23        Q.    In fact, the money you saw later was after he

24   was arrested; isn't that correct?

25        A.    Yes.


BROWARD REPORTING SERVICE  (954) 763-1382

1      Q.    The money was in his vehicle?

2      A.    Yes, it was.

3      Q.    Several times on the tape I thought I heard the

4    defendant when the deal seemed to be falling apart, saying

5    I'm gone, I'm gone; is that correct?

6      A.    I am going, I am gone. That should have been my

7    voice you were hearing.  He never said he was leaving.  He

8    just kept walking around, not saying anything, just not

9    saying anything.  That was me saying I am going to leave.

10      Q.    But he did answer your direct questions or

11    statements, didn't he?

12      A.    I would say no. You can look at it again, but

13    he kept walking around not saying anything, not walking

14    towards his vehicle and he was just walking around the lot

15    and eventually as you can see on the tape, i will say

16    something and he will wave me over.  I waved him over, and

17    then we'll talk again and at one point, you can hear where

18    he says, well, what I am worried about is that your 5-0,

19    and you can hear that on the tape.

20      Q.    I don't recall that. What time did he say that,

21    do you recall?

22      A.    I couldn't give you a time.

23      Q.    I made notes of the times. I would like to go

24    over that with you for a moment.

25            It seems that looking at the videotape and of

1      course, the jury can see for themselves, that 1:36 you are

2      saying the only way it's going to work is if he shows you

3      the money.

4              What did you mean by that?

5      A.    At that point, I think I said it several times

6      on there, I wanted to see the money but I was not willing

7      to go to the vehicle.  I was asking him several times if

8      you have the money, just like when I originally stated we

9      were walking out from the restaurant towards his vehicle

10     and I stopped and said, what do you have?  Do you have it

11     in a bag? Why not just bring it over here?  Why don't you

12     show me a hundred, a fifty or whatever.  I can't recall

13     exactly the words, but I wanted him to bring me some

14     money, show me some money, so I would not have to walk

15     over to his vehicle which is where I felt the robbery

16     would take place.

17     Q.    Did you in fact say to him that the only way it

18     would work is if he showed you the money?

19     A.    I think I stated that a couple times.  I don't

20     know if I said those exact words. I think I probably said

21     you're going to have to show me some money or something

22     like that because I was also willing to show him the

23     cocaine but he wanted me to put the gun up.

24     Q.    At 1:36, I made some notes showing that you

25     said that the only way it's going to work is if you show

1    me the money.  He never did show you any money, correct?

2         A.    That's correct.

3         Q.    So if in fact that was your statement, the deal

4    was not to work, isn't that correct?

5         A.    No, I'd say no, for the fact that he was still

6    walking around the lot. That's why you hear me saying to

7    him, hey, what are you going to do, what's going on, that

8    type of thing, and then he doesn't say anything. He's just

9    kind of looking around. You can see it on the tape.

10        At that point, I still wasn't sure if it was

11   going to go or not.  At some point you can see where I

12   obviously say okay, you have to do something else.

13        Q.    At 1:38 on the videotape, you again said I

14   believe for the eleventh time, just show me some money,

15   you can go look at it.

16        Did you say if you show me the money, he could

17   go look at it or he go look at it irrespective of showing

18   you the money?

19        A.    I don't recall the exact words I used. I do

20   remember telling him to look at my stuff and I do remember

21   like I said asking him several times, well, you know, just

22   bring me the money, show me something, but again as you

23   can see, he eventually says you brought a pistol, you

24   brought a gun.  He's still harping on that issue.

25        Q.    He had no gun on him, correct?

114

1          A.    He had no gun on him, that's correct.

2          Q.    He had no money on him that he showed you;

3     isn't that correct as well?

4          A.    That's correct.

5          Q.    Did Fritz show you any money?

6          A.    No, he did not.

7          Q.    Do you know if Fritz was armed at the time when

8     he left the Denny's?

9          A.    I don't know.

10          Q.    When Fritz was arrested there were no weapons

11     found; is that correct?

12          A.    When he was arrested, there were no weapons

13     found on him, correct.

14          Q.    When you were telling the defendant to show you

15     the money and asking him to go look at your car to see the

16     cocaine, isn't he walking away from his vehicle in the

17     direction of walking away?

18          A.    It depends on what time you are talking about,

19     but there is a point in time which I am saying you know, I

20     will show you the drugs. There is a point in which he was

21     walking away from the vehicle and we are walking towards

22     my vehicle.

23          Q.    Why do you ask so many times for the defendant

24     to show you the money?  What is a so significant about him

25     showing you the money?

1          A.    Why am I asking him that?  The reason I keep

2    asking him to show me the money and not show me the money

3    in the car, like I said, I didn't want to go to the car

4    because I felt that's where a robbery would take place is

5    at his vehicle, so I am asking him to show me the money so

6    I can see that he does want to actually do a deal or if he

7    brought any money or is it just a ripoff.  I am trying to

8    distinguish that myself.

9          Q.    In terms of a ripoff, he's not heading over to

10   the car to -- go back.

11               You know there is no weapon on him at the

12   scene, correct?

13         A.    I know there was no weapon where I patted him

14   down, that's correct.

15         Q.    He's not heading back to the car if there were

16   a weapon he could use in his car. He's not going back in

17   that direction; isn't that correct?

18         A.    That depends at what point you are talking

19   about not going to his vehicle.

20         Q.    Even if he turned around, he's not within fifty

21   feet of his vehicle until he leaves the scene; is that

22   correct?

23         A.    I don't know exactly the distance, but at the

24   point we were walking out, I would say we were about that

25   distance, maybe a little less from his vehicle at the

BROWARD REPORTING SERVICE  (954) 763-1382

1    point I said hold up.

2        Q.   Now, going back a little further before the

3    tape, you had surveillance at the Denny's prior to the

4    arrival of either defendant; is that correct?

5        A.   That's correct.

6        Q.   Did you or the surveillance that you know of

7    personally observe the defendant arrive at the scene at

8    any time prior to the time when they were on the

9    videotape?

10       A.   I was not advised of anyone arriving prior to

11    myself seeing them on the scene.

12       Q.   Did you see Fritz arrive on the scene?

13       A.   Yes, I did see Fritz.

14       Q.   He arrived on foot?

15       A.   I saw him approaching the door on the north

16    side of the Denny's is the first time I saw him, and he

17    was walking up on foot there.

18       Q.   You had testified earlier that the defendant,

19    Katan, was driving through the parking lot; is that

20    correct?

21       A.   Yes, that's correct.

22       Q.   On the videotape, did you notice if there were

23    any empty spaces in the rows that he was driving down?

24       A.   Yes, there were a lot of spaces.

25       Q.   But on the videotape, it showed there were

1    not.  Would that be a more accurate representation than

2    your recollection?

3         A.   No, you can clearly see there are spots in

4    several areas that are actually closer to the Denny's than

5    where we were going to meet.

6         Q.   That's a good point.  If he were going to do a

7    ripoff, wouldn't he want a weapon if he had one in his

8    vehicle, closer to the Denny's?

9         A.   Excuse me?

10        Q.   Let's assume your statement about a ripoff is

11   significant and a weapon would be relevant to a ripoff.

12        First of all, let's go back a second.

13        Were you concerned about him trying to rip you

14   off without a weapon?

15        A.   Yes.

16        Q.   In what sense?

17        A.   In the sense that he is a much bigger guy than

18   I am, a bigger guy.

19        Q.   But you did have ten agents as you testified

20   very close by as you testified, didn't you?

21        A.   Not as close as his vehicle.

22        Q.   In fact, in your training at Quantico, one

23   thing you were trained in was hand to hand self-defense;

24   is that correct?

25        A.   That's correct.

1      Q.   Do you have any personal knowledge about any

2  martial arts or working out or any physical training that

3  either of the defendants have done?

4      A.   Just obvious they work out.  They have a

5  muscular build.

6      Q.   Well, the fact that they have a muscular build

7  in and of itself doesn't mean they are skilled at all in

8  any self-defense or hand-to-hand combat?

9      A.   No, it doesn't, but at the academy, what we go

10  through is very, very basic defense techniques.

11      Q.   Have you had any other hand-to-hand combat

12  training or self defense?

13      A.   Yes, I have very limited.

14      Q.   What would that be?

15      A.   In college I took a couple basic martial arts

16  classes.

17      Q.   Was that karate?

18      A.   Basic karate.

19      Q.   How far did you get in that?

20      A.   Well, they didn't have a belt system.

21      Q.   Do you know what style of karate that was?

22      A.   No, it was very basic, just general like to

23  give you an idea of what martial arts is all about.

24      Q.   You never had training in any other forms of

25  self defense whatsoever?

1       A.   Not really.

2       Q.   No boxing?

3       A.   No.

4       Q.   You also indicated that when you arrived at the

5    scene, I believe at some point, and I don't know if this

6    was at McDonald's or at the Denny's, that you were driving

7    a white Mercedes; is that correct?

8       A.   That's correct.

9       Q.   Why did you chose a white Mercedes?

10      A.   We have basically two vehicles that we use a

11   lot for undercover in our office.

12           The one vehicle had a bunch of stuff in it at

13   the time.   It would have been a hassle to take everything

14   out like, police identifying information, a radio, things

15   like that.

16           This vehicle was a vehicle that was stripped of

17   those things, so it was a vehicle that was just ready and

18   available at the time.

19      Q.   This vehicle wasn't used at all because it was

20   a flashy vehicle and would go along with the idea that you

21   were a drug dealer?

22      A.   I think we keep that in mind when we have

23   vehicles that are available for that.   We have junk

24   vehicles, junk trucks and we have nice vehicles.

25      Q.   What about the fact that both you and Officer

1    Tatum are black? What that chosen as any reason knowing

2    that both defendants were black?

3            Was the fact both of you were black chosen

4    specifically?

5        A.    I would say not, because I was making those

6    decisions.  At first I was going to use Special Agent

7    William Dyer who was in the room during some of the

8    conversations.

9            Eventually we worked down to using Officer Sam

10   Tatum.

11       Q.    Is that because he's black and the defendants

12   would feel more comfortable with a black officer?

13       A.    That would be a consideration, yes.

14       Q.    You say you brought two kilos of cocaine to the

15   arrest scene; is that correct?

16       A.    That's correct.

17       Q.    Those two kilos of cocaine, did you personally

18   field test it to see if it was in fact cocaine in the

19   kilos?

20       A.    We don't actually cut into them at all.

21           What happens is we write up a memo requesting

22   the use of real kilos of cocaine from our lab.  The lab

23   will test them and have a write-up on them that will

24   accompany the cocaine, so when the cocaine is picked up by

25   us, it's already sealed in a bag.  It's weighed to get the

BROWARD REPORTING SERVICE  (954) 763-1382

1    exact amount and it has the lab results of the purity on

2    it, so there is no need for us to cut into it or verify

3    what it is.

4         Q.    These documents you were referring to were in

5    fact on the kilos of cocaine?

6         A.    They weren't on the kilos.  They were with the

7    kilos so when we pick it up, it tells you what they are.

8         Q.    Do you have those labels or wrappers with you

9    today?

10        A.    No, I don't.

11        Q.    At the time, you say you did not cut into the

12   kilos; is that correct?

13        A.    That's correct.

14        Q.    So do you have any personal knowledge other

15   than what you already stated that in act that was even

16   cocaine in those alleged kilos?

17        A.    Yes, I would consider that personal knowledge.

18   The fact that any time we seize narcotics, it's sent off

19   to our lab in Miami, Florida and they in turn test it and

20   they will come to court and testify that this is what it

21   is. They will write us a letter back saying it was

22   cocaine.

23        Q.    But do you know if in fact it had been cocaine

24   that had been seized that was being used?

25        A.    Yes, I believe it was cocaine that had been

BROWARD REPORTING SERVICE   (954) 763-1382

1    seized and was being reused.  It comes out of our stock

2    pile.

3          Q.   How do you know it was cocaine already seized

4    as opposed to cocaine made by the agency?

5          A.   In our stock pile, they usually don't keep

6    cocaine that is made by the agency.  It's a stock pile of

7    seized cocaine.

8          Q.   When you say usually, is there a policy on

9    this?

10         A.   I can't quote you any policy or anything like

11   that.  It's pretty much given knowledge.

12         Q.   As far as actually the cocaine in this case

13   goes, you never did any test to personally determine

14   whether or not there was the presence of cocaine in this?

15         A.   I personally did not.

16         Q.   Isn't it true you wanted to control the

17   situation, that you wanted to control the buy, so that you

18   felt safe?

19         A.   That's true.

20         Q.   Isn't it also true that by doing that, you

21   exerted all the control over the defendant as to how much,

22   the when, the where and the how.

23              Wasn't that all at your discretion?

24         A.   No, it was not.

25         Q.   Let's go through it piece by piece if we can.

1                    The location of the bust originally was

2    supposed to be in Boca Raton; is that correct?

3           A.    That's correct.

4           Q.    You had indicated that the defendant felt that

5    was too far for them to drive; isn't that correct?

6           A.    That's correct, they decided they did not like

7    that location.

8           Q.    You didn't refuse to drive to Miami; is that

9    also correct?

10          A.    At my -- yeah, as I said, I am not going way

11   down to Miami.

12          Q.    You chose Hallandale, correct?

13          A.    We agreed on Hallandale.

14          Q.    Wasn't it you who said that Katan should come

15   by himself and bring no one with him?

16          A.    Initially it would not have been me. I probably

17   on tape said that, but initially on several or a couple

18   points on tape, you will hear me saying the only person

19   I's bringing with me is my boy, the guy I brought the

20   other day at the meeting and then you will hear the

21   defendant say why do you have to do that and at one point,

22   you hear Katan saying how come we can't do it one on one,

23   how come we can't do it alone? Why are you bringing this

24   other guy?

25          Q.    In fact, it was you who had chosen the amount

1    of cocaine, the price, that is?

2        A.    The price, that's correct.  I had two different

3    prices and they actually picked the one that they

4    preferred.

5        Q.    I would like to go back as long as we are on

6    that subject.  Briefly, you mentioned earlier about the

7    word cooking, hadn't you?

8        A.    That's correct, true.

9        Q.    About the defendant cooking cocaine?

10       A.    Yes.

11       Q.    Isn't it true before that ever occurred, that

12   you had said to them that they would have to know what to

13   do with the wet cocaine, that they would have to do

14   something with it.

15           Did you in fact say that to them on the tape?

16       A.    I think you can hear something to that extent.

17   I said if someone knows what to do with it or something to

18   that extent.

19           I am not sure if I said that before or

20   afterward.  We have to listen to the tape to see if they

21   said that first or did I say that.

22       Q.    Now, you testified that at the McDonald's that

23   Sergeant Tatum was there for your protection; isn't that

24   correct?

25           Isn't it correct that you had said that today?

1          A.    Yeah, I said that he was there for that and

2    other reasons.

3          Q.    Didn't you also say today that the purpose of

4    that meeting at McDonald's was for an introduction and

5    that no cocaine was to change hands at that point?

6          A.    That's correct.    During our conversation, the

7    first conversation they wanted to at the time I was

8    speaking to Fritz, was willing to actually do the deal the

9    next day.    They were ready, said are you going to bring

10   yours, I will bring mine.

11          I said no, I just wanted to do a meeting

12   first.    He said okay, we will just do a meeting first.

13          Q.    Why were you afraid of being ripped off at that

14   introductory meeting?

15          If you were not intending to bring cocaine,

16   wouldn't it be logical that the defendants were not

17   intending to bring money?

18          A.    Are you saying the reason I brought Tatum along

19   with me?

20          Q.    No, the reason that you said today that you

21   were afraid of being ripped off at that meeting?

22          A.    I never said that I was afraid of being ripped

23   off at that meeting.    I said he was brought as somewhat

24   protection and somewhat just to have another person

25   there.


BROWARD REPORTING SERVICE    (954) 763-1382

1              It's good when you are dealing with more than

2      one bad guy to not be outnumbered, so it's a good practice

3      to bring someone else with you.

4          Q.   Not meaning to argue with you, but I was

5      writing down verbatim the words that you said, and of

6      course we can have the court reporter go back, but I

7      thought your testimony was specifically that quote, Tatum

8      was there so I wouldn't get ripped off, unqoute.

9              Isn't that what you said today?

10         A.   That's professionally, yes, but like I said, I

11     really wasn't afraid that day of actually being ripped

12     off.

13         Q.   But why did you say that today?

14         A.   I actually have to listen back to see if it was

15     actually said that way.

16         Q.   If in fact you did say that today, would it be

17     for the purpose of making the jury believe this was an

18     intended ripoff?

19         A.   No, it would just be because that's the way I

20     felt at the time.

21         Q.   In fact, on one of the occasions and there have

22     been several occasions, audio tapes that we listened to

23     today, you indicated that the defendant backed out, that

24     they didn't want to do the deal or Katan told you forget

25     it; isn't that correct?

```
 1          A.   I was asked by Mr. Gallagher at that point was

 2    the deal going to continue and I said at that point, it

 3    was put off, at the end of one of the conversations.

 4          Q.   In fact, on the audio tape that we heard, he's

 5    saying forget it and you're saying forget it; isn't that

 6    correct?

 7          A.   Yes, that's correct.

 8          Q.   At that point in time, would you have arrested

 9    the defendant?

10               MR. GALLAGHER: Judge, that's irrelevant what

11          they would have done at that point.  It's not the

12          issue for the trier of fact.

13               THE COURT:  Sustained.

14    BY MR. HOLDEN:

15          Q.   At that point in time, had the defendants

16    committed a crime?

17               MR. GALLAGHER: Same objection; that's for the

18          jury to decide if a crime was committed.

19               THE COURT: Objection sustained.

20    BY MR. HOLDEN:

21          Q.   Why didn't you take the defendant down at that

22    point?

23               MR. GALLAGHER: Judge, it's irrelevant what he

24          might have done, should have done, could have done.

25          It's irrelevant to this case.
```

1                    THE COURT: Sustained.

2      BY MR. HOLDEN:

3            Q.    The defendants are charged with conspiracy to

4      traffic; is that correct?

5            A.    That's correct.

6            Q.    And in your investigation of this case, did you

7      run into any prior drug involvement of the defendants?

8            A.    Yes.

9            Q.    You did?  Which defendant?

10           A.    Well, just through their conversations, they

11     brought up the point that they had did business with Joe

12     before, referring to the C.I., just during the

13     conversations, the statements that they made.

14           Q.    And at that time, did you confirm that at all?

15           A.    No, I didn't confirm it.

16           Q.    Did you attempt to confirm it?

17           A.    It was just said in conversation.  We ran the

18     records once we had their names, but we didn't have the

19     names until later.

20           Q.    Later on when you did get their names, you ran

21     them?

22           A.    Yes, we did.

23           Q.    What was that?

24           A.    The results that we pulled up were negative.

25           Q.    So no prior drug related history that they had

1    been arrested for?

2         A.   No.

3         Q.   You also indicated that the confidential

4    informant -- what is his name?

5         A.   Joseph Clark.

6         Q.   -- that Mr. Clark normally was paid for this

7    kind of situation; is that correct?

8         A.   That's correct.

9         Q.   But that he wasn't paid here?

10        A.   That's correct.

11        Q.   Do you know why he wasn't paid here?

12        A.   Probably a couple different reasons.

13        Q.   Could you tell me what those are, if you know?

14        A.   For one thing, at the time that this deal took

15   place, he was not a registered DEA informant.

16        Q.   Had he been prior to this case?

17        A.   Yes, he had been prior to this case.

18        Q.   The reason he was not paid on this case was

19   because one of the reasons was he was not a registered DEA

20   informant at the time of this case?

21        A.   That was probably part but not the sole reason.

22        Q.   Did he work on a contingency basis?  In other

23   words, did he make his fee based on the amount of money

24   that was seized or was it a set fee in each case?

25             MR. GALLAGHER: Objection, what the informant

BROWARD REPORTING SERVICE  (954) 763-1382

1           may have done in the past is irrelevant.  What he did

2           in this case might be important.  If he wants to ask

3           that question, it would be relevant.

4                THE COURT: Overruled.

5                Can you repeat your question?

6       BY MR. HOLDEN:

7           Q.   Was the defendant normally paid a contingency

8       fee or was he paid a specific set fee on any case?

9           A.   It all depends.

10          Q.   Sometimes contingent, sometimes set fee?

11          A.   No, it just depends on the totality of the

12      circumstances.

13          Q.   In this case, do you know, going into it, if

14      there was any plan how he would be paid, whether it would

15      be a set fee or a contingent fee?

16          A.   I don't remember speaking about whether it

17      would be a set fee or contingent fee.  Like I said, it's

18      all -- I think he expected probably to get paid because

19      like I said, we never really got into that conversation.

20          Q.   In fact, when you say expected to be paid, how

21      would you know that?

22          A.   He had been paid before so I can only assume.

23      I can't really say.

24          Q.   And he was the one who first brought to your

25      attention the existence of these two individuals; correct?

1          A.    That's correct.

2          Q.    He did this at the time knowing that in the

3     past, he had been paid for bringing defendants to your

4     attention?

5               MR. GALLAGHER:  Judge, I object, asking this

6          witness to speculate what is the mind of some other

7          person.  It's impossible to testify to that.

8               THE COURT:  Sustained.

9     BY MR. HOLDEN:

10         Q.    Now, getting back to this time when the

11    defendant Katan had said forget it. I believe you also on

12    the tape said forget it.

13              At that time, there became a lack of

14    communication between the two of you for some length of

15    time.

16              How long was it before you next spoke to Katan

17    or Fritz Maignan after Katan said forget it?

18         A.    I have to get the exact time of that last call,

19    but probably a couple hours because it was -- I think that

20    call ended around three something, after 3:00 p.m., and it

21    was probably a couple hours later that I received a beep

22    from him.

23         Q.    After Katan said forget it and you said the

24    same thing, were you still planning to take him down, to

25    arrest him?

132

```
1              MR. GALLAGHER: Same objection, it's irrelevant
2         what he intended to do at that point.
3              THE COURT:  Sustained.
4    BY MR. HOLDEN:
5         Q.    After Katan said forget it and you said the
6    same thing, when did you next speak to him?
7         A.    Like I said, it would have been couple hours
8    later when he paged me.
9         Q.    Did he page you first or you paged him first?
10        A.    No, he paged me.
11        Q.    That was a few hours after saying forget it or
12   was it the next day?
13        A.    A few hours later I believe.
14        Q.    When he paged you, you immediately called him
15   back?
16        A.    I don't recall how much time.
17        Q.    Was that the one where you called him back at
18   11:00 rather than at 9:00?
19        A.    No, it was not on the tape.
20        Q.    It was not on tape?
21        A.    No.
22        Q.    But he beeped you?
23        A.    That's correct.
24        Q.    Did you have the ability to call him back once
25   you got back to the tape recorder?
```

1        A.    No, because I was not at the office at that

2    time.

3        Q.    How far away were you, time-wise?  At the time

4    when you received the beep, how far away were you in the

5    time sense, from your office I mean?

6        A.    I don't recall, ten minutes, twenty minutes, I

7    don't recall.

8        Q.    Could you have waited to get back to your

9    office and returned the call recorded?

10        A.    Yes, I probably could have.  I don't know if he

11    still would have been at the number, but usually when

12    someone pages you, you try to call him right back.

13        Q.    You don't have any technology available to

14    record a conversation when you are not in your office?

15        A.    Yes, the technology is available, but I didn't

16    have anything with me at the time.

17        Q.    Which vehicle were you in at the time if you

18    could tell me?

19        A.    I was in my usual vehicle, Acura Legend.

20        Q.    That's your only vehicle?

21        A.    No.

22        Q.    Or the vehicle you normally use?

23        A.    That's correct.

24        Q.    There is nothing in that vehicle that you could

25    use, no tape recording device that would allow you to have

1    recorded that conversation from either a pay phone or

2    public phone?

3         A.   That's correct.

4         Q.   You didn't have the ability at that time to go

5    to a public phone and call to headquarters and have them

6    tape the conversation from where he would be calling back?

7         A.   We cannot do that through our base number which

8    is the number to call 24 hours a day because when someone

9    uses Caller ID, it will automatically say DEA is calling

10   you.  There's no way to get by.  You can't do this.

11        Q.   Now, when you met at McDonald's before the

12   arrest, was any money shown to the defendants?

13        A.   No, it was not.

14        Q.   Was any cocaine shown to the defendants at that

15   time?

16        A.   No, it was not.

17        Q.   In reality, you never intended to sell cocaine

18   to the defendants; is that correct?

19        A.   Yes, we did intend to sell cocaine.

20        Q.   Well, as a law enforcement officer, isn't it

21   correct that you would not actually have allowed him to

22   leave the scene with cocaine?

23        A.   That's correct.

24        Q.   You could have prevented them from leaving the

25   scene; correct?

1       A.   You would like to think so.  There have been

2   times when people have gotten away.

3       Q.   Interestingly you said at one point you told

4   the defendants to go, or you told Katan Maignan to go to

5   the car to look at the cocaine; isn't that correct?

6       A.   On the 11th, yeah, I made that statement to

7   him, that he could come look at the cocaine.

8       Q.   One of your concerns is that the defendant was

9   going to rip you off of the cocaine; is that what you

10  testified to earlier?

11      A.   At that point, no.  At this point, he made the

12  statement that he didn't want to go look at it because he

13  still wanted me to get rid of my gun.

14      Q.   But you offered to let him look at it?

15      A.   Correct.

16      Q.   You said you would stand away while he did

17  that; is that correct?

18      A.   I believe so.

19      Q.   If he was going to rip you off, why not just

20  take the cocaine and run at that point?

21      A.   First of all, I don't know that.  He just

22  wanted to --

23      Q.   No surveillance was there, correct?

24           MR. GALLAGHER: Objection to the question.  This

25      witness can't testify what was in the mind of Katan

1          Maignan and certainly he shouldn't be allowed to

2          answer the question just asked by Mr. Holden.

3     BY MR. HOLDEN:

4          Q.   Let me go back to the previous question, if the

5     court reporter can read it back, please.

6               (Thereupon, the question referred to was read

7          back by the court reporter.)

8               THE WITNESS: Yes, at that point, still the same

9          concern that he had the whole time.  I still have the

10         gun.  That's why I don't think he went to the vehicle

11         in the first place because he knew I still had the

12         firearm.

13              THE COURT:  Next question.

14              MR. HOLDEN: Thank you.

15              THE COURT: How much longer do you think you

16         will be?

17              MR. HOLDEN: About at least another half hour,

18         Your Honor.

19              THE COURT: This court will be in recess until

20         1:30 tomorrow afternoon.

21              The jury is admonished not to discuss the case

22         amongst themselves or with anyone else or have it

23         discussed in their presence and neither see, read nor

24         hear any news reports of this matter.

25              Have a nice evening.  Be back about twenty

1    after one.  Walk right into the room here.  Go right

2    back in the jury room until we call you out.

3          Have a nice evening.

4          If this interrupts your testimony, you should

5    not discuss anything with any party at this point or

6    with the attorneys.

7          Anything further?  State?

8          MR. GALLAGHER: Not from the State.

9          THE COURT: Defendant?

10          MR. HOLDEN: Nothing, Your Honor.

11          THE COURT: See you tomorrow.

12          Have a nice evening.

13          (Thereupon, the proceedings were adjourned at

14    5:00 o'clock p.m., to reconvene the following day,

15    June 12, 1996, commencing at or about 1:30 o'clock

16    p.m.)

17

18

19

20

21

22

23

24

25

```
 1      State of Florida )
                         :  SS
 2      County of Broward)

 3

 4                   IN THE CIRCUIT COURT OF THE
                     SEVENTEENTH JUDICIAL CIRCUIT,
 5            IN AND FOR BROWARD COUNTY, FLORIDA

 6

 7      STATE OF FLORIDA,       )
                                )
 8              Plaintiff,      )
                                )
 9          vs.                 ) CASE NO. 95-14021CF10B
                                )
10      FRITZ MAIGNAN,          )
                                )
11              Defendant.      )
        _____)
12

13

14          Proceedings had and taken before the Honorable

15      ROBERT W. TYSON, JR., one of the Judges of said Court, at

16      the Broward County Courthouse, Fort Lauderdale, Broward

17      County, Florida, on the 12th day of June, 1996, commencing

18      at or about 1:30 o'clock p.m., and being a Jury Trial.

19

20      APPEARANCES:

21          JOHN GALLAGHER, ESQUIRE,
            Assistant State Attorney,
22          Appearing on behalf of the State.

23          SCOTT HECKER, ESQUIRE,
            Appearing on behalf of the Defendant Fritz Maignan.
24
            MICHAEL HOLDEN, ESQUIRE,
25          Appearing on behalf of the Defendant Katan Maignan.
```

BROWARD REPORTING SERVICE   (954) 763-1382

```
 1        Thereupon:

 2                    The following proceedings were had:

 3                    THE COURT:  We reconvene in the matter of the

 4        State of Florida versus Fritz and Katan Maignan.

 5                    Counsel and accused are present.  It is now

 6        twenty to two.

 7                    State ready?

 8                    MR. GALLAGHER: Yes, Judge, we put a copy of the

 9        proposed instructions in front of Your Honor, if you

10        want to peruse at your leisure.

11                    We haven't done the verdict form.  I haven't

12        had definite confirmation.

13                    THE COURT: Do you have a copy?

14                    MR. HECKER: Yes, Judge, we do.

15                    THE COURT: Look at them.  If there are any

16        changes, work them out.

17                    Have all the jurors returned?  Okay.  Escort

18        the jury in, please.

19                    (Thereupon, the jury entered the courtroom at

20        1:40 o'clock, and the following proceedings were had

21        within the presence of the jury:)

22                    THE COURT:  Concede the presence of the jury

23        and waive polling, State?

24                    MR. GALLAGHER: Yes, Your Honor.

25                    THE COURT:  Defense?
```

1           MR. HOLDEN: Yes, Your Honor.

2           MR. HECKER:  Yes.

3           THE COURT: Good afternoon.  Have you discussed

4     this case amongst yourselves or with anyone else or

5     have it discussed in your presence, see, read or hear

6     news reports about this matter since the time we

7     recessed?

8           Yes or no?  Those who said yes, raise your

9     hands.  No hands.

10           Ready?  State ready?

11           MR. GALLAGHER: Yes, Your Honor.

12           The witness is still under oath.  Do you

13     understand that?

14           MR. HOLDEN: Yes, I do, Your Honor.

15           THE COURT: You may continue on with cross

16     examination.

17     Thereupon:

18                     HEATH ANDERSON,

19     having been previously duly sworn, was examined and

20     testified upon his oath as follows:

21                     CROSS EXAMINATION

22     BY MR. HOLDEN:

23           Q.    Good afternoon, Agent. How are you today?

24           A.    Good, thank you.

25           Q.    Yesterday when we left, we talked about the

1    things on cross examination but one thing we spoke about

2    was the confidential informant, Joseph Clark.

3              When you had testified yesterday, you spoke

4    about your previous contact with Joseph Clark.

5              As related to this case, did Joseph Clark and

6    you discuss whether or not he had spoken with the

7    defendant Katan Maignan?

8         A.   We didn't discuss whether he spoke with him or

9    not.  He never mentioned his name.  He first mentioned the

10   name Stizzo, which was Fritz.

11        Q.   Did he ever mention Slow?

12        A.   No.

13        Q.   Did he ever mention the name Katan?

14        A.   No.

15        Q.   Any other name in addition to Stizzo that he

16   did mention?

17        A.   I don't believe any other names other than

18   Stizzo.

19        Q.   Now, the C.I. in this particular case, you had

20   indicated earlier had not been paid in this case, correct?

21        A.   That's correct.

22        Q.   But he had been a documented confidential

23   informant for DEA; is that correct?

24        A.   That's correct.

25        Q.   In fact, this was a DEA or federal operation?

```
 1          A.    That's correct.

 2          Q.    You work for the federal government, don't you?

 3          A.    Yes, I do.

 4          Q.    And as stated a moment ago, this was a federal

 5    operation.

 6                Was the case prosecuted on a federal basis?

 7                MR. GALLAGHER: What happened at the federal

 8          level with regard to prosecution is irrelevant.

 9                THE COURT: Sustained.

10    BY MR. HOLDEN:

11          Q.    Did you speak with any prosecutor --

12                MR. GALLAGHER: Same objection, same area.

13                MR. HOLDEN: I haven't asked the question.

14                MR. GALLAGHER: He is going to ask about federal

15          prosecution.  I object to what happened at the

16          federal level with regard to prosecution.

17                MR. HOLDEN: I am requesting any personal

18          knowledge he had.

19                MR. GALLAGHER: Can we go side bar?

20                THE COURT:  Please show the jury to its room.

21                (Thereupon, the jury left the courtroom, and

22          the following proceedings were resumed outside the

23          presence of the jury:)

24                THE COURT:  You can ask the question now.

25                MR. HOLDEN: Agent, did you have any discussion
```

143

1          with any federal prosecutors with respect to the

2          decline for filing charges in this case?

3                    MR. GALLAGHER: My objection is regardless of

4          what happened at the federal level, it's irrelevant

5          to this prosecution.

6                    THE COURT:  Overruled for the moment for

7          proffer purposes of what is before the Court.

8                    You may answer the question.

9                    MR. HOLDEN: Did you talk to anyone?

10                    THE WITNESS: Yes, I did.

11                    MR. HOLDEN: My next question would be did you

12          say anything to any federal officer as input for them

13          to decline charges?

14                    THE WITNESS: To decline charges?  Basically I

15          just gave them the facts, what we had at that time,

16          which was the amount of cocaine we were dealing with

17          and basically gave those facts and the individuals

18          that we were dealing with.

19                    MR. HOLDEN: My next question would relate

20          directly to the crack cocaine issue.

21                    THE COURT: Ask the question.

22                    MR. HOLDEN: Did you mention anything to any

23          federal prosecutor regarding the possibility of crack

24          cocaine?

25                    THE WITNESS: No, I did not.

1          MR. HOLDEN: Did you mention anything to any

2     federal prosecutor about the fact this would be

3     cooked?

4          THE WITNESS: No, I did not.

5          MR. HOLDEN: Did you tell federal officers

6     everything that you knew about the case?  When I say

7     officers, I mean federal prosecutors?

8          THE WITNESS: Yes, to the best of my knowledge,

9     yeah.

10          MR. HOLDEN: That would be it.

11          MR. GALLAGHER: My objection for him to get into

12     this area of inquiry or this particular witness about

13     the federal government's decision to decline the

14     prosecution of this case is only going to lead the

15     jury to believe this case is not worthy of

16     prosecution and therefore they should not give it any

17     credence.  That's why he is asking this line of

18     question, no other reason.

19          In order for him to be asking this line of

20     questions, it's totally irrelevant to state what the

21     federal prosecutor decided to do or this particular

22     special agent told the federal prosecutor with regard

23     to federal prosecution that never took place.

24          MR. HOLDEN: I would state what he said to the

25     federal officers is germane.  If they decided to file

1    charges, they had enough made available to them and

2    they chose to decline prosecution.

3         I am not saying the State is improper.  I

4    haven't alluded to that.  I am saying the federal

5    government is a separate body with a separate set of

6    laws, not bound by our state laws and has voluntarily

7    declined to prosecute based on information provided

8    by this same witness.

9         THE COURT: With is the relevance as to the

10    guilt or innocence of these defendants?

11         MR. HOLDEN: The relevance is that since this

12    witness gave input whether or not these defendants

13    should be charged in a federal information, or

14    federal indictment, that same testimony that he gave

15    to those federal prosecutors should be made available

16    for us to inspect.  It should be made available for

17    the jury to hear as it --

18         THE COURT:  That's not what this is.  For

19    purposes of trial, what they are hearing, what the

20    relevance is, for purposes of trial?

21         MR. HOLDEN: As to the trial, Your Honor, the

22    elements here are that the defendants specifically

23    conspired with one another.  If I can't elicit

24    testimony from the agent that is conflicting with the

25    defendants that we already heard -- for example, the

1           issue of cooking, the issue of crack inflames the

2           jury.  The issue of cooking is an inflammatory fact.

3           The federal prosecutor has not charged them in this

4           information and still declines.  I believe this is

5           significant as to their guilt or innocence.

6                   THE COURT:  Objection sustained, shall not be

7           used.  Precludes both defense counsel from getting in

8           any inquiry with regard to federal prosecution, both

9           or not to get into it unless outside the presence of

10          the jury.  Then I will rule whether it's relevant or

11          not.

12                  Escort the jury in, please.

13                  (Thereupon, the jury entered the courtroom,

14          after which the following proceedings were had within

15          the presence of the jury:)

16                  THE COURT: Ask your next question.

17                  MR. HOLDEN: Thank you, Your Honor.

18      BY MR. HOLDEN:

19          Q.    Agent, earlier I asked if you had personal

20      knowledge of any conversations between Katan Maignan and

21      Joseph Clark and what was your response to that, please?

22          A.    It was no.

23          Q.    That you didn't know of any contact between

24      them?

25          A.    No.

BROWARD REPORTING SERVICE  (954) 763-1382

1        Q.    The confidential informant, did he work under

2   you?  Was he your confidential informant so to speak?

3        A.    Yes.

4        Q.    Had you ever arrested him before?

5              MR. GALLAGHER: Can we go side bar?

6              (Thereupon, the following side bar was held

7        outside the hearing of the jury:)

8              MR. GALLAGHER: Judge, I am noticeably concerned

9        because I have no idea where Mr. Holden is going with

10       this improper questioning about the confidential

11       informant.  I don't like constantly objecting in

12       front of the jury.  That's not my tact, however,

13       Mr. Holden is asking questions about the arrest of a

14       confidential informant and unrelated incidents about

15       the confidential informant.

16             I am asking the Court to please limit

17       Mr. Holden's cross examination with regard to the

18       informant to include those incidents related to this

19       case and not any unrelated incidents.

20             THE COURT: Shall we exclude the jury and find

21       out where he is going?

22             Please show the jury to the jury room.

23             (Thereupon, the jury left the courtroom, after

24       which the following proceedings were resumed outside

25       the presence of the jury:)

BROWARD REPORTING SERVICE  (954) 763-1382

1            THE COURT: Ask your question.

2            MR. HOLDEN: Agent, you had arrested the

3   confidential informant before?

4            THE WITNESS: No.

5            MR. HOLDEN: Had the confidential informant ever

6   been convicted of a felony as far as you know?

7            THE WITNESS: I couldn't say for sure.

8            MR. HOLDEN: Do you recall ever having been to a

9   deposition?

10           THE WITNESS: Yes.

11           MR. HOLDEN: In this case?

12           THE WITNESS: Yes.

13           MR. HOLDEN: At the time of your deposition,

14   were you placed under oath?

15           THE WITNESS: Yes.

16           MR. HOLDEN: And represented by counsel at the

17   time?

18           THE WITNESS: I am not sure if they were there

19   or not; I don't recall.

20           MR. HOLDEN: I hand you what is a true copy of a

21   transcript of deposition of yours, the date of which

22   is on the cover of that deposition, I believe.

23           THE WITNESS:  What page.

24           MR. HOLDEN: Page five.

25           Does that change your recollection as to your

BROWARD REPORTING SERVICE  (954) 763-1382

1      testimony a few moments ago?

2           THE WITNESS: No, it doesn't because what I said

3      was I am really not sure.  I would have to look at

4      his file in our office to tell you if it was a felony

5      or not.

6           MR. HOLDEN: That's why I am saying you did

7      indicate in your deposition he served prison time.

8           THE WITNESS: I can look right here and tell

9      you.

10          MR. HOLDEN: If you would, thank you.

11          If you could keep reading beyond that page, it

12     may clear it up.

13          THE WITNESS: Okay, yeah, it says you asked --

14     whoever was asking the questions at that time, do you

15     know if he served time?  I said I don't know what the

16     charges.  Let's see -- I believe it was stated he had

17     served time again here.  Like it says, I wasn't sure

18     what the charges were.

19          MR. HOLDEN: Did you indicate it was state

20     prison time he served?

21          THE WITNESS: I said I believe it was state.  I

22     am not sure.

23          MR. HOLDEN: Thank you.

24          That's where my proffer is headed, directly to

25     the credibility of the C.I. It's kind of important

150

1          here.

2                    THE COURT:  Sustained.

3                    MR. GALLAGHER: Judge, the question posed to

4          this witness about a prior record of a confidential

5          informant, number one, is hearsay.  This witness

6          would only be testifying to things that he had heard

7          or that he may know something about.  That could only

8          be brought into the courtroom by authenticating those

9          documents properly or bringing in a witness who

10         testifies to personal knowledge of the arrest.

11                   Asking anyone about an arrest is improper.

12         Under the Evidence Code you can't ask about arrests.

13         This is still a pending case.  The only thing is

14         questions about the informant that are unrelated to

15         this case.  This is just irrelevant, flat and simple.

16                   All he is trying to do is paint a picture of

17         someone who is not here to defend themselves and

18         bring out improperly through this witness, basically

19         to denigrate the character of a nonexistent person

20         here today and that serves no probative value at all

21         in this case and is improper and irrelevant and we

22         don't want him to get into that area because it's

23         misleading the jury and focusing on someone totally

24         unrelated to the background of the case.

25                   If they can tie his background into the case,

```
 1        they need to call a witness as to background.  My

 2        client is not the one to do it, since he only knows a

 3        hearsay account of what is going on as far as the

 4        confidential informant is concerned.

 5            MR. HOLDEN: This is a situation where the pot

 6        is calling the kettle black.

 7            Mr. Gallagher in opening remarks indicated

 8        about the use of a confidential informant, but he is

 9        now here seeking to use the cloak here of the

10        truthfulness to verify the fact that these defendants

11        were not entrapped or any other defendants

12        whatsoever, yet he is trying to deny me the same

13        opportunity.  He is using it at trial to keep me from

14        using the same thing.

15            THE COURT:  Granted, objection sustained.  It

16        shall not be used in front of the jury.

17            MR. HECKER: We have no knowledge where Joseph

18        Clark is or any ability to subpoena him.  The

19        government never listed him as a witness in this

20        matter.  That should be brought out.

21            THE COURT: Objection sustained.

22            (Thereupon, the jury entered the courtroom, and

23        the following proceedings were resumed within the

24        presence of the jury:)

25            MR. HOLDEN: Same objection.
```

1                    THE COURT:  Ask your next question.

2                    MR. HOLDEN:  Thank you, Your Honor.

3        BY MR. HOLDEN:

4              Q.   Agent Anderson, do you know who trained the

5        confidential informant in this case?

6              A.   Trained as far as what, sir?

7              Q.   In terms of being a confidential informant,

8        what is required, what is to be done, what's not to be

9        done?

10             A.   The cooperating informant in this case was

11       signed up even before I got him and I re-signed him up,

12       which we call re-establishing him.

13                   When I signed him up, I gave him the rules and

14       regulations as far as what he is to do and what he is not

15       to do while he is signed up with us.

16                   Other than that, just explaining don't go out

17       and try to find someone not in the drug business, don't

18       try to bring them into it, period, things like that is

19       what we explained to him.

20             Q.   Were any rules in writing or were they all

21       verbal?

22             A.   No, it's in writing, it was in writing.

23             Q.   You don't have a copy with you by any chance?

24             A.   No.

25             Q.   Did you keep a record of the times that you

1    spoke to the confidential informant about this case, any

2    notes?

3         A.    If there are any, I don't remember any notes

4    other than what would have been in the actual case file as

5    a matter of business or when you are speaking with a C.I.,

6    and they are bringing you business so to speak.  I do

7    thoroughly make notes of that.

8         Q.    Is that a normal course of business practice

9    for you?

10        A.    Usually we make some type of notes.

11        Q.    You don't recollect any specific notes as to

12   your conversations with Mr. Clark regarding this?

13        A.    Other than just writing down like the suspect's

14   name and number, that would probably be about it.

15        Q.    You say sometimes he has worked for a set fee

16   and sometimes a contingent fee; is that correct?

17        A.    No.

18        Q.    What was that?

19        A.    It all depends.  It depends.  What I said

20   yesterday was like total circumstances.

21        Q.    Who determines those total circumstances?

22        A.    Usually as far as how much they will get paid?

23        Q.    Yes.

24        A.    Usually it's a combination of the control agent

25   and the controlling agents and supervisor.


                 BROWARD REPORTING SERVICE  (954) 763-1382

1          Q.    Now, in this case you indicated the

2    confidential informant was not paid; is that correct?

3          A.    That's correct.

4          Q.    Did you have any input on that?

5          A.    Yes, I did.

6          Q.    Do you know what the reason is the confidential

7    informant was not paid?

8          A.    I don't think the issue of pay came up.  Like I

9    stated, I never discussed with Mr. Clark, you know, about

10   how much we would get paid or whatever.

11         Q.    But in the past, in other cases, you discussed

12   with him how he would be paid or what point and how much,

13   correct?

14         A.    We may have mentioned it, but we make it a

15   practice, at least I did, not to sit down with the

16   informant and say I will pay you $50 for this or a hundred

17   for that because that way it's kind of like they assume

18   it's a promise.  I cannot make promises to him, so I make

19   it a practice not to do this.

20         Q.    But it is understood, as far as you are

21   concerned, that he is to be paid for bringing you business

22   resulting in arrests; is that correct?

23         A.    Pretty much, yeah.  Sometimes we have it that

24   we bring cases and he's not even expected to get paid

25   anything.  That happens also.

1      Q.   For this confidential informant or generally

2   for confidential informants at large?

3      A.   Both.

4      Q.   Do you have anything in writing or anything to

5   reflect that this confidential informant didn't expect

6   anything in this case?

7      A.   No, I don't.

8      Q.   I would like to move on if I could to the

9   conversations between you and the defendants on the

10   telephone as we heard yesterday.

11        Several times you indicated yesterday that you

12   used deceptive language to get them to feel comfortable

13   with dealing with you.

14        Could you give me an example of some of those

15   terms or language that you used to make them feel that you

16   are not an agent and are in fact a drug dealer?

17      A.   For example, I used condo in reference to

18   cocaine instead of saying want to purchase, or what did

19   you want.  Instead of saying two kilos of cocaine, I said

20   two condos.

21      Q.   Did you use any other words that would lead

22   them to believe that you were not an agent and were in

23   fact in the drug dealing business?

24      A.   Words?  I really don't recall any, other than

25   just like saying, you know, what type of phone are you

1    on.  I mean, that's not the words, but a phrase.

2          Q.    Several times in fact you asked what type of

3    phone they are on; is that correct?

4          A.    Couple times, yes.

5          Q.    And you asked several people if they were on a

6    cell phone, am I correct?

7          A.    Yes.

8          Q.    You had mentioned yesterday something about how

9    drug dealers don't like to use their house phone.

10          Again, what is a house phone, please?

11          A.    A residential phone, a phone in a residence.

12          Q.    The reason that people are afraid to use their

13    house phone is they were afraid of having their

14    conversations recorded; is that correct?

15          A.    I am not sure why drug dealers do that.  It's

16    just a common thing I picked up, that a lot of times when

17    you are talking to them and they are on a home phone, they

18    say don't talk like that or don't say those say words.

19          A lot of times they want to go to a pay phone

20    or use cell phones, stuff like that.

21          Q.    When you are working a case and you want to

22    hear someone's telephone conversation at their home, out

23    of their house phone, you have to obtain a warrant to do

24    that, don't you?

25          A.    If I want to listen on their home phone?

BROWARD REPORTING SERVICE  (954) 763-1382

157

1          Q.    Yes, if you want to hear the conversations that
2     are coming from their home phone?

3          A.    If you are going to listen to conversations and
4     there are no consenting parties, you have to get a Title 3
5     or file for Title 3.

6          Q.    Which is essentially getting permission from
7     the court to do that?

8          A.    That's correct.

9          Q.    Is that also true for cell phones?

10         A.    Yeah, any type of -- now, I am not the
11    authority on this, but from what I know, any type of
12    communication that there is no consenting party to, then I
13    believe you would have to have a Title 3.

14         Q.    But isn't it true that cell phones are not
15    private communication and are not subject to the same
16    rules in terms of obtaining a warrant to listen to those
17    unconsented to conversations?

18              MR. GALLAGHER:  He is asking questions requiring
19         a legal opinion of this particular witness.  He is
20         not qualified to answer those questions.  He is an
21         officer of the law.  He is not a judge, he is not a
22         lawyer, so he doesn't have the capability to respond
23         to these questions.  He is asking search and seizure
24         questions.

25              MR. HOLDEN:  I am asking if he knows, Your

```
1          Honor.

2                  THE COURT: Do you know?

3                  THE WITNESS: Repeat your question, please.

4                  MR. HOLDEN:  I apologize. Could I have it read

5          back?

6                  (Thereupon, the question referred to was read

7          back by the court reporter.)

8                  THE COURT: Do you know the answer, yes or no?

9                  THE WITNESS: To my knowledge they are not under

10         the same rules.

11                 THE COURT:  Do you know the answer?

12                 THE WITNESS: No.

13                 THE COURT: Next question.

14     BY MR. HOLDEN:

15         Q.   You indicated on these various tapes that we

16     were listening to yesterday that on one of the occasions

17     you were unable to tape record it because they had called

18     you when you were in your car and you spoke to them from

19     your car phone; is that essentially correct?

20         A.   No, but I was in my car.  It didn't have a

21     device to record. I didn't make the call from my car.

22         Q.   Where did you make that call from?

23         A.   I don't recall but it wasn't from my car.

24         Q.   It wasn't from the office either?

25         A.   No, it was not.
```

```
 1        Q.   Do you have any equipment that is not in the

 2   office that you used for recording from any other

 3   location?

 4        A.   Occasionally I will have something in my car.

 5        Q.   But on this occasion, you didn't?

 6        A.   No, I did not.

 7        Q.   And the items you would have in your car would

 8   be something that hooks up to your portable phone; is that

 9   correct, when you have it with you?

10        A.   That's correct.

11        Q.   It runs on batteries?

12        A.   That's correct.

13        Q.   Now, you were actively investigating this case

14   at this time; isn't that correct as well?

15        A.   That's correct, even, though at this point, you

16   know, we both got off the phone and said okay, just forget

17   it.

18        Q.   At that point, you said forget it, both of you?

19        A.   At the point to where the last conversation had

20   taken place, then I had gotten beeped later, at that

21   point, the last phone call, it was said -- he said forget

22   about it and so did I, maybe not in those words.

23        Q.   Now, you didn't arrest the defendants at that

24   point, did you?

25        A.   No.
```

1          Q.   You say you didn't have the portable device

2     with you to make a tape of the conversation on that

3     particular occasion when he said forget it, just to

4     refresh, that's correct, right?

5          A.   You said when he said forget it I didn't have

6     anything to record it?

7          Q.   When he said forget it, did you have anything

8     to record that?

9          A.   We were in the office.  That was on the tape

10    yesterday.

11         Q.   That was one of the tapes we heard, right?

12         A.   Yes, sir.

13         Q.   After he said forget it and before he called

14    you back, isn't it true that you had beeped him several

15    times between the time when he said forget it and the time

16    he called you back to see if you could work it out?

17         A.   I don't recall.  I may have, but I don't

18    recall.

19         Q.   Isn't it true that you called him at least half

20    a dozen times between the time he said forget it and the

21    time that he called you back?

22         A.   I don't recall.  Could have, but I don't

23    recall.

24         Q.   Going back to the confidential informant,

25    trying to tie that in here, when you did the three—way

```
 1    call, wasn't that after Mr. Maignan said forget it, I
 2    don't want to do it?
 3         A.   No.
 4         Q.   That was before?
 5         A.   The three-way call was before yes, sir.
 6         Q.   The purpose of the call was to do what?
 7         A.   To my knowledge, it was just to reassure them
 8    that there were no problems.
 9         Q.   Well, at that point, there was no agreement,
10    was there, as to doing the deal?
11              MR. GALLAGHER: The jury is here to determine if
12         there is an agreement.  That's the basis of a
13         conspiracy charge.
14              MR. HOLDEN: Also what this agent specifically
15         testifies to bears on whether or not there was an
16         agreement.
17              THE COURT:  What is the question?
18              MR. GALLAGHER: Whether or not there was an
19         agreement at this point with regard to the drug
20         deal.  That's the ultimate issue of fact for the
21         trier of fact to decide.
22              That's why they charged them with conspiracy.
23              THE COURT: Objection overruled.
24              MR. HOLDEN: I am sorry.
25              Could you state whether at the time of the
```

```
1              three-way call, there was --

2              THE COURT:  Wait one minute.  I am

3         interrupting.  Go ahead.

4    BY MR. HOLDEN:

5         Q.   Going back to my question a moment ago, was the

6    purpose of the three-way call to perfect an agreement or

7    what was the purpose of that?

8              Start with what was the purpose of the

9    three-way call?

10        A.   Just to reassure them that there were no

11   problems.  They wanted to hear from Mr. Clark because they

12   said, you know, in the call he even says, I think it was

13   Fritz, but we have to listen to it again, he said I am

14   definitely going to deal with you, but I want to hear from

15   Mr. Clark.

16        Q.   Now, the purpose of Mr. Clark was to assuage

17   any fears the defendant may have had.  Is that what you

18   are saying?

19        A.   Yes.

20        Q.   Did Mr. Clark help perfect the agreement, if

21   you will?

22        A.   Perfect the agreement?  I would say no.

23        Q.   When did you learn the actual identities of the

24   defendants as opposed to their names that you referred to

25   here?
```

1        A.   I believe we learned the last name from the

2   vehicle tag on the vehicle that was driven to the first

3   meeting location and that was the last name of Maignan.

4        Q.   But the vehicle wasn't registered to either of

5   the defendants; is that correct?

6        A.   I don't believe it was registered to either

7   one, but the last name, I would have to look at the

8   records, but the last name on the vehicle was Maignan.

9        Q.   I believe later on you came to learn the

10   vehicle was registered to their sister; is that correct?

11        A.   I am not sure who it was registered to, same

12   last name.

13        Q.   Coming forward on the tapes, several times I

14   recall having heard you say on the August 10th tape that

15   the deal must be now, that if we have to wait for

16   tomorrow, forget it.

17             Is that your recollection?

18        A.   August 10th?

19        Q.   That was I believe the day before the

20   take-down?

21        A.   I don't recall those exact words.  I don't

22   recall even saying like it has to be now, but we kept

23   negotiating.  I was trying to figure out why they wanted

24   to wait.

25             At first they were ready to go, if you remember

BROWARD REPORTING SERVICE  (954) 763-1382

```
1    from the first time.  I had to back up because they said
2    bring your stuff, I will bring my stuff and I had to step
3    back and say, wait a minute, let's meet.
4              Talking about on the 10th, I remember saying a
5    couple times what is the problem, and they said they
6    didn't have a vehicle at the time.
7         Q.   Just a moment ago in answer to the previous
8    question, you indicated it was part of the negotiations;
9    is that correct?
10        A.   What was part of the negotiations?
11        Q.   Saying we need to do it soon, we need to do it
12   tomorrow?
13        A.   I wouldn't consider that part of the
14   negotiations.
15             At that point, we already decided what we were
16   going to do.  It's just a matter of actually getting
17   together and doing it.
18        Q.   I thought I heard you say you were still
19   negotiating; I am sorry.
20             Did you say at any time point if it wasn't
21   tomorrow, forget it, the deal was off?
22        A.   I think in one part on the tape is like a
23   mutual agreement.  I told them if we have the same
24   problems tomorrow or if this same thing happens again
25   tomorrow, as far as making an agreement and then changing
```

1        it or doing whatever, it probably wasn't going to happen.

2                   I think it is on tape and the defendants

3        agreed.

4            Q.   I don't recall hearing that on tape, but I do

5        recall hearing you say if it didn't happen tomorrow, you

6        were going to the Keys, and to forget it.

7                   Do you recall that statement?

8            A.   I recall saying I have to go to the Keys but as

9        far as saying it has to be tomorrow, I have to go to the

10       Keys, I don't know if that type of term was used.

11           Q.   Did the defendants ever -- let me strike that.

12                  You've had many occasions to deal with people

13       who are involved in drugs; is that correct?

14           A.   Yeah, I would say that's correct.

15           Q.   Is it pretty common for someone who is a drug

16       dealer to ask for a taste or advance of the product before

17       they actually purchase it?

18           A.   Sometimes that's true.

19           Q.   Isn't it in fact true that any experienced drug

20       dealer who doesn't want to get bogus products, would in

21       fact ask for and receive a taste of the product prior to

22       purchasing large quantities such as two kilos?

23           A.   It happens but sometimes right when they are

24       actually looking at the kilos.

25           Q.   That didn't happen here, did it?

166

1          A.    No, it did not.

2          Q.    In fact, they never got a taste of any cocaine;

3     is that correct?

4          A.    In this case, that's correct.

5          Q.    Never saw any cocaine in their presence; is

6     that correct?

7          A.    That's correct.

8          Q.    They never offered you any, did they?

9          A.    No, they did not.

10         Q.    Did they ever offer you any marijuana?

11         A.    No.

12         Q.    Did you ever offer them any marijuana?

13         A.    No.

14         Q.    Now, originally you indicated that as far as

15    setting up the actual purchase, that you wanted Sam Tatum

16    to come with you; isn't that correct?

17         A.    For the actual deal when it took place, that's

18    correct.

19         Q.    And subsequently you and acquiesced and changed

20    your mind and said, it's okay if I come alone; is that

21    also correct?

22         A.    I think that was the final agreement was that I

23    would be there by myself and that they would come by

24    themselves or he would come by himself.

25         Q.    Now, I believe yesterday you indicated that one

167

1    of the reasons that you had Sam Tatum there was because he

2    was black isn't that correct?

3         A.   No, I stated that may have been a part of the

4    reason.

5         Q.   In this case, you believed that the defendants

6    would bring 433,000 to the scene; isn't that correct?

7         A.   That's correct.

8         Q.   In fact, nothing near that amount was ever

9    found on them; is that correct?

10        A.   That's correct.

11        Q.   In fact, no money was found on their person to

12   speak of, the money if any that was found was found in the

13   vehicle; is that correct?

14        A.   I don't recall whether any money was found on

15   them or not, but a large amount was found in the vehicle.

16        Q.   As far as you recall, it was less than $2,000?

17        A.   That's correct.

18        Q.   I believe on the 10th, the day before the

19   arrest, when both of you said forget it, you indicated a

20   few minutes ago that you also said forget it, is that

21   correct?

22        A.   Something to that extent, that's correct.

23        Q.   When you said forget it, what did you mean?

24        A.   Basically that it wasn't going to happen, that

25   we weren't going to do it is what I remember.

168

1        Q.   Did you believe that they were just people

2   blowing or puffing if you will?

3        A.   No, I was hoping he would call back and

4   thinking that they would call back.  Most of the time when

5   you came to an agreement on something and then there is

6   like a little problem, people call and try to work it out.

7        Q.   But both of you said forget it at that point,

8   right?

9        A.   That's correct.

10        Q.   At that point, before he called you back, you

11   beeped him a few times, right?

12        A.   I beeped him but when I actually spoke with

13   him, he had beeped me first.

14        Q.   Yes, but that was in response to your beeping

15   him, wasn't it?

16             MR. GALLAGHER:  I object.  That calls for the

17        witness to speculate as to why Katan Maignan beeped

18        this particular witness.

19             MR. HOLDEN: Your Honor --

20             THE COURT: Sustained, you may rephrase the

21        question.

22   BY MR. HOLDEN:

23        Q.   Earlier on when you testified about both of you

24   saying forget it, I had asked you as to whether or not

25   before he called you back you beeped him several times.

```
 1                    Do you recall that question earlier today?

 2          A.    Yes, I do.

 3          Q.    Your response was you had beeped him several

 4     times; is that correct?

 5          A.    I don't know.  I don't recall beeping him.  I

 6     may have.

 7          Q.    When you testified yesterday, you spoke about

 8     an intelligence meeting or a meeting prior to setting up

 9     surveillance; is that correct?

10          A.    That's correct.

11          Q.    You called it a briefing, didn't you?

12          A.    I believe so.

13          Q.    At that meeting, was there a take-down signal

14     that was discussed?

15          A.    Yes, there would have been an arrest signal.

16          Q.    Do you recall what that arrest signal was?

17          A.    No, I do not.

18          Q.    You never issued an arrest signal, did you?

19          A.    No.

20          Q.    Why didn't you issue the arrest signal?

21          A.    The arrest signal that would have been planned

22     would have been given only if a couple things had

23     occurred.  That was that the actual deal take place.

24     That's what that signal was set for, the actual deal as

25     far as the transfer took place.
```

BROWARD REPORTING SERVICE  (954) 763-1382

1      Q.   So there was no take-down signal prepared if

2   the deal did not go through?

3      A.   There is no take-down signal -- I could have

4   used probably the same signal, but that's why I called on

5   the phone to get some guidance from senior agents or

6   supervisors.

7      Q.   Was that Agent Armitage (phonetic)?

8      A.   I believe I spoke with Agent Armitage.  I was

9   speaking with a couple different people so --

10      Q.   Going back to the words that you used, you said

11   you used the word condo as a deceptive term to make him

12   believe you were in the drug trade, correct?

13      A.   That's correct.

14      Q.   The white Mercedes, did you say it had gold

15   rims or not?

16      A.   I didn't mention anything.

17      Q.   Do you recall if it had gold on the Mercedes?

18      A.   If it has any gold on it, it would be very

19   small because I don't recall seeing any gold on the

20   vehicle.

21      Q.   After you and Mr. Maignan both said forget it

22   on the 10th, you spoke to him subsequent to that.

23           Did you ever tell him that you needed to do the

24   deal, that you needed the money?

25      A.   No, I did not.

1          Q.    Would that have been improper in any sense as

2     far as your training goes, to have said to him, I need the

3     money, please let's do the deal?

4          A.    I think it would have been improper.

5          Q.    In what way?

6          A.    Just as far as I really don't know how to

7     explain what way, but I would say it's improper because

8     you are kind of like begging to do something, you know.

9                The only statement I remember saying was just

10     that I am just trying to make a little money off of it.

11          Q.    That is what you said?

12          A.    I think it's on the tape where I stated I am

13     just trying to make some money.

14          Q.    Would you characterize Katan's behavior at the

15     scene of the arrest as indecisive?

16          A.    As far as what?

17          Q.    Whether or not to do the deal?

18                MR. GALLAGHER: Once again, he is asking this

19          witness to say what was in the mind of this

20          particular defendant.  Asking for a characterization

21          doesn't change it.  He is asking him to decide what

22          was in the mind of this man at the time this deal was

23          supposed to consummate.

24                He's not capable of doing that.  It's pure

25          speculation.

1                    THE COURT: He asked about behavior.

2                    MR. GALLAGHER:  He asked about characterization

3          of his behavior.

4                    THE COURT: Overruled, I will allow him to

5          answer if you can.

6                    MR. GALLAGHER:  Can he rephrase the question.

7          That's not what he asked.

8                    THE COURT: Can you answer the question?

9                    THE WITNESS: Yes, I can answer the question.

10                   His behavior, up to the point where when we

11         originally walked out of Denny's, he was set and

12         ready to do the deal, he was ready to go.

13                   At the point where he realized I had a firearm

14         and a vest, is the point to where he was like kind of

15         indecisive, like I don't know.

16    BY MR. HOLDEN:

17         Q.   But he became indecisive?

18         A.   He wasn't, and yes, he became indecisive after

19    finding out I had a firearm.

20         Q.   And again, just to refresh my recollection, you

21    found when you patted him down, you found no firearm on

22    him, correct?

23         A.   In the area I patted down. I didn't do a

24    thorough search.

25         Q.   As far as you know, no firearm was found on his

1    person; is that correct?

2           A.    On his person, that's correct.

3           Q.    I will finish asking you a few questions about

4    the videotape that we saw yesterday, the second videotape,

5    the one of the arrest scene.

6                 Now, I had a hard time hearing some of that, so

7    I would like if you can, to fill in the blanks that I

8    could not hear about.

9                 Several times I recall you saying to him, just

10   show me some money, show me some money.

11                What was the purpose of you trying to get him

12   to show you some money?

13          A.    The purpose of me trying to get him to show me

14   some money was two-fold. I was requesting him to show me

15   the money, but not at his vehicle. Again, I did not want

16   to go to his vehicle because that's where I thought a

17   robbery would take place.

18                What I also wanted to do was confirm he

19   actually had the money to do the deal and it wasn't just a

20   ripoff.

21                That is why I requested him to show me money.

22          Q.    As far as the robbery of yourself, you

23   indicated there was approximately ten officers in very

24   close proximity?

25          A.    They were in the area, that's correct.

1          Q.    As far as you know, all of these agents had

2     been trained at least the way you had at Quantico with

3     self-defense and such?

4          A.    Yeah.

5          Q.    At the very least?

6          A.    At the very least.

7          Q.    Were any agents armed, if you know?

8          A.    Yes, they were armed.

9          Q.    In fact, isn't it required by policy that they

10    are all armed at the scene?

11         A.    Yes, they should have all been armed at the

12    scene.

13         Q.    So you were still afraid of being ripped off?

14         A.    It only takes a second for someone to pull a

15    gun out and shoot you in the head.

16               I mean, it happens.

17         Q.    Out of curiosity, why did you state to the

18    defendant that he should go to your car to look at the

19    cocaine without you there?

20         A.    Go over to look at my car?  That was to get him

21    to go along with what I wanted to do.

22               Again, he did not want to do that unless I put

23    my gun up.  He was willing to go along with the deal as

24    long as I put my firearm up.

25         Q.    All that would be on the tape if it occurred?

BROWARD REPORTING SERVICE  (954) 763-1382

175

```
1         A.    If what had occurred?

2         Q.    If the items you are referring to now actually

3    occurred, we would see them on the tape, correct?

4         A.    To actually tell him to go look at it?

5         Q.    As far as putting the gun away and I am looking

6    at it?

7         A.    That would be on tape.  Yes, he did say on the

8    tape, put the gun away, but I don't think he said I will

9    go look at it if you put the gun away but basically he was

10   saying put the gun away, we can do the deal.

11        Q.    At 1:36 in the afternoon on the videotape,

12   didn't you say to him the only way it's going to work is

13   if you show me some money, that's the only way it's going

14   to work?

15        A.    Again, the time, I couldn't give you the time.

16   Also whether I said that's the only way it's going to

17   work, we have to look at it again, as far as the wording.

18   I remember telling him I need to see some money, just show

19   me something to keep everything going there, because we

20   also, like I said, I was also offering to let him go to my

21   vehicle to look at the cocaine but --

22        Q.    But by saying to him that the only way it's

23   going to work, does that show that if you decide it's not

24   going to happen, it's not going to happen and if you

25   decide if he follows your directions, that the deal will
```

1    happen?

2         A.    Again, I said I didn't recall.  We have to look

3    at the tape about me saying that is the only way it's

4    going to happen is to do that. I don't believe it was on

5    there.

6              Again, we were both trying to -- he wanted the

7    some thing accomplished in order to do the deal and that

8    was for me to put my gun up there. If I put the gun up,

9    then he was willing to do the deal.

10        Q.    No cocaine ever changed hands, right?

11        A.    That's correct.

12        Q.    No deal ever actually occurred; isn't that

13   correct?

14        A.    The transaction never took place.

15        Q.    The defendants are not charged with trafficking

16   in cocaine, are they?

17        A.    No, conspiracy.

18             MR. HOLDEN: Could I have one moment, Your

19        Honor?

20             THE COURT: Yes.

21   BY MR. HOLDEN:

22        Q.    At the end of the videotape where before it

23   cuts off is your voice saying, you call it, you call it.

24             Is that you?

25        A.    Should have been my voice.

1          Q.   Who were you speaking to?

2          A.   I think I would have been speaking to Armitage

3     because I stated to him also in not so nice words to go

4     ahead and lock him up or arrest him.

5          Q.   Do you recall your exact language?

6          A.   Not exactly, but it's on the tape.

7          Q.   And did you say let's take that blank blank

8     down anyway?

9          A.   I don't know anyway, but the blank blank was in

10    there and take him down or arrest him, something to that

11    effect.

12         Q.   Do you say on the tape just before you said

13    let's take that blank blank down, did you state that we

14    ain't got nothing?  Was that your voice saying that?

15         A.   It was my voice, but not saying that.  I was

16    saying that he didn't have anything, as far as thinking he

17    was just going to rip me off.  That's why he doesn't,

18    because he knew I had a gun.

19              MR. HOLDEN: I have nothing further.

20              Thank you.

21                     CROSS EXAMINATION

22    BY MR. HECKER:

23         Q.   Afternoon Agent.

24         A.   Afternoon.

25         Q.   I want to start back in the beginning with you

1     and try not to go through the same questions that Mr.

2     Holden.

3               During your fourteen week course that you took

4     at Quantico, Virginia, did you have classes on the use and

5     control of a confidential informant?

6          A.   Yes, we did.

7          Q.   As well as you have been an agent for five

8     years so you had practical experience as well, correct?

9          A.   That's correct.

10         Q.   Now, would it be a fair statement to say that

11    confidential informants are a very important commodity for

12    DEA?

13         A.   They are important.

14         Q.   It's one of your main ways of getting to bad

15    guys so to speak?

16         A.   One of the ways, that's correct.

17         Q.   Without mentioning what the reasons are, there

18    are many reasons why someone would be a confidential

19    informant, correct?

20         A.   That's correct.

21         Q.   One of the reasons would be to get paid, not as

22    a living, but to earn money, correct?

23         A.   That's correct.

24         Q.   Now, can you please tell the jury when you use

25    the term documented C.I., and I know the government refers

1    to them as cooperating individuals and the State refers to

2    them as confidential informants, but they are really the

3    same thing, right?

4          A.    That's correct.

5          Q.    Can you explain to the jury what a documented

6    C.I. is?

7          A.    Documented C.I. would be an individual that has

8    come into our office, agreed to cooperate with us and give

9    information or work with us as far as cooperate with us,

10   to do investigations.

11              It is someone who has been set down, been

12   explained all the rules and regulations again as far as

13   what they can do or can't do, what their role actually is

14   and again, what he can and cannot do.

15              Then as far as being documented, when it's one

16   that is active at the time because you sign him up.  They

17   are active during that point.  You can deactivate them and

18   then reactivate them.

19         Q.    At some time, Mr. Clark was a documented C.I.?

20         A.    That's correct.

21         Q.    At the time of this case he was de-certified or

22   de-activated?

23         A.    That's correct.

24         Q.    You would reactivate him up again, correct?

25         A.    No, I did not reactivate him.

1          Q.    He brought information to you regarding this

2    case and you used him on this case?

3          A.    He just called and gave me the information,

4    just name, number, basic stuff and then he did the call

5    later, the three-way call and that was it.

6          Q.    When you received the call on this case from

7    Joseph Clark, when in time earlier had you heard from Mr.

8    Clark regarding anything? What is the gap of time between

9    the time you heard from him?

10          A.    Couldn't give you an exact time, probably a

11    couple months I would say.

12          Q.    Were you surprised to hear from Mr. Clark?

13          A.    Not really.

14          Q.    Was he in waning days of being a confidential

15    informant for your agency?

16          A.    Excuse me?

17          Q.    Was he in his last days of being a confidential

18    informant?

19          A.    I would say not.

20          Q.    Had he been terminated from the office

21    subsequent to this deal?

22          A.    He was never signed back up.

23          Q.    He was never signed back up?

24          A.    He was never reassigned by me or my office. He

25    was not signed back up since deactivation.

1    Q.   Was there a reason for him not being signed up,

2    re-signed up?

3    A.   Reason for not being re-signed up?  I don't

4    think there was ever an issue of ever signing him back

5    up.  He was deactivated. Like I said, he called with some

6    information and really at the time I don't think there was

7    a consideration of re-signing him back up.

8    Q.   Is it true after he had worked on this deal, he

9    had given you additional information about something else

10   and it proved to be unreliable, after this case and that's

11   why you decided not to use him anymore?

12   A.   .After this case?

13   Q.   After this case?

14   A.   No.

15   Q.   Now, there are many rules and regulations that

16   a confidential informant must abide by, correct?

17   A.   That's correct.

18   Q.   I am interested in the one regarding

19   entrapment.

20        Were they specifically told they are not to

21   entrap people?

22   A.   Specifically told.

23   Q.   Now, basically that means that whoever he gets

24   information from, that individual has to be known in the

25   drug trade so it speak and be an active participant in the

1    drug trade?

2        A.    I would say an active participant, yes.

3        Q.    A confidential informant is not permitted to

4    create a new crime, right?

5        A.    That's correct.

6        Q.    When the confidential informant in this case

7    contacted you and gave you the information regarding the

8    Maignan brothers, what steps did you take to investigate

9    on your own that the Maignan brothers had prior drug

10   involvement?

11       A.    Okay.    At the time I had only a street name, so

12   I had nothing to look into to find out whether they were

13   active in the business or not.

14       Q.    You are a federal agent, correct?

15       A.    That's correct.

16       Q.    You have access to the FBI records and other

17   federal computer system, correct?

18       A.    Limited access, yes.

19       Q.    Now, isn't it true that street names or

20   nicknames are often put into the federal system, sometimes

21   given numbers and there are ways of finding them, correct?

22       A.    There are ways.

23       Q.    Did you ever run Stizzo through the federal

24   computer to see if he came up prior to you going forth

25   with this?

```
1         A.    No, I did not.  I didn't have an exact

2    spelling.  All I had was just someone explaining the guy's

3    name was Stizzo and not giving a spelling or anything.

4         Q.    Now, did Mr. Clark, the confidential informant,

5    relay to you how many contacts he had with Fritz Maignan?

6         A.    Exact number, no.

7         Q.    Did you get the impression it was more than

8    one?

9         A.    Yes.

10        Q.    Why did you have that impression?

11        A.    Basically he just said that he had met these

12   guys and they had partied or something to that extent.

13        Q.    Did he talk about meeting them at the Foot

14   Locker shoe store in Harlem?

15        A.    No, he did not.

16        Q.    Did he relate that Fritz Maignan worked in that

17   store?

18        A.    No, he did not.

19        Q.    But he did relate to you that he had contact

20   with both the Maignan brothers, right?

21        A.    No.

22        Q.    Did he relate they were brothers coming down

23   here to do business?

24        A.    I don't recall him saying whether they were

25   brothers or not.  I know I used that term, too, but I am
```

1      still not sure if they are actually blood brothers.

2          Q.   Let me ask you this.

3               After you got this information from Mr. Clark,

4      were you anticipating one or two individuals coming down

5      from New York?

6          A.   More than one.

7          Q.   Then why did you feel more than one was coming?

8          A.   Like I stated earlier, he had given me the name

9      of Stizzo and he was just saying these guys would be down

10     in that area and they were going to be in contact with

11     them because they were doing business down here.

12         Q.   Then what type of questioning did you do of Joe

13     Clark in line with his rules and regulations about being a

14     cooperating individual to make sure the Maignan brothers

15     were proper targets in this case?

16         A.   I asked him -- again, the exact wording I

17     couldn't tell you -- but basically I would have asked him

18     what type of violators they are, what tape of drugs they

19     are into.

20         Q.   Do you remember the answers he gave you?  I

21     would like to ask the question and you tell me what the

22     answer was as well if you remember, so let's back up

23     again.

24               You asked what type of violator they were and

25     what was the answer Mr. Clark gave you?

1          A.    He said he wasn't sure but he just knew the

2     guys were in the business, didn't really give me a

3     definite answer.

4          Q.    And what kind of drugs?

5          A.    He said mainly coke.  He didn't say whether it

6     was cooked or powder, he just used coke.

7          Q.    Did he gave you the quantity that the Maignan

8     brothers were allegedly using?

9          A.    Kilos.

10         Q.    Now, how did Mr. Clark gather this information?

11         A.    From partying with him is what he said.

12         Q.    Did Mr. Clark relate to you that he had

13    actually seen kilos in the possession of the Maignan?

14         A.    No, he did not.

15         Q.    Did Mr. Clark ever relate to you that he ever

16    saw any cocaine in the presence of the Maignan brothers?

17         A.    No, he didn't.

18         Q.    Did you ask him?

19         A.    Yes.

20         Q.    Did you have any concern at that point that

21    perhaps the Maignan brothers were not proper targets under

22    the rules and regulations of DEA?

23         A.    No.

24         Q.    Was that based upon Joseph Clark and your

25    relationship with Mr. Clark and your belief that he would

1    follow the rules?

2          A.    Whether I was considering whether they were not

3    really targets or not?

4          Q.    What I am asking is this. I think you already

5    answered the question.  I am not here to confuse you.

6          It appears to me, and stop me if I am wrong,

7    you had the confidential informant, Joseph Clark, that

8    contacted you and said I have a guy that's moving in New

9    York by the name of Stizzo and he's coming to Florida to

10   shop.

11         My question to you was, what did you do to

12   verify the information? You basically told me you didn't

13   do anything.

14         Now, I asked did you question Mr. Clark and you

15   answered that you did.  Mr. Clark related to you he never

16   saw kilos in the presence of the Maignan brothers and he

17   never saw any drugs in the presence of the Maignan

18   brothers.

19         My next question is, did you have a concern at

20   that point that they were not a proper target?

21         A.    No, I didn't.

22         Q.    Why?

23         A.    Because a lot of times we get calls that come

24   in or the informant will give us information on someone,

25   and they may not have seen the person with drugs in their

187

```
1    hand or whatever, but if people are talking about what
2    they are doing or whatever, as far as their business, then
3    you have to take that into consideration.
4            It wasn't like we were going to go out and
5    arrest them based on what Mr. Clark has told us, so at
6    that point, it was still an investigation. We were still
7    taking steps to find out who they are and if they are
8    valid targets.
9        Q.   Tell me what those steps were you took to
10   determine if they were valid targets?
11       A.   We only had a name and with that name, I did
12   not run it.  The first step would probably have just been
13   making contact with him and actually talking to the
14   people.
15       Q.   Did Mr. Clark tell you what state or city they
16   were coming from?
17       A.   It was either New York or Connecticut, I don't
18   recall exactly which one right now.
19       Q.   Did you make any contact with your field office
20   in either New York or Connecticut to verify whether they
21   had the name of Stizzo in their files?
22       A.   No, I did not.
23       Q.   Then again that was because you were waiting to
24   get contact from the Maignan brothers from down here?
25       A.   I wanted to get some definite identified
```

1    information on them because, first of all, I wanted to

2    make sure there was someone that actually showed up down

3    here and then make contact with them and that way it's

4    easy to, usually easy to find out some identifying

5    information on a person.

6        Q.   Now, DEA maintains files on individuals that

7    they believe are in the drug trade, correct?

8        A.   That's correct.

9        Q.   These individuals may or may not have been

10   arrested in the past or charged with anything, correct?

11       A.   That's correct.

12       Q.   So sometimes during investigations when people

13   are arrested, information regarding other people or other

14   names come into your hands or DEA's hands, right?

15       A.   That's correct.

16       Q.   Phone numbers or addresses, that's all put into

17   some type of investigative stockpile, correct?

18       A.   Sometimes, yes.

19       Q.   So had Mr. Clark given you more detailed

20   information regarding where they were coming from and what

21   they were doing, you perhaps would have been able to look

22   into some other field offices to see if the name Stizzo

23   and Slow had been documented as somebody in the trade?

24       A.   I wouldn't have.

25       Q.   You wouldn't have done that or you wouldn't

BROWARD REPORTING SERVICE   (954) 763-1382

1    have had the ability?

2        A.    I wouldn't have done that.  With just a street

3    name like that, I would not have done that.

4            If it was related that this guy is something

5    monstrous like Pablo Escobar, if you mention a name like

6    that, or someone who is well known or talking about a

7    murder or homicide or something, we probably would have

8    tried to find something out.

9        Q.    You basically treated this as another tip from

10   one C.I. and you were going to wait to see what happened?

11       A.    Basically yes.

12       Q.    Fair enough.

13           Now, when you had mentioned to the Maignan

14   brothers that you had two different prices and I think you

15   said $18,500 for good stuff and $16,500 for wet, did that

16   raise concern in the Maignan brothers that the cocaine may

17   have been defective in some manner?

18       A.    I don't think it raised any concerns because

19   they said the sixteen five would be just fine because they

20   were going to cook it up anyway.

21       Q.    You first made the remark on tape you have to

22   know how to fix it up and I believe Fritz answered our

23   stuff is cooked, correct?

24       A.    As I stated yesterday, we have to listen to the

25   tape again because I don't recall whether I said you have

1    to know how to fix it up first or they said we are going

2    to sell ours in whatever form, so we have to listen to the

3    tape again.

4        Q.   Now, I believe you also mentioned that on the

5    tape, Fritz said that they are here to shop and to do

6    business, correct?

7        A.   That's correct.

8        Q.   You had referred to cocaine as condos, right?

9        A.   That's correct.

10       Q.   You never told them you were with DEA, did you?

11       A.   No, I did not.

12       Q.   You were playing the role of a drug dealer,

13    right?

14       A.   That's correct.

15       Q.   What made you believe these two guys were not

16    playing the role of a drug dealer, saying the right words

17    just like you were?

18       A.   Saying the right words just like I was?

19    Frankly, I don't know anyone that would get on the phone

20    other than like a law enforcement person talking to a drug

21    dealer and play drug dealer on the phone.

22       Q.   Let me ask you this question.

23          Do you know whether or not Joseph Clark

24    promised Fritz and Katan Maignan that they could make big

25    money coming down here by contacting you?

1       A.   Big money -- I would say he did not promise

2   anything like that other than just normal drug business,

3   the money one would make.  He wouldn't have promised

4   anyone big money.  That's kind of a little catch thing we

5   practice to tell them don't say you are going to make big

6   money or, you know.

7       Q.   Did you ask Mr. Clark if he said this or are

8   you just assuming based on his training as a C.I., he

9   would not have said that?

10      A.   No, I asked him did you make any promises.

11  It's just like I didn't make him any promises and make

12  sure he doesn't make promises.

13      Q.   He didn't promise that you had the best prices,

14  best quality?

15      A.   Something like that would be a little bit

16  difficult.  That's something that maybe I would say also,

17  that hey, man, I tell you, this is the best stuff you can

18  get, but that's different than telling them you are going

19  to make big money.

20      Q.   Now, as far as you know, kilos of cocaine are

21  available either in New York or Connecticut?

22      A.   They are available.

23      Q.   Higher prices than down here in Florida?

24      A.   Yes.

25      Q.   Significantly higher prices than up there?

BROWARD REPORTING SERVICE  (954) 763-1382

1          A.    There is a difference, yeah.  I wouldn't say

2     significant, but there is a couple thousand, several

3     thousand.

4          Q.    Is it worth a trip to Florida to save the

5     money?

6          A.    It depends.  You also have the risk of trying

7     to get it back up there.  Some people would prefer to buy

8     there to avoid the risk of trying to transport it from

9     there, from Florida back to New York or Connecticut.

10         Q.    Let me ask you this question.

11              If the Maignan brothers were in the business so

12    to speak, then obviously they had connections here where

13    they lived or somewhere else to be in the business,

14    correct.

15              MR. GALLAGHER: He's asking the witness to

16         testify about the knowledge of these defendants.

17              He doesn't have that qualification to do that.

18         He would be speculating at best.

19              MR. HECKER: I was going to ask whether Mr.

20         Clark had related information that they had sources.

21              THE COURT:  All right.

22    BY MR. HECKER:

23         Q.    Did Mr. Clark relate to you that the Maignan

24    brothers had sources of cocaine up in the northeast area?

25         A.    He didn't relate one way or the other.

1          Q.   He didn't tell you it dried up and they needed

2     to shop elsewhere?

3          A.   No.

4          Q.   But it's not uncommon for drug dealers in the

5     northeast to come to Florida to buy drugs, correct?

6          A.   That's correct.

7          Q.   It's just the added risk of trying to get it

8     back to your home town?

9          A.   Sure.

10         Q.   Did Mr. Clark ever obtain any cocaine from the

11    Maignan brothers to show you that they were in the trade?

12         A.   To my knowledge, no.

13         Q.   Did he ever ask you for seed money from the DEA

14    to set up some type of preliminary deal up there?

15         A.   No.

16         Q.   Had he wanted to do something along those

17    lines, would you have related him to a field office in the

18    area, in Connecticut or New York?

19         A.   If he wanted to do business in another area?

20         Q.   Regarding the Maignan brothers, if he needed to

21    do something with them up there, to round this deal up,

22    would you have been able to send Mr. Clark up to a field

23    office where the Maignan brothers lived to allow him to do

24    that?

25         A.   I could have hooked him up with an office up

1    there if they were going to do business up there, that's

2    correct.

3        Q.   Was there any particular reason why it was

4    necessary to bring the Maignan brothers to Florida to do

5    this deal?

6        A.   To bring them down to Florida?  They came down

7    to Florida.  I didn't ask them to come down.  I just

8    assume they came at their own will.

9        Q.   Do you know whether Mr. Clark had worked for

10   any other DEA agent outside of your office?

11       A.   Yeah, I believe he has.

12       Q.   Has he worked for people in New York before?

13       A.   I don't know.

14       Q.   Any other northeast state?

15       A.   I don't know.

16       Q.   Now, you have a lot of experience in the last

17   five years dealing with drug dealers, correct?

18       A.   Yes.

19       Q.   Probably more than you really want to imagine,

20   right?

21       A.   Yes.

22       Q.   You heard a lot -- you had a lot of

23   conversations with drug dealers, right?

24       A.   Yes.

25       Q.   The language used by the Maignan brothers, was

1   that the proper type of language to be used as drug

2   dealers?

3          A.   I would say so.

4          Q.   And they were wary like a drug dealer would be?

5          A.   Yes.

6          Q.   Do you remember on one occasion, Fritz saying

7   he was scared about doing the deal or Katan relating to

8   you his brother was scared and wouldn't be there?

9          A.   Yes.

10         Q.   Did you get the impression Fritz had withdrawn

11  or left at that point or wasn't going to be involved in

12  this anymore?

13         A.   No.

14         Q.   Later on he shows up at the Denny's, but at

15  that point, did you get the impression he was leaving?

16         A.   No, because he stated I will give my money to

17  my brother, he will do it.

18         Q.   That was one of the telephone conversations on

19  the tape?

20         A.   I recall hearing that on the tape.

21         Q.   The jury will be able to hear that as well,

22  correct?

23         A.   Yeah.

24         Q.   Now, how much training did it take you to get

25  conversant in the drug lingo?

1          A.    It's just something that as far as training,

2     just something you kind of pick up as you go along.

3          Q.    From other agents?

4          A.    From other agents, yes.

5          Q.    From other drug dealers you listened to on the

6     phone?

7          A.    Correct.

8          Q.    Kind of like learning on-the-job experience,

9     like when they say something to you, you kind of respond

10    accordingly?

11         A.    Yeah, obviously we have basic training, but a

12    lot is picked up once you are out on the street.

13         Q.    Can you tell me today whether or not the

14    response that you received from the Maignan brothers were

15    merely in response to your questioning and they were

16    trying to play a role of drug dealer as well?

17         A.    Some of it yes; some of it no.

18         Q.    Now, Mr. Holden asked you whether or not a

19    taste or a sample of the drug was something common and you

20    said yes or no, sometimes samples are given at the time.

21              Let me ask you about wet cocaine.

22              Have you had experience selling wet cocaine

23    before?

24         A.    No.

25         Q.    This was the first time?

1          A.    That's correct.

2          Q.    Now, the three-way telephone conversation that

3    you heard between Joe, Fritz and yourself, who contacted

4    Mr. Clark in order to get that conversation started?

5          A.    I did.

6          Q.    What did you tell Mr. Clark?  Why did you tell

7    Mr. Clark that he needed to participate in that

8    conversation?

9          A.    Basically I explained to him that I had talked

10   to the guy who made contact with him.  Actually I spoke

11   with him even before the three-way call was done and just

12   explained to him at this point don't contact, don't talk

13   to him, so at the time we were getting ready to make the

14   three-way call, right before we did the call, I explained

15   to him that I will call you back, I am going to have one

16   of the Maignan brothers on the phone. Basically everything

17   is set, everything looks good.  They just want to hear

18   from you so --

19         Q.    Who asked to hear from Mr. Clark?

20         A.    Actually both of them did.  It's on the tape.

21         Q.    Now, do you recall that conversation?  Do you

22   remember I believe it was Katan, my notes are not clear,

23   saying something like I come down here, I don't know

24   anybody, and then Joe Clark saying, well, I put you with

25   good people, they will treat you right, or something along

```
 1   those lines?

 2        A.   I think that was said, yes.

 3        Q.   In fact, even in that conversation, Joe Clark I

 4   guess playing the role of drug dealer said, are you going

 5   to take care of me, to you, meaning money.

 6             You testified that would have been his little

 7   part of the deal?

 8        A.   That's what he's saying, playing the drug

 9   dealer role.

10        Q.   In fact, you said Stizzo, don't worry about it.

11   He's good people, he'll even get you a lady if you want.

12             Do you remember him saying that?

13        A.   Yes, I do remember that.

14        Q.   You didn't ask him to say that?

15        A.   No.

16        Q.   It was kind of impromptu on his own?

17        A.   Yes.

18        Q.   Is that proper procedure?

19        A.   Proper procedure as far as what?

20        Q.   Well, is that playing the role of a drug dealer

21   or trying to make him feel comfortable?  What was the

22   purpose of saying that?

23        A.   Just playing the role, trying to sound like a

24   drug dealer, just basically -- like I said, I explained to

25   him that the deal was set, he just needed to be kind of
```

1    relaxed a little bit.

2         Q.   By saying the deal was set, did you mean the

3    price was negotiated for sixteen five and there would be

4    two kilos, right?

5         A.   We agreed we were going to do the deal, that

6    was the price and to me everything was set.  It was a

7    matter of the meeting.

8         Q.   And the location had not been set, just the

9    price and the amount had been set?

10        A.   The location was set.

11        Q.   Okay, the location was set in Hallandale at the

12   Denny's?

13        A.   I believe so.

14        Q.   Did you feel some hesitation on behalf of the

15   Maignan brothers? Is that why you brought Joe Clark in, to

16   kind of push the deal along?

17        A.   A little bit, yes.  Like I said, they said they

18   were definitely going to do the deal and I believe it was

19   Fritz saying on the tape, I am going to deal with you, but

20   I need to hear from Joe.  We haven't heard from Joe since

21   he called us.

22        Q.   Now, one thing you said when you initiated the

23   conversation with Joseph Clark, you told him not to

24   contact the Maignan brothers at all, right?

25        A.   Originally when he first contacted me and gave

BROWARD REPORTING SERVICE  (954) 763-1382

1    me information, I said okay, let me try to contact them

2    here because he was not sure if they were here or not.

3            At that point I told him okay, don't contact

4    him any more, don't talk to him.

5        Q.   I am confused because that would have been the

6    initial contact before Stizzo ever got a hold of you.

7            What I meant was when you did the three-way

8    conversation, you testified that before the three-way you

9    called Joe Clark.

10           In that conversation, did you tell him not to

11   contact the Maignan brothers also?

12           What did you tell him in that conversation?

13       A.   Before the three-way, I would have probably

14   said -- I don't recall exactly, but I probably would have

15   reiterated basically what he is to do and what he is not

16   to do.

17       Q.   Did you tell him in that conversation that the

18   Maignan brothers were getting cold feet and needed a

19   little help with this, they wanted to be reassured?

20       A.   Just that they needed to hear from him. That's

21   exactly what they asked, we need to hear from Joe.

22       Q.   Did you get the feeling that if you didn't get

23   Mr. Clark on the phone, that the Maignan brothers would

24   have went home?

25       A.   I couldn't answer that.

```
 1                    THE COURT: Let's take a ten-minute recess.

 2                    You are not to discuss the case with anyone.

 3                    Please show the jury to its room.

 4                    (Thereupon, there was a brief recess, after

 5          which the following proceedings were resumed outside

 6          the presence of the jury:)

 7                    THE COURT:  Ready?

 8                    MR. HECKER: Yes, Your Honor.

 9                    THE COURT: Escort the jury in.

10                    (Thereupon, the jury entered the courtroom at

11          3:10 o'clock p.m., and the following proceedings were

12          resumed within the presence of the jury:)

13                    THE COURT: You may be seated.

14                    Mr. Hecker, continue on with cross

15          examination.

16     BY MR. HECKER:

17          Q.   Agent Anderson, I want to bring your attention

18     back to August 10th.  That was the conversation you had

19     where both you and Katan Maignan agreed the deal would be

20     off, I believe that's correct?

21          A.   That's correct.

22          Q.   Now, up to that point, can you estimate how

23     much time you had invested in this case?

24          A.   Like I said, we had been working on it since

25     the 8th, so three days and then just whatever.  As far as
```

1    time, actual time, I couldn't say.

2        Q.    Can you tell me how long in time it was, and

3    you testified when Mr. Holden asked you that you could

4    have, you weren't quite sure, but you may have beeped

5    Katan after the 10th.

6        Do you know how much time elapsed before you

7    may have beeped him?

8        A.    No.

9        Q.    The telephone call you received from Katan, was

10    that some time after you beeped him?

11        A.    Like I said, I don't recall if I paged him or

12    not afterwards.  As far as how much time was in between, I

13    couldn't say.

14        Q.    Do you recall that conversation was not

15    recorded?  Do you remember what basically occurred in that

16    conversation?

17        A.    Yes.

18        Q.    Tell me what was in that conversation?

19        A.    Basically we just kind of went a little bit

20    back over what we said in the previous call, as far as we

21    wanted, both obviously wanted to do this.  He was saying

22    he definitely wanted to go there.  I think he was saying

23    knock this out, let's go ahead and do it.

24        I said okay.  What I did at first was kind of

25    impressed the point to him that you come alone, like he

1    did to me earlier because he was so adamant about me. I

2    wanted to make sure now that he actually came alone, so I

3    impressed this point and agreed that I would do the same.

4         Q.    When you got to the Denny's and saw the

5    individual on the videotape, the second videotape that we

6    saw, that was some discussion in cross examination by Mr.

7    Holden as to whether or not Katan was heading in or not

8    heading in the direction of the vehicle.

9              I believe you testified there was some

10   occasions where he was heading in the direction of his

11   vehicle, correct?

12        A.    Yes, in the beginning, that's correct.

13        Q.    How close did he get to the vehicle?

14        A.    I would say within twenty, twenty or thirty

15   feet I would say.  I can't be sure.

16        Q.    Again, at that point, in the area in which you

17   patted him down, you did not find any weapons, correct?

18        A.    That's correct.

19        Q.    But you didn't know what was in the car, you

20   didn't want to go over there?

21        A.    That's correct.

22        Q.    Any time within the twenty or thirty feet, did

23   he make any movements towards the vehicle, such as

24   grabbing the door or running to the vehicle?

25        A.    No.

1          Q.    Now, near the end of the tape, you made a

2    remark, you don't have money, you don't even have five

3    dollars, show me twenty, show me a couple of fifties.

4               Do you remember making some remarks along those

5    lines?

6          A.    Yes, I do.

7          Q.    And the purpose of that was what, for him to

8    reveal to you that he actually had the necessary cash to

9    do the deal?

10         A.    Like I said, two reasons.  I actually wanted

11   him to bring money from his vehicle so I would not have to

12   actually go over to his vehicle.

13         Q.    Did he ever mention to you that's where the

14   money was?

15         A.    Yeah, yes, he did.

16         Q.    He told you it was in the vehicle?

17         A.    When we walked out of the Denny's, he was like,

18   I am not sure of the exact words, we can listen to the

19   tape, but I said, do you have your stuff?  He said yeah,

20   it's in the car.  I said, well, what do you have it, in a

21   bag? He said, yes, it's in a bag. I said, well, bring it

22   over here.

23              That's when we are walking towards the

24   vehicle.  I said if it's in a bag, just bring it out to

25   the parking lot.

1     Q.   That portion of the conversation regarding

2   where the money was kept, is that part of the conversation

3   where we are kind of looking at a truck until you come

4   around?  Is that the part of the conversation?

5     A.   At that point I think we are beyond the truck

6   and we are already off to the sidewalk, like a little

7   raised curb there. I think we were already off that and we

8   were walking directly towards his vehicle at that point.

9     Q.   Did Katan ever tell you that he had a gun with

10   him or near him or on him, in the car?

11     A.   No.

12     Q.   And he never displayed that gun to you, right?

13     A.   That's correct.

14     Q.   I know you testified in direct that you liked

15   to use locations that are near I-95.  In fact, you on one

16   tape, you say you don't want to get involved with the

17   locals.

18          Were you referring to local cops, when you

19   started heading away from 95?

20     A.   Something to that extent.

21     Q.   Now, have you used this site before for busts

22   that you participated in?

23     A.   I don't believe so.

24     Q.   Do you have knowledge of it being used before?

25     A.   No, I don't.

1        Q.    How did you come to chose this spot?

2        A.    Just it was a good location as far as you could

3    -- it was populated, where cars could fit in, because

4    obviously we have several people out there.  We need to

5    have cars where they fit in and not stand and kind of look

6    around to see if there are any other people in the area.

7        Q.    So it was a good place for surveillance?

8        A.    Pretty good, yes.

9        Q.    How did you know that?  Did you take a look at

10   the site or one of the other agents told you about using

11   it before?

12       A.    I knew about the area but I was also asking

13   Special Agent William Dyer.  Remember on the tape I kind

14   of covered the phone up and talked to him.

15            Some of the information I already knew but some

16   of it I was asking.

17       Q.    Did you consider and decide not to use the

18   Denny's at Sheridan and I-95?

19       A.    Never considered it.

20       Q.    Now, yesterday on the tape at the very

21   beginning, I believe Agent Dyer is the one on the video

22   camera, he is running the video camera?

23       A.    Are you talking about the final day of the

24   deal?

25       Q.    The final day.

1      A.   No, he is not.

2      Q.   I thought he was.

3           He's coming out of a van though, right?

4      A.   That's correct.

5      Q.   The individual who walked by in a bright orange

6  shirt, you identified as being Fritz Maignan?

7      A.   I don't remember a bright orange shirt.  I

8  remember kind of a maroon shirt.

9      Q.   I may have the color wrong, but the black

10 gentleman who was walking from the right side of the

11 screen to the left and the camera just kind of trails off

12 until he disappears?

13     A.   That's correct.

14     Q.   Now, you also testified that the shirt that he

15 was wearing when he was arrested was different than the

16 shirt that he was wearing when he left Denny's?

17     A.   I said I believe he may have changed shirts.  I

18 was not sure.

19     Q.   What prompted you to make that remark? I don't

20 remember there was a question asking you about the

21 clothes, but you made that remark yesterday that it

22 appeared his shirt was changed?

23     A.   I remember kind of seeing a different shirt.

24     Q.   Did you ever respond to the Miramar address

25 that you received from the run on the tag?

1      A.    Run on the tag -- I am not sure if that address

2    was the one that we came up with after Katan was arrested

3    or not and we responded to one address.

4            I am not sure if that was the same address.

5      Q.    Were you one of the officers responding?

6      A.    Yes.

7      Q.    Now, the individual in that home said they had

8    not seen Fritz or Katan the whole all day, correct?

9      A.    Something to that extent, correct.

10     Q.    Did you have any other knowledge of whether

11   Fritz had another locale near the Denny's, apartment or

12   hotel or anything else that he could have gone to change?

13     A.    I didn't have any information one way or the

14   another.

15     Q.    Now, did you ever -- after Katan had been

16   arrested, you wanted to find Fritz, right?

17     A.    That's correct.

18     Q.    You had that phone number that you had

19   discovered when you searched Katan's car?

20     A.    When we searched his car?  I think it was on

21   Katan's personal property.

22     Q.    Was it a beeper --

23     A.    I didn't find it.

24     Q.    You didn't find it, but --

25     A.    No, I didn't find it.

```
 1          Q.   Do you have knowledge whether it was a beeper

 2    number or whether it was a land line or cellar line?

 3          A.   I believe it was a residence, that they tracked

 4    it down. I didn't do that.  The information was given to

 5    me but the information I received was that it was a

 6    residence.

 7          Q.   Did you call that?

 8          A.   Yes, we did.

 9          Q.   Were you able to get Fritz on the other line?

10          A.   I believe we were.

11          Q.   Did you ever tell Fritz that his brother had

12    been hurt and he needed to come back to Denny's?

13          A.   Absolutely not.

14          Q.   I believe you testified that you made a

15    pretextual call claiming that Katan had locked himself in

16    the vehicle and was not doing the deal?

17          A.   That's correct.

18          Q.   Is that the call you made to Fritz?

19          A.   Yes, I was explaining to him that he was in the

20    car, the seat was laying back and the doors were locked

21    and he was not saying anything.

22               I even told him that I know he has the money,

23    he showed me the money, but he is not doing the deal.

24          Q.   Did Fritz ask to speak to his brother?

25          A.   Yes, he did.
```

212

1          Q.    But you couldn't let that happen, right,

2     because Katan was already arrested?

3          A.    Yes, I could not let that happen.

4          Q.    What excuse did you give Fritz for not allowing

5     him to talk to his brother?

6          A.    What I did was I held the phone out, actually

7     myself and Captain Hawk (phonetic) from Hallandale Beach

8     Police Department was in the vehicle and I held the phone

9     by the window and acted like I was banging on a window,

10    which I was banging on that car window and I was saying,

11    banging on the window, and I screamed, open the door, I

12    have your brother on the phone, open the door and I got

13    back on the phone and said, he won't even open the door.

14    I don't know what's wrong, what's going on.

15         Q.    Did Fritz agree to respond to the area?

16         A.    I don't recall whether he said he was coming or

17    not.  I don't think he did because if not, we'd have been

18    set up on the area if we thought he was coming back.

19         Q.    You testified you showed up and there he was

20    standing in the parking lot and you were surprised that he

21    was there?

22         A.    I did not show up like I was looking.  We were

23    going back to the P.D. thinking, okay, he's taken off and

24    we were going back and I looked over and there he was

25    standing there in the lot.

1          Q.    Did Fritz say if his brother is not going to do

2     the deal, the deal is off?

3          A.    No, he did not.

4                MR. HECKER: May I have just one moment.

5                THE COURT:  Yes.

6                MR. HECKER: Thank you.

7                I have no further questions of this witness.

8                Thank you, Agent.

9                THE COURT:  Redirect?

10               MR. GALLAGHER: Nothing, Judge.

11               THE COURT: Thank you very much.

12               You may step down. Thank you.

13               (Thereupon, the witness left the stand.)

14               THE COURT: Call your next witness.

15               MR. GALLAGHER: The State would call Officer

16        Mike Harrell.

17     Thereupon:

18                    MICHAEL HARRELL,

19     having been first duly sworn, was examined and testified

20     upon his oath as follows:

21               THE CLERK: Please state your name and spell

22        your last name for the record.

23               THE WITNESS: Michael Harrell, H-a-r-r-e-l-l.

24               THE COURT:  Take your seat.

25

294

1                    State ready?

2                    MR. GALLAGHER: Yes.

3                    THE COURT:  Defense ready?

4                    MR. HOLDEN:  Yes.

5                    MR. HECKER:  Yes.

6                    THE COURT: Jury ready?

7                    The State has rested its side of the case.  The

8          defense may proceed.

9                    MR. HECKER: We would call Fritz Maignan, Your

10         Honor.

11     Thereupon:

12                         FRITZ MAIGNAN,

13     having been first duly sworn, was examined and testified

14     upon his oath as follows:

15                    THE CLERK:  Please state your full name and

16         spell your last name for the record.

17                    THE WITNESS:  Fritz Maignan, M-a-i-g-n-a-n.

18                         DIRECT EXAMINATION

19     BY MR. HECKER:

20         Q.   Good afternoon.

21              Where is your place that you live?  Where do

22     you live?

23         A.   New York, sir.

24         Q.   What is the address?

25         A.   I live in 227 Harlem.

EXHIBIT II

```
1         Q.   How old are you?

2         A.   Nineteen.

3         Q.   Now, when you are in New York, do you go to

4    school or work?

5         A.   Go to school and work.

6         Q.   What grade is that?

7         A.   I think is my last year.

8         Q.   What type of school?

9         A.   High school.

10        Q.   You also said you work?  Where do you work?

11        A.   Foot Locker.

12        Q.   What you do at Foot Locker?

13        A.   Shoe man, like when you come in store, ask what

14   size you wear and go get for you.

15        Q.   You are a salesman and stock boy?

16        A.   Yes, sir.

17        Q.   Did there come a time you met an individual by

18   the name of Joseph Clark?

19        A.   Yes.

20        Q.   When you met him, did he use the name Joseph

21   Clark?

22        A.   Yes.

23        Q.   Where did you meet him?

24        A.   On my job, sir.

25        Q.   At Foot Locker?
```

296

1        A.    Yes.

2        Q.    That would be in New York?

3        A.    Yes.

4        Q.    Can you tell me how that meeting came about?

5    How did you meet Mr. Clark?

6        A.    When he come in for it, for shoes, he come up

7    to me and ask like in New York because he figure I am --

8    he come up to me and say where you could find drugs,

9    marijuana, stuff.  I told him I don't know.

10        Q.    Mr. Clark asked you if you could find him

11    marijuana?

12        A.    Yes.

13        Q.    Did Mr. Clark ask if you could find any other

14    type of drugs?

15        A.    Coke and stuff.

16        Q.    When he asked you for cocaine, did he ask

17    specifically powder cocaine or crack cocaine?

18        A.    All kinds of drugs when he asked me that

19    question.

20        Q.    Was that during the first meeting that you had

21    with Mr. Clark?

22        A.    The first time I met him, he started talking to

23    him, making business.  I told him what kind of business.

24        Q.    You met with him several times.  We will go

25    through that, but the first time you met him at the Foot

1    Locker, you say he came in to buy shoes?

2         A.   Yes.

3         Q.   You had a conversation with him and he asked

4    you for drugs?

5         A.   Yes, sir.

6         Q.   Were you able to get the drugs he wanted?

7         A.   No.

8         Q.   Did he continue to ask you for drugs at further

9    meetings?

10        A.   Yeah, he keep asking for drugs and came up to

11   me.

12        Q.   How much in time after that first meeting at

13   the Foot Locker did you see Mr. Clark again?

14        A.   Like several, four, five times -- four, five

15   times.

16        Q.   Face to face?

17        A.   Yes, sir.

18        Q.   After the first meeting, when did you have the

19   next meeting, a day or days later?

20        A.   Few days later.

21        Q.   Was that also at the Foot Locker?

22        A.   At the store.  He don't know where I live.

23   That's where he always meet me.

24        Q.   I know you are really nervous, so talk slow,

25   all right, so the court reporter would appreciate it.

```
 1                   Where were you born?

 2         A.    Born in Haiti, sir.

 3         Q.    Now, do you recall a second meeting that was

 4    also at Foot Locker?

 5         A.    Yes.

 6         Q.    What was the purpose of that meeting?  What did

 7    Mr. Clark want?

 8         A.    He wanted to buy drugs, sir.

 9         Q.    What type of drugs did he ask for at the second

10    meeting?

11         A.    Same kind of drugs -- marijuana, cocaine.

12         Q.    You said you had several meetings.

13               Can you give a number of how many meetings you

14    had?

15         A.    For the last one was like the fifth one --

16    four, five was the last one, was last meeting.

17         Q.    Four or five of what.  You say the last meeting

18    was four or five?

19         A.    I met several times, like four times.

20         Q.    Now, did there come a time when Mr. Clark said

21    to you that he had a source of cocaine in Florida?

22         A.    Yes, sir.

23         Q.    Why did Mr. Clark tell you he had a source of

24    cocaine in Florida?

25         A.    Because he figure like when he tell me, he told
```

1    me like at the time we started talking, he told me if I

2    come down here I could get easy money, if I come down for

3    drugs.

4         Q.    Did he explain that you could get quick or easy

5    money?

6         A.    He got friend.

7         Q.    Did he explain how you would be able to turn

8    the cocaine into money?

9         A.    No, sir.

10         Q.    Did he tell you how much cocaine would cost in

11    Florida?

12         A.    He just told me meet with this guy, he got good

13    stuff for me.

14         Q.    Did there come a time Mr. Clark said that the

15    source now has cocaine in Florida?

16             Did there come a time when Mr. Clark said that

17    to you, that his source, the person in Florida, now had

18    cocaine available?

19         A.    Yes, sir.

20         Q.    Which one of the meetings was that?

21         A.    It was the last one.  He told me that twice.

22    The last one was like month later.  He told me if he come

23    down there, you will make more money than you make in

24    paycheck. At that time, I was making only hundred fifty

25    dollars.  I ain't got that much hours.  He told me if I

1    come down here, I make more money. That's the reason I

2    come down here, sir.

3        Q.    Did he ever tell how much money you can make?

4        A.    A lot of money.

5        Q.    He referred to it as a lot of money?

6        A.    Yeah.

7        Q.    Now, who bought the ticket for you to fly to

8    Florida?

9        A.    I bought the ticket on my own.

10        Q.    How much was the ticket?

11        A.    Like hundred and change.

12        Q.    Was it roundtrip or one way?

13        A.    One way ticket.

14        Q.    Down here?

15        A.    Down here.

16        Q.    Why did you buy only a one-way ticket?

17        A.    He told me when I met with the guy, only take

18    you, keep talking, going to keep talking, he's going to

19    take care of you.  Know what I am saying?

20             When he told me to come down, he told me, ask

21    him, just tell him Joe sent me and he going to take care

22    of you, got good stuff for you.

23        Q.    How did Joseph Clark tell you to get a hold of

24    his source in Florida?

25        A.    He told me he was going to give the person my

1    number, sir.

2          Q.    Did he also give you a phone number?

3          A.    No, sir, he didn't give me nobody's number.

4          Q.    He did not give you a phone number?

5          A.    No, sir.

6          Q.    Did there come a time you were contacted by

7    Heath Anderson, the agent who was testifying?

8          A.    Yes, sir.

9          Q.    How many days after you arrived in Florida did

10   Heath Anderson contact you?

11         A.    After couple days later, Mr. Anderson come and

12   page me and told me that's the guy Joe Clark was talking

13   about.

14         Q.    Now, before you met Mr. Clark, did you have any

15   plans to come to Florida?

16         A.    No, sir.

17         Q.    But do you have family in Florida?

18         A.    I got my sister lives here.

19         Q.    What is her name?

20         A.    Denise Maignan.

21         Q.    You had no plan to come visit her?

22         A.    No, sir.

23         Q.    Now, would it be a fair statement that the

24   reason you came to Florida was because Mr. Clark --

25               MR. GALLAGHER: I have an objection.

```
1                    Counsel continues to ask questions in a leading

2            fashion.  He has to ask in a non-leading fashion.

3                    That is my objection.

4                    THE COURT: Granted.

5    BY MR. HECKER:

6            Q.   What was the purpose of you coming to Florida?

7                    THE COURT:  Objection sustained.

8    BY MR. HECKER:

9            Q.   What was the purpose of you coming to Florida?

10           A.   So I could meet with the guy Joe Clark put me

11   on to.

12           Q.   The guy Joe Clark put you on to?

13           A.   Maybe we talk.

14           Q.   Which you later learned was DEA Agent Heath

15   Anderson?

16           A.   Yeah.

17           Q.   Did you have telephone conversation with Agent

18   Anderson?

19           A.   Yes, when he paged me.

20           Q.   We heard tapes today.  Is that your voice on

21   the tape occasionally?

22           A.   Yes.

23           Q.   Now, did there come a time when you decided how

24   you were going to handle that deal with Heath Anderson?

25                   Did you decide to do the deal or not to do the
```

1       deal? Did you make that decision?

2           A.    I make that decision. Joe told me I will talk

3       to the good guys and also I --

4           Q.    Slow down.

5           A.    I also say on tape it's kind of scary, I don't

6       want to doing nothing.  I never been in the drug business

7       before, sir.

8           Q.    But at first you did agree to the deal,

9       correct?

10          A.    Yes.

11          Q.    Do you know what time in the few days you were

12      down here you decided not to do the deal?

13          A.    I don't remember that, what time.  I know at

14      the end when we finished talking to Anderson, I told him,

15      you heard on the tape, I am scared, I don't want to do

16      nothing no more.

17          Q.    Now, the State introduced into evidence $1750.

18                Is any of that money yours?

19          A.    No.

20          Q.    Do you know where the source of that money is?

21          A.    What happened?

22          Q.    Do you know who owns the money?

23          A.    I don't know who owns the money but they say my

24      brother's money they said.

25          Q.    Talk slow because the court reporter is having

```
 1          difficulty with your accent. I know you are nervous, but

 2          slow down.

 3                      The $1750 belongs to you is what you are

 4          saying?

 5              A.    No, sir.

 6              Q.    When you came to the Denny's Restaurant, you

 7          saw the tape of yourself?

 8              A.    No, sir.

 9              Q.    The last videotape that was played for the

10          jury, there was a black man that walked across the street.

11                      Was that you?

12              A.    No, sir.

13              Q.    Were you at the Denny's?

14              A.    No, sir.

15              Q.    Were you at the Denny's later in the day?

16              A.    Later in the day I was at Denny's because

17          that's when Heath Anderson called me and told me my

18          brother got hurt, he was in the car and can't get out,

19          he's hurt.  He said come help your brother.

20                      That's the reason I showed up and looked for my

21          brother.  That's when they see me in the parking lot, sir.

22              Q.    Is that when you got arrested?

23              A.    Yes, sir.

24              Q.    Can you tell the jury how many times you told

25          Heath Anderson that you did not want to do this deal?
```

1      A.   Several times.

2      Q.   Were there certain times you told him that were

3  not on tape?

4      A.   Yes, sir.   Some ain't on tape because he said

5  -- I don't know if he taped it, but he said he ain't got

6  tape.

7      Q.   Do you know how many conversations totally you

8  had with Heath Anderson?

9      A.   I don't remember.

10      Q.   Were they more than what was played in court on

11  the tape?

12      A.   Yeah, more than the tape, sir.

13      Q.   Can you tell the jury the reason why you came

14  to Florida?

15      A.   The reason I come to Florida, I come to Florida

16  because Joe Clark sent me to down to meet with Heath

17  Anderson, sir.

18           MR. HECKER: No further questions, Judge.

19           THE COURT:  Cross examination.

20                     CROSS EXAMINATION

21  BY MR. HOLDEN:

22      Q.   How old were you when you were arrested in this

23  case?

24      A.   How old was I when I was arrested in this

25  case?  I was eighteen.

306

```
1          Q.   I am sorry, I didn't understand when you were

2     speaking, did you say that you had or had not completed

3     high school yet?

4          A.   Not yet.

5          Q.   So as we sit here today, you still have not

6     completed high school?

7          A.   Not yet, sir.

8          Q.   At the time you met Mr. Clark, was your brother

9     with you at all?

10         A.   Mr. Clark?

11         Q.   When you met Mr. Joseph Clark --

12         A.   One time my brother was not with me.  One day

13    when my brother show up in the store, that's when Mr.

14    Clark showed up, too.

15         Q.   There was an occasion, at least one occasion

16    that you know of when Mr. Clark and your brother met?

17         A.   What is the question?

18         Q.   Let me think of an easier way of saying that.

19              Were you ever there when Joseph Clark met your

20    brother?

21         A.   Yeah.

22         Q.   How many times did you with your own eyes see

23    Mr. Clark meet your brother?

24         A.   Only time Mr. Clark meet my brother, it was

25    always at my store I been working at.
```

1          Q.   You saw that happen?

2          A.   Yes, sir.

3          Q.   Was your brother Katan with you when Mr. Clark

4     was talking to you about these items?

5          A.   Yes.

6          Q.   Telling you to make a lot of money through the

7     drug trade?

8          A.   Yes, sir.

9          Q.   Did your brother -- was there any conversation

10    that you were aware of between Mr. Clark and your brother?

11         A.   Well --

12         Q.   Let me try it a different way.

13              Was your brother present when Mr. Clark was

14    talking to you about getting involved in the drug trade?

15         A.   He wasn't present at the time because I had to

16    tell him.

17         Q.   Did you have any personal knowledge as to

18    whether or not Mr. Clark and your brother Katan spoke

19    directly regarding the drug trade?

20         A.   No.

21              MR. HOLDEN: I have nothing further.

22              Thank you.

23                        CROSS EXAMINATION

24    BY MR. GALLAGHER:

25         Q.   Do you have a street name?  Do you have a

1     street name?

2          A.    Yes, sir.

3          Q.    What is it?

4          A.    Call me Stizzo.

5          Q.    Stizzo?

6          A.    Yes, sir.

7          Q.    Is that what we heard on the tape?

8          A.    Yes.

9          Q.    Your brother has a street name by the name of

10    Slow; is that correct?

11         A.    Yes.

12         Q.    Is the S-l-o-w, like moving slow?

13         A.    Yes.

14         Q.    It's my understanding that you came down to

15    Florida to purchase drugs; is that correct?

16         A.    Yes, sir.

17         Q.    And you were going to purchase two kilograms of

18    cocaine; is that correct?

19         A.    Yes, sir.

20         Q.    You were going to have to pay $33,000 to

21    purchase the cocaine; is that correct?  You have to put up

22    $33,000 to purchase two kilograms of cocaine?

23         A.    Yes, sir.

24         Q.    You paid for a plane ticket to come down here

25    to purchase two kilograms of cocaine?

1     A.   Yes.

2     Q.   You did that of your own free will?

3     A.   The reason I came down was Joe Clark told me to

4   come down to talk to Heath Anderson.  He got a friend who

5   put me on so I could make quick money is the reason I come

6   down.

7          To say I want to come down, I don't have that

8   when I come to Florida before.  I come to Florida buy

9   drugs.  Mr. Joe put me like talk to this person.

10          I don't know anyone from New York anyway, sir.

11     Q.   Let's see if I understand this.

12          You met Joe Clark for the first time in the

13   Foot Locker store that you worked?

14     A.   Yes.

15     Q.   That was in Harlem?

16     A.   Yes.

17     Q.   You never met this guy before in your life?

18     A.   No, sir.

19     Q.   He walked into your store?

20     A.   Um-hum.

21     Q.   Is that right?

22     A.   Yes, sir.

23     Q.   Out of the blue, he starts asking if you want

24   to deal drugs?

25     A.   He buy a pair, I get sneakers.  He asked can I

1    get any discount, like get less price.

2         Q.   On the shoes?

3         A.   Yeah, so I say yeah, I figure like if he like,

4    I give him discount.  I figure I am kind of one person, he

5    asked me --

6         Q.   You are what?

7         A.   I am kind of one person, he trying to figure if

8    you go ask me for like -- know what I'm saying, if I got

9    drugs to sell him.

10        Q.   You are sizing up his shoes?

11        A.   Yes, sir.

12        Q.   Let me ask the question.

13             You are sizing up the shoes at the Foot Locker,

14   never met this guy before in your life, is that right?

15        A.   No, sir.

16        Q.   As you are putting the shoes on his feet, I

17   guess or sizing up his feet --

18        A.   I --

19        Q.   Let me ask the question. I will give you all

20   the opportunity you want to answer.  Let me ask the

21   question.

22             As you are getting shoes for this guy, someone

23   you never met before in your life, he starts asking you

24   about a discount for shoes and in the next breath says by

25   the way, would you be interested in selling me some drugs?

```
1         A.   Yes, sir.

2         Q.   That's how it happened?

3         A.   That's how it happened, sir.

4         Q.   Now, your brother, Katan Maignan, never talked

5    to Joseph Clark about doing a drug deal, did he?

6         A.   He saw him in my store, sir.

7         Q.   That wasn't the question.

8              Your brother, Katan Maignan, never talked to

9    Joseph Clark about doing a drug deal, did he?

10        A.   No, sir.

11        Q.   In fact, it was you who talked your brother

12   Katan Maignan into doing the drug deal, isn't it?

13        A.   What happens, that's what happens.

14        Q.   Is that a yes?  Is your answer a yes?

15        A.   I will answer your question.

16             MR. GALLAGHER: Judge, please ask the witness to

17        either say yes or no, then he can explain.

18             THE COURT: Can you answer the question or not,

19        then explain.

20             THE WITNESS: What is the question?

21   BY MR. GALLAGHER:

22        Q.   The question was, it was you who talked your

23   brother Katan Maignan into doing the drug deal, isn't that

24   true?

25        A.   I ain't talking --
```

1          Q.   Say yes or no.

2               THE COURT: Is it true or not?

3               THE WITNESS: Not true, sir.

4     BY MR. GALLAGHER:

5          Q.   Who talked Katan Maignan into doing the drug

6     deal?

7          A.   Joe.

8          Q.   You just told us, you told your attorney on

9     direct examination, that you are unaware of drug

10    conversation between your brother and Joseph Clark, so

11    what's the truth here, Fritz Maignan?

12         A.   The truth is --

13         Q.   Let me ask the question.

14              Did Joseph Clark talk your brother into doing

15    this drug deal or did you tell your brother let's go,

16    let's go, let's do the deal?

17         A.   Joe Clark met both of us at the store where I

18    was working.  That's when I explained to him, I said, me

19    and my brother, we come down, we could get -- know what I

20    am saying?  He could put me in to get quick money is the

21    reason I came down.  That's why my brother got involved.

22         Q.   Wasn't it you who told your brother, let's go,

23    let's go, let's do the deal?

24         A.   Joe Clark said that.

25         Q.   You didn't say that?

1      A.    No, if it wasn't for Joe, me and my brother

2   never would have been here.

3      Q.    Ever remember saying anything different?

4      A.    Like what?

5      Q.    Were you in the courtroom on the 4th day of

6   June 1996 --

7      A.    Yes, sir.

8      Q.    -- with your attorney present?

9      A.    Yes.

10      Q.    Do you remember being asked this question?

11      A.    What question?

12      Q.    Do you have any personal knowledge whether this

13   individual, meaning Joe Clark, contacted your brother

14   Katan, and your answer was no, it was me and my brother,

15   right.  When he talked to me and I told my brother about

16   it and my brother said, well, we ain't going to do it, at

17   the end I just keep telling my brother, come on, let's go,

18   let's go. He keep forcing me also, too.

19            Do you remember saying that?

20      A.    I didn't say it like that, sir.

21      Q.    You didn't say it like that?

22      A.    No.

23      Q.    May I approach the witness?

24            Page ten, lines 4 through 9, if you can read

25   lines 4 through 9 and tell me if that's exactly what you

1    said, what I just read to you?

2           A.    Like I said --

3           Q.    Did you read lines 4 through 9 of page 10 of

4    that document I just handed you?

5           A.    I am not saying it like that, sir.

6           Q.    What I just read to the Court, is that not on

7    that document that is in front of you right now?

8           A.    That's what you are saying but that's --

9           Q.    Is that in the document?

10          A.    That's not what I said.

11          Q.    You want to read exactly what I just read?  Is

12   that what I said from the podium?

13          A.    But that's not what I said.

14          Q.    That's not what you said?

15          A.    No.

16          Q.    So whoever took this down, a court reporter who

17   took this down, took this down wrong.

18                Is that what you are saying?

19          A.    I am not saying that.

20          Q.    You want to look at it again?

21          A.    You just showed me it.

22          Q.    Did it refresh your recollection about saying

23   it?

24          A.    Like I tell you, my brother seen Joe with me at

25   the shoe store, sir.

1        Q.    That's not the question.

2             The question is if you made those statements in

3    court on June 4th, 1996 that I just read to the jury.

4             Is that true?

5        A.    Not true to me.

6        Q.    So if it's in here, it's not true?

7        A.    Like I just told you before, me and my brother

8    and Joe, when my brother showed up at my job, like I keep

9    telling you, Mr. Gallagher, when my brother showed up at

10   my job is when we met Joe Clark and Joe Clark said he

11   talked to Fritz already, we might as well come down and

12   take care of me, Mr. Anderson.

13       Q.    Mr. Maignan, do you remember being in this

14   courtroom June 4th, 1996, with a court reporter present?

15   Remember your attorney was present, Mr. Hecker.

16            His Honor Judge Tyson was present.  You raised

17   your hand on that date just as you raised your hand today

18   and swore to God to tell the truth that day; is that

19   correct?

20       A.    Um-hum.

21       Q.    You said exactly what I just told you, no, it

22   was me and my brother, right, when he talked to me and I

23   told my brother about it, my brother said well, we ain't

24   going to do it, right, and at the end I just keep telling

25   my brother, come on, let's go, let's go.  He keep forcing

1    me also, too.

2            Do you remember saying that on June 4th, 1996?

3        A.    I didn't say nothing about my brother forcing

4    me.

5        Q.    So you are saying this transcript of that

6    proceeding where you swore to God to tell truth is

7    incorrect?

8        A.    Like I just told you, sir, I don't remember

9    saying that.

10        Q.    Now, Mr. Maignan, you are the type of person

11    obviously if you saw a crime occurring or someone involved

12    in criminal activity, you would certainly notify the

13    police; wouldn't you?

14            MR. HECKER: Objection, improper question;

15        beyond the scope.

16            THE COURT: Overruled.

17    BY MR. GALLAGHER:

18        Q.    You would certainly do that, wouldn't you?

19        A.    What?

20        Q.    You would notify the police if you saw someone

21    involved in criminal activity, you would certainly notify

22    the police, wouldn't you?

23        A.    Depends.

24        Q.    You just said yes.  Did you change your mind

25    since your lawyer stood up?

1          A.    I am telling you what I feel.

2          Q.    So when allegedly Joe Clark, the confidential

3     deposit informant in this case, walked into your Foot

4     Locker store, out of the blue, never met the man before in

5     your life and says, do you want do deal drugs, did you

6     think maybe he was involved in criminal activity?

7          A.    Like I said --

8                MR. GALLAGHER: Would you ask the witness to say

9          yes or no, then explain.

10               THE COURT:  Answer the question.  You may

11         explain your answer.

12    BY MR. GALLAGHER:

13         Q.    Did you think maybe Mr. Clark was involved in

14    criminal activity when he asked you do deal drugs?

15         A.    No, sir.

16         Q.    You didn't think so?

17         A.    I wasn't thinking like he was a bad guy.  Like

18    I was telling you before, sir, anybody make a mistake one

19    time in life, so I just made --

20         Q.    I will get to your mistakes later. I am talking

21    about right now when this man walked into this Foot Locker

22    store and you are sizing up his feet to sell some shoes,

23    how the next breath he says to you, hey, want to sell me

24    drugs.

25               Did you think maybe he was involved in criminal

```
1        activity at that point, yes or no?

2            A.    Yes, sir.

3            Q.    You certainly wouldn't involve yourself in

4        criminal activity, would you?

5            A.    No, sir.

6            Q.    Yet you chose to put yourself on an airplane

7        and travel what, 1500, 2,000 miles from New York to South

8        Florida to buy two kilograms of cocaine; is that correct?

9            A.    All the time --

10           Q.    Is that correct?

11           A.    Yes, sir, but the reason I come down there

12       because Joe Clark told me to come down here.

13           Q.    Wait a minute. He told you to come down here?

14           A.    Yeah, I could make some good friends.

15           Q.    Take a gun and stick it to your head and tell

16       you get on a plane and travel 2,000 miles and buy two

17       kilograms of cocaine for $33,000.

18                 Is that what Joe Clark did to you?

19           A.    He ain't pulled a gun, but he told me I could

20       make easy money.

21           Q.    How in the world are you going to make easy

22       money when the first thing you have to do to involve

23       yourself in a drug deal is to come up with $33,000?

24                 Where were you going to get the $33,000 to

25       involve yourself in drug dealing?  Where?
```

BROWARD REPORTING SERVICE  (954) 763-1382

1          A.    I had the money, sir.

2          Q.    But that's what you negotiated for in this

3    case; isn't that correct?

4          A.    Yes.

5          Q.    So with your theory, before you could make this

6    quick, easy money you, were going to have to first of all

7    buy a plane ticket for a couple hundred dollars, right,

8    and come down here and hand over $33,000 to buy two

9    kilograms of cocaine; is that correct?

10          A.    That's not correct, sir.

11          Q.    What is correct?

12          A.    Like I told you before, it was Joe told me to

13    come down here, he got some good friends.

14          Q.    To sell you drugs?

15          A.    Some good friends.

16          Q.    To sell you drugs?

17          A.    I could make quick money with friends right

18    here.

19          Q.    Quick money. What I am asking is in this case,

20    this case, the first thing you were going to have to do

21    was hand over $33,000?

22          A.    But --

23          Q.    Let me ask my question.

24                -- hand over $33,000 before you could get the

25    drug to sell; is that correct?

BROWARD REPORTING SERVICE   (954) 763-1382

1        A.    That's correct but also saying, the tape record

2    said too, we say we don't want to do nothing, sir.

3        Q.    I am not talking about later.  I am talking

4    about when you got on that jet plane and flew from Harlem,

5    New York to South Florida, in your mind, you were coming

6    down to buy two kilograms of cocaine; right?

7        A.    I said I don't want to do nothing.  Like I told

8    Heath Anderson, I chicken out, I am scared.

9        Q.    On the tape I played for the jury, you said I

10   don't want to do nothing no more, I am chickening out, I

11   am scared, I don't want to do nothing no more?

12            Tell me which tape to play for the jury right

13   now?

14       A.    They heard it.

15       Q.    You tell me where on any of the tapes you say I

16   am chickening out, I am scared, I'm not doing this no

17   more, I don't want to do this no more?

18       A.    I ain't got the tape to show.  If you play all

19   the tapes, they heard for themselves, they heard my voice.

20       Q.    Who came up with the money in this case to hand

21   over to Heath Anderson?

22       A.    I don't know.

23       Q.    It was your sister, wasn't it?

24       A.    No.

25       Q.    Didn't your sister hand you and Katan Maignan

BROWARD REPORTING SERVICE   (954) 763-1382

321

```
1       $1750 allegedly for you guys to get an apartment?

2            A.   Didn't hand me money.  They give my brother

3       money to get apartment.

4            Q.   Gave it to Katan?  Did your sister, Denise

5       Maignan, give Katan Maignan, the $1750 to use in this drug

6       deal?

7            A.   Not the drug deal.

8            Q.   She gave it to you thinking she was giving it

9       to you to get an apartment, didn't she?

10           A.   Yes, sir.

11           Q.   She got it from a bank, didn't she?  She got it

12      from a bank, didn't she?

13           A.   No, sir.

14           Q.   She didn't get it from a bank?

15           A.   No, sir.

16           Q.   Where did she get it from?

17           A.   From saving money at her house.

18                MR. GALLAGHER: Judge, just give me a second.

19      BY MR. GALLAGHER:

20           Q.   Didn't your sister, Denise, go to a Barnett

21      Bank on Miramar Parkway and take out $1750 and give it to

22      your brother, Katan Maignan, which she believed to be used

23      to rent an apartment?

24           A.   I don't remember that.  My sister don't go to

25      banks.  She was in the house and she said we go -- she was
```

1    in the house.

2         Q.    Which one of you put the money together for

3    this drug deal?

4         A.    I don't know, not me.

5         Q.    It wasn't you?

6         A.    No, sir.

7         Q.    Give me a second, Judge.

8               Have you ever said anything different from

9    that?

10        A.    No, sir.

11        Q.    Remember being in the courtroom on June 4th,

12   1996 --

13        A.    Um-hum.

14        Q.    -- with His Honor Judge Tyson present, the court

15   reporter present, yourself, myself and your attorney Scott

16   Hecker present?

17        A.    Um-hum.

18        Q.    Remember raising your hand and swearing to God

19   to tell the truth on that date just as you have done here

20   today?

21        A.    Um-hum.

22        Q.    Remember being asked this question?

23        A.    What question, sir?

24        Q.    I will read it to you right now.

25               Page 23, line 18.  The question: To get an

```
 1    apartment -- but you took that money -- this question I

 2    asked of you June 4th, 1996 -- but you took that money and

 3    you and Katan bound it up and brought it to this drug

 4    deal, didn't you?

 5              Do you remember what your answer was to that

 6    question?

 7         A.   I don't remember saying that.

 8         Q.   I asked that question.

 9              Do you remember what your answer was that day?

10         A.   What is my answer?

11         Q.   Yes, sir.  Want to take a look at it to refresh

12    your recollection a little bit?

13         A.   Where?

14         Q.   Line 18?

15         A.   No, I don't remember saying that.

16         Q.   You don't remember saying it?

17         A.   No.

18         Q.   So that transcript taken down --

19         A.   I --

20         Q.   Let me ask the question, then you can answer.

21              So that transcript of that hearing on June 4th,

22    1996, that court reporter, just like this one, took down

23    that information.

24              Are you saying you didn't say that?

25         A.   Like I just said, I ain't got nothing to do
```

1      with this money.

2           Q.   That's not the question. Are you saying you

3      didn't answer yes, sir, to the question I asked of you?

4           A.   I don't remember saying that.

5           Q.   So instead of calling the police on Joseph

6      Clark who out of the blue comes up to you at the Foot

7      Locker and asked you to do a drug deal, instead of calling

8      the police and telling the police about this, you decided

9      to do a crime; is that correct?  Is that correct?

10          A.   Yes, sir.

11               Like I was saying  --

12          Q.   There is no pending question?

13               MR. HOLDEN: Objection, he's trying to explain

14          after answering as Mr. Gallagher said he could do.

15               THE COURT:  You may explain.

16               THE WITNESS: Like I was telling you, sir, the

17          reason I didn't call the cops is the man told me, you

18          know, don't worry about it, you can't make that much

19          money in your job.  If you come down here, I put you

20          with my friend, my man, he's going to take care of

21          you.

22               That's the reason I come down and that's the

23          reason I didn't call the cops.

24     BY MR. GALLAGHER:

25          Q.   Didn't you tell the jury a few minutes ago that

```
 1    when I see criminal activity occurring --

 2         A.    Yeah.

 3         Q.    -- or when you see someone committing a crime,

 4    that you call the police?

 5               Didn't you just tell the jury that a few

 6    minutes ago?

 7         A.    Um-hum.

 8         Q.    Well, in this case, when a man comes up to you

 9    and asks you if you can sell him some drugs, don't you

10    think he is committing a crime?

11         A.    Yes, sir.

12         Q.    But in this case, you didn't call the police

13    like you said you always do; is that right?

14         A.    But --

15         Q.    Is that a yes or no?

16         A.    I ain't tell the man right away. I told him

17    first, I told him, you know, Joe I don't know drugs.  Some

18    people might have some, but I don't know nobody.

19               That's when he keep coming up to me and asking

20    me at the end, at the last minute, at the end told me, you

21    know, if you come down, there is quick money in Florida,

22    man, you ain't make that much.

23               That's when I come down here.

24         Q.    You don't know anything about doing a drug

25    deal, right?
```

1     A.    No, sir.

2     Q.    What's it mean to cook the cocaine?

3     A.    That he said, he talked to us. He told me, you

4  know, fix it up, know what I am saying?  If you got the

5  tape, you heard it on tape.

6          Heath Anderson told me that's how you going to

7  do this.

8     Q.    He asked you flat out on the tape on August the

9  8th, 1995, the first time you and he spoke, he asked you

10  flat out when he said he had some wet cocaine, he said you

11  can cook yours up.

12          Do you remember what your answer was?

13     A.    That wasn't my voice.

14     Q.    Heath Anderson asked you, you can cook yours

15  up.

16          Do you remember what your response was to that

17  question?  Remember what your answer was?

18     A.    Refresh my memory.

19     Q.    On the tape you said yeah, when he asked if you

20  can cook yours up, you said yeah?

21     A.    Heath Anderson always says, you know, how to

22  fix it.  I say, I tell you how to fix it, too.

23     Q.    When he asked if you are going to cook yours

24  up, you didn't say, well, what do you mean by cooking it

25  up?  You didn't say that.  You said yeah, I am going to

1    cook it up, like you knew what he was talking about,

2    didn't you?

3           Do you remember yourself on the tape saying

4    that?

5           A.   I remember the tape, sir.

6           Q.   When he asked if you were going to get two

7    condos, you knew he was talking about two kilos of

8    cocaine, didn't you?

9           A.   No.

10          Q.   You didn't?

11          A.   No, he had to explain.  We talked to Heath

12   Anderson before, if he put everything in the tape like if

13   he had another tape, I don't know if you got everything on

14   tape, when he explain to us that he was going on, before

15   when we started talking about two condos, I am trying to

16   find out what condos is anyway.

17          Q.   Remember on the tape, August 8th, 1995, same

18   conversation as the cooking up tape, that tape of Heath

19   Anderson said you want to get two condos, right?

20          Do you remember what your answer was?  Do you

21   remember?

22          Do you remember what your answer was to that

23   question?

24          A.   No, I don't know, because Heath Anderson said

25   that he had two condos.

328

```
1        Q.    What was your answer to the question from Heath
2   Anderson on August 8th of 1995 when he asked you, you want
3   to get two condos, right?
4              What was your answer on that date?
5        A.    Refresh my memory.  That was a long time ago.
6        Q.    Your answer was yeah, not what do you mean by
7   condos? Do you remember that?
8        A.    Um-hum.
9        Q.    When he asked if you wanted two condos, you
10  didn't say I don't know what you mean by condos.  You said
11  yeah, as if you knew the two condos meant the two
12  kilograms of cocaine?
13       A.    He got to explain it to me.
14       Q.    He didn't explain it on the tape?
15       A.    I met with him before though.
16       Q.    So you had another meeting that we are not
17  aware of.  Is that what you are saying?
18             We have another meeting Heath Anderson never
19  testified about before this phone call?  Is that what you
20  are saying?
21       A.    If anything being taped, if you were to tape
22  everything on tape, if you record every conversation from
23  day one --
24       Q.    You remember what you said when Heath Anderson
25  told you that he had cocaine at eighteen five that was
```

1    good cocaine, and then he had some cocaine that was

2    cheaper because it was wet.

3                Remember him saying that to you?

4        A.    Um-hum.

5        Q.    You said it didn't matter because I don't sell

6    mine like that.  Remember saying that to him on the tape

7    on August the 8th, 1995?

8        A.    I never sell drugs, sir.

9        Q.    Do you remember saying I don't sell mine like

10   that, when he referred to the kilo of cocaine that was

11   wet?

12               Do you remember saying that to him on the tape

13   that we all heard you say on August 8th, 1995, remember

14   that?

15       A.    I said I don't sell mine like that?

16       Q.    Yes, sir?

17       A.    No.

18       Q.    What you meant by that was you cook it up, you

19   don't sell it in powder form.  Isn't that what you meant?

20       A.    No, I never sell drugs before.  That was the

21   first time I been involved in the drug game, sir.

22       Q.    When you came down here and on August the 8th,

23   1995, you are talking to Heath Anderson and you tell him I

24   come to shop, man, I come to shop.  Know what I am saying?

25       A.    That is how Joe told me, when he met with his

BROWARD REPORTING SERVICE  (954) 763-1382

330

1    man, just let him -- as soon as I tell him my name, he's

2    going to understand what is going on, what I come here

3    for.

4           Joe must talk to Heath Anderson also, so I

5    don't know.

6      Q.   Joseph Clark was not involved in that phone

7    conversation on August the 8th, 1995.  It was just you and

8    Heath Anderson, wasn't it? It's a yes or no.

9      A.   Can I let you know what is going on.

10     Q.   Sure, as soon as you answer yes or no, you can

11   explain your answer.

12          Joseph Clark was not a participant in that

13   phone conversation on August 8th, 1995, between yourself

14   and Heath Anderson, was he?

15     A.   No.  But listen, Joe, that's how I met him,

16   through Heath Anderson, was by Joe.

17          If it wasn't for Joe, I wouldn't see Heath

18   Anderson.  I could have been home or school if it wasn't

19   for Joe.

20     Q.   Well, it's plain and simple here, Mr. Maignan.

21          I mean, you flew down from New York to South

22   Florida specifically to do a drug deal; isn't that

23   correct?

24     A.   Joe sent me.

25     Q.   And you weren't down here doing anything

```
1     legitimate.  You weren't working, right?  You had a

2     cellular phone, didn't you?

3          A.   Um-hum.

4          Q.   You remember talking on the tape about being on

5     the cell phone; do you remember that?

6          A.   Listen what I am saying.

7          Q.   Do you remember that?  Remember telling Special

8     Agent Anderson that you are on your cell phone.

9               Remember telling that on the tape that we all

10    heard?

11         A.   It's on the tape?

12         Q.   It's on several tapes.

13         A.   Let the tape play.

14         Q.   You bet. You will hear it over and over again.

15              Do you remember saying that on the tape, that

16    you are on your cell phone?

17         A.   I got a cell phone.

18         Q.   We saw you on the videotape at the McDonald's

19    making phone calls from your cell phone, didn't we?

20    Didn't we?

21              The first time you met Special Agent Anderson

22    up on Cypress Creek Road you are standing there with your

23    brother, Katan, waiting for Special Agent Anderson to show

24    up so that you could negotiate the two kilogram

25    transaction of cocaine and you're sitting there making
```

1    calls on your cellular phone.

2         Do you remember that?

3         A.    I wasn't calling Heath Anderson though.

4         Q.    I am not asking who you're calling. I'm saying

5    you are standing there with a cell phone, right, making

6    phone calls, right?

7         A.    Um-hum.

8         Q.    You weren't working. You were down here just to

9    buy drugs; isn't that correct?

10        A.    I was working up north.  I ain't been down here

11   for months. I was coming down here in a couple weeks.

12        Q.    To buy drugs?

13        A.    Yeah, but Joe sent me down here to, sir.

14        Q.    You keep saying Joe sent you down?

15        A.    That's the reason I come down here. Like if it

16   wasn't for Joe, I probably wouldn't have been here.

17        Q.    I want to know what pressure, physical pressure

18   forced you to go to a ticket counter at the airport, hand

19   over a couple hundred dollars of your hard earned money

20   from the Foot Locker, take the ticket, get on a plane, and

21   travel 2,000 miles to buy drugs.

22        How did Joe Clark force you to do that?

23        A.    Joe tell me if I come down I could get quick

24   money, more money than I made from my paycheck and that's

25   the reason I come down here, sir.

1          Q.    To do that, the first thing you were going to

2     have to do was hand over $33,000 to someone, right.

3     Right?

4          A.    Yeah, right, but that's when I found out,

5     that's when I went out there, I don't want that, I am

6     chickening out.  I don't want to get involved in this.  I

7     am chickening out.

8          Q.    How did you get to the Denny's Restaurant on

9     August 11th, 1995?

10         A.    How I get to Denny's Restaurant?

11         Q.    Yes.

12         A.    The day I got arrested?

13         Q.    Yes, that day?

14         A.    I took a cab, sir.

15         Q.    Which cab is that?

16         A.    The cab I take from my sister's house and go

17    over there.

18         Q.    What is the name of the cab company?

19         A.    I don't know, sir.

20         Q.    What is the name of the driver?

21         A.    I don't know.

22         Q.    What time did you call the company?

23         A.    What time I call the company?

24         Q.    To get a cab to your house?

25         A.    I don't remember.  It was a long time, sir.

1          Q.   Wasn't this the most important day in your

2    life, August 11, 1995, the day you were arrested?  Wasn't

3    this an important day to you?

4               What this an important day in your life?

5          A.   Can't be that important; I'm in jail.

6          Q.   It wasn't that important that you got

7    arrested?  That wasn't an important day for you?

8          A.         Baddest day that happened to me in my

9    life.

10         Q.   It's a very important day in your life that you

11   got arrested; isn't it?

12         A.   It's not important, it's a bad day to me,

13   baddest day that ever happened to me in my life, sir.

14         Q.   You are able to recall specific instances in

15   New York before you came down here, but you can't recall

16   today, swearing to God to tell the truth, the name of the

17   cab company or the time that you called the cab company to

18   travel from a cab from your house in Miami, right?

19         A.   Um—hum.

20         Q.   Up to Hallandale Beach Boulevard to do a drug

21   deal.  You can't remember that, right?

22         A.   I don't remember that.

23         Q.   Isn't it a fact here, Mr. Maignan, that you and

24   your brother were going to steal two kilograms of cocaine

25   from Special Agent Anderson?

BROWARD REPORTING SERVICE  (954) 763-1382

```
1        A.    Wasn't going to do the deal.  That's when we
2    told him we don't want to do nothing.
3              We said we don't want to do nothing no more.
4        Q.    You don't want to doing nothing, but both of
5    you showed up on the day of the arrest?
6        A.    I wasn't there, sir.
7        Q.    That wasn't you on the tape?
8        A.    That wasn't me.
9        Q.    Let me ask a question.
10             You had a pager number for Special Agent
11   Anderson, didn't you?
12       A.    Um-hum.
13       Q.    You had a phone number for Special Agent
14   Anderson, didn't you?
15       A.    No.
16       Q.    Just a pager?
17       A.    A pager.
18       Q.    So if you didn't want to do this deal, all you
19   would have had to do was page Special Agent Anderson and
20   say we are not going to do the drug deal, Special Agent
21   Anderson?
22       A.    We did tell him that a couple times on the tape
23   and he keep saying come down, come down, it's quick.  Know
24   what I am saying?  I wouldn't need the money.
25       Q.    You wouldn't need the money?
```

BROWARD REPORTING SERVICE  (954) 763-1382

1         A.    Saying come down.

2         Q.    Are you saying Special Agent Anderson was going

3    to hand you over two kilograms of cocaine for free?

4         A.    I don't know.  That's when we said we don't

5    want to do nothing, sir.

6         Q.    When you saw Special Agent Anderson and Captain

7    Hock at the location of this drug deal, you ran, didn't

8    you?

9         A.    I didn't ran. I stood still.  I didn't run.

10        Q.    You didn't run?

11        A.    No, sir.  I was in the parking lot.  Somebody

12   came down and said don't move, DEA.  I am kind of shocked,

13   what is going on.

14        When they saw me, I was looking for my brother

15   at the time.  He told me to come down, my brother got hurt

16   and when he was over the phone, that's when I come down.

17   I was looking for my brother.  I was looking all over the

18   parking lot.  That's when Heath Anderson come up and

19   somebody else I don't know his name.

20        Q.    That would be Captain Hock?

21        A.    He arrest me, sir.

22        Q.    You heard the testimony in court yesterday?

23        A.    Yes, sir.

24        Q.    Are you sure you didn't run?

25        A.    Positive I didn't ran.

1          Q.   Do you remember a phone conversation you had

2     with Heath Anderson on August the 10th, 1995 at 2:35 p.m.,

3     where you told Heath Anderson Joe was on the phone, Joe

4     Clark was on the phone.

5               We had you, the informant Joseph Clark and

6     Heath Anderson.

7               Do you remember telling Joseph Clark in that

8     phone conversation on that date and time, I told you I was

9     coming down to Florida, to put me on to somebody.

10               Remember saying that on the tape?

11          A.   I didn't say none of that, sir.  All I am

12     saying is Joe know I was coming down because he sent me

13     down here.

14          Q.   Do you remember saying that on the tape?

15          A.   No, I don't remember saying that, sir.

16               MR. GALLAGHER: If the Court would allow me, I

17          ask to send the jury out and have an opportunity to

18          find the spot on the tape and show Fritz Maignan how

19          he said it on the tape.

20               MR. HECKER: We would object.  The tape is in

21          evidence.  The jury can listen.

22               MR. GALLAGHER: If he doesn't want to

23          acknowledge that --

24               THE COURT:  Show the jury to its room.

25               (Thereupon, a brief recess was had, after which

1          the following proceedings were resumed within the

2          presence of the jury:)

3               THE COURT:  You may continue on with cross

4          examination.

5    BY MR. GALLAGHER:

6          Q.   Mr. Maignan, the question I posed to you is do

7    you remember saying on August 10th, 1995, on the videotape

8    involving yourself, Joseph Clark, and Heath Anderson, at

9    2:35 p.m., on that date, do you remember saying to Joseph

10   Clark in that phone conversation, "I told you I was coming

11   down to Florida, put me on to somebody."

12          Do you remember saying that?

13          A.   Like I was telling you, I don't remember saying

14   that, sir.

15          Q.   Would it refresh your recollection to hear that

16   tape recording?

17          A.   Yes.

18          Q.   May I play that tape?

19          A.   If it's me, I am going to say it's me, sir, I

20   already told you.

21          Q.   You are not going to change your mind now, are

22   you?

23          A.   Yes, sir.  Go ahead, play the tape.

24          Q.   The person on here is identified at Stizzo.

25   That's you, isn't it?

```
 1          A.    Yes, sir.

 2          Q.    You want to sit so you can hear real clearly?

 3    Can you hear?

 4          A.    I hear.

 5          Q.    The speaker is here if you have a problem.

 6                I'm coming down here, put me on to somebody.

 7                Did you hear yourself say that?

 8          A.    Let me hear it again.

 9          Q.    Sit over here.  You have the speaker right

10    here.

11                (Thereupon, the tape was played.)

12          Q.    I told you I was coming down here to Florida.

13    Put me on to somebody.

14                Did you hear yourself just say that?

15          A.    Yes, sir.

16          Q.    So, sir, you are coming down to Florida and you

17    tell Joseph Clark to put you on to somebody.  Is that what

18    you said on that tape on August 10th, 1995?

19          A.    That's what I say on the tape.  Like I was

20    saying, I spoke to Joe, before that, Joe the one that told

21    me when I coming down, come with me, I'm going to take

22    care of me and put me with somebody so he could take care

23    of me, I could make a lot of quick money.

24                MR. GALLAGHER:  I have no further questions,

25          Judge.
```

```
1                    THE COURT:  Mr. Hecker.

2                    MR. HECKER:  Yes, sir.

3                         REDIRECT EXAMINATION

4    BY MR. HECKER:

5         Q.   Mr. Maignan, regarding the June 4th, 1996

6    motion we had here in court, you were asked the question

7    about whether or not you -- excuse me -- whether or not

8    Joe Clark had contact with your brother, and your answer

9    was no, correct?

10        A.   Yes, sir.

11        Q.   Can you please explain to the jury why you said

12   no at that time?

13        A.   Why I said no at that time?  I think when at

14   that time we was talking if Joe met me and my brother down

15   here.

16        Q.   Down here in Florida?

17        A.   Down here in Florida.

18        Q.   Did Joe Clark to the best of your knowledge

19   meet your brother Katan in New York?

20        A.   Yes, sir.

21        Q.   Do you know how many times he met in New York?

22        A.   Two times.

23        Q.   Where was that meeting at?

24        A.   My job.

25        Q.   At Foot Locker?
```

1       A.    Foot Locker.

2       Q.    Did Joe Clark talk to you, both you and your

3   brother, about coming to Florida for a drug deal?

4       A.    Yes.

5             MR. HECKER: Let me have one moment, Judge.

6   BY MR. HECKER:

7       Q.    I have one more question regarding Mr. Clark.

8             Did Mr. Clark make representations to you and

9   tell you in front of your brother Katan that you could

10  make big money down here in Florida?

11      A.    Yes, sir.

12            MR. HECKER: No further questions, Judge.

13            THE COURT:  Anything else by anyone?

14            MR. HOLDEN: No, Your Honor.

15            MR. GALLAGHER: Nothing from the State.

16            THE COURT: You may step down.  Thank you.

17            (Thereupon, Fritz Maignan left the stand.)

18            THE COURT: You may call your next witness.

19            MR. HECKER: Your Honor, on behalf of Fritz

20  Maignan, we have no other witnesses to call.

21            THE COURT: You may proceed.

22            MR. HOLDEN: The defendant would call Katan

23  Maignan to the stand.

24  Thereupon:

25                      KATAN MAIGNAN,

1      THE COURT:  You may step down; call your next

2   witness.

3      MR. GALLAGHER: Judge, the People of the State

4   of Florida respectfully rest their case.

5      THE COURT: Please show the jury to its room.

6      (Thereupon, the jury left the courtroom, after

7   which the following proceedings were resumed outside

8   the presence of the jury:)

9      THE COURT: Defense?

10      MR. HECKER: Yes, Your Honor.  I would move for

11   a judgment of acquittal renewal of the original

12   motion to dismiss that was filed before this Court.

13   The Court has a copy of that and it's also in the

14   file.

15      This is the leading case of entrapment.  In

16   this case, from the Florida Supreme Court, that

17   discusses the entrapment defense and what burden each

18   party has.

19      The initial burden is by preponderance of the

20   evidence for the defendant to show he had no

21   predisposition.  This can be shown through a lack of

22   a prior record or a lack of criminal activity and can

23   even be shown by evidence that would not normally be

24   admissible at trial.

25      The testimony we heard today from Special Agent



1          Heath Anderson which would be considered the lead

2          agent and the agent with the majority of contact with

3          my client, was basically as follows:  He gets a tip

4          from an individual who at one time was a documented

5          confidential informant but at this point had been

6          reactivated.

7               The tip merely is an individual by the name of

8          Stizzo is coming to Florida to shop.

9               Now, as Agent Anderson testified, he took no

10         further steps on his own, no independent

11         investigation, no running of the record, no further

12         inquiry to discover whether or not Stizzo who he

13         later learned to be Fritz Maignan, was actually

14         involved in the drug trade.

15              When asked specifically had the confidential

16         informant Joe Clark informed Agent Anderson of ever

17         seeing kilos in the possession of Fritz Maignan or

18         ounces or any drug whatsoever, the answer was no, he

19         was never given any information that drugs were

20         around Fritz Maignan.

21              The burden then shifts to the State to show

22         that Fritz Maignan was a proper target in this

23         matter, and this also can be shown by evidence.

24              The State did not proffer nor was any testimony

25         drawn out from Special Agent Anderson or some of the

1    other witnesses, that there is independent evidence

2    over and above and separate from the evidence

3    presented here regarding the instant case which is

4    before the Court.

5        In fact, the specific evidence that was

6    presented was that the confidential informant Joseph

7    Clark had no other independent evidence of them, had

8    never seen any drugs with them or had never observed

9    any deals, never participated in any deals, so the

10    Munoz case prevents this Court from utilizing the

11    facts and circumstances in this case in determining

12    that entrapment had not occurred as a matter of law.

13        Therefore, I renew my motion to dismiss based

14    upon the issue of entrapment as a matter of law and I

15    move for judgment of acquittal at this time.

16        Thank you, Your Honor.

17        MR. HOLDEN: Your Honor, I would be moving for a

18    judgment -- I of course join in counsel's statement

19    and I also move for judgment of acquittal as to the

20    firearm charges.

21        Defendant Katan Maignan is charged before the

22    Court with carrying a concealed firearm.

23        There is no testimony of any witness that the

24    firearm that was seized had his fingerprints on it.

25        There is no testimony of any witness that he

1           had any knowledge of any firearm.

2               There is no testimony of any witness saying

3           that he bent over and in any way exhibited knowledge

4           or awareness of the firearm, which is an element that

5           he knew of the existence of the firearm.

6               To the contrary, he is never seen, there is no

7           testimony saying that he is reaching for it or going

8           to it, nothing at all regarding the firearm.

9               In fact, just the opposite.  There is evidence

10          that the vehicle that the firearm was in was not Mr.

11          Maignan's.

12              There is evidence that the vehicle I believe

13          belonged to his sister, not to himself.

14              There is no evidence that the gun was capable

15          of being fired, Your Honor, absolutely none.  We

16          don't even know if it was a working firearm at this

17          point. Absolutely nothing came in about that.

18              If I could just have a moment.

19              THE COURT: Take your time.

20          MR. HOLDEN: There is also no evidence as to the

21          origination of the firearm.  There is no claim whose

22          name it was under.  There is no claim that it wasn't

23          registered to the defendant or in fact that it was

24          registered to anyone.

25              There is absolutely no evidence whatsoever in

```
 1        this case that the defendant had any knowledge or

 2        awareness of the firearm, merely that one was seized

 3        from the vehicle in this case.

 4             In fact, there has been testimony, I believe,

 5        that the co-defendant was in the vehicle at some

 6        point, so there is certainly a question of any

 7        constructive possession in this case, but clearly,

 8        Your Honor, there is no actual possession by the

 9        defendant and it's our position that there was no

10        constructive possession either as shown by the items

11        -- no prints, no partials attributable to the

12        defendant, no visible objective signs of awareness by

13        the defendant of the existence of the firearm,

14        certainly no admissions by the defendant of the

15        existence of the firearm.  That's it.

16             THE COURT: State?

17             MR. GALLAGHER: Judge, with regard to the

18        motions for judgment of acquittal based upon

19        entrapment defense, there has been no evidence put

20        forth in the past couple days, just theories.

21             In fact, all the evidence is just the opposite,

22        that these two gentlemen, Katan Maignan and Fritz

23        Maignan were ready, willing and able to consummate a

24        drug transaction with regard to conspiracy as

25        demonstrated through Special Agent Anderson's
```

274

1          testimony and that they agreed to purchase two

2          kilograms of cocaine at the price of $33,000, and in

3          an attempt to consummate that transaction, showed up

4          at the scene of the Denny's on Hallandale Beach

5          Boulevard on August 11th, 1995, to consummate that

6          transaction, so there is an agreement and an intent

7          to commit a criminal act and that's all that is

8          required under the theory.

9               There is absolutely no evidence whatsoever that

10         anyone was entrapped in this case, at least at this

11         point.

12              With regard to the firearm, that all the

13         evidence in the case on the date that Katan Maignan

14         is charged with carrying a concealed firearm on

15         August 11th, 1995, never point to Katan Maignan as

16         being in the car, that's illustrated in State's

17         Exhibits 7 and 8.

18              The only person in that car is Katan Maignan.

19         The gun that is State's 17, the gun and the clip that

20         is State's Exhibit 17, by way of photographs by

21         Officer Tommy Long, show that gun and clip to be in a

22         position in the car, to be out of the normal sight of

23         the other citizens if they were to look in the car,

24         to be in a concealed position in the car, because

25         Katan Maignan was the only person in that car at any

1  time on August 11th, 1995, but that subsequent to the

2  arrest he is exclusively in possession of that

3  vehicle and under the law of possession, if you are

4  in exclusive possession of an item, in this

5  particular case, a firearm contained within the

6  vehicle, the court -- the jurors can assume that he

7  had knowledge and in taking the evidence in the light

8  most favorable to the State, which is where we are at

9  now, I ask you to deny the motion judgment of

10  acquittal on the conspiracy count and carrying a

11  concealed firearm count.

12       THE COURT:  The Court herein finds that there

13  has been sufficient evidence to go before the jury as

14  to this case, that there is evidence to, certainly

15  evidence that could find that the government did not

16  induce the accused to commit the crime and that the

17  defendants were predisposed to commit the offense to

18  which they are charged, and there is factually a

19  determination by a jury that a reasonable person can

20  draw different conclusions or even conclude that the

21  defendants were not entrapped or that they were not,

22  that they were predisposed to commit the crime and

23  not induced by the government to do that, and there

24  is sufficient evidence as a matter of law.

25       Anything further by the defendants?

1          MR. HECKER: No.

2          THE COURT: The Court finds that there has been

3     sufficient evidence presented to the jury, that they

4     should be able to make this decision and consider and

5     it is not insufficient pursuant to the rule, and that

6     there has been a prima facie case presented.

7          MR. GALLAGHER: As to Counts I and II.

8          THE COURT: As to Counts I and II, considered in

9     the light most favorable to the State, motion for

10    judgment of acquittal at the close of the State's

11    case as to both counts are denied respectfully.

12         Defense ready to proceed?

13         MR. HECKER: Yes, Judge.

14         It is ten minutes to five.  We anticipate the

15    defendants testifying.

16         THE COURT: Okay.  Should we take a break for

17    the evening?

18         MR. GALLAGHER: Your call, Judge.

19         MR. HECKER: We should finish tomorrow.

20         THE COURT: Did you get a copy of the

21    instructions that were tentatively prepared by the

22    State?

23         MR. HECKER: Yes, Judge.  I didn't see any

24    particular problems.  They were the ones we

25    requested.  They seem to be okay.

1           MR. HOLDEN: No witnesses, Judge.

2           THE COURT: Rebuttal?

3           MR. GALLAGHER: Nothing, Judge, thank you very

4    much.

5           State rests.

6           THE COURT: Show the jury to its room.

7           (Thereupon, the jury left the courtroom, and

8    the following proceedings were had outside the

9    presence of the jury:)

10          THE COURT: Motions?

11          MR. HECKER: On behalf of Fritz Maignan, I would

12   be moving for a judgment of acquittal supported by

13   the testimony the Court took in the motion to dismiss

14   based upon entrapment, the testimony the Court has

15   heard during the State's case and now, the testimony

16   that has been heard from both of the Maignan

17   brothers.

18          The defendants have raised the defense of

19   entrapment which must be shown to the Court by a

20   preponderance of the evidence, not beyond a

21   reasonable doubt.

22          It is uncontroverted that the defendant, Fritz

23   Maignan, and at some point Katan Maignan, were

24   contacted by a paid confidential informant by the

25   name of Joseph Clark, working for DEA.

EXHIBIT    IV

1           The testimony today was at least four, perhaps

2    five meetings took place in New York at the Foot

3    Locker where Fritz Maignan worked.

4           Fritz Maignan testified that he was induced to

5    come to Florida to make big money.

6           Now, Mr. Gallagher, the prosecutor in this

7    matter, elicited there was no gun placed to his head

8    or anything else but I would direct the Court to the

9    instruction that merely says that an individual must

10   be induced or encouraged to engage in conduct

11   constituting a crime of conspiracy to traffic.

12          I would suggest we at least have encouragement

13   here on behalf of Joe Clark.  We have further

14   encouragement on behalf of Special Agent Anderson and

15   further when we have a three-way conversation with

16   Joe Clark, at which point Agent Anderson testified

17   that the deal, he is having concerns about the deal.

18          Now, the three-way conversation took place

19   prior to August 10th when both sides decided the deal

20   would be off, but again we have a continuing pattern

21   on behalf of the government here about the use of the

22   paid confidential informant Joseph Clark, as well as

23   the actions of Anderson himself, and respectfully, I

24   move for a judgment of acquittal for entrapment as a

25   matter of law and I am moving at this point that we

1    be allowed if the Court denies the motion for

2    judgment of acquittal, that entrapment be presented

3    as a defense to the jury.

4         Thank you, Your Honor.

5         MR. HOLDEN: Not only would I join in counsel's

6    motion but I also make a subjective motion to

7    dismiss, judgment of acquittal at this time on the

8    subjective entrapment argument, Your Honor.

9         Under the State versus Munoz case, there is the

10   objective entrapment argument.

11        Through the testimony of the defendants today,

12   they have indicated, which was clearly unopposed by

13   any evidence or testimony, neither evidence nor

14   testimony came in to oppose Katan Maignan or Fritz

15   Maignan having no prior record, having no prior drug

16   involvement, not making the initial contact. The

17   initial contact coming from the C.I., who furthers

18   his own contact as is testified to by Katan and Fritz

19   Maignan, who furthers it by assuaging their feelings

20   and letting them think things are going to go okay,

21   they are covered, they are safe and that they can do

22   the deal with protection -- not protection, but with

23   the protection of knowing that they will be taken

24   care, I believe is the exact phrase used by Mr.

25   Clark.

1          He even induces them further by offering to

2      provide them with sex. He offered to provide them, to

3      I believe the testimony was, to get laid was their

4      exact phraseology.

5          In addition, Your Honor, on the objective

6      argument of entrapment, we also have no evidence

7      presented nor testimony presented.  In fact, we have

8      the contrary of any prior activity by the defendants

9      whatsoever.

10          Agent Anderson indicated that while originally

11      he didn't have an opportunity to run anything of that

12      nature on them, that subsequently he did and was

13      unable to come up with any information whatsoever as

14      to any prior drug history or any indication of such

15      on the defendants.

16          Does Your Honor want me to go through all the

17      motions.

18          THE COURT: Yes, you can.  You may continue on.

19          MR. HOLDEN: Additionally, Your Honor, we move

20      for a JOA at this point as the defendants testified

21      and the evidence was pretty clear, that the

22      defendants withdrew from the conspiracy if there was

23      in fact any conspiracy, they left the scene.

24          The agents were specifically discussing on the

25      tape whether or not to take them down, do we make a

BROWARD REPORTING SERVICE  (954) 763-1382

State v. Ramos, 632 So. 2d 1078
(Fla. 3d DCA 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21-23

The Florida Bar re: Standard Jury Instructions -- Criminal, 508 So. 2d 1221
(Fla. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Yohn v. State, 476 So. 2d 123
(Fla. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

## OTHER AUTHORITIES

Fla Std. Jury Instr. (Crim.) at page 1214 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

## Florida Statutes

777.04(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
777.201 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 25

## PRELIMINARY STATEMENT

Appellant was the defendant in the trial court. He will be referred to as appellant in this brief.

The record on appeal is consecutively numbered. All references to the record will be by the symbol "R" followed by the appropriate page number in parentheses. The trial transcripts are consecutively numbered independently of the record on appeal. All references to the trial transcripts will be by the symbol "T" followed by the appropriate page number in parenthesis. The supplemental record on appeal consists of a transcript of the pretrial hearing on appellant's motion to dismiss. It is consecutively numbered independently of the record on appeal and trial transcripts. All references to the supplemental record will be by the symbol "SR" followed by the appropriate page number in parenthesis.

All emphasis has been added by appellant unless otherwise noted.

## STATEMENT OF THE CASE

Appellant and co-defendant, Katan Maignan, were charged in a single information filed in the Seventeenth Judicial Circuit with conspiracy to traffic in cocaine by purchase or possession (count I) (R-1). Katan Maignan was separately charged in count II with carrying a concealed firearm (R-2).

Pretrial, appellant moved in writing to dismiss the charge based upon entrapment as a matter of law (R-19-20). After an evidentiary hearing, the circuit court denied the motion (SR-7-87).

Appellant and co-defendant Katan Maignan proceeded to jury trial. At the close of the state's case in chief and at the close of the evidence, appellant moved for judgment of acquittal and renewed his motion to dismiss (T-269-271,372-374). The trial court maintained its ruling (T-275). At the close of the evidence, counsel for the co-defendant moved for judgment of acquittal since the evidence established that the "the defendants withdrew from the conspiracy if in fact there was any conspiracy, they left the scene." (T-375-376). The court denied the motion (T-378).

Without objection, the trial court instructed the jury on conspiracy in pertinent part as follows:

> Before you can find the defendants Katan Maignan and/or Fritz Maignan guilty of criminal conspiracy, the State must prove the following two elements beyond a reasonable doubt:
>
> One, the **attempt** of Katan Maignan and Fritz Maignan was that the offense of trafficking in cocaine would be committed. Two, in order to carry out the **attempt**, Katan Maignan and Fritz Maignan agreed, conspired, combined, or confederated with each other or others unknown to the State's Attorneys Office to cause trafficking in cocaine to be committed, either by them or one of them or by some other person, or one.

- 2 -

(T-442).

Also, without objection, the trial court instructed the jury on entrapment in pertinent part as follows:

> On the issue of entrapment, the defendants must prove to you by a preponderance of the evidence that the criminal conduct occurred as a result of the entrapment.

(T-445).

The jury found appellant guilty of conspiracy to traffic in cocaine by purchase or possession as charged in the information. Appellant was adjudicated guilty accordingly (T-459-461, R-46,51-52). Appellant was sentenced to serve a mandatory 15 year term of imprisonment and ordered to pay a $250,000.00 fine (T-467, R-48-50).

## STATEMENT OF THE FACTS

Appellant, Fritz Maignan, and co-defendant Katan Maignan, were jointly tried on the charge of conspiracy to traffic in cocaine by purchase and possession (count I)[1]. The state presented the testimony of 5 witnesses. Appellant and Katan testified in support of their defenses. A non-cumulative recitation of the evidence follows:

Appellant and Katan are brothers. Appellant was 18 years old and in his last year of high school when he was arrested (T-295,305). He was born in Haiti and lived in Harlem, New York where he worked as a salesman at a Footlocker Store (T-294-295,298). Katan was 19 years old (T-342). Katan and their sister lived in Florida (T-301,343-344). Appellant had the nickname "Stizzo" and Katan's nickname was "Slow" (T-308).

Joseph Clark[2] was a documented confidential informant for the federal Drug Enforcement Administration (DEA) (T-39,129,141,179). Although he was not paid for this case, he had been paid in the past (T-39,153-155).

Appellant met Clark when Clark came into the Footlocker store to purchase sneakers (T-297,309). Prior to this meeting, the DEA did not have any information that appellant was involved with narcotics (T-128). Appellant did not have a narcotics related criminal history (T-128-129).

According to appellant, over a period of a month, appellant saw Clark 4 or 5 times at the store (T-297). Clark kept asking for drugs (T-297,299). Clark told appellant that appellant could

---

[1]Co-defendant Katan Maignan was charged in count II of the information with carrying a concealed firearm (R-1-2).

[2]Joseph Clark did not testify at trial or at the pretrial hearing.

go to Florida to make easy money (T-299). Clark told appellant that he had a friend that appellant should meet that had good stuff for appellant (T-299). Clark did not tell appellant how much it would cost (T-299). At the last meeting, Clark told appellant that if he came down to Florida he would make more money than he made in a paycheck (T-299). Appellant was only making $150.00 (T-299). Appellant came to Florida because Clark told appellant he could make alot of money (T-300).

During cross-examination by the co-defendant and the prosecution, appellant testified that Katan met Clark at the store once (T-306, 312). Clark and Katan did not speak directly about the drug trade (T-307). On cross-examination by the prosecution, appellant stated that Clark mentioned the deal to Katan. Katan became involved to make quick money (T-309-312). However, appellant did not remember stating at a prior court proceeding that appellant told his brother about the drug deal (T-312-316). On redirect examination, appellant stated that his prior testimony referred to Clark and Katan having never met each other in Florida (T-340). Clark and Katan met twice at Footlocker (T-340-341). Clark spoke to both brothers about coming to Florida for a drug deal and represented that they could make big money (T-341).

Katan testified that he was visiting appellant in New York when he met Clark at the Footlocker store (T-344). He spoke with Clark on 3 occasions (T-345). Clark told them that he had a connection in Miami and they could make alot of money (T-344). Clark did not tell them that they had to come up with money (T-346).

Appellant bought a one-way plane ticket to Florida for approximately one-hundred dollars and change (T-300). Appellant did not buy a return ticket because Clark told appellant that the guy

would take care of him (T-300). Clark told appellant that he would give appellant's number to the guy (T-301).

According to state witness, Heath Anderson, a special agent with the Drug Enforcement Administration, on August 8, 1995, Clark telephoned Anderson and advised that he met people in New York who wanted to purchase a large amount of drugs (T-39-40). When asked, Clark stated he did not know what kind of drugs they wanted (T-184-185). They were in the business, mainly cocaine (T-185). Anderson did not verify this information (T-186-187). Clark did not say that he had ever seen them with cocaine (T-185). Anderson had no knowledge of Clark purchasing cocaine from appellant (T-193). Anderson conceded that Clark had more than one contact with appellant (T-183). Clark provided the name "Stizzo" and a beeper number (T-40).

Anderson, acting as a cocaine dealer, paged the number (T-40). Appellant returned the call (T-40-41,42). Using the term "condos," Anderson and appellant discussed prices for two different cocaines, one wet and one dry (T-41-42,43). Anderson testified that appellant replied that it did not matter if the cocaine was wet because he would cook it (T-42).

On cross-examination, Anderson acknowledged that he stated that it would not matter if it was wet cocaine if someone knew what to do with it before appellant mentioned cooking it (T-124). This was the first time Anderson ever sold wet cocaine (T-196).

Anderson testified that appellant stated he came to Florida to "shop"(T-42). A price of $16,500 per kilogram was set for a 2 kilogram cocaine deal (T-43). They agreed to meet the following day at McDonald's in Fort Lauderdale (T-43-44). A tape recording of this conversation which Anderson testified was of poor quality was played for the jury (state exhibit 1). It was not

contemporaneously transcribed (T-44-46).

On August 9, 1995, Anderson spoke with Katan by telephone and confirmed that the meeting would occur at McDonald's (T-48). A tape recording of this conversation was played for the jury (state exhibit 2). It was not contemporaneously transcribed (T-49-50).

Undercover surveillance was present at the McDonald's on August 9, 1995, and a videotape without audio was made (state exhibit 3) (T-50,52,56). In addition, an audio cassette tape was made (T-52). Anderson accompanied by Officer Sam Tatum acting as a body guard arrived at the McDonald's (T-51). Eventually, Anderson and Tatum found appellant and Katan (T-51). Introductions were made (T-51). According to Anderson, appellant and Katan attempted to negotiate a lower price but Anderson remained firm (T-53). Anderson suggested that the transaction occur at Denny's in Boca Raton and wrote down the directions for the Maignans (T-54). According to Anderson, they were happy to do the deal (T-54).

On August 10, 1995, Anderson was paged (T-58). Anderson testified that "they" did not like the Boca Raton location (T-59). Anderson provided a new location, Denny's in Hallandale Beach (T-59). State Exhibit 4, a tape recording of this call, was played for the jury and contemporaneously transcribed (T-62). Katan advised Anderson that the location was too far (T-62). Anderson stated that he spoke to Joe (the confidential informant). Anderson stated, "I mean, I don't know what you all did before, but you all told me you guys did business; is that right? You know, a little bit." (T-63). Katan responded "We did business, yeah, (inaudible)." (T-63). Anderson asked, "Know when we can come up there?" Katan responded "I am not going to do it, man." (T-63). Anderson asked if he wanted to talk to Joe's brother (special agent William Dyer) and stated that he would not go

- 7 -

# IN THE DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA

## FOURTH DISTRICT

*4-028ᴲ*

FRITZ MAIGNAN,

        Appellant,

vs.

        CASE NO. 96-2152

STATE OF FLORIDA,

        Appellee.

_____/

**RECEIVED**
OFFICE OF THE
ATTORNEY GENERAL

**FEB 24 1997**

CRIMINAL OFFICE
WEST PALM BEACH

## <u>INITIAL BRIEF OF APPELLANT</u>

On appeal from the Circuit Court of the Seventeenth
Judicial Circuit In and For Broward County, Florida
[Criminal Division]

        **RICHARD L. JORANDBY**
        Public Defender
        15th Judicial Circuit

*State's pleading
( Brief ) due
March 12, 1997*

        **MARCY K. ALLEN**
        Assistant Public Defender
        Attorney for Fritz Maignan
        Criminal Justice Building
        421 Third Street, 6th Floor
        West Palm Beach, Florida 33401
        (407) 355-7600
        Florida Bar No. 332161

*EXHIBIT V*

<u>Fritz Maignan v. State of Florida</u>

Case No. 96-2152

## <u>CERTIFICATE OF INTERESTED PERSONS</u>

Counsel for defendant/appellant certifies that the following persons and entities have or may

have an interest in the outcome of this case:

1.   Honorable Robert Butterworth
     Attorney General for the State of Florida
     By Assistant Attorney General Georgina Jimenez-Orosa
     (Counsel for Appellee)

2.   H. Scott Hecker, Esq.
     (Trial Counsel for Defendant)

3.   Honorable Richard L. Jorandby
     Public Defender, 15th Judicial Circuit
     By Assistant Public Defender Marcy K. Allen
     (Counsel for Appellant)

4.   Fritz Maignan
     (Defendant/Appellant)

5.   Honorable Michael J. Satz
     State Attorney, 17th Judicial Circuit
     By Assistant State Attorney
     (Trial Counsel for Plaintiff)

6.   Honorable Robert W. Tyson, Jr.
     17th Judicial Circuit
     (Trial Judge)

- i -

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS ...................................... i

TABLE OF CONTENTS ..................................................... ii

TABLE OF AUTHORITIES ................................................. iv

PRELIMINARY STATEMENT ................................................ 1

STATEMENT OF THE CASE ................................................ 2

STATEMENT OF THE FACTS .............................................. 4

SUMMARY OF ARGUMENT ............................................... 13

ARGUMENT

## POINT I

THE TRIAL COURT ERRED IN FAILING TO GRANT A JUDGE-
MENT OF ACQUITTAL WHERE THE STATE DID NOT ESTAB-
LISH THAT APPELLANT COMMITTED CONSPIRACY TO
TRAFFIC IN COCAINE. ........................................... 14

## POINT II

REVERSIBLE ERROR OCCURRED WHERE THE TRIAL
COURT INCORRECTLY INSTRUCTED THE JURY ON AN
ELEMENT OF CONSPIRACY. ...................................... 18

## POINT III

THE TRIAL COURT ERRED IN FAILING TO GRANT A
JUDGMENT OF ACQUITTAL ON ENTRAPMENT AT THE
CLOSE OF THE EVIDENCE. ...................................... 20

POINT IV

THE CONVICTION VIOLATES DUE PROCESS OF LAW
BECAUSE THE JURY WAS NOT INSTRUCTED THAT THE
STATE HAD THE BURDEN OF PROVING PREDISPOSITION
BEYOND A REASONABLE DOUBT. ............................... 24

CONCLUSION ......................................................... 27

CERTIFICATE OF SERVICE ............................................. 27

# TABLE OF AUTHORITIES

Cases                                                                                    Page

Bennett v. State, 173 So. 817
    (Fla. 1937) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Carter v. State, 469 So. 2d 194
    (Fla. 2d DCA 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Cristian v. State, 272 So. 2d 852
    (Fla. 4th DCA 1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Doyle v. State, 483 So. 2d 89
    (Fla. 4th DCA 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Fruetel v. State, 638 So. 2d 966
    (Fla. 4th DCA 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 26

Gray v. State, 526 So. 2d 1020
    (Fla. 5th DCA 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 17

Herrera v. State, 594 So. 2d 275
    (Fla. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Jacobson v. United States, ___ U.S. ___, 112 S. Ct. 1535,
    118 L. Ed. 2d 174 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 24, 25

Kocol v. State, 546 So. 2d 1159
    (Fla. 5th DCA 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Mickenburg v. State, 640 So. 2d 1210
    (Fla. 2d DCA 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 17

Motley v. State, 155 Fla. 545, 20 So. 2d 798
    (1945) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Munoz v. State, 629 So. 2d 90
    (Fla. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21, 22, 24, 25

Nadeau v. State, 683 So. 2d 504
(Fla. 4th DCA 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23

O'Connor v. State, 590 So. 2d 1018
(Fla. 5th DCA 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Pennington v. State, 526 So. 2d 87 (Fla. 4th DCA 1987),
approved 534 So. 2d 393 (Fla. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 17

Pickover v. State, 580 So. 2d 287
(Fla. 4th DCA 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 18

Rotenberry v. State, 468 So. 2d 971
(Fla. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Russell v. United States, 369 U.S. 749, 82 S. Ct. 1038,
8 L. Ed. 2d 240 (1962) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Saint Louis v. State, 561 So. 2d 628
(Fla. 2d DCA 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 17, 18

Screws v. United States, 325 U.S. 91, 107, 65 S. Ct. 1031,
89 L. Ed. 1495 (1945) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Sorrells v. United States, 287 U.S. 435, 53 S. Ct. 210,
77 L. Ed. 2d 413 (1932) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Sorrells v. United States, 287 U.S. 435, 53 S. Ct. 210,
77 L. Ed. 2d 413 (1932) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Sparkman v. State, 528 So. 2d 497
(Fla. 2d DCA 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

State v. Delva, 575 So. 2d 643
(Fla. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

State v. Finno, 643 So. 2d 1166
(Fla. 4th DCA 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

State v. Howell, 629 So. 2d 213 (Fla. 2d DCA 1993),
rev. den. 639 So. 2d 981 (Fla. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

State v. Ramos, 632 So. 2d 1078
       (Fla. 3d DCA 1994) .................................................. 21-23

The Florida Bar re: Standard Jury Instructions -- Criminal, 508 So. 2d 1221
       (Fla. 1987) .......................................................... 26

Yohn v. State, 476 So. 2d 123
       (Fla. 1985) .......................................................... 25

## OTHER AUTHORITIES

       Fla Std. Jury Instr. (Crim.) at page 1214 ...................................... 18

## Florida Statutes

       777.04(3) ............................................................ 18
       777.201 ........................................................... 24, 25

## PRELIMINARY STATEMENT

Appellant was the defendant in the trial court. He will be referred to as appellant in this brief.

The record on appeal is consecutively numbered. All references to the record will be by the symbol "R" followed by the appropriate page number in parentheses. The trial transcripts are consecutively numbered independently of the record on appeal. All references to the trial transcripts will be by the symbol "T" followed by the appropriate page number in parenthesis. The supplemental record on appeal consists of a transcript of the pretrial hearing on appellant's motion to dismiss. It is consecutively numbered independently of the record on appeal and trial transcripts. All references to the supplemental record will be by the symbol "SR" followed by the appropriate page number in parenthesis.

All emphasis has been added by appellant unless otherwise noted.

## STATEMENT OF THE CASE

Appellant and co-defendant, Katan Maignan, were charged in a single information filed in the Seventeenth Judicial Circuit with conspiracy to traffic in cocaine by purchase or possession (count I) (R-1). Katan Maignan was separately charged in count II with carrying a concealed firearm (R-2).

Pretrial, appellant moved in writing to dismiss the charge based upon entrapment as a matter of law (R-19-20). After an evidentiary hearing, the circuit court denied the motion (SR-7-87).

Appellant and co-defendant Katan Maignan proceeded to jury trial. At the close of the state's case in chief and at the close of the evidence, appellant moved for judgment of acquittal and renewed his motion to dismiss (T-269-271,372-374). The trial court maintained its ruling (T-275). At the close of the evidence, counsel for the co-defendant moved for judgment of acquittal since the evidence established that the "the defendants withdrew from the conspiracy if in fact there was any conspiracy, they left the scene." (T-375-376). The court denied the motion (T-378).

Without objection, the trial court instructed the jury on conspiracy in pertinent part as follows:

> Before you can find the defendants Katan Maignan and/or Fritz Maignan guilty of criminal conspiracy, the State must prove the following two elements beyond a reasonable doubt:
>
> One, the **attempt** of Katan Maignan and Fritz Maignan was that the offense of trafficking in cocaine would be committed. Two, in order to carry out the **attempt**, Katan Maignan and Fritz Maignan agreed, conspired, combined, or confederated with each other or others unknown to the State's Attorneys Office to cause trafficking in cocaine to be committed, either by them or one of them or by some other person, or one.

- 2 -

(T-442).

Also, without objection, the trial court instructed the jury on entrapment in pertinent part as follows:

> On the issue of entrapment, the defendants must prove to you by a preponderance of the evidence that the criminal conduct occurred as a result of the entrapment.

(T-445).

The jury found appellant guilty of conspiracy to traffic in cocaine by purchase or possession as charged in the information. Appellant was adjudicated guilty accordingly (T-459-461, R-46,51-52). Appellant was sentenced to serve a mandatory 15 year term of imprisonment and ordered to pay a $250,000.00 fine (T-467, R-48-50).

## STATEMENT OF THE FACTS

Appellant, Fritz Maignan, and co-defendant Katan Maignan, were jointly tried on the charge of conspiracy to traffic in cocaine by purchase and possession (count I)[1]. The state presented the testimony of 5 witnesses. Appellant and Katan testified in support of their defenses. A non-cumulative recitation of the evidence follows:

Appellant and Katan are brothers. Appellant was 18 years old and in his last year of high school when he was arrested (T-295,305). He was born in Haiti and lived in Harlem, New York where he worked as a salesman at a Footlocker Store (T-294-295,298). Katan was 19 years old (T-342). Katan and their sister lived in Florida (T-301,343-344). Appellant had the nickname "Stizzo" and Katan's nickname was "Slow" (T-308).

Joseph Clark[2] was a documented confidential informant for the federal Drug Enforcement Administration (DEA) (T-39,129,141,179). Although he was not paid for this case, he had been paid in the past (T-39,153-155).

Appellant met Clark when Clark came into the Footlocker store to purchase sneakers (T-297,309). Prior to this meeting, the DEA did not have any information that appellant was involved with narcotics (T-128). Appellant did not have a narcotics related criminal history (T-128-129).

According to appellant, over a period of a month, appellant saw Clark 4 or 5 times at the store (T-297). Clark kept asking for drugs (T-297,299). Clark told appellant that appellant could

---

[1] Co-defendant Katan Maignan was charged in count II of the information with carrying a concealed firearm (R-1-2).

[2] Joseph Clark did not testify at trial or at the pretrial hearing.

go to Florida to make easy money (T-299). Clark told appellant that he had a friend that appellant should meet that had good stuff for appellant (T-299). Clark did not tell appellant how much it would cost (T-299). At the last meeting, Clark told appellant that if he came down to Florida he would make more money than he made in a paycheck (T-299). Appellant was only making $150.00 (T-299). Appellant came to Florida because Clark told appellant he could make alot of money (T-300).

During cross-examination by the co-defendant and the prosecution, appellant testified that Katan met Clark at the store once (T-306, 312). Clark and Katan did not speak directly about the drug trade (T-307). On cross-examination by the prosecution, appellant stated that Clark mentioned the deal to Katan. Katan became involved to make quick money (T-309-312). However, appellant did not remember stating at a prior court proceeding that appellant told his brother about the drug deal (T-312-316). On redirect examination, appellant stated that his prior testimony referred to Clark and Katan having never met each other in Florida (T-340). Clark and Katan met twice at Footlocker (T-340-341). Clark spoke to both brothers about coming to Florida for a drug deal and represented that they could make big money (T-341).

Katan testified that he was visiting appellant in New York when he met Clark at the Footlocker store (T-344). He spoke with Clark on 3 occasions (T-345). Clark told them that he had a connection in Miami and they could make alot of money (T-344). Clark did not tell them that they had to come up with money (T-346).

Appellant bought a one-way plane ticket to Florida for approximately one-hundred dollars and change (T-300). Appellant did not buy a return ticket because Clark told appellant that the guy

- 5 -

would take care of him (T-300). Clark told appellant that he would give appellant's number to the guy (T-301).

According to state witness, Heath Anderson, a special agent with the Drug Enforcement Administration, on August 8, 1995, Clark telephoned Anderson and advised that he met people in New York who wanted to purchase a large amount of drugs (T-39-40). When asked, Clark stated he did not know what kind of drugs they wanted (T-184-185). They were in the business, mainly cocaine (T-185). Anderson did not verify this information (T-186-187). Clark did not say that he had ever seen them with cocaine (T-185). Anderson had no knowledge of Clark purchasing cocaine from appellant (T-193). Anderson conceded that Clark had more than one contact with appellant (T-183). Clark provided the name "Stizzo" and a beeper number (T-40).

Anderson, acting as a cocaine dealer, paged the number (T-40). Appellant returned the call (T-40-41,42). Using the term "condos," Anderson and appellant discussed prices for two different cocaines, one wet and one dry (T-41-42,43). Anderson testified that appellant replied that it did not matter if the cocaine was wet because he would cook it (T-42).

On cross-examination, Anderson acknowledged that he stated that it would not matter if it was wet cocaine if someone knew what to do with it before appellant mentioned cooking it (T-124). This was the first time Anderson ever sold wet cocaine (T-196).

Anderson testified that appellant stated he came to Florida to "shop"(T-42). A price of $16,500 per kilogram was set for a 2 kilogram cocaine deal (T-43). They agreed to meet the following day at McDonald's in Fort Lauderdale (T-43-44). A tape recording of this conversation which Anderson testified was of poor quality was played for the jury (state exhibit 1). It was not

- 6 -

contemporaneously transcribed (T-44-46).

On August 9, 1995, Anderson spoke with Katan by telephone and confirmed that the meeting would occur at McDonald's (T-48). A tape recording of this conversation was played for the jury (state exhibit 2). It was not contemporaneously transcribed (T-49-50).

Undercover surveillance was present at the McDonald's on August 9, 1995, and a videotape without audio was made (state exhibit 3) (T-50,52,56). In addition, an audio cassette tape was made (T-52). Anderson accompanied by Officer Sam Tatum acting as a body guard arrived at the McDonald's (T-51). Eventually, Anderson and Tatum found appellant and Katan (T-51). Introductions were made (T-51). According to Anderson, appellant and Katan attempted to negotiate a lower price but Anderson remained firm (T-53). Anderson suggested that the transaction occur at Denny's in Boca Raton and wrote down the directions for the Maignans (T-54). According to Anderson, they were happy to do the deal (T-54).

On August 10, 1995, Anderson was paged (T-58). Anderson testified that "they" did not like the Boca Raton location (T-59). Anderson provided a new location, Denny's in Hallandale Beach (T-59). State Exhibit 4, a tape recording of this call, was played for the jury and contemporaneously transcribed (T-62). Katan advised Anderson that the location was too far (T-62). Anderson stated that he spoke to Joe (the confidential informant). Anderson stated, "I mean, I don't know what you all did before, but you all told me you guys did business; is that right? You know, a little bit." (T-63). Katan responded "We did business, yeah, (inaudible)." (T-63). Anderson asked, "Know when we can come up there?" Katan responded "I am not going to do it, man." (T-63). Anderson asked if he wanted to talk to Joe's brother (special agent William Dyer) and stated that he would not go

to Miami (T-64). Anderson suggested the Hallandale Denny's and provided directions (T-64-67). Anderson instructed Katan to check this location then call him back in an hour (T-68).

At approximately 11:40 on August 10, 1995, Anderson spoke with appellant by telephone (T-68). The tape recorded telephone conversation was played for the jury (T-68-69). Appellant stated that he was not going to go to the meeting (T-70). Katan would go alone (T-70). Anderson replied that he was bringing his boy (T-70). Appellant gave the phone to Katan (T-71). Anderson insisted that he intended to bring someone with him (T-71-74).

On August 10, 1995, at 3:40 p.m., Anderson arranged a three way telephone conversation between himself, Joseph Clark (the confidential informant) and appellant (T-75). The purpose of the call was to reassure appellant because the Maignan's were hesitant (T-161-162,199). During this conversation, Clark stated that Anderson was "good people, he'll even get you a lady if you want." (T-198).

A cassette recording of this conversation was played for the jury; it was partially transcribed (T-82-85). Joseph Clark asked Anderson if he intended to pay him for arranging the transaction (T-85). Anderson explained that he dropped the price (T-85). Katan picked up the phone (T-85).

On cross-examination by counsel for the co-defendant, Anderson testified that referring to the deal, Katan said to forget it (T-126-127,160). At this point, the deal was off (T-86,159). The deal was not going to happen (T-167).

On cross-examination, Anderson agreed that during one conversation he learned that appellant was afraid to do the deal (T-195).

Anderson claimed that Katan paged him several hours after the 3:40 p.m. conversation (T-

- 8 -

86,131-132). Anderson could not recall if he beeped Katan first (T-204). Anderson called back, however, the conversation was not tape recorded (T-86,132). Anderson explained that he was not at his office when he returned the call (T-133,158). According to Anderson, they agreed to do the transaction alone at the Hallandale location (T-87).

A briefing occurred (T-88). Anderson obtained 2 kilograms of cocaine (T-88). Surveillance was sent to the Hallandale Denny's and a videotape was made (State exhibit) (T-88-90). Anderson arrived in a white Mercedes (T-119).

According to Anderson, he saw appellant walking up to the front door of the restaurant (T-91). Appellant told him that he gave the money to his brother to do the deal (T-92). Anderson had appellant accompany him inside the restaurant (T-92). They sat down (T-92). Anderson stated only one person could do the deal (T-92). Appellant said he was going to leave (T-92).

Katan Maignan drove around the parking lot (T-92). Anderson advised surveillance that appellant and Katan were present (T-93). Katan met Anderson inside Denny's (T-93). Appellant left the restaurant (T-93).

Katan and Anderson went to the parking lot (T-94). Approximately 10 times in less than 6 minutes, Anderson asked Katan to show him the money (T-102). Katan did not comply (T-110). Katan asked Anderson to come to his car to see the money (T-94). Anderson hesitated because he was afraid he would be robbed (T-94,102). Katan asked to pat-down Anderson. Anderson responded that he had a .9mm with him (T-94-95). Upon learning that Anderson had a gun, Katan became indecisive about doing the deal (T-103-104,172). Katan would not go through with the deal unless Anderson put his gun up (T-174-176). The transaction did not occur (T-176). Anderson and Katan

- 9 -

left in their separate vehicles (T-95).

Anderson testified that it is common for drug dealers to ask to see a sample of the cocaine. However, that did not occur in this instance (T-165-166). Katan never looked at the cocaine (T-110). He never obtained a taste of it (T-166).

Katan was stopped and arrested (T-96). A gun was found on the driver's side floor board near the dimmer switch of the vehicle driven by Katan (T-226,240). The gun was not loaded (T-241,243). Although the gun and magazine were processed, no fingerprints were obtained (T-245-246,259-260). During his meeting with Anderson, Katan did not make any attempt to get into the car (T-205). He did not display the gun (T-207).

A bank deposit bag was located on the passenger side front floorboard of the vehicle (T-224). The bag contained 6 bundles of currency. Each bundle was wrapped in a one hundred dollar bill (T-228). The bundles included 800 one dollar bills, 3 fifty dollar bills and 8 one hundred dollar bills totaling $1750.00 (T-232).

Anderson attempted to locate appellant (T-96). He telephoned a number he found in Katan's property and paged appellant (T-96). As Anderson and Chris Hock, a Hallandale police captain, rode around looking for appellant, appellant returned the page (T-97,212,251-252). Anderson told appellant that Katan had locked himself inside his car with the money and refused to do the deal (T-98,212). Anderson made banging noises and told appellant that Katan would not open the window (T-98). Anderson advised appellant that he was leaving (T-98 ).

Anderson drove past the Denny's lot and appellant was there (T-98,253). According to Anderson, when appellant saw him, appellant ran and was apprehended after a short foot chase (T-

- 10 -

98,253-254).  Anderson thought appellant had changed his shirt (T-101).

Appellant testified that during one of the tape recorded phone conversations, he told Anderson that he was scared and did not want to do anything anymore (T-303).  Appellant had other conversations with Anderson which were not played in court (T-305).  On several occasions, appellant told Anderson that he did not want to do this deal; he was chickening out (T-304,320).  Appellant did not know that he needed $33,000.00 until he came to Florida (T-333).

On cross-examination by the prosecution, appellant testified that he did not know what "condos" meant (T-327).  Anderson explained it to him before the first tape recorded conversation (T-327-328).

The $1750.00 that was found in the car was not appellant's money (T-303-304,320).  On cross-examination by the prosecution, appellant testified that his sister gave Katan the money to get an apartment (T-321).  Appellant did not remember testifying at a prior court hearing that he and Katan bound the money and brought it to the drug deal (T-322-324).

On cross-examination by the prosecution, Katan testified that his sister gave him the money to rent an apartment (T-350).  She did not give him any one-dollar bills (T-351-352).  Katan alone changed the money and made the bundles (T-351,353).

On direct examination,  Appellant testified that he did not go to Denny's for the meeting and did not appear on that video tape (T-304).  The black man that walked across the street was not him (T-304).  Later, appellant went to Denny's to look for his brother (T-304).  Anderson had told appellant that his brother was hurt and could not get out of the car (T-304).  When appellant went to help his brother, appellant was arrested (T-304).  On cross-examination, appellant testified that

he did not run (T-336).

On cross-examination by the prosecution, appellant testified "If it wasn't for Joe [Clark], I wouldn't see Heath Anderson. I could have been home or school if it wasn't for Joe [Clark]"(T-330). Appellant came to Florida because Joe told him that he could make "quick money, more money than [he] made from [his] paycheck" (T-332).

## SUMMARY OF ARGUMENT

Point I: To prove conspiracy, the state must establish that 2 or more persons agreed to commit an offense and that the defendant had the intent to commit the offense. In this case, it was the state's theory that appellant and Katan Maignan conspired to possess cocaine by stealing it from an undercover DEA agent. However, the state wholly failed to prove that there was an agreement between appellant and Katan to steal the cocaine. Thus, appellant's conviction for conspiracy to traffic in cocaine is not supported by the evidence and must be set aside.

Point II: The trial court misstated the law in charging the jury on conspiracy to traffic in cocaine. The court substituted the word "attempt" for the "intent." This changed the entire meaning of the charge and resulted in fundamental error.

Point III: The trial court should have dismissed the charge where the evidence established entrapment as a matter of law. The unrebutted testimony showed that appellant was induced to commit the offense by a confidential informant for the Drug Enforcement Administration. The informant promised appellant that he would make quick easy money if he met the undercover officer. Appellant was not otherwise predisposed to engage in a narcotics transaction. Thus, his conviction must be set aside.

Point IV: The instructions failed to inform the jury that the burden is on the state to prove predisposition beyond a reasonable doubt. Though there was no objection, a fundamental shift in the law has occurred excusing the need for an objection; alternatively, failure to instruct on reasonable doubt is fundamental error.

## ARGUMENT

### POINT I

**THE TRIAL COURT ERRED IN FAILING TO GRANT A JUDGEMENT OF ACQUITTAL WHERE THE STATE DID NOT ESTABLISH THAT APPELLANT COMMITTED CONSPIRACY TO TRAFFIC IN COCAINE.**

Appellant and Katan Maignan were jointly charged with conspiracy to traffic in cocaine by purchase or possession (R-1). The offense is comprised of two elements. First, the state must establish that there was an agreement between two or more persons to commit an offense. Second, the state must establish the intent to commit the offense. Pickover v. State, 580 So. 2d 287,289 (Fla. 4th DCA 1991); Saint Louis v. State, 561 So. 2d 628 (Fla. 2d DCA 1990).

Agreement is the gravamen of the charge. Sparkman v. State, 528 So. 2d 497,498 (Fla. 2d DCA 1988). The state must demonstrate that there was some prearrangement, some prior discussion, some plans or anything done in preparation to commit the offense. Gray v. State, 526 So. 2d 1020, 1021 (Fla. 5th DCA 1988) .

Where the state relies upon circumstantial evidence, it must be both consistent with guilt and inconsistent with any reasonable hypothesis of innocence. Kocol v. State, 546 So. 2d 1159,1160 (Fla. 5th DCA 1989). A defendant's presence at the scene of the offense is insufficient to prove conspiracy. Pennington v. State, 526 So. 2d 87 (Fla. 4th DCA 1987), approved 534 So. 2d 393 (Fla. 1988); Mickenburg v. State, 640 So. 2d 1210 (Fla. 2d DCA 1994). Likewise, presence coupled with flight will not support a conviction. Saint Louis v. State, 561 So. 2d at 628. As the appellate court recognized in Mickenburg v. State, 640 So. 2d at 1211, "One danger that lurks in the criminal charge

- 14 -

of conspiracy is the tendency to make the crime so elastic, sprawling and pervasive as to defy meaningful definition."

Below, the state conceded that it did not prove that appellant conspired to purchase cocaine (T-411-412). Instead, the state claimed that appellant conspired to possess cocaine by stealing it from the DEA agent.[3] (T-412-413). However, the state wholly failed to introduce any evidence that an agreement to steal the cocaine existed between appellant and Katan Maignan.

Preliminarily, although this precise argument was not presented to the trial court below, this Court may nonetheless reach merits of this issue. This Court must set aside a conviction where there is a complete lack of proof to support the charge. O'Connor v. State, 590 So. 2d 1018 (Fla. 5th DCA 1991).

Viewing the evidence in the light most favorable to the state, the proof showed that DEA agent Anderson contacted appellant because a confidential informant advised Anderson that appellant wanted to purchase a large amount of drugs (T-39-40). During their first telephone conversation, Anderson proposed selling two kilograms of wet cocaine for $33,000.00 to appellant (T-40-43). The following day, Anderson met appellant and Katan for the first time (T-43-44). Price as well as a tentative meeting location were discussed (T-44-46,53-54). The next morning, Anderson spoke with Katan by telephone and suggested a new location for the alleged transaction (T-59-68). Later that morning, Anderson and appellant discussed who would be present for the alleged

---

[3] On appeal, the state is bound by the theory it advanced in the trial court. See, Russell v. United States, 369 U.S. 749,763-65, 82 S. Ct. 1038, 8 L. Ed. 2d 240 (1962)(The charging document may not be so written as to let the prosecution "shift its theory of criminality so as to take advantage of each passing vicissitude of the trial and appeal"; See the discussion in Russell, 369 U.S. at 768.)

transaction (T-68-74). That afternoon, Anderson, the confidential informant and appellant spoke by telephone after which Katan and Anderson spoke (T-75-85). Katan told Anderson that he did not want to go through with the transaction (T-126-127). The deal was off (T-86,159,167). At some point, Anderson knew that appellant was afraid to do the deal (T-195).

Several hours later, Anderson spoke to Katan again (T-86,131-132). Katan and Anderson agreed to conduct the transaction alone at Denny's (T-87). The following day, Anderson saw appellant at Denny's (T-91). According to Anderson, appellant stated he gave the money to his brother to do the deal and then left (T-91-92).

Katan arrived (T-92-94). Anderson advised Katan that Anderson had a firearm on his person (T-94-95). Despite numerous requests by Anderson, Katan refused to show Anderson any money (T-102,110). Katan refused to conduct the transaction while Anderson carried the firearm (T-174-176). Katan and Anderson parted and the transaction never occurred (T-95,176). Shortly thereafter, Katan was arrested. Inside the vehicle he drove, law enforcement recovered an unloaded firearm from the driver's side floorboard. In addition, a bag containing 6 bundles of currency each of which was wrapped in a $100.00 bill was seized (T-228). A total of $1750.00 was recovered (T-232).

After Katan's arrest, Anderson contacted appellant (T-97,212,251-252). Appellant returned to the Denny's lot because Anderson told appellant that Katan had locked himself inside his vehicle and refused to do the deal (T-98,212). According to the state witnesses, appellant fled upon sight of Anderson and was apprehended (T-98,253-254).

This evidence establishes appellant initial presence at the scene of the aborted transaction. It shows his return to the scene hours later and his flight upon the sight of law enforcement. It in no

way shows that he had any discussions, made any prearrangements or had any plans with Katan to steal the cocaine from Anderson. <u>Pennington v. State</u>, 526 So. 2d at 87; <u>Saint Louis v. State</u>, 561 So. 2d at 628; <u>Mickenberg v. State</u>, 640 So. 2d at 1210. Absent any evidence of an agreement, the record does not contain a scintilla of proof to support appellant's conspiracy conviction upon the theory advanced by prosecution. <u>Gray v. State</u>, 526 So. 2d at 1021. Thus, this Court must set aside his judgment and sentence for conspiracy to traffic in cocaine.

## POINT II

**REVERSIBLE ERROR OCCURRED WHERE THE TRIAL COURT INCORRECTLY INSTRUCTED THE JURY ON AN ELEMENT OF CONSPIRACY.**

Appellant was charged with conspiracy to traffic in cocaine by purchase or possession (R-1). The offense consists of two elements. First, the state must establish that there was an agreement between to or more persons to commit an offense. Second, the state must establish the intent to commit the offense. Pickover v. State, 580 So. 2d 287,289 (Fla. 4th DCA 1991); Saint Louis v. State, 561 So. 2d 628 (Fla. 2d DCA 1990).

At bar, without objection, the trial court instructed the jury on conspiracy in pertinent part as follows:

> Before you can find the defendants Katan Maignan and/or Fritz Maignan guilty of criminal conspiracy, the State must prove the following two elements beyond a reasonable doubt:
>
> One, the **attempt** of Katan Maignan and Fritz Maignan was that the offense of trafficking in cocaine would be committed. Two, in order to carry out the **attempt**, Katan Maignan and Fritz Maignan agreed, conspired, combined, or confederated with each other or others unknown to the State's Attorneys Office to cause trafficking in cocaine to be committed, either by them or one of them or by some other person, or one.

(T-442). The trial court should have used the word **"intent"** instead of **"attempt"**. Fla Std. Jury Instr. (Crim.) at page 1214. By substituting the word "attempt" for "intent" the trial court omitted an essential element of the crime and thus, misstated the law in a material respect. § 777.04(3) Fla. Stat. Even in the absence of objection, it is fundamental and reversible error to give misleading instructions to a jury. Cristian v. State, 272 So. 2d 852 (Fla. 4th DCA 1973); Carter v. State, 469

- 18 -

So. 2d 194 (Fla. 2d DCA 1985). Appellant is entitled to a new trial. <u>Doyle v. State</u>, 483 So. 2d 89

(Fla. 4th DCA 1986) (substitution of the word "commission" for the phrase "immediate scene" in

the third degree murder instruction constituted fundamental error).

<u>**POINT III**</u>

**THE TRIAL COURT ERRED IN FAILING TO GRANT A JUDGMENT OF ACQUITTAL ON ENTRAPMENT AT THE CLOSE OF THE EVIDENCE.**

By pretrial motion to dismiss and by judgment of acquittal at the close of the evidence, Appellant presented a corroborated and unrebutted subjective entrapment defense both because the state failed to prove predisposition beyond a reasonable doubt, and because the defense had shown entrapment by a preponderance of the evidence.

In <u>Munoz v. State</u>, 629 So. 2d 90 (Fla. 1993), the Florida Supreme Court described the relative burdens of proof on a subjective entrapment defense:

> The first question to be addressed under the subjective test is whether an agent of the government induced the accused to commit the offense charged. On this issue, the accused has the burden of proof and, pursuant to section 777.201, must establish this factor by a preponderance of the evidence. If the first question is answered affirmatively, then a second question arises as to whether the accused was predisposed to commit the offense charged; that is, whether the accused was awaiting any propitious opportunity or was ready and willing, without persuasion, to commit the offense. On this second question, according to our decision in <u>Herrera</u>, the defendant initially has the burden to establish lack of predisposition. However, as soon as the defendant produces evidence of no predisposition, the burden then shifts to the prosecution to rebut this evidence beyond a reasonable doubt.

<u>Munoz v. State</u>, 629 So. 2d at 99.

While <u>Munoz</u> holds the case can be submitted to a jury "when factual issues are in dispute or when reasonable persons could draw different conclusions from the facts," trial and appellate courts retain the authority to rule on subjective entrapment as a matter of law:

> ... if the factual circumstances of a case are not in dispute, if the accused establishes that the government induced the accused to commit the offense charged, and if the State is unable to demonstrate

sufficient evidence of predisposition prior to and independent of the
government conduct at issue, then the trial judge has the authority to
rule on the issue as a matter of law because no factual "question of
predisposition" is at issue. See, e.g., Jacobson; Sherman. Such a
ruling could be proper even when the government presents evidence
of prior convictions. Sherman.

Munoz v. State, 629 So. 2d at 100.

On the initial question, the defense showed unrefuted evidence of inducement. At the

evidentiary hearing and at trial, appellant testified he met Joseph Clark while appellant was working

as a salesman at a New York Footlocker (SR-8-9, T-297,309). Clark went to the store 4 or 5 times

(SR-12, T-299). On several occasions, Clark told appellant that he had friends in Florida (T-299).

Clark told appellant that he could make quick and easy money ( SR-11, T-299). Clark told appellant

that he would make more money than he made working at Footlocker (T-299). At Clark's urging,

appellant came to Florida (T-300). Appellant, however, did not have the money to do a large

cocaine transaction (SR-24-25). Within days of his arrival, appellant was contacted by DEA special

agent Heath Anderson (SR-21, T-40,301).

The DEA did not have any information that appellant was involved in illegal drug activity

prior to Clark's instigation of the instant case (T-128). Appellant did not have a record of drug

related convictions or arrests (T-128-129). Moreover, prior to communicating with appellant,

Anderson did nothing to confirm the information he received from Clark (SR-57,62, T-186-187).

This unrebutted evidence established inducement and lack of predisposition by a preponderance of

the evidence. State v. Ramos, 632 So. 2d 1078 (Fla. 3d DCA 1994) (defendant met initial burden

where unrebutted evidence showed that confidential informant contacted defendant 15 times to

convince him to engage in transaction).

Having met his initial burden of proving inducement and lack of predisposition, the state was required to prove predisposition beyond a reasonable doubt. Munoz v. State, 629 So. 2d at 95. In Munoz, the court repeatedly stressed that the state must prove the predisposition existed both "prior to and independent of the government conduct at issue." 629 So. 2d at 95,100 (citing Jacobson v. United States, ___ U.S. ___, 112 S. Ct. 1535, 118 L. Ed. 2d 174 (1992)). That burden was not met at bar. To the contrary, the prosecution wholly failed to adduce any evidence of predisposition **prior to and independent of** the government's conduct here. Nadeau v. State, 683 So. 2d 504 (Fla. 4th DCA 1995); State v. Howell, 629 So. 2d 213 (Fla. 2d DCA 1993), rev. den. 639 So. 2d 981 (Fla. 1994); State v. Ramos, 632 So. 2d at 1079.

Rather, the prosecution relied upon appellant's telephone conversations with Anderson to show appellant's familiarity with cocaine. However, it was Anderson, not appellant that used the drug jargon "condos" to refer to cocaine (T-43). Similarly, it was Anderson that first suggested that wet cocaine could be sold if someone knew what to do with it, inferring it could be manufactured into crack (T-124). Under Munoz and Jacobson, such evidence cannot be considered in determining predisposition since it is coextensive with the government conduct which is being challenged. Fruetel v. State, 638 So. 2d 966 (Fla. 4th DCA 1994).

In Fruetel, this Court considered the sufficiency of the proof against an entrapment defense in a Munoz-remanded cocaine trafficking case. This Court rejected the defendant's sufficiency claim, finding sufficient evidence of predisposition. However, in so holding, this Court specifically found that the defendant's use of drug jargon during the deal, knowledge of how to test and mix the

cocaine which was demonstrated during the course of the deal, and agreement to take a discount on a future deal "does not demonstrate appellant's predisposition prior to and independent of the government acts." Fruetel, 638 So. 2d 969; see also, State v. Finno, 643 So. 2d 1166 (Fla. 4th DCA 1994).

As the state wholly failed to prove predisposition beyond a reasonable doubt, appellant's motion for judgment of acquittal should have been granted. Nadeau v. State, 638 So. 2d 504 at 969; State v. Finno, 643 So. 2d at 1170; State v. Ramos, 632 So. 2d at 1079. This case should be reversed with instructions to discharge.

## POINT IV

**THE CONVICTION VIOLATES DUE PROCESS OF LAW
BECAUSE THE JURY WAS NOT INSTRUCTED THAT THE
STATE HAD THE BURDEN OF PROVING PREDISPOSITION
BEYOND A REASONABLE DOUBT.**

In Munoz v. State, 629 So. 2d 90,99 (Fla. 1993), the Florida Supreme Court thoroughly

discussed the law of objective and subjective entrapment in Florida in light of Section 777.201,

Florida Statutes (1987). In Munoz, the Court held that in a subjective entrapment case tried to a jury,

once the defendant shows some evidence of a lack of predisposition, the burden shifts to the state

to prove predisposition beyond a reasonable doubt:

> The first question to be addressed under the subjective test is whether
> an agent of the government induced the accused to commit the
> offense charged. On this issue, the accused has the burden of proof
> and, pursuant to section 777.201, must establish this factor by a
> preponderance of the evidence. If the first question is answered
> affirmatively, then a second question arises as to whether the accused
> was predisposed to commit the offense charged; that is, whether the
> accused was awaiting any propitious opportunity or was ready and
> wiling, without persuasion, to commit the offense. On this second
> question, according to our decision in Herrera, the defendant initially
> has the burden to establish lack of predisposition. **However, as soon
> as the defendant produces evidence of no predisposition, the
> burden then shifts to the prosecution to rebut this evidence
> beyond a reasonable doubt....**

Munoz, 629 So. 2d at 99 (emphasis supplied).

In adopting the shifting burden of proof and reasonable doubt standard in Munoz, the Florida

Supreme Court relied heavily on the previous year's decision in Jacobson v. United States, _ U.S.

_, 112 S. Ct. 1535, 118 L. Ed. 2d ___ (1992). Jacobson is the entrapment case involving obscene

literature. The jury rejected the entrapment defense at trial, but the Court found it a matter of law,

- 24 -

holding the government had failed to meet its burden of proving predisposition. This burden, the Court held, is that the state must prove predisposition beyond a reasonable doubt. 112 S. Ct. at 1540.

The instruction in this case never informed the jury the state had the burden of proving predisposition beyond a reasonable doubt. In fact, it inaccurately told them just the opposite: that the burden was on the defense to show entrapment by a preponderance of the evidence:

> **On the issue of entrapment, the defendant must prove to you by a preponderance of the evidence that the criminal conduct occurred as a result of entrapment.**

(T-445) (Emphasis supplied). This instruction is plainly improper according to Munoz and Jacobson.

The standard instruction given here follows the language of Section 777.201, Florida Statutes (1991), and was upheld in Herrera v. State, 594 So. 2d 275 (Fla. 1992). But Herrera is no longer good law on this issue, because the law was changed in Munoz. As the Florida Supreme Court noted in Munoz, in Herrera the same court "did not discuss the subjective, two-step burden of proof test from Sorrells[4] or a trial court's ability to rule as a matter of law on the issue of entrapment. Moreover, at that time, the United States Supreme Court's decision in Jacobson had not been rendered." Munoz, 629 So. 2d at 97-98. According to Jacobson and Munoz, now it could not be clearer that "as soon as the defendant produces evidence of no predisposition, the burden then shifts to the prosecution to rebut this evidence beyond a reasonable doubt." Munoz, 629 So. 2d at 99. The jury here was not told that critical information, and reversal is required. Yohn v. State, 476 So. 2d

---

[4] Sorrells v. United States, 287 U.S. 435, 53 S. Ct. 210, 77 L. Ed. 2d 413 (1932).

- 25 -

123 (Fla. 1985) (reversed where standard instruction stated improper burden of proof on sanity).[5]

See Fruetel v. State, 638 So. 2d 966,970 n. 1 (Fla. 4th DCA May 25, 1994) (finding entrapment instruction that "the state must convince you beyond a reasonable doubt that [defendant] was not entrapped" "coincided with the standard for subjective entrapment as codified in section 777.201, Florida Statutes (1987)").

    Here, there was no objection. However, the failure to give the burden of proof and reasonable doubt instruction on this vigorously disputed predisposition element is a fundamental error. State v. Delva, 575 So. 2d 643 (Fla. 1991) (error in instruction not fundamental where element not in dispute); Motley v. State, 155 Fla. 545, 20 So. 2d 798, 800 (1945) (reversal of conviction where incorrect instruction on self defense); Bennett v. State, 173 So. 817 (Fla. 1937) (approved reaching merits of reasonable doubt instruction even though not preserved). See Screws v. United States, 325 U.S. 91, 107, 65 S. Ct. 1031, 89 L. Ed. 1495 (1945) (willfully depriving person of civil rights, but jury not instructed on meaning of "willfully": "where the error is so fundamental as not to submit to the jury the essential ingredients of the only offense on which the conviction could rest, we think it is necessary to take note of it on our own motion. Even those guilty of the most heinous offenses are entitled to a fair trial"). Reversal is required.

---

    [5] But see Rotenberry v. State, 468 So. 2d 971 (Fla. 1985) (no error under predecessor statute in refusing to instruct on burden of proof regarding entrapment defense). The Supreme Court later replaced the Rotenberry instruction with one allocating the burden of proof in The Florida Bar re: Standard Jury Instructions -- Criminal, 508 So. 2d 1221 (Fla. 1987).

## CONCLUSION

As to points I and III, based upon the arguments and authorities cited above, appellant requests that this Court vacate his conviction and sentence for conspiracy to traffic in cocaine and order his discharge.

As to points II and IV, based upon the arguments and authorities cited above, appellant requests that this Court reverse his conviction and sentence and remand the cause for a new trial.

Respectfully Submitted,

RICHARD L. JORANDBY
Public Defender
15th Judicial Circuit

MARCY K. ALLEN
Assistant Public Defender
Attorney for Fritz Maignan
421 Third Street, 6th Floor
West Palm Beach, Florida 33401
(407) 355-7600
Florida Bar No. 332161

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true copy hereof has been furnished by courier, to GEORGINA JIMENEZ-OROSA, Assistant Attorney General, 1655 Palm Beach Lakes Boulevard, Third Floor, West Palm Beach, Florida 33401, this 20 day of FEBRUARY, 1997.

MARCY K. ALLEN
Assistant Public Defender

- 27 -

**IN THE DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA**

**FOURTH DISTRICT**

RECEIVED
OFFICE OF THE
ATTORNEY GENERAL

OCT 16 1997

CRIMINAL OFFICE
WEST PALM BEACH

FRITZ MAIGNAN,

        Appellant,

vs.                                    CASE NO. 96-2152    *4-0283*

STATE OF FLORIDA,

        Appellee.                    *96-1-5331*

_____/

## MOTION FOR REHEARING

    Appellant, FRITZ MAIGNAN, by and through undersigned counsel pursuant to Florida Rule of Appellate Procedure 9.330 requests that this Court grant rehearing in the above styled case and as grounds states:

    1. On October 1, 1997, this Court per curiam affirmed appellant's conviction for conspiracy to traffic in cocaine and sentence to a 15 year mandatory minimum term of incarceration.

    2. The undersigned is well aware that a motion for rehearing is generally inappropriate where an appeal has been per curiam affirmed without written decision. The instant cause presents an exception.

    3. In point IV of his initial brief, appellant maintained that the fundamental error occurred where the jury was inaccurately instructed on the defense of entrapment. Specifically, the trial court failed to advise the jury that the state was required to prove predisposition beyond a reasonable doubt.

*EXHIBIT VI*

4. Subsequent to the filing of briefs, this Court issued a decision in <u>Vazquez v. State</u>, 22 Fla. L. Weekly D1630 (Fla. 4th DCA July 2, 1997), <u>question certified</u> 22 Fla. L. Weekly D2254 (Fla. 4th DCA Sept. 24, 1997). <u>Vazquez</u> was furnished as supplemental authority by the state and should have controlled disposition of this cause.

5. In <u>Vazquez</u>, this Court reversed a defendant's conviction for trafficking in cocaine where the court erred by declining his request to reopen cross-examination of the lead detective to facilitate the introduction of tape recorded conversations into evidence. This Court chose to reach the issue of whether the standard jury instruction on entrapment is a correct statement of law. This Court concluded that the instruction is "inaccurate or incomplete" in light of <u>Munoz v. State</u>, 629 So. 2d 90 (Fla. 1993), because it does not inform the jury that the burden to prove predisposition beyond a reasonable doubt returns to the prosecution where the defense shows some evidence of lack of predisposition. 22 Fla. L. Weekly at 1633. On rehearing this Court certified the following question as one of great public importance to the Florida Supreme Court:

> Does the inaccuracy or incompleteness of the current standard jury instruction for the defense of entrapment reflect a fundamental change in the law requiring retroactive application to all cases after Munoz, or is it instead an evolutionary change in the law requiring only prospective application?

22 Fla. L. Weekly at D2254. On September 25, 1997, the state filed its notice to invoke the discretionary jurisdiction of the Supreme Court.

6. At bar, the trial court gave the same inaccurate or incomplete instruction on entrapment which this Court disapproved in <u>Vazquez</u>. Based upon the timing of the issuance of the <u>Vazquez</u> opinion it is conceivable that this Court may have overlooked the application of <u>Vazquez</u> to the instant cause. Consequently, appellant requests that this Court reconsider its per curiam affirmance of appellant's conviction and sentence.

-2-

WHEREFORE, appellant requests that this Court grant rehearing and issue a decision which reverses his conviction and sentence and remands the cause for a new trial based upon the trial court's inaccurate or incomplete instruction to the jury on the law of entrapment.

Respectfully Submitted,

RICHARD L. JORANDBY
Public Defender
15th Judicial Circuit

MARCY K. ALLEN
Assistant Public Defender
Attorney for Appellant
Criminal Justice Building
421 Third Street, 6th Floor
West Palm Beach, Florida 33401
(407) 355-7600
Florida Bar No. 332161

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true copy hereof has been furnished by courier, to ETTIE FEISTMANN, Assistant Attorney General, 1655 Palm Beach Lakes Boulevard, Third Floor, West Palm Beach, Florida 33401, this 15 day of OCTOBER, 1997.

MARCY K. ALLEN
Assistant Public Defender

issued a mandate on November 13, 1995. Thereafter, Edwards filed a motion to amend the judgment. She argued entitlement to the full amount of the punitive damage award due to the repeal of section 768.73(2), Florida Statutes (1993), by operation of law effective July 1, 1995. On January 17, 1996, the trial court granted Edwards' motion and amended the final judgment to provide her with the full amount of the punitive damage award.

The trial court apparently entered the amended final judgment pursuant to Florida Rule of Civil Procedure 1.540(b) (1993). Edwards correctly asserts that the trial court had jurisdiction pursuant to rule 1.540(b) to consider her motion to amend the final judgment. See Ohio Cas. Group v. Parrish, 350 So. 2d 466 (Fla. 1977). However, no substantive change was made to the estate between the time the claim accrued in 1992 and the rendition of the original final judgment.[1] Therefore, we hold that the repeal of section 768.73(2) did not constitute a valid reason for relief under rule 1.540(b).

We also hold that because the verdict and final judgment awarding the Department a portion of the punitive damages were rendered before the repeal of the statute, the award vested subject to appellate review. See Division of Worker's Comp., Bureau of Crimes Comp. v. Brevda, 420 So. 2d 887 (Fla. 1st DCA 1982). After this court affirmed the judgment, in the absence of a valid ground for relief from judgment pursuant to rule 1.540(b), the trial court did not have authority to divest the Department of its entitlement to the punitive damage award.

Accordingly, we reverse the amended final judgment. We remand this cause and direct the trial court to reinstate the original final judgment.

REVERSED AND REMANDED. (GLICKSTEIN and SHAHOOD, JJ., concur.)

[1]The amendment to section 768.73(2) provided that it "shall take effect April 8, 1992] and apply to pending cases and causes of action in which a judgment has not been entered." § 768.73(2)n.1, Fla. Stat. (1992).

\* \* \*

Criminal law—Trafficking in cocaine—Entrapment—Abuse of discretion to refuse to permit defendant to reopen cross-examination of lead detective for purpose of introducing into evidence additional tape recording relating to dealings with confidential informant who allegedly persuaded defendant to sell cocaine by offering to give defendant a substantial amount of marijuana free—Fact that defendant could have introduced evidence by calling detective as his own witness no basis for refusal to reopen cross-examination which had as its purpose the weakening of testimony given by the witness on direct examination by the state—Because portions of tape recordings of conversations between defendant and informant were admitted on direct examination, additional tape recording which defendant sought to admit was proper subject of cross-examination under rule of completeness—Tape on which informant said he would "give" defendant marijuana was crucial to defendant's theory of the case—Jury instructions—Standard jury instruction on entrapment does not fairly and correctly present the current state of the law on entrapment—If on remand, trial court determines that evidence is sufficient to submit issue of entrapment to jury, instruction given must adequately reflect current state of the law

RAUL VAZQUEZ, Appellant, v. STATE OF FLORIDA, Appellee. 4th District. Case No. 96-0072. Opinion filed July 2, 1997. Appeal from the Circuit Court for the Seventeenth Judicial Circuit, Broward County; Carole Y. Taylor, Judge; L.T. Case No. 94-21177CF10A. Counsel: Richard L. Jorandby, Public Defender, and Steven H. Malone, Assistant Public Defender, West Palm Beach, for appellant. Robert A. Butterworth, Attorney General, Tallahassee, and Diana Block, Assistant Attorney General, Tampa, for appellee.

(FARMER, J.) In this case where entrapment was a defense, the trial judge refused to reopen cross examination of a detective for the purpose of admitting additional parts of tape recordings relating to dealings with a confidential informant. Defendant also argues that the standard jury instruction on entrapment failed,

under the facts of this case, to fully accurate instruction on the current state of the law. We reverse.

Defendant was charged with trafficking in cocaine after he sold the drug to an informant. A number of conversations leading up to this transaction were recorded and adduced as evidence at trial. Defendant claimed that, to persuade him to sell the informant cocaine, the informant offered to give him a substantial amount of marijuana for free. He also alleged, and evidence was adduced at trial to support the contention, that he had not been in the business of selling drugs for a substantial number of years before being approached by the informant.

## I. Re-Opening Evidence for Cross-Examination

Defendant argues that the trial judge erred in refusing to allow him to reopen cross-examination of the lead detective for the purpose of introducing into evidence additional tape recordings of the conversations between the contact and the informant. The state argues that defendant could have called the detective as his own witness, and thereby offered the tapes into evidence. He did not do so because he did not wish to assert a defense and thus lose the right to open and close final argument. See Fla. R. Crim. P. 3.250.

In Louisy v. State, 667 So. 2d 972 (Fla. 4th DCA 1996), we reversed a trial court's refusal to reopen the defense to present crucial evidence, saying that:

"Although the decision to allow a case to be reopened involves sound judicial discretion not usually interfered with on the appellate level [c.o.] a denial will be reversed where the request is timely made and the jury will be deprived of evidence which might have had a significant impact upon the issues to be resolved. Delgado v. State, 573 So. 2d 83, 86 (Fla. 2d DCA 1990). . . ."

667 So. 2d at 974. The rationale behind Louisy and other such cases is that in some circumstances the refusal to re-open a case is "to enforce a rule of procedure almost to the point of a denial of justice." Steffanos v. State, 80 Fla. 309, 86 So. 204, 205 (1920); see also State v. Ellis, 491 So. 2d 1296, 1297 (Fla. 3d DCA 1986). The state argues in effect that there is no denial of justice where the defendant could so easily have adduced the same evidence during his own defense.

In Hahn v. State, 58 So. 2d 188 (Fla. 1952), where the charge was first degree murder and defendant claimed self-defense, the state called a witness who testified that the victim had not threatened defendant just before the killing. Although defendant cross-examined the witness, he failed to lay the necessary foundation for impeachment through a hearsay statement he had intended to introduce through another witness. When counsel later realized the error, he unsuccessfully sought to recall the state's witness to lay the proper foundation. After the court offered to allow defense counsel to call the witness as his own witness, counsel declined the offer. The supreme court held that the trial judge had abused his discretion in refusing to allow defendant to recall the witness, saying that:

"Rules of practice and their employment in the conduct of trials are not inflexible. Their strict or technical enforcement cannot straight jacket the justice of the cause. Primarily, they are formulated and employed so that the Court may regulate and keep within legal bounds the general conduct of the trial. This Court has always recognized that a trial Court has wide latitude in regulating the conduct of trials in order that the administration of justice be speedily and fairly achieved in an orderly, dignified manner and befitting the gravity of the business in hand. In this function the trial Judge exercises the sound discretion with which he is vested. This discretion may be invoked and its exercise reasonably required for many reasons. It may be invoked when counsel in the stress of trials either overlooks or fails to offer proof of a material matter or otherwise fails in his duty to his client in the conduct of his case. In a grave case, as here, where defendant's life was in jeopardy his ineptitude alone is enough."

58 So. 2d at 191. Aside from the fact that the charges here do not involve a capital offense, it is difficult to find any meaningful difference with *Hahn*.

The distinction between cross examination of a state witness and calling the same person as a defense witness to lay a predicate for a defensive matter was also the basis for the decision in *Coco v. State*, 62 So. 2d 892 (Fla. 1953). There, defendant was also charged with first degree murder, but the jury ultimately convicted him of the lesser included offense of second degree murder. The state had called a police officer to authenticate two fingerprint cards as a predicate for later testimony of the state's fingerprint expert. On cross-examination, defense counsel sought to question the officer regarding a comparison made between the fingerprints on the murder weapon and defendant's fingerprints. The state objected, and the trial court sustained the objection, ruling that the cross-examination exceeded the scope of direct. More importantly for our purposes, in order to present the same testimony to the jury, the trial judge felt that defense counsel could call the witness as defendant's own. In reversing the supreme court stated that:

"In the recent case of *Hahn v. State* [c.o.] we had the almost identical question before us and without equivocation we held that it was fatal error for the trial court to deny defense counsel the right of cross-examination for the purpose of laying a predicate for impeachment. The vital question in that case was not one of identity but was whether the defendant killed the deceased while acting in self-defense. However, the analogy between that case and the instant suit is so clear-cut as to be unquestioned authority for a reversal herein.

"Moreover, the distinction between the two criminal actions consists of a difference which is more favorable to a reversal in the instant, than in the *Hahn v. State*, case. The propriety of recalling a witness for the State for further cross-examination after the State has rested its case for the purpose of laying a predicate for impeachment is a matter which rests in the sound judicial discretion of the court. On the other hand, the right of a full and fair cross-examination of a witness upon subjects the door to which is pushed ajar on the examination in chief is an absolute right which has as its genesis Section 11 of the Florida Declaration of Rights. This Section provides that an accused shall have the right 'to meet the witnesses against him face to face' in open court before an impartial jury."

62 So. 2d at 896.[1] In our opinion, the circumstances in *Coco* are essentially identical to this case. They involve the defendant's right to introduce a defensive matter through cross-examination, rather than by direct examination in his own case. In other words, although the court has discretion in determining whether a case should be re-opened, under *Hahn* and *Coco* this discretion is abused when it touches upon the right to cross-examination that has its purpose the weakening of the testimony given by the witness on direct examination by the state.

There is one difference between this case and *Coco*, however, but it strengthens the defendant's argument. It involves the rule of completeness, which allows an adverse party—*at the time* a portion of a writing or recorded statement is introduced—to have another portion or another statement or writing introduced that should, in fairness, be considered *contemporaneously*. § 90.108, Fla. Stat. (1995). It has thus been noted that:

"If counsel for the adverse party does not seek to invoke section 90.108 at the time the writing or document is offered, the provision may not be utilized during cross-examination or during the party's own case. However, section 90.108 does not prohibit evidence of the remainder of the writing or document; the evidence would have to be subjected to proper cross-examination or meet the usual test of admissibility if offered during counsel's case."

Charles W. Ehrhardt, FLORIDA EVIDENCE § 108.1 at 34 (1995). Despite this, it has generally been held that the rule of complete-

ness allows the admission of otherwise inadmissible evidence during cross-examination, if fairness so requires.

Thus, in *Christopher v. State*, 583 So. 2d 642 (Fla. 1991), the court rejected the state's argument that, because statements sought to be admitted on cross-examination were hearsay, they were inadmissible, the court explaining as follows:

"When the state offers in evidence a part of a confession or admission against interest, the defendant is entitled to bring out on cross-examination the entire confession or admission. *Louette v. State*, 152 Fla. 495, 12 So. 2d 168 (1943). In *Eberhardt v. State*, 550 So. 2d 102, 105 (Fla. 1st DCA 1989), *review denied*, 560 So. 2d 234 (Fla. 1990), the rule was applied as follows:

'Because portions of the defendant's conversation with the officer were admitted on direct examination, the rule of completeness generally allows admission of the balance of the conversation as well as other related conversations that in fairness are necessary for the jury to accurately perceive the whole context of what has transpired between the two. Ehrhardt, *Florida Evidence*, §108.1 (2d Ed. 1984). Once the officer testified in the state's case-in-chief about one portion of Eberhardt's statements to him, the court erred in sustaining the state's hearsay objection for the reason that his statements he was 'high' or intoxicated were self serving. *Heathcoat v. State*, 430 So. 2d 945 (Fla. 2d DCA), *aff'd*, 442 So. 2d 955 (Fla. 1983).'"

583 So. 2d at 646. Again, we find this rationale directly applicable to the present case.

When entrapment is an issue, there are essentially two elements involved: whether the police or one of their agents induced the defendant to commit the crime charged, and whether the defendant was predisposed to commit the crime anyway. *Munoz v. State*, 629 So. 2d 90 (Fla. 1993). The tape sought to be admitted was one of many conversations between the defendant and the informant. It is thus indisputably relevant to the defense of entrapment, particularly in light of the statement on the tape that the contact hadn't seen defendant in a long time, and that the informant would let defendant "have" the marijuana. We therefore conclude that the rule of completeness is directly applicable.

Thus, because the tape was a proper subject for cross-examination under the rule of completeness, *Hahn* and *Coco* even more strongly required the trial judge to permit cross-examination to be reopened to allow their admission during the state's case. Under the holdings in those cases, it does not matter that the same evidence could have been admitted in the defendant's own case, as long as it was in the nature of impeachment or weakening of the state's direct testimony.

Moreover, in light of the evidence in this case, we can not say that exclusion of the tape was harmless. First, the tape on which the informant said he would "give" defendant the marijuana was crucial to defendant's theory of the case. While there were a number of other tapes that indicated that the informant was going to sell the marijuana to defendant, such conflicts are the very purpose of trial by jury. *Munoz*, 629 So. 2d at 100 ("Such direction is consistent with the subjective evaluation of entrapment because the two factual issues above ordinarily present questions of disputed facts to be submitted to the jury as the trier of fact."). And while it is for the trial judge to determine in the first instance whether there is sufficient evidence to allow the defense of entrapment to go to the jury, we cannot say on this record that even with the omitted evidence having been included that the evidence was clearly insufficient.

We stress that we are not making any decision as to the sufficiency of the evidence to support defendant's entrapment theory. In fact, we note that the evidence of an inducement with an offer of an illegal drug would seem to negate defendant's allegation that he was not predisposed to commit the crime. At the same time, however, we understand defendant to claim that the informant was offering a substantial sum of money significantly greater than what defendant might otherwise have realized from a sale

of the cocaine. In other words, if the jury believed that the informant was offering free marijuana, a jury might find that the value of the marijuana served as the inducement. We leave all of this, however, to the trial judge and, if sufficient, to the jury to sort out in the retrial. We merely hold for now that, under *Hahn* and *Coco*, it was error to deny defendant the opportunity to re-open the cross-examination to introduce the additional tape recordings.

## II. Jury Instruction on Entrapment

Defendant also argues that the trial judge erred in giving the standard jury instruction on entrapment, contending that part of the instruction addressing predisposition is now incorrect in light of our supreme court's recent opinion in *Munoz v. State*, 629 So. 2d 90 (Fla. 1993).[2] The pertinent text of the current standard jury instruction on entrapment is as follows:

"[Defendant] was entrapped if

1. he was, for the purpose of obtaining evidence of the commission of a crime, induced or encouraged to engage in conduct constituting the crime of [crime charged], and

2. he engaged in such conduct as the direct result of such inducement or encouragement, and

  . . .

4. the person who induced or encouraged him employed methods of persuasion or inducement which created a substantial risk that the crime would be committed by a person other than one who was ready to commit it, and

5. [Defendant] was not a person who was ready to commit the crime.

It is not entrapment if [defendant] had the predisposition to commit the [crime charged]. [Defendant] had the predisposition if before any law enforcement officer or person acting for the officer persuaded, induced, or lured [defendant], he had a readiness or willingness to commit [crime charged] if the opportunity presented itself.

  . . .

*"On the issue of entrapment, the defendant must prove to you by a preponderance of the evidence that his criminal conduct occurred as a result of entrapment."* [e.s.]

Fla. Std. Jury Instr. (Crim.) 39a–39b (1989). Before the adoption of this amended instruction in 1989, the final paragraph of the standard instruction on entrapment had read: "On the issue of entrapment, the State must convince you beyond a reasonable doubt that the defendant was not entrapped." When the drafting committee transmitted the proposed new instruction to the court, specifically called the court's attention to this change in the instruction on burden of proof for entrapment. *In re Standard Jury Instr. in Criminal Cases*, 543 So. 2d 1205 (Fla. 1989). The court adopted the change without comment, however.[3]

Entrapment as a theory of defense originated in *Sorrells v. United States*, 287 U.S. 435 (1932). The theory adopted came to be called the "subjective" theory of entrapment, and there was general agreement that it involved two separate elements: "inducement" and "predisposition of the accused to commit the crime." *Sherman v. United States*, 356 U.S. 369 (1958). In *Cruz v. State*, 465 So.2d 516 (Fla.), *cert. denied*, 473 U.S. 905 (1985), the Florida Supreme Court specifically rejected the objective test for entrapment, however, and adopted instead the basic principles of the "objective" standard of entrapment. When the legislature enacted section 777.201 in 1987, it overrode *Cruz* to the extent that *Cruz* was not founded on a constitutional basis, and specifically adopted the subjective test for entrapment as the substantive law in Florida. In *Herrera v. State*, So.2d 275 (Fla. 1992), the court considered a certified question from this court as to whether section 777.210 unconstitutionally shifted the burden of proof to the defendant to prove entrapment.[4] The court held that the statute was not unconstitutional on ground, explaining as follows:

"Herrera argues that this Court's decisions on previous versions of the entrapment instruction, e.g., *State v. Wheeler*, 468 So.2d 978 (Fla. 1985), demonstrate that the new instruction and subsection 777.201(2) violate the due process clauses of the United States and Florida Constitutions. The State, on the other hand, contends that the instruction and statute are constitutional because they shift only the burden of persuasion of an affirmative defense, not the burden of proving the elements of the crime charged and the defendant's guilt. The two district courts that have considered this issue have agreed with the State. *E.g.*, *Krajewski v. State*, 587 So.2d 1175 (Fla. 4th DCA 1991); *Gonzalez v. State*, 571 So.2d 1346 (Fla. 3d DCA 1990), *review denied*, 584 So.2d 998 (Fla. 1991). We do likewise.

"Entrapment is a judicially created affirmative defense designed to prevent the government from contending a defendant 'is guilty of a crime where the government officials are the instigators of his conduct.' *Sorrells v. United States*, 287 U.S. 435, 452, 53 S.Ct. 210, 216, 77 L.Ed. 413 (1932). To this end, '[t]he predisposition and criminal design of the defendant are relevant.' *Id.* at 451, 53 S.Ct. at 216. If the defendant 'is a person otherwise innocent whom the government is seeking to punish for an alleged offense which is the product of the creative activity of its own officials . . . . common justice requires that the accused be permitted to prove it.' *Id.* Thus, we have defined the 'essential element of the defense of entrapment' as 'the absence of a predisposition of the defendant to commit the offense.' *State v. Dickinson*, 370 So.2d 762, 763 (Fla. 1979). Subsection 777.201(1) now provides that lack of predisposition is an element of the defense.

"Over the years Florida courts have gone back and forth on which side must produce evidence regarding the defendant's having been entrapped. Some cases hold that defendants must show entrapment by proving their lack of predisposition toward criminal activity. . . . Other cases have held that the State must disprove entrapment by showing the defendant's predisposition to commit the offense. . . . Subsection 777.201(2) evidences the legislature's intent that the defendant should prove entrapment instead of requiring the State to disprove it."

594 So. 2d at 277. After noting that the burden of proving the elements of a crime may not, under the Due Process Clause, be shifted to the defendant, *Sandstrom v. Montana*, 442 U.S. 510 (1979), the court held:

"For the first time the State, through the legislature, has decided that the burden is on defendants claiming entrapment to prove that they were entrapped. § 777.201(2). We hold that allocating this burden to a defendant is not unconstitutional. *Cf. Patterson [v. New York*, 432 U.S. 197, 210, (1977)] (the Court refused 'to adopt as a constitutional imperative, operative countrywide, that a State must disprove beyond a reasonable doubt every fact constituting any and all affirmative defenses related to the culpability of the accused' because '[p]roof of the nonexistence of all affirmative defenses has never been constitutionally required.')

"As stated earlier, the lack of predisposition to commit the crime charged is an essential element of the defense of entrapment. The predisposition to commit a crime, however, is not the same as the intent to commit that crime. As explained by the New Jersey Supreme Court in its consideration of this issue, 'predisposition is not the same as mens rea. The former involves the defendant's character and criminal inclinations; the latter involves the defendant's state of mind while carrying out the allegedly criminal act.' *State v. Rockholt*, 96 N.J. 570, 476 A.2d 1236, 1242 (1984). Requiring a defendant to show lack of predisposition does not relieve the State of its burden to prove that the defendant committed the crime charged."

594 So. 2d at 278. Thus, the court explicitly recognized that section 777.201 was not unconstitutional in requiring a defendant to prove lack of predisposition to commit the crime charged.

Exactly two months after *Herrera* was decided by the Florida Supreme Court, the United States Supreme Court handed down its own entrapment decision, which also addressed the defendant's burden of proof in establishing this defense. In *Jacobson v. United States*, 503 U.S. 540 (1992), the Court set aside a convic-

tion upon a conclusion that the defendant was entrapped as a matter of law. The Court said:

> "In their zeal to enforce the law, however, Government agents may not originate a criminal design, implant in an innocent person's mind the disposition to commit a criminal act, and then induce commission of the crime so that the Government may prosecute. [c.o.] Where the Government has induced an individual to break the law and the defense of entrapment is at issue, as it was in this case, *the prosecution must prove beyond reasonable doubt that the defendant was disposed to commit the criminal act prior to first being approached by Government agents.*[2]" [e.s.]

> [2]"Inducement is not at issue in this case. The Government does not dispute that it induced petitioner to commit the crime. *The sole issue is whether the Government carried its burden of proving that petitioner was predisposed to violate the law before the Government intervened. The dissent is mistaken in claiming that this is an innovation in entrapment law and in suggesting that the Government's conduct prior to the moment of solicitation is irrelevant.* See post, at 1544-1545. *The Court rejected these arguments six decades ago in Sorrells. . . .* Indeed, the proposition that the accused must be predisposed prior to contact with law enforcement officers is so firmly established that the Government conceded the point at oral argument, submitting that the evidence it developed during the course of its investigation was probative because it indicated petitioner's state of mind prior to the commencement of the Government's investigation." [e.s.]

503 U.S. at 508–509. Hence, under *Jacobson* it is the prosecution rather than the defendant that has the burden of proving predisposition beyond a reasonable doubt.

In *Munoz v. State*, 629 So. 2d 90 (1993), where the court next confronted the issue, the court faced conflicting decisions among the district courts of appeal as to whether section 777.201 had abolished objective entrapment in Florida. It began by noting that its previous decisions, coupled with the enactment of section 777.201, had created substantial uncertainty. Its basic holding in *Munoz* is that while the legislature did in fact eliminate objective entrapment, the legislature could not prohibit the judiciary from reviewing the application of entrapment in any individual case for possible violations under the Due Process Clause; and, further, that the courts have the power to conclude in any case that entrapment was established as a matter of law.

During the course of its opinion in *Munoz*, the court canvassed the history of entrapment in both supreme courts. The court summarized the federal holding on entrapment thus:

> "In summary, under the subjective test set forth by the United States Supreme Court, *once a defendant raises entrapment as a defense, the defendant has the burden to establish that the government induced the defendant to commit the offense charged. However, once that burden is met, the burden shifts to the government to establish the defendant's predisposition to commit the offense.* [c.o.] In proving a defendant's predisposition, the government must establish that the defendant was predisposed to commit the offense both prior to and independent of the government's inducement. [c.o.] In doing so, the government may make an appropriate and searching inquiry into the conduct of the defendant and present evidence of the defendant's prior criminal history so long as that history is relevant to the issue of the defendant's predisposition." [e.s.]

629 So. 2d at 95. Later, after discussing the Florida decisions, the court noted that when *Herrera* was decided "at that time, the United States Supreme Court's decision in *Jacobson* had not been rendered." 629 So. 2d at 97. It was at this point that the court candidly acknowledged the uncertainty of the entrapment law in Florida.

Turning its attention to section 777.201, the court stated:

> "The first question to be addressed under the subjective test is whether an agent of the government induced the accused to commit the offense charged. On this issue, the accused has the burden of proof and, pursuant to section 777.201, must establish this

factor by a preponderance of the evidence. If the first question is answered affirmatively, the second question arises as to whether the accused was predisposed to commit the offense charged; that is, whether the accused was awaiting any propitious opportunity or was ready and willing, without persuasion, to commit the offense. On this second question, according to our decision in *Herrera*, the defendant initially has the burden to establish lack of predisposition. *However, as soon as the defendant produces evidence of no predisposition, the burden then shifts to the prosecution to rebut this evidence beyond a reasonable doubt.* In rebutting the defendant's evidence of lack of predisposition, the prosecution may make 'an appropriate and searching inquiry' into the conduct of the accused and present evidence of the accused's prior criminal history, even though such evidence is normally inadmissible. However, admission of evidence of predisposition is limited to the extent it demonstrates predisposition on the part of the accused both prior to and independent of the government acts. . . .

> "The third question under the subjective test is whether the entrapment evaluation should be submitted to the jury. Section 777.201 directs that the issue of entrapment be submitted to the trier of fact. Such direction is consistent with the subjective evaluation of entrapment because the two factual issues above ordinarily present questions of disputed facts to be submitted to the jury as the trier of fact. However, if the factual circumstances of a case are not in dispute, if the accused establishes that the government induced the accused to commit the offense charged, and if the State is unable to demonstrate sufficient evidence of predisposition prior to and independent of the government conduct at issue, then the trial judge has the authority to rule on the issue of predisposition as a matter of law." [e.s.]

629 So. 2d at 99-100. It is apparent from *Munoz* that the court has now aligned the law of entrapment in Florida and the shifting burden of proof with that of the United States Supreme Court in *Jacobson*.

Under this new formulation set forth in *Munoz*, it seems clear that the following text from the current standard jury instruction is inaccurate or incomplete:

> "the defendant must prove to you by a preponderance of the evidence that his criminal conduct occurred as a result of entrapment."

*Munoz* held that the defendant has the burden of proving inducement. Moreover, once defendant presents any evidence showing a lack of predisposition, the burden of proving predisposition then shifts back to the prosecution to overcome the defendant's showing beyond a reasonable doubt. Thus, we agree that the standard jury instruction does not fairly and correctly present the current state of the law on this issue. The trial judge should therefore have given an instruction that complies with *Munoz*. *State v. Bryan*, 287 So. 2d 73 (Fla. 1973), *cert. denied*, 417 U.S. 912 (1974) (despite the supreme court's approval of the standard jury instructions, the trial judge is not relieved of his or her responsibility under the law to correctly charge the jury).

It should be noted that the judge is not necessarily required to submit the issue of entrapment to the jury. *Munoz* held that the judge may decide the issue as a matter of law where the facts are not in dispute. Accordingly, we leave this option open to the trial judge in this case; if she submits the issue to the jury, however, we think the instruction given must adequately reflect the current state of the law.

REVERSED. (GLICKSTEIN and GROSS, JJ., concur.)

---

[1]*See* § 16(a), Art. I, Fla. Const. (as amended 1988) (accused shall have right "to confront at trial adverse witnesses").

[2]Ordinarily, because of mootness, we would not now address this jury instruction issue. The parties have fully briefed the issue, and it is material to the issues tried. Moreover, it is very probable that the issue will remain unsettled throughout the retrial, and so we address it now in the interests of justice and to facilitate the ultimate disposition of this case.

[1]This amended instruction, in turn, copied the text of applicable statute, which reads:

"(1) [An officer] perpetrates an entrapment if, for the purpose of obtaining evidence of the commission of a crime, he induces or encourages and, as a direct result, causes another person to engage in conduct constituting such crime by employing methods of persuasion or inducement which create a substantial risk that such crime will be committed by a person other than one who is ready to commit it.

"(2) A person prosecuted for a crime shall be acquitted if he proves by a preponderance of the evidence that his criminal conduct occurred as a result of an entrapment. The issue of entrapment shall be tried by the trier of fact."

[i] 777.201, Fla. Stat. (1995).

[4]See Herrera v. State, 580 So.2d 653, 654 (Fla. 4th DCA 1991).

* * *

**Torts—Action against corrections officers by plaintiff who, while incarcerated, was assaulted by fellow inmate—Allegations that defendants ignored repeated pleas for protection, that assault occurred in presence of one of defendants, that defendants had prior knowledge of or reason to anticipate danger to plaintiff, and that defendants acted in bad faith and with malicious purpose in failing to take protective action sufficient to state cause of action—Error to grant motion to dismiss**

JOHN W. HARRIS, Appellant, v. ANTHONY MONDS and KENNETH MITCHELL, Appellees. 4th District. Case No. 96-1382. Opinion filed July 2, 1997. Appeal from the Circuit Court for the Nineteenth Judicial Circuit, Martin County; Cynthia G. Angelos, Judge; L.T. Case No. 94-174-CA. Counsel: John W. Harris, Defuniak Springs, pro se. Karen M. Nissen of Vernis & Bowling of Palm Beach, P.A., Jupiter, for appellees.

(PARIENTE, J.) This is an appeal from the dismissal of appellant's seventh amended complaint. In considering a motion to dismiss, we are obligated to accept all factual allegations in the complaint as true. See Laganella v. Boca Grove & Tennis Club, Inc., 690 So.2d 705, 706 (Fla. 4th DCA 1997); Hollywood Lakes Section Civic Ass'n v. City of Hollywood, 676 So.2d 500, 501 (Fla. 4th DCA 1996). In accordance with this principle, we are compelled to reverse.

Appellant's cause of action arises out of injuries he claims he sustained while incarcerated. Because appellant was in custody at the time of his alleged injuries, he was owed a common law duty of reasonable care by the corrections officers charged with his supervision. See Department of Health & Rehabilitative Servs. v. Whaley, 574 So.2d 100, 103 (Fla. 1991); Hutchinson v. Miller, 548 So.2d 883, 885 (Fla. 5th DCA 1989); Dunagan v. Seely, 533 So.2d 867 (Fla. 1st DCA 1988). This duty is an operational level function not protected by sovereign immunity. See Whaley, 574 So.2d at 103; Hutchinson, 548 So.2d at 886; Dunagan, 533 So.2d at 868.

In the cases relied on by appellees, either the plaintiffs were not incarcerated or no special relationship existed giving rise to the common law duty of reasonable care. See, e.g., George v. Vitek Community Control Corp., 639 So.2d 661 (Fla. 4th DCA 1994). Because appellant was in custody at the time of the alleged injuries, these cases are inapposite.

Appellant alleges a breach of appellees' duty to protect him from assault by a fellow inmate. The gist of the factual allegations of appellant's seventh amended complaint is that appellees ignored his repeated pleas for protection, and that the assault in fact occurred in the presence of one of the appellees. Appellant further alleges that appellees had prior knowledge of or reason to anticipate the danger to appellant.

Appellant also alleges that appellees, by failing to take action to protect him from this known danger, acted in bad faith and with malicious purpose. Because appellees have been sued in their individual capacities, this additional allegation must be proved in order to exempt them from the protective cloak of sovereign immunity.[1] See § 768.28(9)(a), Fla. Stat. (1995).

If appellant is unable to establish facts sufficient to support a finding that appellees acted in bad faith, with malicious purpose, or in a manner exhibiting a wanton and willful disregard of his safety, appellees will be entitled to a judgment in their favor. At this stage of the proceedings, however, the allegations of appellant's seventh amended complaint state a cause of action. Accordingly, we reverse and remand with directions to reinstate the seventh amended complaint.

REVERSED (GLICKSTEIN and KLEIN, JJ., concur.)

[1]Our court has held that the duty to protect a prisoner from injuries caused by a third party arises only if there is knowledge of the danger or at least reason to anticipate such danger. See Spann v. State Dep't of Corrections, 421 So.2d 1090, 1091 (Fla. 4th DCA 1982), petition for review denied, 430 So.2d 452 (Fla. 1983). Spann has been followed by the fifth district in Hinson v. Miller, 681 So.2d 1213 (5th DCA 1996). Concerned that Spann imposed an "exceptional element" to establish foreseeability, the first district declined to follow Spann in Jackson v. Milner, 654 So.2d 1045 (Fla. 1st DCA), review denied, 662 So.2d 932 (Fla. 1995). Spann and Jackson both involved suits against the governmental agency and not against the individual employees.

* * *

**Criminal law—Trial court's restriction on defense counsel's direct examination of defendant was harmful error—Questioning concerning substance of defendant's prior convictions would have revealed that prior convictions concerned credit card fraud, not sexual assault type offenses—If defendant had been permitted to explain that he pled guilty in prior case because he was guilty, implied assertion would have been that he was not guilty in instant case because he chose to go to trial—Where only eyewitness testimony as to what happened was conflicting testimony of victim and defendant, credibility of defendant was significant issue**

JOHN ZIERMANN, Appellant, v. STATE OF FLORIDA, Appellee. 4th District. Case No. 96-2701. Opinion filed July 2, 1997. Appeal from the Circuit Court for the Seventeenth Judicial Circuit, Broward County; Mark A. Speiser, Judge; L.T. Case Nos. 93-18039 CF10A & 95-22043 CF10A. Counsel: John H. Pelzer and Allyson D. Goodwin of Ruden, McClosky, Smith, Schuster & Russell, P.A., Fort Lauderdale, for appellant. Robert A. Butterworth, Attorney General, Tallahassee, and Patricia Ann Ash, Assistant Attorney General, West Palm Beach, for appellee.

(PER CURIAM.) While we are not persuaded by appellant's first point on appeal, we are as to his second; therefore, we reverse and remand for new trial.

It was harmful error for the trial court to refuse to permit appellant's counsel to conduct direct examination of his client in accordance with Lawhorne v. State, 500 So.2d 519, 521 (Fla. 1986); Johnson v. State, 679 So.2d 791 (Fla. 3d DCA 1996), rev. denied, 689 So.2d 1070 (Fla. 1997); and Vann v. State, 666 So.2d 176 (Fla. 5th DCA 1995).

The only eyewitness testimony as to what happened was the conflicting testimony of the victim and appellant. Thus, the credibility of appellant was significant in this case. If the defense had been permitted to ask appellant about the substance of his prior convictions, the jury would have learned that appellant's prior convictions concerned credit card fraud, i.e., not sexual assault type offenses. Furthermore, if appellant had been permitted to explain that he pled guilty in the prior case because he was guilty, the implied assertion would be that he was not guilty in this case because he chose to go to trial. Under these circumstances, it cannot be said beyond a reasonable doubt that the trial court's error did not contribute to appellant's conviction. (GLICKSTEIN, KLEIN and PARIENTE, JJ., concur.)

* * *

**Criminal law—Juveniles—Judges—Disqualification—Prohibition—Allegation that presiding judge had been prosecuting attorney in prior prosecution of juvenile supported juvenile's claim of well founded fear that he would not receive fair trial before judge—Judge's voluntary disclosure of friendship with juvenile's case worker not legally sufficient in and of itself to require disqualification**

W.I., a child, Petitioner, v. STATE OF FLORIDA. Respondent. 4th District. Case No. 97-1395. Opinion filed July 2, 1997. Petition for writ of prohibition to the Circuit Court of the Nineteenth Judicial Circuit, Okeechobee County; Shirley M. Brennan, Judge; L.T. Case No. 97-142CJ. Counsel: Karen L. Johnson, Stuart, for petitioner. Robert A. Butterworth, Attorney General, Tallahassee,

IN THE CIRCUIT COURT OF THE
17TH JUDICIAL CIRCUIT, IN AND
FOR BROWARD COUNTY, FLORIDA.

STATE OF FLORIDA,                    CASE NO.: 95-14021CF10B

      Plaintiff,                   JUDGE: TYSON

v.

FRITZ MAIGNAN,

      Defendant.
_____/

### MOTION TO DISMISS

    DEFENDANT, FRITZ MAIGNAN, by and through undersigned counsel, respectfully moves this Honorable Court for entry of an order dismissing these charges and in support thereof would show as follows:

    1.  That the Defendant was arrested and charged with trafficking in cocaine.

    2.  That the Defendant has no prior record for drug dealing and/or drug possession.

    3.  That a confidential informant was utilized in this case that targeted the Defendant for arrest.  The confidential informant knew that the Defendant had no drug history whatsoever and the confidential informant knew that the Defendant was not a "known drug dealer".

    4.  That a review of the evidence, even in the light most favorable to the State, would show that the Defendant, Fritz Maignan, and his brother Katan Maignan, never agreed to purchase any drugs (specifically cocaine) with any Government agents and/or confidential informants.

    5.  The Defendants never had sufficient monies to purchase the

*EXHIBIT VII*

19

cocaine and the Government never had the cocaine to actually supply.

6.   That there is no evidence showing that Fritz Maignan ever engaged in any type of serious negotiations with the confidential informant and/or the Government agents in this matter, whatsoever.

7.   That the Defendant is respectfully requesting that this Court dismiss the charges based on the egregious police conduct in this matter.   The fact that the Defendant had no prior drug history, nor is the Defendant a "known drug dealer" or a "known drug target" and for the violation of the Defendant's due process rights.   That the Defendant was entrapped by law enforcement in violation of Section 77.201 of the Florida Statutes as well as the criteria set out in the case of <u>Munoz v. State</u>, 629 So.2d 90 (Fla. 1993).

WHEREFORE, DEFENDANT, FRITZ MAIGNAN, prays that this Honorable Court grant the relief requested in this motion.

I HEREBY CERTIFY that a true and correct copy hereof has been furnished by Hand Delivery to: John Gallagher, State Attorney's Office of this Court on this _____ day of March, 1996.

LAW OFFICES OF H. SCOTT HECKER, P.A.

H. SCOTT HECKER, ESQUIRE
Florida Bar Number:  602530
517 Southwest First Avenue
Fort Lauderdale, FL 33301
(305) 523-3811
Attorney for Defendant

2 0

1ST CALL of Level 1 printed in FULL format.

MANUEL MUNOZ, Petitioner, v. STATE OF FLORIDA, Respondent.

No. 78,900

SUPREME COURT OF FLORIDA

1993 Fla. LEXIS 1663; 18 Fla. Law W. S 537

October 14, 1993, Decided

NOTICE:    [*1]    NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION AND, IF FILED, DETERMINED.

PRIOR HISTORY: Application for Review of the Decision of the District Court of Appeal - Direct Conflict of Decisions.  First District - Case No. 91-8. (Bay County).

COUNSEL: Alvin L. Peters of McCauley & Peters, Panama City, Florida, for Petitioner.

Robert A. Butterworth, Attorney General and Laura Rush, Assistant Attorney General, Tallahassee, Florida, for Respondent.

JUDGES: OVERTON, BARKETT, McDONALD, GRIMES, HARDING, KOGAN, SHAW

OPINIONBY: OVERTON

OPINION:
OVERTON, J.

    This cause is before us to review State v. Munoz, 586 So. 2d 515 (Fla. 1st DCA 1991), in which the district court held that section 777.201, Florida Statutes (1987), abolished the objective  entrapment  test we set forth in Cruz v. State, 465 So. 2d 516 (Fla.), cert. denied, 473 U.S. 905, 105 S. Ct. 3527, 87 L. Ed. 2d 652 (1985). The Second District Court of Appeal reached a contrary conclusion in Bowser v. State, 555 So. 2d 879 (Fla. 2d DCA 1989), by determining that the objective test in Cruz was still applicable despite the enactment [*2]   of section 777.201. We have jurisdiction. Art. V, @ 3(b)(3), Fla. Const. We find that, in enacting section 777.201, the legislature did eliminate the objective test in Cruz, but we find that the legislature cannot prohibit the judiciary from objectively reviewing the issue of  entrapment  to the extent such a review involves the due process clause of article I, section 9, of the Florida Constitution. As to the facts of this case, we do not reach a due process objective evaluation of  entrapment  because, under the subjective test established by section 777.201, we find that Manuel Munoz was entrapped as a matter of law.

Evolvement of the  Entrapment  Defense

    In order for this Court to properly evaluate the subjective test set forth in section 777.201 and determine whether section 777.201 abolished the objective  entrapment  test set forth in Cruz, it is necessary to examine the evolvement of the  entrapment  defense under both federal and Florida law.

Federal Cases

                                                                          2 1

The defense of entrapment was first recognized by the United States Supreme Court in Sorrells v. United States, 287 U.S. 435, 53 S. Ct. 210, 77 L. Ed. 413 (1932). [*3]   In that case, Sorrells was charged with illegally possessing and selling whiskey based on the following facts. A prohibition agent, posing as a tourist, befriended Sorrells and gained his confidence through fraud. On several occasions during the course of their "friendship," the agent asked Sorrells to get him some liquor. At first, Sorrells declined. Eventually, however, Sorrells obtained a half-gallon of whiskey for the agent. At trial, conflicting evidence was presented as to whether Sorrells had the reputation of being engaged in the business of obtaining liquor for others, but no evidence was presented that Sorrells had actually ever possessed or sold any intoxicating liquor before the transaction at issue.

Even though the evidence of reputation was in dispute, the trial judge determined that, as a matter of law, there was no entrapment, and Sorrells was subsequently convicted by a jury. The Circuit Court of Appeals affirmed.

On appeal, a majority of the United States Supreme Court acknowledged that law enforcement officials could appropriately provide opportunities for the commission of crimes. However, the Court stated that "[a] different question is presented when the criminal [*4]   design originates with the officials of the Government, and they implant in the mind of an innocent person the disposition to commit the alleged offense and induce its commission in order that they may prosecute." Sorrells, 287 U.S. at 442. The Court further stated that, when government officials instigate the commission of a crime by "persons otherwise innocent in order to lure them to its commission and to punish them," the defense of entrapment should be available to prohibit such behavior. Id. at 448. Applying that standard to the facts of Sorrells, the majority concluded that the defense of entrapment should have been available to Sorrells, that the trial court erred in holding as a matter of law that Sorrells was not entrapped, and that the issue should have been submitted to the jury.

The dissenting justices in Sorrells agreed that the entrapment defense should have been available to Sorrells. They believed, however, that the majority erroneously placed the focus of that defense on the predisposition of the defendant to commit the crime, rather than [*5]   on the conduct of law enforcement personnel. In the dissent, Justice Roberts stated:

The doctrine [of entrapment] rests . . . on a fundamental rule of public policy. The protection of its own functions and the preservation of the purity of its own temple belongs only to the court. It is the province of the court and of the court alone to protect itself and the government from such prostitution of the criminal law. . . .

. . . .

. . . To say that such conduct by an official of government is condoned and rendered innocuous by the fact that the defendant had a bad reputation or had previously transgressed is wholly to disregard the reason for refusing the processes of the court to consummate an abhorrent transaction. . . . The accepted procedure, in effect, pivots conviction in such cases, not on the commission of the crime charged, but on the prior reputation or some former act or acts of the defendant not mentioned in the indictment.

287 U.S. 435, 457-59 (Roberts, J., dissenting).

22

1993 Fla. LEXIS 1663, *5; 18 Fla. La N. S 537

The view of the majority and the view of the dissent subsequently came to be characterized, respectively, as the "subjective" and "objective" [*6] views of entrapment.

The Supreme Court next addressed the entrapment defense in Sherman v. United States, 356 U.S. 369, 78 S. Ct. 819, 2 L. Ed. 2d 848 (1958), under the following undisputed facts. A government informant met Sherman at a doctor's office where both the informant and Sherman were being treated for narcotics addiction. After several chance meetings at the doctor's office and pharmacy, they began to discuss mutual experiences regarding their addiction. Eventually, the informant told Sherman he was not responding to treatment and asked Sherman to supply him with a source of drugs. Sherman tried to avoid the issue at first, but, after repeated requests predicated on the informer's presumed suffering, Sherman finally acquiesced. He subsequently provided the informer with drugs on numerous occasions.

At trial, the issue of entrapment was submitted to the jury. Evidence of Sherman's nine-year-old conviction for sale of narcotics and his five-year-old conviction for possession of narcotics was introduced to show his predisposition. Sherman was convicted as charged.

On appeal, the United States Supreme Court [*7] reversed the conviction. The Court reaffirmed its earlier adoption of the subjective view of entrapment and expressly rejected the objective view Justice Roberts propounded in Sorrells. However, unlike its holding in Sorrells, the Court held that, even under the subjective view, the circumstances in Sherman required a finding of entrapment as a matter of law.

In writing for the majority, Chief Justice Warren set forth the primary principles of the subjective entrapment defense stating:

The fact that government agents "merely afford opportunities or facilities for the commission of the offense does not" constitute entrapment. Entrapment occurs only when the criminal conduct was "the product of the creative activity" of law-enforcement officials. [Sorrells, 287 U.S. at 441, 451.] To determine whether entrapment has been established, a line must be drawn between the trap for the unwary innocent and the trap for the unwary criminal. The principles by which the courts are to make this determination were outlined in Sorrells. On the one hand, at trial the accused may examine the conduct of the government [*8] agent; and on the other hand, the accused will be subjected to an "appropriate and searching inquiry into his own conduct and predisposition" as bearing on his claim of innocence. [Id. at 451.]

Sherman, 356 U.S. at 372-73 (alteration in original; emphasis added). In enunciating those principles, the Court effectively approved the decision in United States v. Sherman, 200 F.2d 880, 882-83 (2d Cir. 1952), authored by Judge Learned Hand, which succinctly set forth the subjective test as follows:

In [entrapment] cases two questions of fact arise: (1) did the agent induce the accused to commit the offence charged in the indictment; (2) if so, was the accused ready and willing without persuasion and was he awaiting any propitious opportunity to commit the offence. On the first question the accused has the burden; on the second the prosecution has it.

2:3

Applying the rationale of this test to the case in Sherman, the Supreme Court first concluded that the informant had induced Sherman to commit the crime. The Court then determined [*9]   that neither Sherman's prior record nor his behavior under the facts of the case was sufficient to establish predisposition. Consequently, the Court determined that " entrapment  was established as a matter of law." 356 U.S. at 373. The Court noted that it had reached its conclusion based on the "undisputed testimony of the prosecution's witnesses." Id.

In 1973, the Supreme Court again reaffirmed the subjective  entrapment defense in United States v. Russell, 411 U.S. 423, 93 S. Ct. 1637, 36 L. Ed. 2d 366 (1973). In Russell, an undercover agent was assigned to locate a laboratory believed to manufacture illicit drugs. The undercover agent met with Russell, advising him that he represented an organization interested in controlling the manufacture and distribution of methamphetamine. He then offered to supply Russell with a difficult to obtain but legal ingredient essential to the manufacture of methamphetamine in return for Russell's supplying him with a specific amount of methamphetamine. The undercover agent provided the ingredient, the drug was produced, and  [*10]   methamphetamine was manufactured at the laboratory. Subsequently, a warrant was obtained and Russell was arrested.

At trial, the issue of  entrapment  was submitted to the jury and Russell was found guilty as charged. The Circuit Court of Appeals reversed, holding that the conduct of law enforcement officers required a finding of  entrapment  as a matter of law without regard to Russell's predisposition to commit the crime charged. On appeal to the United States Supreme Court, Russell sought to have the Court reconsider its rejection of the objective standard for the  entrapment  defense by seeking the Court's approval of the Circuit Court's opinion. For purposes of the appeal, Russell conceded his predisposition to commit the offenses charged, but he sought to have the Court rule that he was entrapped as a matter of law given the intolerable degree of government participation in the criminal enterprise. The majority in Russell rejected this position and once again reaffirmed the subjective standard set forth under Sherman and Sorrells, choosing to focus on a defendant's predisposition to commit the crime, rather than on the conduct of law enforcement officials. Significantly,   [*11]   however, the majority did admit that, at some point, the conduct of law enforcement officials, which is the focus of an objective evaluation of  entrapment,  might violate due process. n1 The Court stated: "While we may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction, the instant case is distinctly not of that breed." Russell, 411 U.S. at 431-32 (citation omitted).

- - - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - - -

n1 In Hampton v. United States, 425 U.S. 484, 96 S. Ct. 1646, 48 L. Ed. 2d 113 (1976), the United States Supreme Court did state that the due process defense would be unavailable to a predisposed defendant. However, that statement in Hampton was made in a plurality opinion in which only three justices joined and, as such, did not undermine the Court's pronouncement in Russell.

- - - - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - - -

[*12]

24

Recently, in Jacobson v. United States, 112 S. Ct. 1535, 118 L. Ed. 2d 174 (1992), the Supreme Court again addressed its subjective standard of entrapment.  In that case, two government agencies encouraged Jacobson to break the law by tempting him to order child pornography through the mail. Using at least five fictitious organizations and a bogus pen pal to entice him into ordering pornography, the agencies targeted Jacobson for over two-and-one-half years before he finally ordered illegal materials. These efforts had been aimed at Jacobson because he had previously ordered pornographic materials. However, at the time he did so, receipt through the mail or possession of pornographic materials was not illegal. At trial, Jacobson pleaded  entrapment,  and the issue was submitted to the jury. Rejecting the  entrapment  defense, the jury found him guilty.

On appeal, the United States Supreme Court determined that Jacobson was entrapped as a matter of law. Writing for the majority, Justice White strongly condemned a sting operation that would target an  individual when little basis existed for doing so.

Evidence of predisposition to do what once   [*13]   was lawful is not, by itself, sufficient to show predisposition to do what is now illegal, for there is a common understanding that most people obey the law even when they disapprove of it. . . .

. . . .

. . . As was explained in Sherman, where  entrapment  was found as a matter of law, "the government [may not] play on the weaknesses of an innocent party and beguile him into committing crimes which he otherwise would not have attempted." [356 U.S. at 376.]

Law enforcement officials go too far when they "implant in the mind of an innocent person the disposition to commit the alleged offense and induce its commission in order that they may prosecute." [Sorrells, 287 U.S. at 442]. . . . When the Government's quest for convictions leads to the apprehension of an otherwise law-abiding citizen who, if left to his own devices, likely would have never run afoul of the law, the courts should intervene.

Jacobson, 112 S. Ct. at 1542-43.

The Supreme Court's decision in Jacobson emphasized a basic principle [*14]  of the subjective evaluation of  entrapment.  Although the dissenting justices in Jacobson asserted that a key question in determining predisposition should be how an accused responded to the government's inducement, the majority rejected this view. The majority explained that the evidence must demonstrate predisposition beyond a reasonable doubt both prior to and independent of the government's acts. In effect, the majority emphasized that predisposition means predisposition. On the evidence presented, the Court found that neither Jacobson's prior behavior nor his response to the agencies' inducements was sufficient or proper to establish predisposition.

An evaluation of these federal  entrapment  cases clearly reflects that the United States Supreme Court has adopted the subjective standard of  entrapment, which focuses on a defendant's predisposition, and that the Court has specifically rejected the objective standard, which focuses on the

1993 Fla. LEXIS 1663, *14; 18 Fla. Law. W. S 537

government's conduct. Nevertheless, as noted in Russell, the United States Supreme Court has indicated that government conduct may at some point become so egregious that a defendant's federal constitutional due process rights could be [*15] violated regardless of that defendant's predisposition.

In summary, under the subjective test set forth by the United States Supreme Court, once a defendant raises entrapment as a defense, the defendant has the burden to establish that the government induced the defendant to commit the offense charged. However, once that burden is met, the burden shifts to the government to establish the defendant's predisposition to commit the offense. Sherman. In proving a defendant's predisposition, the government must establish that the defendant was predisposed to commit the offense both prior to and independent of the government's inducement. Jacobson. In doing so, the government may make an appropriate and searching inquiry into the conduct of the defendant and present evidence of the defendant's prior criminal history so long as that history is relevant to the issue of the defendant's predisposition.

Additionally, from these federal cases we also note that the subjective evaluation of an entrapment defense is not always one for a jury. Clearly, when evidence is not conflicting and factual circumstances are not in dispute, the determination of whether a defendant has been entrapped is [*16] an issue that rests with the trial judge as a matter of law. Jacobson; Sherman.

Florida Cases

Having examined entrapment under federal law, we now turn to the entrapment defense as it has recently evolved in Florida. In 1985, in State v. Glosson, 462 So. 2d 1082 (Fla. 1985), this Court evaluated the issue of entrapment under the due process provision in article I, section 9 of the Florida Constitution. Subsequently, in Cruz v. State, 465 So. 2d 516 (Fla.), cert. denied, 473 U.S. 905, 105 S. Ct. 3527, 87 L. Ed. 2d 652 (1985), we specifically rejected the subjective test for entrapment and adopted instead the basic principles of the objective standard of entrapment originally suggested by Justice Roberts in Sorrells. In doing so, we articulated a threshold test for evaluating entrapment as a matter of law. Then, in 1987, the Legislature enacted section 777.201 establishing the subjective test for entrapment.

In reviewing the history of the entrapment defense in Florida, it is important to first examine the constitutional due process issue addressed [*17] by this Court in Glosson. In that case, Glosson was charged with trafficking in and conspiring to traffic in cannabis as the result of a reverse-sting operation. The sting was conducted through a paid informant. For the informant's services in assisting in this and other sting operations and subsequent prosecutions, the State agreed to pay the informant ten percent of all civil forfeiture proceedings resulting from any case the informant initiated. Asserting that the State's conduct violated his due process rights, Glosson moved to dismiss the charges. The trial court agreed that the State's conduct was improper as a matter of law and dismissed the charges.

On appeal before this Court, the State argued that the due process defense was not available to a predisposed defendant. We disagreed, stating:

We reject the narrow application of the due process defense found in the federal cases. Based upon the due process provision of article I, section 9 of the Florida Constitution, we agree with [the state supreme courts of Missouri and

21.

New York] that governmental misconduct which violates the constitutional due process right of a defendant, regardless of that defendant's predisposition [*18]   , requires the dismissal of criminal charges.

Glosson, 462 So. 2d at 1085 (emphasis added). Under the facts of Glosson, we found the behavior of law enforcement officials in entering into a contingency contract to obtain convictions to be violative of due process under the Florida Constitution. Under that objective philosophy of  entrampment,  we determined that Glosson was entitled to a dismissal as a matter of law.

Shortly thereafter, we addressed the issue of  entrapment  in Cruz. In Cruz, law enforcement personnel positioned an officer, who appeared inebriated and who had money hanging visibly from his pocket, as a decoy in a high crime area. Cruz took the money from the decoy's pocket and was arrested as he walked from the scene. The police officers had not been seeking a particular individual nor were they aware of any prior criminal acts by Cruz. Focusing on Cruz's lack of predisposition, the trial court dismissed the charges, finding that Cruz was entrapped as a matter of law.

In reviewing the trial court's decision in Cruz, we stated that the federal subjective test of  entrapment  generally involved a question of predisposition, [*19]   i.e., a question of fact for a jury. However, because we found that " entrapment  is a potentially dangerous tool given to police to fight crime," we rejected the federal subjective standard, adopting instead the principles of the objective standard suggested by Justice Roberts in Sorrells. Cruz, 465 So. 2d at 519. In adopting this objective standard, we propounded a judicially formulated two-part objective threshold test for determining  entrapment  as a matter of law. Under that test,

 entrapment  has not occurred as a matter of law where police activity (1) has as its end the interruption of a specific ongoing criminal activity; and (2) utilizes means reasonably tailored to apprehend those involved in the ongoing criminal activity.

465 So. 2d at 522. We did not, however, expressly find that such an evaluation was mandated by the due process clause contained in article I, section 9, of the Florida Constitution.

Applying the objective threshold test to the facts in Cruz, we concluded that law enforcement agents had not targeted any specific activity. Consequently, we determined that Cruz had been entrapped as a matter  [*20]  of law.

Subsequent to our decision in Cruz, the Florida Legislature, in 1987, enacted section 777.201, which provides:

(1) A law enforcement officer, a person engaged in cooperation with a law enforcement officer, or a person acting as an agent of a law enforcement officer perpetrates an  entrapment  if, for the purpose of obtaining evidence of the commission of a crime, he induces or encourages and, as a direct result, causes another person to engage in conduct constituting such crime by employing methods of persuasion or inducement which create a substantial risk that such crime will be committed by a person other than one who is ready to commit it.

(2) A person prosecuted for a crime shall be acquitted if he proves by a preponderance of the evidence that his criminal conduct occurred as a result

of an entrapment. The issue of entrapment shall be tried by the trier of fact.

The legislative history of that statute clearly reflects that section 777.201 was enacted to reinstate the federal subjective test we rejected in Cruz. See Staff of Fla. H.R. Comm. on Criminal Justice, CS/HB 1467 (1987) Staff Analysis 177 (final June 22, 1987)("[Section 777.201] overrules [*21] the Florida Supreme Court's decision in Cruz v. State, 465 So. 2d 516 (Fla. 1985), which held that the objective test of whether law enforcement conduct was impermissible was in the discretion of the trial court.").

After the legislature adopted section 777.201, we again addressed the entrapment defense in State v. Hunter, 586 So. 2d 319 (Fla. 1991). However, the offenses at issue in Hunter occurred before section 777.201's enactment. Consequently, section 777.201 was not at issue before this Court and was not discussed in the Hunter opinion. Nevertheless, Hunter is still important in the evolving development of entrapment law in Florida given its application of the Cruz entrapment test and related due process considerations.

In Hunter, Ron Diamond, a convicted drug-trafficker facing fifteen years in prison, sought a sentence reduction or suspension under section 893.135(3), Florida Statutes (1985), which statute allowed the prosecutor to request a sentence reduction for a defendant who provided substantial assistance in obtaining the conviction of others. In seeking to have his sentence reduced, Diamond [*22] arranged a deal between David Hunter and Kelly Conklin as follows:

Diamond noticed that another resident of his apartment complex, Kelly Conklin, openly smoked marijuana. Conklin, a twenty-one-year-old recent graduate of an art school, had no prior criminal record. He lived with his pregnant girlfriend and worked for an advertising firm run by David Hunter. Approaching Conklin, Diamond asked for assistance in obtaining drugs, but Conklin could not provide any sources for the drugs that Diamond wanted. Diamond became more insistent and began telephoning Conklin almost daily. Eventually Conklin turned to Hunter, who agreed to help find drugs to sell to Diamond. Hunter sought out a former employee who provided the drugs, but, in doing so, insisted that Hunter, not Conklin, complete the transaction. When Hunter attempted to close the transaction with the police undercover buyers, both he and Conklin were arrested.

Hunter, 586 So. 2d at 320 (footnotes omitted). At trial, both Conklin and Hunter presented the defense of entrapment to a jury, but the jury convicted them as charged. The district court of appeal, relying on our decision in Glosson [*23] , found a due process violation under article I, section 9, of the Florida Constitution, and directed that the charges against both Conklin and Hunter be dismissed.

On review by this Court, we distinguished the case from our holding in Glosson and rejected the district court's determination that a due process violation had occurred. Moreover, we stated that the due process considerations in Glosson were distinct from the objective test we established in Cruz. See Hunter, 586 So. 2d at 321 (holding that the district court should have decided the appeal on the entrapment issue rather than under the due process considerations of Glosson).

2 S

In Hunter, in applying our objective test from Cruz, we found that Conklin had established entrapment as a matter of law because the government knew of no ongoing drug-trafficking at the time Diamond approached Conklin. We rejected the application of the Cruz objective test to Hunter's case, however, because Hunter's involvement was voluntary and because Hunter was induced to commit the crime by Conklin rather than by the State or one of its agents. We expressly noted that "defendants cannot    [*24]    raise 'due process violations allegedly suffered by third parties.'" 586 So. 2d at 322 (quoting United States v. Valdovinos-Valdovinos, 743 F.2d 1436, 1437 (9th Cir. 1984), cert. denied, 469 U.S. 1114, 105 S. Ct. 799, 83 L. Ed. 2d 791 (1985)).

Finally, we addressed section 777.201 in Herrera v. State, 594 So. 2d 275 (Fla. 1992). In that case, defendant Herrera, as a result of a sting operation, was charged with trafficking in cocaine, conspiracy to traffic in cocaine, and obstructing an officer without violence. The sting operation had been initiated by a confidential informant, and Herrera raised entrapment as an affirmative defense. At trial, Herrera requested that the pre-section 777.201 standard jury instruction be given to the jury rather than the jury instruction written to comply with section 777.201. n2 Herrera requested the previous instruction on the grounds that the section 777.201 and the new instruction violated the due process clauses of both the federal and Florida Constitutions because they improperly placed the burden    [*25]    on a defendant to prove that the defendant was entrapped.

- - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n2 Before section 777.201 was enacted, the last paragraph of the standard jury instruction on entrapment read: "On the issue of entrapment, the State must convince you beyond a reasonable doubt that the defendant was not entrapped." After the enactment of section 777.201, the last paragraph of the instruction was changed to read: "On the issue of entrapment, the defendant must prove to you by a preponderance of the evidence that his criminal conduct occurred as the result of entrapment. "

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

On review, we rejected Herrera's argument. We stated that it was not unconstitutional to shift the burden to defendants to prove they were entrapped. Additionally, we stated that lack of predisposition is an essential element of the defense of entrapment as a result of section 777.201's enactment. In rendering this decision, we cited to Sorrells and Russell; however, we did not discuss the subjective, two-step burden of proof test from Sorrells or a trial court's    [*26]    ability to rule as a matter of law on the issue of entrapment. Moreover, at that time, the United States Supreme Court's decision in Jacobson had not been rendered.

District court considerations of this Court's due process pronouncements under the Florida Constitution in Glosson, and this Court's adoption of the objective standard of entrapment in Cruz and our application of that standard in Hunter, in conjunction with the legislative enactment of section 777.201 and our decision in Herrera, have created substantial uncertainty as to the status and application of the entrapment defense in Florida. Obviously, this uncertainty has caused the district courts of appeal to render conflicting decisions regarding the effect of section 777.201. n3 By this opinion, we attempt to set forth specific principles of Florida's entrapment defense to

harmonize the law and to ensure uniform application of the  entrapment  defense in Florida.

- - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - -

   n3 To date, at least thirty-one opinions have been released by the district courts interpreting section 777.201, some finding that section 777.201 abolished the test in Cruz, others finding that it did not.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -
[*27]
Law Enforcement Officials' Conduct and Due Process

The legislature has the authority to statutorily establish  entrapment  as a defense in this state. However, the legislature cannot enact a statute that overrules a judicially established legal principle enforcing or protecting a federal or Florida constitutional right. Accordingly, section 777.201 cannot overrule a decision of this Court regarding  entrapment  in any case decided under the due process provision of article I, section 9, of the Florida Constitution.

   Although the United States Supreme Court has yet to determine in a case before it that the conduct of law enforcement agents in an  entrapment  case has violated federal due process rights, it has determined that law enforcement agents' conduct could, in fact, violate such rights. See Russell. On the other hand, as noted above, we have determined, under the circumstances in Glosson, that the conduct of law enforcement agents violated the due process clause of the Florida Constitution. We recently reached a similar conclusion in State v. Williams, No. 79,507 (Fla. July 1, 1993). In Williams, we relied on Glosson in finding that the police conduct violated  [*28]   the defendant's due process rights under article I, section 9, regardless of the defendant's predisposition. This was because the conduct engaged in by law enforcement agents, i.e., the manufacture of crack for sale within 1000 feet of a school, was illegal. In making our determination, we noted that defining the limits of due process is difficult because due process is not a technical, fixed concept; rather, it is a general principle of law that prohibits prosecutions brought about by methods offending one's sense of justice. Further, although we stated that we are not unmindful of the problems faced by law enforcement agents in combatting crime, we emphasized that certain conduct would not be tolerated in light of the due process considerations mandated by our constitution. "While we must not tie law enforcement's hands in combatting crime, there are instances where law enforcement's conduct cannot be countenanced and the courts will not permit the government to invoke the judicial process to obtain a conviction." Williams, slip op. at 8. Because the legislature cannot abrogate an accused's due process rights, section 777.201 is inapplicable whenever a judge determines as a  [*29]   matter of law that law enforcement personnel have violated an accused's due process rights.

The Elimination of the Cruz Test for  Entrapment

Although the legislature may not enact a statute limiting the application of a constitutional right, it may overrule judicially established substantive principles that do not implicate established constitutional rights. Thus, to the extent the objective test for the  entrapment  defense adopted by this Court in Cruz was not based on due process, the legislature had the authority to

overrule that judicially established standard and to establish entrapment as a defense to be evaluated under the subjective test. As we indicated in the Florida cases outlined above, it is the focus on the behavior of law enforcement officials rather than the objective test itself that implicates due process considerations. Consequently, the legislature had the authority to overrule the judicially established objective test set forth in Cruz to the extent that such objective test did not include due process concerns. As such, we find that the specific test set forth in Cruz has been eliminated by section 777.201. Additionally, we find that the subjective [*30] test set forth in section 777.201 is the test to be applied on the issue of entrapment in the absence of egregious law enforcement conduct. As noted above, however, in the presence of egregious law enforcement conduct, an entrapment defense is to be evaluated under the due process provision of article I, section 9, of the Florida Constitution as in Glosson and Williams.

The Subjective Test for Entrapment under Section 777.201

Given the history of the entrapment defense, we find that the legislature, in establishing a legislatively-created entrapment defense through section 777.201, codified the subjective test delineated by the United States Supreme Court as the means for determining the application of that defense. As indicated under the federal cases discussed above, the application of the subjective test is the test articulated by Judge Hand in Sherman, as further explained by the United States Supreme Court in Jacobson. Three principles arise under this test. The first two involve questions of fact and differing burdens of proof, and the third addresses whether the issue of entrapment must be submitted to the jury or whether the issue can be decided by [*31] the judge as a matter of law.

The first question to be addressed under the subjective test is whether an agent of the government induced the accused to commit the offense charged. On this issue, the accused has the burden of proof and, pursuant to section 777.201, must establish this factor by a preponderance of the evidence. If the first question is answered affirmatively, then a second question arises as to whether the accused was predisposed to commit the offense charged; that is, whether the accused was awaiting any propitious opportunity or was ready and willing, without persuasion, to commit the offense. On this second question, according to our decision in Herrera, the defendant initially has the burden to establish lack of predisposition. However, as soon as the defendant produces evidence of no predisposition, the burden then shifts to the prosecution to rebut this evidence beyond a reasonable doubt. In rebutting the defendant's evidence of lack of predisposition, the prosecution may make "an appropriate and searching inquiry" into the conduct of the accused and present evidence of the accused's prior criminal history, even though such evidence is normally inadmissible. [*32] However, admission of evidence of predisposition is limited to the extent it demonstrates predisposition on the part of the accused both prior to and independent of the government acts. Further, care must be taken in establishing the predisposition of a defendant based on conduct that results from the inducement. The United States Supreme Court, in its majority opinion in Jacobson, explained how this type of evidence may properly be used as follows:

Government agents may not originate a criminal design, implant in an innocent person's mind the disposition to commit a criminal act, and then induce commission of the crime so that the Government may prosecute. Where the Government has induced an individual to break the law and the defense of

entrapment  is at issue, as it was in this case, the prosecution must prove beyond reasonable doubt that the defendant was disposed to commit the criminal act prior to first being approached by Government agents.

Thus, an agent deployed to stop the traffic in illegal drugs may offer the opportunity to buy or sell drugs, and, if the offer is accepted, make an arrest on the spot or later. In such a typical case, or in a more elaborate  [*33] "sting" operation involving government-sponsored fencing where the defendant is simply provided with the opportunity to commit a crime, the  entrapment  defense is of little use because the ready commission of the criminal act amply demonstrates the defendant's predisposition. Had the agents in this case simply offered petitioner the opportunity to order child pornography through the mails, and petitioner--who must be presumed to know the law--had promptly availed himself of this criminal opportunity, it is unlikely that his  entrapment defense would have warranted a jury instruction.

But that is not what happened here. By the time petitioner finally placed his order, he had already been the target of 26 months of repeated mailings and communications from Government agents and fictitious organizations. Therefore, although he had become predisposed to break the law by May 1987, it is our view that the Government did not prove that this predisposition was independent and not the product of the attention that the Government had directed at petitioner since January 1985.

Jacobson, 112 S. Ct. at 1540-41 (citations omitted; footnote omitted).   [*34] The above quote provides guidance as to when conduct resulting from a sting operation may be used to establish predisposition and as to when using such conduct would be improper.

The third question under the subjective test is whether the  entrapment evaluation should be submitted to a jury. Section 777.201 directs that the issue of  entrapment  be submitted to the trier of fact. Such direction is consistent with the subjective evaluation of  entrapment  because the two factual issues above ordinarily present questions of disputed facts to be submitted to the jury as the trier of fact. However, if the factual circumstances of a case are not in dispute, if the accused establishes that the government induced the accused to commit the offense charged, and if the State is unable to demonstrate sufficient evidence of predisposition prior to and independent of the government conduct at issue, then the trial judge has the authority to rule on the issue of predisposition as a matter of law because no factual "question of predisposition" is at issue. See, e.g., Jacobson; Sherman. Such a ruling could be proper even when the government presents evidence of prior convictions. Sherman  [*35]   . We reject any construction of section 777.201 that would require such an issue of law to be submitted to a jury. Under the constitution of this state, juries, as the finders of fact, decide factually disputed issues and judges apply the law to the facts as those facts are found by the jury. To construe section 777.201 as mandating that the issue of  entrapment  is to be submitted to a jury for determination as a matter of law would result in an unconstitutional construction that would violate article I, section 9, of the Florida Constitution. Consequently, we construe section 777.201 as requiring the question of predisposition to be submitted to a jury when factual issues are in dispute or when reasonable persons could draw different conclusions from the facts. In certain instances, however, as illustrated by Sherman and Jacobson, the trial judge and appellate courts clearly have the authority to rule on the issue as a matter of law. To hold otherwise would violate procedural due

process.

The Instant Case

Having thus determined the state of the  entrapment  defense in Florida under section 777.201, we turn to the facts of the instant case.

Manuel Munoz, the owner of "Video  [*36]   Den," was charged with two counts of sale or distribution of harmful materials to a person under 18 years of age, in violation of section 847.012, Florida Statutes (1989). The record reflects that those charges stemmed from the following sequence of events.

The Bay County Sheriff's Office received an anonymous complaint that minors were able to rent X-rated videotapes from a video store known as "Top Banana." In investigating whether minors were able to obtain X-rated videotapes from Top Banana, the sheriff's office decided to spread the investigation to other video stores in the Bay County area that rented X-rated movies. The names of the other video stores selling or renting X-rated videotapes were obtained by searching the Yellow Pages of the local phone book. Consequently, even though Video Den was totally unconnected to Top Banana and even though the sheriff's office had received no complaints regarding Video Den and had no independent knowledge as to whether Video Den was renting X-rated movies to minors, the sheriff's office decided to target Video Den in its investigation.

In conducting its investigation, the sheriff's office obtained a false membership card from Video Den  [*37]   under the fictitious name of Brian Jackson. The membership card reflected that Jackson was thirty-four years old. The sheriff's office also obtained the assistance of a sixteen-year-old girl who had recently been arrested for negotiating the purchase of a pound of marijuana. It is undisputed that the juvenile informant appeared to be at least eighteen years of age.

The Sheriff's office gave the membership card to the juvenile informant and instructed her to rent an X-rated videotape from Video Den, to lie about her age, and to lie about her relationship with Jackson. She was instructed to indicate that she was either the sister or girlfriend of Jackson.

Video Den maintained its X-rated videotapes in a separate room and posted a sign explicitly stating that no person under the age of 18 was allowed to enter the room. On her first trip to Video Den, the juvenile informant obtained an X-rated video from the "adults only" room and presented the false membership card to Munoz at the cash register. In renting the X-rated video, she explained to Munoz that she was Jackson's girlfriend. Approximately two weeks later, she again rented two X-rated movies from Video Den. On the second trip,    [*38] Munoz asked her age and she lied. She explained that she had walked to the store and had forgotten her driver's license. Additionally, she insisted that she had rented these movies before and again claimed to be either the girlfriend or sister of Jackson. After Munoz allowed the juvenile to rent the videotapes, he was charged with the sale or distribution of harmful materials to a minor.

The trial judge dismissed the charges against Munoz on the basis of  entrapment  as a matter of law based on the objective  entrapment  test set forth in Cruz. The district court reversed, holding that the legislature had abolished the objective  entrapment  test set forth in Cruz through the enactment of section 777.201.

Given the unrefuted facts in this case, we find that we need not address whether the conduct of law enforcement personnel constitutes a due process violation under article I, section 9, because we find that, under the subjective test set forth above, Munoz was the subject of entrapment as a matter of law. First, the undisputed facts clearly establish that law enforcement agents induced Munoz to rent the videotapes to the juvenile. Second, there was no evidence whatsoever of predisposition [*39] on Munoz's part prior to and independent of the government inducement. As such, we reject the State's contention that the issue of entrapment in this case should be submitted to a jury.

Conclusion For the reasons expressed, we find that, through section 777.201, the Legislature established entrapment as a statutory defense to be evaluated under the federal subjective entrapment test and, by such action, eliminated the objective test we announced in Cruz. As such, we disapprove Bowser v. State, 555 So. 2d 879 (Fla. 2d DCA 1989). We additionally find that section 777.201 neither prohibits the judiciary from objectively reviewing the issue of entrapment to the extent such a review involves the due process clause of article I, section 9, of the Florida Constitution, nor prohibits the judiciary from determining under the subjective test that, in certain circumstances, entrapment has been established as a matter of law. In this case, we find that, under the subjective test, Manuel Munoz was entrapped as a matter of law. Although the district court in this case correctly noted that section 777.201 abolished the objective entrapment test set forth [*40] in Cruz, it did not reach the conclusion that Munoz was nevertheless entrapped as a matter of law. Consequently, we quash the decision of the district court and remand this case with the direction that the trial court's order of dismissal be reinstated.

It is so ordered.

BARKETT, C.J., and McDONALD, GRIMES and HARDING, JJ., concur.

KOGAN, J., concurs with an opinion, in which BARKETT, C.J., concurs.

SHAW, J., concurs in result only.

CONCURBY: KOGAN

CONCUR: KOGAN, J., concurring.

The due-process entrapment defense recognized in Cruz, Glosson, and Hunter essentially is the same as "objective entrapment. " Thus, the majority appears to toss "objective entrapment" out the front door but then readmits essentially the same concept into Florida law via the rear entrance, with some minor tinkering as to analysis. Perhaps this Court in future cases will be required to state what analysis now must be used in cases of this type, but I generally agree with the majority's conclusions.

BARKETT, C.J., concurs.

```
*         15 PAGES                    681 LINES                                    *
*      6:03 P.M. STARTED       6:08 P.M. ENDED                                     *
****-------------------------------------------------------------------------****
****-------------------------------------------------------------------------****
*                          EEEEE    N     N      DDDD                              *
*                          E        N     N      D    D                           *
*                          E        NN    N      D    D                           *
*                          EEE      N N   N      D    D                            *
*                          E        N    NN      D    D                            *
*                          E        N     N      D    D                            *
*                          EEEEE    N     N      DDDD                              *

****-------------------------------------------------------------------------****

****-------------------------------------------------------------------------****
```

SEND TO: CARUSI, DANIEL
          MCRAE, MITCHELL T., P.A.
          2255 GLADES ROAD
          SUITE 405-EAST
          BOCA RATON FLORIDA 33431

1          that's been shown.

2               MR. GALLAGHER:  If that were the case, the

3          Supreme Court of Florida would not have put

4          what I told you in their opinion.

5               THE COURT:  Court herein finds that the

6          Defendant had a job in New York.  It wasn't a

7          high paying job so he was susceptible possibly

8          to mere earning more money somewhere else and

9          agent, apparently after several contacts with

10         the Defendant, had let him know that such is

11         available in Florida.  Exactly how this came

12         about the Court is uncertain.

13              The Defendant, Fritz Maignan, would like

14         me to believe that the agent approached him and

15         constantly induced him to go to Florida to make

16         quick money.  I will go so far as to say that

17         possibly it's believable that he presented him

18         such a situation that money is available in

19         Florida for drugs.  However, I am not convinced

20         that he was induced by Joe Clarke, the

21         confidential informant.

22              The State must get over the -- The

23         Defendant must get over the threshold to show

24         that there's a preponderance of the evidence

25         that he was induced wrongfully to commit this

EXHIBIT VIII

84

1    crime, that he was not - had any propensity to

2    commit.

3       I can't say that because the Defendant's

4    evidence that he's presented in the surrounding

5    circumstances as well as the - certainly the

6    Defendant testifying himself, so I must view

7    that evidence from which the Defendant presents

8    that evidence himself and that is the

9    Defendant's testimony which is subject to

10   cross-examination.

11      So we have from that evidence and

12   cross-examination that he was communicated with

13   by Joe Clarke in New York.  Ultimately Joe

14   Clarke told the agent in Florida about him,

15   Stizzo, the Defendant Fritz, his beeper that he

16   would be communicated with in Florida.

17      Now, when the - when he was examined here

18   today in his first dealing with drugs, suddenly

19   we have a sophisticated deal which I find very

20   unusual that they're going to rip off not 100

21   or $200 or three or $400 but $33,000 worth of

22   drugs with a phony roll with some money on the

23   outside and eight hundred one-hundred dollar

24   bills on the inside.  This is a very unusual

25   type, sophisticated type - quote - ripoff, for

85

1      lack of another word, for a person first in the

2      deal or drug dealing.

3          More than that, Defendant has an absence

4      of memory of such a thing and yet this is his

5      first dealing.  I find that his absence of

6      memory regarding that puts his credibility in

7      question.

8          In fact, he has an absence of memory

9      concerning Sam Taylor.  He has an absence of

10     memory in several items.  And because of this

11     absence of memory that he has, I find his

12     absence of memory extraordinarily unusual for a

13     person whose first dealing having come to Miami

14     not even know - his absence of memory how much

15     it costs to fly to New York - to Florida, and

16     yet he knows enough to get the money from his

17     sister allegedly for rent and perhaps to

18     deceive her.  It's going to go for drugs.

19         All of this leads me to believe that the

20     Defendant's credibility is highly in question.

21     And yet it is his credibility that I must rely

22     upon in order to find by a preponderance of the

23     evidence that he was entrapped.

24         And with that credibility in question and

25     the manner of the way - and its hurry up to get

86

```
 1          this done and to rip off the drugs within a day
 2          or two not knowing about the phony bills or Sam
 3          Taylor and a gun being used and the whole
 4          surrounding circumstances leads me to believe
 5          that the Defendant has not sustained its burden
 6          by a preponderance of the evidence based upon
 7          that as a single source of the evidence to
 8          support his entrapment, other than the totality
 9          of the circumstances that was presented to me
10          by both the Defendant and the agent that the
11          State presented.  So I don't believe they have
12          met the burden.
13              Now, I'll also make the observation the
14          C.I. was not on commission, getting a certain
15          amount of money to produce this man or on any
16          commission or amount of money or of deals he's
17          gonna create.  So merely because they have
18          presented an opportunity to him, the Defendant,
19          Fritz Maignan, was certainly ready, willing and
20          able to jump on this opportunity.
21              I find based upon the totality of the
22          evidence, credibility of the witnesses and that
23          he took advantage of it, came to Florida and
24          then continued on with what he wanted to do and
25          that is to rip off drugs and make a profit,
```

87

1          motion is respectfully denied.

2               MR. HECKER:  Thank you, Your Honor.

3               MR. GALLAGHER:  Thank you, Judge.

4               THE COURT:  Thank you for the case law in

5          that regard.

6               I'm handing it back to you in case it

7          should come up again.

8               MR. HECKER:  Thank you, Judge.

9               Would the Court like it for the file?  I

10         made extra copies.

11              THE COURT:  I may want it also for

12         purposes in the event there's a hearing on his

13         brother.

14              MR. HECKER:  Very good, Your Honor.

15              (Thereupon, the proceedings were concluded.)

16

17

18

19

20

21

22

23

24

25

1    decision to do anything, has there been a crime

2    committed.

3        At that point, Your Honor, they are still not

4    sure.  They are still figuring out what to do.  That

5    would be my second motion for JOA.

6        Lastly, Your Honor, as to the gun charge, there

7    is absolutely no evidence whatsoever, zip, that the

8    defendant had any knowledge of the existence of the

9    gun.

10        No objective standards, no bending down

11    testified to, no objective or even subjective

12    interpretation showing the gun was known by the

13    defendant.

14        Additionally, there is absolutely no evidence

15    that the gun was where it was when the defendant was

16    pulled over.  We do not have the testimony of Agent

17    Tamer, who the other officer, Officer Long, indicated

18    arrived at the scene first.

19        There is absolutely no evidence before the

20    Court as to where the gun was located.

21        I'm sorry.  There's one last item.

22        Finally, Your Honor, that was absolutely no

23    testimony elicited whatsoever as to any weight of any

24    cocaine being brought to the scene or of any belief

25    that there was any actual cocaine.

1          The agent testified that he hoped there was the

2     presence of cocaine and that he believed there would

3     be, but he didn't test it and he had no personal

4     knowledge as to whether or not.

5          He also never testified as to any weight of any

6     cocaine that they he brought to the scene.

7          That's it, Your Honor.

8          MR. GALLAGHER: First all, Judge, there is no

9     longer objective entrapment as a matter of law.  That

10    was done away with.

11         The only thing left is due process violation

12    and subjective entrapment.

13         The issue here is subjective in nature.  It's

14    an issue for the trier of fact on the issue of

15    entrapment.

16         It is something that needs to go to the jury.

17         With regard to conspiracy, there was no showing

18    that either defendant abandoned their criminal

19    intent.  In conspiracy, all the State has to prove is

20    there was an agreement, number one, and also intent

21    to commit a crime.

22         There has been plenty of testimony with regard

23    to the fact there was an agreement here for these two

24    gentlemen to purchase two kilograms of cocaine.

25    That's the amount that Mr. Holden keeps referring to,

1          two kilograms, for the price of $33,000.

2              In conspiracy, you don't need a chemist to say

3          what two kilograms is.  You don't need a chemist to

4          bring in the cocaine.

5              Conspiracy is merely an agreement or words or

6          actions so the surplus by Mr. Holden is unnecessary

7          for a conspiracy conviction.

8              With regard to the gun charge, as we stated

9          yesterday, the only person in that car at the time

10         that gun was in that car was, at least what the

11         evidence showed, was Katan Maignan.  Although he says

12         someone may have put it in there, that is up to the

13         trier of fact on all issues and I ask the Court to

14         deny the motion and allow the case to proceed to the

15         jury.

16             THE COURT: Motion for judgment of acquittal at

17         the close of all the evidence, first of all, there

18         has been sufficient evidence presented to the jury

19         now for them to decide the question as to entrapment.

20             The State has carried their burden. I find this

21         certainly by a preponderance of the evidence says

22         certain question of predisposition and other

23         questions of -- whether it was a government

24         inducement, there was ample evidence presented to

25         show this was not governmental inducement or that

1    they were predisposed, the defendants. These are

2    questions of fact to be determined by the jury.

3        I find that by a preponderance of evidence the

4    State has carried its burden in that regard.

5        The evidence has been sufficient. Entrapment

6    shall be read to the jury, otherwise the State has

7    otherwise carried its burden as to both counts as to

8    both defendants. There has been sufficient evidence

9    presented that the evidence is not insufficient as

10   3.380 indicates and that there has been sufficient

11   evidence to warrant a conviction in both cases, if in

12   the event that is submitted to the jury and if in the

13   event that jury should find them guilty as to both

14   counts, there is sufficient evidence to sustain that

15   to go to the jury, and otherwise looking at Rule

16   3.380, the motion for judgment of acquittal at the

17   close of all the evidence as to both defendants in

18   both cases, as to both cases, and the motion is

19   respectfully denied.

20       What now? Closing argument.

21       How long do you want at the beginning?

22       MR. HOLDEN: Ten minutes.

23       MR. HECKER: We'd like to close thirty minutes a

24   piece. I will take fifteen minutes. About fifteen,

25   twenty minutes.

BROWARD REPORTING SERVICE   (954) 763-1382

# EXHIBIT  U

IN THE CIRCUIT COURT OF THE 17TH JUDICIAL CIRCUIT
IN AND FOR BROWARD COUNTY, FLORIDA

STATE OF FLORIDA,                    )
                                     )
          Plaintiff,                 )        CASE NO.:  95-14021CF10B
                                     )
vs.                                  )        JUDGE:  MARC H. GOLD
                                     )
FRITZ MAIGNAN,                       )
                                     )
          Defendant.                 )
_____)

## ORDER DENYING DEFENDANT'S
## MOTION FOR POST CONVICTION RELIEF

THIS CAUSE, having come before the Court upon Defendant's Motion For Post

Conviction Relief, pursuant to Florida Rule of Criminal Procedure 3.850, and the Court

having considered same, the State's Response thereto, the Defendant's Motion to

Strike State Response, Defendant's Response to State's Response, the appellate

briefs, the court file and otherwise being fully advised in the premises, hereby finds as

follows:

Defendant, FRITZ MAIGNAN, and his brother, KATAN MAIGNAN, were

arrested in Broward County, Florida on August 11, 1995. Both brothers were charged

by Information with Conspiracy to Traffic in Cocaine (between 400 grams and 150

kilograms). Katan was also charged with Carrying a Concealed Firearm. The events

leading up to the arrest began earlier in August, 1995, in New York,  when the

Defendants met a man who worked for the DEA as a paid informant. The Defendants

were put in touch with a DEA agent and several telephone conversations resulted in

both Defendants coming to Fort Lauderdale, Florida to purchase two kilograms of

cocaine for $33,000.00.

Katan Maignan was arrested in Hallandale, Florida after a meeting with the DEA agent. His car was stopped and a search revealed $1750.00 in cash and a handgun on the floor of the car. Fritz Maignan was arrested several hours later when he returned to the area to look for his brother. No money or cocaine ever changed hands. At the trial of this cause the Defendants testified that they were lured into this crime by the action of the law enforcement officers and that they were not predisposed to be involved in dealing drugs. The entrapment defense failed and both Defendants were found guilty as charged by a jury. The Honorable Robert W. Tyson, Jr. sentenced the Defendants to 15 years in prison with a 15 year mandatory minimum on June 14, 1996. The Defendants both filed appeals in the Fourth District Court of Appeal. On October 1, 1997 both cases were Per Curiam Affirmed and a Mandate was issued on December 5, 1997.

The Defendant in this Motion for Post Conviction Relief alleges that his trial counsel provided ineffective assistance by failing to call the confidential informant as a witness, by insufficiently arguing the Motions for Judgment of Acquittal, by not objecting to the jury instruction on entrapment, by not having moved to dismiss the trafficking charge based on the confidential informants lack of supervision and that the Court erred in admitting recorded telephone conversations into evidence. This Court has thoroughly reviewed the allegations of the Defendant and the law applicable to each issue. The Court finds that the Defendant's claims are without merit and adopts the State's Response along with the attached portions of the record which conclusively refute the Defendant's entitlement to relief. The various allegations of ineffective assistance of counsel do not rise to level required by Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed 674 (1984) and Downs v. State, 453 So.2d 1102

(Fla. 1984). The allegation of error on the part of the court improperly allowing the admission of evidence is not cognizable in a post conviction setting and could have been addressed on direct appeal.

Accordingly, it is hereby,

**ORDERED AND ADJUDGED** that Defendant's Motion for Post Conviction Relief is respectfully, **DENIED**.

The Defendant has thirty (30) days from the date of this Order to file an appeal.

**DONE AND ORDERED** in Chambers, Fort Lauderdale, Florida, this _19th_ day of _May_, 1999.

_____
MARC H. GOLD
CIRCUIT COURT JUDGE

Copies furnished:

Mr. Fritz Maignan, Defendant, DC#196119
DeSoto Correctional Institution
P.O. Drawer 1072
Arcadia, Florida 34265

Assistant State Attorney Joel Silvershein
Broward County Courthouse

# EXHIBIT  X

IN THE CIRCUIT COURT OF THE SEVENTEENTH
JUDICIAL CIRCUIT IN AND FOR BROWARD
COUNTY, STATE OF FLORIDA

CRIMINAL DIVISION:

FRITZ MAIGNAN,
   Defendant / Appellant,

VS.

CASE NO. 95-14081CF10B

STATE OF FLORIDA,
   Plaintiff / Appellee.

RECEIVED
OFFICE OF THE ATTORNEY GENERAL
AUG 03 1999
CRIMINAL DIVISION
WEST PALM BEACH

RECORD

NOTICE OF APPEAL

    **NOTICE IS HEREBY GIVEN** that **FRITZ MAIGNAN**, Defendant / Appellant, pro se, pursuant to Florida Rule(s) of Appellate Procedure, 9.110 & 9.140(i), files this his **NOTICE OF APPEAL**.

    Appellant, appeals to the Fourth District Court of Appeal the "Order Denying Defendant's Motion For Rehearing" tendered JUNE 9, 1999. SEE: ATTACH-MENT #1. On the trial court's "Order Denying Defendant's Motion For Postconviction Relief" tendered MAY 19, 1999. SEE: ATTACHMENT #2.

    The nature of the final Order is the "Summary Denial of Motion For Rehearing", (ATT.#1), dated: JUNE 9TH, 1999, heard by Honorable MARC H. GOLD, circuit Judge, On the "Summary Denial of Defendant's Motion For Postconviction Relief", (ATT.#2.), dated MAY 19, 1999, heard by Honorable MARC H. GOLD, circuit Judge.

-1-

Further, **Appellant**, moves this Honorable Court to take Notice that this "**Notice of Appeal**" had been Filed via Institutional Mail. And as the **Appellant** has no other remed for redressing the Court i.e., mailing and receiving legal concern of Timely Filing of this "Notice" would be in accordance with **HAAG V. STATE**, 591 So.2d 614 (Flo. 1992).

Pursuant to the heretofore facts and authorities, All parties are called upon to take Notice and act accordingly.

## AFFIDAVIT OF INSOLVENCY

The undersigned, Appellant, **FRITZ MAIGNAN**, prose, hereby swear and affirm, that he is the **Appellant** in these proceedings and is unable to pay the costs or any charges payable by law, incident to this cause of action.

Furthermore, he has no personal assets or property, either real or personal, nor has he divested funds or property for the purposes of obtaining benefits from this Oath. **Appellant** asserts that the pleading filed in this action is meritorious and unless this court enters an **ORDER** adjudging him insolvent, he will be deprived of his right under the Florida, and United States Constitutions.

**Appellant** also offers himself up to the court for further examination into his insolvency.

Respectfully Submitted,

/s/ fritz Maignan
FRITZ MAIGNAN.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing, "**NOTICE OF APPEAL** w/attached COURT ORDER

- 2 -

DATED: JUNE 9, 1999 (ATT# 1)., and COURT ORDER DATED: MAY 19, 1999. (ATT# 2.); "AFFIDAVIT OF INSOLVENCY" had been furnished via U.S. MAIL to: ATTORNEY GENERAL'S OFFICE, 1655 PALM BEACH LAKES BLVD., THIRD FLOOR, WEST PALM BEACH, FLORIDA. 33401-2299; MR JOEL SILVERSHEIN, ASSISTANT STATE ATTORNEY, 201 S.E. 6TH STREET, ROOM 673, FT. LAUDERDALE, FLORIDA. 33301; HON. MARILYN BEUTTENMULLER, CLERK OF COURT, FOURTH DISTRICT COURT OF APPEAL, P.O. BOX 3315, WEST PALM BEACH, FLORIDA. 33402 on this 23rd day of JUNE, 1999, By the undersigned.

/S/ _Fritz Maignan_
FRITZ MAIGNAN,
Appellant, Pro Se

## DECLARATION

I HEREBY DECLARE UNDER PENALTY OF PERJURY that I, FRITZ MAIGNAN, have read the foregoing: "NOTICE OF APPEAL", "AFFIDAVIT OF INSOLVENCY", "CERTIFICATE OF SERVICE", and the facts and matters stated therein are TRUE and CORRECT.

ACCORD: Chapters 92.52, 92.525 Florida Statutes EXECUTED on this 23rd day of JUNE, 1999, By the undersigned.

/S/ _Fritz Maignan_
FRITZ    MAIGNAN
DC# 196119 - M.N.# 4017
DESOTO CORRECTIONAL INST. (ANNEX)
P.O. DRAWER 1072
ARCADIA, FLORIDA. 34265-1072

Appellant, Pro Se

ATTACHMENTS: 2

-3-

# EXHIBIT  V

JUNE 2, 1999

FRITZ MAIGNAN
DC# 196119 - M.N.# 4017
DESOTO CORRECTIONAL INST. (ANNEX)
P.O. DRAWER 1072
ARCADIA, FLORIDA. 34265-1072

HONORABLE MARC H. GOLD
CIRCUIT COURT JUDGE
BROWARD COUNTY COURTHOUSE
GEORGE W. TEDDER, SR. DRIVE
201 S.E. 6TH STREET
FT. LAUDERDALE, FLORIDA. 33301

RE: MOTION FOR REHEARING
STATE OF FLORIDA vs. FRITZ MAIGNAN,
CASE NO. 95-14621-CF-10B

Dear Judge Gold:

    Your Honor, Please find enclosed for your review a courtesy copy of "DEFENDANT'S MOTION FOR REHEARING" directed towards the Order Denying motion for Postconviction Relief, dated MAY 19, 1999.

    Please note that the original has been filed in the Clerk of Court's Office. And counsel for the State, Mr Joel Silverstein, A.S.A., has been furnished a true and correct copy as indicated in the certificate of service. I remain,

Respectfully Yours,

/s/ Fritz Maignan
FRITZ MAIGNAN, # 196119
Defendant, Pro Se

ENCLOSURES : 1

CC: JOEL SILVERSTEIN, A.S.A.,
    F.M. FILE

IN THE CIRCUIT COURT OF THE
SEVENTEENTH JUDICIAL
CIRCUIT IN AND FOR
BROWARD COUNTY, FLORIDA.

STATE OF FLORIDA,
                    Plaintiff,                    CRIMINAL DIVISION:

vs.                                               CASE NO. 95-14021-CF-10B

FRITZ MAIGNAN,
                    Defendant.  /                 JUDGE MARC H. GOLD

_____


## DEFENDANT'S MOTION FOR REHEARING


COMES NOW, the Defendant, **FRITZ MAIGNAN**, in
**pro se**, and pursuant to RULE 3.850 **Fla. R. Crim. P.**,
And respectfully files this Motion For Rehearing
on this court's "Order Denying Defendant's Motion For
Postconviction Relief", dated May 19, 1999. Wherein the
Defendant respectfully submits that the court has
overlooked controlling points of law and fact in
denying his Motion For Postconviction Relief, And
moves the court to grant this Rehearing, Withdraw
its Order of Denial, and Order an Evidentiary
Hearing in accordance with RULE 3.850, Due Process
of Law, And established case precedence. And
the Defendant respectfully shows this court as
follows:

## I.
## TIMELINESS OF MOTION

Florida Rules of Criminal Procedure, RULE 3.850
(g), Grants a Defendant "Fifteen (15) Days from the

-1-

date of **SERVICE** of the Order [Denying Postconviction Relief]. **Id.** (emphasis added).

The Rule further provides: "The Clerk of the Court **SHALL** promptly **SERVE** on the prisoner a copy of any order denying a motion for postconviction relief or denying a motion for rehearing noting thereon the **DATE OF SERVICE BY AN APPROPRIATE CERTIFICATE OF SERVICE**." **Id. RULE 3.850 (g).** (emphasis added)

The Court's Order bears **NO** "certificate of service" by the Clerk of Court. And while the Order was apparently rendered by Judge Gold on **MAY 19, 1999**. It was **NOT** received by this Defendant until **MAY 28, 1999**.

Thus, the Defendant is forced to calculate his "15 days" to file his Motion For Rehearing from the date of rendition of the Order **MAY 19, 1999**. As such, his "15 days" would **expire** on **JUNE 3, 1999**.

This Motion For Rehearing having been filed, by delivering same to the Institutional Mailroom at DeSoto Correctional Institution in Arcadia, Florida, on **JUNE 2, 1999**, should be deemed timely filed under the "mailbox Rule". **SEE: HAAG V. STATE**, 591 So.2d 614 (Fla.1992); **HOUSTON V. LACK**, 487 U.S. 266, 108 S. Ct. 2379, 101 L.Ed.2d 245 (1988).

## II.
## LAW AND FACTS OVERLOOKED

A trial court may not summarily deny a claim for postconviction relief without stating the basis for the ruling and attaching the relevant portions of the record on which the trial court relies in tendering its ruling. **PRIETO V. STATE**, 708 So.2d 647, 649 (Fla. 2d DCA 1998). In this case the trial court

- 2 -

ruled as follows:

> "The Court finds that the Defendant's
> claims are without merit and adopts
> the State's Response along with the
> attached portions of the record which
> conclusively refute the Defendant's en-
> titlement to relief. The various al-
> legations of ineffective assistance
> of counsel do not rise to level required
> by STRICKLAND V. WASHINGTON, 466 U.S.
> 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984);
> DOWNS V. STATE, 453 So.2d 1102 (Flo. 1984)."
> Id. at COURT'S ORDER OF MAY 19, 1999, At
> PAGE 2-3. SEE: ATTACHED - EXHIBIT "1 in Cm

The Court has apparently overlooked controlling
points of law and fact in this case.

The law is well established that an Ineffective
Assistance of Counsel claim is shown when there is
evidence that counsel's performance was deficient
and that deficient performance prejudiced the De-
fendant, STRICKLAND V. WASHINGTON, 466 U.S. 668,
687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); OSORIO V.
STATE, 676 So.2d 1363 (Flo. 1996).

1. In GROUND ONE of Defendant's Motion For Post-
conviction Relief, the Defendant stated that trial
counsel rendered Ineffective Assistance of Counsel
by failing to subpoena, and call "JOSEPH CLARK", the
State's Informant who lured the Defendant into the
State's nefarious plot to violate the Due Process Clauses
of the Florida, and United States Constitutions by
creating a crime, and then prosecuting the undis-
posed Defendant for its commission.

While recognizing that the decision of whether to call certain witnesses is generally a matter of trial strategy and perfection judgment on the part of trial counsel. "[W]hen the decision made is so irresponsible as to constitute inadequate representation ... such a ground constitutes a proper collateral attack on the competence of counsel". ROTH V. STATE, 479 So.2d 848 (Fla.3d DCA 1985); MAULDIN V. STATE, 382 So. 2d 844 (Fla. 1st DCA 1980); e.g., ARMSTRONG V. STATE, 429 So. 2d 287 (Fla.), cert. denied, 464 U.S. 865, 104 S.Ct. 203, 78 L.Ed.2d 177 (1983).

In order for such a claim to be "LEGALLY SUFFICIENT", the Defendant must "IDENTIFY" the witness. Allege that the witness was "AVAILABLE", And give a detailed accounting of the "SUBSTANCE OF THE WITNESSES TESTIMONY". HIGHSMITH V. STATE, 617 So.2d 825 (Fla. 1st DCA 1993); MARROW V. STATE, 715 So.2d 1075 (Fla. 1st DCA 1998).

The Defendant specifically demonstrated how his defense was prejudiced through the exclusion of the witness JOSEPH CLARK. And in so doing, satisfied the two prong "STRICKLAND" test, and stated a "legally sufficient" claim under this issue. HIGHSMITH, supra., MARROW, supra.

This court should grant Rehearing, withdraw its previous order of denial, And grant an Evidentiary Hearing. And/or Grant Defendants Motion For Post-conviction Relief, vacate judgment and sentence, and order that a New Trial be had in this cause.

2. In GROUND TWO, of Defendants Motion For Post-conviction Relief, this court has clearly overlooked the "FUNDAMENTAL" significance of this issue.

"Fundamental Error" which can be considered on appeal, or in collateral review even in the absence of an objection below... IS ERROR WHICH

GO'S TO THE FOUNDATION OF A CASE OR MERITS OF THE CAUSE". **SANFORD V. RUBIN**, 237 So.2d 134, 137 (Fla 1970).

While this issue at first glance might appear to be an evidentiary issue. **ANEIRO V. STATE**, 674 So.2d 913 (Fla. 4TH DCA), rev. denied, 686 So.2d 582 (Fla.1996).

It actually, "involves a corruption of the truth seeking function of the jury trial". **UNITED STATES V. AGURS**, 427 U.S. 97, 104, 96 S.Ct. 2392, 2398, 49 L.Ed. 2d 342 (1976), Where the State, through false and misleading assertions to the trial Court, **STATE V. BURTON**, 314 So.2d 136 (Fla. 1975), obtains a favorable ruling on the admissibility of irrelevant, and prejudicial hearsay evidence. **ANEIRO**, supra., such actions by the State is "incompatible with rudimentary demands of justice". **GIGLIO V. UNITED STATES**, 405 U.S. 150, 153, 92 S.Ct. 763, 765, 31 L.Ed.2d 104 (1972), And clearly violated the very "Due Process" rights of the Defendant that the State is sworn to protect. **SEE**: **BERGER V. UNITED STATES**, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935); **WILSON V. STATE**, 294 So.2d 327, 328-29 (Fla.1974)

This Court should view this claim as precisely what it was. An egregious act of Prosecutorial misconduct aimed at depriving the Defendant of a Fundamentally Fair Trial. "FUNDAMENTAL ERROR". This Court should grant this Rehearing motion, withdraw its previous Order of denial, And Order an Evidentiary Hearing, And/or Grant Defendants 3.850 motion, vacate judgment and sentence, And Order that a New Trial be had in this cause.

3. In regards to **GROUND THREE**, of Defendant's motion For Postconviction Relief, trial counsel was Ineffective for failing to incorporate a "SUFFICIENCY OF THE EVIDENCE" argument in the judgment of acquittal.

This Court has apparently overlooked the **FACT** that the State's Response, and the portions of the

Record relied upon by the State, and adopted by this Court in denying this claim, controverts the very ruling. SEE: ATTACHED - EXHIBIT #2 PORTIONS OF THE TRIAL TRANSCRIPTS - JUDGMENT OF ACQUITTAL- PAGE(S) 269 - 276, 372-379. infra., which are by attachment, and reference, incorporated hereto.

A casual reading of those portions of the Record, clearly shows that the ONLY basis for trial counsel's Motion for Judgment of Acquittal was the ENTRAPMENT DEFENSE, NOT, the "SUFFICIENCY OF THE EVIDENCE TO SUSTAIN THE CONVICTION" as alleged by the Defendant.

This Honorable Court should grant this Rehearing, withdraw its previous Order of denial, and order an Evidentiary Hearing on this claim. And / or Grant Defendant's Motion For Postconviction Relief, vacate and set aside the judgment and sentence, And order that a New Trial be had in this cause.

4. In regards to GROUND(S) THREE and FOUR of Defendant's Motion For Postconviction Relief, the State has argued in their Response, which was accepted and adopted by this Court, "that the issues were raised on direct appeal. And are therefore not cognizable in a 3.850 motion."

With all due respect to this Court, the Court is clearly overlooking the very nature of these claims. "INEFFECTIVE ASSISTANCE OF COUNSEL". Denial of Effective Assistance of Counsel, was NOT, and by law, with rare exception, could not have been raised on direct appeal.

Consequently, the fact that an "issue was raised on direct appeal does not bar a subsequent collateral challenge based on a claim of ineffective assistance of counsel". SEE: VENTO V. STATE, 621 So.2d 493, 495 (Fla. 4TH DCA 1993); PUCKETT V. STATE, 641 So.2d 933, 934 (Fla. 2d DCA 1994).

- 6 -

Thus, the fact that the inaccurate jury instruction under **VAZQUEZ V. STATE**, 700 So. 2d 5 (Fla. 4th DCA 1997), was raised on direct appeal. Does not bar a claim of Ineffective Assistance of counsel for failing to properly object to the error in order to properly preserve the issue for appellate review. **VENTO V. STATE**, supra.

This Honorable court should grant this Rehearing, withdraw its previous Order of denial. And Order an Evidentiary Hearing on this claim. And/or this court should Grant Defendants Motion for Postconviction Relief, vacate and set-aside the judgment and sentence, And Order that a New Trial be had in this cause.

In further support of this Motion for Rehearing, the Defendant hereby adopts and incorporates by reference hereto his, "REPLY TO STATE'S RESPONSE TO DEFENDANT'S MOTION FOR POSTCONVICTION RELIEF", and the facts, arguments and authorities cited therein, filed on **FEBRUARY 24, 1999.**

**WHEREFORE,** Based upon the foregoing arguments, facts, and authorities which this court has overlooked in denying Defendants Motion for Post-conviction Relief, The Defendant respectfully moves this court to grant Rehearing.

Respectfully Submitted,

By _____
FRITZ MAIGNAN, #196119
Defendant, Pro Se

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing. "DEFENDANT'S MOTION FOR REHEARING

- 7 -

CONTINUED!

CONT: W/ ATTACHMENTS, has been furnished by Regular
U.S. MAIL to: MR. JOEL SILVERSHEIN, ASSISTANT STATE
ATTORNEY, 201 S.E. 6TH STREET, ROOM 675, FT. LAUDER-
DALE, FLORIDA. 33301; HON. MARC H. GOLD, CIRCUIT
COURT JUDGE, GEORGE W. TEDDER, SR., DRIVE, 201 S.E.
6TH STREET, FT. LAUDERDALE, FLORIDA. 33301, by
placing same in the Institutional Mailbox at Desoto
correctional Institution, in Arcadia, Florida on this
2nd day of JUNE, 1999, By the undersigned.

/S/ Fritz Maignan
FRITZ   MAIGNAN # 196119
Defendant, Pro Se

### DECLARATION

I HEREBY DECLARE UNDER PENALTY OF PERJURY that
I, FRITZ MAIGNAN, have read the foregoing, "DEFEN-
DANT's MOTION FOR REHEARING W/ ATTACHMENTS", "CER-
TIFICATE OF SERVICE", and the facts and matters
stated therein are TRUE and CORRECT.

ACCORD: chapters 92.52, 92.525 Florida Statutes (1997)

EXECUTED on this 2nd day of JUNE, 1999, By the
undersigned.

/S/ Fritz Maignan
FRITZ   MAIGNAN
DC# 196119  -  M.N.# 4017
DESOTO CORRECTIONAL INST. (ANNEX)
P.O. DRAWER 1072
ARCADIA, FLORIDA. 34265-1072

Defendant, Pro Se

- 8 -

IN THE CIRCUIT COURT OF THE
SEVENTEENTH JUDICIAL
CIRCUIT IN AND FOR
BROWARD COUNTY, FLORIDA.

STATE OF FLORIDA,
        Plaintiff,         CRIMINAL DIVISION:

vs.                    CASE NO. 95-14021-CF-10B

FRITZ MAIGNAN,
        Defendant.        JUDGE: GOLD

## · ATTACHMENTS ·

Defendant, Pro se,

FRITZ MAIGNAN
DC# 196119 - M.N# 4017
DESOTO CORRECTIONAL INST. (ANNEX)
P.O. DRAWER 1072
ARCADIA, FLORIDA. 34265-1072

- i -

TABLE OF CONTENTS

| EXHIBIT # | DESCRIPTION OF DOCUMENT(S) | PAGE NO. |
|---|---|---|

COVER PAGE TO ATTACHMENTS . . . . . i

TABLE OF CONTENTS . . . . . . . . ii

EXHIBIT #1.  COURT ORDER DENYING DEFENDANTS
             MOTION FOR POST CONVICTION RELIEF
             DATED: MAY 19, 1999 . . . . . . A1 - A3

EXHIBIT #2.  PORTIONS OF THE TRIAL TRANSCRIPTS,
             JUDGMENT OF ACQUITTAL - PAGE(S) 269 -
             274, and 372 - 379 . . . . . . A4 - A19

IN THE CIRCUIT COURT OF THE 17TH JUDICIAL CIRCUIT
IN AND FOR BROWARD COUNTY, FLORIDA

STATE OF FLORIDA,                    )
                                     )
                 Plaintiff,          )      CASE NO.:  95-14021CF10B
                                     )
vs.                                  )      JUDGE:  MARC H. GOLD
                                     )
FRITZ MAIGNAN,                       )
                                     )
                 Defendant.          )
_____)

## ORDER DENYING DEFENDANT'S
## MOTION FOR POST CONVICTION RELIEF

THIS CAUSE, having come before the Court upon Defendant's Motion For Post

Conviction Relief, pursuant to Florida Rule of Criminal Procedure 3.850, and the Court

having considered same, the State's Response thereto, the Defendant's Motion to

Strike State Response, Defendant's Response to State's Response, the appellate

briefs, the court file and otherwise being fully advised in the premises, hereby finds as

follows:

Defendant, FRITZ MAIGNAN, and his brother, KATAN MAIGNAN, were

arrested in Broward County, Florida on August 11, 1995. Both brothers were charged

by Information with Conspiracy to Traffic in Cocaine (between 400 grams and 150

kilograms). Katan was also charged with Carrying a Concealed Firearm. The events

leading up to the arrest began earlier in August, 1995, in New York,  when the

Defendants met a man who worked for the DEA as a paid informant. The Defendants

were put in touch with a DEA agent and several telephone conversations resulted in

both Defendants coming to Fort Lauderdale, Florida to purchase two kilograms of

cocaine for $33,000.00.

EXHIBIT # 1                                          A 1

(Fla. 1984). The allegation of error on the part of the court improperly allowing the admission of evidence is not cognizable in a post conviction setting and could have been addressed on direct appeal.

Accordingly, it is hereby,

ORDERED AND ADJUDGED that Defendant's Motion for Post Conviction Relief is respectfully, **DENIED**.

The Defendant has thirty (30) days from the date of this Order to file an appeal.

DONE AND ORDERED in Chambers, Fort Lauderdale, Florida, this 19th day of May, 1999.

_____
MARC H. GOLD
CIRCUIT COURT JUDGE

Copies furnished:

Mr. Fritz Maignan, Defendant, DC#196119
DeSoto Correctional Institution
P.O. Drawer 1072
Arcadia, Florida 34265

Assistant State Attorney Joel Silvershein
Broward County Courthouse

A 3

Katan Maignan was arrested in Hallandale, Florida after a meeting with the DEA agent. His car was stopped and a search revealed $1750.00 in cash and a handgun on the floor of the car. Fritz Maignan was arrested several hours later when he returned to the area to look for his brother. No money or cocaine ever changed hands. At the trial of this cause the Defendants testified that they were lured into this crime by the action of the law enforcement officers and that they were not predisposed to be involved in dealing drugs. The entrapment defense failed and both Defendants were found guilty as charged by a jury. The Honorable Robert W. Tyson, Jr. sentenced the Defendants to 15 years in prison with a 15 year mandatory minimum on June 14, 1996. The Defendants both filed appeals in the Fourth District Court of Appeal. On October 1, 1997 both cases were Per Curiam Affirmed and a Mandate was issued on December 5, 1997.

The Defendant in this Motion for Post Conviction Relief alleges that his trial counsel provided ineffective assistance by failing to call the confidential informant as a witness, by insufficiently arguing the Motions for Judgment of Acquittal, by not objecting to the jury instruction on entrapment, by not having moved to dismiss the trafficking charge based on the confidential informants lack of supervision and that the Court erred in admitting recorded telephone conversations into evidence. This Court has thoroughly reviewed the allegations of the Defendant and the law applicable to each issue. The Court finds that the Defendant's claims are without merit and adopts the State's Response along with the attached portions of the record which conclusively refute the Defendant's entitlement to relief. The various allegations of ineffective assistance of counsel do not rise to level required by Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed 674 (1984) and Downs v. State, 453 So.2d 1102

A2

1          THE COURT:  You may step down; call your next

2     witness.

3          MR. GALLAGHER: Judge, the People of the State

4     of Florida respectfully rest their case.

5          THE COURT: Please show the jury to its room.

6          (Thereupon, the jury left the courtroom, after

7     which the following proceedings were resumed outside

8     the presence of the jury:)

9          THE COURT: Defense?

10         MR. HECKER: Yes, Your Honor.  I would move for

11    a judgment of acquittal renewal of the original

12    motion to dismiss that was filed before this Court.

13    The Court has a copy of that and it's also in the

14    file.

15         This is the leading case of entrapment.  In

16    this case, from the Florida Supreme Court, that

17    discusses the entrapment defense and what burden each

18    party has.

19         The initial burden is by preponderance of the

20    evidence for the defendant to show he had no

21    predisposition.  This can be shown through a lack of

22    a prior record or a lack of criminal activity and can

23    even be shown by evidence that would not normally be

24    admissible at trial.

25         The testimony we heard today from Special Agent

EXHIBIT # 2

270

1       Heath Anderson which would be considered the lead

2       agent and the agent with the majority of contact with

3       my client, was basically as follows:  He gets a tip

4       from an individual who at one time was a documented

5       confidential informant but at this point had been

6       reactivated.

7              The tip merely is an individual by the name of

8       Stizzo is coming to Florida to shop.

9              Now, as Agent Anderson testified, he took no

10      further steps on his own, no independent

11      investigation, no running of the record, no further

12      inquiry to discover whether or not Stizzo who he

13      later learned to be Fritz Maignan, was actually

14      involved in the drug trade.

15             When asked specifically had the confidential

16      informant Joe Clark informed Agent Anderson of ever

17      seeing kilos in the possession of Fritz Maignan or

18      ounces or any drug whatsoever, the answer was no, he

19      was never given any information that drugs were

20      around Fritz Maignan.

21             The burden then shifts to the State to show

22      that Fritz Maignan was a proper target in this

23      matter, and this also can be shown by evidence.

24             The State did not proffer nor was any testimony

25      drawn out from Special Agent Anderson or some of the

BROWARD REPORTING SERVICE   (954) 763-1382

A 5

1        other witnesses, that there is independent evidence

2        over and above and separate from the evidence

3        presented here regarding the instant case which is

4        before the Court.

5              In fact, the specific evidence that was

6        presented was that the confidential informant Joseph

7        Clark had no other independent evidence of them, had

8        never seen any drugs with them or had never observed

9        any deals, never participated in any deals, so the

10       Munoz case prevents this Court from utilizing the

11       facts and circumstances in this case in determining

12       that entrapment had not occurred as a matter of law.

13             Therefore, I renew my motion to dismiss based

14       upon the issue of entrapment as a matter of law and I

15       move for judgment of acquittal at this time.

16             Thank you, Your Honor.

17             MR. HOLDEN: Your Honor, I would be moving for a

18       judgment -- I of course join in counsel's statement

19       and I also move for judgment of acquittal as to the

20       firearm charges.

21             Defendant Katan Maignan is charged before the

22       Court with carrying a concealed firearm.

23             There is no testimony of any witness that the

24       firearm that was seized had his fingerprints on it.

25             There is no testimony of any witness that he

1    had any knowledge of any firearm.

2         There is no testimony of any witness s

3    that he bent over and in any way exhibited k      ige

4    or awareness of the firearm, which is an ele      that

5    he knew of the existence of the firearm.

6         To the contrary, he is never seen, the    is no

7    testimony saying that he is reaching for it   r going

8    to it, nothing at all regarding the firearm.

9         In fact, just the opposite.  There is evidence

10    that the vehicle that the firearm was in was not Mr.

11    Maignan's.

12         There is evidence that the vehicle I believe

13    belonged to his sister, not to himself.

14         There is no evidence that the gun was capable

15    of being fired, Your Honor, absolutely none.  We

16    don't even know if it was a working firearm at this

17    point. Absolutely nothing came in about that.

18         If I could just have a moment.

19         THE COURT: Take your time.

20         MR. HOLDEN: There is also no evidence as to the

21    origination of the firearm.  There is no claim whose

22    name it was under.  There is no claim that it wasn't

23    registered to the defendant or in fact that it was

24    registered to anyone.

25         There is absolutely no evidence whatsoever in

1    this case that the defendant had any knowledge or

2    awareness of the firearm, merely that one was seized

3    from the vehicle in this case.

4        In fact, there has been testimony, I believe,

5    that the co-defendant was in the vehicle at some

6    point, so there is certainly a question of any

7    constructive possession in this case, but clearly,

8    Your Honor, there is no actual possession by the

9    defendant and it's our position that there was no

10    constructive possession either as shown by the items

11    -- no prints, no partials attributable to the

12    defendant, no visible objective signs of awareness by

13    the defendant of the existence of the firearm,

14    certainly no admissions by the defendant of the

15    existence of the firearm.  That's it.

16        THE COURT: State?

17        MR. GALLAGHER: Judge, with regard to the

18    motions for judgment of acquittal based upon

19    entrapment defense, there has been no evidence put

20    forth in the past couple days, just theories.

21        In fact, all the evidence is just the opposite,

22    that these two gentlemen, Katan Maignan and Fritz

23    Maignan were ready, willing and able to consummate a

24    drug transaction with regard to conspiracy as

25    demonstrated through Special Agent Anderson's

BROWARD REPORTING SERVICE   (954) 763-1382

A8

1          testimony and that they agreed to purchase two

2          kilograms of cocaine at the price of $33,000, and in

3          an attempt to consummate that transaction, showed up

4          at the scene of the Denny's on Hallandale Beach

5          Boulevard on August 11th, 1995, to consummate that

6          transaction, so there is an agreement and an intent

7          to commit a criminal act and that's all that is

8          required under the theory.

9              There is absolutely no evidence whatsoever that

10         anyone was entrapped in this case, at least at this

11         point.

12             With regard to the firearm, that all the

13         evidence in the case on the date that Katan Maignan

14         is charged with carrying a concealed firearm on

15         August 11th, 1995, never point to Katan Maignan as

16         being in the car, that's illustrated in State's

17         Exhibits 7 and 8.

18             The only person in that car is Katan Maignan.

19         The gun that is State's 17, the gun and the clip that

20         is State's Exhibit 17, by way of photographs by

21         Officer Tommy Long, show that gun and clip to be in a

22         position in the car, to be out of the normal sight of

23         the other citizens if they were to look in the car,

24         to be in a concealed position in the car, because

25         Katan Maignan was the only person in that car at any

BROWARD REPORTING SERVICE   (954) 763-1382

A9

1          time on August 11th, 1995, but that subsequent to the

2          arrest he is exclusively in possession of that

3          vehicle and under the law of possession, if you are

4          in exclusive possession of an item, in this

5          particular case, a firearm contained within the

6          vehicle, the court -- the jurors can assume that he

7          had knowledge and in taking the evidence in the light

8          most favorable to the State, which is where we are at

9          now, I ask you to deny the motion judgment of

10         acquittal on the conspiracy count and carrying a

11         concealed firearm count.

12              THE COURT:  The Court herein finds that there

13         has been sufficient evidence to go before the jury as

14         to this case, that there is evidence to, certainly

15         evidence that could find that the government did not

16         induce the accused to commit the crime and that the

17         defendants were predisposed to commit the offense to

18         which they are charged, and there is factually a

19         determination by a jury that a reasonable person can

20         draw different conclusions or even conclude that the

21         defendants were not entrapped or that they were not,

22         that they were predisposed to commit the crime and

23         not induced by the government to do that, and there

24         is sufficient evidence as a matter of law.

25              Anything further by the defendants?

A 10

1           MR. HECKER: No.

2           THE COURT: The Court finds that there has been

3       sufficient evidence presented to the jury, that they

4       should be able to make this decision and consider and

5       it is not insufficient pursuant to the rule, and that

6       there has been a prima facie case presented.

7           MR. GALLAGHER: As to Counts I and II.

8           THE COURT: As to Counts I and II, considered in

9       the light most favorable to the State, motion for

10      judgment of acquittal at the close of the State's

11      case as to both counts are denied respectfully.

12          Defense ready to proceed?

13          MR. HECKER: Yes, Judge.

14          It is ten minutes to five.  We anticipate the

15      defendants testifying.

16          THE COURT: Okay.  Should we take a break for

17      the evening?

18          MR. GALLAGHER: Your call, Judge.

19          MR. HECKER: We should finish tomorrow.

20          THE COURT: Did you get a copy of the

21      instructions that were tentatively prepared by the

22      State?

23          MR. HECKER: Yes, Judge.  I didn't see any

24      particular problems.  They were the ones we

25      requested.  They seem to be okay.

1          MR. HOLDEN: No witnesses, Judge.

2          THE COURT: Rebuttal?

3          MR. GALLAGHER: Nothing, Judge, thank you very

4     much.

5          State rests.

6          THE COURT: Show the jury to its room.

7          (Thereupon, the jury left the courtroom, and

8     the following proceedings were had outside the

9     presence of the jury:)

10         THE COURT: Motions?

11         MR. HECKER: On behalf of Fritz Maignan, I would

12    be moving for a judgment of acquittal supported by

13    the testimony the Court took in the motion to dismiss

14    based upon entrapment, the testimony the Court has

15    heard during the State's case and now, the testimony

16    that has been heard from both of the Maignan

17    brothers.

18         The defendants have raised the defense of

19    entrapment which must be shown to the Court by a

20    preponderance of the evidence, not beyond a

21    reasonable doubt.

22         It is uncontroverted that the defendant, Fritz

23    Maignan, and at some point Katan Maignan, were

24    contacted by a paid confidential informant by the

25    name of Joseph Clark, working for DEA.

1          The testimony today was at least four, perhaps

2     five meetings took place in New York at the Foot

3     Locker where Fritz Maignan worked.

4          Fritz Maignan testified that he was induced to

5     come to Florida to make big money.

6          Now, Mr. Gallagher, the prosecutor in this

7     matter, elicited there was no gun placed to his head

8     or anything else but I would direct the Court to the

9     instruction that merely says that an individual must

10    be induced or encouraged to engage in conduct

11    constituting a crime of conspiracy to traffic.

12         I would suggest we at least have encouragement

13    here on behalf of Joe Clark.  We have further

14    encouragement on behalf of Special Agent Anderson and

15    further when we have a three-way conversation with

16    Joe Clark, at which point Agent Anderson testified

17    that the deal, he is having concerns about the deal.

18         Now, the three-way conversation took place

19    prior to August 10th when both sides decided the deal

20    would be off, but again we have a continuing pattern

21    on behalf of the government here about the use of the

22    paid confidential informant Joseph Clark, as well as

23    the actions of Anderson himself, and respectfully, I

24    move for a judgment of acquittal for entrapment as a

25    matter of law and I am moving at this point that we

BROWARD REPORTING SERVICE   (954) 763-1382

A13

1    be allowed if the Court denies the motion for

2    judgment of acquittal, that entrapment be presented

3    as a defense to the jury.

4         Thank you, Your Honor.

5         MR. HOLDEN: Not only would I join in counsel's

6    motion but I also make a subjective motion to

7    dismiss, judgment of acquittal at this time on the

8    subjective entrapment argument, Your Honor.

9         Under the State versus Munoz case, there is the

10    objective entrapment argument.

11        Through the testimony of the defendants today,

12    they have indicated, which was clearly unopposed by

13    any evidence or testimony, neither evidence nor

14    testimony came in to oppose Katan Maignan or Fritz

15    Maignan having no prior record, having no prior drug

16    involvement, not making the initial contact. The

17    initial contact coming from the C.I., who furthers

18    his own contact as is testified to by Katan and Fritz

19    Maignan, who furthers it by assuaging their feelings

20    and letting them think things are going to go okay,

21    they are covered, they are safe and that they can do

22    the deal with protection -- not protection, but with

23    the protection of knowing that they will be taken

24    care, I believe is the exact phrase used by Mr.

25    Clark.

1          He even induces them further by offering to

2     provide them with sex. He offered to provide them, to

3     I believe the testimony was, to get laid was their

4     exact phraseology.

5          In addition, Your Honor, on the objective

6     argument of entrapment, we also have no evidence

7     presented nor testimony presented.  In fact, we have

8     the contrary of any prior activity by the defendants

9     whatsoever.

10          Agent Anderson indicated that while originally

11     he didn't have an opportunity to run anything of that

12     nature on them, that subsequently he did and was

13     unable to come up with any information whatsoever as

14     to any prior drug history or any indication of such

15     on the defendants.

16          Does Your Honor want me to go through all the

17     motions.

18          THE COURT: Yes, you can.  You may continue on.

19          MR. HOLDEN: Additionally, Your Honor, we move

20     for a JOA at this point as the defendants testified

21     and the evidence was pretty clear, that the

22     defendants withdrew from the conspiracy if there was

23     in fact any conspiracy, they left the scene.

24          The agents were specifically discussing on the

25     tape whether or not to take them down, do we make a

A 15

1   decision to do anything, has there been a crime
2   committed.
3       At that point, Your Honor, they are still not
4   sure.  They are still figuring out what to do.  That
5   would be my second motion for JOA.
6       Lastly, Your Honor, as to the gun charge, there
7   is absolutely no evidence whatsoever, zip, that the
8   defendant had any knowledge of the existence of the
9   gun.
10      No objective standards, no bending down
11  testified to, no objective or even subjective
12  interpretation showing the gun was known by the
13  defendant.
14      Additionally, there is absolutely no evidence
15  that the gun was where it was when the defendant was
16  pulled over.  We do not have the testimony of Agent
17  Tamer, who the other officer, Officer Long, indicated
18  arrived at the scene first.
19      There is absolutely no evidence before the
20  Court as to where the gun was located.
21      I'm sorry.  There's one last item.
22      Finally, Your Honor, that was absolutely no
23  testimony elicited whatsoever as to any weight of any
24  cocaine being brought to the scene or of any belief
25  that there was any actual cocaine.

A16

377

1          The agent testified that he hoped there was the

2     presence of cocaine and that he believed there would

3     be, but he didn't test it and he had no personal

4     knowledge as to whether or not.

5          He also never testified as to any weight of any

6     cocaine that they he brought to the scene.

7          That's it, Your Honor.

8          MR. GALLAGHER: First all, Judge, there is no

9     longer objective entrapment as a matter of law.  That

10    was done away with.

11         The only thing left is due process violation

12    and subjective entrapment.

13         The issue here is subjective in nature.  It's

14    an issue for the trier of fact on the issue of

15    entrapment.

16         It is something that needs to go to the jury.

17         With regard to conspiracy, there was no showing

18    that either defendant abandoned their criminal

19    intent.  In conspiracy, all the State has to prove is

20    there was an agreement, number one, and also intent

21    to commit a crime.

22         There has been plenty of testimony with regard

23    to the fact there was an agreement here for these two

24    gentlemen to purchase two kilograms of cocaine.

25    That's the amount that Mr. Holden keeps referring to,

A17

1       two kilograms, for the price of $33,000.

2               In conspiracy, you don't need a chemist to say

3       what two kilograms is.  You don't need a chemist to

4       bring in the cocaine.

5               Conspiracy is merely an agreement or words or

6       actions so the surplus by Mr. Holden is unnecessary

7       for a conspiracy conviction.

8               With regard to the gun charge, as we stated

9       yesterday, the only person in that car at the time

10      that gun was in that car was, at least what the

11      evidence showed, was Katan Maignan.  Although he says

12      someone may have put it in there, that is up to the

13      trier of fact on all issues and I ask the Court to

14      deny the motion and allow the case to proceed to the

15      jury.

16              THE COURT: Motion for judgment of acquittal at

17      the close of all the evidence, first of all, there

18      has been sufficient evidence presented to the jury

19      now for them to decide the question as to entrapment.

20              The State has carried their burden. I find this

21      certainly by a preponderance of the evidence says

22      certain question of predisposition and other

23      questions of -- whether it was a government

24      inducement, there was ample evidence presented to

25      show this was not governmental inducement or that

A18

1   they were predisposed, the defendants. These are

2   questions of fact to be determined by the jury.

3        I find that by a preponderance of evidence the

4   State has carried its burden in that regard.

5        The evidence has been sufficient.  Entrapment

6   shall be read to the jury, otherwise the State has

7   otherwise carried its burden as to both counts as to

8   both defendants.  There has been sufficient evidence

9   presented that the evidence is not insufficient as

    3.380 indicates and that there has been sufficient

    evidence to warrant a conviction in both cases, if in

12  the event that is submitted to the jury and if in the

13  event that jury should find them guilty as to both

14  counts, there is sufficient evidence to sustain that

15  to go to the jury, and otherwise looking at Rule

16  3.380, the motion for judgment of acquittal at the

    close of all the evidence as to both defendants in

    both cases, as to both cases, and the motion is

19  respectfully denied.

20       What now?  Closing argument.

21       How long do you want at the beginning?

22       MR. HOLDEN: Ten minutes.

23       MR. HECKER: We'd like to close thirty minutes a

24  piece.  I will take fifteen minutes.  About fifteen,

25  twenty minutes.

A19

IN THE CIRCUIT COURT OF THE SEVENTEENTH
JUDICIAL CIRCUIT IN AND FOR BROWARD
COUNTY, STATE OF FLORIDA

CRIMINAL DIVISION:

FRITZ MAIGNAN,
   Defendant / Appellant,

vs.              CASE NO. 95-14021CF10B

STATE OF FLORIDA,
   Plaintiff / Appellee.

RECEIVED
OFFICE OF THE ATTORNEY GENERAL

JUN 25 1999

CRIMINAL DIVISION
WEST PALM BEACH

## NOTICE OF APPEAL

    NOTICE IS HEREBY GIVEN that FRITZ MAIGNAN, Defendant / Appellant, pro se, pursuant to Florida Rule(s) of Appellate Procedure, 9.110 & 9.140(i), files this his NOTICE OF APPEAL.

    Appellant, appeals to the Fourth District Court of Appeal the "Order Denying Defendant's Motion For Rehearing" rendered JUNE 9, 1999. SEE: ATTACHMENT #1, on the trial court's "Order Denying Defendant's Motion For Postconviction Relief" rendered MAY 19, 1999. SEE: ATTACHMENT #2.

    The nature of the final Order is the "Summary Denial of Motion For Rehearing", (ATT. #1), dated: JUNE 9TH, 1999, heard by Honorable MARC H. GOLD, Circuit Judge, on the "Summary Denial of Defendant's Motion For Postconviction Relief", (ATT. #2.), dated MAY 19, 1999, heard by Honorable MARC H. GOLD, Circuit Judge.

- 1 -

Further, **Appellant**, moves this Honorable Court to take Notice that this "**Notice of Appeal**" had been filed via Institutional Mail. And as the **Appellant** has no other remed for redressing the Court. i.e., mailing and receiving legal concern of Timely Filing of this "Notice" would be in accordance with **HAAG V. STATE**, 591 So.2d 614 (Flo. 1992).

Pursuant to the heretofore facts and authorities, All parties are called upon to take Notice and act accordingly.

## AFFIDAVIT OF INSOLVENCY

The undersigned, Appellant, **FRITZ MAIGNAN**, pro-se, hereby Swear and affirm, that he is the **Appellant** in these proceedings and is unable to pay the costs or any charges payable by law, incident to this cause of action.

Furthermore, he has no personal assets or property, either real or personal, nor has he divested funds or property for the purposes of obtaining benefits from this Oath. **Appellant** asserts that the pleading filed in this action is meritorious and unless this Court enters an **ORDER** adjudging him insolvent, he will be deprived of his right under the Florida, and United States Constitutions.

**Appellant** also offers himself up to the Court for further examination into his insolvency.

Respectfully Submitted,

/S/ _fritz Maignan_
FRITZ MAIGNAN.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing, "**NOTICE OF APPEAL** W/attached COURT ORDER

- 2 -

DATED: JUNE 9, 1999, (ATT # 1), and COURT ORDER DATED: MAY 19, 1999, (ATT # 2), ; "AFFIDAVIT OF INSOLVENCY" had been Furnished via U.S. MAIL to: ATTORNEY GENERAL'S OFFICE, 1655 PALM BEACH LAKES BLVD., THIRD FLOOR, WEST PALM BEACH, FLORIDA. 33401-2299; MR. JOEL SILVERSHEIN, ASSISTANT STATE ATTORNEY, 201 S.E. 6TH STREET, ROOM 673, FT. LAUDERDALE, FLORIDA. 33301; HON. MARILYN BEUTTENMULLER, CLERK OF COURT, FOURTH DISTRICT COURT OF APPEAL, P.O. BOX 3315, WEST PALM BEACH, FLORIDA. 33402 on this ___23rd___ day of JUNE, 1999, By the undersigned.

/S/ Fritz Maignan
FRITZ MAIGNAN,
Appellant, Pro se

## DECLARATION

I HEREBY DECLARE UNDER PENALTY OF PERJURY that I, FRITZ MAIGNAN, have read the foregoing "NOTICE OF APPEAL", "AFFIDAVIT OF INSOLVENCY", "CERTIFICATE OF SERVICE", and the facts and matters stated therein are TRUE and CORRECT.

ACCORD: Chapters 92.52, 92.525 Florida statutes EXECUTED on this ___23rd___ day of JUNE, 1999, By the undersigned.

/S/ Fritz Maignan
FRITZ MAIGNAN
DC# 196119 - M.N.# 4017
DESOTO CORRECTIONAL INST. (ANNE
P.O. DRAWER 1072
ARCADIA, FLORIDA. 34265-107

ATTACHMENTS: 2

Appellant, Pro se

· 3 ·

IN THE CIRCUIT COURT OF THE 17TH
JUDICIAL CIRCUIT, IN AND FOR
BROWARD COUNTY, FLORIDA

STATE OF FLORIDA,                    CASE NO. 95-14021-CF-10B

v.                                   JUDGE MARC H. GOLD

FRITZ MAIGNAN,

    Defendant.

_____/

## ORDER

**THIS CAUSE** came on to be heard on Defendant's Motion for Rehearing, dated June 2,

1999, and the Court having considered same and having reviewed the Court file herein, and being

otherwise duly advised in the premises, it is thereupon

**ORDERED AND ADJUDGED** that the Defendant's Motion for Rehearing is respectfully

**DENIED.**

**DONE AND ORDERED** in Chambers at Fort Lauderdale, Broward County, Florida,

this ___7 TH___ day of June, 1999.

                             **MARC H. GOLD**
                              **A TRUE COPY**

                            _____

                            MARC H. GOLD
                            CIRCUIT COURT JUDGE

Copies furnished:
Mr. Fritz Maignan, DC# 196119 - MN # 4017
Desoto Correctional Institution Annex
P.O. Drawer 1072, Arcadia, FL 34265-1072

Joel Silvershein, Esq., A.S.A., Broward County; FL

ATTACHMENT # 1

STATE OF FLORIDA,                )
                                 )
            Plaintiff,           )          CASE NO.: 95-14021CF10B
                                 )
vs.                              )          JUDGE: MARC H. GOLD
                                 )
FRITZ MAIGNAN,                   )
                                 )
            Defendant.           )
_____)

## ORDER DENYING DEFENDANT'S
## MOTION FOR POST CONVICTION RELIEF

THIS CAUSE, having come before the Court upon Defendant's Motion For Post
Conviction Relief, pursuant to Florida Rule of Criminal Procedure 3.850, and the Court
having considered same, the State's Response thereto, the Defendant's Motion to
Strike State Response, Defendant's Response to State's Response, the appellate
briefs, the court file and otherwise being fully advised in the premises, hereby finds as
follows:

Defendant, FRITZ MAIGNAN, and his brother, KATAN MAIGNAN, were
arrested in Broward County, Florida on August 11, 1995. Both brothers were charged
by Information with Conspiracy to Traffic in Cocaine (between 400 grams and 150
kilograms). Katan was also charged with Carrying a Concealed Firearm. The events
leading up to the arrest began earlier in August, 1995, in New York, when the
Defendants met a man who worked for the DEA as a paid informant. The Defendants
were put in touch with a DEA agent and several telephone conversations resulted in
both Defendants coming to Fort Lauderdale, Florida to purchase two kilograms of
cocaine for $33,000.00.



ATTACHMENT #2.

Katan Maignan was arrested in Hallandale, Florida after a meeting with the DEA agent. His car was stopped and a search revealed $1750.00 in cash and a handgun on the floor of the car. Fritz Maignan was arrested several hours later when he returned to the area to look for his brother. No money or cocaine ever changed hands. At the trial of this cause the Defendants testified that they were lured into this crime by the action of the law enforcement officers and that they were not predisposed to be involved in dealing drugs. The entrapment defense failed and both Defendants were found guilty as charged by a jury. The Honorable Robert W. Tyson, Jr. sentenced the Defendants to 15 years in prison with a 15 year mandatory minimum on June 14, 1996. The Defendants both filed appeals in the Fourth District Court of Appeal. On October 1, 1997 both cases were Per Curiam Affirmed and a Mandate was issued on December 5, 1997.

The Defendant in this Motion for Post Conviction Relief alleges that his trial counsel provided ineffective assistance by failing to call the confidential informant as a witness, by insufficiently arguing the Motions for Judgment of Acquittal, by not objecting to the jury instruction on entrapment, by not having moved to dismiss the trafficking charge based on the confidential informants lack of supervision and that the Court erred in admitting recorded telephone conversations into evidence. This Court has thoroughly reviewed the allegations of the Defendant and the law applicable to each issue. The Court finds that the Defendant's claims are without merit and adopts the State's Response along with the attached portions of the record which conclusively refute the Defendant's entitlement to relief. The various allegations of ineffective assistance of counsel do not rise to level required by Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed 674 (1984) and Downs v. State, 453 So.2d 1102

(Fla. 1984). The allegation of error on the part of the court improperly allowing the admission of evidence is not cognizable in a post conviction setting and could have been addressed on direct appeal.

Accordingly, it is hereby,

**ORDERED AND ADJUDGED** that Defendant's Motion for Post Conviction Relief is respectfully, **DENIED**.

The Defendant has thirty (30) days from the date of this Order to file an appeal.

**DONE AND ORDERED** in Chambers, Fort Lauderdale, Florida, this 19th day of _____, 1999.

_____
MARC H. GOLD
CIRCUIT COURT JUDGE

Copies furnished:

Mr. Fritz Maignan, Defendant, DC#196119
DeSoto Correctional Institution
P.O. Drawer 1072
Arcadia, Florida 34265

Assistant State Attorney Joel Silvershein
Broward County Courthouse

IN THE CIRCUIT COURT OF THE SEVENTEENTH
JUDICIAL CIRCUIT IN AND FOR BROWARD
COUNTY, STATE OF FLORIDA


CRIMINAL DIVISION:

FRITZ MAIGNAN,
    Pro Se, Appellant,

VS.               CASE NO. 95-14021-CF-10B

STATE OF FLORIDA,
    Appellee,


## DIRECTIONS TO CLERK


Defendant/Appellant, FRITZ MAIGNAN, in pro se, hereby directs the Clerk of this Court to include the following items in the Original Record on Appeal described in Florida Rules of Appellate Procedure, RULE(S) 9.140 (i); 9.110:

    1. Conformed copy of "MOTION FOR POSTCONVICTION RELIEF," "STATEMENT OF GROUNDS AND SUPPORTING FACTS," "MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR POST-CONVICTION RELIEF."

    2. Conformed copy of the "COURT'S ORDER DIRECTING THE STATE TO FILE A RESPONSE TO DEFENDANT'S MOTION FOR POSTCONVICTION RELIEF."

    3. Conformed copy of the "DEFENDANT'S MOTION FOR EVIDENTIARY HEARING PURSUANT TO FLA. R. CRIM.

- 1 -

1655 Palm Beach Lakes Blvd., Third Floor, West Palm Beach, Florida. 33401-2299 ; FRITZ MAIGNAN, Appellant, DC# 196119 - M.N.# 4017, DESOTO CORRECTIONAL INSTITUTION (ANNEX), P.O. DRAWER 1072, ARCADIA, FLORIDA. 34265-1072,

Respectfully Submitted,

/S/ _Fritz Maignan_
FRITZ   MAIGNAN,

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing " DIRECTIONS TO CLERK ", have been furnished via U.S. MAIL to: ATTORNEY GENERAL'S OFFICE, 1655 PALM BEACH LAKES BLVD., THIRD FLOOR, WEST PALM BEACH, FLORIDA. 33401-2299 ; JOEL SILVERSHEIN, ASSISTANT STATE ATTORNEY, 201 S.E. 6TH STREET, ROOM 675, FT. LAUDERDALE, FLORIDA. 33301 ; HON. MARILYN BEUTTENMULLER, CLERK OF COURT, FOURTH DISTRICT COURT OF APPEAL, P.O. BOX 3315, WEST PALM BEACH, FLORIDA. 33402 on this __23rd__ day of JUNE, 1999 By the undersigned.

/S/ _Fritz Maignan_
FRITZ    MAIGNAN
DC# 196119 - M.N.# 4017
DESOTO CORRECTIONAL INST. (ANNEX)
P.O. DRAWER 1072
ARCADIA, FLORIDA. 34265-1072

Appellant, Pro Se

FRITZ MAIGNAN
DC# 196119 — M.N.# 4017
DESOTO CORRECTIONAL INST. (ANNEX)
P. O. DRAWER 1072
ARCADIA, FLORIDA. 34265-1072

JUNE 23, 1999

CLERK OF THE CIRCUIT COURT
BROWARD COUNTY COURTHOUSE
201 S.E. 6TH STREET
FT. LAUDERDALE, FLORIDA. 33301

RE: NOTICE OF APPEAL / AFFIDAVIT OF INSOLVENCY;
DIRECTIONS TO CLERK.

FRITZ MAIGNAN VS. STATE OF FLORIDA
CASE NO. 95-14021-CF-10B

Dear Clerk of Court:

Please find enclosed for filing in the above-styled cause the Original(s), NOTICE OF APPEAL / AFFIDAVIT OF INSOLVENCY, and DIRECTIONS TO CLERK.

Additionally, Please note that all parties have been furnished a true and correct copy, as indicated in the Certificate of Service. I respectfully remain,

Sincerely Yours

ENCLOSURES: 2

/S/ _Fritz Maignan_
FRITZ MAIGNAN
Appellant, Pro-Se

CC: ATT. GENERAL'S OFFICE,
STATE ATT. OFFICE, 17TH CIV.
CLERK OF COURT, 4TH DCA
F.M. FILE



**EXHIBIT   W**

IN THE CIRCUIT COURT OF THE 17TH
JUDICIAL CIRCUIT, IN AND FOR
BROWARD COUNTY, FLORIDA

STATE OF FLORIDA,                    CASE NO. 95-14021-CF-10B

v.                                   JUDGE MARC H. GOLD

FRITZ MAIGNAN,

        Defendant.
_____/

## ORDER

THIS CAUSE came on to be heard on Defendant's Motion for Rehearing, dated June 2,

1999, and the Court having considered same and having reviewed the Court file herein, and being

otherwise duly advised in the premises, it is thereupon

ORDERED AND ADJUDGED that the Defendant's Motion for Rehearing is respectfully

DENIED.

DONE AND ORDERED in Chambers at Fort Lauderdale, Broward County, Florida,

this ___9 TH___ day of June, 1999.                MARC H. GOLD
                                                   A TRUE COPY
                                            _____
                                            MARC H. GOLD
                                            CIRCUIT COURT JUDGE

Copies furnished:
Mr. Fritz Maignan, DC# 196119 - MN # 4017
Desoto Correctional Institution Annex
P.O. Drawer 1072, Arcadia, FL 34265-1072

Joel Silvershein, Esq., A.S.A., Broward County, FL

ATTACHMENT # 1

IN THE CIRCUIT COURT OF THE 17TH JUDICIAL CIRCUIT
IN AND FOR BROWARD COUNTY, FLORIDA

| | | |
|---|---|---|
| STATE OF FLORIDA, | ) | |
| | ) | |
| Plaintiff, | ) | CASE NO.: 95-14021CF10B |
| | ) | |
| vs. | ) | JUDGE: MARC H. GOLD |
| | ) | |
| FRITZ MAIGNAN, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## ORDER DENYING DEFENDANT'S
## MOTION FOR POST CONVICTION RELIEF

THIS CAUSE, having come before the Court upon Defendant's Motion For Post

Conviction Relief, pursuant to Florida Rule of Criminal Procedure 3.850, and the Court

having considered same, the State's Response thereto, the Defendant's Motion to

Strike State Response, Defendant's Response to State's Response, the appellate

briefs, the court file and otherwise being fully advised in the premises, hereby finds as

follows:

Defendant, FRITZ MAIGNAN, and his brother, KATAN MAIGNAN, were

arrested in Broward County, Florida on August 11, 1995. Both brothers were charged

by Information with Conspiracy to Traffic in Cocaine (between 400 grams and 150

kilograms). Katan was also charged with Carrying a Concealed Firearm. The events

leading up to the arrest began earlier in August, 1995, in New York, when the

Defendants met a man who worked for the DEA as a paid informant. The Defendants

were put in touch with a DEA agent and several telephone conversations resulted in

both Defendants coming to Fort Lauderdale, Florida to purchase two kilograms of

cocaine for $33,000.00.

ATTACHMENT #2.

Katan Maignan was arrested in Hallandale, Florida after a meeting with the DEA agent. His car was stopped and a search revealed $1750.00 in cash and a handgun on the floor of the car. Fritz Maignan was arrested several hours later when he returned to the area to look for his brother. No money or cocaine ever changed hands. At the trial of this cause the Defendants testified that they were lured into this crime by the action of the law enforcement officers and that they were not predisposed to be involved in dealing drugs. The entrapment defense failed and both Defendants were found guilty as charged by a jury. The Honorable Robert W. Tyson, Jr. sentenced the Defendants to 15 years in prison with a 15 year mandatory minimum on June 14, 1996. The Defendants both filed appeals in the Fourth District Court of Appeal. On October 1, 1997 both cases were Per Curiam Affirmed and a Mandate was issued on December 5, 1997.

The Defendant in this Motion for Post Conviction Relief alleges that his trial counsel provided ineffective assistance by failing to call the confidential informant as a witness, by insufficiently arguing the Motions for Judgment of Acquittal, by not objecting to the jury instruction on entrapment, by not having moved to dismiss the trafficking charge based on the confidential informants lack of supervision and that the Court erred in admitting recorded telephone conversations into evidence. This Court has thoroughly reviewed the allegations of the Defendant and the law applicable to each issue. The Court finds that the Defendant's claims are without merit and adopts the State's Response along with the attached portions of the record which conclusively refute the Defendant's entitlement to relief. The various allegations of ineffective assistance of counsel do not rise to level required by Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed 674 (1984) and Downs v. State, 453 So.2d 1102

(Fla. 1984). The allegation of error on the part of the court improperly allowing the admission of evidence is not cognizable in a post conviction setting and could have been addressed on direct appeal.

Accordingly, it is hereby,

**ORDERED AND ADJUDGED** that Defendant's Motion for Post Conviction Relief is respectfully, **DENIED**.

The Defendant has thirty (30) days from the date of this Order to file an appeal.

**DONE AND ORDERED** in Chambers, Fort Lauderdale, Florida, this 19th day of _____, 1999.

_____
MARC H. GOLD
CIRCUIT COURT JUDGE

Copies furnished:

Mr. Fritz Maignan, Defendant, DC#196119
DeSoto Correctional Institution
P.O. Drawer 1072
Arcadia, Florida 34265

Assistant State Attorney Joel Silvershein
Broward County Courthouse

IN THE CIRCUIT COURT OF THE SEVENTEENTH
JUDICIAL CIRCUIT IN AND FOR BROWARD
COUNTY, STATE OF FLORIDA

CRIMINAL DIVISION:

FRITZ MAIGNAN,
        Pro Se, Appellant,

VS.                                      CASE NO. 95-14021-CF-10B

STATE OF FLORIDA,
            Appellee,

## DIRECTIONS TO CLERK

Defendant/Appellant, FRITZ MAIGNAN, in pro se, hereby directs the Clerk of this Court to include the following items in the Original Record on Appeal described in Florida Rules of Appellate Procedure, RULE(S) 9.140 (i); 9.110:

1. Conformed copy of "MOTION FOR POSTCONVICTION RELIEF;" "STATEMENT OF GROUNDS AND SUPPORTING FACTS;" "MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR POST-CONVICTION RELIEF."

2. Conformed copy of the "COURT'S ORDER DIRECTING THE STATE TO FILE A RESPONSE TO DEFENDANT'S MOTION FOR POSTCONVICTION RELIEF."

3. Conformed copy of the "DEFENDANT'S MOTION FOR EVIDENTIARY HEARING PURSUANT TO FLA.R.CRIM.

- 1 -

P. RULE 3.850.

4. Conformed copy of the State's "RESPONSE TO DEFENDANT'S MOTION FOR POST-CONVICTION RELIEF."

5. Conformed copy of "DEFENDANT'S MOTION TO STRIKE AS UNTIMELY STATE'S RESPONSE TO DEFENDANT'S MOTION FOR POST-CONVICTION RELIEF."

6. Conformed copy of "DEFENDANT'S REPLY TO STATE'S RESPONSE TO DEFENDANT'S MOTION FOR POST-CONVICTION RELIEF," W/ ATTACHMENT."

7. Conformed copy of the Court's "ORDER DENYING DEFENDANT'S MOTION FOR POST-CONVICTION RELIEF and any attached files and records to conclusively show defendant/Appellant is entitled to no relief.

8. Conformed copy of "DEFENDANT'S MOTION FOR REHEARING" W/ ATTACHMENTS".

9. Conformed copy of the Court's "ORDER" denying Defendant's Motion For Rehearing W/ any attached files and records to conclusively show defendant/Appellant is entitled to no relief".

10. Conformed copy of Defendant/Appellant's "NOTICE OF APPEAL.

11. Conformed copy of these "DIRECTIONS TO CLERK".

The clerk is further directed to file the original record in the clerk's office of the lower tribunal and to certify ONE (1) copy each to the District Court of Appeal, Fourth District; Attorney General's office,

1655 Palm Beach Lakes Blvd., Third Floor, West Palm Beach, Florida. 33401-2299; FRITZ MAIGNAN, Appellant, DC# 196119 - M.N.# 4017, DESOTO CORRECTIONAL INSTITUTION (ANNEX), P.O. DRAWER 1072, ARCADIA, FLORIDA. 34265-1072.

Respectfully Submitted.

/S/ *Fritz Maignan*
FRITZ MAIGNAN,

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing "DIRECTIONS TO CLERK", have been furnished via U.S. MAIL to: ATTORNEY GENERAL'S OFFICE, 1655 PALM BEACH LAKES BLVD., THIRD FLOOR, WEST PALM BEACH, FLORIDA. 33401-2299; JOEL SILVERSHEIN, ASSISTANT STATE ATTORNEY, 201 S.E. 6TH STREET, ROOM 675, FT. LAUDERDALE, FLORIDA. 33301; HON. MARILYN BEUTTENMULLER, CLERK OF COURT, FOURTH DISTRICT COURT OF APPEAL, P.O. BOX 3315, WEST PALM BEACH, FLORIDA. 33402 on this _23rd_ day of JUNE, 1999. By the undersigned.

/S/ *Fritz Maignan*
FRITZ MAIGNAN
DC# 196119 - M.N.# 4017
DESOTO CORRECTIONAL INST. (ANNEX)
P.O. DRAWER 1072
ARCADIA, FLORIDA. 34265-1072

Appellant, Pro Se

# EXHIBIT  Y

IN THE DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT                                JULY TERM 1999

**FRITZ MAIGNAN,**

Appellant,

v.

**STATE OF FLORIDA,**

Appellee.

---

CASE NO. 99-2654

---

Decision filed    September 29, 1999

Appeal of order denying rule 3.850 motion from
the Circuit Court of the Seventeenth Judicial
Circuit, Broward County; Marc H. Gold, Judge;
L.T. Case No. 95-14021 CF10B.

Fritz Maignan, Arcadia, pro se.

No appearance required for appellee.

PER CURIAM.

AFFIRMED.

STONE, POLEN and STEVENSON, JJ., concur.

**NOT FINAL UNTIL THE DISPOSITION OF
ANY TIMELY FILED MOTION FOR
REHEARING.**

RECEIVED
OFFICE OF THE ATTORNEY GENERAL

SEP 29 1999

CRIMINAL DIVISION
WEST PALM BEACH

# EXHIBIT Z

OCTOBER 12, 1999

FRITZ MAIGNAN
DC# 196119 ~ M.N.# 4017
DESOTO CORRECTIONAL INST. (ANNEX)
P. O. DRAWER 1072
ARCADIA, FLORIDA. 34265-1072

HON. MARILYN BEUTTENMULLER
    CLERK OF THE COURT
FOURTH DISTRICT COURT OF APPEAL
P. O. BOX 3315
WEST PALM BEACH, FLORIDA. 33402

RECEIVED
OFFICE OF THE ATTORNEY GENERAL

OCT 15 1999

CRIMINAL DIVISION
WEST PALM BEACH

RE: MOTION FOR REHEARING AND MOTION FOR
    REHEARING EN BANC.

    MAIGNAN (FRITZ) VS. STATE OF FLORIDA.
    CASE NO. 99-2654

Dear Ms. Beuttenmuller:

    Please find enclosed for filing in the above-styled
cause the "original" MOTION FOR REHEARING AND MOTION
FOR REHEARING EN BANC.

    Additionally, Please note that the filing is in ac-
cordance with the principle announced in HAAG V. STATE,
591 So.2d 614 [Flo. 1992], And this motion being due to be
filed on or by October 14, 1999, should be deemed time-
ly filed accordingly.
    And the office of the Attorney General has been
furnished a true and correct copy as specified in
the "Certificate of Service and Filing". I remain,

ENCLOSURE(S) 1 "original"          Sincerely Yours.
CC: ATTORNEY GENERALS OFFICE.
    F.M. FILE

                              /S/ Fritz Maignan
                              FRITZ MAIGNAN
                              Appellant, Pro Se.

IN THE DISTRICT COURT OF APPEAL
FOR THE FOURTH DISTRICT
STATE OF FLORIDA


FRITZ MAIGNAN,
              Appellant,

VS.                                    CASE NO. 99-2654


STATE OF FLORIDA,
              Appellee.

_____


## MOTION FOR REHEARING AND MOTION FOR REHEARING EN BANC


COMES NOW, the Appellant, FRITZ MAIGNAN, in pro se, and respectfully moves this Honorable Court for Rehearing pursuant to Fla.R.App.P., 9.330, and for Rehearing En Banc pursuant to Fla.R.App.P., 9.331, And in support thereof, shows the Court as follows:

## I.
## MOTION FOR REHEARING

On SEPTEMBER 29, 1999, this Court rendered a decision "PER CURIAM. AFFIRM[ING]", (PCA), the trial Court's orders denying Appellant's Motion For Postconviction Relief, and Motion For Rehearing thereon.

The Appellant, acting in "PRO SE", respectfully acknowledges that it is generally inappropriate

- 1 -

to file a Motion For Rehearing on a "PCA" decision. However, This Court's "PCA" decision, make it clear, or apparent that this Court has "OVERLOOKED CONTROLLING points of law and fact" in this case. As follows:

**1.** In **GROUND ONE**, of Defendant's Motion For, Postconviction Relief, which was summarily denied by the trial court without an evidentiary hearing, this Defendant alleged that trial counsel rendered "Ineffective Assistance of counsel" for failing to investigate, subpoena, and call to the witness-stand the State's informant, **JOSEPH CLARK**, who had initially lured the Defendant into the State's nefarious plot to "**ENTRAPE**" the indisposed Defendant, in violation of the "Due Process Clauses" of the Florida, and United States constitutions, by creating a crime, and then prosecuting the Defendant(s) for their participation. **SEE: STATE V. GLOSSON**, 462 So.2d 1082 (Fla. 1985).

Under the authority of **HIGHSMITH V. STATE**, 617 So.2d 825 (Fla. 1st DCA 1993); and **MARROW V. STATE**, 715 So.2d 1075 (Fla. 1st DCA 1998), the Appellant's allegations set forth a legally sufficient claim for postconviction relief, by "**IDENTIFYING**" the witness; alleging that the witness was "**AVAILABLE**" to testify, and giving the "**SUBSTANCE OF THE WITNESSES TESTIMONY**". **MORROW**, Supra., **HIGHSMITH**, supra.

Generally, claims of this nature requires an Evidentiary, Hearing, e.g., **BAUER V. STATE**, 570 So.2d 314 (Fla. 2d DCA 1990), citing **DOWNS V. STATE**, 453 So.2d 1102 (Fla. 1984), cf., **GORDON V. STATE**, 608 So.2d 925 (Fla. 3d DCA 1992). But when an Evidentiary, Hearing has NOT been held, "movant's allegations in motion for postconviction relief **MUST BE ACCEPTED AS TRUE**

-2-

except to extent that they are CONCLUSIVELY REBUTTED by record". HARICH V. STATE, 484 So.2d 1239,1241 (Fla. 1986), (emphasis added)., cf., MURPHY V. STATE, 638 So.2d 975, 976 (Fla. 1st DCA 1994).

The trial court in this case "adopt[ed] the State's Response along with the attached portions of the record which conclusively refute the defendants entitlement to relief." Id. The State merely argued that "since defense counsel was able to cross-examine AGENT ANDERSON about the fact that CLARK was a paid informant, and about the control, or lack of control, of this informant"., And that "the defendant testified about allegedly being unlawfully induced to be involved in this deal. That the facts the defendant wished to present to the jury were brought out in testimony". Id.

The State seemed to be arguing that counsels failure to call, and present JOSEPH CLERK was in effect "Harmless Error."

However, This is totally incorrect because the states informant JOSEPH CLARK, and his inducement of the defendant, WAS the "ENTRAPMENT DEFENSE".

Agent Anderson DID NOT testify to the facts surrounding JOSEPH CLARK's initial contacts, and inducements to the defendant(s).

And while the defendant did offer testimony regarding these facts. In the eyes of the jurors, the testimony was obviously viewed as self-serving, and suspect. Thus, Had JOSEPH CLARK been subpoenaed, and called to testify, barring him committing perjury before the Court, JOSEPH CLARK's testimony would have corroborated the defendants testimony. And the jury would have found that the defendant(s) were ENTRAPPED as a matter

of law.

Nothing in the States Response, Portions of the Record attached thereto, Or the trial Courts Order "CONCLUSIVELY REFUTES" the Defendants allegations, and by law was entitled to an Evidentiary Hearing. SEE: LEWIS V. STATE, 613 So.2d 115 (Fla.4th DCA 1993); WEST V. STATE, 455 So.2d 1158 (Fla.2d DCA 1984). SEE ALSO: RULE 9.140 (i) Fla.R.App.P.

Defendant respectfully submits that this Court has apparently overlooked the above enunciated points of law and fact in "PCR" affirming the lower tribunals Order denying Postconviction Relief. And/or this Courts decision is in express and direct conflict with the above-enunciated authorities on their respective points of law.

This Honorable Court should grant rehearing, reconsider this cause, and reverse and remand this case in accordance with established precedence.

**2.** In regards to **GROUND TWO** of Defendants motion For Postconviction Relief. And the trial Courts Order Summarily denying the **3.850** motion. This Court has apparently overlooked the essence of this claim. This claim involves a "corruption of the truth seeking function" of the jury trial in this case. While the underlying issue may be the improper admission of evidence, which could, and should have been raised on direct appeal. It is the nefarious manner in which the Prosecutor misled the Court, and Defence, in order to get this inadmissible evidence before the jury, that is at issue herein.

As the Florida Supreme Court stated in **STATE V. BURTON**, 314 So.2d 136,137 (Fla.1975) ("It was a plain case of producing a judicial act by fraudulent representations

-4-

to the judge.") **Id.** at **314 So.2d at 137.** Such action(s) violates a Defendants Due Process rights under the Florida, and United States Constitutions. Which goes to the very foundation of this case. "**FUNDAMENTAL ERROR**". **SEE: HARGRAVE V. STATE**, 427 So.2d 713 (Fla. 1983); **RAY V. STATE**, 403 So.2d 956 (Fla. 1981). As such, this Court should grant rehearing, revisit this case, and reverse and remand the trial Courts Order denying post-conviction relief for an Evidentiary Hearing in accordance with the proviso of **RULE 9.140 (i)** Fla. R. App. P.

3. In regards to **GROUND THREE**, of Defendants motion for postconviction relief, and the trial Courts Order summarily denying same by adopting the States Response and attached portions of the record thereto.

The Defendant maintains that trial counsel was Ineffective for failing to motion the trial Court for a judgment of acquittal based upon the "insufficiency of the evidence to sustain the conviction". The record attached to the States Response clearly shows that the **ONLY** basis for judgment of acquittal argued by trial counsel was **ENTRAPMENT**.

This Court has clearly overlooked controlling points of law and fact in regards to this issue.

This Honorable Court in **LEWIS V. STATE**, 613 So. 2d 115 (Fla. 4TH DCA 1993), held ("when the records fail to refute the claim an evidentiary hearing is required") Likewise, this is the mandated procedure prescribed by **RULE 9.140 (i)** Fla. R. App. P. This Courts "PCA" affirmance places this Courts decision in express and direct conflict with this Courts own authority, And is contrary to established law. This Court should

grant rehearing. And reverse and remand the trial courts order of denial for an Evidentiary hearing. ACCORD: <u>LEWIS V. STATE</u>, 613 So.2d 115 (Fla. 4th DCA 1993); RULE 9.140 (i) <u>Fla. R. App. P.</u>

4. In regards to <u>GROUND FOUR</u> of Defendants **3.850** motion. And the trial courts order summarily denying same. It is apparent that this Honorable court has overlooked controlling points of law rendered by this court on the same question of law.

This Court in <u>VAZQUEZ V. STATE</u>, 700 So.2d 5 [Fla. 4th DCA 1997), held that the jury instruction requiring the Defendant to establish his lack of pre-disposition beyond a reasonable doubt, did not accurately apprise the jury of the law of this State in regards to the defendant's burden of proof to establish lack of predisposition in a case using Entrapment as the defense.

This, Appellants Public Defender in his initial direct appeal raised the <u>VAZQUEZ</u> issue, arguing that while trial counsel failed to object to the trial courts giving of the erroneous jury instruction. Unlike <u>VAZQUEZ</u>, supra., where the error was properly objected to and preserved for appellate review. that the error should be deemed "Fundamental Error". because the instruction given did not accurately apprise the jury of the law. and in effect shifted the burden of proof to the Defendant.

This Court on November 14, 1997, rendered a "PER CURIAM" decision "AFFIRM[ING]" the judgment and sentence of the trial court. apparently finding that. unlike <u>VAZQUEZ</u>, Appellants trial counsel had failed to properly preserve the issue for appellant review. <u>SEE</u>: <u>MAIGNAN (FRITZ) V. STATE</u>, 701 So.2d 882

(Fla. 4TH DCA 1997).

Subsequently, this Court rendered its decision in **MILLER V. STATE**, 723 So.2d 353 (Fla. 4TH DCA 1998), holding that the trial Court's giving of the erroneous jury instruction condemned by **VAZQUEZ**, supra., was "**FUNDAMENTAL ERROR**" requiring **NO** objection below. The State has sought review of this Court's decision in **MILLER**, supra., by the Florida Supreme Court. **SEE**: **STATE V. MILLER**. No. 94,916 (Fla. May 1999), which is still pending disposition

This Appellant, in the interval, filed his "motion for postconviction relief" claiming denial of "Effective Assistance of Counsel" for failing to properly object to the jury instruction condemned by this Court in **VAZQUEZ**.

The trial Court summarily denied this issue, adopting the States Response, and their argument that the issue **was** raised on direct appeal, and was therefore barred from **3.850** review.

While the **VAZQUEZ** issue was in fact raised on direct review, It does "not bar a subsequent collateral attack based on a claim of Ineffective Assistance of Counsel". e.g., **VENTO V. STATE**, 621 So.2d 493, 495 (Fla. 4TH DCA 1993); **PUCKETT V. STATE**, 641 So.2d 933, 934 (Fla. 2d DCA 1994).

And subsequently, this Court rendered its decision in **CRUTCHFIELD V. STATE**, 24 Fla. L. Weekly (D) 1763 (Fla. 4TH DCA JULY 28, 1999), following its **MILLER**, supra., decision that the trial Court's giving of the jury instruction condemned in **VAZQUEZ**, was "**FUNDAMENTAL ERROR**". Id.

Thus, this Honorable Court in "PCA" Affirming the trial Court's summary denial of Appellant's

Motion For Postconviction Relief has overlooked. MILLER V. STATE, 723 So.2d 353 (Fla. 4th DCA 1998), rev. granted, STATE V. MILLER, NO. 94,916 (Fla. May, 1999); CRUTCHFIELD V. STATE, 24 Fla. L. Weekly (D) 1763 (Fla. 4th DCA July 28, 1999), and VENTO V. STATE, 621 So.2d 493 (Fla. 4th DCA 1993). PUCKETT V. STATE, 641 So.2d 933 (Fla. 2d DCA 1994). And as such, Has rendered a decision which is in direct, and express conflict with prior decisions of this court, and other District courts of Appeal on the same questions of law. SEE: "MOTION FOR REHEARING EN BANC", infra., Or this court is willfully denying this Appellant Due Process, and Equal Protection of the law through its refusal to apply its own well established authorities.

This Honorable Court should grant rehearing and reverse, and remand the trial courts denial of postconviction relief with directions to grant Appellant a New Trial. ACCORD: VAZQUEZ V. STATE, 700 So.2d 5 (Fla. 4th DCA 1997); MILLER V. STATE, 723 So.2d 353 (Fla. 4th DCA 1998); CRUTCHFIELD V. STATE, 24 Fla. L. Weekly (D) 1763 (Fla. 4th DCA July 28, 1999), and VENTO V. STATE, 621 So.2d 493 (Fla. 4th DCA 1993).

For each of the foregoing reasons the Appellant contends that the court erroneously, affirmed the trial courts order denying postconviction relief by overlooking, or refusing to apply established law, and facts to the instant case. As such the contrary, order approved by this court should be reversed.

## II.

## MOTION FOR REHEARING EN BANC

In support of this motion for rehearing en banc,

- 8 -

the Appellant contends that the panel misapplied, and/or failed to apply the previous rulingss of this court in VENTO V. STATE, 621 So.2d 493 (Fla. 4TH DCA 1993). In the former case the court held that "Counsels failure to object to reversible error, while waiving the point on direct appeal, does not bar a subsequent collateral challenge based on a claim of Ineffective Assistance of counsel."

And in MILLER V. STATE, 723 So.2d 353 (Fla. 4TH DCA 1998); CRUTCHFIELD V. STATE, 24 Fla. L. Weekly (D) 1763 (Fla. 4TH DCA July 28, 1999), holding that the trial court's giving of the jury instruction condemned by VAZQUEZ V. STATE, 700 So.2d 5 (Fla. 4TH DCA 1997), was "FUNDAMENTAL ERROR", and per se reversible even in the absence of an objection in the trial court. For these reasons the Appellant submits that the matter should be considered by the court en banc.

Respectfully Submitted,

B/ fritz Maignan

FRITZ MAIGNAN,
Appellant, Pro se

## STATEMENT OF PRO SE APPELLANT

I express a belief, based upon extensive legal research and sound reasoned judgment, that the panel decision is contrary to the following decisionss of this court, and that a consideration by the full court is necessary to maintain uniformity of decisionss in this court: VENTO V. STATE, 621 So.2d 493 (Fla. 4TH DCA 1993); MILLER V. STATE, 723 So.2d 353 (Fla. 4TH DCA 1998); CRUTCHFIELD, 24 Fla. L. Weekly (D) 1763 (Fla. 4TH DCA July 28, 1999); and VAZQUEZ V. STATE, 700 So.2d 5 (Fla. 4TH DCA 1997).

## CERTIFICATE OF SERVICE AND FILING

I HEREBY CERTIFY that the original "MOTION FOR RE-HEARING AND MOTION FOR REHEARING EN BANC" was filed to the CLERK OF COURT, FOURTH DISTRICT COURT OF APPEAL, P.O. BOX 3315, WEST PALM BEACH, FLORIDA, 33402, and a copy furnished to: ATTORNEY GENERALS OFFICE, 1655 PALM BEACH LAKES BLVD., THIRD FLOOR, WEST PALM BEACH, FLORIDA, 33401-2299 by delivering to the Institutional Mailroom at DeSoto Correctional Institution (Annex) for mailing in accordance with the principle announced in HAAG v. STATE, 591 So.2d 614 (Fla 1992), on this 12TH day of OCTOBER, 1999, By the undersigned, And should thus be deemed timely filed. ACCORD: HAAG, supra.

/s/ Fritz Maignan
FRITZ' MAIGNAN,
Appellant, Pro Se.

## DECLARATION

I HEREBY DECLARE UNDER THE PENALTY OF PERJURY that I, FRITZ MIAIGNAN, have read the foregoing, "MOTION FOR REHEARING AND MOTION FOR REHEARING EN BANC"; "CERTIFICATE OF SERVICE AND FILING" and the facts and matters stated therein are TRUE and CORRECT.

ACCORD: Chapter(s) 92.52, 92.525 Florida Statutes.

EXECUTED on this 12TH day of OCTOBER, 1999, By the undersigned.

/s/ Fritz Maignan
FRITZ MIAIGNAN
DC# 196119 ~ M.N.# 4017
DESOTO CORRECTIONAL INST. (ANNEX)
P.O. DRAWER 1072
ARCADIA, FLORIDA, 34265-1072
Appellant, Pro Se.

# EXHIBIT  AA

*Pinx*

# IN THE DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
## FOURTH DISTRICT, P.O. BOX 3315, WEST PALM BEACH, FL 33402

November 30, 1999

**CASE NO.: 99-2654**
L.T. No. : 95-14021 CF10B

Fritz Maignan                    v.        State Of Florida

_____

Appellant / Petitioner(s),                    Appellee / Respondent(s).

## BY ORDER OF THE COURT:

ORDERED that appellant's motion filed October 15, 1999, for rehearing and motion for rehearing en banc is hereby denied.

I HEREBY CERTIFY that the foregoing is a true copy of the original court order.

Served:

State Attorney- Brow.        Fritz  Maignan        Attorney General-W.P.B.
Public Defender-P.B.

ch

*Marilyn Beuttenmuller*
**MARILYN BEUTTENMULLER, Clerk**
**Fourth District Court of Appeal**



RECEIVED
OFFICE OF THE ATTORNEY GENERAL

DEC 01 1999

CRIMINAL DIVISION
WEST PALM BEACH

# EXHIBIT  BB

# M A N D A T E

from

## DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
## FOURTH DISTRICT

This cause having been brought to the Court by appeal, and after due consideration the Court having issued its opinion;

YOU ARE HEREBY COMMANDED that such further proceedings be had in said cause as may be in accordance with the opinion of this Court, and with the rules of procedure and laws of the State of Florida.

WITNESS the Honorable MARTHA C.WARNER, Chief Judge of the District Court of Appeal of the State of Florida, Fourth District, and seal of the said Court at West Palm Beach, Florida on this day.

**DATE:**                    December 17, 1999

**CASE NO.:**                99-2654

**COUNTY OF ORIGIN:**        Broward

**T.C. CASE NO.:**           95-14021 CF10B

**STYLE:**                   FRITZ MAIGNAN           v.   STATE OF FLORIDA



*Marilyn Beuttenmuller*
**MARILYN BEUTTENMULLER, Clerk**
**Fourth District Court of Appeal**

RECEIVED
OFFICE OF THE ATTORNEY GENERAL

DEC 2 0 1999

CRIMINAL DIVISION
WEST PALM BEACH

**ORIGINAL TO:**          Robert E. Lockwood, Clerk
**cc:**
Fritz Maignan            Attorney General-W.P.B.

al